OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

        Respondent,

and                          Case No. 18-CA-160654
                                   18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLRS INTERNATIONAL UNION,
AFL-CIO,

        Charging Party.

Pages:  1 through 245 (Volume 1 of 4)

Date:  April 18, 2016

Place:  Cedar Rapids, Iowa

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD


In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

          Respondent,

and                          Case No. 18-CA-160654
                                        18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLERS INTERNATIONAL UNION,
AFL-CIO,

          Charging Party.

    The above entitled matter came on for trial pursuant to

notice, before The Honorable Mark Carissimi, Administrative Law

Judge, in Room 008, Board of Supervisors Formal Board Room of

the Jean Oxley Linn County Public Service Center, 935 Second

Street SW, Cedar Rapids, Iowa, on Monday, April 18, 2016, at

9:14 a.m.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 2 of 1141

```
 1                    A P P E A R A N C E S

 2       On behalf of the NLRB, Counsel for the General Counsel:

 3       TYLER J. WIESE, ESQ.

 4       CHINYERE C. OHAERI, ESQ.

 5       National Labor Relations Board, Region 18

 6       212 Third Avenue South, Suite 200

 7       Minneapolis, Minnesota  55401

 8       Tyler Wiese: (612)348-1784 /Chinyere Ohaeri: (612)348-1766

 9       Tyler.Wiese@nlrb.gov / Chinyere.Ohaeri@nlrb.gov

10       On behalf of the Charging Party:

11       SETH MARLING,

12       BCTGM Local 100G

13       5000 J Street SW

14       Cedar Rapids, Iowa   52404

15

16       On behalf of the Respondent:

17       STUART R. BUTTRICK, ESQ.

18       RYAN J. FUNK, ESQ.

19       Faegre Baker Daniels

20       300 N. Meridian Street, Suite 2700

21       Indianapolis, Indiana   46204

22       Stuart Buttrick:  (317)237-1038

23       Ryan Funk:  (317)237-1131

24       stuart.buttrick@FaegreBD.com/ryan.funk@FaegreBD.com

25
```

1                              **I N D E X**

2    **OPENING STATEMENT:**                                        **PAGE:**

3    By Mr. Wiese, on behalf of the NLRB,              18

4    Counsel for the General Counsel

5

| | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| **WITNESSES** | | | | | |
| Bruce Bishop | 29 | 41 | 48 | 51 | |
| Jeff Rausch | 54 | 70 | 79 | | |
| Dave Fuchs | 81 | 93 | 95 | | |
| Ken Meadows | 100 | | | | |
| Pat Drahos | 151 | 170 | 174 | 175 | |
| Ann Junge | 176 | 213 | | | |
| Andy Sullivan | 215 | | | | |
| Renita Shannon | 222 | | | | |

6    **WITNESSES**          **DIRECT**  **CROSS**   **REDIRECT** **RECROSS** **VOIR DIRE**

7    Bruce Bishop            29      41        48      51

8    Jeff Rausch             54      70        79

9    Dave Fuchs              81      93        95

10   Ken Meadows            100

11   Pat Drahos             151     170       174     175

12   Ann Junge              176     213

13   Andy Sullivan          215

14   Renita Shannon         222

15

16

17

18

19

20

21

22

23

24

25

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 4 of 1141

| | EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| 1 | **E X H I B I T S** | | |
| 2 | **EXHIBIT** | **IDENTIFIED** | **IN EVIDENCE** |
| 3 | **General Counsel's** | | |
| 4 | 1(a) through (t) | | 10 |
| 5 | 1(u) | | 10 |
| 6 | 2(a) | 115 | 117 |
| 7 | 7 | 232 | 233 |
| 8 | 15 | 112 | 113 |
| 9 | 19 | 127 | 128 |
| 10 | 20 | 128 | 130 |
| 11 | 21 | 120 | 120 |
| 12 | 23 | 120 | 122 |
| 13 | 26 | 130 | 131 |
| 14 | 28 | 143 | 144 |
| 15 | 29 | 141 | 142 |
| 16 | 32 | 131 | 134 |
| 17 | 35 | 134 | 135 |
| 18 | 36 | 135 | 136 |
| 19 | 38 | 136 | |
| 20 | 42 | 137 | 219 |
| 21 | 46 | 14 | 15 |
| 22 | 48 | 167 | 168 |
| 23 | 49 | 168 | 169 |
| 24 | 53 | 156 | |
| 25 | 55 | 229 | 230 |

1               E X H I B I T S (continued)

| | EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| 2 | | | |
| 3 | General Counsel's | | |
| 4 | 57 | 197 | 198 |
| 5 | 59 | | 222 |
| 6 | 60 | 14 | 15 |
| 7 | 61 | | 222 |
| 8 | 62 | | 222 |
| 9 | 63 | | 222 |
| 10 | 64 | | 222 |
| 11 | 65 | | 222 |
| 12 | 66 | | 222 |
| 13 | 70 | 203 | 205 |
| 14 | 72 | 159 | 165 |
| 15 | 73 | 212 | 212 |
| 16 | 74 | 209 | 211 |
| 17 | | | |
| 18 | Respondent's | | |
| 19 | 100 | 48 | |
| 20 | | | |
| 21 | Joint | | |
| 22 | 1 | | 99 |
| 23 | 2 | | 99 |
| 24 | 3 | | 99 |
| 25 | 4 | | 99 |

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1                    E X H I B I T S (continued)

2      **EXHIBIT**                    **IDENTIFIED**              **IN EVIDENCE**

3      **Joint**

4        5                                                           99

5        6                                                           99

6        7                                                           99

7        8                                                           99

8        9                                                           99

9       10                                                           99

10      11                                                           99

11      12                                                           99

12      13                                                           99

13      14                                                           99

14      15                                                           99

15      16                                                           99

16      17                                                           99

17      18                                                           99

18      19                                                           99

19      20                                                           99

20      21                                                           99

21      22                                                           99

22      23                                                           99

23      24                                                           99

24      25                                                           99

25      26                                                           99

1                    E X H I B I T S (continued)

2    EXHIBIT                    IDENTIFIED                IN EVIDENCE

3    Respondent's

4     27                                                   99

5     28                                                   99

6     29                             13                    14

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1                    P R O C E E D I N G S

2                                        9:14 a.m.

3        JUDGE CARISSIMI:  On the record.

4        The hearing will be in order.

5        This is a formal trial before the National Labor Relations

6    Board in Ingredion Incorporation, d/b/a Penford Products

7    Company, cases 18-CA-160654 and 18-CA-170682.

8        The Administrative Law Judge presiding is Mark Carissimi.

9        Any communications should be addressed to the Washington,

10   D.C. Division of Judges, to which I am assigned.  Any

11   communications or requests for extension of time addressed to

12   that office should be sent the Chief Administrative Law Judge in

13   Washington, D.C.

14       Now will counsel please state their appearances for the

15   record.

16       First, for the General Counsel.

17       MR. WIESE:  Yes, Your Honor.

18       Tyler J. Wiese, from Region 18.

19       MS. OHAERI:  And Chinyere C. Ohaeri, also from Region 18.

20       JUDGE CARISSIMI:  And is the Charging Party, Union's

21   representative going to state an appearance for the record?

22       MR. MARLING:  Seth marling, BCTGM 100G.

23       JUDGE CARISSIMI:  Thank you.

24       And for the Respondent.

25       MR. BUTTRICK:  Sure, Stuart R. Buttrick, from Faegre Baker

1    Daniels.

2         MR. FUNK:  Ryan J. Funk from Faegre Baker Daniels.

3         JUDGE CARISSIMI:  Very good.

4         Now we've had conference calls in this case, and there was

5    discussions about settlement.  The case has not settled.  But if

6    there is any renewed interest in discussing the settlement

7    during the trial, let me know, and I'll grant a reasonable

8    period of recess for that to occur.

9         Now at this time, I'd like the General Counsel to please

10   introduce the formal papers in this case.

11        MR. WIESE:  Yes, Your Honor.

12        I offer into evidence the formal papers, General Counsel

13   Exhibit 1(a) through (t); Exhibit 1(a) is an index and

14   description of the entire exhibit; and the exhibit has

15   previously been shown to the parties.

16        JUDGE CARISSIMI:  Is there any objection to General Counsel

17   Exhibit 1 - 1(a) through 1(t), I should say.

18        MR. BUTTRICK:  I think that --

19        MR. WIESE:  Excuse me, Your Honor.

20        JUDGE CARISSIMI:  Yes.

21        MR. WIESE:  I misspoke.

22        Exhibit 1(t) is the index and description, not 1(a).

23        JUDGE CARISSIMI:  All right, very good.

24        MR. BUTTRICK:  And we have no objection.

25        JUDGE CARISSIMI:  All right, General Counsel Exhibit 1 is

1  admitted, 1(a) through (t).

2  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 1(a) through (t).)

3  JUDGE CARISSIMI:  Now I understand there was an amendment

4  to the Complaint that was recently filed, and that will be

5  introduced at this time.

6  MR. WIESE:  Yes, Your Honor.

7  General Counsel Exhibit 1(u), the Second Amendment to the

8  Complaint, dated April 16, 2016.

9  JUDGE CARISSIMI:  Okay.

10  Is there any objection to the admission of the Second

11  Amendment to the Complaint?

12  MR. BUTTRICK:  Well, we certainly deny many of the

13  substantive allegations, but no other procedural objection to

14  its amendment at this point.

15  JUDGE CARISSIMI:  All right.

16  I will admit the amendment.

17  (EXHIBIT RECEIVED: GENERAL COUNSEL'S 1(u).)

18  JUDGE CARISSIMI:  And as I indicated in our conference

19  call, Respondent has a opportunity to orally answer the

20  Complaint, then you may do that at this time, Mr. Buttrick.

21  MR. BUTTRICK:  Yes, thank you, Your Honor.

22  I believe that we've reach some stipulations about some of

23  the finer points under the allegation under Roman Numeral I.

24  The Respondent admits the supervisory status of all the

25  individuals in Roman Numeral I, which are David Vislisel, Greg

1    Schmidt, Pat Drahos, John Swails, Brad Bumba, Chad Reid, Darryl

2    Norman and Scott Maki.  We also -- the parties have reached a

3    stipulation about the titles of some of these folks; and,

4    correct me if I'm wrong Chinyere, but I think the parties

5    stipulate that David Vislisel became a plant coordinator by no

6    later than on or about December 31, 2015, but that he was a

7    facility manager in the summer of 2015.

8        Greg Schmidt also became a plant coordinator sometime at

9    least by December 31st of 2015, but that he was a facility

10   manager in the summer of 2015.

11       Pat Drahos -- we admit her job title as noted in the Second

12   Amended Complaint.

13       John Swails -- we admit his title as provided in the Second

14   Amended Complaint.

15       Brad Bumba -- I think that we have a stipulation that he

16   became an operations lead by no later than December 31st of

17   2015, but that in the summer of 2015, he was a process

18   specialist.

19       Chad Reid -- we admit that he is a maintenance supervisor.

20       Darryl Norman -- we admit that his job title is a

21   maintenance manager; and

22       Scott Maki -- we admit that his title is a utilities

23   manager.

24       And the Respondent denies the allegations in paragraphs

25   5(e), (f) and (g).  With regard the allegations in 2(a), the

1   Respondent admits that the Union requested various information

2   from the Respondent, and admits that the Respondent responded to

3   those requests, and it denies that it failed to produce any

4   information that was requested.

5        For paragraph 12(b), (c) and (d) -- we deny all of those

6   allegations.

7        For paragraph 4, we deny -- or Roman Numeral IV -- we deny

8   those allegations.

9        For Roman Numeral V, we deny that the requested remedy is

10   appropriate.

11        And, also, the Respondent articulates several additional

12   defenses.  The first is that the allegations in the Second

13   Amended Complaint are untimely, that although we deny the

14   alleged comments as provided in the Second Amended Complaint; we

15   assert that even if true, they are protected or permissible

16   under 8(c) of the National Labor Relations Act.

17        And we also assert that that having a Second Amended

18   Complaint at this time violates the due process rights of the

19   Respondent.

20        JUDGE CARISSIMI:  Very good.

21        Now at this time, are there any preliminary motions first

22   on behalf of the General Counsel?

23        MR. WIESE:  Your Honor, I'll provide copies of this.

24        Your Honor, there are a few brief things that I would like

25   to mention.

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 13 of 1141

1    The first is the parties have agreed to a joint stipulation

2    of facts.  I will provide a signed copy to Your Honor and copies

3    to the rest of the parties.

4    JUDGE CARISSIMI:  All right.

5    Is this something in writing?

6    MR. WIESE:  Yes, it is, Your Honor.

7    JUDGE CARISSIMI:  Okay, and what exhibit will this be?

8    MR. WIESE:  We can mark it as General Counsel Exhibit --

9    or, actually, how about let's -- is it Joint Exhibit?  Let's go

10   Joint Exhibit 29.

11   MR. FUNK:  Yes.

12   MR. BUTTRICK:  Just -- another --

13   JUDGE CARISSIMI:  Let's go off the record.

14   (Off the record.)

15   JUDGE CARISSIMI:  Let's go back on the record.

16   Mr. Wiese, you indicated there's a Joint Exhibit that you

17   have regarding a stipulation of facts?

18   (EXHIBIT MARKED:  JOINT EXHIBIT 29.)

19   MR. WIESE:  Yes, Your Honor, Joint Exhibit 29 has been

20   reviewed by all the parties.  There's been an agreement on the

21   stipulation and we have one signed copy to enter into the

22   record; and we will provide signed copies on a break to complete

23   the record.

24   JUDGE CARISSIMI:  Very good.

25   Is there any objection to Joint Exhibit 29?

1      MR. BUTTRICK:  No objection.

2      JUDGE CARISSIMI:  All right.

3      Joint Exhibit 29 is admitted.

4  (EXHIBIT RECEIVED:  JOINT EXHIBIT 29.)

5      JUDGE CARISSIMI:  Thank you.

6      Now one thing I'd like to note:  Off the record, I

7  discussed with the Charging Party's representative, Mr. Marling.

8  At this time, he doesn't intend to ask any questions.

9      If you change your mind, Mr. Marling, let me know and I'll

10  give you that right.

11     Is there anything further on behalf of the General Counsel

12  as a preliminary matter?

13     MR. WIESE:  Yes, Your Honor.

14  (EXHIBIT MARKED:  GENERAL COUNSELS'S 46.)

15     MR. WIESE:  Two more stipulated exhibits.  The first is

16  marked as General Counsel Exhibit 46.  It is a seniority list

17  dated February 18, 2016.

18  (EXHIBIT MARKED:  GENERAL COUNSEL'S 60.)

19     MR. WIESE:  The second document is General Counsel Exhibit

20  60.  This is a copy of an org. chart -- various org. charts from

21  Penford and Ingredion.

22     JUDGE CARISSIMI:  What kind of chart is it, sir?

23     MR. WIESE:  Organizational chart.

24     JUDGE CARISSIMI:  Okay, all right.

25     And is there any objection first to the admission of

1    General Counsel 46?

2          MR. BUTTRICK:  No.

3          JUDGE CARISSIMI:  General Counsel 46 is admitted.

4    (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 46.)

5          JUDGE CARISSIMI:  Is there any objection to the

6    introduction of General Counsel 60?

7          MR. BUTTRICK:  No.  Just as a matter of process though,

8    Your Honor, I would request that before I am asked to admit any

9    documents or exhibits, I get to see them first.  I know what

10   these are, but I just haven't seen what we're referencing.

11         JUDGE CARISSIMI:  Absolutely.  Do you want to take a look

12   at those now?

13         MR. BUTTRICK:  No, I'm comfortable with these.

14         I just want to make sure that we have the process straight

15         JUDGE CARISSIMI:  All right.

16         General Counsel's 60 is admitted.

17   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 60.)

18         JUDGE CARISSIMI:  Is there anything preliminarily from the

19   General Counsel in addition to what we have already discussed?

20         MR. WIESE:  Yes, Your Honor.

21         One more thing:  We would like to request sequestration --

22         JUDGE CARISSIMI:  All right.

23         MR. WIESE:  -- of our witnesses.  As part of the request

24   for sequestration, we would further request that the witnesses

25   for both parties be allowed to hear the opening statements.  In

1    our view, those do not constitute substantive evidence and

2    should be allowed to be heard by the parties.

3        JUDGE CARISSIMI:  Very good.

4        The Board's policy is that if any party requests

5    sequestration, I am required to grant it and I will do so in

6    this case.

7        I would like to know the Respondent's position with regard

8    to General Counsel's position that since opening statements are

9    not evidence, that everybody, including witnesses, can be

10   present for the opening statements.

11       MR. BUTTRICK:  No objection to that, Your Honor, though I

12   will respectfully request that we defer our opening statement

13   until our case in chief.

14       JUDGE CARISSIMI:  That is fine, sir, you can do that.

15   That's very good.

16       So I'm going to grant the sequestration order requested by

17   the General Counsel in this proceeding.

18       This means that all persons who expect to be called as

19   witnesses in this proceeding, other than the person designated

20   as essential to the presentation of a party's case, will be

21   required to remain outside the courtroom whenever testimony or

22   other proceedings are taking place.

23       Since there are no alleged discriminatees in this case, I

24   will not go through the Board's somewhat involved rule regarding

25   when alleged discriminatees may be present in this matter.

1     The sequestration order prohibits all witnesses from

2 discussing with any other witness or any possible witness the

3 testimony he or she has already given or will give.  Likewise,

4 counsel for a party may not disclose to any witness the

5 testimony of any other witness.  Counsel may, however, inform

6 his or her own witness of the content of testimony given by any

7 opposing party's witness to prepare to rebut that witness'

8 testimony.

9     It is the responsibility of counsel to see that they and

10 their witnesses comply with this sequestration rule.

11     Now on behalf of the General Counsel, do you wish to

12 designate anybody as a representative?

13     MR. WIESE:  Yes, Your Honor, Christopher Eby.

14     JUDGE CARISSIMI:  Okay.

15     And that's Christopher Eby?

16     MR. WIESE:  Eby, E-B-Y.

17     JUDGE CARISSIMI:  All right, very good.

18     And for the Respondent.

19     MR. BUTTRICK:  Yes, Your Honor, Ken Meadows.

20     JUDGE CARISSIMI:  All right, very good, Mr. Meadows.

21     Mr. Eby and Mr. Meadows, what that means is that you can

22 stay throughout the entire trial even if you're called as a

23 witness.

24     All right, now since the Charging Party at this point is

25 not going to actively participate in the hearing, it would

1  appear that there wouldn't be a necessity for a Charging Party

2  representative.

3      Do you have any objection to that, Mr. Marling?

4      I mean, you can stay, you are a party, you can stay.  But

5  what I'm asking is is there anybody that you would need to

6  assist you in asking questions.  And since you have indicated

7  you don't intend to ask questions, I'm not inclined to have yet

8  another person who might be excluded by sequestration present in

9  the courtroom.  I wanted to make sure you understood that.

10      MR. MARLING:  Yes.

11      JUDGE CARISSIMI:  All right.

12      Now I guess at this point, is there anything preliminarily

13  from the Respondent?

14      MR. BUTTRICK:  No, Your Honor.

15      JUDGE CARISSIMI:  Very good.

16      Does General Counsel wish to make an opening statement?

17      MR. WIESE:  Yes, Your Honor.

18      JUDGE CARISSIMI:  You may do so.

19                     OPENING STATEMENT

20      BY MR. WIESE:  Your Honor, this is a case about a successor

21  employer who has launched a two-front assault to unlawfully

22  corral and undermine the Union that has successfully represented

23  employees in Cedar Rapids for decades.

24      The first front in negotiations with the Union, the

25  Respondent at its very first meeting with union representatives,

1   even before formal bargaining began, stated its intention to

2   replace employees; opened the first negotiation on June 1st by

3   threatening impasse; thereafter, refused to substantively

4   discuss union proposals and responded by continuously bombarding

5   the Union with substantive proposals that bore little, if any,

6   relation to the parties' discussion at the bargaining table.

7        The evidence will further show that on the second front in

8   its dealings with employees away from the table, in these

9   dealings Respondent took every opportunity to undermine and

10  denigrate the Union by intentionally misleading employees about

11  what was going on at the bargaining table, by directly dealing

12  with employees about what they wanted in the contract, by

13  threatening employees that they would never return to work if

14  they chose to exercise their economic weapons, by falsely

15  accusing the Union of refusing to bargaining, and placing the

16  fault of the bargaining breakdowns at the Union's feet -- all

17  acts designed to drive a wedge between the employees and the

18  Union in order to unlawfully strengthen Respondent's position at

19  the bargaining table.

20       Respondent implemented the final stage of this grand design

21  on September 14, 2015, when after only 3 months of bargaining,

22  it implemented its last, best and final offer.  The cumulative

23  affects of Respondent's actions have been to provide it with an

24  unlawfully begotten upper hand, and have conversely left the

25  Union gasping for air as it struggles to find its footing.

1    Although, not all is lost for the Union at the moment, the only

2    forum to restore the integrity of the labor relations between

3    the parties is through the processes provided by the National

4    Labor Relations Act.

5        Now, Your Honor, a little introduction of the parties in

6    this case:  The Respondent, Ingredion, as the evidence will

7    show, is a multi-billion dollar, multinational corporation.  It

8    is by all accounts, an economically successful one, and one with

9    a recent history of expansions and acquisitions.  Part of this

10   strategy involved the purchase of a company called "Penford

11   Products," which was the predecessor employer at this facility

12   in Cedar Rapids, Iowa.  This purchase was finalized in March of

13   2015, and the unfair labor practices in this case began almost

14   immediately thereafter.

15       The second major player in this dispute, the Charging

16   Party, is the Union, the Bakery, Confectionary, Tobacco Workers

17   and Grain Millers, Local 100G.  This Union has effectively

18   represented employees at the Cedar Rapids facility for decades.

19   It is an employee-run local.  All the leadership positions are

20   elected and filled with employees who work full time at the

21   plant.  During its time representing employees, the Union has

22   shown an ability to work with employers, including by

23   implementing a recent multi-year wage freeze, and helping

24   Penford with a historic flood in Cedar Rapids in 2008.

25       Of course, as envisioned by the Act itself, the Union's

 1   relationship with Penford was not without its adversarial

 2   hiccups, including the strike in 2004.  That being said, the

 3   record evidence will demonstrate that the Union has shown an

 4   ability to defend its bargaining unit members where necessary,

 5   but also a realistic willingness to work productively with

 6   employers in order to address workplace and economic concerns.

 7        Finally, there are the employees in this bargaining unit.

 8   Approximately 160 employees are represented by this Union.

 9   Prior to Respondent's purchase of this facility, you will hear

10   how these employees have benefitted from decades -- or for

11   decades from the productive labor relations at the Cedar Rapids

12   facility.  Respondent's actions here have greatly damaged and

13   threatened to destroy these gains; realized through the lawful

14   collective bargaining processes presented by -- or protected by

15   the Act.

16        Now, Your Honor, the evidence will show that the stage in

17   this case was set by the Respondent from the very beginning.  As

18   the evidence will show, at its very first meeting with the

19   Union's local leadership, Respondent's lead negotiator, Ken

20   Meadows, laid down the gauntlet for how Respondent viewed the

21   parties' relationship moving forward.

22        After threatening the employee union vice president for the

23   tone he used in an e-mail, protesting Respondent's changes to

24   working conditions, the evidence will show that Meadows launched

25   into a discussion of various bargaining topics; told the union

1   representatives that, among other things, they could wave bye-

2   bye to their pension and health care benefits.  And after

3   telling the union representatives what they were facing in

4   negotiations, Meadows then told the negotiators that he knew he

5   could replace the employees.

6       The very next day, for reasons that quickly become clear,

7   the evidence will show that Ken Meadows decided to take a tour

8   of Respondent's plant.  During his foray, Meadows spoke with

9   numerous employees.  In these conversations, which he initiated,

10   Mr. Meadows did what the evidence will show he has consistently

11   refused to do with the union representatives at the bargaining

12   table.  He inquired about what employees wanted in the upcoming

13   contract and he engaged with them over what Respondent was

14   willing to consider.  In doing so, Respondent gained an unlawful

15   advantage in bargaining, one that would continue to press as

16   parties entered into formal negotiations in June.

17       Turning to these formal negotiations, there's no need to

18   belabor blow by blow the details of what the parties discussed

19   at the table at this time.  There are, however, six specific

20   points that Your Honor should keep in mind as he hears the

21   evidence regarding the bargaining.  First, note what the

22   evidence will show regarding the timeline of these negotiations.

23   The evidence will show that the Union made repeated offers to

24   begin negotiations early, all of which were turned down by

25   Respondent.  After its refusals to begin negotiations early,

 1    Respondent opened negotiations on June 1st with an initial
 2    proposal that as the evidence will show by its cover sheet, told
 3    the Union that Respondent wanted to start from scratch and
 4    negotiate a new collective bargaining agreement.  Less than 3
 5    months later, after only 10 bargaining sessions, the evidence
 6    will show that Respondent claimed the parties were at impasse;
 7    and, shortly thereafter, implemented what it claimed was its
 8    last, best and final offer.  The evidence will demonstrate that
 9    this is a paradigm case of an employer rushing to impasse.
10    Second, Your Honor, pay attention to the tone set at the
11    parties' first bargaining session on June 1st.  At this session,
12    Respondent informed the Union that there would be radical
13    changes at the facility, and, thereafter, threatened that the
14    Respondent would not waste the Union's time and would declare
15    impasse.
16    Third, note what the evidence will show regarding
17    Respondent's responses to the first -- to the Union's first two
18    proposals.  In this regard, the evidence will show that
19    Respondent largely rejected these proposals outright, without
20    any explanation, and, certainly without any substantive
21    negotiations.  And after rejecting these proposals, Respondent's
22    lead negotiator told the Union that he was willing to go to a
23    last, best and final offer at the parties' third bargaining
24    session, and that the Union should expect to see preparations in
25    play; preparations that later turned out to be highly visible

1   strike replacements.

2        Fourth, examine how the evidence will show the shift in

3   Respondent's conduct after its threat of a last, best and final

4   offer.  After this statement, the evidence will show that

5   Respondent undertook a concerted effort to create a paper trail

6   of supposedly good faith bargaining, by offering over the course

7   of the next four negotiations, five comprehensive proposals that

8   bore little, if any, relation to the employees' existing terms

9   and conditions of employment, and did not reflect movement at

10  the table or discussions of the terms between the parties.  As

11  will become evidence at the hearing, these comprehensive

12  proposals were unwieldy, did not always have changes marked, and

13  proved an obstacle to meaningful discussion.

14       In hearing the evidence regarding these negotiation

15  sessions and the respective proposals, pay special attention to

16  Respondent's explanation for these proposals; or, more

17  appropriately, its lack thereof, and its willingness to move on

18  to its next contract, as the evidence will show Mr. Meadows

19  called these proposals, before the parties had even negotiated

20  over the prior changes.  And, Your Honor, as you hear the

21  limited discussion that went on regarding these proposals at the

22  table, there are certain proposals that provide a window into

23  Respondent's true intent.  These include the changes that

24  Respondent made to the retiree gap insurance, which the evidence

25  will show Respondent instituted not as a product of substantive

1　discussion at the bargaining table, but as a product of its

2　unlawful direct dealings with employees in July.

3　　　　And look at the wage proposal, which had the effect of

4　obliterating seniority and creating a permanent division in the

5　work place, and which was provided without economic

6　justification.

7　　　　And, also, the evidence will show that in the discussion

8　over mundane topics, such as jury duty, or the parties' flower

9　fund, the evidence will show that Respondent reacted with utter

10　intransigence in response to the Union's attempt to defend these

11　existing benefits and refused to respond to the Union's requests

12　for Respondent's rationale for eliminating them.

13　　　　Fifth, pay attention to the evidence regarding what

14　happened when the existing contract expired on August 1st.  At

15　negotiations on July 31st, he evidence will show that Respondent

16　provided its supposed "final offer," as they called it, one that

17　it improved only two sessions later.  After this offer was voted

18　down, the evidence will show that Respondent thereafter insisted

19　to the Union that the parties were not at impasse.  Yes, after

20　only 20 minutes of face-to-face negotiations at the next session

21　on August 17th, Respondent presented a last, best and final

22　offer on August 18th, and, according to its evidence, thereafter

23　declared impasse.

24　　　　The evidence will demonstrate that this declaration of

25　impasse occurred completely independent of the parties' conduct

1   at the bargaining table, notably before the Union had even

2   presented a substantive response on wages.

3       Sixth, after this declaration of impasse, take a close look

4   at Respondent's contradictory signals to the Union.  Note, on

5   the one hand how the evidence will demonstrate that Respondent

6   refused to consider the Union's proposals on and after August

7   18th.  Yet, also note how the evidence will show that

8   Respondent, while refusing to consider these proposals, also

9   regularly talked about how it was willing to "massage" its last,

10   best and final offer, indicating that there is still room to

11   move.  The evidence will show that faced with these conflicting

12   signals, the Union made a concerted effort to address the

13   differences that existed between the parties in a comprehensive

14   offer of settlement, one, that the Union made movement on by

15   dropping its cherished labor relations committee, largely

16   adopting Respondent's grievance procedure, and dropping many

17   important letters of understanding among many other changes.

18   The evidence will further demonstrate that Respondent, after

19   soliciting this offer, refused to even consider it.

20       Now, as I mentioned, Your Honor, these are only the

21   highlights of a clear case of surface bargaining.  The evidence

22   will demonstrate that Respondent engaged in other conduct that

23   indicated its lack of sincere intent to reach an agreement; and,

24   instead, will betray its true motivations to obtain the contract

25   that it wanted at any cost and to get the Cedar Rapids facility

1   in line with the other Ingredion facilities.  And the evidence

2   will conclusively demonstrate that the parties were never within

3   striking distance of impasse; that at the time of Respondent's

4   declaration, there was room to move on both sides, and that this

5   movement was reflected in statements and actions from both

6   parties.

7       Now, Your Honor, much of this conduct is established by the

8   documents in this case, and the conduct that is not will be

9   supported by the testimony of multiple witnesses.  Faced with

10  this evidence, Respondent may try to distract Your Honor by

11  attempting to focus attention on the Union's conduct.  This

12  evidence will prove to be nothing more than a smoke screen.

13  While the Union undoubtedly expressed frustration at

14  Respondent's unlawful bargaining tactics, the evidence will

15  demonstrate that the actions that the Union took never

16  approached a level required to excuse Respondent's obligation to

17  bargain in good faith, as Respondent may contend.

18      In the end, Your Honor, Respondent's sham bargaining,

19  campaign of misinformation and unlawful implementation have

20  placed the Union in an untenable position: either bargain from a

21  nearly insurmountable deficit or refused to bargain and allow

22  its bargaining unit members to suffer under Respondent's

23  interpretation of its implemented final offer.  This is exactly

24  the type of situation that the Act is designed to prevent and is

25  why we are here today, Your Honor, and why we will be arguing

1    the impact of these actions in Federal Court in the near future.

2          In order to restore the order unlawfully usurped by

3    Respondent, Counsel for the General Counsel respectfully

4    requests that Your Honor find Respondent has committed the

5    violations as alleged in the Complaint; and further requests the

6    fullest remedy available under the law be granted.

7          Thank you.

8          JUDGE CARISSIMI:  Very good.

9          Mr. Buttrick, you are going to defer to the Respondent's

10   case for your statement, is that correct?

11         MR. BUTTRICK:  Yes, it is, Your Honor.

12         JUDGE CARISSIMI:  All right.

13         One thing, there has been a Petition for a 10(j) injunction

14   filed in this case?

15         MR. WIESE:  Yes, Your Honor.

16         JUDGE CARISSIMI:  Yes.

17         Under the Board's rules, I'm required to expedite my

18   consideration of that.  So what I want you to do is to have a

19   copy of the Petition placed into the record; because it's been

20   filed, correct?

21         MR. WIESE:  Yes, Your Honor.

22         JUDGE CARISSIMI:  All right.

23         So I'll need one with the case number so I can refer to it.

24   Now the fact that a 10(j) injunction request has been filed in

25   this case means nothing to me with regard to the merits.  I'll

1   make my own decision based on this record.  But it should be

2   entered into the record, because, as I said, I have to expedite

3   the case, and the Board does also.  So for that reason, it

4   should be introduced.

5       Now are you ready to call your first witness?

6       MS. OHAERI:  Yes, Your Honor.

7       JUDGE CARISSIMI:  Now, before we do that, we're going to go

8   off the record and prepare for the sequestration of witnesses.

9       Off the record.

10  (Off the record.)

11      JUDGE CARISSIMI:  On the record.

12      General Counsel you may call your first witness.

13      MS. OHAERI:  General Counsel calls Bruce Bishop.

14      JUDGE CARISSIMI:  Mr. Bishop, if you'd please approach the

15  witness stand.  Before you have a seat, I'm going to ask you to

16  be sworn in as a witness, and if you would please raise your

17  right hand.

18  (WITNESS SWORN:  BRUCE BISHOP)

19      JUDGE CARISSIMI:  Please have a seat.

20      You may continue.

21      MS. OHAERI:  Good morning.

22      THE WITNESS:  Good morning.

23                      DIRECT EXAMINATION

24  Q   BY MS. OHAERI:  Mr. Bishop, where are you currently

25  employed?

1   A    Penford Products, now Ingredion, here in Cedar Rapids.

2   Q    And when were you hired?

3   A    May of '87.

4   Q    And could you explain briefly what it is that Penford

5  Products, and now Ingredion, does?

6   A    It's a wet corn milling plant.  We take the starch from the

7  corn and modify it to sell mostly to the paper industry, some

8  food grade now.

9   Q    And what position do you currently hold there?

10  A    I'm considered a 95 operator, it's the Building 95 where we

11  do some of this converting of the starch for a papermill --

12  papersizing.

13  Q    And what department is that in?

14  A    It's within the wet -- or I'm sorry, dry starch.

15  Q    And how long have you held that position?

16  A    With the exception of just a year or two, I think 18 years

17  now.

18  Q    Can you explain what your job duties are?

19  A    We take the corn starch and convert it.  We make a cationic

20  product, which means we just add a negative charge to it.  It

21  adheres to the paper for a specific application that they use.

22     JUDGE CARISSIMI:  That term you used, sir -- "cationic" --

23  do you know how to spell that for the Reporter?

24     THE WITNESS:  C-A-T-A -- or I'm sorry, C-A-T-I-O-N-I-C.

25     JUDGE CARISSIMI:  All right, very good.

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 31 of 1141

1        Thank you.

2   Q    BY MS. OHAERI:  And, approximately, how many hours a week

3   do you work?

4   A    I suppose with overtime, roughly around average maybe 50.

5   Q    What shift do you work?

6   A    First shift.

7   Q    And what's the start time for first shift?

8   A    Seven a.m. to 3 p.m.

9   Q    Are there any other shifts?

10  A    Yeah.  We work around the clock.  The second shifts starts

11  at 3 p.m. till 11; and third shift from 11 p.m. till 7 a.m.

12  Q    Other than the first, second and third shift, are there any

13  other shifts?

14  A    Yeah, there's what we would consider a fourth shift or what

15  we consider a swing shift, since we work 7 days a week around

16  the clock, they fit in to our schedule, so we all work the same

17  amount of hours.

18  Q    And how does the scheduling work?  Do all the shifts work

19  the same days?

20  A    Yes, but at different times, we all would work -- work 7

21  straight, get one day off; work seven more, get 2 days off; work

22  seven more, get 4 days off.

23  Q    And you mentioned that the fourth shift, the swing shift

24  fills in.

25  A    Yeah.

1  Q    Can you explain a little bit more about that?

2  A    If I'm on first shift, if Monday is our day off, the fourth

3  shift, the swing will be on days on that day; the next 2 days

4  would be second shift's day off; they would rotate the second

5  shift then, and then the following 4-day, Thursday through

6  Sunday, they would -- third shift would be off, so they would

7  rotate the third shift for those 4 days, and then they would

8  have their one day off.

9  Q    And does the plant ever close?

10  A    No.

11  Q    Who is your direct supervisor?

12  A    Right now, it's Eric Tupper.

13  Q    Are you a member of the employees represented by the Union

14  in this case, Bakery, Confectionary, Tobacco Workers?

15  A    Yes, I am.

16  Q    Have you ever held any position with the Union?

17  A    No, I have not.

18  Q    Have you ever met Mr. Ken Meadows?

19  A    Just one time.

20  Q    And when was that?

21  A    In, I believe, April of last year.  He came through my

22  Building 95 with Levi Wood and Phil Kluetz.

23  Q    And what time of day was that approximately?

24  A    It was early, soon after the shift started, between 7 and 9

25  I'm going to say.

1  Q    And where in Building 95 were you?

2  A    I was down on  first floor at that time in the warehouse

3  area.

4  Q    And what happened when you saw Mr. Meadows, Mr. Kluetz and

5  Mr. Wood?

6  A    They just approached me and introduced Mr. Meadows.  Since

7  there had been other people touring through, since Ingredion had

8  taken over, I met quite a few chemists and engineers and things

9  like that; so I kind of made a practice -- I'd ask where they

10  are from because they might have been Kansas City or

11  Indianapolis, whatever, and what their title was.  I'd asked him

12  and he mentioned -- his reply was "labor."  "I'm labor, I don't

13  recognize you."  And I believe Levi at that time said, "Ken is

14  with HR, he's actually the negotiator for Ingredion.

15  Q    And then after you were introduced to Mr. Meadows, what

16  happened?

17  A    There was that first meeting then, and I -- he asked me --

18  I guess I was trying to keep it light, like how I said -- once

19  Levi had mentioned that he was the negotiator -- excuse me?

20      JUDGE CARISSIMI:  What is Levi's last name?

21      THE WITNESS:  Oh, Wood, I'm sorry.

22      JUDGE CARISSIMI:  And who is he?

23      THE WITNESS:  I don't know what -- considered -- a process

24  team leader, I believe.

25      JUDGE CARISSIMI:  All right.

1       Was there another individual present?

2       THE WITNESS:  Yes, Phil Kluetz.

3       JUDGE CARISSIMI:  And what is his position with the

4  company, if you know?

5       THE WITNESS:  They change quite often.  Now it's some sort

6  of safety coordinator.

7       JUDGE CARISSIMI:  All right, thank you.

8       You can continue, Ms. Ohaeri.

9  Q    BY MS. OHAERI:  I had asked you what happened after the

10  introduction, and you were in the middle of answering that.

11  A    When Levi mentioned that he was the lead negotiator, I kind

12  of -- I said, "Well, great, you and I will just go out for a

13  couple beers after work tonight, and we'll get this straightened

14  out, and you'll be on a plane back to Chicago in the morning, no

15  problem."  He didn't -- I didn't get much of a response from him

16  there; and he said, you know, "What would you like to see

17  yourself?"  And I said, again, I just -- I said, "You know, on

18  top of my big raise, I'd like to see a $5.00 raise to my pension

19  multiplier."  And he -- again, not much of a -- he says "I don't

20  think you're going to see that."  So I says, "Well, I don't" --

21  he says, "Seriously, what would you like to see?"  I said, "I

22  don't know, I'm one of the ones that's close to retirement.  I'm

23  interested in our pension, our gap insurance, things like that.

24  And he said -- I can remember this part -- he said, "But are you

25  planning on retiring soon?"  I said, "Well, I'd like to have

1    that option, hopefully." He says, "Well you really don't need

2    any gap insurance unless you're really sure you're going to go

3    soon." And I could see that this wasn't going to be a real

4    friendly exchange, so at that point, I just decided "I've got a

5    lot of work to do, you boys can move along."

6    Q    And that exchange was with whom, of Mr. Wood, Mr. Kluetz

7    and Mr. Meadows?

8    A    They still were all three roughly standing right there.

9    Mr. Meadows and I were kind of more face to face, but they stood

10   back a few feet roughly.

11   Q    And the person you were referring to as "he said," who was

12   the "he" there?

13   A    Mr. Meadows.

14   Q    After you told him that they could move along, what

15   happened after that?

16   A    I think they did. I moved -- I went on with my business.

17   At that time, I walked away.

18   Q    And approximately how long was that conversation with Mr.

19   Meadows?

20   A    This whole exchange was less than 2 minutes, I'm sure.

21   Q    Were any other employees present for that conversation?

22   A    Just myself and those three.

23   Q    Before you had this conversation with Mr. Meadows, had you

24   ever had any manager or supervisor come up to you and talk with

25   you about contract negotiations?

1   A    No.

2   Q    Or ask you what you wanted to see in the contract?

3   A    No.

4   Q    Did there come a time when you became aware of the

5   Employer's strike preparations?

6   A    Yes, several weeks to a month before July 31st, several

7   things changed.  They brought in some trailers that, which I had

8   no idea if they were meant for sleeping trailers or office of

9   what, I don't know.  They brought in several trailers.  They

10  brought in a food truck, I remember that.  They brought -- they

11  hired some -- apparently, some outside security, security that

12  didn't -- you know, I know our security that work up front and

13  these were outside people; and they would tour the plant.  They

14  stayed especially close to the trailers and the food truck and

15  those things, but they would patrol the outside, around the

16  gates and things like that.

17       They started bringing groups of people through that were --

18  I'm honestly -- some I know were from Indianapolis.  Somebody

19  asked where they were from occasionally or some other plants in

20  small groups were to just look over our shoulder and -- I didn't

21  have any conversation with them.  I wouldn't really give them

22  the time of day.

23  Q    You mentioned the food trailer or food truck.  Where was

24  that located at the plant?

25  A    When I saw it, it was right behind the first -- the front

1   office building, just off of First Street there.

2   Q    And do you recall approximately how many trailers you saw?

3   A    I believe there were at least -- I'm sure there were two --

4   maybe there was three.

5   Q    And where were those trailers located?

6   A    When they brought those in, they put them back by what

7   would be considered probably Building 21, kind of in the middle

8   of the plant, middle of the compound.

9   Q    You mentioned some groups of people coming in from various

10  other cities.  Did anyone ever ask you to train any of those

11  people who came to the plant?

12  A    No, no one ever asked me.

13  Q    Did you ever see any of those people use the trailers?

14  A    No, I did not.

15  Q    Did you ever see the food truck being used to feed those

16  people who were coming from outside cities?

17  A    No, I had heard some people from up front say that they got

18  a meal or something from there, but, no, I never saw it.

19  Q    When you say, "some people up front," are those regular

20  employees?

21  A    I'm sorry, office people, managerial people.

22  Q    And those are office employees and managers -- do they

23  normally work there?

24  A    Yes.

25  Q    Did any supervisor or manager ever speak with you about the

1  strike preparations that you saw or speak with you about the

2  strike?

3  A    One time I guess I can think of, there was a lot of, as you

4  can well imagine, the talk around.  We've got a -- one of the

5  facility managers one time was in the --  up in our control room

6  in 95, made some comment because -- and, again, the talk was all

7  strike -- no strike, the contract all the time.  This was Dave

8  Vislisel made the comment.  He said, "You boys, you might want

9  to think long and hard about walking out on these people.

10  They've got the deep pockets and lots of plants that make the

11  same thing you do.  You may not get back in the door if you go

12  out."

13  Q    Were you alone during this conversation with Mr. Vislisel

14  or were other employees present?

15  A    I work -- there are four other people -- three other people

16  -- four total that work in 95 on every shift.  I'm pretty sure

17  Vaude Wilford was in the room.  I can't remember for sure if the

18  other two were in there or not.

19      MS. OHAERI:  That's it, Your Honor.

20      JUDGE CARISSIMI:  Before we go to cross-examination,

21  there's allegations in the Complaint and there's been

22  amendments.  Can you tell me what complaint allegations Mr.

23  Bishop's testimony went to?   And I would ask the General

24  Counsel in the future before the witness testifies to let me

25  know what complaint allegations, so that I can follow the

1    testimony in relation to the Complaint.

2        Since I didn't ask you that prior to this, let's go off the

3    record, you can find it and let me know, all right?

4        MS. OHAERI:  Thank you.

5        JUDGE CARISSIMI:  Off the record.

6    (Off the record.)

7        JUDGE CARISSIMI:  On the record.

8        I have requested of General Counsel to let me know with

9    respect to Mr. Bishop's testimony and going forward with other

10   witnesses what testimony is related to complaint allegations.

11   This allows me to follow the testimony and, also, to determine

12   whether testimony is related to complaint allegations.

13       So if you could tell me what testimony Mr. Bishop's -- his

14   testimony, what it went to, what complaint allegations.

15       MS. OHAERI:  Sure, Your Honor.

16       It's complaint allegation 5, subparagraph (e); paragraph

17   13, subparagraph (a) and complaint paragraph 14.

18       JUDGE CARISSIMI:  Okay, thank you very much. And those are

19   all in the original Complaint, if you will.

20       MS. OHAERI:  Five(e) is in the Second Amended Complaint.

21       JUDGE CARISSIMI:  Okay.

22       MS. OHAERI:  From the 16th of April.

23       JUDGE CARISSIMI:  Thank you.

24       And this is for my use at the hearing.  This is not

25   something that I'm going to say is absolutely binding on the

1  General Counsel.  This will allow me and the Respondent to

2  follow the testimony and make sure that it is related to the

3  Complaint.  If it turns out that when all is said and done and

4  you contend the testimony supports another complaint allegation,

5  you can do that, but I'd like to have some guide at the hearing

6  to assist me in following the testimony.

7      MS. OHAERI:  I'd just like to add that although this isn't

8  a complaint allegation, his testimony also relates to the

9  special remedy being requested by the General Counsel in this

10  case.

11      JUDGE CARISSIMI:  Very good.

12      All right, cross-examination by the General Counsel -- I'm

13  sorry, by the Respondent.

14      MR. BUTTRICK:  Thank you, Your Honor.

15      Before I begin, I'd like to review any affidavits or <u>Jencks</u>

16  statements provided by this witness.

17      JUDGE CARISSIMI:  Is there a <u>Jencks</u> statement?

18      MS. OHAERI:  There is.

19      JUDGE CARISSIMI:  What do you have, and if you could tell

20  me how long it is.

21      MS. OHAERI:  There is one affidavit from Mr. Bishop, dated

22  August 1, 2015; it is 3 pages in length.  And then there's, in

23  addition to that, two other documents, which are handwritten

24  statements from Mr. Bishop; one is undated, and the second is

25  dated January 11, 2016.  Those total 3 pages in length.

1       JUDGE CARISSIMI:  Very good.

2       How much time do you need to prepare?

3       MR. BUTTRICK:  How about 15 minutes.

4       JUDGE CARISSIMI:  Very good.

5       We'll be in recess for 15 minutes.

6       Off the record.

7  (Off the record.)

8       JUDGE CARISSIMI:  On the record.

9                       CROSS-EXAMINATION

10  Q    BY MR. BUTTRICK:  Mr. Bishop, hello.

11  A    Hi.

12  Q    My name is Stuart Buttrick, and I'm counsel for Ingredion;

13  and thank you so much for coming today.   I know you have much

14  better things to do than to be here.

15       As a preliminary question, on our break, did you speak with

16  anyone about the testimony you gave?

17  A    No, I did not.

18  Q    Okay.

19       And so when you were speaking with Mr. Meadows on April

20  7th, you didn't write down any notes about your conversation at

21  the time you were talking with him, did you?

22  A    No.

23  Q    Okay. And so, immediately after you were done with your

24  conversation with Mr. Meadows, you didn't write down any notes

25  about that conversation, did you?

1   A     No.

2   Q     So the testimony you would have now is based solely upon

3 your memory, correct?

4   A     That's right.

5   Q     And it's probably safe to say that you don't remember

6 everyone you talked to on April 7, 2015, correct?

7   A     True.

8   Q     And it's probably safe to say that you don't remember

9 everything you said and everything people said to you on April

10 15th -- or April 7, 2015, correct?

11   A     True.

12   Q     Now, Mr. Meadows met with you out in the open, correct?

13   A     Yes.

14   Q     He didn't call you into an office to meet with you?

15   A     No.

16   Q     Okay.  And were there other employees in the area at the

17 time he was talking to you?

18   A     As I mentioned, just Levi Wood and Phil Kluetz who were

19 with him and myself, we're all that was there.

20   Q     Mr. Bishop, I'm going to ask you to keep your voice up and

21 speak loud enough so the people in the back of the room can hear

22 you, okay?

23   A     Yup.

24   Q     And you don't have any personal knowledge whether Mr.

25 Meadows met with the Union's bargaining committee prior to

1    talking with you, correct?

2    A    I have no idea.

3    Q    And you testified that others -- you saw others walking

4    through the facility from Ingredion prior to Mr. Meadows,

5    correct?

6    A    Yes.

7    Q    And so, those were other management type people from

8    Ingredion?

9    A    Yes.

10   Q    And you initiated about Mr. Meadows' title, correct?

11   A    Yes.

12   Q    And you brought up the negotiations by joking about getting

13   a contract done over beers, correct?

14   A    Yes.

15   Q    And your conversation lasted less than 2 minutes?

16   A    Right.

17   Q    And after you said that the parties needed to move on, they

18   left you alone?

19   A    Yes.

20   Q    Would you characterize the exchange as a friendly

21   conversation?

22   A    I was trying to make it that way.

23   Q    You were joking?

24   A    Yes.

25   Q    And Mr. Meadows was responding.

1    A    Yes.

2    Q    You have a supervisor, correct?

3    A    Yes.

4    Q    And do you talk to your supervisor about work-related

5    issues?

6    A    Certainly, yes.

7    Q    You ask him questions about work-related issues?

8    A    Yes.

9    Q    And he responds to those questions?

10   A    Yes.

11   Q    The Cedar Rapids facility has a program called "InfoShares"

12   correct?

13   A    Mmm-hmm, yes, sorry.

14   Q    Okay, and those are meetings that are hosted by management

15   and attended by hourly employees, correct?

16   A    Yes.

17   Q    And at these meetings, the company provides employees with

18   information about the company, correct?

19   A    Correct.

20   Q    And employees can ask questions in those -- in the

21   InfoShares, as well, can't they?

22   A    Yes.

23   Q    And the Penford, when it owned the facility, had something

24   called "safety meetings," correct?

25   A    Yes.

1     Q     And those were about work-related safety issues, correct?

2     A     Yes.

3     Q     And employees could ask questions in those meetings about

4   work-related safety things, correct?

5     A     Yes.

6     Q     Now you were employed at the Cedar Rapids plant in 2004,

7   correct?

8     A     That's correct.

9     Q     And there was a long strike in 2004, correct?

10     A     Yes.

11     Q     Approximately 70 days?

12     A     Yes, it was going on parts of 3 months.  I thought it was

13   80 or so, but, yes.

14     Q     Thereabouts.

15         Did the company hire replacement workers in 2004?

16     A     Yes.

17     Q     And were you temporarily replaced in 2004?

18     A     Yes.

19     Q     And you returned to work after the strike concluded?

20     A     Yes.

21     Q     The parties' prior collective bargaining agreement was

22   called the "Red Book," correct?

23     A     Yes.

24     Q     Okay.  And the Red Book had a provision in it where the

25   employees could take a day off to vote on the contract, correct?

1    A    Yes.

2    Q    Okay.  So all of the bargaining unit employees would leave

3    the facility to go vote on the contract, correct?

4    A    That's correct.

5    Q    In June and July of 2015, there was a lot of talk amongst

6    the employees in the bargaining unit that you heard about a

7    strike, correct?

8    A    Yes.

9    Q    That was something that the employees were talking about,

10   correct?

11   A    Yes.

12   Q    In 2015, no one ever said anything to you personally about

13   being replaced, correct?

14   A    That's correct.  I'm sorry, I can't say that.  My

15   conversation with Dave Vislisel, absolutely, he mentioned, "I

16   wouldn't go out if I were you guys, these guys have the deep

17   pockets and all the resources.  You might not get back in the

18   door."  I guess is that different than what you asked?

19   Q    Well, let me show you an affidavit you gave the National

20   Labor Relations Board on August 1, 2015.

21        MR. BUTTRICK:  May I approach the witness.

22        JUDGE CARISSIMI:  You may.

23        Now what I'd like you to do, any time you show something to

24   the witness, put an exhibit number on it.  It doesn't mean you

25   have to introduce it, but I want the record to reflect what

1   you're showing the witness.

2       You can give it any number you want to.

3   (EXHIBIT MARKED:  RESPONDENT'S 100.)

4   (Witness proffered the document.)

5   Q   BY MR. BUTTRICK:  Mr. Bishop, I'm going to show you what's

6   been marked as Penford Exhibit 100.

7       Do you recognize this document?

8   A   Yes.

9   Q   Is that your signature on the last page?

10  A   Yes, it is.

11  Q   And this is an affidavit you gave the National Labor

12  Relations Board on August 1, 2015, correct?

13  A   Yes.

14  Q   I'm going to turn your attention to line 11.

15  A   Mmm-hmm, yes.

16  Q   Does that refresh your recollection as to whether anyone

17  personally told you you were going to be replaced.

18      JUDGE CARISSIMI:  Before you answer, I want the record to

19  reflect that counsel has, in fact, taken the affidavit back from

20  the witness and the affidavit is no longer in front of the

21  witness.

22      THE WITNESS:  Please state the question again.

23      MR. BUTTRICK:  Sure.

24  Q   BY MR. BUTTRICK:  So does that refresh your recollection

25  for the answer to my question, "Did anyone personally tell you

1    that you were going to be replaced?"

2    A    Correct.

3    Q    So no one told you you were going to personally be

4    replaced, correct?

5    A    Correct.

6         MR. BUTTRICK:  Let's see here.

7    (Pause.)

8    Q    BY MR. BUTTRICK:  In the summer of 2015, the Union held a

9    number of rallies, public rallies, outside of the Ingredion

10   facility in Cedar Rapids, correct?

11   A    Yes.

12   Q    Those rallies were attended by a lot of people, correct?

13   A    Yes.

14   Q    And it was to garner support for the Union's bargaining

15   position?

16   A    Yes.

17   Q    Were there signs at those rallies?

18   A    Yes.

19        MR. BUTTRICK:  I have nothing further.

20        JUDGE CARISSIMI:  Very good.

21        Any redirect.

22                         REDIRECT EXAMINATION

23   Q    BY MS. OHAERI:  Mr. Bishop, why is it that you can recall

24   your conversation with Mr. Meadows in April?

25   A    It was the first time I had met the man.  It was -- this

1   was the man that was going to be negotiating and the chief

2   negotiator for the company.  It had an impact on me definitely

3   in that way.

4   Q    You mentioned previously about several people walking

5   around.  Those people that were walking around -- did any of

6   them talk with you about the contract negotiations other than

7   Mr. Meadows?

8   A    No.

9   Q    What was Mr. Meadows' demeanor like during your

10  conversation with him?

11  A    Serious, to the best of my recollection.

12  Q    Have you ever attended any of the InfoShares meetings?

13  A    Yes.

14  Q    And during those meetings, did any manager or supervisor

15  talk about the contract negotiations?

16  A    No.

17  Q    At the safety meetings that you attend, has any manager or

18  supervisor talked about the contract negotiations?

19  A    No.

20  Q    When you met with the Board Agent and provided your

21  affidavit, did he ask you any questions about conversations with

22  Mr. Vislisel, if you can recall?

23  A    I don't recall.

24  Q    There was a vote on whether the employees were going to

25  ratify a contract.  Do you recall when that vote was?

1  A    I think it was July 1st or July 31st or August 1st.

2     JUDGE CARISSIMI:  Remember to keep your voice up, Mr.

3  Bishop.

4     THE WITNESS:  I'm sorry.

5  Q    BY MS. OHAERI:  The affidavit that Mr. Buttrick showed you

6  was dated August 1st.  Did you provide the affidavit the same

7  day as the vote?

8  A    Yes.

9  Q    Do you recall whether you attended the vote first or the

10  affidavit first?

11  A    The vote first.

12  Q    And to the best of your recollection, can you recall what

13  that vote or the process of the vote or the outcome of the vote

14  that day was like for you personally?

15  A    Not good.  It was a big kick in the stomach, actually.  We

16  had hoped for something to come out of it better, so I -- I

17  guess other than that, I'm not sure.  Yah, just I don't know, I

18  was very down after that vote and that meeting.

19  Q    And were you still feeling down at the time that you met

20  with the Board Agent to provide your affidavit?

21  A    I suppose.

22  Q    Did Mr. Vislisel specifically say that you were going to be

23  replaced if employees went on strike?

24  A    To the best of my recollection, I believe he phrased it as

25  "you guys" or "you," meaning talking to the room, I believe.

1        MS. OHAERI:  That's all.

2        JUDGE CARISSIMI:  Very good.

3        Is there any recross within that scope?

4        MR. BUTTRICK:  Just a little bit.

5                              RECROSS-EXAMINATION

6  Q    BY MR. BUTTRICK:  When was your conversation with Mr.

7  Vislisel?

8  A    I can't put a date on it.  It was sometime before the vote

9  that summer.

10  Q    And --

11        JUDGE CARISSIMI:  The summer of 2015, sir?

12        THE WITNESS:  2015, correct.

13        JUDGE CARISSIMI:  Okay.

14        About how long before the vote you testified about?  Give m

15  your best recollection?

16        THE WITNESS:  June or July to the best of my recollection.

17        JUDGE CARISSIMI:  All right.

18        You may continue, counsel.

19  Q    BY MR. BUTTRICK:  And when you filled out this Board

20  affidavit on August 1, 2015, were you truthful in it?

21  A    Absolutely.

22  Q    And as you sit here today, do you recall the exact words

23  Mr. Vislisel told you in the summer of 2015?

24  A    To the best of my recollection.

25  Q    But you don't have notes of that conversation?

1    A    No, I do not.

2    Q    You didn't tape record that conversation, correct?

3    A    No.

4    Q    It's all based upon your memory, correct?

5    A    Yes, it is.

6    Q    And you don't have a photographic memory, correct?

7    A    No.

8    Q    And so you can't recall exactly what words were used,

9  correct?

10    A    Possibly not exactly all the words, right.

11        MR. BUTTRICK:  Nothing further.

12        JUDGE CARISSIMI:  Very good.

13        I take it there's nothing within that range?

14        MS. OHAERI:  Nothing, Your Honor.

15        JUDGE CARISSIMI:  Okay.

16        Mr. Bishop, you are excused as a witness, sir.

17        You can step down.

18  (Witness excused from the stand.)

19        JUDGE CARISSIMI:  Let's go off the record briefly.

20  (Off the record.)

21        JUDGE CARISSIMI:  Let's go on the record.

22        Make your request on the record, Ms. Ohaeri.

23        MS. OHAERI:  I'd like to request the return of Mr. Bishop's

24  affidavit and related Jencks statements.

25        JUDGE CARISSIMI:  My view is consistent with the General

1   Counsel's Case Handling Manual.  The Respondent is permitted to

2   keep the affidavit to the end of the unfair labor practice

3   hearing, at which time all affidavits must be returned.

4       So I'm going to instruct the Respondent along those lines.

5   I mean you can return it now if you want to, but you don't have

6   to.

7       MR. BUTTRICK:  Thank you, Your Honor.

8       We'll keep it till the end, and then we'll return it then.

9       MS. OHAERI:  I'd like to request that the Respondent not

10  make any copies, photographs, taken any handwritten duplications

11  or keep any copies or retain any copies of any of the Jencks

12  statements for any of the witnesses.

13      JUDGE CARISSIMI:  I agree with the General Counsel's

14  statement and so instruct you.

15      All right, we are ready for your next witness.

16      MS. OHAERI:  Yes.

17      Mr. Rausch will be testifying with regard to complaint

18  allegations --

19      JUDGE CARISSIMI:  Well, first, let's call Mr. Rausch.

20      MS. OHAERI:  Oh, okay.

21      JUDGE CARISSIMI:  And his name?

22      MS. OHAERI:  General Counsel calls Jeff Rausch.

23      JUDGE CARISSIMI:  Okay.

24      Mr. Rausch, if you would please stand for a moment, sir,

25  and raise your right hand.

1   (WITNESS SWORN:  JEFF RAUSCH)

2       JUDGE CARISSIMI:  Please have a seat.

3       Ms. Ohaeri, if you could tell me what complaint allegations

4   Mr. Rausch will be testify to.

5       MS. OHAERI:  He will be testifying with regard to Complaint

6   paragraphs 13(a) and 14, as well the special remedy that is

7   being requested by the General Counsel.

8       JUDGE CARISSIMI:  Thank you.

9       You may continue.

10                          DIRECT EXAMINATION

11  Q   BY MS. OHAERI:  Mr. Rausch, can you please state and spell

12  your first and last name for the record, please.

13  A   Jeff William Rausch, R-A-U-S-C-H.

14  Q   And where are you currently employed?

15  A   Ingredion.

16  Q   And when were you hired?

17  A   March 8th of 1988.

18  Q   What position do you currently hold?

19  A   Ethanol operator.

20  Q   And what department is that in?

21  A   Specialty Department.

22  Q   Where is the Specialty Department located?

23  A   It's in the -- pretty much the center of the plant in the

24  second floor of the maintenance building.

25  Q   How long have you been ethanol operator?

1   A    Probably going on about 7 years.

2   Q    And as an ethanol operator, what are your job

3  responsibilities?

4   A    We just -- we convert sugars into ethanol and some of my

5  duties are to get samples in the morning and run the samples to

6  know where we are to -- how to adjust the equipment.

7   Q    What position did you hold at the plant prior to becoming

8  an ethanol operator?

9   A    I was in the conversion sugar department prior to ethanol.

10  Q    And how long were you there?

11  A    Probably 3 years there.

12  Q    Where is the sugar conversion department located in the

13  plant?

14  A    It would be on the north side of the plant on the north

15  side of the tracks, railroad tracks.

16  Q    And what were your job duties at that time?

17  A    I was relief operator then.

18  Q    What did you do as relief operator?

19  A    I filled in as far as if somebody was on vacation, then I

20  would fill in their job.  Otherwise, I unloaded syrup for the

21  conversion -- for the sugar department, I'm sorry.

22  Q    Approximately how many hours per week do you work now as an

23  ethanol operator?

24  A    Anywhere from 56 to 64, it varies with the time of the

25  year.

1 Q    And what shift do you work?

2 A    I work on day shift.

3 Q    Is day shift the same as first shift?

4 A    Yes.

5 Q    Who is currently your direct supervisor?

6 A    John Gordinier now.

7 Q    Do you know his position title?

8 A    No, because it changes quite often.

9 Q    Have you ever held any positions with the Union?

10 A    No, I have not.

11 Q    Have you ever met Mr. Meadows?

12 A    Yes, I have.

13 Q    How many times have you met Mr. Meadows?

14 A    Probably a total of a couple.  One day he came into the

15 control room and another day, they were explaining the insurance

16 policy.

17 Q    I want to ask you some questions about the day that he came

18 into the control room.   Was that the first or the second time

19 you had met Mr. Meadows?

20 A    That was the first time.

21 Q    And do you recall when that meeting was?

22 A    April 5th of 2015.

23 Q    Do you recall approximately what time the meeting was or

24 what time of day?

25 A    It was before lunch, it was probably 10:30 -- 10:30,

1    quarter to 11, something like that.

2    Q    And you had mentioned this took place in the control room?

3    A    Could you repeat?

4    Q    You had mentioned that this took place in the --

5         JUDGE CARISSIMI:  Don't repeat the witness' testimony, just

6    ask the question.

7         MS. OHAERI:  Okay.

8    Q    BY MS. OHAERI:  Where is the control room?

9    A    Second floor of Building 13.

10   Q    Are there more than one control room at the plant?

11   A    Yes, there are several control rooms.

12   Q    How did Mr. Meadows come to be in the control room?

13   A    He came in with Phil Kluetz and Levi Wood.

14   Q    And what happened when they entered the control room?

15   A    Ken Meadows -- he introduced himself, and said that he had

16   been with Ingredion for 15 years and that he would be

17   negotiating the contract for them.

18   Q    And who was present in the control room?

19   A    When they first came in, it was Dave Fuchs, myself and the

20   three of them that came in.

21   Q    What happened after Mr. Meadows introduced himself?

22   A    He had asked what we were looking for in the contract, as

23   far as things that we would be looking for in the contract; and

24   I -- right away, I brought up the gap insurance, if that would

25   be something they would be honoring or continuing.  And  he had

1    said, yes, that they would be -- that would be something that

2    they would be looking into.

3    Q    Could you describe briefly to the best of your knowledge

4    what the "gap" insurance is?

5    A    Gap insurance is if you retire say at 60, it would cover

6    the insurance till Medicare would kick in at 65.  And, then,

7    also a supplement that would be -- that is provided when you get

8    Medicare, you buy a supplement on top of that.

9    Q    What happened after Mr. Meadows responded regarding the gap

10   insurance?

11   A    Then a maintenance -- two maintenance men walked in, one,

12   Jeff Kuddes, and I guess I'm not sure what the other guy's name

13   is that kind of come and go and worked off-shift, so I don't

14   know the other guy, what his name was.  But, right away, they

15   introduced themselves to Ken Meadows, and Ken introduced

16   himself; and Kuddes -- Jeff Kuddes had asked him if we would be

17   looking at, as far as percentage of our wage, and he asked --

18   Ken Meadows asked him what kind of a rate or percentage you

19   think you would be ask -- getting; and he said 3 to 3 and a half

20   percent, and Ken Meadows said, "No, it's probably going to be

21   more like 2 -- 2 and a half percent."

22   Q    Why did Mr. Kuddes and the other maintenance employee come

23   to the control room?

24        MR. BUTTRICK:  Objection:  calls for speculation.

25        JUDGE CARISSIMI:  Sustained.

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 59 of 1141

1    Q    BY MS. OHAERI:  Do maintenance employees regularly come to

2    the control room?

3    A    Yes, they do when they are going to do work.  We have a

4    policy, a work -- it's a work permit that you have to filled out

5    before anyone can work in a PSM chemical area; and so that way,

6    we know where they are at and where they are working; and in

7    case something would happen, we would know where to go get them

8    and get them out of there.

9    Q    Do you know why Mr. Kuddes and the other maintenance

10   gentlemen were there?

11        MR. BUTTRICK:  Objection:  calls for speculation.

12        JUDGE CARISSIMI:  Can we have a little foundation now and

13   see if the witness knows.

14        THE WITNESS:  Yes, they were going to get a work permit

15   because they had work to do out in the department.

16   Q    BY MS. OHAERI:  What happened after the exchange about the

17   wage percentage?

18   A    Then it was brought up -- Jeff Kuddes had asked about --

19   well, he was telling Ken that maintenance people, when they are

20   first hired, work a 7-day schedule, and that when they -- the

21   first year, they only have four personals; and it's hard for

22   them to get any time off if they have things that they have to

23   do, and that, after that, there's only 5 days of vacation for a

24   full week of -- full work week of 7 days, that they only get 5

25   days off; and was asking if that was something that could be

1  changed.

2  Q    When you said "four personals," what are "personals"?

3  A    It's like an unexcused absence.

4  Q    Do you recall anything else about the -- about what Mr.

5  Meadows said about the maintenance department?

6  A    He said they were understaffed and that we should be hiring

7  more people so they wouldn't have to work so many days.

8  Q    Did Mr. Meadows say anything about scheduling?

9  A    He did.  He did say that third shift was a dangerous shift

10  to be working.  And, also, he had brought up a 25-week rotation,

11  5 weeks of being on first shift, 5 weeks of second shift, 5

12  weeks of third shift, 5 weeks of -- you'd be covering vacations,

13  and then the other 5 weeks, you would be cleaning or doing

14  maintenance on equipment.

15  Q    Did you -- do you recall whether anything was said by Mr.

16  Meadows with regard to health insurance or other similar

17  benefits?

18  A    He did mention that -- he didn't think our insurance was

19  that good at that -- that we were having at that time, which I

20  thought -- personally, I thought we had one of the better

21  insurance plans around.  And he said that there was a Cadillac

22  policy -- or that our insurance plan would be under a Cadillac -

23  - would be -- I guess it's if you have a really good insurance,

24  it's called a "Cadillac," and that there would be fines or

25  whatever that the Government would be putting on them for having

1    a policy like that.

2    Q    Did Mr. Meadows say anything about what his thoughts were

3    about this Cadillac plan?

4    A    No.

5    Q    Was pensions mentioned?

6    A    Yes, pensions were mentioned.  He had spoken that they are

7    a thing in the past and that would probably be going away.

8         JUDGE CARISSIMI:  How did that topic about pensions come

9    up?

10        THE WITNESS:  I think when we were just generally talking

11   about everything with the contract and stuff.  I can't remember

12   if somebody brought that up, but it come up out of the

13   conversation.

14        JUDGE CARISSIMI:  All right, thank you.

15   Q    BY MR. OHAERI:  Did Mr. Meadows say what he was going to do

16   with the information he received from you guys during the

17   conversation?

18   A    He did say that he would be back in May with a plan.

19   Q    Approximately how long was this conversation?

20   A    I would say he was in the control room anywhere from 25 to

21   30 minutes possibly.

22   Q    Where were Mr. Wood and Mr. Kluetz during that

23   conversation?

24   A    Oh, they were standing over by a sink, and there's a table

25   there.  I think Phil was standing and Levi was sitting down at

1   the table.

2   Q     And what, if anything, did Mr. Wood or Mr. Kluetz say

3   during the conversation?

4   A     There was something brought up about having radios,

5   everybody carrying radios in the plant.  And Ken had said -- or

6   Phil had said, "Yah, we just spent $20,000 on radios," and Ken

7   said, "Well, I don't want to hear numbers.  I don't want to hear

8   amounts of money, I want to hear numbers;" and Phil said, "Well,

9   probably 18 to 20 radios we just purchased."

10  Q     What was Mr. Meadows like during the meeting?

11  A     I would say he was very brass -- brash, you know that he

12  was -- you know what was running the show.

13  Q     When Mr. Meadows left the control room, did he leave with

14  anyone?

15  A     With Phil and Levi.

16  Q     Before this conversation with Mr. Meadows, had any manager

17  or supervisor over come to talk with you about the contract

18  negotiations?

19  A     No.

20  Q     Or ask you what you wanted in the contract?

21  A     No, because why would they?  I'm not on the negotiating

22  committee.

23  Q     You mentioned was -- strike that.

24        Was that meeting with Mr. Meadows the last time you saw

25  him?

1    A    No, I seen him again it must have been towards the -- in

2    December when they were implementing the new insurance would be

3    starting and met up in the conference room up front. There was

4    approximately 40 union people up there asking questions about

5    the new insurance.

6    Q    And what was Mr. Meadows doing at the meeting?

7    A    Explaining everything to you.

8    Q    Did there come a time when you became aware of the

9    Employer's strike preparations?

10   A    Yes, July 13th through the 17th, there was people being

11   paraded through the plant and shown around, and you definitely

12   knew who they were because they all had the yellow hard hats on,

13   so they were, you know, not permanent employees of Penford or of

14   Ingredion, but they were -- we were told that they were from

15   other plants that would be working our jobs if we did go out on

16   strike.

17   Q    Who told you that?

18   A    That would have come from Phil Kluetz and Scott Maki.

19   Q    Approximately, what size, in terms of numbers of people,

20   were these groups?

21   A    It varied anywhere from 20 to 30 to -- in a group, and

22   there would four to five different groups that were going

23   around.

24   Q    Other than these groups of people, was there anything else

25   you observed with regard to the Employer's strike preparations?

1 A    Well, after that week that they were bringing people

2 through, I was on a week's vacation.  And I came back like July

3 27th, and there were three large trailers with air conditioners

4 on the front of them sitting outside of Building 13.

5 Q    Did any manager or supervisor speak with you about what

6 those trailers were for?

7 A    Scott Maki had said that they would used for people that

8 were going to be working my job if we went out on strike for

9 sleeping quarters.

10 Q    Did you ever see any activity around those trailers?

11 A    Yes, I did.  About noon on the 31st I believe it was, there

12 were four men that pulled up with a couple trucks, like rental

13 trucks, and they were unloading cots into the trailer.

14      As far as the other activity around there, there was always

15 a car that was parked to the west of the trailers and 24/7,

16 there was a guy in there watching -- just sitting there watching

17 those trailers keeping an eye on those trailers and -- yah.

18 Q    Do you recall whether the car that the gentleman was

19 sitting in was turned on or off?

20 A    I believe it was off.

21 Q    Other than the trailers with the cots in them, did you see

22 any other vehicles?

23 A    There was up front behind the administration building,

24 there was like a truck that I was told that it was where they

25 were going to be preparing the food for the strike or the

1   employees that were going to be working my job.  And then there

2   was also another SUV that sat outside the fence, and one or two

3   people would be in that vehicle watching that truck.

4        JUDGE CARISSIMI:  Who told you anything about the food

5   preparation.

6        THE WITNESS:  Scott Maki.

7        JUDGE CARISSIMI:  Thank you.

8   Q    BY MS. OHAERI:  Does Ingredion own any other ethanol

9   producing plants to your knowledge?

10  A    Not that I know of.  We were told that we were going to be

11  the first one that they would have.

12  Q    Do you recall who told you that?

13  A    That came from Phil Kluetz and Scott Maki also.

14       JUDGE CARISSIMI:  Ms. Ohaeri, is Mr. Kluetz alleged o be a

15  supervisor agent in the Complaint?  I don't see him.  Maybe I'm

16  missing something.

17       MS. OHAERI:  No, he's not.

18       JUDGE CARISSIMI:  Without an allegation or some agreement,

19  I can't rely on anything he might have said as an admission.

20  I'm just raising that for you to consider.  But he's not there,

21  so since there's no allegation, I have no admission.  And as far

22  as I know at this point, I only know anything about his

23  position, so I'm going to raise the issue, if you want to

24  explore it.  Right now, it might be hearsay.

25       MS. OHAERI:  General Counsel would ask whether Respondent

1  is willing to stipulate to Phil Kluetz being the Operations

2  Manager and an agent and supervisor under Section 2(11) of the

3  Act.

4      JUDGE CARISSIMI:  Mr. Buttrick?

5      MR. BUTTRICK:  If we could have a moment.

6      JUDGE CARISSIMI:  Let's go off the record.

7  (Off the record.)

8      JUDGE CARISSIMI:  On the record.

9      MR. BUTTRICK:  Yes, we will stipulate that he is a

10  supervisor under the Act.

11      JUDGE CARISSIMI:  Very good.

12      I'll accept the stipulation.

13      You may continue.

14      MS. OHAERI:  Just to be clear, do we have a stipulation on

15  his title as well?

16      MR. BUTTRICK:  That he was an Operations Manager in the

17  summer of 2015.

18      JUDGE CARISSIMI:  All right.  That's acceptable to General

19  Counsel?

20      MS. OHAERI:  Yes.

21      JUDGE CARISSIMI:  I'll accept that.

22  Q    BY MS. OHAERI:  Mr. Rausch, were you ever asked to train

23  any of the people who were touring around in the yellow hats?

24  A    No, I was not.

25  Q    How  many employees work in the ethanol control room?

1  A    We have four shifts, there are two operators on each shift,

2  plus there's a floating relief between conversion and ethanol

3  department on each shift.

4  Q    So if my math is right, is 12 accurate?

5  A    Yup -- yes, that's what it would be.

6  Q    Did you see any of the people that were doing the plant

7  tours in the yellow hard hats training in the ethanol control

8  room?

9  A    No, I did not.

10  Q    Could you explain what would be some of the potential

11  consequences of having untrained people running the ethanol

12  control room?

13  A    Well, ethanol spill, a fire.  We have a fire suppression

14  unit there, but when ethanol burns, you don't --  you'll feel

15  the heat, you won't see the fire.

16  Q    The ethanol control room is an -- I'm not clear on what the

17  acronym is -- is it a PMS or a PSM area.

18  Q    PSM.

19  Q    Do you know what "PSM" stands for?

20  A    Process Safety Management.

21  Q    Why do the maintenance employees need a work permit to be

22  in that area?

23  A    Because if there is something that would go wrong, I know

24  where they are and we go through with them where the fire

25  extinguishers are in the area, and that way, we know if they

1   need a tool use or a work permit out there -- not a work permit,

2   but tool use or fire -- tool use or a burn permit.  And then

3   that's decided at that time if they are going to need that.  And

4   that way, if there is something that would happen, we know where

5   they are to get them out of there.

6   Q    Did you ever see the people in the yellow hard hats use the

7   trailers?

8   A    No, I did not.

9   Q    Do you know where the people in the yellow hats were

10  staying or sleeping when they weren't at the plant?

11  A    They -- well, what I heard around was that they were --

12       MR. BUTTRICK:  Objection:  calls for speculation.

13       JUDGE CARISSIMI:  Sustained.

14  Q    BY MS. OHAERI:  Were you ever told by any supervisor or

15  manager where the people in the yellow hats were staying or

16  sleeping when they weren't in the plant?

17  A    I was told that they were staying out at the Sheraton.

18  Q    And who told you that?

19  A    That would have been Scott Maki.

20  Q    When the contract expired on August 1st, did the people in

21  the yellow hats leave the plant?

22  A    No.

23  Q    Were you told by any supervisor or manager why they were

24  still there?

25  A    They were still staying around in town in case we were

1    going -- we'd walk out.

2    Q    And who told you that?

3    A    Once, again, Scott Maki.

4    Q    Did you ever see the food truck used to feed any of the

5    people in the yellow hard hats?

6    A    No, I did not.

7    Q    To the best of your recollection, did you recall anything

8    odd about the food truck or in the food truck?

9    A    Yes, I kind of chuckled and had talked to a few other

10   operators that, "I'm glad I wasn't eating out of that food

11   truck, because there was a d-Con -- like mouse -- rat poisoning

12   -- sitting on the dash of the truck."

13       MS. OHAERI:  No further questions.

14       JUDGE CARISSIMI:  Cross-examination.

15       MR. BUTTRICK:  Yes.

16       May we review any statements or affidavits provided by --

17       JUDGE CARISSIMI:  What type of Jencks material does General

18   Counsel have?

19       MS. OHAERI:  I will be providing Respondent's counsel with

20   one copy of an affidavit, consisting of 3 pages, taken by Board

21   Agent, Charles Chermak, and signed by Mr. Jeff Rausch.  It's

22   dated August 1, 2015.  In addition to that, there is a half a

23   page written statement undated, which his in part signed by the

24   witness.

25       JUDGE CARISSIMI:  Very good.

1       How much time would you like to prepare?

2       MR. BUTTRICK:  Fifteen minutes or thereabouts, yes.

3       JUDGE CARISSIMI:  Very good.

4       We'll be in recess for 15 minutes.

5       Off the record.

6   (Off the record.)

7       JUDGE CARISSIMI:  On the record.

8       Mr. Rausch, you can return to the witness stand.

9   (Witness resumed the stand.)

10      JUDGE CARISSIMI:  Counsel, you may cross-examine.

11      MR. BUTTRICK:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13  Q   BY MR. BUTTRICK:  Mr. Rausch, good morning.

14  A   Good morning.

15  Q   My name is Stuart Buttrick.  I'm counsel for Ingredion and

16  I'll just be asking you some questions about your testimony a

17  moment ago.

18      And thank you so much for spending your time and coming

19  here this morning.

20  A   Yes.

21  Q   On the break, have you talked to any other witnesses or

22  potential witnesses about the testimony you gave?

23  A   No.

24  Q   Okay.

25      And so when you were speaking with Mr. Meadows, you didn't

1  write down any notes at the time you were talking with him, did

2  you?

3  A    No.

4  Q    Okay.  And immediately after Mr. Meadows, Mr. Kluetz and

5  Mr. Wood left, you didn't write down any notes about what those

6  conversations were, correct?

7  A    No.

8  Q    Okay.  So the testimony is based solely upon your own

9  memory, correct?

10 A    Correct.

11 Q    And it is safe to say that you don't remember everyone you

12 talked to on April 5, 2015, correct?

13 A    That's correct.

14 Q    And it's safe to say you don't remember exactly everything

15 that you said in every conversation on April 5, 2015, correct?

16 A    That's correct.

17 Q    So it's also safe to say that you don't remember exactly

18 what words were used and who said them and in what sequence when

19 you were speaking with Mr. Meadows on April 5, 2015, correct?

20 A    No.  No.

21 Q    Upon learning about the purchase of the Cedar Rapids

22 facility, were you concerned about what that might mean for you

23 and the facility?

24 A    I don't know if I was concerned at that time because

25 everybody was talking that it would be great -- it's going to be

1    great for the company, because we'll have more influx of money

2    to do more projects and expand more.

3    Q    So you didn't have any questions about well, what the

4    purchase might mean for the Cedar Rapids facility when you

5    learned of its transaction?

6    A    No.

7    Q    Were you in April of 2015, interested in what the up-coming

8    contract negotiations might result in?

9    A    Yes, I was.

10   Q    And you have a supervisor at work, correct?

11   A    Correct.

12   Q    And you speak with your supervisor about work-related

13   issues?

14   A    Daily.

15   Q    And talk about things you like about work?

16   A    Sure.

17   Q    Things you don't like about work?

18   A    Sure.

19   Q    Have you attended a program called "InfoShares" at the

20   Cedar Rapids facility?

21   A    Yes, I have.

22   Q    And in those InfoShares, employees are given an opportunity

23   to ask questions about what's going on at the facility, correct?

24   A    Yes.

25   Q    And management gives employees information about what's

1   going on at the facility, correct?

2   A    Correct.

3   Q    You spoke about radios.  Do you remember that testimony

4   about radios?

5   A    Mmm-hmm.

6   Q    Okay, was that a "yes"?

7   A    Yes.

8   Q    Okay.  The radios were purchased prior to Mr. Meadows'

9   visit in April of 2015, correct?

10       MS. OHAERI:  Objection.

11       JUDGE CARISSIMI:  Basis?

12       MS. OHAERI:  There's no foundation for his knowledge of

13   when any radios were purchased.

14       JUDGE CARISSIMI:  Overruled.

15       The witness can tell us if he knows.

16       THE WITNESS:  I don't know when they were purchased.

17   Q    BY MR. BUTTRICK:  At no time since you spoke with Mr.

18   Meadows in April of 2015, have you been temporarily or

19   permanently replaced, correct?

20   A    That's correct.

21   Q    And at no time did any member of management ever threaten

22   you with being locked out, correct?

23   A    No.

24   Q    No  -- is that -- was my statement correct?

25   A    Your statement was correct.

1  Q    And the Union had a strike in 2004, correct?

2  A    Yes, we did.

3  Q    And it lasted approximately 11 weeks, correct?

4  A    Seventy-eight days, I believe.

5  Q    And when Ingredion bought the Cedar Rapids plant, it

6  continued to abide by the terms of the Red Book, correct?

7  A    Yes, they did.

8  Q    Until the Red Book expired, correct?

9  A    Well -- okay, yes.

10  Q    And the "Red Book" is the common parlance for the

11  collective bargaining agreement, that was the old Penford

12  collective bargaining agreement.

13  A    It was our old contract.

14  Q    And in the 2004 strike, Penford hired replacement workers,

15  correct?

16  A    Yes, they did.

17  Q    And were you replaced in that strike?

18  A    Yes, I was.

19  Q    And did you return to work after the strike was over?

20  A    Yes, I did.

21  Q    And the Red Book was set to expire on August 1, 2015,

22  correct?

23  A    Correct.

24  Q    As you sit here today, do you have any recollection of who

25  brought up the topic of negotiations when you met with Mr.

1  Meadows?

2  A    Well, Ken said -- Ken did.

3  Q    It's true, though, that Mr. Kuddes brought up the topic of

4  wages, correct?

5  A    Correct.

6       JUDGE CARISSIMI:  Mr. Rausch, if you could try to remember

7  to use last names.

8       THE WITNESS:  Okay.

9  Q    BY MR. BUTTRICK:  And Mr. Kluetz brought up the topic of

10  maintenance people working a 7-day schedule, correct?

11  A    Yes, he did.

12  Q    The parties began bargaining a new contract -- the parties

13  being Ingredion and the Union, on or about June 1st, correct?

14       MS. OHAERI:  Objection:  no foundation for the witness'

15  knowledge about when bargaining negotiations started.

16       JUDGE CARISSIMI:  Overruled.

17       MR. BUTTRICK:  Please answer the question.

18       THE WITNESS:  I don't when negotiations started because I

19  wasn't on the negotiating committee.

20  Q    BY MR. BUTTRICK:  Prior to Mr. Meadows visiting the

21  facility, had you seen other visitors tour the plant before?

22  A    Yes.

23  Q    Approximately how often?

24  A    I guess I don't understand the question as far as how

25  often.

1    Q      I mean how many times have you observed, other -- before

2    Mr. Meadows, others being toured around the plant?

3    A      Many times.

4    Q      And on some of those tours, did those visitors talk with

5    you?

6    A      Yes.

7    Q      You never had to personally train any replacement workers,

8    correct?

9    A      No.

10   Q      Is my statement correct?

11   A      Yes.

12   Q      You referenced in your direct testimony a statement made by

13   Scott Maki.

14   A      Yes.

15   Q      When was that statement made approximately?

16          MS. OHAERI:  Objection, Your Honor.  It's vague.  He

17   testified about --

18          JUDGE CARISSIMI:  I'm going to sustain that objection.

19   Q      BY MR. BUTTRICK:  Do you recall your testimony about Scott

20   Maki referencing replacements to you?

21   A      Do I remember him asking or telling us about it?

22   Q      Yes.

23   A      Yes

24   Q      And when was that approximately?

25   A      It as continually prior to them coming through around July

1   13th to the 17th is when I seen most of the activity.

2   Q    So that comment was made sometime in July 2015?

3   A    I would say yes.

4   Q    With regard to the trailers that you referenced in your

5   testimony, no bargaining unit employees were working in those

6   trailers, correct?

7   A    No.

8   Q    Is my statement correct?

9   A    Your statement is correct.

10  Q    Okay.

11       And you would agree it's important to be well-trained

12  before working on equipment and machinery that is present in the

13  Cedar Rapids plant, correct?

14  A    Yes.

15  Q    Because bad things would happen if someone who is not

16  trained were to start working on that, correct?

17  A    That's correct.

18  Q    People could get hurt, correct?

19  A    Correct.

20  Q    People could even die, correct?

21  A    That's true.

22  Q    And no replacement workers were staying on site overnight,

23  correct?

24       MS. OHAERI:   Objection.

25       JUDGE CARISSIMI:   Overruled.

1    MS. OHAERI:  I'll withdraw.

2    JUDGE CARISSIMI:  Okay.

3    Overruled.

4    You can answer, sir.

5    THE WITNESS:  Not that I know of -- only the ones that were

6 sitting in the car watching the trailer.

7  Q    BY MR. BUTTRICK:  They weren't sleeping there, correct?

8  A    I guess I don't know for sure, but --

9  Q    And they were just watching the trailer, correct?

10 A    Right.

11 Q    They were not watching bargaining unit employees, correct?

12 A    They were just like guarding the trailer.

13 Q    And in that conversation with Mr. Meadows in April of 2015,

14 you brought up the subject of gap insurance, correct?

15 A    I did.

16 Q    And you bought up the subject of health insurance, correct?

17 A    I did.

18 Q    And the mobile trailers about which you testified -- those

19 were brought in on July 27th, correct?

20 A    Correct.

21 Can I go back?

22 They were there when I came back to work on the 27th.  They

23 were already there.  I didn't see them get pulled in.

24 Q    You don't know when they were brought there, correct?

25 A    I do not.  I just know when I came back from being on

1    vacation, that they were there.

2    Q    That's right.  They could have been brought there on July

3    26th, correct?

4    A    I guess, you're correct.

5    Q    And on July 30th, you saw cots being unloaded, correct?

6    A    Correct.

7    Q    In that conversation with Mr. Meadows, in which Mr. Kuddes

8    arrived, he brought up the topic of personal time off after

9    years of service, correct?

10    A    Yes.

11    Q    Mr. Kuddes brought that up, correct?

12    A    Yes.

13    MR. BUTTRICK:  I have nothing further.

14    JUDGE CARISSIMI:  Is there any redirect by the General

15    Counsel?

16                        REDIRECT EXAMINATION

17    Q    BY MS. OHAERI:  Prior to your conversation with Mr.

18    Meadows, did you speak with any managers or supervisors about

19    contract negotiations?

20    A    No.

21    Q    At the InfoShares meetings that you attended, did any

22    presenter or supervisor or manager discuss contract

23    negotiations?

24    A    No.

25    Q    The visitors that were coming to the plant in and around

1   your ethanol control room -- did the ones that came -- before

2   you met Mr. Meadows, did any of them talk with you about the

3   contract negotiations?

4   A    No.

5   Q    What about any visitors that were in the ethanol control

6   room or the plant after you spoke with Mr. Meadows?  Did any of

7   them mention contract negotiations to you?

8   A    No.

9        MS. OHAERI:  That's it.

10       JUDGE CARISSIMI:  Within that limited range, anything Mr.

11  Buttrick?

12       MR. BUTTRICK:  I don't have anything.

13       JUDGE CARISSIMI:  Very good.

14       You are excused as a witness, sir.

15       You may step down.

16  (Witness excused from the stand.)

17       JUDGE CARISSIMI:  Let's go off the record.

18  (Whereupon, a brief discussion was held between the parties off

19  the record.)

20       JUDGE CARISSIMI:  Let's go on the record.

21       General Counsel, you may call your next witness.

22       MS. OHAERI:  General Counsel calls Dave Fuchs.

23       JUDGE CARISSIMI:  Mr. Fuchs, if you would please raise your

24  right hand.

25  (WITNESS SWORN:  DAVE FUCHS)

1          JUDGE CARISSIMI:  Please have a seat.

2                              DIRECT EXAMINATION

3    Q    BY MS. OHAERI:  Could you please state and spell your last

4    name for the record?

5    A    Fuchs, F-U-C-H-S.

6    Q    Where are you currently employed?

7    A    Penford Products, a wholly owned subsidiary of Ingredion.

8    Q    And when were you hired?

9    A    April 23, 1984.

10   Q    What position do you currently hold?

11   A    I'm an ethanol operator.

12   Q    What department is -- are you in?

13   A    The ethanol department.

14   Q    And where is that located?

15   A    Building 13, which is the maintenance building in the

16   middle of the plant.

17   Q    How long have you been an ethanol operator?

18   A    Since it was built in '07.

19   Q    Since what was built?

20   A    The ethanol department.  We built the still down there to

21   make ethanol.

22   Q    And can you please describe your job responsibilities?

23   A    I run the still, the computer part of running the still and

24   I also do the lab work on the ethanol to make sure it meets all

25   the specs.

```
 1        JUDGE CARISSIMI:  Did you use the term "still"?

 2        THE WITNESS:  Right.

 3        JUDGE CARISSIMI:  Okay.

 4        THE WITNESS:  I run a still down by the river.

 5        JUDGE CARISSIMI:  I'm sorry?

 6        THE WITNESS:  I run a still down by the river.

 7        JUDGE CARISSIMI:  Okay.

 8        Go ahead, counsel.

 9   Q    BY MS. OHAERI:  Approximately, how many hours per week do

10   you work?

11   A    Work 7 days a week, 8 hours a day, 56 hours a week.

12   Q    Does that include overtime?

13   A    No.

14   Q    What shift do you work on?

15   A    Day shift, 7 to 3.

16   Q    Seven a.m. to 3 p.m.?

17   A    Yes.

18   Q    Who is your direct supervisor?

19   A    Right now, it's John Gordinier.

20   Q    Have you ever held any positions with the Union?

21   A    No.

22   Q    Have you ever met Mr. Ken Meadows?

23   A    Yes, I have.

24   Q    Approximately, how many times have you met him?

25   A    A few times.
```

1    Q     When was the first time that you met Mr. Meadows?

2    A     I met him on April 7th, last year.

3    Q     And approximately what time of day was it?

4    A     About 11 o'clock -- the afternoon.

5    Q     Where did you meet him?

6    A     He came into my department with Levi Woods and Phil Kluetz.

7    Q     Where in the department were you at the time?

8    A     I was in the office running the computer.

9    Q     Is that office also called a "control room"?

10   A     Right.

11   Q     How did Mr. Meadows come to be in the control room?

12   A     They were showing it to the plant and I don't know how -- I

13 don't know why he stopped in there.

14   Q     When you say "they" who are referring to?

15   A     Levi Woods and Phil Kluetz.

16   Q     What happened when Mr. Meadows entered the control room?

17   A     He introduced himself as the person that would be

18 responsible for getting our contract negotiated.

19   Q     Did he say anything about his position or he background?

20   A     He said he had worked for the company for about 15 years

21 and that he had been doing this the whole time.

22   Q     What happened after he introduced himself?

23   A     He made himself comfortable, sat down and talked to people

24 that was coming in and out of the department.

25   Q     Do you recall what he said? Did you have a --

1  A    Yah, he -- at the time I was working, but he struck up a

2  conversation about the people about what they were interested in

3  for a contract, what they were looking for.

4  Q    Approximately, how many employees did Mr. Meadows strike up

5  these conversations with?

6  A    Well, I was there, Jeff Rausch was there, some maintenance

7  people come in.  Kuddes was working on maintenance -- he came in

8  to work on some things.  And it's a PSM area, so I was making

9  him out a work permit.  It's a process safety management area.

10  I was making out a work permit so he would be allowed to work in

11  our area.  And so they got to talk while I was doing that.

12      JUDGE CARISSIMI:  When you say "they," Mr. Fuchs, who are

13  you referring to?

14      THE WITNESS:  Kuddes and Jeff Rausch.

15      JUDGE CARISSIMI:  Okay.

16      THE WITNESS:  And then --

17      JUDGE CARISSIMI:  All right, thank you.

18  Q    BY MS. OHAERI:  Other than Mr. Jeff Rausch, you and Mr.

19  Kuddes, were any other employees there?

20  A    Yah, there was one other maintenance guy there, but I don't

21  remember who it was right now.

22  Q    What happened after Mr. Meadows asked about the contract?

23  A    We just kind of gave him our impression of what we were

24  looking for.  Everybody was looking for a little something

25  different.  Jeff Kuddes -- he wanted to have more days off for

1   vacation instead of 5 days of vacation, he wanted a full 7 days

2   of vacation.   Jeff Rausch -- he was interested in his insurance

3   that he lost on the last contract.

4        We were all worried about our pensions of course and what

5   we were going to make.

6   Q    Do you --

7   A    We were talking about a 3 -- 3 and 1/2 percent raise, and

8   he said, "No," he said, "it would be more like 2 or 2 or 1/2.

9   Q    Do you recall what, if anything, Mr. Meadows said regarding

10  the pensions?

11  A    He said that they would be gone, along with our insurance,

12  that we would have to have their insurance.

13  Q    Did he say why the insurance would be gone or why you had

14  to have the other insurance?

15  A    He brought up something about a Cadillac tax that was going

16  to get charged to him in 2018.

17  Q    Did Mr. Meadows respond to Mr. Kuddes' statements regarding

18  the personal days?

19  A    Yeah, he said that he understood that we were running on

20  employees and that we would have to hire some more employees;

21  but he never actually said whether we would get our vacation or

22  not.

23  Q    Do you recall whether Mr. Meadows discussed safety or

24  safety issues at all during this meeting?

25  A    We brought up the fact that -- I believe the manlifts had

1   just been shut down that take you from floor to floor in the

2   plant, and so we did bring up safety there.  We were kind of

3   wondering what they were going to do there, and what we're going

4   to do now that those were gone.

5       And he brought up the fact that working third shift was

6   also hard on people, that it was dangerous to work third shift

7   all the time.

8   Q   Do you recall what, if anything, Mr. Meadows said about the

9   manlifts?

10  A   No, I don't believe he did. We brought it up and I don't

11  think he did.  He had a response for it, just that they were

12  shut down and they probably wouldn't be coming back.

13      JUDGE CARISSIMI:  Mr. Fuchs, tell me what a "manlift" is at

14  this plant?

15      THE WITNESS:  It's a rotating belt with platforms on it

16  that you can ride from floor to floor.

17      JUDGE CARISSIMI:  All right.  Is it open?  Does it have a

18  cage on it or anything?  How --

19      THE WITNESS:  They are open from floor to floor.  They've

20  just got a hole going through the floor.  They've been running

21  down there the whole time I've worked down there.  It saves a

22  lot of time going up and down a lot of steps, especially when

23  you've got people in the steep house, you know, that's six --

24  seven stories up.  If something happens downstairs, you've got

25  to move downstairs pretty quick, because we run short of help.

1          JUDGE CARISSIMI:  And these manlifts -- do they run from

2    the ground floor?

3          THE WITNESS:  All the way to the top, yah.

4          JUDGE CARISSIMI:  And how many floors to the top,

5    approximately?

6          THE WITNESS:  Gosh, I'm not sure.  Most of them were three

7    or four floors.  There were some larger ones like in the corn

8    elevator.

9          JUDGE CARISSIMI:  Mmm-hmm.

10          THE WITNESS:  I think that went up like seven or eight.

11          JUDGE CARISSIMI:  All right, thank you.

12          You may continue, counsel.

13    Q    BY MS. OHAERI:  Do you recall whether Mr. Meadows said

14    anything about scheduling?

15    A    He -- when he brought up the fact that we were overworked

16    on third shift, that working third shift all the time was

17    dangerous, he would come up with something about 5 weeks on each

18    shift and rotating from days to nights, nights to days and I

19    didn't understand a lot of what he was talking about.  I had

20    worked third shift for over 20 years, never had but one accident

21    on third shift.

22    Q    Do you recall what, if anything, Mr. Meadows said about the

23    maintenance department as a whole?

24    A    He just said that they were understaffed and he understood

25    that they were changing their schedule around.  I --

1    Q     Approximately how long was your conversation with Mr.

2    Meadows?

3    A     Probably 25 minutes to half an hour?

4    A     Where were Mr. Wood and Mr. Kluetz during this

5    conversation?

6    A     They were right behind him on the other side of the table

7    stand --

8    Q     Do you recall whether Mr. Wood or Mr. Kluetz said anything?

9    A     No, they never said a word.

10   Q     Did Mr. Meadows leave by himself?

11   A     No, they left together.

12   Q     Prior to Ingredion taking over at the plant, had any

13   manager or supervisor ever met with you or spoke with you about

14   the contract negotiations?

15   A     No.

16   Q     Was that the last time that you saw Mr. Meadows in the

17   control room?

18   A     No, he came back later after they finally started

19   negotiating the contract.  They didn't want to talk to me, he

20   wanted to talk to Chris Eby.

21   Q     And was Mr. Eby present at the time?

22   A     Yes, he was.

23   Q     Do you recall approximately when Mr. Meadows came back into

24   the control room the second time?

25   A     Oh, I don't think it was before -- I was thinking it was in

1   August, the first part of August, after we voted to go on

2   strike.

3   Q    What did Mr. Eby and Mr. Meadows discuss?

4   A    I don't know. They went in the back room, I closed the

5   door.

6   Q    How far away were you during their conversation?

7   A    Oh, 15 -- 18 feet.

8   Q    Did you hear any raised voices?

9   A    No.

10   Q    Approximately how long were they in the room?

11   A    Oh, they were in there about an hour or so.

12   Q    Did there come a time when you became aware of the

13   Employer's strike preparations?

14   A    Yah, before we went to vote on the contract, August 1st,

15   they had moved in some trailers and they had other people

16   walking around the plant from other plants -- from other

17   facilities.

18   Q    Do you recall where those trailers were located?

19   A    Right in the middle of the plant. They had security

20   watching them the whole time.

21   Q    Was that the normal plant security?

22   A    No, it was extra security. They were sitting in rental

23   cars, running the rental cars the whole time.

24   Q    Other than the trailers and the security guards, did you

25   observe any other of the Employer's strike preparations?

1   A   They did bring a food truck in to feed the people that were

2   going to be there.

3   Q   Where was the food truck located?

4   A   It was up by Building 28 up front.

5   Q   Do you recall whether during that time before the vote on

6   August 1st, there were any additional people in the plant?

7   A   Yah, there was people walking around from other facilities

8   that they brought in.  I believe they were doing safety training

9   with them just in case we were to walk out on strike.

10  Q   Were you ever asked to train any of those people?

11  A   No, I was asked to let them look through my area and I

12  declined them to let them go through my area without a

13  supervisor.

14      JUDGE CARISSIMI:  Who asked you that, sir?

15      THE WITNESS:  I don't know who it was.  They were just

16  extra people that were walking around.

17      JUDGE CARISSIMI:  All right.

18      Now these additional people that you referred to -- anybody

19  in management talk to you about these folks?

20      THE WITNESS:  They told us that they would be there.

21      JUDGE CARISSIMI:  When you say "they," who do you mean?  I

22  need names.

23      THE WITNESS:  Ah, at that time, it was my supervisor,

24  Scott.

25      JUDGE CARISSIMI:  What's his name?

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 91 of 1141

1          THE WITNESS:  Maki.

2          JUDGE CARISSIMI:  All right.

3          THE WITNESS:  He told us that they would be in the plant,

4    in the facility

5          JUDGE CARISSIMI:  What did he say about these individuals?

6    Did he tell you who they were?

7          THE WITNESS:  No.  He just told us that they were from the

8    other plants and that they would be looking over our facility.

9          JUDGE CARISSIMI:  Did he tell you why they were there?

10         THE WITNESS:  He just said that they would be looking over

11   the facility.  He didn't go into specifics.

12         JUDGE CARISSIMI:  All right.

13         Can you tell me about when this conversation with Mr. Maki

14   occurred?

15         THE WITNESS:  It was after they brought in the trailers, so

16   it was close to August 1st.

17         JUDGE CARISSIMI:  Thank you.

18         You may continue, counsel.

19   Q    BY MS. OHAERI:  Did you ever observe these people from the

20   other facilities using the trailers?

21   A    No.

22   Q    What about the food truck?

23   A    No.

24         MS. OHAERI:  That's all.

25         JUDGE CARISSIMI:  Cross-examination?

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 92 of 1141

1    MR. BUTTRICK:  Yes, please.

2    If we could review any statements.

3    JUDGE CARISSIMI:  Very good.

4    What does the General Counsel with regard to <u>Jencks</u>

5  material?

6    MS. OHAERI:  I will be providing Respondent with a copy of

7  an affidavit consisting of 3 pages, taken by Board Agent,

8  Charles Chermak, and signed by Mr. Dave Fuchs on August 1, 2015;

9  as well as a half page statement that Mr. Fuchs signed in part.

10  It is undated.

11    JUDGE CARISSIMI:  Very good.

12    How much time would you like, Mr. Buttrick?

13    MR. BUTTRICK:  Just about the same, if we can have 10 -- 15

14  minutes, thereabouts?

15    JUDGE CARISSIMI:  All right.

16    We'll be in recess for approximately 15 minutes.

17    Off the record.

18  (Off the record.)

19    JUDGE CARISSIMI:  On the record.

20    Yes.

21    MS. OHAERI:  The half page statement is the same statement

22  that was previously provided as part of the <u>Jencks</u> statements of

23  Mr. Jeff Rausch to Respondent, same statement as last time.

24    JUDGE CARISSIMI:  It's the same statement?

25    MS. OHAERI:  Same exact statement signed by both Mr. Rausch

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 93 of 1141

1  and Mr. Fuchs.

2      JUDGE CARISSIMI:  Okay, very good.

3      So now we'll go off the record.

4  (Off the record.)

5      JUDGE CARISSIMI:  On the record.

6      Mr. Buttrick, you may proceed.

7                          CROSS-EXAMINATION

8  Q    BY MR. BUTTRICK:  Mr. Fuchs, good morning. I'm Stuart

9  Buttrick, I'm counsel for Ingredion.

10     First of all, I want to thank you for your time here this

11 morning and sorry that you have to be dragged in here, so thank

12 you for that.

13     Before I get going, in our break, did you talk to any other

14 witnesses or potential witnesses about your testimony?

15 A    No.

16 Q    Okay, thank you.

17     Mr. Fuchs -- by the way, I have to say that we talked at

18 our table over here that we think you're the funniest witness so

19 far, so appreciate the sense of humor.

20     After Mr. -- you spoke with Mr. Meadows in April of 2015,

21 your schedule didn't change, correct?

22 A    No.

23 Q    And prior to Mr. Meadows' visit, you would speak with your

24 supervisors about your work, correct?

25 A    Yes.

1  Q    And about things you liked about work?

2  A    Of course.

3  Q    And things you didn't like about work, correct?

4  A    Yes.

5  Q    And you weren't required to train any replacement

6  employees, correct?

7  A    No.

8  Q    I mean, you weren't required to train your replacement

9  employees?

10  A    No, I wasn't required to train anybody.

11  Q    Okay.

12        And the mobile trailers about which you testified -- those

13  were delivered on July 27th, correct?

14  A    I believe so, yes.

15  Q    And no supervisors told you about what those trailers'

16  purpose was, correct?

17        JUDGE CARISSIMI:  I'm sorry, I couldn't hear your question,

18  sir.

19        What was that?

20        MR. BUTTRICK:  Yes, no problem.

21  Q    BY MR. BUTTRICK:  No supervisors told you about what the

22  purpose of those trailers were for, correct?

23  A    No.

24  Q    And no supervisors ever told you that you were going to be

25  replaced if there was a strike, correct?

1    A    No.

2    Q    And when you answered "no" to those two questions, you are

3    affirming my question, correct?

4    A    Right.

5        MR. BUTTRICK:  I don't have anything further.

6        JUDGE CARISSIMI:  Very good.

7        Any redirect within that limited range?

8        MS. OHAERI:  Yes.

9                        REDIRECT EXAMINATION

10   Q    BY MS. OHAERI:  Did any of your supervisors ever talk with

11   you about contract negotiations before Mr. Meadows spoke with

12   you?

13   A    No.

14       MS. OHAERI:  That's all.

15       JUDGE CARISSIMI:  Very good.

16       Mr. Fuchs, you are excused as a witness, sir.

17       You may step down.

18       THE WITNESS:  Thank you.

19       JUDGE CARISSIMI:  Okay.

20   (Witness excused from the stand.)

21       JUDGE CARISSIMI:  Let's go off the record.

22   (Whereupon, a brief discussion was held between the parties.)

23       JUDGE CARISSIMI:  So let's go on the record.

24       We've discussed the scheduling of the case.

25       The next witness is going to be lengthy, so we're going to

1   have our luncheon recess now, and we will be in recess for 1

2   hour.  The hearing will resume at 1:20.

3        And with that, we are off the record.

4   (Whereupon, at 12:20 p.m., the trial recessed for lunch, to

5   resume at 1:20 p.m., in the same place.)

6        JUDGE CARISSIMI:  Let's go on the record.

7        General Counsel, you may call your next witness.

8        MR. WIESE:  Your Honor, before we call the next witness --

9        JUDGE CARISSIMI:  Yes.

10       MR. WIESE:  -- the parties have discussed some Joint

11  Exhibits.

12       JUDGE CARISSIMI:  Very good.

13       MR. WIESE:  We're going to put in front of the Judge and

14  the witnesses and counsel for both parties.

15       Both parties have had a chance to review those exhibits and

16  General Counsel would move for their admission with the note

17  that the hand -- so many of the documents are contract proposals

18  and there's handwriting on those proposals.  It's my

19  understanding that that handwriting will be, you know, explained

20  by a later witness, but at least at this point, the documents

21  are being entered, excluding the handwriting.

22       JUDGE CARISSIMI:  All right.

23       And Respondent agrees?

24       MR. BUTTRICK:  We agree.

25       JUDGE CARISSIMI:  All right.

1      What I'll need, as I keep track of all of the exhibits as

2  the case goes along -- so you're going to need to -- if you have

3  a list, that's fine; if not, you can read them off and I'll

4  write down the numbers.  If it's a possible to give me a brief

5  explanation of what they are as you read through them, that

6  would be helpful to me.

7      MR. WIESE:  Would you like to do that right now, Your Honor

8  or do you want --

9      JUDGE CARISSIMI:  Well, why don't we do this, I mean,

10 you've all agreed on these exhibits.   Are you going to be using

11 these exhibits for your next witness?

12     MR. WIESE:  Yes, Your Honor.

13     JUDGE CARISSIMI:  Then we'll need to do it now.

14     MR. WIESE:  Okay, all right, that's fine.

15     I think we can --

16     MR. FUNK:  We have a list.

17     MR. WIESE:  We have a list.

18     MR. FUNK:  We don't have a paper copy of it, but --

19     MR. WIESE:  We'll see if we can get it printed quick, Your

20 Honor.

21     JUDGE CARISSIMI:  Is there a -- let's go off the record.

22 (Off the record.)

23     JUDGE CARISSIMI:  Back on the record.

24     I now have been given a list of the Joint Exhibits referred

25 to by the Counsel for the General Counsel that appears to be a

1   complete list of numbers and descriptions and it is what I need

2   to monitor the exhibits as we go through the hearing.

3      So Counsel for General Counsel, are you now moving to admit

4   the exhibits?  I guess we start with 1, and are they consecutive

5   up through 28?

6      MR. WIESE:  Yes, Your Honor.

7      JUDGE CARISSIMI:  All right.

8      Are you now moving for the admission of Joint Exhibit 1

9   through 28?

10      MR. WIESE:  Yes, Your Honor, with one slight change.  So

11   the document with -- Joint Exhibit 22, the last Bates-numbered

12   document and that's at PF906, should be part of -- I believe

13   it's Joint Exhibit 27, the company's -- or, excuse me, Joint

14   Exhibit 28, the documents provided in response to 7/31

15   information request.

16      JUDGE CARISSIMI:  So I'm not sure if I -- you're going to

17   have to explain that to me again.

18      So we're talking about 22, it says "PF 902 to 906"?

19      MR. WIESE:  Right, so there's 5 pages of documents.

20      JUDGE CARISSIMI:  Okay.

21      MR. WIESE:  The fifth document -- or the fifth page is

22   Bates number 906.

23      JUDGE CARISSIMI:  Okay.

24      MR. WIESE:  And that document should have been part of --

25   or should be part -- is really a part of Joint Exhibit 28, the

1   information provided on July 31st.  It's self-evident from that

2   page of the document that it was provided on 7/31 and not 7/23.

3        JUDGE CARISSIMI:  All right, let's go off the record.  I

4   need to look at this so I make sure I understand.

5        Off the record.

6   (Whereupon, a brief discussion was held between the parties off

7   the record.)

8        JUDGE CARISSIMI:  Let's go back on the record.

9        I've taken a look at the actual document, Respondent's 22.

10  I now understand the references Counsel for the General Counsel

11  made, and we are now ready to move forward with this exhibit.

12  And I take it the Respondent has no objection to the admission

13  of Joint Exhibits 1 through 28, correct?

14       MR. BUTTRICK:  No objection, Your Honor.

15       JUDGE CARISSIMI:  Joint Exhibits 1 through 28 are admitted.

16  (EXHIBITS RECEIVED:  JOINT 1 through 28.)

17       JUDGE CARISSIMI:  And you may proceed, Mr. Wiese.

18       Is General Counsel going to call another witness now?

19       MR. WIESE:  Yes, Your Honor.

20       At this time, the Counsel for the General Counsel calls Ken

21  Meadows to the stand.

22       JUDGE CARISSIMI:  Mr. Meadows, if you would please come up

23  to the witness stand, sir.

24       And if you would please raise your right hand.

25  (WITNESS SWORN:  KEN MEADOWS)

1    JUDGE CARISSIMI:  Please have a seat.

2                         DIRECT EXAMINATION

3    Q    BY MR. WIESE:  Good afternoon, Mr. Meadows.

4         My name is Tyler Wiese.  I'm an attorney with the National

5    Labor Relations Board.

6         Have we spoken before today?

7    A    No.

8    Q    Okay.

9         Mr. Meadows, could you please state and spell your name for

10   the record?

11   A    Ken Meadows, M-E-A-D-O-W-S.

12   Q    What is your current occupation?

13   A    Director of Human Resources.

14   Q    For what company?

15   A    Ingredion.

16   Q    How long have you been -- or are you the only Director of

17   Human Resources?

18   A    No, I'm not.

19   Q    Okay.  How long have you been a Director of Human Resources

20   for Ingredion?

21   A    Fourteen years.

22   Q    We don't need to go blow by blow on every little thing that

23   you do, but what, generally, does that position involve?

24   A    My position -- 80 percent of it is labor, 10 percent, some

25   management directives and another 10 percent in just general

1   duties.

2   Q    Okay.

3        Could you tell me a little bit about Ingredion, what that

4   company does?

5   A    Ingredion is a corn starch manufacturing company, produce

6   different modified type corn starches for all different types of

7   products.

8   Q    Is that a publicly traded company?

9   A    Yes, it is.

10  Q    Do you know the approximate valuation of Ingredion -- best

11  guess?

12  A    5.3 billion, I think.

13  Q    And Ingredion has expanded over the last couple of years.

14  Is that correct?

15  A    That's correct.

16  Q    Okay, and one of those expansions was the purchase of the

17  Penford facility here in Cedar Rapids?

18  A    Correct.

19  Q    And that was in 2015?

20  A    Correct.

21  Q    What date, in particular?  Do you recall?

22  A    It was March of 2015.  I'm not sure I remember the correct

23  -- the actual date.

24  Q    Along with Penford, Ingredion acquired another company in

25  2015, isn't that right?

1   A   Correct.

2   Q   That was called "Kerr Products" -- is that correct?

3   A   Correct.

4   Q   So, Mr. Meadows, in your position as the Director -- or as

5   a Director of HR, where do you fit into the Ingredion hierarchy?

6   A   I'm not sure how to answer that question.

7   Q   Okay, well, who supervises you, I guess?

8   A   The Vice President of HR for North America.

9   Q   And who is that individual?

10  A   Becky Tinkham.

11  Q   And then below you, who are you supervising?

12  A   I have nobody underneath me.

13  Q   Okay.

14      So you mentioned earlier that 80 percent of your job is

15  "labor" you called it.  Is that correct?

16  A   Correct.

17  Q   Okay.  And what does that entail?

18  A   Manage all the labor contracts for the company.  I did

19  manage labor contracts for Australia, Germany, Brazil, Mexico,

20  but I'm kind of in a transition, getting ready for retirement;

21  so those have gone to somebody else, and I'm strictly doing

22  U.S., Canada right now.

23  Q   Okay.

24      Who do you interact with at the Cedar Rapids plant here in

25  Iowa?

1  A    Erwin Froehlich, Plant Manager, Safety Manager, HR Manager,

2  you know, basic management staff of the organization.

3  Q    Who would you say out of all of those different categories

4  that you named there are your primary contacts?

5  A    Probably the Plant Manager and the HR Manager.

6  Q    And who is the Plant Manager?

7  A    Erwin Froehlich.

8  Q    Okay

9      And the HR Manager?

10 A    Currently is Andy Sullivan.

11 Q    And what do you go to Erwin Froehlich about.  What is your

12 contact with him?

13 A    Pretty much, it would be organizational or people issues.

14 Q    And what about Andy Sullivan?

15 A    Organizational issues, people issues.  He's the local

16 representative to handle the contract, manage the contract; so

17 you know, work with him on interpretation issues.

18     MR. WIESE:  Your Honor, at this time, I'd like to request

19 to examine the witness pursuant to 611(c) of the Federal Rules

20 of Evidence.

21     JUDGE CARISSIMI:  Permission is granted.

22 Q    BY MR. WIESE:  Mr. Meadows, when did you first become

23 involved with the facility here in Cedar Rapids, Iowa?

24 A    The first time I ever visited the plant, April 6, 2015.

25 Q    When was the first time you had heard of Penford Products

1   in Cedar Rapids, Iowa?

2   A    Oh, I've known of Penford Products through the Corn Wet

3   Milling Council for years.

4   Q    Okay.  And in relation to Ingredion's purchase of Penford,

5   when did you become involved in that?

6   A    April of 2015.

7   Q    So you didn't have any involvement before that date?

8   A    No.

9   Q    When did you become aware that employees at the Penford

10  Cedar Rapids facility were represented by the Bakery Workers

11  Union?

12  A    I've known that through the Corn Wet Milling Council.

13  Q    And how long have you been involved in that?

14  A    Twelve -- 14 years.

15  Q    Were you involved in any discussions about whether

16  Ingredion would continue to recognize the Bakery Workers Union

17  at the facility in Cedar Rapids?

18  A    I'm not sure I understand the question.

19  Q    Were you -- first of all, I'll repeat the question.

20       Were you involved in any discussions at the time -- at or

21  around the time that Ingredion purchased Penford, so March 2015,

22  about whether Ingredion would continue to recognize the Union as

23  the representative of employees in Cedar Rapids?

24  A    Yes.

25       MR. BUTTRICK:  I'm going to intersperse an objection just

1   to the extent to instruct him not to disclose any attorney-

2   client privileged discussions about these sorts of things.

3        JUDGE CARISSIMI:  Do you understand, Mr. Meadows?

4        THE WITNESS:  Yes.

5        JUDGE CARISSIMI:  Okay, all right.  And if you have any

6   questions or, obviously, there can be an objection; or if you

7   have a problem with a question, we'll go through it one by one.

8        Okay, go ahead.

9   Q    BY MR. WIESE:  Did you answer my question?

10  A    I said "yes."

11  Q    Okay, okay.  And who did you speak with about this?

12  A    The manufacturing organization.

13  Q    Any names?

14  A    It was just a committee about going through the transition

15  period, and, "Do they have a Union at the facility?"  "Yes, they

16  do."  "Do we continue with the same Union?"  "Yes, we do, things

17  continue on."  "Okay" and that was it.

18  Q    And you were aware, again around this time, March of 2015,

19  that the employees, the Bakery employees at the Penford facility

20  were covered by a collective bargaining agreement.  Is that

21  accurate?

22  A    Yes.

23  Q    And you became aware at some point that the existing

24  collective bargaining agreement was going to expire on August

25  1st of 2015?

1  A    Yes.

2  Q    When did you become aware of that fact?

3  A    When we purchased the facility and we started the

4  transition phase.

5  Q    And is it fair to say that you were, at least during this

6  case, the chief negotiator for the collective bargaining

7  agreement for the Employer --

8  A    Correct.

9  Q    -- Penford facility.  When was it decided that you were

10 going to be the chief negotiator?

11 A    When they purchased the facility and it was determined that

12 it was a union facility, that automatically fell over to me.

13 Q    Okay.  Was there any discussion about that decision?

14 A    No.

15 Q    That was just part of your role as the -- as you described

16 earlier?

17 A    Correct.

18 Q    Okay.  And prior to Ingredion's purchase of the facility in

19 March of 2015, had you been involved in any collective

20 bargaining negotiations at the Penford facility in Cedar Rapids,

21 Iowa.

22 A    No.

23 Q    So these were your first negotiations with Bakery, Union

24 Local 100G, this specific Local here?

25 A    Correct.

1  Q    Do you recall meeting with union representatives in person

2  on April 6, 2015?

3  A    Yes, I do.

4  Q    Who do you recall being at that meeting?

5  A    Chris Eby was there, Ms. Shannon was there, Matt Maas was

6  there.  There was another gentleman there, but I don't recall

7  his name.

8  Q    Okay.  And what about from Ingredion and Penford?

9  A    The meeting started out from the people that came on the

10 trip from Ingredion, Mark Madsen, who was the Vice President of

11 Manufacturing, Becky Tinkham, who was the Vice President of HR,

12 and myself from Ingredion.

13 Q    Okay.  And I'm not going to get into the substance of the

14 meeting right now, but this was the first time you had met face

15 to face with the union representatives --

16 A    Correct.

17 Q    -- in Cedar Rapids, is that right?

18 A    Correct.

19 Q    Okay.  So during that -- actually, where is home work

20 location?  Where do you base out of?

21 A    I have an office in Indianapolis, but I also have one in

22 Westchester, Illinois -- Chicago.

23 Q    And so when you met with employees or with the union

24 representatives on April 6th, that involved a trip out to Cedar

25 Rapids, is that right?

1 A  Yes.

2 Q  And during that trip, you also met with employees.  Is that

3 correct?

4 A  Correct.

5 Q  Employees besides the local union leadership?

6 A  Correct.

7 Q  Okay.  And you had these meetings with employees he next

8 day, is that right?

9 A  That day.

10 Q  Was it the same day as you recall?

11 A  Same day.

12 Q  Okay.  And those meetings with employees happened while you

13 were just walking around the plant floor, is that right?

14 A  Correct.

15 Q  What areas of the plant floor do you recall visiting that

16 day?

17 A  They guys took me on a major tour just around the plant.

18 The -- I know they wanted me to see ethanol area, because I had

19 not -- it was not an Ingredion product, and they wanted me to

20 see ethanol.  There's a product there that they make that we

21 make at our other facilities; it's known as "LNP," and they

22 wanted to show me how they did it compared to what our other

23 facilities did.

24   We went through some of the warehouses around, just a

25 general tour.  They took me out to the dock and all and was

1   explaining to me about the flood here in Cedar Rapids, and how

2   that occurred, and what all, so it was just a general plant

3   tour.

4   Q    So you visited -- is it fair to say that you visited a lot

5   of areas in the plant?

6   A    Probably four -- five specific maybe.

7   Q    Out of how many in total would you say?

8   A    I really don't know.

9   Q    Okay.  I think you mentioned --

10       MR. WIESE:  Well, strike that, Your Honor.

11  Q    BY MR. WIESE:  Who took you on the tour?

12  A    Levi Wood and Phil Kluetz.

13  Q    And during your tour, you initiated some conversations with

14  employees.  Is that correct?

15  A    Introduced myself, yes.

16  Q    And many of these discussions or many of these

17  conversations involved discussions about the upcoming collective

18  bargaining negotiations.  Is that right?

19  A    Some of the employees mentioned some things that were on

20  their mind.

21  Q    And you responded to those discussions about the collective

22  bargaining agreement, is that right?

23  A    In general terms, as much as possible.

24  Q    And in your responses, you talked with employees about what

25  Ingredion would be looking to do with the Penford facility, is

1   that right?

2   A    That's not correct.

3   Q    But you did talk about the contract negotiations, isn't

4   that right?

5   A    I don't think we talked about specific contract

6   negotiations.

7   Q    Okay.  So let's dig in then a little bit.

8        So employees -- so is it your testimony that employees did

9   not talk to you about the collective bargaining agreement?

10       JUDGE CARISSIMI:  No, just ask a question.

11  Q    BY MR. WIESE:  Did any employees that you spoke with on

12  April 6th bring up the collective bargaining agreement?

13  A    There was people that mentioned some specific things that

14  they were interested in.

15  Q    And did you respond to those requests?

16  A    Responded to those --

17  Q    You responded to those concerns?

18  A    Yes, and a lot of it was in very general terms.

19  Q    And you initiated some of these conversations with

20  employees, is that right?

21  A    Initiated by -- what are you saying?

22  Q    You were the one who started talking to the employees,

23  first, is that right?

24  A    I would walk up and introduce myself, yes.

25  Q    Okay.  Prior to talking with these employees, did you get

1  permission from any managers at the Cedar Rapids plant?

2  A    Did I ask a manager if -- the plant manager if  he could

3  get some people to take me on a tour?

4  Q    No, permission to specifically talk with employees during

5  that tour?

6  A    I'm not sure I understand your question.

7  Q    Did any -- before going on that tour, did you speak with

8  any managers, any other managers at the Penford facility, and

9  let them know you were going to go out and talk to employees?

10  A    The Plant Manager.

11  Q    You did?

12  A    Yes.

13  Q    Okay.  You didn't let the Union know that you were going to

14  be asking -- that you were going to be speaking to employees,

15  did you?

16  A    I do not recall.

17  Q    So, Mr. Meadows, in your role as chief negotiator, you were

18  involved in scheduling negotiations, is that correct?

19  A    Yes.

20  Q    Okay.  And are you aware that starting in March, the Union

21  communicated that -- in March of 2015, the Union communicated

22  that it wanted to begin collective bargaining negotiations?

23  A    I was not -- didn't have any knowledge that they asked

24  about March.  I didn't come on the picture, as I said, until

25  April.

1  Q    Okay.  Well, starting in April, when you came on the

2  picture, do you recall the Union making requests to begin

3  negotiations early?

4  A    Chris Eby, at the meeting we had, said that they would be

5  willing to start early.

6  Q    Is that the meeting that we spoke about earlier, the April

7  6th with the --

8  A    Correct.

9  Q    -- union representatives?

10  Q    Okay, all right. And, in fact, even though the Union

11  requested negotiations starting on April 6th, those negotiations

12  did not begin until June 1st, is that right?

13  A    Correct.

14  Q    And this was only 2 months before the existing collective

15  bargaining agreement was set to expire.  Is that correct?

16  A    That's correct.

17  (EXHIBIT MARKED:  GENERAL COUNSEL'S 15.)

18  (Witness proffered the document.)

19  Q    BY MR. WIESE:   I'm going to show you what's been marked as

20  General Counsel Exhibit 15.  Do you recognize this document, Mr.

21  Meadows?

22  A    Yes, I do.

23  Q    And if you turn it over, do you recognize the back side of

24  this document as well?

25  A    Yes, I do.

1  Q    Did you draft this letter?

2  A    Yes, I did.

3  Q    And did you -- were you the one who filled out the back of

4  this document?

5  A    No, I was not the one who filled out the back.

6  Q    Do you know who was?

7  A    Pat Drahos.

8  Q    Okay.

9     MR. WIESE:  I'll offer General Counsel Exhibit 15.

10    JUDGE CARISSIMI:  Is there any objection to GC 15?

11    MR. BUTTRICK:  Just one point of clarification.

12    I don't think in its original form that this document is

13  actually on both sides.  Is that correct, Tyler?  It's actually

14  two different pages?

15    MR. WIESE:  That is correct.

16    MR. BUTTRICK:  Okay.

17    With that understanding, no objection.

18    JUDGE CARISSIMI:  All right.

19    General Counsel 15 is admitted.

20  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 15.)

21  Q   BY MR. WIESE:  So, Mr. Meadows, you sent this letter to the

22  Union on May 11, 2015, is that right?

23  A    That's correct.

24  Q    And you also sent the letter to the Federal Mediation and

25  Conciliation Service on that date, is that right?

1   A    The local person here sent it.  I believe that's a correct

2   statement.

3   Q    And I'd like to direct your attention to the second

4   paragraph in the body of that letter; and that paragraph states

5   that if --

6        JUDGE CARISSIMI:  I can read the letter, counsel.

7        MR. WIESE:  Right, right.  I'll paraphrase, Your Honor.

8   Q    BY MR. WIESE:  What that states there is if the parties

9   don't reach a collective bargaining agreement, that the existing

10  contract and practices or customs aren't going to be in effect

11  anymore.  Or, excuse me, if the parties don't reach a collective

12  bargaining agreement by August 1st, that the terms and

13  conditions in the existing contract are no longer going to be in

14  effect, is that right?

15  A    That's correct.

16       JUDGE CARISSIMI:  Are you asking him what this letter says?

17       MR. WIESE:  It's a foundational question.

18       JUDGE CARISSIMI:  That's what it sounds like to me.  I

19  mean, I've read the letter.

20       MR. WIESE:  Okay.

21       JUDGE CARISSIMI:  So why don't you just ask your question.

22  Q    BY MR. WIESE:  You are aware, Mr. Meadows, that this

23  statement that you put in this letter is not, in fact, true,

24  aren't you?  This paragraph?

25  A    I'm not understanding your question.

1  Q    What is your understanding of what happens after the

2  expiration of a collective bargaining agreement to the terms and

3  conditions of employment in that agreement?

4  A    That depends on what is going on it -- happens at the point

5  in time at the end of that contract.

6  Q    But if the contract expires, what happens with those terms

7  and conditions of employment?

8  A    I think that can be answered in several ways.  It depends

9  on what is happening at that point in time.

10 Q    Mr. Meadows, was this the -- was this your first attempt to

11 schedule bargaining dates with the Union?

12 A    Yes.

13 Q    If you turn this document over.

14      So let's turn to the negotiations on June 1st.

15 (EXHIBIT MARKED:  GENERAL COUNSEL'S 2(a).)

16 Q    BY MR. WIESE:  I'm going to be showing you a document

17 that's been marked as General Counsel Exhibit 2(a).

18      MR. WIESE:  Your Honor, can we go off the record for a

19 second?

20      JUDGE CARISSIMI:  Off the record.

21 (Off the record.)

22      JUDGE CARISSIMI:  Back on the record.

23      You may proceed, Mr. Wiese.

24      MR. WIESE:  I'm showing the witness what has been marked as

25 General Counsel Exhibit 2(a).

1    (Witness proffered the document.)

2    Q    BY MR. WIESE:  Do you recognize this document, Mr. Meadows?

3    A    Yes, I do.

4    Q    Okay.  And this was the cover sheet to the Employer's

5    initial offer to the Union on June 1, 2015?

6    A    It's a document that I've read, opening statements at

7    negotiations when we passed out the contracts.

8    Q    Did you draft this document?

9    A    Yes.

10   Q    Was this document provided to the Union on June 1st?

11   A    I know I've read the document to them.  I don't know if

12   they actually got a physical copy.

13       MR. WIESE:  I'll offer General Counsel Exhibit 2(a) into

14   the record and it's a double sided document.  The back page is

15   already in the record.

16       JUDGE CARISSIMI:  The back page is the first page of a

17   proposed agreement?

18       MR. WIESE:  Yes.

19       JUDGE CARISSIMI:  And I take it at some point -- and maybe

20   it's already in the Joint Exhibits, the proposed agreement?

21       MR. WIESE:  That's correct, Your Honor, that's Joint

22   Exhibit 1.

23       JUDGE CARISSIMI:  That's Joint Exhibit 1.

24       MR. WIESE:  Yes.

25       JUDGE CARISSIMI:  All right.

1       Is there any objection to General Counsel Exhibit 2(a)?

2       MR. BUTTRICK:  I don't have any objection, Your Honor, to

3  the talking points about what Mr. Meadows testified to, I just

4  don't think that -- the original document had the back page is

5  on it, and so the record is clear, I think this is the front I

6  have no objection to.  I just object to the extent that there is

7  a position that the back and the front were actually in the

8  original form on the same document.

9       JUDGE CARISSIMI:  I take it that the second page of this

10  document is going to be on the Joint Exhibit, Joint Exhibit 1,

11  is it?

12       MR. WIESE:  That's correct, Your Honor.  The back side of

13  this document is the first page of Joint Exhibit 1.

14       JUDGE CARISSIMI:  It's duplicative.

15       I'm going to admit the General Counsel Exhibit 2(a).

16  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 2(a).)

17       JUDGE CARISSIMI:  You may proceed.

18       I mean, the second page is duplicative, not the first page,

19  obviously.

20  Q   BY MR. WIESE:  And on June 1st, when you opened

21  negotiations, you were seeking a number of changes in the

22  existing contract.  Ingredion was looking to change the contract

23  that existed between Penford and the Union, is that correct?

24  A   That's correct.

25  Q   Okay.  Many of these changes involved major terms and

1    conditions of employment, is that right?

2    A    Yes.

3    Q    Okay.

4         You were seeking to change scheduling, how employees were

5    scheduled?

6    A    We were looking at schedules being an option for the

7    company to manage.

8    Q    And you were seeking changes to seniority?

9    A    We were putting into our proposal what we considered to be

10   true plant-wide seniority for all employees.

11   Q    Well, regardless of what you considered it, you were

12   seeking changes from what was in the existing Red Book, the

13   Union's existing contract regarding seniority language?

14   A    That's correct.

15   Q    Okay.

16        And you were also looking, at least initially, to change

17   the recognition clause in the agreement?

18   A    That's incorrect.

19   Q    So it's your testimony -- so if I were to look at the

20   recognition clause in your June 1st offer and the recognition

21   clause in the existing Red Book, I would find the same language?

22   A    No, you wouldn't, but you would also find a comment in my

23   original that I put down the word "define" in there.  And when I

24   came to the table, I was trying to make sure that with the Union

25   -- and I said this several times over -- "I just want to make

1  sure that we've got this totally correct, please help me to get

2  it correct." So that was always subject to what is correct

3  according to the certification and the NLR Act, what is the

4  correct here. That's why I put that in "defined."

5  Q    But in between June 1st and your final offer, there were

6  several iterations of that recognition language, weren't there?

7  A    I don't think so.

8  Q    Oh, okay.

9       You were also seeking changes to the grievance procedure,

10 is that right?

11 A    I believe so, yes.

12 Q    And changes to health insurance?

13 A    Correct.

14 Q    Changes to wages?

15 A    Correct.

16 Q    Changes to the pension plan?

17 A    Correct.

18 Q    In fact, you were seeking to eliminate that pension plan,

19 weren't you?

20 A    We were looking at making changes in the pension plan.

21 They had two different pension plans, and our attempt was to try

22 it make it one pension plan.

23 Q    When I'm talking about a pension plan -- well, strike that.

24      You were also seeking changes to the retiree gap insurance

25 on June 1st, is that right?

1    A     We were trying to increase that, yes.

2    Q     Since your --

3    (EXHIBIT MARKED: GENERAL COUNSEL'S 21.)

4    (Witness proffered the document.)

5    Q     BY MR. WIESE: I'm showing you what's been marked as

6    General Counsel Exhibit 21.

7        Do you recognize this document, Mr. Meadows?

8    A     Yes, I do.

9    Q     This is a list of concessions that was created by the

10   Union, is that right?

11   A     It's a list of concessions that they perceived were

12   concessions. We didn't agree that they were all concessions.

13   Q     And this was something that the Union gave to the Employer

14   during collective bargaining negotiations, is that correct?

15   A     Correct.

16        MR. WIESE: I'll offer General Counsel Exhibit 21.

17        JUDGE CARISSIMI: Any objection to Respondent's 21? I'm

18   sorry, General Counsel 21, by the Respondent?

19        MR. BUTTRICK: No objection.

20        JUDGE CARISSIMI: General Counsel 21 is admitted.

21   (EXHIBIT RECEIVED: GENERAL COUNSEL'S 21.)

22   (EXHIBIT MARKED: GENERAL COUNSEL'S 23.)

23   (Witness proffered the document.)

24   Q     BY MR. WIESE: I'm showing you what's been marked as

25   General Counsel Exhibit 23.

1    THE WITNESS:  I'm just stacking these to the side, Your

2  Honor.

3    JUDGE CARISSIMI:  That's fine.

4  Q    BY MR. WIESE:    Do you recognize this document?

5  A    Yes, I do.

6  Q    Okay.  And this is something that the Employer created, is

7  that right?

8  A    That's correct.

9  Q    Did you draft this document?

10  A    One or two of my people that was working with me -- they

11  all put this together.

12  Q    Who helped you put it together?

13  A    I think Levi Wood and Kim Villegas helped put this

14  together.

15  Q    What is this document?  What --

16  A    During negotiations, the Union was saying, "You're taking

17  all this stuff out of the -- our contract," that was in their

18  contract, and were telling them that, "No, we weren't, that a

19  lot of the stuff that you're talking about is in our contract."

20  And this was a comparison sheet that was showing them that where

21  your article and this contract is here, that language or that

22  item or whatever it might be is over here in ours.  So we were

23  doing a comparison to show that that stuff was still there.

24    MR. WIESE:  I'll offer General Counsel 23 into evidence.

25    JUDGE CARISSIMI:  Any objection to General Counsel 23?

1      MR. BUTTRICK:  No objection, Your Honor.

2      JUDGE CARISSIMI:  General Counsel 23 is admitted.

3  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 23.)

4  Q    BY MR. WIESE:  Let's take a look at Joint Exhibit 1.

5  That's the June 1st --

6      JUDGE CARISSIMI:  You know, let's go off the record.

7  (Off the record.)

8      JUDGE CARISSIMI:  Let's go on the record.

9      You may proceed, counsel.

10      MR. WIESE:  I'm showing the witness what's been marked as

11  Joint Exhibit 1, and I'd like to turn to page 4 of that

12  document, Bates number PF1966.

13  (Witness proffered the document.)

14  Q    BY MR. WIESE:  Did you draft this contract proposal, the

15  entire document from scratch, Mr. Meadows?

16  A    Yes.

17  Q    Okay.  Did you use language from other contracts in

18  drafting this proposal?

19  A    Yes, I did.

20  Q    And those wee other contracts that Ingredion had --

21  A    That's correct.

22  Q    -- with other unions?  Okay and most of those other unions

23  are Steelworkers Unions, is that right?

24  A    Now it is, yes.  We formerly had a BCMTG facility.

25  Q    What was that?

1   A    We did have a facility that -- we used to be BCMTG.

2   Q    And looking at Article -- or, excuse me, Article I, Section

3   5 on page 4, the dues check-off language there, that language

4   indicates that union dues should go to the International, isn't

5   that right?

6   A    That's correct, but that was a discussion that we had at

7   the table, and Jethro Head -- I believe it was Jethro and not

8   Chris -- commented that who we were indicating that it went to

9   was wrong, and we had told him that, you know, just tell us

10   exactly who it should go to and we'll make that change.

11   Q    And when do you recall that conversation occurring in

12   negotiations?

13   A    Right towards the end.

14   Q    All right, you can set that document aside, Mr. Meadows.

15       I'd like to talk to you about who you had at the

16   negotiating table with you during contract negotiations.

17       Who -- or as the lead negotiator, did you have the

18   authority to select who was going to be on the Employer's

19   negotiation committee?

20   A    Correct.

21   Q    From the Cedar Rapids plant, you had Erwin Froehlich with

22   you at the table, is that right?

23   A    That's correct.

24   Q    And his position is the Plant Manager?

25   A    At that time, yes.

1 Q    And had Erwin participated in prior collective bargaining

2 negotiations with the Bakery Union before that date?

3 A    I do not know the answer to that.

4 Q    You didn't check with him before you asked him to be on the

5 negotiating committee?

6 A    I don't know the answer to that.

7 Q    You don't know whether you checked with him about whether

8 he had been involved in prior contract --

9 A    I did not ask him that question.

10 Q    And you also had Levi Wood at the table, is that right?

11 A    That's correct.

12 Q    And what is Levi Wood's position?

13 A    At the time, I believe his title was Operations Manager.

14 Q    Did you check with Mr. Wood whether he had been involved in

15 contract negotiations prior to adding him to the negotiating

16 committee?

17 A    We had a discussion, yes.

18 Q    And had he been involved in those negotiations?

19 A    This was his first one.

20 Q    Are you aware who has participated in contract negotiations

21 in the past at the Penford facility in Cedar Rapids?

22 A    I don't really know.

23 Q    So you didn't check before these negotiations?

24 A    No.

25 Q    Do you recall having a conversation with Pat Drahos about

1  whether she would be on the negotiating committee?

2  A    Yes.

3  Q    And that conversation occurred about a week before June

4  1st, is that accurate?

5  A    I don't remember the date.

6  Q    Would it be fair to say that that conversation occurred

7  shortly before June 1st?

8  A    I'm thinking it happened sometime in May.  I'm not sure

9  exactly when.

10 Q    And about a week after contract negotiations began on June

11 1st, do you recall Pat Drahos being moved into a new job?

12 A    I believe she got moved into it before contract

13 negotiations started.  I'm not sure of the date.

14 Q    And that job that she got -- her job prior to being moved

15 was the Human Resources Manager at the Cedar Rapids facility?

16 A    That's correct.

17 Q    And the job that she got moved into was a recruiter job, is

18 that right?

19 A    That's correct.

20 Q    Was there a recruiter at the Cedar Rapids facility before

21 Pat Drahos was moved into that position?

22 A    I don't know what their structure was.  I'd have to look at

23 documents.

24 Q    So at the time that you moved her into this recruiter

25 position, you didn't know whether there was anybody in that

1  position?

2  A    At Cedar Rapids, my knowledge was that there wasn't at

3  Cedar Rapids.

4  Q    And, if you know, once Pat Drahos was moved into that

5  position, she worked almost exclusively from home, is that

6  correct?

7  A    That's correct.

8  Q    And I want to ask about somebody who was at the negotiating

9  table with you -- there's a list of people.  Do you recall a

10  Mike Robilotto appearing at negotiations with the Employer?

11  A    Yes.

12  Q    What is his position?

13  A    He was an outside consultant that we had brought in -- to

14  help put together some organization design and he dropped by the

15  facility at one point while we were negotiating.  Chris had

16  called and asked if I could come down.  I didn't have any --

17  they were all busy doing something and wanted a quick

18  conversation -- I think it was about insurance.  And Mike just

19  happened to be there and asked him if he would walk down to take

20  notes for me, because I didn't have anybody else, and that was

21  it.

22      JUDGE CARISSIMI:  You mentioned the name "Chris."  Who is

23  "Chris"?

24      THE WITNESS:  Chris Eby.

25      JUDGE CARISSIMI:  All right.

1    THE WITNESS:  I'm sorry.

2    JUDGE CARISSIMI:  And then what's Mike's last name?

3    THE WITNESS:  Robilotto.

4    JUDGE CARISSIMI:  Okay, close enough.

5    Thank you.

6  Q    BY MR. WIESE:  What is Mr. Robilotto -- is that how you say

7  his last name?

8  A    It's Robilotto.

9  Q    What is he a consultant for?

10  A    He was for organizational design of the facility.

11  Q    What company does he work for, do you know?

12  A    He's a retired, self-employed consultant.

13  (EXHIBIT MARKED:  GENERAL COUNSEL'S 19.)

14  (Witness proffered the document.)

15  Q    BY MR. WIESE:  I'm going to show you what's been marked as

16  General Counsel Exhibit 19.

17  (Pause.)

18  Q    Do you recognize this document?

19  A    Yes, I do.

20  Q    Okay.  And what is it?

21  A    It was a document that after their initial proposals on

22  June 1st, the Union came back and Jethro presented to this that

23  he was resubmitting this as his Union non-economic proposals.

24  Q    Okay.  I don't think -- who is "Jethro"?

25  A    Jethro Head, International Rep. for the Local.

1  Q    The handwriting on this document -- whose handwriting is

2  that?  Do you know?

3  A    That's mine.

4       MR. WIESE: I'll offer General Counsel Exhibit 19 into

5  evidence.

6       JUDGE CARISSIMI:  Any objection to GC 19?

7       MR. BUTTRICK:  No objection.

8       JUDGE CARISSIMI:  GC 19 is admitted.

9  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 19.)

10 Q    BY MR. WIESE:  Now, Mr. Meadows, during the course of these

11 contract negotiations that we're talking about, the company sent

12 several letters to employees about negotiations, is that

13 correct?

14 A    Several -- what are you talking about?

15 Q    Approximately four letters.

16 Q    I don't remember four, but I --

17 Q    Do you remember any letters being sent to employees?

18 A    Yes.

19 Q    Okay.

20 (EXHIBIT MARKED: GENERAL COUNSEL'S 20.)

21 (Witness proffered the document.)

22 Q    BY MR. WIESE:  Showing you what's been marked as General

23 Counsel 20, do you recognize this document?

24 A    Yes, I do.

25 Q    And this is a letter that the company sent to employees on

1    July 17, 2015, is that right?

2    A    That's correct.

3    Q    And the purpose of the letter was to update employees where

4    things were at in negotiations, is that right?

5    A    That's correct.

6    Q    Did you draft this letter?

7    A    No, I did not.

8    Q    Do you know who draft this letter?

9    A    Not really, I don't.

10   Q    Did you review his letter before it was sent out?

11   A    I did review it.

12   Q    Who gave it to you to review it?

13   A    I believe Erwin Froehlich did.

14   Q    Do you know is Delmar Jellison an employee of Ingredion?

15   A    I'm sorry --

16   Q    I'm looking at the name -- the names at the top of the

17   document, "Delmar and Jenny Jellison." Are both of those

18   individuals employed by Ingredion here in Cedar Rapids? Do you

19   know the answer?

20   A    I'm making an assumption that they are. I don't know for

21   100 percent.

22   Q    Do you know whether these letters were addressed to both

23   employees and their spouses?

24   A    This letter appears that it was.

25       MR. WIESE: I'll offer General Counsel Exhibit 20.

1      JUDGE CARISSIMI:  Any objection to GC 20?

2      MR. BUTTRICK:  No objection.

3      JUDGE CARISSIMI:  GC 20 is admitted.

4  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 20.)

5  (EXHIBIT MARKED:  GENERAL COUNSEL'S 26.)

6  (Witness proffered the document.)

7  Q    BY MR. WIESE:  Showing you what's been marked as General

8  Counsel Exhibit 26, do you recognize this document, Mr. Meadows?

9  A    Yes, I do.

10 Q    This is another letter to employees updating them on

11 negotiations, is that correct?

12 A    Correct.

13 Q    Did you draft this letter?

14 A    No, I did not.

15 Q    Did you review it before it went out?

16 A    Yes, I did.

17     MR. WIESE:  I'll offer General Counsel Exhibit 26.

18     JUDGE CARISSIMI:  Any objection to GC 26?

19     MR. BUTTRICK:  Just one moment, Your Honor.

20     JUDGE CARISSIMI:  Certainly.

21     MR. BUTTRICK:  If we can go off the record for just a

22 moment.

23     JUDGE CARISSIMI:  Let's go off the record.

24 (Off the record.)

25     JUDGE CARISSIMI:  On the record.

1     MR. BUTTRICK:  We have no objection.

2     JUDGE CARISSIMI:  General Counsel 26 is admitted.

3   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 26.)

4     MR. WIESE:  Thank you, Your Honor.

5   Q   BY MR. WIESE:  Do you recall who gave you this document for

6   review?

7   A   Based on who it is from, I would have to say Erwin

8   Froehlich.

9   (EXHIBIT MARKED:  GENERAL COUNSEL'S 32.)

10  (Witness proffered the document.)

11  Q   BY MR. WIESE:  Showing you what has been marked as General

12  Counsel Exhibit 32, do you recognize this document, Mr. Meadows?

13  A   Yes, I do.

14  Q   And this is another update to employees regarding

15  negotiations, is that correct?

16  A   Correct.

17  Q   Did you draft this letter?

18  A   No, I did not.

19  Q   Did you review it before it went out?

20  A   Yes, I did.

21  Q   And who did you get the letter from when you reviewed it?

22  A   Again, it would have probably come from Erwin Froehlich.

23  Q   Turning to the back page of the document, this medical

24  coverage, do you know was that something that was attached to

25  this letter when it was sent out?

1  A    I do not know that.  I know that it's a document that we

2  passed out at negotiations.

3       MR. WIESE:  I'll offer General Counsel Exhibit 32.

4       JUDGE CARISSIMI:  Is there any objection to GC 32?

5       MR. BUTTRICK:  If we can just go off the record for one

6  more moment, Your Honor.

7       JUDGE CARISSIMI:  Off the record.

8  (Off the record.)

9       JUDGE CARISSIMI:  On the record.

10      MR. BUTTRICK:  And I'm seeking your forgiveness, here, Your

11  Honor, because I was looking at the document when Mr. Meadows

12  was testifying.

13     Was Mr. Meadows asked a question about the medical coverage

14  document that's on the back of this?

15      JUDGE CARISSIMI:  Yes, he was.

16      MR. BUTTRICK:  And what was Mr. Meadows' answer.

17      JUDGE CARISSIMI:  Well, let's -- I don't want to repeat the

18  witness' testimony since I don't want attorneys to do it.

19     Mr. Meadows, can you tell us, again, whether this last page

20  saying "medical coverage" was attached to the letter, to your

21  knowledge?

22      THE WITNESS:  I do not know that whether this is the exact

23  document that was attached to the letter.

24      JUDGE CARISSIMI:  Do you know if there was a document

25  attached to the letter?

1      THE WITNESS:  There -- there is reference that there was a

2   document attached, so I assume that there was.

3      JUDGE CARISSIMI:  All right.

4      Looking at this page 4 of 4, though, you are not certain

5   whether that, in fact, was what was attached to the letter?

6      THE WITNESS:  That's correct.

7      JUDGE CARISSIMI:  Now, what, if anything, was done with

8   regard to page 4 of 4 at the meetings with the Union?

9      THE WITNESS:  If I remember, I'm thinking this is the

10   document that we passed out at negotiations.

11      JUDGE CARISSIMI:  All right.

12      Do you remember when it was passed out to the Union.  This

13   letter is dated August 19th of 2015.  Was it passed out to the

14   Union before or after that date?

15      THE WITNESS:  Before.

16      JUDGE CARISSIMI:  All right.

17      MR. BUTTRICK:  And so, I guess, if the request is to admit

18   all of GC 32 as one document, I don't think the foundation has

19   been laid that the last page was actually included with the

20   letter.

21      JUDGE CARISSIMI:  I would agree with that.

22      The first three pages have been sufficiently authenticated,

23   but not 4.  So I can admit it as is, because it's a double-sided

24   copy, but as of right now, I'm not going to conclude, unless

25   there's other evidence, that page 4 was, in fact, attached to

1  this letter, because the witness who has been examined about it

2  can't tell us that it was.

3      So do you want to have the document admitted with that

4  reservation?

5      MR. WIESE:  Yes, Your Honor, we'll admit it at this time

6  and attempt --

7      JUDGE CARISSIMI:  All right.

8      MR. WIESE:  -- to authenticate it through other witnesses.

9      JUDGE CARISSIMI:  GC Exhibit 32 is admitted, but I'm not

10  going to give any consideration at this point to the fact that

11  the page 4 may have been attached.  I'm not prepared to conclude

12  that it was at this point.

13      So with that proviso, GC 32 is admitted.

14  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 32.)

15  (EXHIBIT  MARKED:  GENERAL COUNSEL'S 35.)

16  (Witness proffered the document.)

17  Q    BY MR. WIESE:  I'm going to show you what's been marked as

18  General Counsel's 35.

19  (Pause.)

20      JUDGE CARISSIMI:  Let's go off the record.

21  (Off the record.)

22      JUDGE CARISSIMI:  Back on the record.

23  Q    BY MR. WIESE:  Mr. Meadows, I'm showing you what's been

24  marked as General Counsel Exhibit 35.  Do you recognize his

25  document?

1    A    Yes, I do.

2    Q    Okay.  And this is a letter of implementation, is that

3    correct?

4    A    That's correct.

5    Q    And this was given to the Union at negotiations on

6    September 10, 2015?

7         Is that a "yes"?

8    A    Yes.

9    Q    Did you hand to this letter to the Union at negotiations

10   that day?

11   A    Yes.

12   Q    Did you draft this letter?

13   A    Yes.

14   Q    Looking at the middle paragraph of the front page, did the

15   parties actually negotiate on July 13, 2015?

16   A    I have to go back and check my notes on that date.

17   Q    All right.

18        MR. WIESE:  I'll offer General Counsel Exhibit 35.

19        JUDGE CARISSIMI:  Any objection to GC 35?

20        MR. BUTTRICK:  No objection.

21        JUDGE CARISSIMI:  GC 35 is admitted.

22   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 35.)

23   (EXHIBIT MARKED:  GENERAL COUNSEL'S 36.)

24   (witness proffered the document.)

25        MR. WIESE:  I'm showing the witness what's been marked as

1    General Counsel Exhibit 36.

2    (Pause.)

3    Q    BY MR. WIESE:  Mr. Meadows, do you recognize this document?

4    A    Yes, I do.

5    Q    This is another letter of implementation.  Is that correct?

6    A    Correct.

7    Q    And this one was sent to employees.  Is that right?

8    A    Yes.

9    Q    Did you draft this letter?

10   A    I believe so.

11        MR. WIESE:  I'll offer General Counsel Exhibit 36 into

12   evidence.

13        JUDGE CARISSIMI:  Is there any objection to GC 36?

14        MR. BUTTRICK:  No objection, Your Honor.

15        JUDGE CARISSIMI:  GC 36  is admitted.

16   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 36.)

17   (EXHIBIT MARKED:  GENERAL COUNSEL' 38.)

18   (Witness proffered the document.)

19   Q    BY MR. WIESE:  Showing you what's been marked as General

20   Counsel Exhibit 38, Mr. Meadows, do you recognize this document?

21   A    No, I do not.

22   Q    You've never seen this document before?

23   A    I do not recall this document.

24   Q    You can set that aside for now then.

25   (EXHIBIT MARKED:  GENERAL COUNSEL'S 37.)

1    (Witness proffered the document.)

2    Q    BY MR. WIESE:  Showing you what's been marked as General

3    Counsel's 37, do you recognize this document, Mr. Meadows?

4    (Pause.)

5    A    I don't recall this document.

6    Q    Were you still involved in collective bargaining

7    negotiations as of October 12, 2015, here in Cedar Rapids?

8    A    Yes, I was.

9    Q    And you attended a negotiating session after that date, on

10   November 4, 2015.  Do you recall that?

11   A    Yes.

12   Q    And this document -- this references the collective

13   bargaining agreement that the Employer implemented back in

14   September.  Is that right?

15   A    The way I'm reading it, that's -- I'll take it that way.

16   Q    So you would agree with me that this document has something

17   to do with the collective bargaining negotiations.  Is that

18   right?

19   A    Probably from a local level, yes.

20   Q    You can set that document aside, Mr. Meadows.

21   (EXHIBIT MARKED:  GENERAL COUNSEL'S 42.)

22   (Witness proffered the document.)

23   Q    BY MR. WIESE:  I'm showing you what's been marked General

24   Counsel Exhibit 42.

25   (Pause.)

1   Q    Mr. Meadows, do you recognize this document at all?

2   A    This is the first time I've seen this document.

3   Q    Have you ever heard of the position of Overtime

4   Administrator before?

5   A    I know they were looking at putting that in at this

6   facility, yes.

7   Q    Do you know whether that position was, in fact, filled?

8   A    My understanding, it was.

9   Q    And it was filled by a bargaining unit employees, is that

10  correct?

11  A    That's correct.

12  Q    Do you recall during collective bargaining negotiations,

13  having discussions with the Union over who would be in charge of

14  managing overtime?

15  A    Yes.

16  Q    And, in fact, one of the changes in your last, best and

17  final offer was to move the management of overtime from

18  employees to management, is that correct?

19  A    The word "managing overtime" is a very broad statement for

20  me to answer.

21  Q    You will agree with me that there was some change in the

22  Employer's last, best and final offer of how overtime was going

23  to be handled, is that correct?

24  A    We put it back to the way the original Red Book was doing

25  it.

1   Q      Okay.

2          MR. WIESE:  Could we go off the record for just a minute,

3   Your Honor.

4          JUDGE CARISSIMI:  Off the record.

5   (Off the record.)

6          JUDGE CARISSIMI:  On the record.

7          You may continue, counsel.

8   Q      BY MR. WIESE:  Mr. Meadows, I'd like to talk a little bit

9   about the contract proposals that the company made.  In many --

10  so every proposal that the company made was a new comprehensive

11  contract, is that right?

12  A      That's correct.

13  Q      And in many of those contracts, the changes were

14  highlighted, is that right?

15  A      That's correct.

16  Q      Would you say that all the changes were  highlighted in

17  every contract?

18  A      There were times that we made a change.  We tried to

19  highlight it in red.

20  Q      Did you always highlight it in red?

21  A      The changes that -- if we presented a new contract

22  proposal, we tried to highlight the changes in red.  The next

23  time we made a -- presented a new contract proposal, and changes

24  were made, we tried to highlight those in red; and the stuff we

25  had done from the time before, we tried to put that in just bold

1  black print, so it was not indicating that it was an additional

2  change.

3  Q    Is it your testimony that you did that for every single

4  contract offer that you gave to the Union?

5  A    It's -- my recollection is that we did.

6  Q    Including the final offer?

7  A    The last -- the final offer?

8  Q    Yes.

9  A    On -- the final offer probably didn't have any red lines in

10  it.

11  Q    And what about the last, best, final offer that you gave

12  after your final offer?

13  A    I don't think it had any red in it.

14  Q    When you presented your last, best and final offer to the

15  Union, you included a cover sheet to that offer, is that right?

16  A    That's correct.

17  Q    And that was -- that's indicated by Joint Exhibit 9, is

18  that right.  If you look at it --

19        MR. WIESE:  Sorry, Your Honor.

20  (Witness proffered the document.)

21        THE WITNESS:  Thank you, sir.

22  Q    BY MR. WIESE:  Looking at Joint Exhibit 9, this is the

23  cover sheet that you provided with that offer, is that right?

24  A    It was a sheet that went along with the last, best and

25  final.  I'm not going to say it was a cover sheet.

1  Q    Okay, but it was a part of that proposal, is that right?

2  A    Correct.

3  Q    And you provided this portion of the proposal -- was this

4  portion of the proposal ever provided to employees in the

5  bargaining unit?

6  A    I do not know if the Union provided this or not.

7  Q    Did the company, to your knowledge, ever provide it to the

8  employees in the bargaining unit?

9  A    Not to my knowledge.

10  Q    Did the company provide copies of the last, best and final

11  offer to employees in the bargaining unit?

12  A    I believe they did.

13  Q    But you -- can you recall whether this was part of those

14  documents?

15  A    Off the top of  my head, I cannot recall.

16  (EXHIBIT MARKED:  GENERAL COUNSEL'S 29.)

17  (Witness proffered the document.)

18  Q    BY MR. WIESE:  I'm going to show you what's been marked as

19  General Counsel Exhibit 29.  Looking at the first two pages of

20  this document, Mr. Meadows, do you recognize those pages?

21  A    Yes, I do.

22  Q    Would it be fair to say that these are plant rules for the

23  Cedar Rapids facility?

24  A    Yes, it is.

25  Q    Okay.  I'll -- in looking at the next three pages of this

1  document, do you recognize these three pages?

2  A    Yes, I do.

3  Q    Okay, and this is the substance abuse policy, is that

4  right?

5  A    Ingredion Substance Abuse Policy, yes.

6  Q    And this also applies to the employees in Cedar Rapids, is

7  that right?

8  A    Correct.

9      MR. WIESE:  I'll offer General Counsel Exhibit 29.

10     JUDGE CARISSIMI:  Is there any objection to GC 29?

11     MR. BUTTRICK:  No objection.

12     JUDGE CARISSIMI:  GC 29 is admitted.

13  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 29.)

14  Q    BY MR. WIESE:  Mr. Meadows, are you aware that in the red

15  book, the plant rules are, in fact, part of that -- or were, in

16  fact, part of that contract?

17  A    I am.

18  Q    And that was something you were looking to change, is that

19  right?

20  A    The plant rules would be not inside the contract, but still

21  a set of plant rules for the plant.

22  Q    And these plant rules gave the company the right to modify

23  or delete any rules, is that correct?

24  A    I'm sorry, I didn't understand the question.

25  Q    The plant rules allow, by their very terms, allowed the

1  company to delete and modify rules, is that right?

2  A    There was -- one of our proposals in the -- that we've made

3  was that any -- before any changes in the plant rules, there

4  would be discussions with the Union.

5  Q    That's not the question I asked.  I wasn't asking about the

6  proposals in the contract, I was asking about these plant rules,

7  in particular.  Do they allow the company to delete, change,

8  modify the plant rules?

9  A    Not without discussion with the Union.

10  Q    Do you know whether every plant rule changed since the

11  implementation has been discussed with the Union?

12  A    I don't know that there's been any plant rule change.

13  Q    Okay.  So you aren't aware of whether there's been any

14  plant rule changes?

15  A    No, I'm not.

16  (EXHIBIT MARKED:  GENERAL COUNSEL'S 28.)

17  (Witness proffered the document.)

18  Q    BY MR. WIESE:  Showing you what's been marked as General

19  Counsel Exhibit 28, do you recognize this document?

20  A    Yes, I do.

21  Q    And this is a set of attendance rules, is that right?

22  A    The Absentee Control Program, yes.

23  Q    For the Cedar Rapids plant.  Is that right?

24  A    Yes.

25  Q    Okay.  And this attendance policy was implemented by the

1   Employer as part of its last, best and final offer, is that

2   correct?

3   A   That's correct.

4   Q   But this policy -- this language itself wasn't in the last,

5   best and final offer, is that right?

6   A   It was -- this was given at the final, when the final was

7   given, and nothing ever communicated back, and nothing changed

8   from that.

9   Q   This language is not included the implemented offer, is it?

10   A   That's correct.

11   Q   Okay. And the implemented offer just references an

12   attendance policy, is that correct?

13   A   I believe so.

14      MR. WIESE: I'll offer General Counsel Exhibit 28.

15      JUDGE CARISSIMI: Any objection to GC 28?

16      MR. BUTTRICK: No objection.

17      JUDGE CARISSIMI: GC 28 is admitted.

18   (EXHIBIT RECEIVED: GENERAL COUNSEL'S 28.)

19   Q   BY MR. WIESE: Mr. Meadows, are you aware of a proposal in

20   the Employer's implemented last, best and final offer that

21   allows bargaining unit employees to vote on whether their

22   schedule will be changed?

23   A   Could you please restate that?

24   Q   Yes, yes, I can.

25      Mr. Meadows, are you aware of a provision in your last,

1  best and final offer that allows employees to vote on whether

2  they want their schedule to be changed?

3  A    Yes.

4  Q    And that was a provision that was implemented as part of

5  the last, best and final offer?

6  A    Yes.

7  Q    And are you aware -- do you know whether any employees in

8  the Cedar Rapids plant have actually exercised that provision?

9  A    My understanding is the maintenance department did.

10 Q    Mr. Meadows, the Employer declared impasse at negotiations

11 on August 18th, is that right?  That was the day of the last,

12 best and final offer?

13 (Pause.)

14 Q    Do you recall?

15 A    I'd have go back to check my notes on that.

16 Q    If you look -- looking at Joint Exhibit 8, looking at the

17 cover sheet of this offer and the date on it, does that refresh

18 your recollection about when the Employer declared impasse?

19 (Witness proffered the document.)

20 A    I think there was discussion on this date that we were at

21 impasse, but I'd have to refer back to the letter that you gave

22 me earlier that the -- I don't remember without looking at the

23 company's notes.

24 Q    Okay.  Looking at that letter that I gave you earlier,

25 General Counsel Exhibit 35, dated September 10th, do you recall

1   whether the Employer --

2        JUDGE CARISSIMI:  Well, first, let's let Mr. Meadows find

3   it before you go on with your question.

4        THE WITNESS:  You said 35, correct?

5        MR. WIESE:  Yes, that's correct.  It's the September 10th

6   letter that you gave to Mr. Head and to Mr. Eby.

7   (Pause.)

8        THE WITNESS:  I'm there.

9        MR. WIESE:  Do you have that letter?

10       THE WITNESS:  I'm there.

11       MR. WIESE:  Okay.

12  Q    BY MR. WIESE:  Do you recall whether you declared impasse

13  before you gave this letter to the Union?

14  A    I believe so, yes.

15  Q    So is that you believe you did declare impasse --

16  A    Yes.

17  Q    -- before you gave this letter to the Union?

18  A    Yes.

19  Q    Okay.  But you don't recall on which bargaining date you

20  told the Union that the parties were at impasse.

21  A    I would need to look back at the notes to --

22  Q    I'd like to direct your attention to Joint Exhibit 29.

23  (Witness proffered the document.)

24       MR. WIESE:  That's the stipulation.

25  (Pause.)

1    Q    BY MR. WIESE:  Mr. Meadows, this is a stipulation that the

2    parties agreed to regarding dates and bargaining times.  And

3    looking at this document -- so the letter was given on September

4    10th.  The final offer was given on August 18th.  Does looking

5    at the dates on this document help refresh your recollection

6    about when you declared impasse?

7         MR. BUTTRICK:  I'm just going to object that that question

8    mischaracterizes the testimony about when the final offer was

9    given.  The final offer and last, best and final offer, Tyler

10   may have inadvertently referenced the wrong offer.

11        JUDGE CARISSIMI:  All right.

12        Do you want to ask your question again?

13        MR. WIESE:  That's correct.  I did misspeak.

14   Q    BY MR. WIESE: Between the date of the last, best and final

15   offer on August -- that was on August 18th, is that right, the

16   last, best and final offer?

17   A    We presented it on August 18th.

18   Q    And the letter in General Counsel Exhibit 35 was presented

19   on September 10th, is that right?

20   A    Say that once more.

21   Q    The letter in General Counsel Exhibit 35 -- that was

22   presented on September 10th?

23   A    Correct.

24   Q    And looking at the dates now on General Counsel -- or,

25   excuse me, Joint Exhibit 29, August 18th, September 9th,

1  September 10th, does that help refresh your recollection about

2  when, in fact, you declared impasse?

3  A    Based on this document, I declared impasse on September

4  10th.

5  Q    And this is the first time you declared impasse --

6  September 10th?

7  A    There was discussions on other occasions of not being at

8  impasse.

9  Q    But it is your testimony that this is the first time you

10  said, "We are at impasse," September 10th?

11  A    Formally.

12  Q    So, Mr. Meadows, we talked a little bit earlier about the

13  employees --

14      MR. WIESE:  Excuse me, Your Honor.

15  Q    BY MR. WIESE:  Did you have any involvement in the

16  employees in the maintenance department voting to change their

17  schedule?

18  A    No.

19  Q    When did you become aware of the fact that they had voted

20  to change their schedule?

21  A    I don't remember dates.  I think I got a call saying that

22  they -- the maintenance department wanted to do it and did I

23  have any objection.  And I said, "As long as you all are

24  following the contract, I don't have objection."  And that was

25  it.

1  Q    And who called you about that?

2  A    I don't remember off the top of my head, it was just

3  notification.

4  Q    During that conversation, do you recall whether there was

5  any discussion about what the schedules were going to be when

6  you first heard about employees voting to change their schedules

7  in the maintenance department?

8  A    My understanding is that they had -- were going out to vote

9  on a schedule, and had talked to the Union, and the Union had

10  stated that they didn't think that this was correct by the last,

11  best and final.  I got a call for an interpretation, and I

12  agreed with the Union, that their interpretation was correct,

13  and they needed to go that way.

14  Q    And then after that conversation, do you know whether there

15  was a vote on a change in the maintenance department?

16  A    My understanding that there was a vote, they would go to a

17  new schedule.

18  Q    Do you know what schedule they went to?

19  A    Some people went to a 12-hour schedule and some people were

20  on an 8-hour schedule.

21  Q    Did you have any input on that schedule that they actually

22  voted on and implemented?

23  A    Beyond them calling me and saying that -- I'm trying to

24  remember off the top of my head right now.  I'm thinking that

25  they called me and they were trying to put an 8 and a 10-hour

1  schedule in, and the Union said, "No, that's not part of the

2  contract."  And they called me and asked me, "Hey, this is what

3  we did. Are we right or wrong?"  And I told them that no, you

4  need to follow the contract, and what the Union is saying is

5  correct, you need to do it that way, the way the Union is

6  telling you.

7  Q    Okay.

8        Mr. Meadows, who made the decision to terminate Pat Drahos'

9  unemployment -- or employment, excuse me.

10 A    That was a corporate decision.

11 Q    Were you involved in that decision?

12 A    No.

13      MR. WIESE:  Nothing further, Your Honor.

14      Thank you.

15      JUDGE CARISSIMI:  Very good.

16      Counsel for Respondent, do you wish to examine now or

17 reserve to your case in chief.

18      MR. BUTTRICK:  Yes, we would like to do it in our case in

19 chief, if you don't mind, Your Honor.

20      JUDGE CARISSIMI:  That would be fine.

21      Mr. Meadows, you are excused as a witness for now.  My

22 understanding is Respondent is going to call you in their case.

23      THE WITNESS:  Okay.

24      JUDGE CARISSIMI:  Very good.

25      THE WITNESS:  I'm leaving these papers here?

1    JUDGE CARISSIMI:  Yes, please do.

2  (Witness excused from the stand.)

3    JUDGE CARISSIMI:  Let's go off the record.

4  (Off the record.)

5    JUDGE CARISSIMI:  Let's go on the record.

6    General Counsel, you may call your next witness.

7    MR. WIESE:  Yes, Your Honor.

8    At this time, the General Counsel calls Pat Drahos to the

9  stand.

10    JUDGE CARISSIMI:  Mr. Drahos, if you would please stand for

11  a moment and raise your right hand.

12  (WITNESS SWORN:  PAT DRAHOS)

13    JUDGE CARISSIMI:  Please have a seat.

14                    DIRECT EXAMINATION

15  Q    BY MR. WIESE:  Ms. Drahos, my name is Tyler Wiese.  I'm an

16  attorney with the National Labor Relations Board.

17    Could you please state and spell your name for the record?

18  A    Pat Drahos, P-A-T D-R-A-H-O-S.

19  Q    What is your current occupation, Ms. Drahos?

20  A    I'm retired.

21  Q    And prior to retiring, what was your occupation?

22  A    I was the HR Manager for Penford.

23  Q    How long were you the HR Manager for Penford?

24  A    Twenty-one years.

25  Q    Did you hold any other positions besides being the HR

1  Manager?

2  A     No.

3  Q     Were you ever moved into a H -- recruiter position?

4  A     I did recruiting in my role as an HR Manager.

5  Q     What about a specific position as a recruiter?

6  A     Yes, part of my package was about 6 months doing corporate

7  recruiting.

8  Q     Do you recall about what period of time that was for?

9  A     June of 2015 through the end of December of 2015.

10  Q     Do you recall what day in June that position started?

11  A     No, I don't.  I was given the option to look into if I

12  wanted to take that position.  It was in the middle of June, I

13  think.

14  Q     Ms. Drahos, during your time working at Penford, did you

15  work with Ann Junge?

16  A     Yes.

17  Q     Were you generally aware of her job duties, what she did?

18  A     Yes, she reported half to me and half to accounting.

19  Q     Do you know who she reported to in account?

20  A     Sharon Gardner.

21  Q     Did one of Ms. Junge's job duties involve dealing with

22  retirement benefits for employees?

23  A     She administered the paperwork.

24  Q     And as part of her duties with retirement benefits, did she

25  hold meetings with employees?

1   A    You have to when the sign the papers.

2   Q    And, to your knowledge, would there be any other company

3   representatives at the meeting besides Ms. Junge?

4   A    I think a notary would be there.

5   Q    Was there a notary at every meeting?

6   A    If there was a spouse involved, a notary would generally be

7   up there.

8   Q    And if a spouse wasn't involved --

9   A    I don't know then.

10  Q    Okay.  During the time that you were the Human Resources

11  Manager, would it be fair to say that you were the primary

12  contact with the Union at the Cedar Rapids plant?

13  A    Yes.

14  Q    In this role, would you respond to grievances?

15  A    Yes.

16  Q    And what -- describe that a little more for me.  What would

17  you do with grievances?

18  A    Well, it depended what the grievance was about, but I

19  generally would either write the answer or discuss with whoever

20  was going to answer what it was going to be.

21  Q    Okay.

22       Did you have any role on the labor relations committee as

23  HR Manager?

24  A    Yes.

25  Q    And what was your role in that?

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

```
 1   A      Just the Human Resource representative for Penford.

 2   Q      Did you attend labor relations committee meetings?

 3   A      Yes, I scheduled them.

 4   Q      Did you attend every meeting?

 5   A      Just about.

 6   Q      How long were you involved in the labor relations

 7   committee?

 8   A      The entire time I was at Penford.

 9   Q      So would that be 21 years?

10   A      Yes.

11   Q      During your 21 years on the labor relations committee, what

12   are some of the issues that you can recall being resolved

13   through that body?

14   A      Oh, all of the issues that were resolved, were resolved

15   through that body.  We had a couple of arbitrations -- or we had

16   several arbitrations that, or course, resolved the issues for

17   us.

18   Q      Do you believe that the labor relations committee helped

19   the Employer resolve grievances short of arbitration?

20   A      Sometimes.

21   Q      During your time as HR Manager at Penford, were you

22   involved in contract negotiations?

23   A      Yes.

24   Q      In what capacity?

25   A      I was chief spokesperson probably at the last -- probably
```

1   the last 18 years, I guess.

2   Q   How many contracts were you the chief spokesperson for or

3   how many contract negotiations?

4   A   I don't know, two or three and we had a couple of

5   extensions that I worked out with the Union.

6   Q   As the chief spokesperson for the Employer, what would you

7   do to prepare for contract negotiations?

8   A   I'd start about a year early, and would get involved with

9   wage surveys, demographics, industry standards, get with the

10   supervisors.

11   Q   Would you keep a list of issues that you would use during

12   negotiations?

13   A   I had a long list, but you can't address them all

14   negotiations, so sometime before you start negotiating, the

15   people that I report to would sit down and decide which ones we

16   were going to take on.

17   Q   I'd like to talk about the contract negotiations in 2015,

18   when Ingredion took over.  Had you started getting demographic

19   information together for those negotiations?

20   A   I had started long before Ingredion even said they were

21   going to be purchasing us, yes.

22   Q   And had you started speaking with supervisors about things

23   that they wanted changed in the contract prior to Ingredion?

24   A   I didn't change any of my preparation.  I did everything

25   like I always did.

1 Q    Did you take notes of those conversations with supervisors?

2 A    Not really.

3 Q    Did you have a list of issues that you kept?

4 A    Yes.

5 Q    Did Ken Meadows ever request this list from you?

6 A    Yes, I gave him all of my preparation stuff.

7 (EXHIBIT MARKED:  GENERAL COUNSEL'S 53.)

8 (Witness proffered the document.)

9 Q    BY MR. WIESE:  I'm going to show you what's been marked as

10 General Counsel Exhibit 53.

11    Ms. Drahos, do you recognize this document?

12 A    I'm sorry, I don't.

13 Q    Oh, this wasn't something that you drafted?

14 A    No.

15 Q    So you've never seen this document before?

16 A    I may have, I don't remember it.  It was a long time ago.

17 I mean, it looks similar to proposal formats, but I don't recall

18 it specifically, no.

19 Q    So in your collective bargaining negotiations, prior to

20 Ingredion taking over, this was how you would formulate your

21 proposals?

22 A    It wouldn't look like this, but similar, I mean, the same

23 function.

24 Q    Well, describe that a little more.  What was the same?

25 What was different?

1  A    It seems to me that mine was more in a letter form.  I

2  often would use a table.

3  Q    And when you were talking about changes to make in the

4  contract, would it reference the then-existing contract?

5       MR. BUTTRICK:  I'm just going to lodge an objection, Your

6  Honor, that we're talking about her bargaining which predates

7  any of the allegations in the Complaint.  There's no

8  illegalities alleged about Ms. Drahos, and so I think all of

9  this is irrelevant.

10      JUDGE CARISSIMI:  Yes, what's the relevance of this?

11      MR. WIESE:  Your Honor, just attempting to establish as

12 part of both the impasse case and the surface bargaining case,

13 that what the Employer was doing a total break from what the

14 Union  had dealt with in past contract negotiations, that there

15 was -- as Ms. Drahos testified to, she negotiated contracts for

16 almost two decades.  The way that she did things I believe is

17 certainly to the impasse, may be relevant to the surface

18 bargaining as well.

19      JUDGE CARISSIMI:  I'm not so sure, but I'm going to let you

20 pursue this.  But I'd like you to make it relatively brief.

21      MR. WIESE:  Right.

22      JUDGE CARISSIMI:  At best, it's background.

23      MR. WIESE:  Okay.

24      JUDGE CARISSIMI:  And perhaps you can convince me that it's

25 meaningful, but I don't want to spend a lot of time on this.

1          MR. WIESE:  Understood, Your Honor.

2          JUDGE CARISSIMI:  So I'm going to overrule the objection.

3     Q    BY MR. WIESE:  Ms. Drahos, in your past experience in

4     negotiations, when you were proposing changes to the contract,

5     would you refer to the then-existing contract?

6     A    Yes.

7     Q    Like -- in a similar manner to how this document does?

8     A    Yes.

9     Q    Okay.

10         I'm going to refer you to Joint Exhibit 17.

11    (Witness proffered the document.)

12    Q    Do you recognize this letter, Ms. Drahos?

13    A    Yes.

14    Q    And this is an information request from the Union, is that

15    right?

16    A    Yes.

17    Q    Dated May 13, 2015.

18    A    Yes.

19         JUDGE CARISSIMI:  Ms. Drahos, I'm going to ask you to keep

20    your voice up a little bit.  Those last couple answers were a

21    little bit -- while we want to make sure that everybody --

22    number one, the Reporter hears you, but everybody needs to hear

23    you.  So talk loud enough so the people in the back can hear

24    you, all right?

25         THE WITNESS:  Okay.

1  Q    BY MR. WIESE:  After you received this information request,

2  did you give it to anyone to help you respond to the document

3  requests in there?

4  A    I probably asked a lot of people for help on it, the people

5  that had the information.  I'm sure, IT and probably Lisa Wade.

6  Everybody helped pull the stuff together.

7  Q    Was one of those people Ann Junge?

8  A    Yes.

9  Q    Do you recall when you gave it to Ms. Junge?

10  A    No.

11  Q    Okay.

12  (EXHIBIT MARKED:  GENERAL COUNSEL'S 72.)

13  (Witness proffered the document.)

14  Q    BY MR. WIESE:  I'm showing you what's being marked as

15  General Counsel Exhibit 72.

16      MR. WIESE:  Unfortunately, Your Honor, I don't have copies

17  of this document right now.  I'm showing it to opposing counsel

18  before I show it to the witness.

19      JUDGE CARISSIMI:  All right.

20      MR. BUTTRICK:  And I guess I would just request, Your

21  Honor, that before any detailed questioning to the witness about

22  this that we have a copy so we can look at it while it's

23  happening, as opposed to being the dark.

24      We can go off the record if he needs to make a copy or --

25      JUDGE CARISSIMI:  Let's go off the record to discuss that.

1   (Whereupon, a brief discussion was held between the parties off

2   the record.)

3       JUDGE CARISSIMI:  Let's go on the record.

4       Counsel for the General Counsel indicated that the copies

5   are being made.  He's going to move into another area so we

6   don't delay things, and he will go back to that particular

7   exhibit when copies have been made.

8       You may proceed, Mr. Wiese

9   Q   BY MR. WIESE:  Ms. Drahos, were you on the Employer's

10  negotiating committee for the most recent contract negotiations?

11  A   No.

12  Q   Were you ever on that committee?

13  A   No.

14  Q   Who told you that you were not going to be on that

15  committee?

16  A   Ken Meadows.

17  Q   And when were you told that?

18  A   I believe the decision was made on June 1.

19  Q   Do you recall when that decision was communicated to you?

20  A   It was in the morning.

21  Q   The morning of what day?

22  A   June 1.

23  Q   Do you recall where that conversation took place where you

24  were informed you're not going to be on the committee?

25  A   In the conference room, the front conference room.

```
 1   Q     The conference room at the --

 2   A     At Penford.

 3   Q     What were you doing in that conference room at that time,

 4   do you recall?

 5   A     We were meeting.

 6   Q     Okay.  Who was there with you?

 7   A     I know Ken was there, possibly Erwin.

 8         JUDGE CARISSIMI:  Would you tell us last names if you can?

 9         THE WITNESS:  Froehlich -- I can't spell it though.

10         JUDGE CARISSIMI:  That's all right.  We have documents with

11   the spelling.

12         THE WITNESS:  Okay.

13         I can't remember if anybody else was there or not.  I think

14   that was it.

15   Q     BY MR. WIESE:  And as best you can recall, tell me what

16   happened during that conversation in the conference room.

17   A     Ken had said that he had been working hard the week before

18   getting the proposals ready and that they've decided that I

19   wasn't going to be on the committee.  And, at that time, he

20   floated an option of taking severance package that Penford had;

21   and I said I would be interested, but would like to work until

22   the end of the year.  And he said he'd see what he can do about

23   that.

24   Q     Did -- had you worked with Mr. Meadows on contract

25   negotiations the week before your meeting?
```

1  A    We had worked on the phone, yeah.  I had been sending him

2  information, he had worked on proposals and had sent them to

3  Erwin and me to look over some ideas that he had, some changes

4  and, yah, we had some conversations about --

5  Q    During that meeting, did Ken Meadows provide any

6  explanation of why you weren't going to be on the negotiating

7  committee?

8  A    No, he didn't.

9  Q    I'm going to show you what's been marked as General Counsel

10  Exhibit 72.

11  (Witness proffered the document.)

12  Q    BY MR. WIESE:  Do you recognize this document?

13  A    Yes.

14  Q    What is it?

15  A    This is the request -- this is the request that the Union

16  had given me for information; and, as I was going through it, I

17  checked off the things that we had, and I gave to Darryl --

18  Darryl, the maintenance manager --

19  Q    Okay.

20  A    -- to help me get some of the information.

21  Q    Looking -- did you also give this document to Ann Junge?

22  A    Yes.

23  Q    Is the handwriting on this document -- is this all your

24  handwriting?

25  A    Not all of it.

```
 1   Q    Could you indicate what's your handwriting?

 2   A    All of it, except for that "O-M-E what," because I do all

 3   caps when I print; but I think all of the rest of it is mine.

 4   Q    And looking at the top right of the document below where it

 5   says "gathering documents," are those dates accurate up there,

 6   to be best of your recollection?

 7   A    Yes.

 8   Q    Okay.  And I have a question about some of the writing on

 9   it.  And next -- where it says, "The cents per hour per

10   individual cost of each dollar increased to the pension

11   multiplier," that handwriting next to that -- what does that

12   say?

13   A    It says, "We don't have."  We didn't have that information

14   at the time.

15   Q    Oh, I think we must be looking at different --

16   A    Oh, at a different spot?

17   Q    Let me see how I can indicate it on the record.

18        So if you go three bullet points down from that, from the

19   "We don't have," where it says, "The cents per hour per

20   individual cost for each dollar increase."

21   A    Yeah.

22        JUDGE CARISSIMI:  Are you asking her about the handwriting

23   on the right-hand side?

24        MR. WIESE:  Right, correct.

25        JUDGE CARISSIMI:  Okay.
```

1       MR. WIESE:  I'm not going to have her read the document,

2  Your Honor.  I just want to --

3  Q      BY MR. WIESE:  Well, do you see the handwriting that I'm

4  talking about now?

5  A      Yes.

6  Q      Okay.  And what does that handwriting say?

7  A      I think it says, "Not applicable" or "Not app."

8  Q      Do you recall why you wrote that?

9  A      We were probably not going to be giving them a pension

10  increase.  That was going to be one of our proposals.

11  Q      And was it because of that fact that you wrote, "Not

12  applicable"?

13  A      Yah, I probably -- I probably would have gone back to get

14  it later, but there was a short time period to get all this

15  information.  The request came really, you know, a couple of

16  weeks before we were going to negotiate a contract.  So I just

17  tried to get as much information as I could out to them, and as

18  much relevant information as I could.

19      MR. WIESE:  I'll offer General Counsel Exhibit 72 into

20  evidence.

21      JUDGE CARISSIMI:  Is there any objection to General Counsel

22  72?

23      MR. BUTTRICK:  No objection.

24      JUDGE CARISSIMI:  I'm going to admit General Counsel 72,

25  but I'm not going to give any consideration to what Ms. Drahos

1    said was not her handwriting on the document, okay.

2        General Counsel Exhibit 72 is admitted.

3    (EXHIBIT RECEIVED: GENERAL COUNSEL'S 72.)

4    Q    BY MR. WIESE:  Ms. Drahos, do you know whose handwriting

5    that is, the "OME what"?

6    A    No, I don't.

7    Q    After you were told you were not going to be on the

8    negotiating committee on June 1st, how long after that were you

9    placed into your recruiter position?

10   A    Probably a couple of weeks.

11   Q    And who put you in that position?

12   A    Ken.

13   Q    Do you recall having a conversation with Mr. Meadows about

14   that move from HR Manager to recruiter?

15   A    Yes.

16   Q    When did that conversation take place?

17   A    I can't remember the day.

18   Q    Was it before or after you moved into the recruiter

19   position?

20   A    It was on June 1 is when he told me that I wasn't going to

21   be on the negotiating committee and to consider this package,

22   and I asked if there was some work that I could do till the end

23   of the year, said I would consider the package.  I think it was

24   maybe about 10 days later, he came back and he had gotten me

25   this position -- recruiter.  It was a wonderful position, a

1    great package, and so I took it.  And so then I set up a home

2    office.

3    Q    And where did that conversation take place?

4    A    In that front conference room.

5         MR. BUTTRICK:  I'm just going to lodge an objection at this

6    point, Your Honor.

7         JUDGE CARISSIMI:  I'm sorry?

8         MR. BUTTRICK:  I'm just going to lodge an objection at this

9    point, Your Honor.  I don't see the relevance about her roles,

10   or recruiter in any of the allegations in the Complaint.

11        JUDGE CARISSIMI:  What is the relevance of Ms. Drahos' role

12   as a recruiter?

13        MR. WIESE:  I'm not asking about her role.  I'm not going

14   to be asking any questions about her role as a recruiter.  I'm

15   developing testimony.  I mean, if I may make -- I'm trying --

16        JUDGE CARISSIMI:  What complaint -- how does it relate to

17   surface bargaining?

18        MR. WIESE:  Again, I believe that this testimony all

19   supports the idea that there was a complete break between when

20   Penford was there, when Ingredion was there and, you know --

21        JUDGE CARISSIMI:  Is your position that a Respondent who

22   hires a -- that comes in and becomes a successor can't make

23   changes with regard to the negotiating team?

24        MR. WIESE:  No, Your Honor, not at all; but I think it is

25   relevant to the timeline that we're looking at in this case.  I

1    mean, we have, as I spoke of --

2         JUDGE CARISSIMI:  No, I've let you ask questions, there's

3    been no objections, but that doesn't mean I sometimes cut things

4    off even without objections; but I've let you ask questions

5    about Ms. Drahos' role in negotiations, but I'm not going to

6    hear anything further about her role as a recruiter because I

7    don't see how that really relates to the surface bargaining

8    allegations of the Complaint.

9         So I'm going to sustain the objection.

10   Q    BY MR. WIESE:  Do you know who filled --

11        MR. WIESE:  This is not related to the recruiter.

12        JUDGE CARISSIMI:  I would assume so.

13   Q    BY MR. WIESE:  Who filled your role after you went into the

14   recruiter position?

15   A    I think Ken was filling the role until they had recruited

16   somebody new to take the position.

17   Q    And do you know how long it was until somebody filled your

18   position?

19   A    No, no.

20   Q    Okay.  Do you know who filled your position?

21   A    I just met him yesterday.

22   (EXHIBIT MARKED:  GENERAL COUNSEL'S 48.)

23   (Witness proffered the document.)

24   Q    BY MR. WIESE:  Let me show you what's been marked as

25   General Counsel Exhibit 48.

1      Do you recognize this document, Ms. Drahos?

2  A    Not really.  I mean, I probably saw it, but it's nothing

3  that left a big impression.

4  Q    Looking seven lines down, and recipients of the e-mail are

5  listed alphabetically, do you see your name there?

6  A    Yes.

7  Q    To the best of your recollection, did you receive this e-

8  mail?

9  A    I remember the code of conduct coming out when the sale was

10 completed or when it was approved.  We would do this probably

11 annually anyway.

12 Q    Okay.

13     MR. WIESE:  I'll offer General Counsel 48 into evidence.

14     JUDGE CARISSIMI:  Is there any objection to GC 48?

15     MR. BUTTRICK:  No objection.

16     JUDGE CARISSIMI:  GC 48 is admitted.

17 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 48.)

18 (EXHIBIT MARKED:  GENERAL COUNSEL'S 49.)

19 (Witness proffered the document.)

20 Q    BY MR. WIESE:  Ms. Drahos, I'm showing you what's been

21 marked as General Counsel Exhibit 49.

22     Do you recognize this document?

23 A    I recall when this was put into place.

24 Q    And looking right next to the "cc" on this document, is

25 that your e-mail address or your name?

1   A    Yes.

2        MR. WIESE:  I'll offer General Counsel Exhibit 49.

3        JUDGE CARISSIMI:  Is there any objection to GC 49?

4        MR. BUTTRICK:  No objection.

5        JUDGE CARISSIMI:   GC 49 is admitted.

6   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 49.)

7   Q    BY MR. WIESE:  Ms. Drahos, are you aware of whether any

8   managers spoke with the Union about the decision to shut down

9   the manlifts before it happened?

10  A    I can't recall.  I can't recall what happened.

11  Q    So you can't recall what happened specifically with the man

12  lifts?

13  A    No, this was a very, very busy time, we were transitioning

14  over.  There were a lot of changes, a lot of things going on for

15  everybody that worked there.  I remember when they shut down the

16  manlifts, which were just an incredible safety hazard, I can't

17  remember the details about who talked to who or what.

18  Q    Okay, thank you.

19       MR. WIESE:  Nothing further.

20       JUDGE CARISSIMI:  Very good.

21       Is there any cross-examination by Respondent.

22       MR. BUTTRICK: Yes, Your Honor.

23       I don't think she has one, but I'll ask.  I'd like to see

24  any statements or your affidavits, if there are any.

25       JUDGE CARISSIMI:  Does General Counsel have any Jencks

1   material?

2       MR. WIESE:  No, Your Honor.

3       JUDGE CARISSIMI:  Very good.

4                       CROSS-EXAMINATION

5   Q    BY MR. BUTTRICK:  Ms. Drahos, thanks so much for coming

6   today.  I'm counsel for Ingredion.  My name is Stuart Buttrick,

7   and I'm sorry that you have to be here, so I appreciate -- I

8   certainly appreciate your time.

9       Let's turn to the Union -- or the Board had introduced as

10  GC Exhibit 72.  It's -- do you have that in front of you?

11  A    Yup.

12  Q    Okay.

13      You responded to this information request, correct?

14  A    Yes.

15  Q    And -- go ahead.

16  A    I got as much as I could get done, right.

17  Q    Okay, and you provided documents in response to it?

18  A    Yes.  If there was a checkmark there, I probably had it

19  gathered and put in place.

20  Q    And do you have any personal knowledge whether or not at

21  any later date, the company provided information responsive to

22  the cents per hour per individual cost to reach dollar increase

23  to the pension multiplier, or the cents per hour individual cost

24  for each one percent increase and direct contribution point?

25  A    No, I don't, and, you know, another problem with that, you

1  have to have Mercer do that, which takes for like ever, and it's

2  very, very expensive.  So probably one of the other reasons I

3  jotted that down on the side, it wasn't we really weren't going

4  to provide, there was just no way I could get it in a timely

5  fashion.

6  Q    And what is "Mercer"?

7  A    Mercer is the one that administered our pension plan.

8  Q    Looking at, then, if you can turn your attention to GC

9  Exhibit 48, which was this e-mail about the code of business

10  ethics.

11  A    Yes.

12  Q    Prior to Ingredion's purchase of Penford, did Penford have

13  its own code of business ethics?

14  A    Yes, and we annually would do a computer-based training and

15  sign off on it.

16  Q    And do you  have any personal knowledge whether in the

17  Ingredion world that ultimately required any bargaining unit

18  employees to sign the code of business ethics?

19  A    We put it out on a CBT.  We would have a couple of people

20  annually that would refuse to sign it.  I think we just sort of

21  ignored them and went on with our business, but, yeah.

22  Q    And do you have any personal knowledge whether in any labor

23  relations meetings in March of 2015, the company agreed that the

24  bargaining unit employees would not have to sign the Ingredion

25  code of business ethics?

 1   A     You know, that sounds familiar, but I can't say for sure,

 2   but now that you mention that, yah.

 3   Q     When Penford owned the Cedar Rapids facility, it would shut

 4   down the manlifts from time to time as well, correct?

 5   A     Ah, yeah, not all of them at once, but, yeah, we shut down

 6   several of them?

 7   A     Because they were unsafe?

 8   A     Unsafe and hard to fix, hard to find parts for.  They were

 9   very old.  They were incredibly unsafe.

10   Q     And a manlift was a part of the company's facilities at the

11   Cedar Rapids plant, correct?

12   A     Yes.

13   Q     And it was used by production employees from time to time,

14   correct?

15   A     Yes.

16   Q     Are you familiar with the Management Rights Clause of what

17   was formerly called the "Red Book"?

18   A     Yes.

19   Q     I think -- I'll find it for you.  Joint 16.  So let's see

20   how I do.  Trying to find this thing now.  Here it is, Joint 16.

21   (Witness proffered the document.)

22   Q     Do you recognize Joint 16 as the Red Book?

23   A     Yes, I've never heard it called the "Red Book."  It was

24   many different colors when we had that book.

25   Q     Was the most recent one red just out of curiosity?

1    A    I think it was.

2    Q    Okay, so that makes some sense, I guess.

3         So you said you're familiar with the management right

4    clause in the Red Book?

5    A    Yes.

6    Q    And did the management rights clause of the Red Book give

7    the company the ability to introduce new and improved production

8    methods or facilities?

9    A    Yes.

10   Q    And did it give it the unilateral ability to change

11   existing production methods at the facilities?

12   A    I believe it did.

13   Q    And the Red Book was in effect when Ingredion purchased the

14   facility, correct?

15   A    Well, I think, technically, it wasn't because there were

16   two extensions on it.  The Red Book was negotiated 11 years

17   prior.  We had like 15 years on this -- or 11 years on this

18   contract, two extensions, so, technically, I'm not sure.

19   Q    Well, you had the extensions to the underlying big

20   document, correct?

21   A    Yes.

22   Q    And when Ingredion bought the Cedar Rapids facility, it

23   continued to abide by the Red Book, correct?

24   A    Yes.

25        MR. BUTTRICK:  Nothing further.

1    JUDGE CARISSIMI:  Is there any redirect within that limited

2  range?

3    MR. WIESE:  Briefly, Your Honor.

4                       REDIRECT EXAMINATION

5  Q    BY MR. WIESE:  So regarding that information request for

6  the pension information, while you were the HR Manager, did you

7  ever request -- or make a request to Mercer to get that

8  information?

9  A    Yes.

10  Q    And do you recall about when you made that request?

11  A    No, no, every contract negotiation where we thought there

12  were going be pension increases, we would -- one of the

13  extensions, we did a pension increase; and so we did -- another

14  one, we made no increase in the pension multiplier I don't

15  think.

16  Q    Did you ever make a request to Mercer related to this

17  specific information request, the May 13th one, do you recall?

18    MR. BUTTRICK:  Objection:  asked and answered.

19    JUDGE CARISSIMI:  Overruled.  I'm not certain about that.

20    Go ahead, you may answer.

21    THE WITNESS:  No, I never got to  it.  Like I said, this

22  was -- we had two weeks before the contract was going to start.

23  It was -- besides all of the changes that were going on, it was

24  working like crazy just to get as much information as I could to

25  the Union before June 1.

1      MR. WIESE:  Nothing further.

2      JUDGE CARISSIMI:  Nothing further?

3      MR. BUTTRICK:  One question if I could.

4      JUDGE CARISSIMI:  Okay.

5                    RECROSS-EXAMINATION

6   Q   BY MR. BUTTRICK:  Mercer is not Penford, correct?

7   A   No.

8   Q   And Mercer is not Ingredion, correct?

9   A   No, Mercer --

10  Q   It's a separate, independent company?

11  A   Right.  They administered our pension.

12     MR. BUTTRICK:  Nothing further.

13     JUDGE CARISSIMI:  You are excused, Ms. Drahos.

14     THE WITNESS:  Great, thank you.

15     JUDGE CARISSIMI:  You may step down.

16  (Witness excused from the stand.)

17     JUDGE CARISSIMI:  Let's go off the record.

18  (Off the record.)

19     JUDGE CARISSIMI:  On the record.

20     General Counsel, you may call your next witness.

21     MS. OHAERI:  General Counsel calls Ann Junge.

22     JUDGE CARISSIMI:  Ms. Junge, if you would please stand and

23  raise your right hand.

24  (WITNESS SWORN:  ANN JUNGE)

25     JUDGE CARISSIMI:  Please have a seat.

1    You may proceed.

2    And before you begin your questioning, counsel, if you

3  could tell me what complaint allegations Ms. Junge's testimony

4  goes to.

5    MS. OHAERI:  Yes, complaint paragraph 4, subparagraph (b).

6    JUDGE CARISSIMI:  Four (b).

7    MS. OHAERI:  Complaint paragraph 5, subparagraph (d).

8    JUDGE CARISSIMI:  Okay.

9    MS. OHAERI:  And complaint paragraph 14.

10    JUDGE CARISSIMI:  Fourteen.

11    MS. OHAERI:  And the special remedy of notice reading, Your

12  Honor.

13    JUDGE CARISSIMI:  All right, very good.

14    You may proceed.

15                  DIRECT EXAMINATION

16  Q    BY MS. OHAERI:  Ms. Junge, my name I Chinyere Ohaeri, and

17  I'm the co-counsel for the General Counsel.  I'm going to be

18  asking you some questions today.

19    For whom do you currently work?

20  A    Ingredion.

21  Q    And what is your position there?

22  A    I'm the payroll specialist.

23  Q    When did you become the payroll specialist?

24  A    Effective January 1 of 2016.

25  Q    And what position did you hold prior to January 1, 2016?

 1  A    I was the payroll benefits administrator.

 2  Q    And when did you become the payroll benefits administrator?

 3  A    I don't know the exact date, but I was the payroll

 4  administrator for, oh, I'm sorry, like 10 years.  And then in

 5  2009, I became -- they added benefits as well, but, I'm sorry, I

 6  don't know the exact dates.

 7  Q    When were you hired?

 8  A    My God, about 35 years ago, I think '81 -- October of '80

 9  or '81.  I don't know for sure.

10  Q    What are your current job duties?

11  A    As the payroll specialist?

12  Q    Yes.

13  A    I'm responsible for the Union payroll, and then I also do

14  the attendance and keep up the attendance database.

15  Q    As the payroll benefits administrator, what were your job

16  duties?

17  A    I was responsible for the -- administrating all the

18  benefits, dental, vision, sickness and accident, FMLA any of the

19  benefits. They all -- I administered all of them.

20  Q    Including retirement benefits?

21  A    Yes.

22  Q    And who do you currently report to?

23  A    Sharon Gardner.

24  Q    And who did you report to in 2015?

25  A    Sharon Gardner.

1  Q    Approximately how long have you reported to Sharon Gardner?

2  A    Ten years, since I became the payroll.  Payroll is under

3  our Finance Department and Sharon Gardner is the head of

4  finance.

5  Q    Do you recall a phone conversation that I had with you on

6  March 6th?

7  A    I do.

8  Q    And during that phone conversation, do you recall that I

9  introduced myself and stated that I worked for the National

10  Labor Relations Board?

11  A    I did.

12  Q    Do you recall that I told you I was contacting you about

13  Ingredion?

14  A    You did -- yes, I do.

15  Q    Do you recall that I told you that I wanted to speak with

16  you regarding this hearing that at the time was scheduled for

17  March 21st?

18  A    Yes.

19  Q    Do you recall that I wanted to schedule a time to speak

20  with you about issues related to that trial?

21  A    I don't think it got that far, but, I think I stopped you

22  before it got that far.

23  Q    Do you recall that you said that you didn't think -- well,

24  your exact words were, "I don't think I should talk with you."

25  Do you recall making that statement?

1    A    Yes.

2    Q    Do you recall that I said I could subpoena you to testify?

3    A    Yes.

4    Q    And do you recall that in response to that, you said, "If

5    you do, then I'll talk to you then."

6    A    That's correct.

7    Q    And you were subpoenaed by me to appear here today, is that

8    correct?

9    A    That's correct.

10        MS. OHAERI:  Your Honor, I request to examine the witness

11    under 611(c).

12        MR. BUTTRICK:  And I'm just going to lodge an objection,

13    Your Honor, in that she's not a supervisor and not an agent.  So

14    I think that the 611(c) questioning is inappropriate as it

15    relates to Ms. Junge.

16        JUDGE CARISSIMI:  Yes, I'm not satisfied that merely

17    because there's someone that you contacted and didn't want to

18    speak with you that that shows that is an adverse witness within

19    the meaning of 611(c).  So I'm not going to grant that request.

20        MS. OHAERI:  I'll continue to ask questions.

21        JUDGE CARISSIMI:  Pardon?

22        MS. OHAERI:  I'll continue to ask questions without it,

23    Your Honor.  I can continue to ask --

24        JUDGE CARISSIMI:  Well, do you want to persist in trying to

25    show this witness is adverse to you.

1     MS. OHAERI:  I do.

2     JUDGE CARISSIMI:  You may continue.

3  Q   BY MS. OHAERI:  When did you become aware of the scheduling

4  of this trial?

5  A   I don't know the exact date.  I'm sorry.  If I could go

6  look it up, I'd know the exact date.  I was instructed that I

7  was named in a subpoena and that I needed to go to Chicago.  But

8  I don't know, I think it was a Monday we went to Chicago to meet

9  with the attorneys.

10 Q   And who instructed you that you were going to be doing

11 that?

12 A   That I was named in the subpoena, Stuart and --

13    MR. BUTTRICK:  I'm also going to note here that we have --

14 she has since retained us in our individual capacity to

15 represent her jointly with Penford in this case.  And so Ms.

16 Junge is now also my client; and so, I'm going to prohibit her

17 from sharing any attorney-client communications about any of

18 this.

19    JUDGE CARISSIMI:  All right.

20    I'll take it that was in the nature of an objection, so

21 I'll sustain the objection based upon counsel's representation

22 of a representative arrangement being in place.

23    MS. OHAERI:  Well, Your Honor, with that addition facts

24 provided by Mr. Buttrick, then at this time, I would renew my

25 request to examine the witness under 611(c).

1    JUDGE CARISSIMI:  You haven't demonstrated to me this

2    witness is adverse to your position.

3        I direct you to examine her by non-leading questions and,

4    if you want to make a request later on, when we start to hear

5    what the witness has to say, I'll consider it at that time.

6    Q    BY MS. OHAERI:  Who told you that you were going to be

7    subpoenaed?

8    A    That I was going to be subpoenaed?  You did.

9    Q    Who told you that a subpoena was actually received by

10   Ingredion?

11   A    It wasn't.  It was sent to my personal home, so nobody at

12   Ingredion told me that, it was sent to my home by registered

13   mail.

14   Q    Have you seen the Complaint that National Labor Relations

15   Board issued in this case?

16   A    I did.

17   Q    When did you see that?

18   A    It was shown to me when I was asked to go to Chicago, that

19   I was named in a lawsuit and that I needed to appear in Chicago.

20   That was the first I knew of it.  And at that point, I hadn't

21   been subpoenaed or didn't know anything about a subpoena.

22   Q    When were you first contacted by Ingredion's attorney

23   related to the issues in this case?

24   A    I'm not sure I understand what you mean.  When was I first

25   contacted --

1 Q    By the Employer's attorney regarding the issues in this

2 case?

3 A    I don't know the exact date.  I think it was the Friday

4 maybe before we went to Chicago, they let me know I was named in

5 a lawsuit, and that I was supposed to go to Chicago, to

6 Westchester to meet with --

7 Q    Had you had any conversation with them prior to that call?

8        MR. BUTTRICK:  Objection:   attorney-client privilege.

9        JUDGE CARISSIMI:  Sustained.

10        When are you going to get to the substance of the complaint

11 allegations?

12 Q    BY MR. OHAERI:  After I contacted, did you tell anyone that

13 you were contacted by the NLRB?

14 A    Yes.

15 Q    And whom did you tell that to?

16 A    I told Mr. Stuart Buttrick.

17        MR. BUTTRICK:  I instruct her not to share any attorney-

18 client communications.

19        JUDGE CARISSIMI:  In that she merely indicated that she

20 contacted you, so there was nothing privileged in that answer.

21 Q    BY MS. OHAERI:  Did you tell anybody else?

22 A    No, he's the one I told.

23 Q    Directing your attention to General Counsel's Exhibit 60 --

24 I believe it's up there.

25        JUDGE CARISSIMI:  If you want the witness to look at a

1   document, you have to show her.  I don't expect her or any

2   witness to go through that big pile.

3   (Pause.)

4       JUDGE CARISSIMI:  Let's go off the record and tell me when

5   you're ready.

6   (Off the record.)

7       JUDGE CARISSIMI:  Back on the record.

8   (Witness proffered the document.)

9   Q   BY MS. OHAERI:  Do you want to take a minute to look

10  through the document and let me know when you're ready.

11      JUDGE CARISSIMI:  Now this is a new document.  This has not

12  been admitted previously, has it?

13      MS. OHAERI:  It was stipulated to and admitted.

14      JUDGE CARISSIMI:  This is one of the stipulated documents.

15      Let's go off the record.

16  (Off the record.)

17      JUDGE CARISSIMI:  Back on the record.

18      You may proceed, Ms. Ohaeri.

19      THE WITNESS:  I'm ready, ma'am.

20  Q   BY MS. OHAERI:  Can you tell me which pages of this

21  document your name appears?

22  (Pause.)

23  A   I don't think I'm on it.  Just a minute.

24  Q   On page --

25  A   I -- I'm sorry, page 11 of 13, under "Finance/Customer

1  Service, EN&S," under Jared Fish, hen Sharon Gardner, I'm the

2  last name on the list.

3  Q    Is your name also on page 1 and page 2 of the document?

4      JUDGE CARISSIMI:  So what was that question.  I couldn't

5  hear.

6      MS. OHAERI:  Whether her name is also on page 1 and page 2

7  of the document.

8      JUDGE CARISSIMI:  Is there a particular place that you're

9  looking at to direct the witness' attention to?

10 Q    BY MS. OHAERI:  Directing your -- on page 1 --

11 A    I see, yes, it is.

12 Q    And on page 2 on the far right?

13 A    Yes, correct.

14 Q    And those first two pages with regard to Penford Products

15 and where you are in Penford Products organization, are those

16 two pages accurate as to what you -- where you were in the

17 organization in May of 2015?

18 A    Yes.  Yes, they are.

19 Q    Pages 4 through 8 -- that series of documents is from

20 October 1st.  Are you aware of what -- whether was a change in

21 your duties in October?

22 A    No.

23 Q    Okay.

24 A    No.

25 Q    Since May of 2015, has there been a change in your duties

1  at Penford, and now Ingredion?

2  A    Yes, under Penford, the benefits was under the Finance

3  Department and the payroll.  Under Ingredion, the benefits are

4  under HR, so we've transitioned the benefits to the HR

5  Department, and I stayed with payroll.

6  Q    And was that transition -- when was that transition?

7  A    Effective January 1 of 2016.

8  Q    Okay.

9       What is your role in scheduling bargaining unit employees?

10  A    I have no role in scheduling bargaining unit employees.

11  Q    Did you assist in the production of documents subpoenaed by

12  the General Counsel for the purposes of this trial?

13  A    Yes.

14  Q    Are you aware that one of those requests was for documents

15  referring in any way to shift changes that you made or approved

16  since January 1st of 2015?

17  A    Yah, I believe I am.

18  Q    And did you assist in responding to that request?

19  A    I did.

20  Q    Were you the only one from Ingredion who gathered documents

21  as part of that request?

22  A    As part of that specific request?

23  Q    Yes, only the request related to you?

24  A    Yes, because I don't think there is any.  I don't do

25  anything with their shifts, so I don't think we've submitted

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1  anything.  I don't do their scheduling.

2  Q    Are you aware that there were several scheduling sheets

3  submitted with respect to that request?

4  A    I would have to see them.  I don't remember any off the top

5  of my head, no.

6  Q    Are you aware as part of the contract negotiations, the

7  Employer received some information requests from the Union?

8  A    Yes.

9  Q    Did you have any involvement with the Employer in reviewing

10 or responding to those information requests?

11 A    Yes.

12 Q    What was your involvement?

13 A    I was called into an office with five other people, and Mr.

14 Meadows was on the speakerphone and we had a copy of the

15 documents they requested, and he went down the list and assigned

16 them to whoever.  And because I was payroll and benefits, they

17 asked for a lot of like dollar amounts with insurance claims,

18 insurance premiums.  So I was instructed to get -- my boss and I

19 and my boss happened to be gone, so I was taking the lead.  And

20 then we were instructed to get those documents to Mr. Meadows

21 before we left.

22 Q    Who was your boss at the time?

23 A    Sharon Gardner.

24      MS. OHAERI:  May I approach, Your Honor

25      JUDGE CARISSIMI:  You may.

1    THE WITNESS:  Do you want this one back?

2    MS. OHAERI:  I'm giving the witness Joint Exhibit 17.

3    JUDGE CARISSIMI:  Very good.

4  (Witness proffered the document.)

5  Q    BY MS. OHAERI:  Have you seen this document before?

6  A    No, ma'am.

7  Q    You've never seen this?

8  A    No.

9    MS. OHAERI:  May I approach, Your Honor?

10    JUDGE CARISSIMI:  You may.

11    MS. OHAERI:  Showing the witness what's been previously

12  marked as General Counsel's Exhibit 72.

13  (Witness proffered the document.)

14  Q    BY MS. OHAERI:  On General Counsel's Exhibit 72, on the

15  left-hand column, there's some handwriting.

16  A    Mmm-hmm.

17  Q    And about three-quarters down the page, there's "OME what."

18  Do you see that?

19  A    Yes.

20  Q    Is that your handwriting?

21  A    No, ma'am.

22  Q    Have you seen this document before?

23  A    No.

24    JUDGE CARISSIMI:  If you would keep your voice up a little

25  bit.

1      THE WITNESS:  I'm sorry.

2      JUDGE CARISSIMI:  That's all right.

3      I want you to talk loud enough so the people in the back

4  row can hear you, all right.

5      THE WITNESS:  Okay, sorry.

6  Q   BY MS. OHAERI:  At the top, right-hand corner of that

7  document, there's some handwriting under the Union's emblem.  Do

8  you see that?

9  A   I do.

10 Q   And do you recognize whose handwriting that is?

11 A   No, I really don't.

12     MS. OHAERI:  May I approach again, Your Honor?

13     JUDGE CARISSIMI:  Sure.  You may.

14 (Pause.)

15 (Witness proffered document.)

16     MS. OHAERI:  I gave the witness Joint Exhibit 21.

17 Q   BY MS. OHAERI:  Do you recognize this?

18 A   No, ma'am.

19     MS. OHAERI:  Approaching again, Your Honor.

20     JUDGE CARISSIMI:  You may.

21 (Witness proffered document.)

22 Q   BY MS. OHAERI:  I'm handing you Joint Exhibit 23.

23 A   Okay.

24 Q   Have you seen Joint Exhibit 23?

25 A   No, ma'am.

1  (Pause.)

2      MS. OHAERI:  I'll take that one back.

3      THE WITNESS:  Do you want these?

4      MS. OHAERI:  Yes.

5  (Pause.)

6  (Witness proffered document.)

7  Q    BY MS. OHAERI:  Handing you Joint Exhibit 26.  Have you

8  seen that document before?

9  A    No.

10  (Pause.)

11  (Witness proffered document.)

12  Q    BY MS. OHAERI:  I'm handing you Joint Exhibit 19.  Do you

13  recognize that?

14  A    Yes.

15  Q    When you responded to the Union's information request, was

16  it via e-mail?

17  A    Yes.

18  Q    Were you given what documents were being requested by e-

19  mail?

20  A    Not usually.  It was usually like in a conference call and

21  they'd say, "I'd need -- run me a report that shows this or run

22  me a report that shows that," but never anything really that was

23  a listing of what everything was or just, "You need to get

24  this," more like they read it from a sheet or something; but we

25  never got the actual request, just what they were wanting.

1  Q    And who is "they"?

2  A    Mr. Meadows.

3  Q    And so would you -- how would you get the information that

4  you gathered back to Mr. Meadows?

5  A    We were instructed to e-mail it to Levi Wood, who is at

6  negotiations, and he would print it off there, I guess.  I'm not

7  sure what they did with it after that.

8  Q    Okay.  Directing your attention to page 1 of the document,

9  Bates number PF898, three-quarters of the page down, there's an

10  e-mail from you.  Do you see that?

11  A    I do.

12  Q    Underneath where it has your name, "Ann," did you type all

13  that information?

14  A    No, I just responded and put the -- starting with the

15  insurance rates for hourly three-fourths of the way down, see

16  the different print.  I just responded to their e-mail and

17  inserted that in.

18  Q    The different print that you're referring to -- what is --

19  where is it on the document?

20  A    Where it starts, "Insurance rates for hourly employees

21  effective January 1."  See how the print is different?  I just

22  cut and pasted that information and e-mailed it back to them.

23  Q    And the lines right above that, the two bullets and the

24  sentences there -- did you type that?

25  A    No, I copied it from the previous e-mail and pasted it and

1  then sent it back.

2  Q    Do you recall when you received the request to respond to

3  that information request from the Union?

4  A    No, I just remember Mr. Meadows telling us, "Don't leave

5  till you get it back to us."

6  Q    And did you get it back to Mr. Meadows the same day that he

7  instructed you to gather it?

8  A    If not, I did it very shortly thereafter.

9  Q    Was that typical of the instructions Mr. Meadows would give

10 you about responding to information requests?

11 A    He just always said it was important that we stop

12 everything, do what they requested and get it back to them.

13 Q    And would you do that?

14 A    Yah.

15 Q    And what's the longest amount of time, if you can recall,

16 that it took you to respond to an information request that Mr.

17 Meadows instructed you to gather?

18 A    They requested a lot of information on the Blue Cross/Blue

19 Shield data.  We didn't have any of it.  We had to request that

20 from Blue Cross/Blue Shield.  And, actually, I can't do that I'm

21 not authorized, my boss has to.  And she was actually gone, as I

22 remember, but when she came back, she had to send the request to

23 Blue Cross.  They had all the data, then they ran a report and

24 sent it back.  That would have been anything that we had on

25 site, available, we sent immediately, unless we had to send away

1    for it.

2    Q    Do you ever receive performance reviews?

3    A    Yes, ma'am.

4    Q    How often?

5    A    Annually.

6    Q    And who completes those performance reviews?

7    A    Sharon Gardner and Pat Drahos would do a part of it,

8    because I halfly reported to them on attendance issues; but

9    mainly, Sharon Gardner.

10   (EXHIBIT MARKED:  GENERAL COUNSEL'S 69.)

11   (Witness proffered the document.)

12   Q    BY MS. OHAERI: I'm showing you a document that's been

13   previously marked as General Counsel's Exhibit 69.  Do you

14   recognize that?

15   A    Yah -- yes, sorry.

16   Q    And what is it?

17   A    This looks like my performance review from 2015.

18        MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

19   69 into evidence.

20        JUDGE CARISSIMI:  Is there any objection to General Counsel

21   Exhibit 69?

22        MR. BUTTRICK:  No objection, Your Honor.

23        JUDGE CARISSIMI:  General Counsel's 69 is admitted.

24   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 69.)

25   Q    BY MS. OHAERI:  On page one about three-quarters of the way

1  down, there's a header that says "goals".  Do you see that?

2  A    Yes, ma'am.

3  Q    And if you could flip through the document and let me know

4  how many goals were there for your performance evaluation for

5  2015?

6       JUDGE CARISSIMI:  Isn't the performance evaluation going to

7  indicate that?  Are you asking her what's on the document or

8  something else?  That's what it sounded like to me.

9       MS. OHAERI:  Well, there are several headings and

10  subheadings, so I'm just asking how many are goals and --

11       JUDGE CARISSIMI:  You can count them up and tell me in your

12  brief if you think it's important.

13       MS. OHAERI:  Okay.

14  Q    BY MS. OHAERI:  Do you see towards the bottom of page one,

15  there's a row or a header that says "weight"?

16  A    Yes.

17  Q    Could you explain how the weights work in this performance

18  evaluation?

19  A    My understanding -- this is the first one I've done because

20  it's a new system -- is whatever your goals are, you divide them

21  so that your total amount of all your goals equals 100, and

22  that's the weighted goal.

23  Q    And who does that division?  Is that you?

24  A    Who decides what percentage?

25  Q    Yes.

1    A    Usually your supervisor and you, yes.

2    Q    You and the supervisor would decide it?

3    A    Correct.  Correct.

4    Q    Okay.

5         At the bottom of that page 1, there's a header called

6    "Manager Evaluation."

7    A    Correct.

8    Q    And there's a rating and a comment section.  Who drafted

9    that, what's in that section?

10   A    Sharon Gardner, my boss.

11   Q    And to the right of that, there's another column, "Employee

12   Evaluation."  Under the "Employee Evaluations" section -- is

13   that -- did you complete the ratings and comments there?

14   A    Under the employee?

15   Q    Yes, the "Employee Evaluation" section, bottom right-hand

16   corner?

17   A    Correct.

18   Q    Is that true for all of those sections in the document?

19   A    Yes.

20   Q    On page 2 at the top section, under the "Manager

21   Evaluation" comments, can you just read the -- not read the

22   comments on the record, but can you read them to yourself.

23   Are you ready?

24   A    Yes.

25   Q    How closely did you work with Mr. Meadows with regard to

1   the information requests that were provided to the Union?

2   A    Well, not really closely at all.  Usually it was over the

3   phone or by e-mail when he needed information; and then it was

4   only information that was either in the payroll or the benefits

5   system.

6   Q    How often would you speak with Mr. Meadows with regard to

7   the information requests?

8   A    Actually speak to him?

9   Q    Yes.

10  A    I believe twice,  he had us in the room and he read us --

11  told us what we needed to do and then maybe a few e-mails asking

12  for further information; or it came from Levi or from Erwin

13  Froehlich, someone that was negotiating and they needed

14  something that was in my -- under benefits or payroll, then they

15  would e-mail me or send me a request.

16  Q    After you sent the information to Mr. Meadows or Mr. Levi

17  Wood, did Mr. Meadows ever ask you any questions about the

18  information that you had provided?

19  A    Not really, no.

20  Q    What about Mr. Levi?  Did he ever come back and ask you any

21  questions about the information you provided?

22  A    Not me, personally, no.

23  Q    Did you assist with providing information for the

24  Employer's proposals?

25  A    No.

1    JUDGE CARISSIMI:  You have to speak up, Ms. Junge.

2    THE WITNESS:  I'm sorry, no.

3  Q    BY MS. OHAERI:  Under the page 2, it states that you

4  responded to the company's information as well.  Is that not

5  accurate?

6  A    Are you referring to "all relevant information was

7  submitted"?  Is that what you're referring to?  I'm not sure

8  what you're --

9  Q    I'm referring to the "Manager Evaluation" comments.  Ms.

10  Gardner states in there that you also provided information

11  requested by the company.  Is that -- is her statement in there

12  inaccurate?

13  A    Yes, I cannot recall anything they asked of me, any

14  information they were asking from me, unless I'm forgetting it,

15  but I don't recall anything, no.

16  Q    With regard to the information that you gathered, did Mr.

17  Meadows ever ask you about cost savings for benefits or related

18  to the payroll?

19  A    No, he just asked for the information, and that's really

20  the last I ever heard of it.

21  Q    He never asked you to explain anything about the

22  information you provided?

23  A    No, he could have asked my boss, maybe, but, no, I never

24  got asked any further questions.

25  Q    Do you meet with employees regarding their retirement

1   benefits?

2   A    Yes.

3   Q    Have you been meeting with employees since January 1st of

4   2015, with regard to their retirement benefits?

5   A    I've been meeting with them for the last 10 years, since

6   '09, yes, correct.

7   (EXHIBIT MARKED:  GENERAL COUNSEL'S 57.)

8   (Witness proffered document.)

9   Q    BY MS. OHAERI:  I'm handing you what's been previously

10  marked as General Counsel's Exhibit 57.  Do you recognize this?

11  A    Yes.

12  Q    And what is it?

13  A    It's a list of those employees who were requesting pension

14  calcs or retirement.

15  Q    Whose handwriting is on that document?

16  A    Not mine.

17  Q    The text that's typed?

18  A    I typed it, correct.

19  Q    Do you recognize the handwriting?

20  A    Sorry, no.

21       MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

22  57, with the exception of the handwritten marks.

23       JUDGE CARISSIMI:  With that proviso, is there any objection

24  to GC 57?

25       MR. BUTTRICK:  No, Your Honor.

```
1        JUDGE CARISSIMI:  GC 57 is admitted.  I won't give any

2   consideration unless there's further explanation to anything in

3   handwriting.

4   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 57.)

5   Q    BY MS. OHAERI:  Did you meet with someone named "D.

6   Huffer"?

7   A    Dennis Huffer, yes, I did.

8   Q    Did you meet with him regarding the retirement benefits?

9   A    Yes, I did.

10  Q    And did you meet with an "M. Sarchett"?

11  A    Yes.  Let me reframe that.  I don't know if I actually met

12  with them.  They would have called me on the phone and said,

13  "Could you do a pension calc?"  I don't know if they actually

14  came in and I met with them, but both of those -- I remember

15  both of them contacted me about pensions.

16  Q    Both of who?

17  A    The D. Huffer and M. Sarchett.

18  Q    So the list of names -- it includes people that you either

19  met with or spoke with over the phone?

20  A    Correct.

21  Q    With regard to their pension benefits?

22  A    Correct.

23  Q    When did those meetings take place?  Not the exact dates,

24  but if you could give a range.

25  A    I would guess -- really, I'm not quite sure what you're
```

1    asking.  When did the meetings take -- I mean, a lot of these

2    people just called on the phone and said, "Do me a pension

3    calc."  They started probably in July, early July, mid-July,

4    some maybe even in June.  I don't know exact dates, but the

5    second and third week of July, there was a lot.

6    Q    Approximately, how many face to face meetings did you have

7    with employees with regard to their retirement benefits?

8    A    Approximately, 25.

9    Q    And when you met with those employees, did they bring

10   anyone with them?

11   A    It depends when you're talking.  When you actually sign

12   your application for benefits, they usually bring their spouse.

13   And then we always have a union representation in there as well,

14   if they can make it, and when they do their final signing.  But

15   when they -- you know, they're asking me for a calculation and

16   they're coming up, and I hand them a calculation, they were

17   usually at work and would just walk up to my office, so, no, not

18   usually.

19   Q    I want to discuss the meetings in which the employees were

20   there to sign documents.

21   A    Okay.

22   Q    And at those meetings, there's some sort of paperwork

23   that's involved.  Can you describe what the paperwork is?

24   A    Sure.  When somebody decides to retire, ideally, the Union

25   does what we call a "pension calc" and I do a pension calc, and

1   then we compare the two to make sure their numbers are right.

2   And then I transfer those numbers to what we call an application

3   for benefits, which is really just a document that shows these

4   are your options as a single life annuity; your different

5   options for the distribution of the pension.  And I type that up

6   on a sheet.

7       And then we also have -- if they're getting the retiree,

8   medical or the gap insurance.  There's a document we include

9   that says, "Just so you know when you retire, this amount of

10  money is coming from your pension check."  And when we meet to

11  go over for them to say, "Yah, okay, I'm going, this is it," we

12  have the application of benefits, we have all those documents;

13  their direct deposit they're going to do, their taxes.  And then

14  we sit down in a meeting and go over everything so they

15  understand what's going to happen and how it progresses from

16  there.  And then they say, "Yup, I'm going to go," and they sign

17  the document.  And then I sign the document, saying, "Okay, I

18  saw you sign it, you want to go, you're good."  And then I

19  usually give them a copy of it if they want it or I actually

20  tell them they should take a copy for their records.  And that's

21  kind of it.  It's kind of short and sweet, but --

22  Q    And when you're referring to those meetings, that's the

23  meeting with the employee and their spouse, if they have one?

24  A    And a Union rep., either Renita or Chris would be there.

25       JUDGE CARISSIMI:  Can you tell me Renita or Chris' last

1  names?

2      THE WITNESS:  Oh, I'm sorry, Renita Shannon and Chris Eby.

3      JUDGE CARISSIMI:  Thank you.

4  Q    BY MS. OHAERI:  Does the employee have to request a Union

5  representative at the meeting or do you contact the Union

6  representative and have them come in?

7  A    I contact the Union representative, and some, quite

8  frankly, say no; but that's their call.  But I usually send an

9  e-mail notice to Renita Shannon is who I usually send it to

10  because she's the one on the Union side that does the pensions.

11      JUDGE CARISSIMI:  Who at times says "no"?  The employee or

12  the Union representative?

13      THE WITNESS:  The employee.

14      JUDGE CARISSIMI:  Okay.

15      THE WITNESS:  Sometimes they choose just to sign and get

16  out and they don't want any -- they don't want anything to do

17  with it.  So I respect their request, I don't force them.

18      JUDGE CARISSIMI:  Okay.

19  Q    BY MS. OHAERI:  Do you check with the employee prior to

20  contacting the Union about whether they want a Union

21  representative present?

22  A    No, I just assume they are going to be present, and unless

23  they specifically say, "No, I do not want them here."

24  Q    okay.  And during those meetings, you are representative of

25  the Employer presence, is that right?

1   A    I'm not sure I understand what you mean.

2   Q    At those meetings with the employee, the spouse,

3   potentially the Union representative to discuss the retirement

4   benefits, you are there to represent the Employer, isn't that

5   right?

6   A    Yes, I would say I am there to represent -- I am the

7   administrator of the plan, so I would be there to administrate

8   it, yes.

9   Q    Who told you that you were authorized to meet independently

10  with the employees for the purposes of these retirement benefit

11  conversations and meetings?

12  A    It's part of the pension plan.  It's my assigned

13  responsibility because I am the administrator.  And it is a

14  benefit, so I would say Sharon Gardner instructed me this is my

15  responsibility is to handle the administration work for the

16  pension plans.

17  Q    And has Sharon Gardner been your supervisor with regard to

18  the retirement benefit plan since 2009?

19  A    Yes.

20  Q    And during those meetings with the employees, you go over

21  the calculated benefits with them?

22  A    Yes.

23  Q    And do you explain to them how the different benefit

24  packages work?

25  A    Yes.

1 Q    Do you explain to them what happens in the event of one or

2 if both of them dies?

3 A    Yes.  I give them a sheet of paper that actually tells them

4 those options as well.

5 Q    And during that meeting, do you answer any questions that

6 they have?

7 A    If I can, yes.  If not, I refer it to my boss.  Usually by

8 that point, it's pretty much done, they are basically signing

9 off on it; but, yes, I do.

10 Q    Do you also answer questions that the employee's spouse has

11 about the benefits, retirement benefits?

12 A    Yes.

13 Q    And you mentioned that you sign the forms as well.  Do you

14 sign the forms as the plan sponsor or the plan representative?

15 A    I think that's what it says, but I'm more just the witness

16 that, yes, he has officially signed it, I saw you sign it,

17 nobody else is making you sign it that you want to retire of

18 your own free will.

19 (EXHIBIT MARKED:  GENERAL COUNSEL'S 70.)

20 (Witness proffered the document.)

21 Q    BY MS. OHAERI:  I'm handing you what's been previously

22 marked as General Counsel's Exhibit 70.  The document is 15

23 pages -- Ms. Junge, can you please flip through it and let me

24 know when you're done.

25 A    I'm very well familiar with these documents.  I'm ready.

1  Q    These are some of the forms that you discuss -- I'm sorry,

2  do you recognize it?

3  A    Yes.

4  Q    And what are they?

5  A    The page 1 is a copy of a -- that's what we call the

6  "Application for Benefit." That's the form where the employee

7  signs which distribution method they would like and sign off on.

8       Page 2 looks like -- I mean, it looks like there's just

9  several copies of the same thing. There appears to be a copy of

10 the medical insurance coverage that I talked to you about, so

11 they understand that their medical insurance is going to be

12 deduced, their gap insurance will be deducted from their pension

13 checks. It looks like there's more of the same, but different

14 employees.

15 Q    Can you turn to page 15 on the document, and what is that?

16 A    Mr. Smith went out of Penford on a disability pension, and

17 this is the letter. This is basically the same letter I would

18 send to somebody who retires, that "Congratulations on your

19 retirement and this is your last day of work, and this is your

20 benefits."

21      MS. OHAERI: Your Honor, I offer General Counsel's Exhibit

22 70.

23      JUDGE CARISSIMI: Any objection to GC 70?

24      MR. BUTTRICK: No objection.

25      JUDGE CARISSIMI: GC 70 is admitted.

1  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 70.)

2  Q    BY MS. OHAERI:  I want to direct your attention to pages 1

3  through 3.  And if you could, could you just explain why page 1

4  looks so different than pages 2 and 3?

5  A    Page 1 is a pension plan for a single person, no spouse, so

6  they  have one option; where page 2 is for a married employee,

7  so a married employee is entitled to different joint and

8  survivor options.  So they have more on their page than the

9  other ones.

10 Q    When you are meeting with the employees, do you have them

11 execute the documents correctly?  Is that accurate?

12 A    I'm not sure I understand what you're saying.   When I meet

13 with --

14 Q    Yes, when you meet with them --

15 A    Yah.

16 Q    -- do they sign these documents in your presence?

17 A    Yes.

18 Q    And they date them in your presence, right?

19 A    Yes.

20 Q    And the signature on the "plan sponsor" and "plan

21 representative" lines for some of these documents are filled

22 out.  Do you use that?

23 A    Yes.

24 Q    And let's just -- for example, page 1, "plan sponsor

25 signature" -- is that your signature?

1    A    Yes.

2    Q    And on page 8, middle of the page, under "plan

3    representative" -- is that also your signature?

4    A    Yes.

5    Q    On page 8, the form is notarized.  Why is that?

6    A    Because Mr. Kobusch elected a single life annuity.  So they

7    make the spouse sign with a notary that she understands when Mr.

8    Reckling dies, the pension ceased, it does not transfer on to

9    her.

10   Q    These documents provide for the employee to revoke them.

11   Is that accurate?

12   A    These documents do not, no; but the pension can be revoked,

13   yes.

14   Q    If an employee executes these documents and doesn't revoke

15   the pension, what happens?

16   A    Then I take this information, I fill out yet another form,

17   and it goes to our pension provider; and say, "Okay, they've

18   signed off, now you can start their pension effective this date.

19   And I send it to the -- Milliman was our pension at that time.

20       JUDGE CARISSIMI:  So what was your answer?  Who was the --

21   I missed that last part of your answer.  You were indicating who

22   you send it to?

23       THE WITNESS:  Milliman Benefits is the name -- is who had

24   our pensions.

25       JUDGE CARISSIMI:  All right.

1    THE WITNESS:  They hold the pensions, they distribute the

2    checks, we just submit it to them and they --

3    Q    BY MS. OHAERI:  Does anyone review the form before you send

4    it to -- is it Milliman?

5    A    Yes, yeah, my boss signs off on them.

6    Q    Would that be Sharon Gardner?

7    A    Sharon Gardner, yes.  Yes, sir.

8    Q    BY MS. OHAERI:  At the time that these forms get sent to

9    Milliman, do they become legally binding?

10    MR. BUTTRICK:  Objection.  That calls for a legal

11    conclusion.

12    JUDGE CARISSIMI:  Sustained.

13    Q    BY MS. OHAERI:  Do you know whether the Employer is bound

14    by the terms of these agreements once they are sent to Milliman?

15    A    I would have no idea.  I administer it, I don't make the

16    rules or --

17    Q    Do you know whether any other forms are sent to Milliman?

18    A    The forms we send to Milliman is called -- it's a Milliman

19    form that you fill out that says who is the name, what's their

20    social, what's the amount.  It's just a generic form they have

21    me fill out to send to them with their information to start the

22    pension -- the pension change form or something.  I can't

23    remember the exact name, I'm sorry.

24    Q    Does anyone review that before you send that to Milliman?

25    A    No.

1  Q    Have you ever had any issue with an employee or their

2  spouse's benefits after you've sent these forms to Milliman?

3       MR. BUTTRICK:   Objection.  That's a vague question about

4  "ever had any issue."  I don't know what that means.

5       JUDGE CARISSIMI:  Yes, what's the -- let me ask you this,

6  and, particularly, this area -- what's the relevance of that

7  with respect to the issues you've told me that are germane to

8  the Complaint?

9       MS. OHAERI:  It's with respect to her status as an agent,

10 as well as what her role is in the retirement benefit meetings

11 that she has with employees, as it relates to the allegations --

12      JUDGE CARISSIMI:  That question is far afield.

13      I'm going to sustain the objection.

14 Q    BY MS. OHAERI:  When you are in the meetings with the

15 employees reviewing these documents, if you notice an error in

16 them, for example, if their retirement date is wrong, can you

17 fix it?

18 A    Yes.

19 Q    And then once you fix it, can you have the employee sign

20 the document?

21 A    Yah.

22      JUDGE CARISSIMI:  Remember to keep your voice up.

23      THE WITNESS:  Yah.

24 Q    BY MS. OHAERI:  After you've completed these forms, do you

25 communicate directly with the employee about when they receive

1   their payments or any other issues with their retirement

2   benefits?

3   A      Yes.

4        MS. OHAERI:  Your Honor, I have to mark some exhibits.  Do

5   you want me -- do you want to go off the record or --

6        JUDGE CARISSIMI:  Yes, let's go off the record.

7   (Off the record.)

8        JUDGE CARISSIMI:  Ms. Ohaeri, you may proceed.

9   (EXHIBIT MARKED:  GENERAL COUNSEL'S 74.)

10  (Witness proffered the document.)

11  Q      BY MS. OHAERI:  I'm showing you what's been marked as

12  General Counsel Exhibit 74.

13  A      Thank you.

14  Q      Do you recognize that?

15  A      I do.

16  Q      And what is that?

17  A      This was an attempt to make sure that anybody who wanted to

18  retire could retire, and anybody who didn't want to, could

19  revoke it, because of the rush of -- you know, normally, we have

20  four people retire a year -- and because of the rush, and on the

21  Union's side Renita Shannon was the one who also did pensions.

22  She was in negotiations, so it was kind of all falling on me,

23  and I was concerned that I was going to miss somebody.  And the

24  deadline, for instance, was like July 31st.  Well, that was a

25  Friday, well, I'm leaving at 5; and if somebody at the last

1   minute wanted to say, "No, no, no, I don't want to do this," I

2   wanted a way that they could fill out a form, put in my secure

3   mailbox. I didn't want anybody calling a facility manager or

4   calling a Union rep. I wanted to have one person to have all

5   the information funneled to me so that we didn't miss somebody.

6       So this was our attempt, or my attempt to give them a means

7   of revoking if I wasn't there, if it was over a weekend,

8   whatever. I think it was a good idea. I mean to tell you it

9   fell flat on its face, nobody used it. I had maybe two people

10   do it after July 1st, going forward. It just didn't -- it

11   didn't work. And my intent was so that nobody got messed up. I

12   didn't want anybody to have to retire when they've changed their

13   mind or not be able to, if the last second, they wanted to

14   retire; plus I was getting hit with a lot of pension calcs.

15   "Can you run my calc? Can you run me a calc?" But when someone

16   retires, there' documents that require -- we need copies of the

17   birth certificates, marriage license, social security cards. I

18   was trying to be proactive. I was trying to get stuff done in

19   advance, so that if these people really wanted to go, I had it

20   ready. But I needed a way of making sure that they knew -- I

21   mean, just because you come in at the last second and say, "I'm

22   retiring," there's more to it than that. You need documents,

23   you need -- and I didn't want anybody to get -- pardon my French

24   -- "screwed" because they didn't know what they needed. So this

25   was my attempt -- I remember walking through it with Erwin

1  Froehlich saying, "You know, here's my concern. I don't want
2  anybody to get -- not be able to do what they really want to do.
3  What do you think?" And I put this out to help the situation.
4  And I have to be honest, in the end nobody used it. So it
5  really ended up -- I think one person did, maybe two. And they
6  didn't end up retiring, so they never even requested it. So
7  that's kind of what that's all about.
8  Q   Did you draft this document?
9  A   I did.
10     MS. OHAERI: Your Honor, I offer General Counsel's Exhibit
11 74.
12     JUDGE CARISSIMI: Any objection to 74?
13     MR. BUTTRICK: No objection.
14     JUDGE CARISSIMI: GC 74 is admitted.
15 (EXHIBIT RECEIVED: GENERAL COUNSEL'S 74.)
16 Q   BY MS. OHAERI: So this was your idea to draft this
17 document?
18 A   Yah, I was just very concerned that -- you know, because
19 somebody calls and says to me, "Hey, can you run me a pension
20 calc," it doesn't mean they are retiring. And I already had a
21 large list, so I just wanted to get something out there that if
22 you're serious about retiring, these are the things you need,
23 and you need to keep moving on it. Don't --
24     JUDGE CARISSIMI: Do you want me to interrupt you?
25     THE WITNESS: Sure.

1      JUDGE CARISSIMI:  Because the question was was this your

2   idea?

3      THE WITNESS:  Oh, I'm sorry, yes.

4      JUDGE CARISSIMI:  Okay, so that's a -- you've done very

5   well up to this point, but just listen to the question and

6   answer the question, all right?

7      THE WITNESS:  Yes, sir.

8   (EXHIBIT MARKED:  GENERAL COUNSEL'S 73.)

9   (Witness proffered the document.)

10  Q    BY MS. OHAERI:  I'm handing you what's been marked as

11  General Counsel's Exhibit 73.

12      Do you recognize that?

13  A    I do.

14  Q    And what is that?

15  A    This was the one person who completed it.

16      MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

17  73.

18      JUDGE CARISSIMI:  Is there any objection to GC 73?

19      MR. BUTTRICK:  No objection.

20      JUDGE CARISSIMI:  GC 73 is admitted.

21  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 73.)

22      MS. OHAERI:  That's all for me, Your Honor.

23      JUDGE CARISSIMI:  Very good.

24      Is there any cross-examination by Respondent?

25      MR. BUTTRICK:  Yes.

1       I'm turning it over to my colleague, Mr. Funk.

2                       CROSS-EXAMINATION

3    Q    BY MR. FUNK:  Just one point to clarify about responding to

4    the request for information.

5    A    Yes.

6    Q    Did you ever meet in person with Mr. Meadows regarding --

7    regarding providing documents that the Union had requested?

8         Let me rephrase that.

9         Did you ever meet on the phone with -- were you ever in a

10   room on a speakerphone when Mr. Meadows was asking for documents

11   pursuant to a Union information request?

12   A    Yes.

13   Q    Did you ever meet in person with Mr. Meadows when he was

14   asking for documents related to an information request?

15   A    No, they were always out wherever they were negotiating,

16   and we were back at the office.  He was never there in person

17   asking for it.

18   Q    Thank you.

19        MR. FUNK:  No further questions.

20        JUDGE CARISSIMI:  I take it there's nothing within that one

21   question?

22        MS. OHAERI:  That's it.

23        JUDGE CARISSIMI:  Very good.

24        Ms. Junge, you're excused as a witness.

25        You may step down.

1       You can just leave those there.

2       THE WITNESS:  Okay.

3       JUDGE CARISSIMI:  Thank you.

4  (Witness excused from the stand.)

5       JUDGE CARISSIMI:  Off the record.

6  (Off the record.)

7       JUDGE CARISSIMI:  On the record.

8       I understand there's a stipulation that the parties wish to

9  enter into the record.

10      Ms. Ohaeri, is that correct?

11      MS. OHAERI:  Yes.

12      The parties stipulate that there was no bargaining

13  negotiation session held between Respondent and the Union on

14  July 13, 2015.

15      JUDGE CARISSIMI:  Very good.

16      And, Mr. Buttrick, can you so stipulate?

17      MR. BUTTRICK:  I do.

18      JUDGE CARISSIMI:  I will accept the stipulation.

19      General Counsel, you may call your next witness.

20      MR. WIESE:  Yes, Your Honor.

21      At this time, Counsel for the General Counsel calls Andy

22  Sullivan to the stand.

23      JUDGE CARISSIMI:  Mr. Sullivan, if you'd please stand for a

24  moment and raise your right hand.

25  (WITNESS SWORN:  ANDY SULLIVAN)

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 215 of 1141

1      JUDGE CARISSIMI:  Please have a seat.

2                       DIRECT EXAMINATION

3   Q    BY MR. WIESE:  Good afternoon, Mr. Sullivan.

4   A    Good afternoon.

5   Q    My name is Tyler Wiese.  I'm an attorney with the National

6   Labor Relations Board.

7        Have we spoken before today?

8   A    No.

9   Q    What is your current occupation?

10  A    HR Manager.

11  Q    For what company?

12  A    Ingredion.

13  Q    How long have you been in that position for?

14  A    Eight months.

15  Q    And what do you do in that position?

16  A    Recruiting, hiring, on-boarding, employee relations, labor

17  relations, implementation of the collective bargaining

18  agreement.

19  Q    Okay.

20       MR. WIESE:  Your Honor, I request permission to question

21  this witness under 611(c).

22       JUDGE CARISSIMI:  I'll grant that.

23       And what paragraphs of the Complaint is Mr. Sullivan going

24  to testify about?

25       MR. WIESE:  One moment, Your Honor.

1    JUDGE CARISSIMI:  Let's go off the record.

2  (Off the record.)

3    JUDGE CARISSIMI:  On the record.

4    You may proceed counsel.

5    MR. WIESE:  Your Honor, this witness is going to provide

6  testimony relative to complaint paragraphs 16, 14 and requested

7  remedy of a notice reading.

8    JUDGE CARISSIMI:  All right.

9    You may proceed.

10 Q    BY MR. WIESE:  Showing the witness what's been marked as

11 General Counsel 37.

12 (Witness proffered the document.)

13 A    Thank you.

14 Q    Do you recognize this document?

15 A    No, I do not.

16 Q    You've never seen this document?

17 A    I have not.

18 Q    Did you assist in gathering the documents pursuant to the

19 subpoena issued in this case?

20 A    Yes.

21 Q    Are you aware of that subpoena?

22 A    Yes.

23 Q    Okay.

24    Have you ever -- so you mentioned, I believe, that one of

25 your -- are you in charge of how the implemented -- how the

1 Employer's last, best and final is implemented at Cedar Rapids?

2 A    Yes.

3 Q    Do you recall there being any discussions after that

4 contract was implemented about changing the classifications in

5 the work place?

6 A    Yes.

7 Q    Do you recall any documents being drafted related to that?

8 A    I don't recall if there were documents.  I believe it was

9 just verbal discussion.

10 Q    All right.  Who did you talk to about that?

11 A    I've had a conversation with Chris Eby in regard to

12 classifications, the current Union leadership with concerns to

13 classifications, several folks from the Union officers.

14 Q    And what -- besides the Union officers, did you speak with

15 anyone from Ingredion?

16 A    Locally, yes, through our operations team.

17 Q    Did you speak with Ken Meadows about it?

18 A    Yes.

19       MR. WIESE:  Showing the witness what's been marked as

20 General Counsel Exhibit 38.

21 (Witness proffered the document.)

22       THE WITNESS:  Thank you.

23       MR. WIESE:  I'll take back 37 from the witness.

24 Q    BY MR. WIESE:  Do you recognize this document, Mr.

25 Sullivan?

1   A      Yes.

2   Q      And what is it?

3   A      It looks like a document that we put together and provided

4   to the Union as an attempt to alleviate issues around overtime.

5   Q      And do you recall about when this document was created?

6   A      October time frame.

7   Q      Are you certain that it was created after the Employer

8   implemented its last, best and final --

9   A      Yes.

10          MR. WIESE:  I'll offer General Counsel Exhibit 38.

11          JUDGE CARISSIMI:  An objection to GC 38?

12          MR. BUTTRICK:  No objection.

13          JUDGE CARISSIMI:  General Counsel 38 is admitted.

14   Q      BY MR. WIESE:  Did you draft this document?

15   A      I believe so, yes.

16   Q      Okay. Did you -- when you drafted it, did you work in

17   consultation with anybody else?

18   A      Yes.

19   Q      Who?

20   A      Levi Wood.

21   Q      Did you work with Ken Meadows?

22   A      No.

23   (EXHIBIT PREVIOUSLY MARKED:  GENERAL COUNSEL'S 42.)

24   (Witness proffered the document.)

25          MR. WIESE:  I'm showing the witness what's been marked as

1   General Counsel Exhibit 42.

2       THE WITNESS:  Do you need this one back?

3       Thank you.

4   Q   BY MR. WIESE:  Do you recognize this document, Mr.

5   Sullivan?

6   A   Yes.

7   Q   And what is it?

8   A   Temporary bid notice for a non-traditional role.

9   Q   And what -- that specific role is what?

10  A   Overtime administrator.

11  Q   Did you create this posting?

12  A   Well, yes.

13  Q   I'll offer General Counsel Exhibit 42 into evidence.

14      JUDGE CARISSIMI:  Is there any objection to GC 42?

15      MR. BUTTRICK:  No objection.

16      JUDGE CARISSIMI:  GC 42 is admitted.

17  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 42.)

18  Q   BY MR. WIESE:  Do you recall whether there was a posting

19  before this for an overtime administrative position?

20  A   Yes.

21  Q   And, about when would that posting have been created?

22  A   January.

23  Q   And these postings for the overtime administrator position

24  -- who are those open to?

25  A   All bargaining unit members.

1      MR. WIESE:  Showing the witness --

2      Could we go off the record for just a second?

3      JUDGE CARISSIMI:  Off the record.

4  (Whereupon, a brief discussion was held between the parties off

5  the record.)

6      JUDGE CARISSIMI:  Let's go on the record.

7      MR. WIESE:  Oh, Your Honor, could we go off the record a

8  second?

9      JUDGE CARISSIMI:  Yes, off the record.

10 (Whereupon, a brief discussion was held between the parties off

11 the record.)

12     MR. WIESE:  On the record.

13     Mr. Wiese, you may proceed.

14     MR. WIESE:  Your Honor, I have no further questions for Mr.

15 Sullivan at this time.

16     JUDGE CARISSIMI:  Okay.

17     Now I know we have some exhibits that we're going to deal

18 with, but since there's been some questions asked of Mr.

19 Sullivan and General Counsel has nothing further in terms of

20 questioning, is there any cross-examination of Mr. Sullivan, or

21 do you wish to reserve any questions you may have to your case

22 in chief?

23     MR. BUTTRICK:  Case in chief, Your Honor.

24     JUDGE CARISSIMI:  Very good.

25     Mr. Sullivan, for now, you are excused as a witness.

1        You may step down, sir.

2        THE WITNESS:  Thank you.

3        JUDGE CARISSIMI:  But my understanding is that you may be

4   called again as a witness in this case.

5        THE WITNESS:  Okay.

6   (Witness excused from the stand.)

7        JUDGE CARISSIMI:  All right, let's go off the record.

8   (Off the record.)

9        JUDGE CARISSIMI:  So let's go on the record.

10       Mr. Wiese, you have some exhibits that you would propose to

11  offer into evidence at this point, correct?

12       MR. WIESE:  Yes, Your Honor.

13       At this time, Counsel for the General Counsel would propose

14  to offer 59, 61, 62, 63, 64, 65 and 66.

15       JUDGE CARISSIMI:  All right.

16       MR. WIESE:  And these documents collectively constitute

17  post-implementation grievances.

18       JUDGE CARISSIMI:  Okay.

19       And these relate to the allegations of paragraph 16?

20       MR. WIESE:  That's correct, Your Honor.

21       JUDGE CARISSIMI:  All right, very good.

22       And I know Respondent's counsel has had an opportunity to

23  look at these.

24       Is there an objection to 59, 61, 62, 63, 64, 65 and 66?

25       MR. BUTTRICK:  No, Your Honor.

1       JUDGE CARISSIMI:  Those documents are admitted.

2   (EXHIBITS MARKED AND RECEIVED:  GENERAL COUNSEL'S 59, 61, 62,

3   63, 64, 65 and 66.)

4       JUDGE CARISSIMI:  Mr. Wiese, you may call your next

5   witness.

6       MR. WIESE:  Yes, Your Honor, at this time Counsel for the

7   General Counsel calls Renita Shannon.

8       JUDGE CARISSIMI:  Ms. Shannon, if you would please stand

9   for a moment and raise your right hand.

10  (WITNESS SWORN:  RENITA SHANNON)

11      JUDGE CARISSIMI:  Please have a seat.

12                      DIRECT EXAMINATION

13  Q   BY MR. WIESE:  Good evening, Ms. Shannon.

14  A   Hi.

15  Q   Could you please state and spell your name for the record?

16  A   Renita Shannon, R-E-N-I-T-A  S-H-A-N-N-O-N.

17  Q   Ms. Shannon, who is your current employer?

18  A   Ingredion.

19  Q   How long have you worked for Ingredion?

20  A   Ingredion Penford -- I've been there approximately 26

21  years.

22  Q   So what date did you start, do you recall?

23  A   June 11th of 1990.

24  Q   During your time working for Penford and Ingredion, what

25  jobs have you held?

1   A    I have been the janitor, I've worked in the sugar

2   department, in the grind, I've been an operator in the starch

3   department, an operator in the ethanol department, general

4   utility in the starch department; and, currently, I am a

5   lubrication technician in the maintenance department.

6   Q    Have all of these positions been in the bargaining unit?

7   A    They have.

8   Q    Which of those position is the most recent?  Did you say

9   that?

10   A    I'm a lubrication technician right now.

11   Q    Okay.  And as a lubrication technician, what are your job

12   duties?

13   A    Myself and my partner handle all the equipment in the whole

14   plant.  We lubricate, grease, if you will, add oil, filter oil,

15   all the stuff that goes with greasing and oiling.

16   Q    Who is your direct supervisor?

17   A    Chad Reid.

18   Q    Do you know what his title is?

19   A    Maintenance Manager.

20   Q    Ms. Shannon, do you currently hold any positions in the

21   Union?

22   A    I do not.

23   Q    During your time working for Penford and Ingredion, have

24   you held any roles in the Union?

25   A    I have.

1  Q    What roles have you held?

2  A    I was trustee and their recording secretary and also was on

3  the committee, the negotiating committee for our recent

4  contract.

5  Q    Approximately, what period of time were you a trustee for?

6  A    Approximately, 2009 and 2010.

7  Q    And what period of time were you the recording secretary

8  for?

9  A    2011 through 2015.

10  Q    Okay.

11      And what about your time on the bargaining committee?  When

12  have you been on the bargaining committee?

13  A    I started -- I was informed -- asked by Chris Eby

14  approximately December of 2014, and he put me on the bargaining

15  committee in February of 2015.

16  Q    In your role as Union recording secretary, what were your

17  job duties?

18  A    I recorded any membership meetings and I posted meeting

19  notices, all notices out in the plant.  And I went with members

20  when they retired to sign their papers; and I wrote up vouchers

21  that coincided with checking, kind of a checks and balances

22  thing.

23  Q    Ms. Shannon, when did you become aware that Ingredion would

24  be taking over Penford?

25  A    I think it was approximately October of 2014.

```
 1   Q     How did you hear about that?

 2   A     Just through work, you know, I mean, through the grapevine

 3   and that's about it, yah.

 4   Q     Do you know about when that -- when Ingredion took over

 5   Penford?

 6   A     I believe it was in -- it was April of 2015.

 7   Q     After Ingredion took over Penford, do you recall having a

 8   meeting with managers and HR from Ingredion?

 9   A     I do.

10   Q     And when was that meeting?

11   A     That was April 6th of 2015.

12   Q     Who was present at that meeting from the Union?

13   A     Myself, Chris Eby, Vaud Wilford and Matt Maas.

14   Q     And who do you recall being present at that meeting from

15   Ingredion?

16   A     Ken Meadows, Pat Drahos, Becky Tinkham and Erwin Froehlich.

17   Q     Was -- excuse me, where did that meeting take place?

18   A     In the front office at Penford.

19   Q     How did you find out about this meeting?

20   A     Chris Eby got a hold of me and told me that I would be

21   involved in it.

22   Q     And what was your understanding of what this meeting was

23   going to entail?

24   A     It would be a meet and greet with the new company.

25   Q     Did you know who Ken Meadows was before that meeting?
```

1   A     I did.

2   Q     How had you heard about him?

3   A     I had heard about him through our Interunion, Wet/Dry Corn

4   Council that is held twice a year; and I had probably heard

5   about him for 3 years previous.

6   Q     And what is that "Interunion Wet/Dry Corn Council"?

7   A     It is corn wet milling plants throughout the country and in

8   Canada.  They get together to talk about what's going on in the

9   industry and what their current contracts -- they've gotten in

10  their current contracts and stuff like that.

11  Q     Are there Ingredion facilities that attend those meeting?

12  A     There are.

13  Q     So turning to that meeting on April 6th, what is the first

14  thing you recall happening at that meeting?

15  A     We came in and everybody introduced themselves, you know,

16  handshakes and just introductions.

17  Q     What do you recall from Mr. Meadows' introduction of

18  himself?

19  A     Just that he shook our hand and introduced himself as the

20  HR representative from Ingredion and that he would be the head

21  negotiator in the upcoming contract negotiations.

22  Q     And after those introductions, what do you recall happening

23  next at the meeting?

24  A     We all said what we did in the plant and then we started

25  talking about -- they had had a meeting before with the

1   membership about code of conduct and just things like that, kind

2   of a meet-and-greet with all the members, if you will.

3   Q    And what do you recall from the discussion about that

4   topic?

5   A    We talked about that, and Chris brought up that there was a

6   part of it where they wanted us to sign a code of conduct, and

7   that it was supposed to be turned in like by a certain date.

8   And Mr. Meadows didn't know -- didn't recall that we were going

9   to have to do that, because we did that in computer-based

10  training with our company.

11  Q    And when you mentioned "Chris," is that Chris Eby?

12  A    Yes, it is.

13  Q    Okay.

14       And after that discussion about the business ethics policy,

15  what do you recall being discussed next at that meeting?

16  A    I recall Chris asking about the manlifts.  We had manlifts

17  in our plant, which Ingredion had shut down when they came in on

18  April 1st, I believe; and Chris just asked Mr. Meadows why he --

19  I mean, he didn't let us know so that we could inform our

20  members before that happened, because it was kind of a big

21  thing.  We have many floors that our members work on and stuff,

22  and it just a convenient way to get up and down, do your job.

23  Q    And what response, if any, do you recall the company having

24  when Mr. Eby brought up the manlifts?

25  A    Mr. Meadows became very defensive and said that he would

1  never in his plant have a manlift and he would -- because  he

2  would not go to someone's house and tell their loved ones that

3  they had died in an accident on the manlift.

4  Q    And after that discussion about the manlifts, what do you

5  recall coming up next in that meeting?

6  A    There was discussion about insurance, like what kind of

7  insurance we had and stuff.  And I recall Mr. Meadows asking

8  Mrs. Drahos if -- about our deductibles and stuff; and she told

9  him that we had a 200 -- 400 deductible.  And when that

10 happened, Mr. Meadows, "Bye, bye."

11 Q    Did Mr. Meadows actually wave his hand as he said that?

12 A    He did.

13 Q    Did the parties discuss any other -- or what did the

14 parties discuss after that?

15 A    Yes, they also discussed pension -- we still had a pension

16 at that time, and, at that, Mr. Meadows waved his again, "Bye,

17 bye."  And Mr. Meadows also told us a few times that he would

18 never lie to us, because he could never go home and face his

19 family or look in the mirror if he ever lied to us.

20 Q    Do you recall Mr. Meadows talking about the up-coming

21 contract negotiations in that meeting?

22 A    I do.

23 Q    What do you recall about that?

24 A    Mr. Meadows said -- there was exchanges between him and

25 Chris -- Chris Eby -- and at one point, Mr. Meadows said that if

1  we went out on strike, he knew the steps he would have -- could

2  take up and to getting rid of all the current work force and

3  hiring back who he wanted.

4  Q    Okay, what do you recall Mr. Meadows' demeanor being during

5  this meeting?

6  A    He -- when the manlift discussion started, it seemed like

7  he threw up this big defense, like, maybe he -- and he got real,

8  like --  he was, like, on Chris Eby, like maybe he had heard --

9  you know, heard from people about Chris, like, maybe somebody --

10       JUDGE CARISSIMI:  You know, I've got to tell you right now,

11  subjective reactions aren't very meaningful.

12       THE WITNESS:  Okay.

13       MR. WIESE:  Okay.

14       THE WITNESS:  Sorry.

15       JUDGE CARISSIMI:  And I know we've and some of that --

16       MR. WIESE:  I --

17       JUDGE CARISSIMI:  -- but it's what people said.  Demeanor -

18  - characterization of people's demeanor is just -- is not really

19  very helpful.

20       MR. WIESE:  Okay, we'll move on, Your Honor.

21       JUDGE CARISSIMI:  It's too subjective.

22  (EXHIBIT MARKED:  GENERAL COUNSEL'S 55.)

23  (Witness proffered the document.)

24  Q    BY MR. WIESE:  Showing the witness what's been marked as

25  General Counsel Exhibit 55.  Do you recognize this document, Ms.

1    Shannon?

2    A    I do.

3    Q    And what is it?

4    A    It is a document that started with my notes after the

5    meeting had taken place.  I went home and wrote some notes down

6    as what I could best remember from the meeting; and then, I

7    believe it was two days later, Chris Eby and I were out at the

8    union hall, and Mr. Maas, and Mr. Wilford came out there, and we

9    collectively went through my notes; and they added, if, you

10   know, we agreed or disagreed on them.

11   Q    Who is Mr. Maas?

12   A    He was our --

13   Q    or who was he?

14   A    He was our Vice President at the time.

15   Q    And what about Mr. Wilford?

16   A    He was our third member labor relations.

17        MR. WIESE:  I'll offer General Counsel Exhibit 55.

18        JUDGE CARISSIMI:  Any objection to GC 55?

19        MR. BUTTRICK:  No objection.

20        JUDGE CARISSIMI:  GC 55 is admitted.

21   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 55.)

22   Q    BY MR. WIESE:  Ms. Shannon, after you became a member of

23   the negotiating committee, what efforts did you engage in to

24   prepare for negotiations?

25   A    I attended negotiating classes down at the Labor Center in

1   Iowa City.

2   Q    And when were those classes, approximately?

3   A    The spring of 2015.

4   Q    How far before the contract negotiations actually started

5   do you recall those meetings being?

6   A    I don't recall.

7   Q    Was it more than 6 months?

8   A    It was ahead of time.  Actually, I think it was the fall of

9   2014, I'm sorry, because it was quite a bit ahead of time.

10  Q    Besides this labor course, what other preparations did you

11  engage in?

12  A    We had taken a survey at work of all of our members, seeing

13  what they would like to see in the contract and compiled that.

14  Q    And what did you do with that survey?

15  A    We compiled it and we came up with what we would ask for in

16  bargaining from it.

17  Q    You mentioned -- excuse me, was there anything in the

18  Interunion Wet/Dry Corn Council that you did to prepare for

19  contract negotiations once you were on the negotiating

20  committee?

21  A    Yes, we had seen the other Ingredion plants that were in

22  the Wet/Dry Corn Council, their current contracts, and what they

23  had asked for in their contracts and what they got.

24  Q    Going into negotiations, Ms. Shannon, what was your role in

25  the Union?

1    A    I was the recording secretary.

2    Q    Okay.  And what was your role in negotiations?

3    A    To record the proceedings.

4    Q    And during the period of time that you were the recording

5    secretary, did you attend every negotiating session?

6    A    I did.  I left early on one of them to attend -- we were

7    hosting the Wet/Dry Corn Council that fall, and I left early one

8    day.

9    Q    And which did -- or when was that Wet/Dry Corn Council?

10   A    It was in October.

11   (EXHIBIT MARKED:  GENERAL COUNSEL'S 7.)

12   (Witness proffered the document.)

13       MR. WIESE:  Showing the witness what's been marked as

14   General Counsel Exhibit 7 --

15       JUDGE CARISSIMI:  Did you say "7," Mr. Wiese?

16       MR. WIESE:  Seven, thank you, Your Honor.

17   Q    BY MR. WIESE:  Ms. Shannon, do you recognize this document?

18   A    I do.

19   Q    And what is it?

20   A    These are my notes from negotiations.

21       MR. WIESE:  I'll offer General Counsel Exhibit 7 into

22   evidence.

23       JUDGE CARISSIMI:  Any objection to GC 7?

24       MR. BUTTRICK:  No objection.

25       JUDGE CARISSIMI:  GC 7 is admitted.

1  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 7.)

2      MR. BUTTRICK:  Well, I take that back.  I spoke too soon,

3  Your Honor.  One small objection --

4      JUDGE CARISSIMI:  Yes.

5      MR. BUTTRICK:  -- if I may.

6      JUDGE CARISSIMI:  Certainly.

7      MR. BUTTRICK:  I see that the notes go to October 8th.  The

8  allegations in the Complaint about surface bargaining are from

9  June 1st to September 14th, so any information about bargaining

10  dates since then is not alleged in the Complaint and is

11  irrelevant.

12      JUDGE CARISSIMI:  Well, I'll tell you, it's close in time,

13  so I'm going to admit them.  I'm going to bound by the

14  parameters in the Complaint, but for a meeting so close, I mean,

15  there could be something relevant in that.  And if we're talking

16  about June of this year, I'd have a different position.

17      But I'm going to admit the entirety of the notes and

18  overrule your objection to that extent.

19  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 7.)

20      JUDGE CARISSIMI:  You may continue, Mr. Wiese.

21      MR. WIESE:  Your Honor, what I would propose to do -- so

22  these notes are not self-explanatory.  What I would propose to

23  do would be to provide an additional copy of the notes to Ms.

24  Shannon that she can annotate along with her testimony and then

25  enter that document -- or offer that document as General Counsel

1    Exhibit 7(a) or some version of General Counsel Exhibit 7.

2         JUDGE CARISSIMI:  Now you want to have a written document

3    that she annotates and introduce that as another exhibit?

4         MR. WIESE:  That's correct, an annotated version of her

5    bargaining notes, to explain the ambiguities and make the record

6    clear.  I mean, if you look at the bargaining notes, the

7    speakers aren't necessarily clearly indicated on the notes.

8         JUDGE CARISSIMI:  Well, that's true, and that's -- that

9    point is important.  For me to really derive a lot of meaning

10   from this, I at least need to know who the speaker is if it's

11   not apparent.

12        MR. WIESE:  Right.

13        JUDGE CARISSIMI:  Counsel for the Respondent wish to --

14        MR. BUTTRICK:  I would be worried about the accuracy of

15   that kind of annotation now, you know, a year later to try to

16   figure out who was talking when and where, that's an important

17   fact.  If they are not in the notes, to try to have her try to

18   recreate it now is subject to lots of inaccuracy and error.

19        JUDGE CARISSIMI:  Well, there are two ways to go about it.

20   I mean -- and, again, obviously, I've never seen these notes,

21   all of you have.  If counsel feels that -- if Counsel for the

22   General Counsel feels there needs to be some explanation, there

23   are two ways to go about it.  I mean, we can sit here in the

24   hearing and you can ask questions to clarify things; or you

25   could take the approach that you suggested or last that you are

1    proposing.

2        But, in any event, I'm going to -- if General Counsel feels

3    that there needs to an explanation of these notes, I'm going to

4    permit them to do that, just as I will permit the Respondent to

5    do that, if you think there's something in your notes that are

6    unclear, if you choose to introduce them.

7        MR. BUTTRICK:  Yes, I have no problem with her answering

8    questions to explain who is talking.   What I would be worried

9    about is her marking up a document and certain lines.  I was

10   afraid that that process might result in some accuracies, but

11   I'll abide by your ruling.

12       JUDGE CARISSIMI:  And, again, if we go that route, I mean,

13   you can certainly cross-examine on that point.  And then you can

14   ask any questions that you want to within reason about any

15   annotations made to contemporaneous notes, because, obviously,

16   the annotations wouldn't be contemporaneous notes.

17       So Counsel for the General Counsel, I will leave it to you

18   how you wish to proceed.  If you want to do the annotation, I

19   mean, even though the counsel for the Respondent has some

20   objection to it, I'll permit, because there'll be an opportunity

21   to cross-examine on that.

22       MR. WIESE:  And, Your Honor, that is how we would like to

23   proceed.  What I would propose doing is I'll provide an extra

24   copy to everybody to annotate, along with Ms. Shannon, and then

25   once she completes her testimony, we can make copies of her

1   annotated version of the notes.

2       JUDGE CARISSIMI:  Okay, now I want to -- so where are we at

3   on the annotations?  That's been done already?

4       MR. WIESE:  No, no, no, no.  No, after she completes her

5   testimony.

6       JUDGE CARISSIMI:  Well, see, the problem is with that is

7   that when is this going to be done, this annotation that you

8   propose?

9       MR. WIESE:  When -- at the end of her testimony?

10      JUDGE CARISSIMI:  Tonight?

11      MR. WIESE:  I doubt it, Your Honor.

12      MS. OHAERI:  If we're ending at 6:30, which is in 15

13  minutes, then no.

14      JUDGE CARISSIMI:  Because, as I said, Counsel for the

15  Respondent has -- they're going to have an opportunity to cross-

16  examine.  So does that mean that he won't cross-examine at the

17  completion of her testimony and he'll -- when those annotations

18  are done, he'll then get an opportunity to cross-examine on her

19  entire testimony?  How is this going to work procedurally?  See

20  what I mean?

21      MR. WIESE:  No, I'll admit, I don't, Your Honor.

22      JUDGE CARISSIMI:  So we have a copy of notes.  You want to

23  have annotations.  When are those annotations going to be done

24  by the witness.

25      MR. WIESE:  Contemporaneous with her testimony on the

1  record.

2       JUDGE CARISSIMI:  Oh, I mean, you're going to do it by

3  question and answer.

4       MR. WIESE:  Yes.

5       JUDGE CARISSIMI:  I thought there was going to be some

6  written --

7       MR. WIESE:  Oh, no, Your Honor, I apologize.

8       JUDGE CARISSIMI:  All right.

9       MR. WIESE:  So the annotation would be contemporaneous with

10 her testimony.

11      JUDGE CARISSIMI:  Absolutely, I understand that.

12      Okay, just go right ahead.

13      MR. WIESE:  Okay.

14      JUDGE CARISSIMI:  I thought that there was going to be

15 something in writing, and I think counsel for the Respondent

16 thought that also.

17      MR. BUTTRICK:  I did, yes, that's correct.

18      JUDGE CARISSIMI:  But, as I said, if you're going to do it

19 by question and answer, by all means.

20      MR. WIESE:  Oh, yes, yes, Your Honor.

21      JUDGE CARISSIMI:  I'm sorry for my misunderstanding.

22      MR. WIESE:  I think it was poor explaining.

23      JUDGE CARISSIMI:  Yes, the word "annotation" is what threw

24 me off.

25      MR. WIESE:  Yes, yes.

1      JUDGE CARISSIMI:  "Clarification" I would have understood,

2  but I took that to mean something in writing.

3      MR. BUTTRICK:  So I guess, yes, so I'm clear -- now I'm

4  confused too.  So is the process where Tyler will ask her

5  questions and she will answer the questions, and then write --

6  mark on the exhibit as she's answering the question?

7      MR. WIESE:  That's the process that I was proposing, Your

8  Honor.

9      JUDGE CARISSIMI:  Well, if she's going to answer the

10  question, why do we need another marked up exhibit?

11      MR. WIESE:  Well --

12      JUDGE CARISSIMI:  Let me ask her a question.

13      On the fifth line on page 1, who said that, and she

14  answers.  Why do we need another document?

15      MR. WIESE:  Well, Your Honor, I think it will aid in having

16  a clear record at the very least, instead of having to --

17      JUDGE CARISSIMI:  I've been through this before.

18      MR. WIESE:  Okay.

19      JUDGE CARISSIMI:  I mean, these notes from bargaining --

20  they always need clarification; and I've plowed through many

21  records where I have the notes and I have the witness' testimony

22  explaining what happened on page 15 of a certain meeting.  So,

23  frankly, I don't see the need for annotation.  And you can

24  certainly clarify the notes, but the transcript is going to be

25  the annotation, if you will.  That's going to be -- you're going

1   to direct her attention to a specific portion of the notes,

2   you're going to ask her questions to clarify them.

3       MR. WIESE:  Yes.  Yes, Your Honor.

4       JUDGE CARISSIMI:  That's it for me.  I think that's all we

5   need.  I don't see what the point is of having another document

6   with handwritten notes; because then we have -- then we're going

7   to have the notes, we're going to have testimony, and then we're

8   going to have another version, if you will, because there might

9   be differences between what the witness said and what she

10  annotates, and, you know, then it gets even more complicated.

11      So what I would really suggest is that you clarify the

12  notes any way you want to, but I don't see the need to have

13  another document because, frankly, if there's credibility

14  issues, then there's going to be three versions of what

15  occurred, the notes, the testimony about the notes, an annotated

16  copy of the notes.  And I will assure you that there's a greater

17  chance for some discrepancy the more versions of a piece of

18  evidence there is.  And it's your witness, I mean -- but that's

19  a point I'd like you to consider.

20      MR. WIESE:  Okay, understood, Your Honor.

21      Could we go off the record for just one second?

22      JUDGE CARISSIMI:  Off the record.

23  (Whereupon, a brief discussion was held between the parties off

24  the record.)

25      JUDGE CARISSIMI:  On the record.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1    General Counsel, can you try to clarify what your proposal

2    with respect to an annotated version of General Counsel Exhibit

3    7 is?

4    MR. WIESE:  Yes, Your Honor.  What we are proposing to do

5    is to have Ms. Shannon, as she is testifying about her notes,

6    mark a copy of the notes, because the notes contain, as I think

7    the parties agree, some ambiguities, mark a copy of the notes

8    contemporaneous with her testimony, to take that marked copy,

9    make copies of that -- of her marked copy, and then enter that

10   as a separate exhibit.

11   MS. OHAERI:  And just to be clear, at the same, we have

12   extra copies of General Counsel Exhibit 7, so that the rest --

13   Your Honor and Respondent can also mark based on her testimony.

14   They will have the opportunity to review the one that she has

15   marked compared to what they have marked, and the one that she

16   has marked will be entered in as an exhibit.

17   Additionally, just to make clear, because the notes

18   themselves aren't clear, I assume that Respondent, for the

19   purposes of their cross-examination, are going to be at least

20   taking notes somewhere about what she is saying is meant by her

21   own notes.  And so to the extent that they are going to cross

22   her on it, it actually may be important to insure that the note

23   -- the annotation is clear; otherwise, they may be asking her

24   questions that aren't actually accurate as to her own testimony,

25   especially to the extent, you know, I'm not clear on how long

1     Ms. Shannon's going to be testifying tomorrow in any event.

2          And so the idea was that, this way, they would be able to

3     follow along as would Your Honor, if you would choose to

4     annotate and it would be compared to -- there wouldn't be a

5     disagreement with regard to what would be entered as General

6     Counsel's Exhibit 7(a).

7          JUDGE CARISSIMI:  Well, let me -- so your proposal is that

8     as the witness testifies, she contemporaneously with her

9     testimony makes notes on General Counsel Exhibit 7, right?

10         MS. OHAERI:  Correct.

11         JUDGE CARISSIMI:  And those notes would be of what nature?

12    Just identifying speakers?

13         MS. OHAERI:  Yes, or any abbreviations or things of that

14    nature.

15         MR. WIESE:  It would just be limited to identifying

16    speakers, Your Honor.

17         JUDGE CARISSIMI:  Be limited to identifying the speakers?

18         MR. WIESE:  In terms of her annotations on the notes.

19         JUDGE CARISSIMI:  Right.

20         MR. WIESE:  Her testimony will go a little bit beyond that.

21         MR. BUTTRICK:  Well, I guess if one --

22         MS. OHAERI:  And --

23         MR. BUTTRICK:  Sorry.

24         MS. OHAERI:  Sorry.

25         We had an off-the-record conversation about how those types

1  of -- that type of testimony is normally entered in bargaining

2  and in other types of cases.  I would just -- and there was some

3  discussion by Respondent by demonstratives, and how this isn't

4  typical of the demonstrative.  I just would like to say that in

5  other types of cases, witnesses do mark documents as a way of

6  describing what happened, where things were located --

7       JUDGE CARISSIMI:  Right, I'm familiar with that, it happens

8  with diagrams, maps, and, of course, whatever markings, then you

9  have to have another document, which we would be doing here.

10      I'll hear from counsel for the Respondent. But as is

11  further explained, I mean, if it's limited to identifying

12  speakers, there might be some benefit to that.  If I allow the

13  General Counsel to do that, then there would have to be copies

14  made of this revised version of the notes.

15      MS. OHAERI:  That's correct.

16      JUDGE CARISSIMI:  And then given to counsel to review

17  before cross-examination.

18      MS. OHAERI:  And that is --

19      JUDGE CARISSIMI:  And then you can cross-examine over the -

20  -

21      MR. BUTTRICK:  I guess my one procedural problem I see with

22  the approach, and I'm certainly not accusing Ms. Shannon of

23  doing anything wrong.

24      JUDGE CARISSIMI:  Yes.

25      MR. BUTTRICK:  She's a very honest woman, but if she were

1    to erroneously mark on the note where someone spoke which was

2    different than what her verbal testimony was, just because she

3    made a mistake and counted down the wrong number of lines --

4          JUDGE CARISSIMI:  Right.

5          MR. BUTTRICK:  -- then  you're now going to have an error

6    in the document about who spoke where.

7          JUDGE CARISSIMI:  Right.

8          MR. BUTTRICK:  So to do this really effectively, you would

9    have to have someone watch her as she marks it to make sure

10   she's actually putting it in the place where she said the thing

11   was.

12         JUDGE CARISSIMI:  Well, I don't think it's -- because

13   you're going to get a copy of it.  And then we're all going to

14   get a transcript.  So the value of this is going to be argued to

15   me in your briefs, and if you feel that there's some material

16   discrepancy between what the witness testified to and what's

17   marked on the exhibit, I'm sure you'll bring that to my

18   attention to show that it's unreliable in some fashion.

19         So having heard -- I need to ask you though, do you have an

20   objection to this procedure?

21         MR. BUTTRICK:  I have the on-going objection, Your Honor.

22         JUDGE CARISSIMI:  Okay, you do have an on-going objection?

23         MR. BUTTRICK:  I do.

24         JUDGE CARISSIMI:  All right.

25         I'm going to overrule the objection.  I'm going to permit

1  you to do that, but, of course, it's going to be limited to

2  identifying speakers.  And then after the witness' direct

3  testimony is completed, there will have to be copies made of

4  that later exhibit -- what are you going to call it?  GC 7(a)?

5       MR. WIESE:  7(a), Your Honor.

6       JUDGE CARISSIMI:  -- before Respondent begins cross-

7  examination, so he has the ability to review that before he

8  cross-examines the witness.  All right?

9       MR. WIESE:  Understood.

10      JUDGE CARISSIMI:  So that's the ruling.

11      And so anything further that anybody wants to raise today?

12 (No response.)

13      JUDGE CARISSIMI:  All right.

14      So we'll be in recess then until 9 a.m. tomorrow morning.

15      Let's go off the record.

16 (Whereupon, at 6:36, p.m., the trial adjourned until tomorrow,

17 April 19, 2016, at 9 a.m. in the same place.)

18

19

20

21

22

23

24

25

1          <u>C E R T I F I C A T E</u>

2          This is to certify that the attached proceedings before the

3    National Labor Relations Board, Region 18, Case 18-CA-160654 and

4    18-CA-170682, Ingredion, Inc, d/b/a Penford Products Co. and

5    BCTGM Local 100G, affiliated with Bakery, Confectionary, Tobacco

6    Workers, and Grain Millers International Union, AFL-CIO, in

7    Cedar Rapids, Iowa on April 18, 2016, was held according to the

8    record, and that this is the original, complete and true and

9    accurate transcript that has been compared to the recording, at

10   the hearing; and that the exhibits are complete and no exhibits

11   received in evidence or in the rejected exhibit files are

12   missing.

13

14                    *Christopher Walls*

15                    Christopher Walls

16                    Official Reporter

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

         Respondent,

and                         Case No. 18-CA-160654
                                  18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLRS INTERNATIONAL UNION,
AFL-CIO,

         Charging Party.

Pages:  246 through 468  (Volume 2 of 4)

Date:  April 19, 2016

Place:  Cedar Rapids, Iowa

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

        Respondent,

and                           Case No. 18-CA-160654
                                        18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLERS INTERNATIONAL UNION,
AFL-CIO,

        Charging Party.

    The above entitled matter resumed trial pursuant to

adjournment, before The Honorable Mark Carissimi, Administrative

Law Judge, in Room 008, Board of Supervisors Formal Board Room

of the Jean Oxley Linn County Public Service Center, 935 Second

Street SW, Cedar Rapids, Iowa, on Tuesday, April 19, 2016, at

8:58 a.m.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1                    <u>A P P E A R A N C E S</u>

2    **On behalf of the NLRB, Counsel for the General Counsel:**

3    TYLER J. WIESE, ESQ.

4    CHINYERE C. OHAERI, ESQ.

5    National Labor Relations Board, Region 18

6    212 Third Avenue South, Suite 200

7    Minneapolis, Minnesota  55401

8    Tyler Wiese: (612)348-1784 /Chinyere Ohaeri: (612)348-1766

9    Tyler.Wiese@nlrb.gov / Chinyere.Ohaeri@nlrb.gov

10   **On behalf of the Charging Party:**

11   SETH MARLING,

12   BCTGM Local 100G

13   5000 J Street SW

14   Cedar Rapids, Iowa   52404

15

16   **On behalf of the Respondent:**

17   STUART R. BUTTRICK, ESQ.

18   RYAN J. FUNK, ESQ.

19   Faegre Baker Daniels

20   300 N. Meridian Street, Suite 2700

21   Indianapolis, Indiana   46204

22   Stuart Buttrick:  (317)237-1038

23   Ryan Funk:  (317)237-1131

24   stuart.buttrick@FaegreBD.com/ryan.funk@FaegreBD.com

25

1                                **I N D E X**

2    **WITNESSES**              **DIRECT**  **CROSS**    **REDIRECT** **RECROSS** **VOIR DIRE**

3    Renita Shannon            252      349        375       377

4    (Resumed)                                      379

5

6    Christopher Eby           380

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1                        **E X H I B I T S**

2    **EXHIBIT**                    **IDENTIFIED**              **IN EVIDENCE**

3    **General Counsel's**

4      4   (Offer withdrawn-pg 386.)  385

5      7(a)                            252                        348

6      8                              403                        404

7      9(b)                            259                        259

8     11                              394                        395

9     13                              394                        395

10    18                              262                        263

11    24                              274                        275

12    25 (Withdrawn - pg. 277)        275

13    31                              325                        327

14    40                              394                        395

15    75                              250                        300

16    76                              445

17

18    **Respondent's**

19      **37**                          **368**                        **369**

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                                              (8:58 a.m.)

3        JUDGE CARISSIMI:  On the record.

4        Mr. Wiese, there was an administrative matter that you'd

5    like to address before we continue the testimony?

6    (EXHIBIT MARKED:  GENERAL COUNSEL'S 75.)

7        MR. WIESE:  Yes, Your Honor.  I have the Petition for

8    Injunction that you requested yesterday.  It's marked as General

9    Counsel Exhibit 35.

10       JUDGE CARISSIMI:  So it's GC 35?

11       MR. WIESE:  GC 75.  Excuse me.

12       JUDGE CARISSIMI:  Seventy-five?

13       MR. WIESE:  Yes.

14       JUDGE CARISSIMI:  Okay.  Thank you.

15       Is there any objection to the introduction of GC 75?

16       MR. BUTTRICK:  No objection, Your Honor.

17       Just one question, though.  Would you also have it -- find

18   it helpful if you had our response to this petition?

19       JUDGE CARISSIMI:  You could put that in.  I don't really

20   need that.  The only thing I really need is the fact that a

21   petition was filed and the case number, because I refer to it in

22   a footnote.

23       MR. BUTTRICK:  No problem.

24       JUDGE CARISSIMI:  So, if you wish to, that's fine.  But as

25   I said, this is really an administrative matter, for my

1    purposes.

2        What I would ask, though, is that if there's some

3    disposition of this case while my case is pending, to advise me

4    of that.  I'll direct the General Counsel, since they're the

5    petitioner, to do that.  You can send me an e-mail with copies

6    to the parties.  Because, again, I should be accurate when I

7    issue my decision, as to the state of the 10(j) petition.  And

8    that's important because if it's still pending in some fashion,

9    then I must expedite my consideration of this case, as does the

10   Board.  If it's dismissed, that's a different situation.  So it

11   is important for me to know and the Board to know, if the case

12   goes there, what is the status of that 10(j) petition.

13       All right?

14       MR. WIESE:  Okay.

15       JUDGE CARISSIMI:  Okay.

16       MR. WIESE:  Understood.

17   (WITNESS RECALLED:  RENITA SHANNON)

18       JUDGE CARISSIMI:  All right.  Ms. Shannon is on the witness

19   stand.

20       And since you were sworn in yesterday, Ms. Shannon, I won't

21   give you the oath again.  I'll just merely remind you that you

22   are still under oath.

23       THE WITNESS:  Okay.

24       JUDGE CARISSIMI:  All right?

25       Mr. Wiese, you may proceed.

1      RESUMED DIRECT EXAMINATION

2  (EXHIBIT MARKED:  GENERAL COUNSEL'S 7(a).)

3      MR. WIESE:  Your Honor, I'm providing copies of General

4  Counsel Exhibit 7(a) for marking.

5      JUDGE CARISSIMI:  Well, as I said, consistent with my view

6  yesterday, I think the approach that we'll take is if you wish

7  to have the witness mark 7(a), she can.  When her direct

8  examination is concluded, then we're going to have copies made

9  of the notes that she put on what is now Exhibit 7.  Respondent

10  -- I will give them time to review those before their cross-

11  examination, and then they can conduct cross-examination.

12      MR. WIESE:  That's what I understood.

13      JUDGE CARISSIMI:  All right.  Now, if parties want to make

14  their own notes on what they have, what you've given them as

15  Exhibit 7(a), that's fine, but the actual Exhibit 7(a) is not

16  going to be admitted into evidence until the witness's testimony

17  is complete and until she's made whatever markings she's going

18  to make on 7(a).

19      All right?  Everybody understand?

20      MS. OHAERI:  Yes.

21      MR. WIESE:  Yes, Your Honor.

22      JUDGE CARISSIMI:  Okay.  Very good.

23      You may proceed, sir.

24  (Witness proffered the document.)

25  Q    BY MR. WIESE:  Ms. Shannon, what was your process for

1  taking notes?

2  A    I had never done it before, so I just put all the people

3  normally that were in and the date.  And I tried to annotate

4  where each person was speaking.

5  Q    Were you taking these notes as bargaining was happening?

6  A    Yes.

7  Q    Did you change these notes in any way after negotiations?

8  A    No.

9  Q    Did you review these notes prior to your testimony today?

10  A    Yes.

11  Q    Is it the Union's standard practice to have a chief note

12  taker at negotiations?  Do you know?

13  A    It's my understanding yes.

14  Q    And who typically fills that role?

15  A    The recording secretary.

16  Q    So let's take a look at General Counsel Exhibit 7 -- or

17  7(a), I guess -- the one to mark, for you.  So, starting at the

18  top with "Exchange proposals", who do you recall saying that?

19  A    That was just a note that I put down.

20  Q    Could you indicate that on the exhibit?

21       And then picking up with the line below that, "get a

22  contract".  Who is that line in reference to?

23  A    That's Mr. Meadows.

24  Q    And how far down in your notes is Mr. Meadows speaking?

25  A    That would be down to where it says "will be discussable".

1   Q      Could you mark that on General Counsel Exhibit 7(a)?

2   A      Yes.

3   Q      Okay.

4          JUDGE CARISSIMI:  Well, might I suggest that with respect

5   to anything Mr. Meadows says, why don't you say "KM"?

6          THE WITNESS:  Okay.

7          JUDGE CARISSIMI:  That will indicate Ken Meadows.

8          THE WITNESS:  Okay.

9          JUDGE CARISSIMI:  All right?  And why don't you take that

10  approach for everybody?  For example, Levi Wood can be "LW".

11  Renita Shannon can be "RS".

12         Is that agreeable to the General Counsel?

13         MR. WIESE:  Yes.

14         JUDGE CARISSIMI:  To the Respondent?

15         MR. BUTTRICK:  Sure.

16         THE WITNESS:  Okay.

17         JUDGE CARISSIMI:  Okay.

18  Q      BY MR. WIESE:  I'm going to show you what's -- I'm going to

19  direct your attention to Joint Exhibit 1 and General Counsel

20  Exhibit 2(a).  They're up front here.

21  (Witness proffered the documents.)

22  Q      First of all, do you recognize Joint Exhibit 1?

23  A      I do.

24  Q      What is it?

25  A      It was the Company's initial proposal.

1  Q    And what about General Exhibit 2(a)?  Have you seen that

2  document before?

3  A    Yes.

4  Q    When did you see that document?

5  A    That came with the other document, with a document 1.

6  Q    With the Joint Exhibit 1?

7  A    Right.

8  Q    Okay.  So, turning back to your notes, the line starting

9  with "Jethro".  Who is that line in reference to?

10  A    That is my note.

11  Q    And then picking up with "No reduction at 80 points".  Who

12  is that line?

13  A    That is KM.

14  Q    And how far down is KM speaking?

15  A    Down to "80 points is 80 points."

16  Q    And what is that reference in "80 points" to?

17  A    We have a retirement to 80 points: age plus years of --

18  times years of service at a 51-dollar multiplier.  And at -- if

19  you are under 62 years old, there is a reduction for every year.

20  And Mr. Meadows said that he didn't know why that was happening

21  in our plant.

22  Q    And then picking up below that with "Active service".  Who

23  is that line in reference to?

24  A    That is Mr. Meadows; KM.

25  Q    And how far down is Mr. Meadows --

1   A     To "Will look at that."

2   Q     Could you indicate that on the document?

3   A     Yes.

4   Q     Then the line below that, "Company prop."  What is -- or

5  who is that?

6   A     That's my note.

7   Q     Next to that, where it says "pathetic proposals", is that -

8  -

9   A     That's my notes.

10  Q     And then picking up the line below that, "I will not waste

11  your time".  Who is that?

12  A     That is KM.

13  Q     And how far down is Mr. Meadows speaking?

14  A     That is all the way to the bottom of that page 1.

15  Q     In this line about "I will not waste your time if we come

16  to impasse we will move on it," are you sure that that's

17  something that Mr. Meadows said?

18  A     Yes.

19  Q     Turning over to page 2 of the document, starting with

20  "assigned training positions".  Who is that line in reference

21  to?

22  A     KM.

23  Q     And how far down is Mr. Meadows speaking on these notes?

24  A     To "Pool to pull from."  "Extra Crew" to "Pool to pull

25  from."

1  Q    And could you explain what the extra crew is, as best you

2  can recall?

3  A    That was in the Company's proposal.  They were proposing an

4  extra crew to be maintained for -- they would learn jobs or they

5  would do cleaning.  Just in looking ahead to maybe retirements

6  coming up or something, they might be put in a position to learn

7  a job.

8  Q    Okay.  And the line below that, starting with "gap ins."?

9  What is that?

10  A    That's my note.

11  Q    And what does the -- what is the "gap ins."?  What is that?

12  A    Gap insurance was what -- the word we referred to.

13  Insurance from anytime you retired until 65 years old, when

14  Medicare would take over.

15  Q    And why did you write "they have a supplement in Indy"

16  after that?

17  A    Because I had talked to the union president in Indianapolis

18  and I knew that they had that there.

19  Q    Was that another Ingredion plant?

20  A    Yes.

21  Q    And then picking up below that with -- starting with "KM".

22  I see some initials there.  Who is "IF"?

23  A    That's Erwin Froehlich.

24  Q    And what about "CE"?

25  A    Chris Eby.

1   Q    Okay.  And starting with "KM ask", down to the bottom of

2   the notes on the page.  What do those notes indicate?

3   A    Mr. Meadows -- there was an exchange.  Mr. Meadows asked if

4   we were paid weekly or biweekly, or how we were paid.  And he

5   asked Mr. Froehlich this, and Mr. Froehlich indicated that we

6   were paid weekly.  And on our side of the table, we knew

7   different, but -- and then there -- after an exchange with Chris

8   Eby, Ken was informed that we are paid biweekly.  And right then

9   Ken turned to Erwin Froehlich and shot him a look that would've

10  put anyone under the table.

11  Q    All right.  Let's turn over then to -- or, actually, before

12  we do that.

13       Just to clarify, starting with the "KM" there, who is that

14  in that exchange?

15  A    Mr. Meadows.

16  Q    Okay.  Thank you.  And is that consistent throughout that

17  exchange, "KM" being Ken Meadows?

18  A    Yes.

19  Q    All right.  Let's turn over to page 3.  So, starting at the

20  top, next to "I will address", is that the initial "KM" up

21  there?

22  A    Yes.

23  Q    And how far down is Mr. Meadows speaking in the notes?

24  A    It would be that line.  I am not real clear on the "3.1 on

25  5 page 10".

1  Q    And picking up after that with the "May FB cost". Who is

2  saying that?

3  A    That is KM.

4  Q    And how far down is KM speaking in the notes?

5  A    He would be down to "No offer on pension multiplier".

6  Q    Could you indicate that on your notes?

7  (EXHIBIT MARKED:  GENERAL COUNSEL'S 9(b).)

8  Q    BY MR. WIESE:  I'm going to direct your attention to

9  General Counsel Exhibit 9(b).

10  (Witness proffered the document.)

11  Q    Do you recognize this document, Ms. Shannon?

12  A    I do.

13  Q    And what is it?

14  A    It was the information request.

15  Q    And do you recall when this information request was

16  provided?

17  A    Yes.  On 6/29 of '15.

18  Q    Do you recall, was it during bargaining that day?

19  A    Yes.

20       MR. WIESE:  I'll offer General Counsel Exhibit 9(b).

21       JUDGE CARISSIMI:  Is there any objection to GC 9(b)?

22       MR. BUTTRICK:  No objection, Your Honor.

23       JUDGE CARISSIMI:  General Counsel 9(b) is admitted.

24  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 9(b).)

25  Q    BY MR. WIESE:  Picking up with the lines where it says

1  "JH".  Who is that?

2  A    That is Jethro Head, our region 3 vice president.

3  Q    And looking at your notes, how far down is Mr. Head

4  talking?

5  A    He is just the line that is "JH".

6  Q    And looking at those two lines, the "No offer on pension

7  multiplier" and then Mr. Head's response, do you recall what

8  those lines are in reference to?

9  A    Yes.  It's the request for information.  There was -- and

10  Mr. Meadows said there was no offer.  They had made no offer on

11  the pension multiplier, so it didn't appear that he was going to

12  get an answer to it.

13  Q    And then picking up below that, below Mr. Head's line about

14  "Our Request", starting with "don't have it".  Who is that?

15  A    That is KM.

16  Q    And how far down is Mr. Meadows speaking?

17  A    That would be down to "retiree costs not until October

18  November same as above."

19  Q    Picking up below that with "add subjects".  What is -- or

20  who is saying that?

21  A    I believe it's my notes.  I don't think it's anyone

22  talking.

23  Q    Then picking up below that, starting with the Roman numeral

24  III.  What is that in reference to?

25  A    That is Mr. Meadows giving answers to our proposals that we

1  gave him.

2  Q    Directing your attention to Joint Exhibit 10.

3  (Witness proffered the document.)

4  Q    Ms. Shannon, do you recognize this document?

5  A    I do.

6  Q    What is it?

7  A    This was our proposal presented to the Company.

8  Q    Okay.  And do the notes starting with the Roman numeral III

9  -- do those correspond in any way to this proposal?

10  A    Yes, they do.

11  Q    Okay.  And if you could, explain how these notes interact

12  with General Counsel -- or, excuse me, Joint Exhibit 10.

13  A    They -- they're the answers Mr. Meadows gave to each of our

14  proposals.

15  Q    And is that true for all of the notes, starting with Roman

16  numeral III, down to the bottom of the page, on page 3 of your

17  notes?

18  A    Yes.

19  Q    So, looking next to that Roman numeral III, there's a page

20  number.  Or, well, there's the number 1, and then there's a page

21  number next to that.  Do you recall what that page number is in

22  reference to?

23  A    Not right off the top of my head.  No.

24  Q    Okay.  All right.  Let's turn the page then to number 4.

25  Picking up at the top with "not interested".  Is that also in

1  reference to Joint Exhibit 10, the Union's initial proposal?

2  A    Yes.

3  Q    And how far down is that the case in your notes?

4  A    Down to "caucus at 1:20 pm".

5  Q    Okay.  And could you please mark that on your notes?

6      Looking at these responses on page 4, these "not

7  interested", is that -- does that represent Ken Meadows'

8  response to the Union's initial offer on those items?

9  A    That does.

10 Q    And then picking up after the "caucus at 1:20 pm".  What do

11 the notes below that indicate?

12 A    After the "3:52", we came back from caucus.  And the

13 "incorporated" to "entertained" is KM.

14 Q    Did you indicate that in your notes?

15 A    Yes.

16 Q    And then, below that line, "J.H. reads"?  Who said that?

17 A    It's just -- it's my note.

18 (EXHIBIT MARKED:  GENERAL COUNSEL'S 18.)

19 Q    BY MR. WIESE:  Showing you what's been marked as General

20 Counsel Exhibit 18.

21 (Witness proffered the document.)

22 Q    Do you recognize this, Ms. Shannon?

23 A    I do.

24 Q    What is it?

25 A    It was, during caucus, something that we made up to counter

1    the Mr. Meadows -- how he addressed our initial proposal.

2    Q    Okay.  And looking at the handwriting on this document, is

3    this your handwriting?

4    A    It is.

5    Q    And what does the handwriting on this document indicate?

6    A    These were Mr. Meadows' answers, as far as I can tell right

7    now.  Yes.  I used this paper instead of writing on my notepad.

8    Q    And did you write on the proposal in General Counsel

9    Exhibit 18 as Mr. Meadows was speaking as well?

10   A    Yes, I did.

11   Q    All right.  And looking at page 3 of the document, where it

12   says, about halfway down, "pursuant to IA Code".  What do you

13   recall that -- about that?

14   A    There was a -- the section was in our contract that we were

15   given time off to go vote in general or municipal elections, and

16   Ken's answer was he would think about it and get back to us.

17   And it was indicated that it's an Iowa law, as the "Code"

18   indicates, by our side.

19       MR. WIESE:  I'll offer General Counsel Exhibit 18 into

20   evidence.

21       JUDGE CARISSIMI:  Is there any objection to GC 18?

22       MR. BUTTRICK:  No objection, Your Honor.

23       JUDGE CARISSIMI:  General Counsel 18 is admitted.

24   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 18.)

25   Q    BY MR. WIESE:  All right.  And then picking up with the

1  notes on the top of page 5 starting with "not interested".  Who

2  is speaking there?

3  A    From "not interested in maintaining" to "not in my

4  contract" is KM.

5  Q    Did you indicate that in your notes?

6  A    I did.

7  Q    Okay.  Great.  Thanks.

8      And then picking up with "is there a problem".  Do you know

9  who said that line?

10 A    I cannot recall who said that line.

11 Q    Okay.  And what about the line below that, starting with

12 "somebody"?  Do you --

13 A    I don't recall those two lines, who said those.

14 Q    Okay.  And picking up with "I will put something".  Who is

15 that?

16 A    From the line "I will put something in" to "I am working

17 from my proposal" is KM.

18 Q    And what about the last line on the page, the "8:30

19 resume"?  What is that?

20 A    That indicates that we would resume at 8:30 in the morning

21 with negotiations.

22 Q    Turning to the next page, page 6 of your notes, starting

23 with "KM", down to, I guess, the -- well, do the initials on

24 this page -- does it indicate who was speaking, down to the next

25 set of initials?  Is my question clear?

1   A    From "My contract is my proposal" down to the end of the

2   page is KM.

3   Q    All right.  Have you indicated that in your notes?

4   A    I have.

5   Q    Okay.  And starting -- and so, starting with the top of the

6   document, down to that point, "My contract is my proposal", the

7   initials indicate who is speaking?  Is that correct?

8   A    I'm sorry.  On page what?

9   Q    We're still on page 6.

10       JUDGE CARISSIMI:  Let me ask a question.

11       Ms. Shannon, I see in that first section the references to

12  "JH".  When there's notes next to "JH", does that mean that

13  Jethro Head made that statement?

14       THE WITNESS:  Yes.

15       JUDGE CARISSIMI:  All right.

16  Q    BY MR. WIESE:  And the same is true with "KM" on this page?

17  They're for Ken Meadows?

18  A    Yes.  Yes.

19  Q    I'm going to show you what's been marked as Joint --

20       JUDGE CARISSIMI:  Well, I have one further question.

21       When we get to the end of the page, there's no initials.

22  So just so that I am following this, the line -- do you see "Not

23  going"?  Begins with "Not going"?

24       THE WITNESS:  Yes, I do.

25       JUDGE CARISSIMI:  To the end of the page, who said that?

1     THE WITNESS:  KM, Your Honor.

2     JUDGE CARISSIMI:  Thank you.

3   Q     BY MR. WIESE:  Directing your attention to Joint Exhibit 2.

4   (Witness proffered the document.)

5   Q     Do you recognize this document, Ms. Shannon?

6   A     I do.

7   Q     And what is it?

8   A     This would be an updated counterproposal on the -- our

9   counter from the day before.

10  Q     And this is a company proposal?

11  A     The same day.

12        Yes.  Yes, it is.

13  Q     In your notes, is this proposal indicated by the "Counter

14  proposal" near the top of the page, next to the second time

15  where it mentions "KM"?

16        JUDGE CARISSIMI:  You're on page 6, Mr. Wiese?

17        MR. WIESE:  Yes.  Yes, I am, Your Honor.

18        JUDGE CARISSIMI:  Do you see, Ms. Shannon?

19        THE WITNESS:  Yes.  This does correspond with that.

20        MR. BUTTRICK:  If we can just pause for a moment, I'm

21  trying to find it myself.  Sorry.

22        JUDGE CARISSIMI:  Sure.  Let me know when you're ready.

23        Let's go off the record.

24  (Off the record.)

25        JUDGE CARISSIMI:  Back on the record.

1   Q    BY MR. WIESE:  Ms. Shannon, the reference to "Counter

2   proposal" in the line starting with "KM", "added specifics", is

3   that in reference to Joint Exhibit 2, the Employer's proposal

4   dated 6/29?

5   A    Yes, it is.

6   Q    What do you recall about when the Employer presented this

7   proposal, Joint Exhibit 2?

8   A    That there -- most -- I think all of the things were

9   highlighted in it, or most of them, that they had changed or

10  updated.

11  Q    And what about in your notes where it says "were agreed

12  to"?  What is -- what do you recall about that?

13  A    I'm sorry.  Where at?

14  Q    On that same line, so starting with "KM", "added specifics

15  that were agreed to".  Do you --

16  A    That would be the specifics that were in our

17  counterproposal the day before, of the June 29th.  Exhibit 18.

18  Q    All right.  Let's turn over to page 7 of your notes, Ms.

19  Shannon.

20  A    Okay.

21  Q    Starting with the top, "under our guidelines".  Who is

22  saying that?

23  A    That would be KM, until "It may be a drop dead date for

24  me".

25  Q    And then what about the line next to that, "Ken", "not for

1   me"?

2   A    That would be JH.

3   Q    Where it says "LBF", what does -- what do you understand

4   that to mean?

5   A    I understand that to be a last, best, and final offer.

6   Q    And then the line below that for Mr. Meadows, "I am going

7   to prep accordingly".  What was your understanding of what that

8   meant?

9        JUDGE CARISSIMI:  Hold it.  All I care about is what's

10  said.

11       MR. WIESE:  Okay.

12       JUDGE CARISSIMI:  All right?  Understandings don't help me.

13  Q    BY MR. WIESE:  Do you recall Mr. Meadows saying anything

14  further at that time about what he meant by "I am going to prep

15  accordingly"?

16  A    No, I don't.

17  Q    All right.  And picking up with the line below that, is

18  that -- "You have not done".  Is that -- who is that?

19  A    That's JH.

20  Q    And then picking up with "Extra Crew," the line below that.

21  Who is that?

22  A    Down to "categories brought up to scale", that would be all

23  KM.

24       JUDGE CARISSIMI:  I'm going to ask a question, Mr. Wiese.

25       MR. WIESE:  Yes.

1    JUDGE CARISSIMI:  Let me intervene for a second.  I'm a

2  little bit uncertain about something.

3    MR. WIESE:  Yes.

4    JUDGE CARISSIMI:  Ms. Shannon, I want you to go back to the

5  top of that page on the third line that says "It may be a drop

6  dead date for me".  That was Mr. Meadows?

7    THE WITNESS:  That was.

8    JUDGE CARISSIMI:  Now, I know counsel asked this, but I was

9  uncertain of the answer.  Now, when we go farther to the right,

10  it says "Ken" at the top, "not for me".  Who said that?

11    THE WITNESS:  That was JH.

12    JUDGE CARISSIMI:  Okay.  So can you tell me to the best of

13  your recollection what Mr. Head actually said?  Were those his

14  words, as best you can recall?

15    THE WITNESS:  Yes, as best I can recall.

16    JUDGE CARISSIMI:  All right.  Thank you.

17    You may continue, Mr. Wiese.

18    MR. WIESE:  Okay.  Thank you.

19  Q    BY MR. WIESE:  So I just -- I have one more question about

20  the notes on this page.  The "Current health plan handout"?

21  What is that in reference to?  Do you recall?

22  A    I don't recall right off the top of my head.

23  Q    Okay.  Let's turn over to page 8 of your notes, starting

24  with the upper left, where it says "transparency", "gossip".

25  Who said that?

1   A    I don't recall who said "transparency" or "gossip".  It may

2   have just been my notes.

3   Q    And then picking up with the -- okay.  Yes, picking up with

4   the line next to that, "I don't see 124 concessions".  Who is

5   saying that?

6   A    That is KM.

7   Q    And how far down is Ken Meadows -- or how far down in the

8   notes is Ken Meadows talking?

9   A    That would be to the bottom of the -- of my writing there.

10  Q    So ending with "our company" --

11  A    "Allow our company to grow."  "Not allow our company to

12  grow."

13  Q    Could you indicate that?

14  A    Yes.

15  Q    And the "124 concessions" that's listed there?  Do you

16  recall what that is in reference to?

17  A    Yes.  We went through the proposal by the Company and

18  matched it with our current contract and we came up that there

19  were 124 concessions in the Company's proposal.

20       JUDGE CARISSIMI:  Did somebody make mention of that at the

21  meeting to Mr. Meadows?

22       THE WITNESS:  I don't recall that, Your Honor.

23       JUDGE CARISSIMI:  Well, when I see your notes, you've

24  indicated in your testimony today Mr. Meadows said "I don't see

25  124 concessions."  So how did that come up that he made that

1  statement?

2      THE WITNESS:  Well, I know we made a list.  So I can't

3  recall if we gave it to him that morning or -- I don't recall.

4      JUDGE CARISSIMI:  All right.  Thank you.

5  Q    BY MR. WIESE:  Directing your attention to General Counsel

6  Exhibit 21.

7  (Witness proffered the document.)

8  Q    Do you recognize this document, Ms. Shannon?

9  A    I do.

10 Q    And what is it?

11 A    This is the list of concessions that we came up with from

12 the Company's proposal.

13 Q    Do you recall this list being at least mentioned in

14 negotiations on July 27?

15 A    I don't recall.

16 Q    Okay.  You can set that aside.

17     Let's turn over then to page 9 in your notes.  So, starting

18 with "Personal holidays", is that -- are those the initials "KM"

19 next to that?

20 A    Yes.

21 Q    And then, below that, "Not going to get us"?  Is that JH?

22 A    Yes.

23 Q    And how far down on the page is JH speaking?

24 A    That would be to "with retirees."

25 Q    And then the line below that.  Is that Ken Meadows?

1  A    Yes.

2  Q    And how far down is Mr. Meadows speaking?

3  A    From "Really need to take a look" to "Give it some

4  consideration".

5  Q    Directing your attention to Joint Exhibit 3.

6  (Witness proffered the document.)

7  Q    Do you recognize this document, Ms. Shannon?

8  A    I do.

9  Q    And what is it?

10 A    That would be an updated counterproposal given to us on

11 7/28 of '15.

12 Q    Looking at the -- strike that.

13       Is this a proposal that you recall being given at

14 negotiations on July 28th?

15 A    Yes.

16 Q    Looking at the line "KM", "Really needs to take a look at

17 fair offer", do you recall if that line was in reference to this

18 offer?

19 A    I don't recall if it was at that time.

20 Q    Okay.  Let's --

21       JUDGE CARISSIMI:  Mr. Wiese, I have a question I'm going to

22 ask now.

23       Ms. Shannon, I'm going to direct your attention to the top

24 of page 9.  Next to the date, "July 28, 2015" --

25       THE WITNESS:  Yes.

1      JUDGE CARISSIMI:  -- it says "Mediator".

2      THE WITNESS:  Yes.

3      JUDGE CARISSIMI:  Was there a mediator present?

4      THE WITNESS:  Yes, there was.

5      JUDGE CARISSIMI:  Okay.  Thank you.

6  Q   BY MR. WIESE:  And is that consistent throughout your notes

7  that where it says "Mediator" --

8  A   Where it started, yes.  Yes, when he --

9  Q   -- that indicates that a mediator --

10  A   -- when he came.

11  Q   -- was present --

12  A   Yep.

13  Q   -- at the session?

14     Okay.  Thank you.

15     MR. BUTTRICK:  And just so you know, Your Honor, our

16  stipulated facts actually identify what days the mediator was

17  present.

18      JUDGE CARISSIMI:  Very good.  Thank you for reminding me.

19  Q   BY MR. WIESE:  Picking up again where we were, Ms. Shannon,

20  below "Give it some consideration".  Do you see where I'm at in

21  your notes?

22  A   I do.

23  Q   Okay.  And it looks like there's a time next to that, the

24  "1:20".  Or does it say "1:20"?

25  A   Yes, it does.

1  Q    Okay.  The "1:20 pm".  What does that time indicate?

2  A    That we had a caucus after the -- after we started that

3  day.

4  Q    And where you have a time indicated in the left-hand margin

5  like that -- like if you go down about three-quarters of the way

6  down the page, next to "KM", "May have been provided", there's

7  another, "6:53".  Do you see that?

8  A    Yes.

9  Q    Is that also in reference to a caucus break?

10 A    Yes.

11 Q    And is that consistent throughout your notes where you have

12 a time written in the left-hand side of the margins?

13 A    Yes.  It would indicate caucus, or lunch also.

14 Q    All right.  Let's pick up then starting with "headed for a

15 train wreck".  Who is that in reference to?

16 A    That is JH.

17 Q    And how far down is Mr. Head talking?

18 A    That would be "headed for a train wreck" to "and

19 information requests."

20 (EXHIBIT MARKED:  GENERAL COUNSEL'S 24.)

21 Q    BY MR. WIESE:  Showing you what's been marked as General

22 Counsel 24.

23 (Witness proffered the document.)

24 Q    Do you recognize this document, Ms. Shannon?

25 A    I do.

1  Q    What is it?

2  A    It was an offer to extend our current contract, a union --

3  an offer from the Union to extend the current contract.

4  Q    Is this something that you recall being given to the

5  Company at negotiations on July 28th?

6  A    I do.

7       MR. WIESE:  I'll offer General Counsel Exhibit 24.

8       JUDGE CARISSIMI:  Any objection to GC 24?

9       MR. BUTTRICK:  No objection, Your Honor.

10      JUDGE CARISSIMI:  GC 24 is admitted.

11 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 24.)

12 (EXHIBIT MARKED:  GENERAL COUNSEL'S 25.)

13 Q    BY MR. WIESE:  I'm going to show you what's been marked as

14 General Counsel Exhibit 25.

15 (Witness proffered the document.)

16 Q    Ms. Shannon, I realize that the first page of this is a

17 repeat of General Counsel Exhibit 24.  But picking up with page

18 2 of that document, do you recognize this?

19 A    Yes, I do.

20 Q    And what is it?

21 A    It is a request for information from the Union to the

22 Company.

23 Q    When was that request provided?

24 A    That was provided on July 28th also.

25      MR. WIESE:  I'll offer General Counsel Exhibit 25 into

1  evidence.

2      JUDGE CARISSIMI:  Is there any objection to GC 25?

3      MR. BUTTRICK:  Yes, Your Honor.  I do believe, as Tyler

4  indicated, that the first page actually is a different document

5  than the subsequent pages.  In fact, Joint Exhibit 23 is a

6  better memorialization of the information request than in

7  General Counsel 25.  So I would submit that we rely on Joint

8  Exhibit 23, as opposed to GC 25.

9      MR. WIESE:  May I respond to that?

10     JUDGE CARISSIMI:  Sure.

11     MR. WIESE:  So this Joint Exhibit 23 is a different

12 document than GC Exhibit 25.  If you look at Joint Exhibit 23,

13 it has some of the responses to the actual information request

14 written in the document.

15     JUDGE CARISSIMI:  Well, let's go off the record while

16 everybody locates the applicable document.

17 (Brief discussion held off the record.)

18     JUDGE CARISSIMI:  Let's go back on the record.

19     The parties have had a chance to review both General

20 Counsel Exhibit 25 and Joint Exhibit 23, which has already been

21 admitted into evidence.  As was noted by counsel for the

22 Respondent, the first page of GC 25 has already been admitted as

23 GC 24, and examination of Joint Exhibit 23 and the remainder of

24 proposed exhibit GC 25 indicates that the information request

25 made on that day is in fact contained in Joint Exhibit 23,

1   except for some handwritten notations which I've previously

2   indicated I'm not going to give any consideration to unless

3   there's further evidence regarding those handwritten notations.

4       So, in light of that, Mr. Wiese, does the General Counsel

5   intend to not move to introduce, then, General Counsel Exhibit

6   25?

7       MR. WIESE:  That's correct, Your Honor.  We'll withdraw our

8   offer of General Counsel Exhibit 25.

9       JUDGE CARISSIMI:  Very good.

10      So General Counsel Exhibit 25 is withdrawn.

11   (EXHIBIT WITHDRAWN:  GENERAL COUNSEL'S 25.)

12      JUDGE CARISSIMI:  And you may proceed, sir.

13   Q   BY MR. WIESE:  Ms. Shannon, I'll direct your attention to

14   Joint Exhibit 23.

15   (Witness proffered the document.)

16   Q   Do you recall this information request being provided at

17   the table on July 28th?

18   A   I do.

19   Q   All right.  Let's turn back to your notes, then.  Starting

20   with the "KM", "Some information has been provided", could you

21   indicate on your notes how far down Mr. Meadows is speaking?

22   A   That would be from "Some information has been provided"

23   down to "people who get 49 hours equals out."

24   Q   I'm going to direct -- okay.

25       And then the line below that, starting with "How is there

1   not any".  Are those the initials "JH" next to that?

2   A    Yes.

3   Q    And how much -- how far down is Mr. Head speaking on the

4   page?

5   A    Mr. Head is asking the question "How is there not any

6   savings for number 8?"

7   Q    Okay.  And then picking up with "end of the week".  Who is

8   that?

9   A    That is KM, down to "Premium pay".

10   JUDGE CARISSIMI:  Ms. Shannon, can you tell me what the

11   reference to the "number 8" in the notes is?

12   MR. WIESE:  Your Honor, I was just going to get to that.

13   JUDGE CARISSIMI:  You were going to ask that question?

14   MR. WIESE:  Yes.  Beat me to the punch.

15   JUDGE CARISSIMI:  All right.  I didn't mean to preempt you,

16   but --

17   So could you tell us?

18   THE WITNESS:  Oh.  Yes.  That would be on page 6 of the

19   general -- Exhibit 23, page 6.  And that would correspond with

20   number 8 on page 6: "Please provide estimated savings from

21   elimination of Sunday and Holiday pay as a credit towards

22   overtime."

23   JUDGE CARISSIMI:  Thank you.

24   Q   BY MR. WIESE:  So I'd like to show you or direct your

25   attention to Joint Exhibit 24.

1   (Witness proffered the document.)

2   Q    Do you recognize this document?

3   A    Yes.

4   Q    What is it?

5   A    This would be the answers that the Company gave us to our

6   information request.

7   Q    And so the reference to "number 8" next to the initials

8   "JH" at the bottom of page 9 of your notes, that refers to the

9   number 8 on -- or does that refer to the number 8 on page -- I

10  guess it would be PF913.  Do you see those numbers on the

11  bottom?

12  A    I do.

13  Q    So if you'd turn to PF913?  The number 8 on there.  Does

14  that number 8 also correspond -- the "number 8" in your notes

15  correspond to number 8 of Joint Exhibit 24 on page PF913?

16  A    It does.

17  Q    Let's turn then to page 10 of your notes.  Picking up with

18  "person who fills out form".  Who is that?

19  A    That is KM, that sentence.

20  Q    And then, when you say "that sentence," how far are you

21  talking about?

22  A    From "person fills out" to "not weeks".

23  Q    Could you indicate that on your notes?

24  A    I did.

25  Q    And then the line below that with the initials "JH" next to

1    it?  Is that Jethro Head?

2    A    Yes.

3    Q    And the line below that with -- starting with "KM", "weak

4    systems"?  Is that Ken Meadows?

5    A    Yes.

6    Q    How far down is Mr. Meadows speaking in your notes?

7    A    That would be down to -- it is KM from "weak system" down

8    to where there is a "5" circled, "BC BS plan."

9    Q    Okay.  And then picking up next the line below that.  Is

10   that starting with "HSA"?  Is that --

11   A    Yes.  That is a question from our side.  I cannot attribute

12   it to anyone.

13   Q    Okay.  And then is that entire line a question from the

14   Company?

15   A    "HSA" --

16        MR. BUTTRICK:  That mischaracterizes prior testimony.

17        THE WITNESS:  Sorry.

18        JUDGE CARISSIMI:  I'm sorry.  Your objection was?

19        MR. BUTTRICK:  Yes.  I think she said that was a question

20   from the Union.  And I think he said -- then Mr. Wiese, in his

21   question, said, "Was that a question from the Company?"  That's

22   the way I heard it, at least.

23        JUDGE CARISSIMI:  All right.  Well, let's ask the question

24   again.

25        MR. WIESE:  Okay.

1    Q    BY MR. WIESE:  Is that a question, or is that entire line

2    there starting with "HSA" -- is that a question from the Union?

3    A    Yes.  The "HSA does company contribute going in".

4    Q    And then, after that, what does the note say?

5    A    That says "Yes - 2 or 3 year".  And it goes on to explain

6    the HSP deductible, 2600 -- or "3,000 deductible 2600".

7    Q    And who is saying that?

8    A    That is KM.

9    Q    Looking at the numbers on this page, so the number 6 next

10   to "stays proposal NO" and number 3 below that, and then the

11   rest of the numbers.  And then the numbers -- the number 7, 8,

12   9, 10, 11, 12, 13, and 14.  Do you see those numbers that I'm

13   talking about?

14   A    I do.

15   Q    And what are those numbers in reference to?

16   A    That corresponds with the numbers on PF913.

17   Q    Okay.  Let's turn over then to page --

18        JUDGE CARISSIMI:  Now, I have a question.

19        Ms. Shannon, on the last -- looking at page 10, the last

20   two lines of your notes, I'm having a little trouble reading

21   them.  Could you read to me what you wrote down beginning "1

22   SP"?

23        THE WITNESS:  I believe that's "HSP", Your Honor.

24        JUDGE CARISSIMI:  Okay.

25        THE WITNESS:  "3,000 deductible 2600" --

1       JUDGE CARISSIMI:  See?  That's what I --

2       THE WITNESS:  -- I'm kind of fuzzy on that part too --

3       "bottom line governed by the government".  And I can't read the

4       end of that one either off this page.

5       JUDGE CARISSIMI:  All right.  Who was talking about that?

6       THE WITNESS:  That is Mr. Meadows.

7       JUDGE CARISSIMI:  All right.  Do you recall today what he

8       said with regard to those issues, to clarify for us what's going

9       on here?

10      THE WITNESS:  He was explaining the -- I believe that the

11      Company, they contribute, like in years one, two, and three,

12      some up-front money for the HSP plan.  And he was -- I believe

13      he was -- and these were the deductibles, then, on the bottom,

14      the HSP plan.  And I don't know about the "2600".  I'm not --

15      it's kind of fuzzy right there, the words are.

16      JUDGE CARISSIMI:  Now, does "HSP" refer to a health savings

17      plan?

18      THE WITNESS:  It does, Your Honor.

19      JUDGE CARISSIMI:  And was that part of the Company's

20      proposal to the Union?

21      THE WITNESS:  It was.

22      JUDGE CARISSIMI:  All right.  Thank you.

23      Mr. Wiese, you may continue.

24   Q   BY MR. WIESE:  And looking above that, the letters "BC BS

25   plan".  What is that?  What are those letters?

1    A    Blue Cross Blue Shield.

2    Q    All right.  Let's turn over to page 11, starting with

3    "scenario says".  Who said that?

4    A    I do not recall from those top lines to "18 percent less or

5    more".  I don't recall who said that.

6    Q    All right.  And then picking up with "KM".  Is that "KM"

7    next to "Will take a look at that"?

8    A    That is.

9    Q    And how far down is Mr. Meadows speaking?

10   A    That would be from "Will take a look at that" to "no cost

11   savings to us."

12   Q    And the numbers on this next to the text, the 15, 17, and

13   19.  What are those numbers in reference to?

14   A    That would be starting on PF913, corresponds with the

15   numbers to PF914.

16   Q    Okay.

17        JUDGE CARISSIMI:  Ms. Shannon, look at the first page of

18   that document that you have.  You've made reference to PF13.

19   Could you turn to the first page of that document?

20        THE WITNESS:  Yes.  All the way.

21        JUDGE CARISSIMI:  All the way.

22        THE WITNESS:  Okay.

23        JUDGE CARISSIMI:  What exhibit number does it have down

24   there on the bottom?

25        THE WITNESS:  "JT 24".

1    JUDGE CARISSIMI:  Okay.  I just wanted the record to

2  reflect that, because we're talking about Bates numbers and when

3  I look at this I want to know what document the witness was

4  referring to.  So it's Joint Exhibit 24.

5    MR. WIESE:  Yes.

6    JUDGE CARISSIMI:  Very good.  You can continue, counsel.

7    MR. WIESE:  Thank you, Ms. Shannon.

8  Q    BY MR. WIESE:  Looking below "no cost savings to us", kind

9  of to the left of the main text, what does that say there?

10  A    It says "8:20 Back in Session".

11  Q    And then next to that, is that the initials "JH"?

12  A    That is.

13  Q    And how far down is Mr. Head speaking?

14  A    Just that line: "Point out quantify 21 issues, remove

15  items".

16  Q    And then picking up with "I will give".  Who is that?

17  A    That is KM.

18  Q    How far down is Mr. Meadows speaking?

19  A    From "I will give consideration" to "not interested at this

20  time".

21  Q    All right.  And then looking to the left there that --

22  that's "8:34"?  Is that right?

23  A    Yes.

24  Q    And then what does it say below that?

25  A    "We're back".

1  Q    And then --

2  A    Must have had a little caucus.

3  Q    And then next to that, the initial "KM".  How far down is

4  Mr. Meadows speaking on the page?

5  A    That would be to the bottom of the page.

6  Q    And then let's pick up with the top of page 12.  Who is

7  that speaking at the top of page 12?

8  A    That would be KM.

9  Q    How far down in the notes is Mr. Meadows speaking?

10  A    It would be that line.  The next line, I don't know if

11  that's my notes or him speaking, the "January 1, 2016 we will go

12  under plan".  The first line would be contributed to KM.

13  Q    Okay.  So the first line is KM and the second line is you

14  aren't sure.  Is that right?

15  A    No.

16  Q    Okay.

17  A    It could be my notes.

18  Q    Okay.  And then --

19      JUDGE CARISSIMI:  Before we go on, Mr. Wiese.

20      So the top line is Mr. Meadows, on page 12, where it starts

21  with the word "could"?

22      THE WITNESS:  Yes.

23      JUDGE CARISSIMI:  Could you read your notes to me, what

24  that says, that line?

25      THE WITNESS:  "It could go up if government raises

1  deductibles."

2      JUDGE CARISSIMI:  Now, sitting here today, do you recall

3  what Mr. Meadows was talking about at that time?

4      THE WITNESS:  I do not.

5      JUDGE CARISSIMI:  Okay.  Thank you.

6      You may continue, counsel.

7  Q    BY MR. WIESE:  Then starting with number 16, who is that?

8  A    That is KM.

9  Q    And how far down in the notes is Mr. Meadows speaking?

10 A    That is from the number 16 down to "Flower fund is gone!"

11 Q    And the numbers on that page -- 16, 17, 18, 19, 20, and 21?

12 What are those in reference to?

13 A    That would be Exhibit 24, the numbers from PF913 and 914.

14 Q    What's the flower fund?

15 A    The flower fund was a fund maintained by the Company for

16 the Union that would include pop can money.  We have a 5-cent

17 deposit in Iowa.  Would include people -- if people forgot to

18 punch in or forgot to punch out, they were docked an hour -- or,

19 I mean, I'm sorry, a half an hour.  And that would go into the

20 flower fund.  And the fund was, like I said, maintained by the

21 Company for the Union.  And if someone died from the Union, or a

22 past member of the Union or someone from their family, we would

23 send flowers to them, or if someone was in the hospital.  And

24 the Union would get a hold of the Company, and they would take

25 care of that for us, sending the flowers in the Union's name.

1  Also, like one young man, they had a -- him and his wife had a

2  baby, and it had a bad heart defect.  And in a regular meeting

3  of the Union, we decided to give them a thousand dollars.  So it

4  was for things like that, for the Union to be able to give back

5  to their members in times of need or times of sorrow.

6  Q    What do you recall from that exchange about the flower fund

7  on July 28th?

8  A    I recall a lot of shouting.

9  Q    Is that line "Flower fund" -- shouting from both sides?

10  A    Yeah.

11  JUDGE CARISSIMI:  Ms. Shannon, do you want to take a break?

12  THE WITNESS:  I'm okay.

13  That Mr. Meadows said it would be a administrative

14  nightmare for them and there could be legal implications and

15  that it would be no longer there, it would be gone.  And it was

16  a very contentious thing between him and Mr. Eby, and there was

17  a lot of shouting.  And it just was -- and it just -- it wasn't

18  pretty.

19  JUDGE CARISSIMI:  How did that topic come up?  Did one

20  party raise the flower fund issue?

21  THE WITNESS:  Well, it was in -- it was as number 21 in

22  this document.

23  JUDGE CARISSIMI:  In the Joint Exhibit we referred to?

24  THE WITNESS:  Yes, in the Joint Exhibit we referred to.

25  JUDGE CARISSIMI:  Okay.

1    THE WITNESS:  And that's how it came up.

2    JUDGE CARISSIMI:  All right.  Thank you.

3    Mr. Wiese, you may continue.

4  Q    BY MR. WIESE:  Picking up with the line below "Flower fund

5  is gone", Ms. Shannon, what is the first word in that line?

6  A    After "Flower fund is gone"?  I'm sorry.

7  Q    Yes.

8  A    Oh, okay.  That is JH.

9  Q    JH speaking --

10 A    Jethro Head.  Yes.

11 Q    -- at that point?

12    Okay.  And how far is Jethro Head speaking on this page?

13 A    He is from "Ken I am disappointed", and "you do not seem to

14 grasp a point" would be the end of that.

15 Q    So the first word on that next "I am disappointed" is

16 "Ken"?  Is that --

17 A    "Ken I am disappointed".  Yes.

18    JUDGE CARISSIMI:  Okay.  But the speaker of those two lines

19 was who?

20    THE WITNESS:  JH.

21    JUDGE CARISSIMI:  Okay.  Very good.  Thank you.

22 Q    BY MR. WIESE:  Turning over to page 13 of your notes,

23 starting with "K.M. Comes in at 8:40".  Who is saying that, or

24 what is that in reference to?

25 A    Oh, those are my notes.  Mr. Meadows came in at 8:40 a.m.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1  and -- alone -- and he apologized to Chris about the flower fund

2  and explained his side, like he didn't want the legalities and

3  things like that.

4  Q    When you say "Chris," who are you talking about?

5  A    Chris Eby.

6  Q    And how far down in the notes does that exchange go?

7  A    That just goes "K.M. Comes in at 8:40" and "he does not

8  want the legalities et cetera."

9  Q    Then picking up with the line below that, "brings update

10 proposal"?

11 A    Yes.

12 Q    Who said that?

13 A    That's my notes.  Ken brought an updated proposal.

14 Q    Directing your attention to Joint Exhibit 4.

15 (Witness proffered the document.)

16 Q    Do you recognize this, Ms. Shannon?

17 A    I do.

18 Q    Is this the updated proposal referenced in your notes?

19 A    Yes, it is.

20 Q    You can set that document aside.

21     JUDGE CARISSIMI:  First, I have a question.  And I know

22 we've covered this before, but I need a refresher.

23     There is parts of this that are marked in red, Ms. Shannon,

24 if you go through, like on page 17.  And I'm referring to Joint

25 Exhibit 4.  Can you tell me what the red markings are, if you

1   know?

2        THE WITNESS:  I believe those were the changes that the

3   Company had made in their new proposal from the last one.

4        JUDGE CARISSIMI:  All right.  Thank you.

5        You may continue, Mr. Wiese.

6        MR. WIESE:  Thank you.

7        Okay.  Sorry.  Thought you were talking about the notes.

8   Q    BY MR. WIESE:  Picking up with below "brings updated

9   proposal", "attorneys doing double".  Who is that?

10  A    That is Mr. Meadows.

11  Q    How far down on the page is Mr. Meadows speaking?

12  A    That would be from "brings updated proposal" down to

13  "double time for maintenance call in" on second-to-the-bottom

14  line.

15  Q    And then what about that line at the bottom, "ART 1 Section

16  2"?  What is that in reference to?

17  A    That was a part brought in the new proposal that was not

18  highlighted that had been changed without highlights.

19  Q    Was that something that was said, do you recall?

20  A    No, that's my notes.

21  Q    Turning to the top of page 14, starting with "unit is

22  described".  Who said that?

23  A    That would be JH.

24  Q    How far down is Mr. Head speaking?

25  A    That would be from "unit is described in current contract"

1    to "senior folks penalized".

2    Q    And picking up with the line below that, the initials.  Are

3    those initials "KM" there?

4    A    Yes.

5    Q    So it's right next to "We have a difference"?

6    A    Yes.

7    Q    And how far down is Mr. Meadows speaking on this page?

8    A    "We have a difference of definition", "counts towards 40" -

9    - that is Mr. Meadows.  "Language that corresponds to funeral

10   leave why is it changed", I am not -- I do not recall.

11   Q    Okay.

12   A    If we pick up where "We believe economic reasons for new

13   hires", that would be KM.

14   Q    And then from "We believe economic reasons for new hires" -

15   - starting from there, how far down is Mr. Meadows speaking?

16   A    That would be to the bottom of the page.

17   Q    All right.  And this long section of writing, do you recall

18   what Ken Meadows was talking about at this point?

19   A    Where at?  In the whole thing?

20   Q    What was that?

21   A    The whole --

22   Q    Yes.  Collectively.  What --

23   A    Okay.

24   Q    Is this discussion in reference to anything in particular

25   that you can recall?

1  A    This was Mr. Meadows explaining his new -- his -- some of

2  his new proposals.  Or his amended proposals, if you would.

3  Q    Okay.  Directing your attention to General Counsel Exhibit

4  21.  Do you have that up there?  It's the concessions list the

5  Union made.

6  A    Oh.  Yes.

7  Q    So, looking right to "Ken Meadows", "We have difference of

8  definition of pyramiding hours".  Does that correspond at all to

9  anything in General Counsel Exhibit 21 that you can see?

10  A    It does.

11  Q    Okay.  And what does that correspond to?

12  A    The first line, "We have a difference of definition in

13  pyramiding hours", "counts towards 40", would correspond with

14  bullet number 3 under the concessions from the Company's

15  proposal.

16  Q    The "Elimination of pyramiding" section?

17  A    Yes.

18  Q    Okay.  All right.  And looking -- again, starting from

19  "difference of definition of pyramiding hours", down to the

20  bottom of the page, are all of those notes in reference to

21  discussions about General Counsel Exhibit 21?

22  A    Yes, it does.

23  Q    Okay.  All right.  I have a question about a couple of

24  terms on this page.  So do you see the line where it says "STD

25  Standard in industry"?

1  A    Yes, I do.

2  Q    Do you recall what that "STD" --

3  A    That is "short-term disability."

4  Q    Okay.  And then, a couple lines below that, "if there is a

5  department 6 people in TB"?  What is that?

6  A    That's a department in our plant called thin boil.

7  Q    And is that consistent throughout the next couple of

8  references to TB on that page?

9  A    Yes, it is.

10 Q    Could you explain, if you recall, what this discussion

11 about the thin boil was about?

12 A    This was about going to plant-wide seniority with bumping

13 and bidding if they eliminated jobs or something like that --

14 you know, if jobs in a certain classification were eliminated.

15 Q    Thank you, Ms. Shannon.

16      Let's turn over then to page 15 of your notes, picking up

17 at the top with "days of vacation".  Who is making that

18 statement?

19 A    That is KM.

20 Q    And how far down is Mr. Meadows speaking in these notes?

21 A    That would be to the bottom of the page KM.

22 Q    Okay.  Let's turn to the top then of page 16, starting with

23 "training 4 mos. Lab".  Do you know what that "mos." is --

24 A    Oh.  "Months."

25 Q    -- on the top of page --

1      Okay.

2   A   "Months."

3   Q   "Months"?  All right.

4      And who is saying that, the "training", that line?

5   A   That's KM.

6   Q   Going from "training", how far down is Mr. Meadows

7   speaking?

8   A   That would be from "training 4 months in Lab" down to

9   "defining work week for pay period" about three-quarters of the

10   way down.

11   Q   And then picking up with the line below that, "physical

12   written grievances".  Who is that?

13   A   That would be CE.

14   Q   Who is "CE"?

15   A   Christopher Eby.

16   Q   Okay.  And how far down is Mr. Eby speaking?

17   A   He would be "physical written grievances is kept down with

18   labor relations."

19   Q   And then, after that, starting with "Plant will not

20   handle"?  Who is saying that?

21   A   That would be KM, from "Plant will not handle 3rd Step

22   grievances".

23   Q   And how far down is Mr. Meadows speaking?

24   A   He -- to "trickle down effect can be massive".

25   Q   Okay.  And then, next to that, are those the initials "CE"?

1   A     They are.

2   Q     Is the line next to that attributable to Chris Eby?

3   A     It is.

4   Q     And then, next to that, are those -- in the next phrase,

5   starting "Would you consider stop loss?" are those the initials

6   "KM" to the left of that?

7   A     It is.

8   Q     That's Ken Meadows?

9   A     Yes.

10  Q     Want to direct your attention about a third of the way down

11  the page, that statement "omissions".

12  A     Yes.

13  Q     Do you see?

14        What is that in reference to?  Do you recall?

15  A     Oh.  We had -- in our union in our contract we had the

16  check-off authorization for the Union to take dues out, if you

17  will.  It was in our union philosophy, but not, I believe, not

18  in theirs -- I mean, as something that was omitted from that,

19  from -- in their philosophy -- in their plan, if you will.

20  Q     And looking at -- at this point, looking at these notes on

21  page 15 and 16, are these still in reference to the bullet

22  points in General Counsel Exhibit 21, the list of concessions?

23  A     In page 15 and 16?

24  Q     Yes.

25  A     Yes.

```
 1   Q    All right.  So, looking again at that, at the "omissions"
 2   statement again, a third of the way down on page 16 of your
 3   notes.
 4   A    Yes.
 5   Q    Does that refer or reference anything in General Counsel
 6   Exhibit 21?
 7   A    It does.  On page 2 there is concessions by omissions in
 8   the Company's proposal.
 9   Q    So, below "omissions", the discussion points in your notes
10   reference the parts of General Counsel Exhibit 21 below that?
11   A    Yes, they do.
12   Q    Thanks.
13        Let's turn over to page 17, Ms. Shannon.  Starting with "LR
14   Committee", who is that?
15   A    "Labor Relations Committee."
16   Q    Oh.  That's what "LR Committee" is?
17   A    Yes.
18   Q    Okay.  And who is saying that?
19   A    That's KM.
20   Q    And how far in the notes is Mr. Meadows speaking?
21   A    That would be to the bottom of the page.
22   Q    There's a couple of other acronyms on this page that I
23   would like to talk about.  The "PTD"?  Do you recall what that's
24   in reference to?
25   A    "Permanent total disability."
```

1    Q    And the "LTD" below that?

2    A    "Long-term disability."

3    Q    And then, below that, "at no cost to you."  What is that to

4    the left there?  What does that say?

5    A    "4:45 pm".

6    Q    What does that indicate?

7    A    Caucus.

8    Q    At the top of page 17, down to the caucus, do you recall

9    whether the parties were still discussing the concessions list

10   in General Counsel Exhibit 21?

11   A    Yes.

12   Q    And picking up after that caucus, "things that I can be

13   flexible on".  Who is saying that?

14        Or you may have indicated that already, Ms. Shannon.

15   A    That's KM.

16   Q    Okay.  And is it KM down to the bottom of the page?

17   A    Yes.

18   Q    Did I hear you correctly before?

19   A    Yes.

20   Q    Okay.  All right.  Thank you.

21        Let's turn over then to page 18.  Looking at page 18, the

22   top, "You made a comment".  Who said that?

23   A    That is KM.

24   Q    How far down is Mr. Meadows speaking on the page?

25   A    That would be to the bottom of the page.  The whole page.

1   From "You made a comment" to the bottom of the page.

2   Q    What about that kind of up and to the right of "You made a

3   comment", the statement "I cannot disagree"?  Do you recall

4   anything about who said that?

5   A    I do.  That was Mr. Meadows.

6        JUDGE CARISSIMI:  When he's referring to "you," who was Mr.

7   Meadows referring to?

8        THE WITNESS:  The union side.

9        JUDGE CARISSIMI:  Anybody in particular that you recall

10  making a comment before his statement?

11       THE WITNESS:  Yes.  That would be Mr. Eby made a statement

12  about how the management was running the facility or not running

13  the facility.

14       JUDGE CARISSIMI:  All right.  Do you recall anything

15  specific that he said?

16       THE WITNESS:  That the management was not running it

17  according to, you know -- that they just were not -- they were

18  not up to par in running the facility, doing their job, as far

19  as discipline or fair discipline across the board, doing their

20  overtime properly.  There were -- you know, there were a few

21  things, but I recall those two for sure.

22       JUDGE CARISSIMI:  And then Mr. Meadows responded to that?

23       THE WITNESS:  Yes.

24       JUDGE CARISSIMI:  And his response is set forth in your

25  notes?

1    THE WITNESS:  Yes.

2    JUDGE CARISSIMI:  All right.  Thank you.

3    Mr. Wiese, do you have anything further on that date on

4  page 18?

5    MR. WIESE:  Just briefly, Your Honor.

6  Q    BY MR. WIESE:  Was there -- looking at the July 29th

7  session as a whole, did that session differ from the bargaining

8  sessions previous to that?

9  A    It did.  It did.  It --

10  Q    How so?

11  A    In my observations, it carried a different tone.  It was --

12  it seemed that it was the first time Mr. Meadows looked at what

13  we were -- what we really were saying and proposing and what the

14  Company was taking away and that he was really engaging us --

15  engaging, you know, with us, or at least answering what we were

16  asking.

17  Q    And that was different than what you recall happening on

18  the sessions before July 29th?

19  A    It was.

20    MR. WIESE:  That's all that I have for this day, Your

21  Honor.

22    JUDGE CARISSIMI:  All right.  Very good.

23    We're going to have a recess.  We're exactly halfway

24  through of 36 pages of notes, and the witness has been

25  testifying for an hour and 45 minutes plus.  So we're going to

1  be in recess for 10 minutes.

2  (Brief recess taken.)

3      JUDGE CARISSIMI:  On the record.

4      Before we proceed with the testimony, I appear to have

5  failed to formally admit GC Exhibit 75, in my discussions with

6  our reporter, Mr. Walls.  He indicated that I had not done that.

7  So I'm going to do that at this time.  The record will indicate

8  that GC Exhibit 75 is admitted.

9  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 75.)

10      JUDGE CARISSIMI:  And, Mr. Wiese, you may proceed with your

11  examination.

12  Q    BY MR. WIESE:  So, picking up in your notes on page 19,

13  starting with "JH", "Attendance policy", could you indicate how

14  far down Mr. Head is speaking?

15  A    That would be from "Attendance policy" to "What do you".

16  Q    All right.  And then picking up with the "KM", "We know".

17  How far down is Mr. Meadows speaking?

18  A    That would be to -- "We know if grievance" to "I did not

19  address the attendance policy".

20  Q    All right.  And then the initials in the line below that?

21  Are those "JH"?

22  A    They are.

23  Q    Okay.  And then picking up -- or, actually, I'm going to

24  show you what's been marked as Joint Exhibit 5.  I direct your

25  attention to it.

1    (Witness proffered the document.)

2    Q     Do you recognize this document, Ms. Shannon?

3    A     I do.

4    Q     And what is it?

5    A     It would be a new, updated proposal from the Company on

6    July 30th.

7    Q     Was this a proposal you recall being presented at the table

8    that day?

9    A     I do.

10   Q     And right next to it, where it says "page 4 section 4", do

11   you recall that being a reference to the Employer's proposal?

12   Next to the initials "JH"?

13   A     Yes; that's correct.

14   Q     All right.  And then picking up with, below that, the

15   initials "KM".  How far down is Mr. Meadows speaking?

16   A     KM is "If we were to hold out wrong dues you must get

17   monies back from union."

18   Q     Okay.  And then picking up below that, next to the first

19   bullet, "I thought that was addressed".  Who is that?

20   A     I'm having trouble recalling that right now.

21   Q     Okay.  And so what portion are you not recalling at the

22   moment in the notes?

23         JUDGE CARISSIMI:  Mr. Wiese, you're going to have to keep

24   your voice up a little bit.

25         MR. WIESE:  Sorry.  Sorry.

1    JUDGE CARISSIMI:  Yes.

2    MR. WIESE:  Sorry, Your Honor.

3    JUDGE CARISSIMI:  That's all right.

4  Q    BY MR. WIESE:  Starting with -- or could you indicate what

5  portion --

6  A    Oh.  I'm sorry.  "I thought that was addressed on very 1st

7  item - breakdown for pension amount."

8  Q    Okay.

9  A    I'm kind of drawing a blank there.

10  Q    Okay.  And then picking up below that, "proposing current

11  attendance policy".  What are -- whose initials are next to

12  that?

13  A    I have a "J".  That would be JH.

14  Q    Okay.  And the line below that?  Is that "KM"?

15  A    Yes.

16  Q    The "It remains"?

17    Okay.  And that's -- and then the line below that, "You

18  alluded".  "JH"?  Is that right?

19  A    Yes.

20  Q    Okay.  And then, at the bottom, "KM", "Will look at it and

21  address"?

22  A    Yes.

23  Q    All right.  This exchange starting with "proposing current

24  attendance policy" from Mr. Head and then Mr. Meadows' response

25  right below that, "It remains", what is that in reference to?

1  Do you recall?

2  A    Yes.  The attendance policy was going to change.  And I

3  believe at that time we hadn't got an updated attendance policy.

4  We believed it was going to change.

5  Q    Looking at Mr. Head's notes, what was he proposing at that

6  point?

7  A    He was proposing our current attendance policy that we had.

8  Q    And what was Mr. Meadows' response to that?

9  A    Mr. Meadows said it will remain as it is.

10  Q    All right.  Let's turn over to page 31.  Or, excuse me,

11  July 31st, page 20 of your notes.

12  A    Okay.

13  Q    Starting with "remains until 65", who is that?

14  A    That was -- as it indicates at the top, Mr. Robilotto came

15  in that morning.  Robilotto.  He was an outside consultant or

16  counsel for the Company.  And he was explaining that currently

17  what the retirees, the -- the people -- I need to back up.

18  Q    Okay.

19  A    There were people that were planning, that had signed

20  papers, that had planned to retire if we didn't have a contract

21  on August 1st.  So Mr. Robilotto came in that day for the

22  Company and explained that the people were indeed assured of

23  their gap insurance, if you will, until age 65, but that would

24  not include the supplement that was included in the current

25  contract.

1  Q    And then so looking at starting with "remains until 65",

2  how far down was -- in your notes do you recall Mr. Robilotto

3  being in the room?

4  A    That was just till "doesn't include supplement".

5  Q    Okay.  All right.  And then -- and are those statements,

6  "remain until 65", "doesn't include supplement" -- was that Mr.

7  Robilotto?

8  A    As I recall, yes.

9  Q    And then picking up with the line below that, "Nothing will

10  change".  Who said that?

11  A    That would be KM.

12  Q    And how far down was Mr. Meadows speaking?

13  A    That would be there until -- from "Nothing will change

14  until 1-1-16" to "getting them together."

15  Q    All right.  And then starting to the right of the "11:18",

16  "Per your request".  Who said that line?

17  A    That would be KM.

18      JUDGE CARISSIMI:  Let me ask a question.  I'm uncertain

19  about a note.

20      If we go back to a line in your notes -- it's about the

21  fifth line down.  It says, "Contingent before people tomorrow."

22  Can you tell me what that discussion was about, what that

23  statement indicates?

24      THE WITNESS:  I don't recall.

25      JUDGE CARISSIMI:  All right.  Thank you.

1  Q    BY MR. WIESE:  So, picking up with the "Per your request",

2  did I hear right that that was Mr. Meadows?

3  A    Yes.

4  Q    Okay.  All right.  And then what do you recall that line

5  being in reference to?

6  A    That they were still bringing in data from the information

7  request.

8  Q    All right.  And the line below that, starting with "Plant

9  rules".  Who is that?

10  A    That would be JH.

11  Q    And how long was Mr. Head speaking?

12  A    That would be just that line.

13      Excuse me.

14      Yes.  That would be just that line, "Plant rules we asked

15  for them in request".

16  Q    Okay.  I'm going to draw your attention to General Counsel

17  Exhibit 28.

18  (Witness proffered the document.)

19  Q    Do you recognize this document, Ms. Shannon?

20  A    I do.

21  Q    Okay.  And what is it?

22  A    It is the Company's Absentee Control Program.

23  Q    Was this one of the items that the Company provided the

24  Union at negotiations on July 31st?

25  A    I believe it was.

1  Q    Is this attendance policy different than the attendance

2  policy that was in the Union's collective-bargaining agreement

3  at the time?

4  A    Yes.

5  Q    All right.  Let's turn back to the notes here, starting

6  with "LTD program".  Who is that?

7  A    That's Mr. Meadows; KM.

8  Q    And how long is Mr. Meadows speaking?

9  A    That would be from the "LTD" down to the bottom of the page

10 KM.

11 Q    What does the "LTD" mean?  Do you recall?

12 A    That's the long term disability program.

13 Q    And the "STD", the line below that?

14 A    The short term disability program.

15 Q    Directing your attention to Joint Exhibit 6.

16      Here it is.  It's right here.  Lot of documents.

17 (Witness proffered the document.)

18 Q    Do you recognize this document, Ms. Shannon?

19 A    I do.

20 Q    What is it?

21 A    That would be another updated proposal from the Company.

22 Q    Do you recall when the Company gave this proposal to the

23 Union?

24 A    That would -- that would be sometime between the "11:18"

25 and the 1:20 p.m. caucus.  Or the "11:18" and, yeah, 1:20 p.m.,

1    when we came from caucus and then went back.

2    Q    Okay.  And the "1:20" that you're talking about, that's on

3    the top of page 21 of your notes?

4    A    That is.

5    Q    Okay.  And looking through this proposal, are there items

6    indicated in red in the proposal; for example, on page 9?

7    A    Yes.  I see one on page 4 and page 9, page 10.

8    Q    What is your understanding of what those red items

9    indicate?

10    A    That those would be the items that were changed -- or

11    tweaked, if you will -- by the Company.

12    Q    Ms. Shannon, let's turn over to page 21, starting with

13    "Contract off".  Who is that?

14        JUDGE CARISSIMI:  That's page 21 of --

15        MR. WIESE:  Of the notes.

16        JUDGE CARISSIMI:  -- GC 7(a), right?

17        MR. WIESE:  Thank you.  Thank you, Judge.

18    Q    BY MR. WIESE:  Let's look at page 21 of General Counsel

19    Exhibit 7, starting with "Contract off".  Who is that?

20    A    That is KM.

21    Q    How long is Mr. Meadows talking?

22    A    He is attributed to the "Contract offer is on the table",

23    down to "feedback".

24    Q    All right.  And then the line below that, next to the

25    "1:20", the "response to morning proposal on pension".  What is

1    that in reference to?

2    A    I'm not quite sure if we gave them an updated proposal on

3    our part or not.  I'm not quite sure on that.

4    Q    Directing your attention to Joint Exhibit 12.

5    (Witness proffered the document.)

6    Q    Do you recognize this document?

7    A    I do.

8    Q    What is it?

9    A    It is a updated proposal that we gave to the Company,

10   striking out -- striking out many things in the pension plan and

11   also adding to it, in our existing pension plan.

12   Q    And do you recall the Union giving this pension proposal to

13   the Employer at negotiations on July 31st?

14   A    My recollection's a little fuzzy on that.

15   Q    Okay.

16   A    It's dated July 31st, so I'm -- yes.  I mean, according to

17   my notes, it looks like it.

18   Q    Looking at the handwriting in the upper right-hand corner

19   of the document, is that your handwriting?

20   A    No, it's not.

21   Q    Do you know whose handwriting that is?  Do you recognize

22   it?

23   A    It looks to be Christopher Eby's.

24   Q    All right.  You can set that aside.  Let's set aside Joint

25   Exhibit 12.  Let's turn back to the notes.

1       So, starting with -- below the "response to morning

2    proposal on pension", starting with "August 1st", who is saying

3    that?

4    A    That is JH.

5    Q    How far down is Mr. Head speaking?

6    A    JH would be from "August 1st not a drop dead date" to

7    "resume negotiations at an agreeable time".

8    Q    Okay.  And picking up below that with "Give me time to put

9    a final offer".  Who is saying that?

10   A    That's KM.

11   Q    How far down is Mr. Meadows speaking?

12   A    That would be "Give me time to put a final offer" and "time

13   people release", "What time people release".

14   Q    Okay.  And then, next to that, the "7 am"?  Who's that in

15   reference to?

16   A    Christopher Eby; CE.

17   Q    All right.  And then below the "7 am CE".  Who is speaking

18   there?

19   A    That's KM.  "I have heard you and we will get something for

20   you."

21   Q    Looking at again right next to the "1:20" reference in your

22   notes at the top of the page, "1:20 pm", the reference to August

23   1st not being a drop-dead date.  What do you recall about that

24   statement?

25   A    August 1st, previous to this current -- this contract we

1  were negotiating, was -- had been, since I had been there, for

2  25 years, a date where we either had an extension, a contract,

3  or, in 2004, we went on strike.

4  Q    And so what -- so this "August 1st is not a drop dead"

5  statement, how does that relate to what you just said?

6  A    Jethro Head was saying that August 1st is not a drop-dead

7  date, it's not a date for if we don't have a contract that, you

8  know, we would go on strike, that we -- or it's not a drop-dead

9  date to have the signers sign the contract.

10      JUDGE CARISSIMI:  Did Mr. Head make any reference to a

11  possible strike?

12      THE WITNESS:  No.  He did not.

13      JUDGE CARISSIMI:  All right.  So, as best that you can

14  recall, he told Mr. Meadows that August 1st is not a drop-dead

15  date.

16      THE WITNESS:  Yes.

17      JUDGE CARISSIMI:  Did he expand upon that at all?

18      THE WITNESS:  No.

19      JUDGE CARISSIMI:  Okay.  Thank you.

20  Q    BY MR. WIESE:  All right.  Picking up I believe where we

21  left off, next to the "3:23".  Below that, it says "I Froehlich

22  too".  What does -- what do you recall about that?

23  A    Erwin came in at that point that day.  He came in with Mr.

24  Meadows too.

25  Q    And then, next to that, starting with "final offer".  Who

1    said that?

2    A    I don't know that anybody said it or they just brought it

3    in.  I'm not real clear on that, about the "final offer" and the

4    "pension offer".

5    Q    Okay.  Directing your attention to Joint Exhibit 7.

6    (Witness proffered the document.)

7    Q    Do you recognize this document, Ms. Shannon?

8    A    I do.

9    Q    And what is it?

10   A    It was the Company's final offer to the Union on July 31st.

11   Q    Is this the offer that was presented to the Union after the

12   3:23 caucus?

13   A    Yes.

14   Q    And when the Employer came back from that caucus, was it

15   just -- or who -- was it just Ken Meadows and Erwin Froehlich in

16   the room?  Do you recall?

17   A    I don't recall for sure.

18   Q    All right.  And then below the "final offer" and "pension

19   offer" -- or do you recall who made those statements, "final

20   offer", "pension offer"?

21   A    I don't.

22   Q    Okay.  Picking up below that with "2 tier bidding".  Who do

23   you recall making that statement?

24   A    That would be KM.

25   Q    And how far down is Mr. Meadows talking?

1  A    Mr. Meadows said the "2 tier bidding put back",

2  "Maintenance pulled up $2".  And the "Where to pick up final

3  copies", I don't know if that was a question from us or if

4  that's -- if that was a statement from Mr. Meadows.

5  Q    Okay.  And then picking up below that with "plant rules".

6  Who do you recall making that statement?

7  A    Those were the union side.  I can't recall who was saying

8  it, but these were the things we were going to need to put

9  together a comprehensive package for our members.

10 Q    And at the very bottom of the page, the text that looks cut

11 off.  Can you, as best you can, explain what that says at the

12 bottom, the very last line?

13 A    They would find a place to get -- the Company would find a

14 place to get copies and they would call and let us know where to

15 pick up those copies after they had got them together for us.

16 Q    Is that the last thing that you recall happening at

17 negotiations on July 31st, the discussion about the final offer?

18 A    While the Company was in there, yes.

19 Q    Okay.  And then what did you do after the Company presented

20 the final offer that day?

21 A    Mr. Eby, Mr. Yeisley, Mr. Maas, and myself took -- each

22 took a group of people.  I believe there was 22 names on the

23 list that we would call -- the people who had signed up to

24 retire if things had fallen through, if you will -- on -- before

25 5 o'clock that day.  And they had to have their papers signed

1  before 5 o'clock that day, when Ms. Junge left the plant.  So we

2  called them to let them know what had happened that day and what

3  they should -- you know, that they needed to make their

4  decisions.

5  Q    Do you recall how many -- about how many employees retired?

6  A    I believe there was around 22.

7  Q    And then looking at the next day -- excuse me.  Strike

8  that.

9       Did the Union take the Employer's final offer to a vote?

10 A    We did.

11 Q    When was that vote?

12 A    That would be on August 1, 2015.

13 Q    At what time?  Do you recall?

14 A    It was in the morning.  I don't recall the exact time.

15 Q    And looking at the final offer, Joint Exhibit 7, could you

16 point out -- strike that.

17      Are there any highlighted changes in this offer, as you

18 flip through it?

19 A    I don't see any.

20 Q    Turning back to that meeting on the morning of August 1st,

21 did the Company -- or did the Union take the contract to a vote,

22 the final offer?

23 A    We did.

24 Q    And what were the -- or was the contract ratified by the

25 employees?

1    A    No.

2    Q    All right.  Let's turn then to the negotiations on August

3    17th.  On page 22, starting with the initials "JH" next to

4    "explains rejected offer", how far down was Mr. Head talking?

5    A    He would be from "explains rejected offer" to "never be the

6    same."

7    Q    All right.  And then picking up below that with the

8    initials "KM", "Appreciate the comments".  How long was Mr.

9    Meadows speaking?

10   A    From "I appreciate the comments" to "I made adjustments".

11   Q    All right.  And then picking up with the next initials

12   below that, "JH", next to "You have to take".  How long is Mr.

13   Head speaking?

14   A    That would be from "You have to take" to "respect that

15   contract".

16   Q    And then the next line, starting with "Modification for

17   retirees".  Who said that?

18   A    I can't recall if that was said or just a note.

19   Q    Okay.  And then picking up the initials below that, "KM",

20   "revamped on 6-29".  Was that Mr. Meadows?

21   A    That is.

22   Q    And how long was Mr. Meadows talking?

23   A    From "revamped" to "extension not a counter".

24   Q    And then, below that, it looks like the writing is cut off

25   again.  As best you can recall, what does that state at the very

1   bottom of page 22?

2   A    That's Mr. Head stating that the extension that we offered

3   is still on the table.

4   Q    And picking up at the top of page 23, the initials "KM"

5   next to "What your offering".  How long was Mr. Meadows talking?

6   A    That would be from "What your offering" to "the main

7   concerns".

8   Q    And then the next set of initials.  Whose are those?

9   A    That's Jethro Head; JH.

10  Q    Okay.  And how long is Mr. Head talking in the notes?

11  A    That would be from "Until you put" to "agree on a process".

12  Q    And then the next set of initials, "KM".  How long is Mr.

13  Meadows speaking?

14  A    That would be from "I hear this" to "hard and heavy".

15  Q    And then the two lines below that.  I notice there's --

16       JUDGE CARISSIMI:  Excuse me.  I have a question on the

17  notes themselves.

18       If we look at the section that you were just talking about,

19  there's reference to "KM", and it starts "I hear this", "We need

20  to go back and discuss this", "We need to take it back".  And

21  then could you tell me what that next word is?  Do you see where

22  I'm at?

23       THE WITNESS:  Oh.  Okay.  "We need to take it back and look

24  at it hard and heavy".

25       JUDGE CARISSIMI:  Okay.  Thank you.

1       You may continue, Mr. Wiese.

2   Q    BY MR. WIESE:  Picking up with the two lines below that, I

3   notice next to the initials "JH" and "KM" that there are some

4   cross-outs there.  Do you recall what happened with those?

5   A    No, I don't.  I mean, this -- it was a quick exchange that

6   day, and I just crossed out as need be.

7   Q    So do you recall Jethro Head making the statement "We have

8   not one tentative agreement"?

9   A    I do.

10  Q    Okay.  And then the line below that, from -- is that

11  attributable to KM, starting with "Is there anything"?

12  A    Yes.

13  Q    And how long is Mr. Meadows speaking?

14  A    That sentence: "Is there anything that could be considered

15  a tentative agreement?"

16  Q    Okay.  And then the next line.  Who is that?

17  A    That's JH.

18  Q    And the line below that?

19  A    That's KM.

20  Q    How long is Mr. Meadows speaking?

21  A    That whole sentence: "The language we did not like in the

22  contract we removed and we".

23  Q    Okay.

24       JUDGE CARISSIMI:  You don't recall what happened or what

25  was said after the "we" in your notes?

1      THE WITNESS:  No, I don't.

2      JUDGE CARISSIMI:  Thank you.

3   Q    BY MR. WIESE:  Turning back or looking up a second again to

4   those cross-outs that we talked about on page 23 next to the

5   "JH" and "KM" initials, did you -- do you recall whether you

6   made those markings at the bargaining table?

7      JUDGE CARISSIMI:  I'm sorry, Mr. Wiese.  What was that

8   question?  I missed it.  I couldn't hear you.

9   Q    BY MR. WIESE:  So I'm referring again to the initials next

10  to the "We have not one tentative agreement", and then the line

11  below that, "Is there anything that could be considered a

12  tentative agreement?" -- the, I guess, cross-outs in the notes

13  next to those two lines.  Were those annotations made at the

14  bargaining table?

15  A    Yes.

16  Q    Turning over now to page 24, August 18th, starting with the

17  -- are those initials "KM" next to "We took the time"?

18  A    Yes.

19  Q    How far down is Mr. Meadows speaking?

20  A    That would be from "We took out" -- "We took the time" down

21  to "bonus offer on the table."

22  Q    And the reference to "LBF", starting with the line "Copied

23  over".  What was that in reference to?  Do you recall?

24  A    The last, best, and final offer.

25  Q    Directing your attention to Joint Exhibit 8.  And I'll also

1    direct your attention to Joint Exhibit 9 at this time.

2    (Witness proffered the documents.)

3    Q    So, looking at first of all Joint Exhibit 8, do you

4    recognize this document?

5    A    I do.

6    Q    What is it?

7    A    It was the Company's last, best, and final offer on August

8    18th.

9    Q    And this is something that the Company presented at the

10   table on August 18th?

11   A    Yes.

12   Q    Do you recall when they presented it at the table,

13   approximately?

14   A    I would say by my notes it was first thing in the -- at the

15   first of the bargaining, because I am referring to their LBF in

16   my notes right away.

17   Q    All right.  And directing your attention to the line

18   starting with "Secondary sheet", the initials "HSP" or the

19   acronym "HSP".  What is that in reference to?

20   A    That's a health savings plan, seed money, on Exhibit 9.

21   Q    And then, looking below that, are those the initial -- or,

22   excuse me, below the line "and bonus offer on table", are those

23   the initials "JH"?

24   A    Below that?

25   Q    Yes.

1   A    Yes.

2   Q    And how far down is Mr. Head speaking?

3   A    He would be those two lines, "Outside of committee" and

4  "bonus anything else".

5   Q    And then the line below that.  Are those the initials "KM"

6  next to it?

7   A    They are.

8   Q    And this statement "Management responsible for overtime".

9  Is that something you recall Mr. Meadows saying?

10   A    Yeah, I do.

11   Q    Is that in -- or when he said that, was it in reference to

12  his last, best, and final offer?

13   A    Yes.

14   Q    All right.  Does this statement stand out to you for any

15  reason in particular?

16   A    It does.

17   Q    Why is that?

18   A    Because they don't do that.  In the contract they imposed

19  on us on September 14th, they -- management does not take care

20  of overtime.

21   Q    Who does take care of overtime?

22   A    There is a -- there is a gentleman named Roger Roseberry

23  who is a union member.  And it was a -- in their contract -- I'm

24  trying to recall the name of it.  It would be a bid that they

25  could put up that would be a reoccurring bid after every 3

1  months.  I can't recall the name of what -- what they call it.

2  Q    Okay.

3  A    But no, management is not taking care of overtime.

4  Q    All right.  And picking up with the line below that,

5  starting with "discipline on anniversary date".  What initials

6  are next to that?

7  A    "KM".

8  Q    How far down is Mr. Meadows speaking?

9  A    That would be from "discipline on anniversary date" to "out

10  penalty qualifier".

11  Q    And the acronym "LOA" in that block of writing?  What does

12  that mean?

13  A    That would be "leave of absence."

14  Q    Okay.  And two lines below that, the "S&A"?  What is that

15  in reference to?

16  A    That would be "sick and accident insurance."

17  Q    All right.  And then looking at the line below "out penalty

18  qualifier".  Are those the initials "JH" next to it?

19  A    That is.

20  Q    And then the line below that, starting with "under an look

21  at"?  What are the initials next to that?

22  A    That's "KM".

23  Q    And how much of this -- or how far down is Mr. Meadows

24  speaking?

25  A    That would be to the end of the page.  To "taken out".

1  Q    And so, looking at that statement, what do you recall Mr.

2  Meadows doing during this exchange on page 24 after he presented

3  the last, best, and final offer?

4  A    He was explaining what he changed from his final offer.

5  Q    And turning over to the top of page -- actually, before we

6  do that, Ms. Shannon, next to where you indicated the initials

7  "KM" are, could you read what the next couple of words are in

8  the notes?

9  A    To me, it looks like "under an look at page 28". So "under

10  a" or "an". I don't know what that means. But it says "look at

11  page 28 above 9". Or "g". I can't -- I -- it's kind of fuzzy

12  on here.

13  Q    Okay.

14  A    And then "payments discontinues for work stoppage taken

15  out".

16  Q    And then, if you work your way back up that page, do you

17  see the line starting with "Outside of committee recognition"?

18  It's about halfway up the page. I believe it's next to the

19  initials "JH".

20  A    Yes.

21  Q    What's the last word on that line?

22  A    "Outside of committee recognition clause and bonus anything

23  else."

24  Q    Okay. Thank you, Ms. Shannon.

25       Let's turn over to page 25. So, starting with the top

1  line, "Anything else?"  Are those the initials "JH" next to

2  that?

3  A    They are.

4  Q    And then the line below that, "What is the changes?"  Are

5  those the initials "KM"?

6  A    It is.

7  Q    At that point were the parties still talking about the

8  last, best, and final offer?

9  A    Yes.

10  Q    Then the line below that, starting with "JH", "vibration

11  analysis".  What is that about?

12  A    I can't tell you how many years before, but there was a

13  gentleman named Jon Swails that was in maintenance, and he had

14  the job of vibration analysis in the plant.  He went to -- we

15  have a -- we had a safety committee at the time called the

16  Looking Glass Safety Committee, and we had a union

17  representative move to that job and ran that for the union side.

18  Mr. Swails went to that job.  And at the time, nobody was

19  qualified in maintenance to do the vibration analysis.  So it

20  was agreed upon at that time that it would be given to an

21  outside contractor and that when Mr. Swails came back to the --

22  back to his job in maintenance that he would be put back in that

23  job, in the vibration analysis job.

24        JUDGE CARISSIMI:  What kind of vibrations were being

25  analyzed?

1    THE WITNESS:  Like motors and -- motors and pumps and

2    things like that.  I'm not real familiar with all that stuff,

3    but yes.

4    JUDGE CARISSIMI:  Do you know if it was analyzing the

5    machinery itself or its effect on people?

6    THE WITNESS:  Oh.  The machinery itself.  If it would be

7    like -- I think that they can tell if it -- if the vibration is

8    bad enough, if it needs to be changed out, or something like

9    that.

10    JUDGE CARISSIMI:  All right.  Thank you.

11    Q    BY MR. WIESE:  Ms. Shannon, what's your understanding of

12    why vibration analysis was being brought up at the table at this

13    time?

14    A    Because when Mr. Eby was voted in as president of our union

15    -- at that time, Mr. Swails, the vibration -- the man -- he was

16    still in the safety committee, the head of the safety committee

17    for the Union.  They ran against each other, and Mr. Swails lost

18    in that election.  And after that, Mr. Swails went to the --

19    went to a salaried position with the Company.

20    Q    And what happened to the vibration analysis work at that

21    time?

22    A    We grieved it at that time because they were not -- the

23    Company was not filling -- Penford was not filling it at that

24    time.  So we grieved it because it was supposed to come back as

25    soon as Mr. Swails was done with that -- to the bargaining unit,

1   not the outside contractors.

2   Q    Are you aware of what the disposition was of that

3   grievance?

4   A    Yes.

5   Q    What was it?

6   A    It was that we had agreed that there would be an extra

7   maintenance person put on until the -- for the duration, until

8   the contract came up, and then it would be revisited at that

9   time.  We agreed to that.

10  Q    So, turning back to your notes, Ms. Shannon.  So it looks

11  like we have the initials "JH" next to the "vibration analysis".

12  Are those the initials "KM" below that?

13  A    Beside the "No"?

14  Q    Yes.

15  A    Yes.

16  Q    Okay.  And then, below that, the initials "JH".  How long

17  was Mr. Head speaking?

18  A    He said, "Well the others with you are aware of this."  And

19  after that, it's my notes: "meaning Irwin and Levi".

20  Q    And the "Irwin and Levi", who is that in reference to?

21  A    Erwin Froehlich and Levi Wood.

22  Q    All right.  Then, next to the -- or, first of all, the

23  "1:40 pm" reference there?  What is that in reference to?

24  A    A caucus or lunch.

25  Q    And then, next to that, are those the initials "JH"?

1   A    They are.

2   Q    How far down is Mr. Head talking?

3   A    "You have refused to recognize the process"; "contracts

4   from other plants."

5   Q    And what about the line after that, starting with "MO"?  Do

6   you recall who made that statement?

7   A    That was Mr. Head too, that Ken's modus of operandi was "If

8   I beg you, we will give it to you."

9   Q    Okay.  And then picking up with the line below that,

10  starting with "Ken".  Is that something that -- or do you recall

11  someone saying that?

12  A    He asked for the clarification, then he said it will

13  determine what we are worth and tell us how efficient we are as

14  employees.

15       Wait a minute, wait a minute.

16       Yes.  Yes.

17  Q    So that's all Mr. Meadows, as best you can recall?

18  A    As best I can recall, yes.

19  (EXHIBIT MARKED:  GENERAL COUNSEL'S 31.)

20  Q    BY MR. WIESE:  Okay.  And I'm going to direct your

21  attention to General Counsel Exhibit 31.

22  (Witness proffered the document.)

23  Q    Do you recognize this document?

24  A    I do.

25  Q    What is it?

1   A    This would be -- we started with Article 1, the union side,

2   and went through again, trying to delete what we found not

3   relevant, and tried to match it to the Company's proposal.

4   Q    And looking at, for example -- on page 2 of this document

5   there is some handwriting to the right of Article 2, Section 2.

6   Whose handwriting is that?

7   A    That's mine.

8   Q    And what does the handwriting on this document indicate?

9   A    These were Meadows's responses.

10  Q    So, for example, next to section -- or Article 2, Section

11  2, where it says "Not interested", do you recall Mr. Meadows

12  saying anything more than that in response to the proposal, the

13  proposed change?

14  A    No.

15  Q    And what about below that?  Article 2, Section 3.  Do you

16  recall him saying anything more than what is indicated in your

17  notes?

18  A    No, I don't.

19  Q    Once we get to the -- the last note that I can see is at

20  the top of page 3, Section 4: "Will clean up".  Do you see what

21  I'm talking about?

22  A    Yeah.  I do.

23  Q    Are there any other handwritten notes in the document?

24  A    No, there aren't.

25  Q    Do you know why that is?

1    A    Because he stopped there.

2    Q    Who stopped?

3    A    Mr. Meadows.

4    Q    He stopped doing what?

5    A    Stopped looking at it or stopped giving us -- stopped

6    looking at the -- at it.

7         MR. WIESE:  I'll offer General Counsel Exhibit 31.

8         JUDGE CARISSIMI:  Is there any objection to GC 31?

9         MR. BUTTRICK:  No objection.

10        JUDGE CARISSIMI:  GC 31 is admitted.

11   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 31.)

12   Q    BY MR. WIESE:  So, picking up below "employees" on the

13   notes, starting with "Section 3".  Do you recall who said that?

14   A    That was JH.

15   Q    And how far down in the notes is Mr. Head speaking?

16   A    From "Section 3" to "This will be our process".

17   Q    Okay.  And picking up below that with the line "You know my

18   LBF".  Who is that?

19   A    That is KM.

20   Q    How far down is Mr. Meadows speaking?

21   A    That's Mr. Meadows.

22   Q    Down to the bottom of the page?  Or how -- excuse me.

23   A    Yes.

24   Q    Could you just clarify for me from where -- from what point

25   down to the bottom of the page Mr. Meadows is speaking?

1  (Pause.)

2      JUDGE CARISSIMI:  Let's go off the record.

3  (Off the record.)

4      JUDGE CARISSIMI:  Back on the record.

5      Go ahead.

6      THE WITNESS:  From "You know my LBF" to "it is fine".

7      MR. WIESE:  Okay.

8      JUDGE CARISSIMI:  Who said those words?

9      THE WITNESS:  That would be KM.

10     JUDGE CARISSIMI:  Thank you.

11  Q    BY MR. WIESE:  And then the line below that, "Check our

12  proposal".  Who is that?

13  A    That would be JH.

14  Q    All right.  Let's turn over to page 26.  What are the

15  initials at the top of that page?  Or whose initials are those?

16  A    That is "KM".

17  Q    And then the initials below that?

18  A    That is "CE".

19  Q    How far down is Chris Eby speaking?

20  A    That would be from "We are asking" to "page 3 of my

21  contract".

22  Q    And then below that are the initials "KM".  How long is Ken

23  Meadows speaking?

24  A    From "Don't see a need" to "I am not going through them

25  word for word".

1   Q    And the initials below that.  Whose initials are those?

2   A    JH.

3   Q    And how far down is Mr. Head speaking?

4   A    "What is your problem".  "Are you refusing to discuss it".

5   Q    And then picking up below that, "Don't see that it is

6   needed".  Who said that?

7   A    That would be KM.

8        JUDGE CARISSIMI:  Ms. Shannon, the --

9        THE WITNESS:  Wait a minute, wait a minute.

10       JUDGE CARISSIMI:  Okay.  Go ahead.

11       THE WITNESS:  I'm sorry.

12  (Pause.)

13       THE WITNESS:  The one beside "Article 1 Section 2", I don't

14  recall who said that.

15  Q    BY MR. WIESE:  Okay.  What about the line below that,

16  starting with "Jethro you are"?

17  A    That is KM.

18  Q    How far down is Mr. Meadows speaking?

19  A    "Jethro you are taking".  "That language is in my

20  proposal".

21  Q    The "Art. 1 Section 2" and the "Section 3" references to

22  the left of that?  Do you recall what those are in reference to?

23  A    I'm thinking it's the last exhibit, but I can't be sure.

24       JUDGE CARISSIMI:  When you say "the last exhibit" --

25       THE WITNESS:  I'm sorry.  Exhibit 31.

1      JUDGE CARISSIMI:  Okay.  General Counsel 31.  Correct?

2      Does it say "GC" on the document?

3      THE WITNESS:  It does.

4      JUDGE CARISSIMI:  Yes.  Very good.  Thank you.

5   Q    BY MR. WIESE:  Okay.  Picking up with below "That language

6   is in my proposal", starting with "What is wrong".  Who is

7   saying that?

8   A    That would be Jethro Head; JH.

9   Q    And how far down is Mr. Head speaking?

10  A    That would be down to "Section 3 What do you want".

11     JUDGE CARISSIMI:  A question about your notes, Ms. Shannon?

12     THE WITNESS:  Yes.

13     JUDGE CARISSIMI:  The line that states "What is wrong with

14  it this is based off".  What's that next word?

15     THE WITNESS:  "Your."

16     JUDGE CARISSIMI:  All right.  Thank you.

17     THE WITNESS:  I misspoke.  I'm sorry.

18     JUDGE CARISSIMI:  What is it that you thought you'd

19  clarify?

20     THE WITNESS:  Okay.  I think I --

21     "Jethro you are taking", "language is in my proposal" --

22  that would be KM.  I don't know if I said that.

23     And then are we down to the next one?  I'm sorry.

24     JUDGE CARISSIMI:  That's all right.

25     MR. WIESE:  No, that's fine.

1  Q    BY MR. WIESE:  So I believe we were down -- do you have it

2  indicated in your notes who is talking --

3  A    I do.

4  Q    -- in your annotated copy?

5  A    I do.

6  Q    Okay.  All right.  And what's the -- where do you stop in

7  that?

8  A    I have "KM", "Jethro you are taking", "That language is in

9  my proposal".

10 Q    Okay.  And then the line below that, starting with "What is

11 wrong"?

12 A    That is JH.

13 Q    How far down is Mr. Head speaking?

14 A    To "What do you want".

15 Q    So, picking up below that, the initials next to "I am not

16 going back".  Are those KM?

17 A    Yes.

18 Q    How far down is Mr. Meadows speaking?

19 A    That would be from "I am not going back to your contract",

20 "I refer you to our LBF Article 4".

21 Q    And the section references on the left-hand side?  Do you

22 recall what those are in reference to?

23 A    I believe they were in reference to the Union's proposals -

24 -

25 Q    General Counsel --

1    A       -- on General Counsel Exhibit 31.

2    Q       Thank you.

3            All right.  And picking up below that with the initials.

4    Are those -- below the "I will refer you to our LBF Article 4",

5    are those the initials "JH"?

6    A       Yes.

7    Q       And how far down is Mr. Head speaking?

8    A       From "We are going to have to go through it", "How does

9    your grievance procedure work?"

10   Q       And then the last set of initials down there?  Whose are

11   those?

12   A       That is "KM".

13   Q       Okay.  Turning over to the top of page 27, starting with

14   the line "We don't".  Who is saying that?

15   A       That would be Mr. Eby.

16   Q       Okay.  And then, picking up with the line below that,

17   starting with the initials "KM", how long is Mr. Meadows

18   speaking?

19   A       KM asks, "What is the main difference in ours?"  CE

20   answers, "We think our proposal is a more simplified procedure,"

21   I believe.

22   Q       Oh.  You believe that?

23   A       Yeah.  I'm sorry.

24           KM comes from "What is the main difference in ours" and

25   down to "week in our LBF".  I'm sorry.

1   Q    Well, that's fine, Ms. Shannon.

2        Looking at the time, or next to the time, "Back at 4:50",

3  whose initials are those?

4   A    JH.

5   Q    And how far down is that JH talking?

6   A    From "1 2 page cleanup" to "proposing wages now."

7   Q    Direct your attention to Joint Exhibit 14.

8  (Witness proffered the document.)

9   Q    Do you recognize this document, Ms. Shannon?

10   A    I do.

11   Q    What is it?

12   A    This would be our -- the next article we went to, on wages,

13  that we modified and gave to the Company.

14   Q    Did you give this to the Company on August 18th?

15   A    We did.

16   Q    When did you give it to the Company?

17   A    After the caucus, when we came back at 4:50.

18   Q    Okay.  And then let's turn back to your notes here, below

19  the "We are proposing wages now."  Is that the initials "KM" in

20  the next line?

21   A    That is.

22   Q    Okay.  And how far down is Mr. Meadows talking?

23   A    "Again I am not interested", "I refer you back to LBF".

24   Q    And then, below that, what initials are those next to the

25  "Our first wage proposal"?

1    A    "JH".  "Our first wage proposal" down to "Done for today".

2    Q    Okay.  And then the line below that, "Suggest you look at

3  my last best final".  Who is that?

4    A    That would be KM.

5    Q    How far down is Mr. Meadows speaking?

6    A    To the end.

7    Q    Turning over to page 28, are these notes still from August

8  18th?

9    A    They are.

10    Q    And why are these notes on page 28 on a different sheet of

11  paper?  Do you recall?

12    A    Because when Mr. Meadows left with it -- with his -- the --

13  we would meet at 9 a.m., I assumed we were done and I had put

14  all my note taking stuff in my bag and was ready to go.  And he

15  came back in.  And there was a notepad from the Hampton on the

16  table, and a pen.  So that's where I took that last set of

17  notes.

18    Q    Was that where the negotiations were at that day, the

19  Hampton?

20    A    Yes.

21    Q    So, starting with "pretty disappointed", who is saying

22  that?

23    A    That is Mr. Meadows.

24    Q    How far down is Mr. Meadows speaking?

25    A    He would be from "pretty disappointed" to "proceed the way

1   I need to".

2   Q    And then the line below that.  What does that say?

3   A    It says "September 9th, 10th, and 11th".

4   Q    What are those in reference to?

5   A    Those were dates that Mr. Head gave at that time to Mr.

6   Meadows to resume negotiations.

7   Q    Okay.  And looking --

8   A    Or that he had open, anyway.

9   Q    And then looking at the line below that.  What does that

10  say?

11  A    "We have to check".

12  Q    And who said that?

13  A    That would be Mr. Meadows; KM.

14  Q    All right.  Let's turn over to the top of page 29.  Do you

15  recall, starting with the line "Ken What do you want to do?" who

16  said that?

17  A    That would be JH.

18  Q    How long did Mr. Head speak?

19  A    Just "Ken What do you want to do?"

20  Q    Okay.  And then the line below that, "My LBF is on the

21  table"?  Who said that?

22  A    That would be KM.

23  Q    Okay.  And the line below that, "Not interested"?  Who said

24  that?

25  A    That would be JH.

1  Q    And then the line below that, "We will be implementing"?

2  Who said that?

3  A    That's KM.

4  Q    And then the line below that, "3 minutes - done".  Did

5  anybody say that?

6  A    No.

7  Q    What is that?

8  A    That's my notes.

9  Q    To the best of your recollection, is that how long

10  negotiations lasted that day?

11  A    As best I can recall, yes.

12  Q    And then picking up below that with the "9-10", are those

13  the notes from the September 10th negotiations?

14  A    Yes.

15  Q    Okay.  Starting with the initials "KM", how long was Mr.

16  Meadows speaking?

17  A    "I am on my LBF", "reconsider recommendations."

18       JUDGE CARISSIMI:  Let me suggest, Mr. Wiese --

19       MR. WIESE:  Yes.

20       JUDGE CARISSIMI:  That particular date on this page 29

21  seems to be pretty clear, unless there's something that you find

22  to be confusing and you want to clarify.  But there's many

23  initials as we go through that, and at least it's apparent to me

24  when somebody is speaking and somebody stops.  If you don't

25  think it's apparent, perhaps you could just focus in on that.

1    MR. WIESE:  Okay.  That sounds fine, Your Honor.

2  Q    BY MR. WIESE:  I have a question about the -- so do you see

3  where it says "9:08 pm"?

4  A    Yes.

5  Q    The line above that, "Officially yes"?  Who do you recall

6  saying that?

7  A    That was Mr. Meadows.

8  Q    And then looking at the line next to -- starting with

9  "9:08" there.  Who is saying that?

10  A    That is JH.

11  Q    Starting with "Committee spent"?

12  A    Yes.

13  Q    Is that Mr. Head down to the bottom of the page?

14  A    Yes.

15  Q    What was Mr. Head talking about at that point?

16  A    After the brief meeting in the morning, we spent, the four

17  of us -- Mr. Eby, myself, Mr. Maas, and Mr. Yeisley spent all

18  day melding, if you will, the LBF and our current contract.  We

19  spent the whole day doing it.  And at the end of the day, Mr.

20  Maas and myself took what we had done and went out to make

21  copies.  And it was at 5 minutes till 8 when we started with the

22  copies, and the copy -- the lady, when we walked in, she goes,

23  "We close at 8."  But they did -- they did do that.  They did

24  that for us that night so that we had copies to give to the

25  Company when we came back in.

1  Q    I'm going to direct your attention to Joint Exhibit 15.

2  (Witness proffered the document.)

3  Q    Do you recognize this document, Ms. Shannon?

4  A    I do.

5  Q    What is it?

6  A    It is our offer of settlement from our arduous work that

7  day.

8  Q    And was this the offer of settlement that you presented to

9  the Company of September 10th?

10  A    It is.

11  Q    Well, let's turn over to the top of the next page, page 30,

12  starting with "Cost of Living".  Who is saying that?

13      JUDGE CARISSIMI:  We're back to Exhibit 7, right?

14      MR. WIESE:  Yes, Your Honor.  My apologies.

15      JUDGE CARISSIMI:  I just do that to make sure, because when

16  we all read this we want to make sure we know we're going back

17  and forth between different documents.  I knew what you meant,

18  but I want to make sure when I read it, whenever I get a chance

19  to read this, I know which exhibit we're on.

20      MR. WIESE:  Thank you.

21  Q  BY MR. WIESE:  So, turning to the top of General Counsel --

22  or turning to the top of page 30 of General Counsel Exhibit 7,

23  starting with "Cost of Living", who is saying that?

24  A    That is JH.

25  Q    How far down is Mr. Head speaking?

1  A    That would be from the top to "Deleted lots of language

2  incorporated yours".

3  Q    And looking at the Roman numerals IX, XI, X, et cetera,

4  starting on the second line, do you recall what those are in

5  reference to?

6  A    Yes, I do.  They would be referred back to our initial

7  proposal, Exhibit 10.  The things we were pulling back from.

8  Q    Okay.

9       JUDGE CARISSIMI:  Let me ask you this, Ms. Shannon.  I see

10  that the Joint Exhibit 15, the offer the Union gave to the

11  Employer on that date, also contains Roman numerals.

12      THE WITNESS:  Yes.

13      JUDGE CARISSIMI:  All right?  So the Roman numerals on page

14  30 of General Counsel 7 that Mr. Wiese asked you about --

15      THE WITNESS:  Mm-hmm?

16      JUDGE CARISSIMI:  -- those Roman numerals don't refer to

17  Joint Exhibit 15?  They refer to another exhibit?

18      THE WITNESS:  They -- I need to look.  I'm sorry.

19      JUDGE CARISSIMI:  That's fine.  This is -- there's a lot to

20  consider here.  But I want to make sure I understand what your

21  notes refer to.

22  (Pause.)

23      JUDGE CARISSIMI:  Let's go off the record.

24  (Off the record.)

25      JUDGE CARISSIMI:  On the record.

1    So can you tell us what your notes on page 30 of GC 7, the
2    Roman numerals, what document they refer to?
3    THE WITNESS:  They would refer to our document here,
4    because we came up with this one from our existing contract.  So
5    they will be concurrent with that.
6    JUDGE CARISSIMI:  Okay.  So when you say -- there's two
7    documents that you've looked at.
8    THE WITNESS:  Yeah.
9    JUDGE CARISSIMI:  There's the proposal that you gave on
10   September -- the evening of September 9th.  Joint Exhibit 15,
11   correct?  The big one.
12   THE WITNESS:  Yes.
13   JUDGE CARISSIMI:  And then there's Joint Exhibit 10, which
14   was the original proposal of the Union on June 1st of 2015,
15   correct?
16   THE WITNESS:  Yes.
17   JUDGE CARISSIMI:  All right.  Now, do those Roman numerals
18   in your notes on page 30 of General Counsel Exhibit 7 refer to
19   which of these documents, or both?
20   THE WITNESS:  They would be able to refer to both, because
21   the original document, the union contract proposal that we
22   proposed in the beginning, came from the Red Book, if you will -
23   - from our current contract -- and the articles and the sections
24   were correspondent with that.
25   JUDGE CARISSIMI:  All right.  Thank you.

1       Counsel, you may proceed.

2   Q   BY MR. WIESE:  Ms. Shannon, when we came back from the

3   break, you held up a document in your hand.

4       MR. WIESE:  We'll move on.

5       JUDGE CARISSIMI:  If you think there -- I'm trying to

6   clarify --

7       MR. WIESE:  I think there may have been an ambiguity in the

8   record that I'm trying --

9       JUDGE CARISSIMI:  If you want to try to clarify something

10  that --

11  Q   BY MR. WIESE:  Did you hold up a document to the Judge

12  after we came out of the brief break?  Do you recall doing that?

13      JUDGE CARISSIMI:  Well, rather than having her try to

14  recall which document she was holding up, if you have questions

15  about the exhibits, refer to exhibits in your questions.  If you

16  think there's some ambiguity, you can certainly try to rectify

17  it, if you do.  But --

18  Q   BY MR. WIESE:  So, looking at -- let's move on, Ms.

19  Shannon.

20  A   Okay.

21  Q   Down to starting with -- I believe we were at "This is

22  unacceptable".  Is that right?

23  A   Yes.

24  Q   And who is saying that?

25  A   That's KM.

1  Q    How far down is Mr. Meadows speaking?

2  A    To the bottom of the page.  From "This is unacceptable" to

3  "I will review and see if there is anything to".

4  Q    Okay.  Thank you.

5       JUDGE CARISSIMI:  Let's go off the record for a minute.

6  (Brief discussion held off the record.)

7       JUDGE CARISSIMI:  So let's go back on the record.

8       Mr. Wiese, you may continue.

9       MR. WIESE:  Okay.

10  Q    BY MR. WIESE:  Ms. Shannon, I am going to show you what's

11  been marked as General Counsel Exhibit 35.

12  (Witness proffered the document.)

13  Q    Do you recognize this document, Ms. Shannon?

14  A    I do.

15  Q    What is it?

16  A    This was a letter brought to Mr. Head and Mr. Eby --

17  addressed to them, brought back in -- a notice of implementation

18  that would take place on September 14.

19  Q    Do you recall getting or receiving this document from the

20  Employer on September 10th?

21  A    I do.

22       JUDGE CARISSIMI:  Which exhibit was that, Mr. Wiese?

23       MR. WIESE:  This is General Counsel Exhibit 35, Your Honor.

24       JUDGE CARISSIMI:  Thirty-five.  Thank you.

25  Q    BY MR. WIESE:  And do you recall, did you receive this

1   document after you presented the Employer the offer of

2   settlement in Joint Exhibit 15?

3   A    Can you repeat the question?

4   Q    Yes.  Yes, I can, Ms. Shannon.

5       Do you recall whether you received this letter after the

6   Union presented the Employer the document, the offer of

7   settlement, the Union's contract offer in Joint Exhibit 15?

8   A    We did.

9   Q    Do you recall about how long after it was, after you

10   presented this, after you presented Joint Exhibit 15, that you

11   received the letter in General Counsel Exhibit 35?

12   A    It was minutes.

13   Q    Let's turn over to the top of page 31, just those two

14   lines.  Who said those lines?

15   A    That was the end of Mr. Meadows' "I will review and see if

16   there's anything to consider".  And "9 am in the morning", I

17   don't know who said that.

18   Q    Picking up with negotiations on September 11th.  Why were

19   your notes on this Hampton Inn pad that day?

20   A    For some reason, my bag was still at my house.

21   Q    Picking up with the top, starting with "Couple of issues".

22   Who said that?

23   A    That would be KM.

24   Q    And how far down was Mr. Meadows speaking?

25   A    From "Couple of issues" to "on the table we have nothing

1   else."

2   Q    And then looking at the initial below that, is that "JH"?

3   A    It is.

4   Q    And then, going from there, how far down is Mr. Head

5   speaking?

6   A    That would be the rest of the page.

7   Q    Including the dates?

8   A    Yes.

9        JUDGE CARISSIMI:  I have a question or two, Ms. Shannon.

10       Going back to the fourth line down on your notes, it says

11  "Responses on requests".  Do you recall anything further about

12  what Mr. Meadows was saying regarding that topic?

13       THE WITNESS:  Don't recall, Your Honor.

14       JUDGE CARISSIMI:  All right.  The other question I have is,

15  if we go to the end of the "JH" part of the note, it says "We

16  made great and good faith effort and would not consider it".

17  Can you tell me anything more about what Mr. Head said?

18       THE WITNESS:  No.  I believe that was it.

19       JUDGE CARISSIMI:  What would -- do you recall what he was -

20  -

21       THE WITNESS:  That would be "and you would not consider

22  it", like he was directing it to Mr. Meadows, to the Company

23  side.

24       JUDGE CARISSIMI:  All right.  So I was kind of distracted.

25  There was some noise outside.  Can you tell me again what you

1    now recall Mr. Head saying?

2        THE WITNESS:  That we worked hard on that process and that

3    we made a great and good-faith effort and that Mr. Meadows would

4    not even consider it.

5        JUDGE CARISSIMI:  All right.  Thank you.

6        Mr. Wiese, you may continue.

7        MR. WIESE:  Your Honor, with regard to the rest of the

8    notes, starting on October 8th, I've reviewed the notes pretty

9    thoroughly.  I think they're self-explanatory.  I don't think we

10   need to -- or largely, at least.  So we don't need to go through

11   that process.

12       JUDGE CARISSIMI:  Well, my quick look would agree with you,

13   because those seem very detailed, in terms of who was speaking

14   for those last couple of pages.

15       So is there anything further?

16       MR. WIESE:  Could we just go off the record for 1 minute to

17   confer --

18       JUDGE CARISSIMI:  Let's go off the record.

19       MR. WIESE:  -- with co-counsel?

20       JUDGE CARISSIMI:  Yes.

21   (Off the record.)

22       JUDGE CARISSIMI:  On the record.

23   Q    BY MR. WIESE:  So, Ms. Shannon, I'd like to direct your

24   attention briefly to page 3 of General Counsel Exhibit 7.

25       THE WITNESS:  Am I supposed to look at this one?

1     JUDGE CARISSIMI:  Is that a document that Ms. Shannon has?

2     MR. WIESE:  Those are your notes, Ms. Shannon.

3     JUDGE CARISSIMI:  Oh.  Of course.

4     THE WITNESS:  Okay.

5     JUDGE CARISSIMI:  I was making it more complicated than it

6 is.

7     MR. WIESE:  Yes.  And I should have --

8     THE WITNESS:  Page 3?

9     MR. WIESE:  I should have --

10    JUDGE CARISSIMI:  Yes.

11    MR. WIESE:  -- clarified that.

12    THE WITNESS:  Yes.

13    MR. WIESE:  Page 3.

14 Q   BY MR. WIESE:  So, starting with again those Roman numerals

15 about halfway down that run to the bottom of the page?

16 A   Yes?

17 Q   Do you see those?

18 A   I do.

19 Q   Where it says "Not interested", do you recall Mr. Meadows

20 saying anything beyond that?

21 A   No, I don't.

22 Q   And was the "Not interested" -- was that actually what he

23 was saying at the table?

24 A   Yes.

25 Q   And is that true for "Not" -- all the "Not interesteds" on

1  page 3 --

2  A    Yes.

3  Q    -- as best you can recall?

4       Okay.  And then turning over to page 4 of the notes, is

5  that also true for all of the "Not interesteds" on that page?

6  A    Yes.

7  Q    Do you recall how long it took for Mr. Meadows to go

8  through the Union's initial contract offer that day?

9  A    It was very brief.  That, if I recall right, that was a

10 Monday, and that we start at 1 o'clock because of travel time.

11 And it was very brief.  It just was right through the list.

12 Q    And just one more quick question.  Was your husband

13 employed by Ingredion in August of 2015?

14 A    No.

15      MR. WIESE:  Nothing further.

16      JUDGE CARISSIMI:  Very good.

17      Now, as we've discussed, before I can ask counsel of the

18 Respondent to --

19      I take it you're now going to move to introduce --

20      MR. WIESE:  Yes.

21      JUDGE CARISSIMI:  -- Exhibit 7(a)?

22      MR. WIESE:  Yes, Your Honor.

23      JUDGE CARISSIMI:  But counsel has to have an opportunity to

24 review those.  So we're going to have copies made and we will

25 give -- and we can do that at the present time?

1    MS. OHAERI:  Yes.  The facilities people said that they

2  would make the copies for us.

3    JUDGE CARISSIMI:  Okay.

4    MS. OHAERI:  So I'm going to go.

5    JUDGE CARISSIMI:  So we will get the copies made.  We will

6  give them to Respondent's counsel.  We're then going to be in

7  recess.

8    And let's go off the record.

9  (Whereupon, a lunch recess was taken at 12:46 p.m., to resume at

10  2:16 p.m. in the same place.)

11    JUDGE CARISSIMI:  Let's go on the record.

12    Before we broke for our recess, General Counsel moved

13  General Counsel Exhibit 7(a), which is the annotated copy of Ms.

14  Shannon's notes, into evidence.  I gave the Respondent an

15  opportunity to review that document.

16    And I'd like to ask at this time whether you have any

17  objection to the admission of General Counsel Exhibit 7(a).

18    MR. BUTTRICK:  No objection, Your Honor.

19    JUDGE CARISSIMI:  General Counsel Exhibit 7(a) is admitted.

20  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 7(a).)

21    JUDGE CARISSIMI:  And, Mr. Buttrick, you may cross-examine.

22    MR. BUTTRICK:  Yes.  One other preliminary note, just for

23  the record, Your Honor.

24    JUDGE CARISSIMI:  Yes.

25    MR. BUTTRICK:  I noticed that at the conclusion of Ms.

1  Shannon's direct testimony Mr. Bishop, who testified yesterday,

2  was in the audience.  I know he's done with his direct, but I

3  wanted to note that for the record, in the event that he's

4  called back.

5      JUDGE CARISSIMI:  That is correct.  And I believe the

6  General Counsel is aware of that.

7      MR. WIESE:  Yes, Your Honor.

8      MS. OHAERI:  Yes.

9      JUDGE CARISSIMI:  And therefore he will not be able to be

10  permitted to be called as a rebuttal witness in this case.

11      MR. BUTTRICK:  Thank you, Your Honor.

12      JUDGE CARISSIMI:  Very good.

13      MR. BUTTRICK:  Ms. Shannon, thank you so much for coming.

14  And I certainly appreciate and understand how this is -- can be

15  an emotional circumstance for you.

16      THE WITNESS:  Mm-hmm.

17      MR. BUTTRICK:  So I really do appreciate your time, and

18  sorry that you have to be here, but thank you for that.

19      My name is Stuart Buttrick.  I'm counsel for Ingredion and

20  I'll be asking you some questions about the testimony you just

21  gave.

22                    CROSS-EXAMINATION

23  Q   BY MR. BUTTRICK:  Have you talked with any other witnesses

24  or potential witnesses about the testimony that either they gave

25  or you gave?

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 351 of 1141

1    A    No.

2    Q    Okay.  I want to first talk with you about some testimony

3    you gave yesterday.  Do you have in front of you General Counsel

4    Exhibit 55?  Mr. Funk will help you find it, if you don't.

5        MR. FUNK:  Just want to give me some of those --

6        THE WITNESS:  Okay.  Yeah.

7        MR. FUNK:  -- and I think I'll keep them.

8        Give them all back to me, and I can --

9        THE WITNESS:  Okay.

10       MR. BUTTRICK:  And with your permission, Your Honor --

11       JUDGE CARISSIMI:  Let's go off the record, and then we'll

12   locate the exhibits.

13   (Brief discussion held off the record.)

14       JUDGE CARISSIMI:  On the record.

15       You may proceed.

16   Q    BY MR. BUTTRICK:  Ms. Shannon, do you recall yesterday when

17   you testified that Erwin Froehlich was not in this April 6th

18   meeting with Ken Meadows?  Do you recall that?

19   A    No, I testified that he was.

20   Q    Okay.  So you testified that he was in this meeting,

21   correct?

22   A    Yeah.

23   Q    Okay.  And do you recall testimony yesterday that when you

24   were discussing pension issues with Mr. Meadows, he --

25       MR. WIESE:  Your Honor, I'm going to object.

1    JUDGE CARISSIMI:  Yes.  I'm going to sustain the objection.

2    That's what I don't want to have happen.  Just ask questions.

3    No references to prior testimony.  It's in the record.  You

4    don't have a transcript.  So we're not going to do that.

5    MR. BUTTRICK:  Okay.

6    Q    BY MR. BUTTRICK:  Well, Ms. Shannon, looking at General

7    Counsel Exhibit 55, you didn't note that Mr. Froehlich was

8    present, correct?

9    A    That is correct.

10   Q    And if you look down, it's about halfway down the page.  It

11   says "Pension:".  Do you see that reference?

12   A    I do.

13   Q    You don't reference Mr. Meadows saying "Bye-bye" after that

14   sentence, correct?

15   A    Correct.

16   Q    And so your recollection about what occurred on April 6th

17   in that meeting is incomplete, correct?

18   A    No.

19   Q    Well, your documents don't reflect what you testified to,

20   correct?

21   A    That's correct.

22   Q    And you prepared General Counsel Exhibit 55 several days

23   after the meeting occurred?  Is that correct?

24   A    I wrote down several of these things that I could recall

25   right after the meeting.

1  Q   And did you write them down on notepaper?

2  A   I imagine.

3  Q   And do you still have those notes?

4  A   I do not.

5  Q   And so you testified that several days later you met with

6  the rest of the bargaining people who were present and then kind

7  of compiled everyone's thoughts to prepare General Counsel

8  Exhibit 55?

9  A   Yes, from my notes and their thoughts.

10 Q   And looking at General Counsel Exhibit 55, there's a

11 reference to it that's underlined.  It says "hire back whomever

12 I want."  Do you see that?

13 A   I do.

14 Q   Okay.  And then, in parentheses, you say "only recalled by

15 Matt Maas and R. Shannon", correct?

16 A   Yes.

17 Q   Okay.  So that means that Chris Eby and Vaude Wilford did

18 not recall that comment, correct?

19 A   That's -- yes.  That's correct.

20 Q   There was some testimony yesterday about manlifts.  Do you

21 remember that testimony?

22 A   I do.

23 Q   And manlifts are types of elevators, correct?

24 A   They are.

25 Q   And it's true, isn't it, that when Penford owned the Cedar

1    Rapids facility it would shut down manlifts from time to time,

2    correct?

3    A    Yes.

4    Q    Let's look at the notes that you took which are General

5    Counsel Exhibit 7.  And Mr. Funk --

6         MR. FUNK:  Seven?

7         MR. BUTTRICK:  Seven.

8         Mr. Funk can help you find those.

9    (Witness proffered the document.)

10        THE WITNESS:  Thank you.

11   Q    BY MR. BUTTRICK:  Do you have those in front of you?

12   A    I do.

13   Q    Is it fair to say that the Red Book was something that the

14   Union held dear?  Correct?

15   A    That's correct.

16   Q    And it was a contract that the Union, from its perspective,

17   had fought hard for, correct?

18   A    That's correct.

19   Q    And it wasn't something that it wanted to give away,

20   correct?

21   A    Yes.

22   Q    And the Union actually went on at least an 11-week strike

23   in 2004 in order to bolster its position to keep the terms it

24   wanted in the Red Book, correct?

25   A    Yes.

1  Q    Now, you're not a trained court reporter, correct?

2  A    That's correct.

3  Q    Okay.  And you're not skilled in shorthand, correct?

4  A    That's correct.

5  Q    Okay.  And so it's fair to say that General Counsel Exhibit

6  7 is not a verbatim recollection of what everyone said at the

7  bargaining sessions, correct?

8  A    That's correct.

9  Q    And so there's likely things that were said by both parties

10  that aren't actually reflected in General Counsel Exhibit 7,

11  correct?

12  A    Yes.

13  Q    And so, as you sit here today, you can't recall exactly

14  what was said in each of the bargaining sessions, correct?

15  A    That -- yes.  That's correct.

16  Q    You have to -- you're relying on General Counsel Exhibit 7

17  to help refresh your recollection, correct?

18  A    For a lot of it, yes.

19  Q    So let's look at then page 1 of General Counsel 7.  You

20  note that -- you'll see at the very top, second line -- Ken

21  Meadows said "Get a contract.  Nobody will be happy.  We will

22  get there."  Correct?

23  A    Yes.

24  Q    And then looking down at the bottom several, it says "Ken

25  Meadows".  He says it will be discussable, correct?

1  A    Yes.

2  Q    And then looking further down -- one, two, three, four,

3  five -- six lines up.  Talking about active service.  Do you see

4  that reference?  Ken Meadows said he will look at that, correct?

5  A    Yes.

6  Q    And then, several lines down, Ken Meadows says, "I'm giving

7  and proposing a brand-new contract."

8      MR. WIESE:  Objection, Your Honor.  The document speaks for

9  itself.

10     JUDGE CARISSIMI:  It does.

11     Mr. Buttrick, if you have questions about what's in the

12  notes, that's one thing.  But to merely point out sections of

13  the notes, you can do that in your brief, if you want to make

14  some argument about them.

15     MR. BUTTRICK:  I guess, Your Honor --

16     JUDGE CARISSIMI:  So far, you haven't asked a question

17  about them.  You've just said, "Well, the notes say this."

18     MR. BUTTRICK:  Well, I guess this is kind of the

19  counterpoint to what happened in General Counsel's case, where

20  they selectively pointed out quotes about what was said.  And so

21  --

22     JUDGE CARISSIMI:  I disagree, sir.  That was an indication

23  as to who said what.  Now, if you have questions about who said

24  what, ask that question.  But so far I haven't heard that.

25     MR. BUTTRICK:  Okay.

1     Let's go off the record for a moment, Your Honor.

2     JUDGE CARISSIMI:  Off the record.

3  (Off the record.)

4     JUDGE CARISSIMI:  Back on the record.

5     You may continue, sir.

6     MR. BUTTRICK:  Thank you.

7  Q   BY MR. BUTTRICK:  If you could look at Joint Exhibit 10?

8  (Witness proffered the document.)

9  Q   This is the Union's proposal from June 1, 2015, correct?

10 A   That's correct.

11 Q   And if you can look at General Counsel Exhibit 18?

12    MR. FUNK:  May not be up here.

13    Oh.  There it is.

14 (Witness proffered the document.)

15 Q   BY MR. BUTTRICK:  And that's the Union's June 29, 2015,

16 non-economic proposal, correct?

17 A   That's correct.

18 Q   And then, finally, if you could look at Joint Exhibit 12,

19 which is the July 31, 2015, pension proposal?

20 (Witness proffered the document.)

21 Q   Do you have that in front of you?

22 A   I do.

23 Q   Okay.  These are the only three written proposals that the

24 Union provided to the Company between June 1st and August 18th,

25 correct?

1  A    We came up with the other full proposal.  I -- I don't --

2  I'm sorry.

3       I'm vague on the dates without looking.

4  Q    What would you like to look at to refresh your

5  recollection?

6  A    I can look at these notes real quick.

7       JUDGE CARISSIMI:  When you say "these notes," that's

8  General Counsel --

9       THE WITNESS:  Just the general --

10      JUDGE CARISSIMI:  -- Exhibit 7(a), your notes?

11      THE WITNESS:  Seven or seven (a).

12      JUDGE CARISSIMI:  Yes.

13      THE WITNESS:  Yes.

14      JUDGE CARISSIMI:  Very good.

15      Let's go off the record.

16  (Off the record.)

17      JUDGE CARISSIMI:  Back on the record.

18  Q    BY MR. BUTTRICK:  The question was is between June 1st and

19  when the company provided the Union with its last, best and

20  final offer on August 18th, were these the only three written

21  proposals the Union had given the company?

22  A    That I can recall.

23  Q    If you can look at, then, Joint Exhibit 10 -- I think you

24  already have it in front of you.

25      And so looking at this document, there's a column on the

1   left-hand side that says, "Article."  Do you see that?

2   A    I do.

3   Q    And there's another that says, "Section."  Do you see that?

4   A    I do.

5   Q    And these are references to articles and sections in the

6   Red Book, correct?

7   A    That is.

8   Q    And so the Unions proposals in Joint Exhibit 10 were

9   premised off the Red Book, correct?

10  A    They were.

11  Q    So if you can look at the Union's proposal for Article 10,

12  Section 2 -- I have to find it myself.

13       And so this says, "Add 'company will pay 100 percent of all

14  planned premiums during active service.'"  If you can reference

15  Joint Exhibit 2 -- do you have that in front of you?

16  (Witness proffered the document.)

17  Q    And turn to  Article 11, Section 7, which I think is on

18  PF2019.

19  (Pause.)

20  A    Okay.

21  Q    The company in Section 7, made a proposal related to

22  medical insurance for families in military service, correct?

23  (Pause.)

24  A    Yes, it says, "The company will make available medical

25  insurance for the family for up to 12 months."

1   Q    If you can turn back to Joint Exhibit 10, and you look at a

2   reference in Article 6 -- 1.  It's on PF572.

3   A    I'm sorry, PF what?

4   Q    572.  I's Article 6, Section 1.

5   A    Oh, okay.

6   Q    On Joint Exhibit 10.

7   A    Okay, and where am I looking on it again?

8   Q    Sure, Article 6, Section 1, that reference on Joint Exhibit

9   10.  It's on the second page.

10  A    Yes.

11  Q    Okay, it says, "The Union is proposing add MLK Day and day

12  after Thanksgiving."  Do you see that?

13  A    I do.

14  Q    Okay.  If you can then turn to Joint Exhibit 3, which is

15  the company's July 28th proposal; and it's on page 17, PF2054.

16  (Witness proffered the document.)

17  Q    Are you there?

18  A    Yes, I am.

19  Q    Okay.  Do you see in that reference to Section 7(d), the

20  company proposed two additional holidays per year, correct?

21  A    Yes.

22  Q    If you can turn back to Joint Exhibit 10, which was the

23  Union's first proposal --

24       MR. WIESE:  Your Honor, I'm going to object, again, with

25  this line of questioning.

1      JUDGE CARISSIMI:  Yes.

2      MR. WIESE:  These proposal speak for themselves.  And as

3  you've mentioned before, I mean, this is an argument both

4  parties can make in brief regarding the movement that's made in

5  each side's respective proposals.

6      JUDGE CARISSIMI:  Well, I'm going to -- I take it all this

7  looking at exhibits is a preface to a question, or are you just

8  merely directing the witness to observe various proposals, and

9  you can do that in your brief.

10     MR. BUTTRICK:  No, the heart of this case is the surface

11 bargaining allegation --

12     JUDGE CARISSIMI:  Right.

13     MR. BUTTRICK:  -- which was that the company wasn't taking

14 in consideration the Union's proposals.

15     JUDGE CARISSIMI:  Right.

16     MR. BUTTRICK:  And so this whole line of questioning, if

17 allowed to proceed, will show a substantial movement from the

18 company's position in response to union proposals.

19     JUDGE CARISSIMI:  Well, are you saying that that's going to

20 be shown by these documents?

21     MR. BUTTRICK:  Yes, when you link them up together, as I've

22 just done.

23     JUDGE CARISSIMI:  Well, what I want you to do is I want you

24 to ask questions, probative questions, about these exhibits;

25 because merely making reference to the exhibits, as I said, you

1    can make any argument you want to about record evidence in a

2    brief.

3        MR. BUTTRICK:  Okay, fair enough.

4    Q    BY MR. BUTTRICK:  And so looking then at Joint Exhibit 3,

5    page 32 -- I guess, actually, let me go back to Article 11's,

6    part (g), in Joint Exhibit 10, and it's "XIG" actually, so it's

7    the second one from the top on page PF573.  Do you see that

8    where it references "employees with less than 60 points on

9    August 1st will be entitled to the same retiree medical

10   provisions."  Do you see that?

11   A    Yes.

12   Q    Did the company subsequently make a proposal related to

13   retiree medical provisions for certain employees?

14   (Pause.)

15   A    For the employees before that time -- or at that time after

16   -- or before 2004.

17   Q    That's after the Union gave the company Joint Exhibit 10,

18   in the company's proposals after that fact, after that time, did

19   it subsequently make a proposal related to retiree medical

20   provisions?

21   A    Not that I recall.

22   Q    So I'd like to turn your attention to Joint Exhibit 3, on

23   PF2069, are you there?

24   A    Yes, I am.

25   Q    Do you see Article 20, Section 3?

1  A    I do.

2  Q    That is, in fact, a company proposal related to retiree

3  medical, correct?

4  (Pause.)

5  A    That wasn't what we were asking for in our proposal.

6  Q    Well, your -- that's not the question.  The question is was

7  that a proposal from the company related to retiree medical?

8  A    Oh, yes.

9  Q    Okay, all right.

10      So direct your attention back to Joint Exhibit 10, and then

11  look at the Union's proposal to Article 10, 1(k), which is on

12  page 3, which is PF573.

13  A    I'm sorry, 7 -- 3?

14  Q    No, it's Section -- Article 10, Section 1(k), and it's on

15  page 3 of the document, or PF573.

16  A    Oh, okay, I see that.

17  Q    Okay, got it, okay.

18      And there -- that's a Union proposal related to full

19  premium for S & A and company-paid STD, correct?

20  A    Yes.

21  Q    And did the company subsequently make a proposal related to

22  S & A and STD benefits?

23  A    Yes, I believe they did.

24  Q    If you can look at GC Exhibit 18, which are the Union's

25  non-economic proposals.

1   (Pause.)

2   A    Okay, I have it.

3   Q    Okay.  And looking at this document, it references articles

4   and sections.  These articles and sections are articles and

5   sections in the Red Book, correct?

6   A    That's correct.

7   Q    So if you look at the proposal for Article 5, 1, which is

8   seniority rules.  Do you see that?

9   A    I do.

10  Q    Did the company subsequently make a proposal related to

11  seniority?

12  (Pause.)

13  A    By my notes on this, it looks like they may have.

14  Q    Okay.  And I can turn your attention to Joint Exhibit 5,

15  which is the company's July 30th proposal.  And do you have that

16  in front of you.

17  A    I do.

18  Q    Okay, if you turn to PF2122 and 2123.

19  A    Okay.

20  Q    And if you turn to -- so this is a section on -- article on

21  seniority, correct?

22  A    Yes.

23  Q    Okay.  On page 10, which is PF2123, under subpart (e), do

24  you see the red about three consecutive days?

25  A    I do.

1  Q    Okay.  So that was the change in the seniority proposal

2  about which you recalled, correct?

3  (Pause.)

4  A    I don't recall it, but it's there on that paper.

5  Q    Okay.

6      If you can turn back to General Counsel Exhibit 18, which

7  is the non-economic proposals.

8  A    Okay.

9  Q    And look at Article 8, leave of absence, do you see the

10  references there for time off to vote in elections and certain

11  time off for union-related business?

12  A    I see it.

13  Q    Okay.  And did the company then subsequently make proposals

14  related to time off for participation in elections and for

15  union-related business?

16      MR. WIESE:  Your Honor, I'm going to object, again, to this

17  line of questioning.  I mean, all we're doing is reading

18  proposals.

19      JUDGE CARISSIMI:  Well, I have asked counsel to be

20  probative.  I'm going to let him pursue this a little bit

21  longer; but, as I said, I think much of this can be better done

22  in argument in the brief.  I don't think we're really

23  accomplishing much, but I'm not going to cut counsel quite yet.

24      MR. BUTTRICK:  And just to give you a heads up, Your Honor,

25  I'm going to do this for a long time, so if you --

1    JUDGE CARISSIMI:  Then I'm going to cut you off at a
2    certain point, sir, because I don't think it's that probative.
3    Cross-examination is for a specific purpose, not to regurgitate
4    documents that are already in the record.
5    MR. BUTTRICK:  Well, just for the purpose of efficiency and
6    to defer to your wishes, I'd like to make an offer of proof if
7    the testimony were allowed to continue.
8    JUDGE CARISSIMI:  Unfortunately, you can't make an offer of
9    proof on cross-examination.
10    MR. BUTTRICK:  I am unaware of that.
11    JUDGE CARISSIMI:  You don't know what the witness is going
12    to say, it's not your witness, you've never prepped him.
13    MR. BUTTRICK:  Well, as an offer of proof if the testimony
14    would have been allowed to proceed --
15    JUDGE CARISSIMI:  Pardon.
16    MR. BUTTRICK:  It's an offer of proof about what would
17    happen if the testimony would be allowed to proceed to its
18    logical conclusion, and I think I am entitled to make that offer
19    of proof.
20    JUDGE CARISSIMI:  Well, I'll let you make that, but I take
21    it that's going to be in the nature of an oral argument that
22    you're going to, you know, tell me again in your brief.  I'll
23    let you do that.
24    MR. BUTTRICK:  Okay.  Well, I'm just trying to be sensitive
25    to everyone's wishes, if you don't want this testimony to

1  continue --

2      JUDGE CARISSIMI:  And I don't mean to preclude your cross-

3  examination, but, so far, I must be honest, there's nothing that

4  I've seen so far that you couldn't point out to me in your

5  brief, because we're just looking at documents that are already

6  admitted into the record.

7      MR. BUTTRICK:  Well, let me just say this then.

8                           OFFER OF PROOF

9      MR. BUTTRICK:  For a short offer of proof about had this

10  testimony had been allowed to continue until it was completed is

11  that the proof would show that the company had made numerous

12  proposals in response to things that the Union was asking for;

13  and that they are linked up even -- when there was a proposal

14  from the Union, the company would then make a proposal about

15  that subject area.  And this testimony, if allowed to continue

16  until it was finished, would establish that fact.

17      JUDGE CARISSIMI:  I'll accept that.  It is in the nature of

18  an oral argument, and, again, your argument is based upon the

19  documents that are admitted into record.

20      Correct, sir?

21      MR. BUTTRICK:  That's correct.

22      JUDGE CARISSIMI:  All right.  That's why I'm going to

23  preclude any further examination of this type.  If you have

24  other cross-examination, that's fine; but merely going back and

25  having the witness compare a union proposal and a company

1  proposal, you appear to be quite knowledgeable about these

2  proposals, and I think it would be more efficient for you to

3  make whatever arguments you want to make in your brief, and

4  point to me which proposals you feel support the company's

5  position.

6  Q    BY MR. BUTTRICK:  Ms. Shannon, if you can look at -- first,

7  the company proposed gap insurance in its first proposal,

8  correct?

9  A    I would have to look at it.

10  Q    Feel free.  I can turn your attention to Joint Exhibit 1.

11  (Pause.)

12  Q    Have you found it?

13  A    No, I haven't found it.

14  Q    Okay, page 32, which is PF1994, Article 20, Section 3.

15  (Witness proffered the document.)

16  (Pause.)

17  Q    That's gap -

18  A    What is your question?

19  Q    That's a form of gap insurance, correct?

20  A    Oh, it's a form.

21  Q    You had testimony about the flower fund.  Do you remember

22  that testimony?

23  A    I do.

24  Q    And you can look back at GC Exhibit 7 or your notes, and

25  I'll try to find it too, of what page that's on.

1  (Pause.)

2      MR. BUTTRICK:  If someone else finds it before me, tell me.

3      MR. WIESE:  Page 12.

4      THE WITNESS:  I think that would be page 12.

5      MR. BUTTRICK:  Okay, thanks, let me --

6  Q    BY MR. BUTTRICK:  You testified that there was a lot of

7  shouting in that context of the discussion.

8      JUDGE CARISSIMI:  Just ask the question, sir.  Her

9  testimony is in the record.  I don't need you to tell us what

10  your recollection is.

11  Q    BY MR. BUTTRICK:  Well, your notes don't reflect that there

12  was any shouting with regard to the flower fund on page 12,

13  correct?

14  A    That's correct.

15  Q    If you can -- I'll hand you what will be marked as Penford

16  Exhibit 37.  Actually, Ryan will hand it to you.  This is mine.

17  (EXHIBIT MARKED:  RESPONDENT'S 37.)

18  (Witness proffered the document.)

19  Q    BY MR. BUTTRICK:  Have you seen this document before?

20  A    I have.

21  Q    And what is this document?

22  A    This was notifying our members of the August 1st union

23  contract meeting?

24  Q    Okay, and this is a document created by the Union?

25  A    Yes.

1    Q     Okay.

2          MR. BUTTRICK:  I move to admit Penford Exhibit 37.

3          JUDGE CARISSIMI:  Any objection to Respondent's 37?

4          MR. WIESE:  No objection, Your Honor.

5          JUDGE CARISSIMI:  Respondent's 37 is admitted.

6    (EXHIBIT RECEIVED:  RESPONDENT'S 37.)

7    Q     BY MR. BUTTRICK:  Why did the Union write in the last

8    sentence, "As a precaution, it is recommended that you remove

9    all your personal property from the plant prior to meeting."

10   A     Because we didn't know what would happen at that meeting.

11   Q     It is possible you might go on strike, correct?

12   A     I don't know.

13   Q     Does the Union typically instruct its membership to remove

14   their personal property after they leave work every day?

15   A     Every day, no.

16   Q     This was an unusual request, correct?

17   A     Not unusual.

18   Q     How often does that happen?

19   A     This is the second time it has happened in my tenure.

20   Q     Was the first time in 2004?

21   A     It was.

22   Q     Is that when you went on strike?

23   A     It was.

24   Q     The Union conducted a strike vote among its membership in

25   the summer of 2015, correct?

1  A   They did.

2  Q   And when was that?

3  A   August 1st.

4  Q   Where was that vote?  Was the vote to go on strike?

5  A   No, the vote was to give the existing committee the right

6  to call a strike at any time.

7  Q   Looking at --

8     MR. BUTTRICK:  I'm looking for the company's final offer,

9  which I believe is Joint Exhibit 7.

10  (Witness proffered the document.)

11     THE WITNESS:  Okay.

12  Q   BY MR. BUTTRICK:  The company -- do you have that in front

13  of you?

14  A   I do.

15  Q   The company gave a clean version of the final offer to the

16  union to give to the membership to vote on, correct?

17  A   Yes.

18  Q   Okay, so as you sit here today, you don't have any

19  knowledge whether there were or were not changes in the final

20  offer from the company's prior proposals?

21  A   I don't understand the question.

22  Q   The question is do you know, as you sit here, whether or

23  not the final offer had any additional proposal changes from the

24  offer the company gave immediately before it?

25  A   I believe it did not.

1  Q    But do you know?

2  A    As of the way they were doing it before, there was not.

3  Q    But you got a clean copy to give to the membership,

4  correct?

5  A    Yes.

6  Q    Okay, and so the prior versions were red-lined copies,

7  correct.

8  A    They were.

9  Q    And so it's possible that the final actually had some

10  changes in it weren't identified via a red line, because it was

11  clean, correct?

12  A    As far as I sit here today, it is.

13  Q    Does the last, best and final, which is  -- find it myself

14  -- Joint Exhibit 8, do you know whether it contains in it a

15  provision that lets the company create non-traditional roles?

16  (Witness proffered the document.)

17  A    It does.

18  Q    And do you know whether or not that such role is occupied

19  by a Mr. Roseberry, Jr.?

20  A    I do, I do know that.

21  Q    And is that a non-traditional role?

22  A    That's what they call it.

23  Q    The Union provided its first wage proposal to the company

24  on August 18th, correct?

25  A    I believe so.

1  Q    And the bargaining started on June 1st, correct?

2  A    That's correct.

3  Q    If you can look at GC 7 on page 29.

4  (Pause.)

5  Q    And just tell me when you have that in front of you.

6  (Witness proffered the document.)

7  A    I have it.

8  Q    Okay, at the bottom, you see there's "JH, Jethro

9  withdrawing items from original proposal." Do you see that

10 reference?

11 A    I do.

12 Q    This is the first time the Union was actually withdrawing

13 proposals, correct?

14 A    I can't answer that in all certainty without looking

15 through it.

16 Q    Feel free to look through it if you'd like.

17 (Pause.)

18      JUDGE CARISSIMI:  Mr. Buttrick, what's your question again?

19      MR. BUTTRICK:  The question was was that the first time the

20 Union had withdrawn any proposals?

21      JUDGE CARISSIMI:  Can you answer that question from memory?

22      THE WITNESS:  Not from memory.

23      JUDGE CARISSIMI:  If the witness can't answer that question

24 from memory, the notes are in evidence, can't you tell me

25 whether or not the notes show if there is or not.

1     MR. BUTTRICK:  Well, I can tell you that, sure, but she

2  said she needed to refer to the notes, and so I was giving her

3  the opportunity to look at that.

4     JUDGE CARISSIMI:  And what's that going to add?

5     MR. BUTTRICK:  It will show that that's the first time that

6  the Union was withdrawing any proposals.

7     JUDGE CARISSIMI:  And why do we need to sit here while the

8  witness looks through 36 pages?

9     MR. BUTTRICK:  It would be an admission from the Union of

10  that fact which I think I'm entitled to elicit.

11     JUDGE CARISSIMI:  The witness can't answer from memory,

12  you've looked at the notes.  You've looked at the notes.  You

13  say the notes reflect that's the first time.

14     Now the witness either confirm -- if the witness says

15  something different, you've looked at the notes and your

16  contention is there's nothing in these notes about that,

17  correct, sir?

18     MR. BUTTRICK:  That's correct.  And I think she said then

19  after we started down this line that she didn't know.  And so if

20  she doesn't know, that's fine.  If that's the answer after

21  looking at the notes and she doesn't know, that's her answer,

22  and that's acceptable.

23     JUDGE CARISSIMI:  See, but my concern is that we're

24  spending, you know, lots of time looking through 36 pages.  And

25  if counsel -- and I say this to everybody -- if you know

1  something, if you have some argument you want to make based on

2  the document, I historically don't like to have witnesses search

3  through documents looking for something.  I don't think that's

4  very effective use of trial time, all right?

5      MR. BUTTRICK:  Okay.

6      JUDGE CARISSIMI:  So do you want the witness to continue

7  looking through these notes and answer your question, is that

8  correct?

9      MR. BUTTRICK:  Well, I'd like her to answer the question.

10  If she doesn't -- whatever the answer is, if she knows or

11  doesn't know, I'd like to have an answer to the question.

12     THE WITNESS:  Can you restate the question, please?

13     MR. BUTTRICK:  Sure, no problem.  That's a fair point.

14  Q   BY MR. BUTTRICK:  And so it was the first time that the

15  Union withdrew any proposals on September 10, 2015?

16  A   I don't recall with all certainty.

17  Q   Okay.  The Union gave the company its first proposal, which

18  is Joint Exhibit 10, on June 1st, correct?

19  A   Yes.

20  Q   Okay.  And then the company provided the Union with its

21  response to that proposal on June 29th, correct?

22  A   I believe that's correct, yes.

23     MR. BUTTRICK:  Just one moment off the record, Your Honor,

24  and see if I have anything else.

25     JUDGE CARISSIMI:  Certainly.

1         Off the record.

2    (Off the record.)

3         JUDGE CARISSIMI:  Let's go back on the record.

4         Mr. Buttrick, is there anything further?

5         MR. BUTTRICK:  Nothing further.

6         JUDGE CARISSIMI:  Very good.

7         Is there any redirect?

8         MR. WIESE:  Can I have just a minute off the record,

9    please?

10        JUDGE CARISSIMI:  Let's go off the record.

11   (Off the record.)

12        JUDGE CARISSIMI:  On the record.

13        Mr. Wiese, you may conduct redirect examination.

14        MR. WIESE:  Your Honor, before -- I'll do this after Ms.

15   Shannon testifies.

16                    REDIRECT EXAMINATION

17   Q    BY MR. WIESE:  Do you recall, Ms. Shannon, prior to

18   Ingredion taking over operations in March of 2015, whether all

19   of the manlifts had been shut down at once?

20   A    Oh, never.

21   Q    I'd like to turn your attention to General Counsel Exhibit

22   18.

23   (Witness proffered the document.)

24   Q    Turning over to page 2 of that document, the section -- one

25   of the seniority rules, do you recall the note at the top that

1  begins with "Not a problem with this beyond mine stays as

2  written."  What was that in reference to specifically?

3  A    Mr. Meadows didn't have a problem with if more than one

4  employee was employed on the same day drawing names out of a

5  hat, if you will, for seniority.

6  Q    Okay.  And then the note below that, starting with "not

7  agreeing," do you recall what that is in reference to?

8  (Pause.)

9  A    He was not agreed about the non-assigned people based on

10  the fact that it wasn't in his contract.

11  Q    Who are you talking about?

12  A    Mr. Meadows, I'm sorry.

13  Q    Turning your attention to company exhibit 37, directing

14  your attention to the statement at the bottom of the document

15  about removing personal property from the plant, did the Union

16  have any other concerns besides strike or any other reason for

17  that language?

18  (Witness proffered the document.)

19  A    Everybody was out of the plant that day, all union

20  employees were out of the plant that day, and we didn't know how

21  the -- we don't know how the plant is run when we're not in

22  there, so it could be that they brought other people in.  We had

23  had that before, that they'd bring other people in to run the

24  plant and -- or management.  So we don't know what they're going

25  to do with our stuff when it's in there.  That's --

1  Q    Ms. Shannon, do you ever recall seeing a -- or turn your

2  attention to Joint Exhibit 7.

3  (Witness proffered the document.

4  Q    Do you ever recall -- and this is the company's final

5  offer.  Do you ever recall seeing a red-lined version of this

6  document?

7  A    No, I don't.

8  Q    And turning your attention to General Counsel Exhibit 8 or

9  Joint Exhibit 8, excuse me, do you ever recall seeing a red-

10  lined version of the company's last, best and final offer?

11  (Witness proffered the document.)

12  A    I do not.

13  Q    Do you recall -- or did the Union ever mention that they

14  were going to take the last, best and final offer to a vote with

15  employees?

16  A    No, I don't recall that.

17       MR. WIESE:  Nothing further.

18       JUDGE CARISSIMI:  Is there any recross within that range?

19       MR. BUTTRICK:  Just a little bit, Your Honor.

20                          RECROSS-EXAMINATION

21  Q    BY MR. BUTTRICK:  Is it fair to say, Ms Shannon, that

22  during the bargaining in the summer of 2015, the company was

23  adamant on working from a new contract it wanted to propose?

24  A    That was evident.

25  Q    Okay.  And is it also fair to say that the Union in the

1  summer of 2015, was adamant on trying to work off the Red Book?

2  A    Yes, we were adamant on putting them together -- melding

3  them together.

4  Q    And all of the Union's proposals were based upon the Red

5  Book, correct?

6  A    They were.

7  Q    And so is it fair to say that the parties couldn't agree --

8       MR. WIESE:  I'm going to object, Your Honor.  This is

9  outside the scope of the recross.

10      JUDGE CARISSIMI:  This last question sounds like it is.  Up

11 until that point, I think it's within the range.

12      What's the last question?  If you want to finish the

13 question.  You were somewhat interrupted.

14      MR. BUTTRICK:  The question would be is it fair to say that

15 the parties, in the summer of 2015, couldn't agree about which

16 document they were going to be working from.

17      JUDGE CARISSIMI:  Do you have an objection to that

18 question?

19      MR. WIESE:  Yes.

20      JUDGE CARISSIMI:  I'm going to overrule the objection.

21 I'll let the witness answer it.

22      THE WITNESS:  Can you restate it again?

23      MR. BUTTRICK:  Sure.

24 Q    BY MR. BUTTRICK:  Is it fair to say that in the summer of

25 2015, the parties couldn't agree whether they were going to work

1   from the Red Book or the company's proposal?

2   A    That's fair.

3        MR. BUTTRICK:  Nothing further.

4        JUDGE CARISSIMI:  Anything within that very limited range?

5                    FURTHER REDIRECT EXAMINATION

6   Q    BY MR. WIESE:  Ms. Shannon, do you ever recall the Union

7   saying that it would only bargain from the Red Book?

8   A    No.

9   Q    Did you ever issue an ultimatum to the Employer that they

10  had to bargain from the Red Book, otherwise, the Union wouldn't

11  negotiate any further?

12  A    Never.

13       MR. WIESE:  Nothing further.

14       JUDGE CARISSIMI:  Very good.

15       Mr. Buttrick, do you have another question in that range or

16  are we done?

17       MR. BUTTRICK:  We can be done.

18       JUDGE CARISSIMI:  Very good.

19       Ms. Shannon, thank you, you are excused as a witness.

20       You may step down.

21       THE WITNESS:  Thank you.

22  (Witness excused from the stand.)

23       JUDGE CARISSIMI:  And with that, we'll go off the record.

24  (Whereupon, a brief discussion was held between the parties off

25  the record.)

1    JUDGE CARISSIMI:  Back on the record.

2    The parties have a stipulation that they'd like to propose.

3    Mr. Wiese?

4    MR. WIESE:  Your Honor, the General Counsel proposes that

5    the parties stipulate that the Employer's -- that Joint Exhibit

6    2, the Employer's -- the Employer's second proposal, which is

7    dated on the document June 29, 2015 was actually provided during

8    bargaining on June 30, 2015.

9    JUDGE CARISSIMI:  Mr. Buttrick, can you stipulate to that?

10   MR. BUTTRICK:  Yes.

11   JUDGE CARISSIMI:  I'll accept the stipulation.

12   And, with that, we are off the record, again.

13   (Brief recess taken.)

14   JUDGE CARISSIMI:  On the record.

15   Mr. Wiese, you may call your next witness.

16   MR. WIESE:  Your Honor, at this time, Counsel for the

17   General Counsel calls Chris Eby to the stand.

18   JUDGE CARISSIMI:  Mr. Eby, if you would please stand for a

19   moment and raise your right hand.

20   (WITNESS SWORN:  CHRISTOPHER EBY)

21   JUDGE CARISSIMI:  Please have a seat.

22                   DIRECT EXAMINATION

23   Q    BY MR WIESE:  Mr. Eby, could you please state and spell

24   your name for the record?

25   A    Yes, it's Christopher Eby,  C-H-R-I-S-T-O-P-H-E-R, and it's

1   E-B-Y.

2   Q      Mr. Eby, what is your occupation?

3   A      Production worker at Ingredion.

4   Q      What do you do specifically at Ingredion?

5   A      My job title is ethanol operator.

6   Q      As an Ethanol Operator, what do you do?

7   A      We take care of the fermentation process, which basically

8   where you convert yeast -- converts sugars into ethanol; and

9   also the distillation process, which removes the alcohol down to

10  -- well, 100 percent.  It takes the water out of it.

11  Q      Mr. Eby, how long have you worked for Ingredion and its

12  predecessor, Penford Products?

13  A      Approximately, 25 years.

14  Q      Do you recall the date you were hired?

15  A      It was November 18, 1991.

16  Q      During the time that you've worked for Penford and

17  Ingredion, what positions have you held?

18  A      Multiple positions.  I started in the grind and worked out

19  there for approximately 5 years, starch refinery, millhouse

20  operator.  Then after that, I worked in the sugar department,

21  and as a sugar operator.  That was for a couple of years.  And

22  then I worked up in the lab for about 7 years or so.  And then

23  my current position since the fall of 2007.

24  Q      In your current position as an ethanol operator, roughly,

25  how many hours per week do you work?

1  A    Without overtime -- it's a goofy schedule, but what it

2  basically comes down to is contractually, you know, in a 28-day

3  period, it averages out to 42 hours of work a week, although

4  some weeks are longer than others.

5  Q    Who is you supervisor as an ethanol operator?

6  A    Right now, the one doing the acting duties is John

7  Gordinier.

8  Q    Do you know what his title is?

9  A    I believe he's -- he used to be called a maintenance

10 planner.  I don't know if it still is or not.

11 Q    How many employees work in the ethanol department?

12 A    In the department itself -- just for clarification, the

13 department is called "specialty department."

14 Q    Okay.

15 A    And there are five employees per shift in the specialty

16 department.

17 Q    How many shifts are there?

18 A    Four shifts.

19 Q    And which shift do you work?

20 A    I work the fourth shift.

21 Q    How does the fourth shift work?

22 A    We all basically -- the four different shifts -- 1st, 2nd,

23 3rd, 4th have a -- we work seven, have one off; work seven, have

24 two off, which is always Tuesday and Wednesday for everybody --

25 Monday for the one off; and then you have four off, which is

1  Thursday through Sunday.  And it's a continual rotation for 28

2  days.  So as it goes along, what fourth shift does is they cover

3  the individual -- the other shifts' days off.

4  Q    What are the hours for the first shift?

5  A    7 a.m. to 3 p.m.

6  Q    And what are the hours for the second shift?

7  A    3 p.m. to 11 p.m.

8  Q    And for the third shift?

9  A    11 p.m. to 7 a.m.

10 Q    So what are the hours that you work covering for -- as the

11 fourth shift?

12 A    All of them.

13 Q    During your time working at Penford and Ingredion, have you

14 held any positions with the Union?

15 A    Yes.

16 Q    And if you could please run through those positions and the

17 times that you've held them?

18 A    I would say in 1992, I began as a -- or I took the position

19 of a department steward, and after a year or two, a couple of

20 years, I was the shift steward.  And during that time, I served

21 part of the term as the alternate member to the labor relations

22 and executive board.  And so that would have carried us through

23 to approximately 1998; and, from there, nothing until 2005.  And

24 in 2005, again, I became the alternate member of the executive

25 board in labor relations.  Approximate date -- somewhere in

1  2006, I believe I became the third member of the executive board

2  in labor relations, served that for a year and a half or so.

3  Then I became vice president.  And then I served as vice

4  president until January 1, 2012.  And on January 1, 2012,

5  through December 31, 2015, I served as the president of Local

6  100G.

7  Q    In your most recent position as the president of Local

8  100G, what were your principle job duties?

9  A    Well, as president, I am the principle officer, so -- the

10 president, along with the financial secretary, have a fiduciary

11 responsibility, but the duties, specifically, to the president,

12 is, you know, responsible for the budget, responsible for the

13 operation of the local, to be the chair of all committees,

14 including the labor relations committee.

15 Q    Okay.  All right.

16      In your role as Union President, who did you deal with from

17 Penford?

18 A    I dealt with all the management, but, I mean, as my

19 position, I would deal with all the management when we had an

20 issue; but primarily, would Pat Drahos.

21 Q    During your time in any of these positions, were you

22 involved in any contract negotiations with Penford?

23 A    No, I wasn't.

24 Q    Did you ever agree to an extension with Penford while you

25 were in your position as Union President.

1  A     An extension got approved by membership in December of

2  2011.  I did not specifically negotiate it, because it was just

3  a few brief discussions with the President our Union and Pat

4  Drahos and Tim Kortemeyer; but I was left with finalizing the

5  extension going through and making sure all the words were

6  correct, and, also, ironing out a lot of "T's" that weren't

7  crossed and "I's" that weren't dotted.

8  (EXHIBIT MARKED:  GENERAL COUNSEL'S 4.)

9  (Witness proffered the document.)

10  Q     BY MR. WIESE:  Showing the witness what's been marked as

11  General Counsel Exhibit 4.  Do you recognize this document, Mr.

12  Eby?

13  A     Yes.

14  Q     What is it?

15  A     This is the contract extension agreement that membership

16  ratified in December 2011.

17  Q     And is this the agreement that you worked on the language

18  on after it was approved by members?

19  A     This was presented to our membership, and then it was

20  incorporated into our contract, and also into our, like, the

21  disability plan and the health care plans and things like that.

22      MR. WIESE:  I'll offer General Counsel Exhibit 4 into

23  evidence.

24      JUDGE CARISSIMI:  Any objection to GC 4.

25      MR. BUTTRICK:  Just it's already in evidence, Your Honor --

1      JUDGE CARISSIMI:  It is?

2      MR. BUTTRICK:  -- at Joint Exhibit 16, on PF9679.

3      JUDGE CARISSIMI:  So it's Joint Exhibit 16 did you say, Mr.

4  Buttrick?

5      MR. BUTTRICK:  That's correct, if you look at PF9679 on

6  that document.

7      JUDGE CARISSIMI:  Mr. Wiese, that is correct.

8      Let's go off the record.

9  (Off the record.)

10      JUDGE CARISSIMI:  On the record.

11      Is counsel for the Respondent correct that that document is

12  already admitted as Joint Exhibit 16.  Is that correct, Mr.

13  Wiese?

14      MR. WIESE:  Yes, that's correct, Your Honor.

15      JUDGE CARISSIMI:  So there's no need to introduce GC 4

16  then, is that correct?

17      MR. WIESE:  That is correct, Your Honor.

18      JUDGE CARISSIMI:  So you'll withdraw your request to admit

19  GC 4?

20      MR. WIESE:  That is also correct.

21      JUDGE CARISSIMI:  Very good.

22      You may proceed.

23  Q   BY MR. WIESE:  I'd like to direct your attention to Joint

24  Exhibit 16.

25  (Witness proffered the document.)

1  Q    Directing your attention to page 96, or, excuse me, Bates

2  number 9679, in the lower right-hand corner of the document.

3  A    Yes.

4  Q    Are you there, Mr. Eby?

5  A    Yes.

6  Q    Okay.  Is this the extension we were just talking about a

7  moment ago and was referred to as General Counsel's Exhibit 4?

8  A    It looks like it.

9  Q    During your time as Union -- well, do you recall a flood in

10 Cedar Rapids?

11 A    Yes.

12 Q    Okay, what was your position in the Union at that time?

13 A    I believe it was Vice President.

14 Q    What did the -- what happened with the facility, the

15 Penford facility, during that flood?

16 A    It was flooded out.

17 Q    What did the Union do with the company while the company

18 was flooded out?

19 A    What did the Union do --

20 Q    Yes, in terms of -- what?

21 A    with the facility?  Could you say that again?

22 Q    Yes.

23       What negotiations did the Union have with the company while

24 the facility was -- or during that flood?

25 A    We met, myself, the President at the time, Matthew Maas --I

1 have to correct, I believe I was third member in 2008, because I

2 believe Matthew Maas was Vice President.  We met with Pat Drahos

3 out at the union hall and did a -- worked on getting a short-

4 term agreement to modify our contract, and directly related to

5 the company.  One, they wanted to be able to bring outside

6 contractors in to do the cleanup, but, also, they -- our

7 contract provided that they had to call you back by seniority;

8 but the company didn't want to do that.  They wanted to be able

9 to call you back by the areas of need, and so we made an

10 agreement to do such a thing.

11 Q     All right.

12       Mr. Eby, let's turn to the current contract negotiations,

13 the ones starting on June 1st with Ingredion.  In your role as

14 Union President, what efforts did you take to prepare for

15 negotiations?

16 A     I'll try to list it, but, you know, it's pretty

17 comprehensive.

18       As an executive officer, even before I was president, but

19 in labor relations, if there were discussions that I thought

20 would be relevant to the upcoming contract negotiations, I would

21 start to document them, as myself preparing for the negotiations

22 themselves.  Myself Renita Shannon and Jamie Shelton, who

23 happened to be an officer at the time -- this is in I believe

24 it's in January of 2014 -- attended a course, a bargaining

25 course at the University of Iowa Labor Center -- did a lot of

1  background searching on economics, both industry research -

2  local areas.

3      We did a contract survey for our members in the fall of

4  2014.  By that time, we also knew through the news, that

5  Ingredion was looking to purchase Penford Products, so at the

6  fall Corn Council, we paid extra attention to discussions over

7  Ingredion.

8      And I had conversations with the prior president and Pat

9  Drahos about the proper way to exchange proposals, as our

10 contract outlined that you have to exchange at 60 days ahead of

11 time, but you also needed to list out the article and the

12 section that you were proposing the change to, what the change

13 was, because anything else not mentioned would remain closed.

14 And both Dave and Pat could confirm that.

15     And I also reviewed prior -- the Union's prior negotiating

16 proposals and the company's negotiating proposals.

17     JUDGE CARISSIMI:  Mr. Eby, who is "Dave"?

18     THE WITNESS:  I'm sorry, Your Honor, it would be David

19 Holmes.  He was the president for 20 of 21 years prior to me.

20     JUDGE CARISSIMI:  Very good, thank you.

21 Q    BY MR. WIESE:  Pick pack up -- excuse me, pick back up if

22 you would with where you were at in your preparations.

23 A    Well, we had met -- I had a couple discussions and actually

24 met in person with the bargaining committee with Blue Cross/Blue

25 Shield of Iowa's labor representative.  We requested information

1 from them.

2 Q    You mentioned a "bargaining committee."  Who was on the

3 bargaining committee?

4 A    By the fall, it became myself, Renita Shannon, Matt Maas

5 and Kelly Yeisley.

6 Q    When did that meeting with Blue Cross/Blue Shield occur?

7 A    That would have been in the early portion of 2015.

8 Q    Are there other preparations you remember engaging in

9 regarding contract negotiations?

10 A    Sure, in contact with our International Union, both as to

11 request to have a representative at the table, because that's

12 just not a normal practice for our union.  Also exchanged

13 communications from everything from -- with the International

14 from everything with, you know, our survey, and its results.  We

15 were heading to -- we had a Corn Council that was going to be

16 coming in April 2015, and so we pre-requested that all the

17 Ingredion unions bring as much as they related to their

18 contracts, proposals, you know, those type of items.

19 Q    Did you look at those contracts that the other Ingredion

20 companies brought -- or other Ingredion unions brought?

21 A    Yes.

22 Q    Were there any common themes in those contracts?

23 A    Yes, as we prepared to negotiate with Ingredion for the

24 first time, it seemed the common themes were that all of the

25 United States -- so all, except for Canada's Ingredions, had

1    their pensions frozen.  And then there was a move to change

2    their health insurance to high deductible health insurance and

3    HSAs.

4    Q    You mentioned that you contacted --

5         MR. WIESE:  Strike that, Your Honor.

6    Q    BY MR. WIESE:  When did you contact the International Union

7    regarding these negotiations?

8    A    To be honest with you, probably back in 2013, initially,

9    and then as negotiations approached in the change of purchase of

10   the employer, then the negotiations -- or the conversations with

11   the International would be more frequent.

12   Q    During these conversations, did you eventually get an

13   international representative to assist with bargaining?

14   A    Yes.

15   Q    Who was that?

16   A    Jethro Head.

17   Q    And when did the Union decide to enlist Mr. Head to assist

18   with negotiations?

19   A    That was the intent all along, at least in my mind, and

20   that was the plan going forward for a couple of years, you know;

21   but, specific to insure after we knew that --  the Ingredion

22   purchase.

23   Q    Why was it your plan to enlist assistance from the

24   International Union in the negotiations?

25   A    Originally, the point behind it was due to the lack of

1    experience on the bargaining committee.  This would be my first

2    contract negotiation with Renita Shannon.  The actual last

3    contract that we had negotiated was in 2004, so there was that

4    backdrop along with -- then, of course, the new purchase too.

5    Q    Prior to Ingredion's purchase Penford, did the Union hold

6    regular labor relations meetings with the company?

7    A    Yes.

8    Q    How often were these labor relations held?

9    A    Every month.

10   Q    How many labor relations meetings have you attended during

11   your time working for Penford and Ingredion?

12   A    I believe every month since 2007.

13   Q    So how many meetings would that be, just roughly?

14   A    At a minimum, 12 a year, so --

15        JUDGE CARISSIMI:  We can do the math.

16        MR. WIESE:  Okay.

17   Q    BY MR. WIESE:  Who would be in attendance at the labor

18   relations meetings for the Union?  Not names, but positions?

19   A    The regular joint labor relations committee for the Union

20   is the President, the Vice President and the third member.

21   Q    And what about from the company?

22   A    The company would almost always -- the normal practice is

23   to have three people there, and their Chair would be Pat Drahos.

24   Q    Were there any other regular management participants in

25   those meetings besides Pat Drahos?

1    A     Yes, Eric Tupper.

2    Q     how long would these labor management meetings typically

3    last?

4    A     Well, they varied on the subject matter.  Generally, maybe

5    three hours, but there's been ones that have run nine hours.

6    Q     What was the purpose of the labor relations meetings?

7    A     Well, I believe like it's outlined in our contract, for

8    harmonious relations in resolving issues, but, basically, it was

9    to deal with any issues going on in the plant, whether it was

10   the Union or the company.  Every month, we would both come to

11   the meeting, and if there was items to discuss.  But these

12   included anything from, obviously, grievances that had made it

13   to that step, to perhaps rules or policies that the company

14   wanted to implement, to new job creation and discussing that.

15   Q     During your time serving on the labor relations committee,

16   what are some of the major issues that you recall being resolved

17   through that process?

18   A     Well, I think we discussed -- you know, we had --

19   grievances, obviously, terminations and things like that, mostly

20   avoided arbitrations.  Also there was some -- one of the more

21   I'd say recent examples, although maybe it was five years ago,

22   but the company was going to add eight jobs in what we called it

23   at the time "LNA," liquid natural adhesive; but the company was

24   concerned because they didn't have permission at this time to

25   actually add staffing.  And so -- or not enough of the staffing,

1   so they were concerned about how they could get those important

2   jobs filled, you know, contractually, and we worked out a way

3   that fit our contract, but also ended up satisfying what the

4   company was looking for.

5        JUDGE CARISSIMI:  Mr. Wiese, how much more background?

6        MR. WIESE:  This is getting right to the end.

7        JUDGE CARISSIMI:  Good.

8        Let's get to the negotiations.

9        MR. WIESE:  All right.

10       May we go off the record for just a minute, Your Honor?

11       JUDGE CARISSIMI:  Let's go off the record.

12  (Off the record.)

13       JUDGE CARISSIMI:  Back on the record.

14       You may proceed, Mr. Wiese.

15  (EXHIBITS MARKED:  GENERAL COUNSEL'S 11, 13 and 40.)

16  (Witness proffered the documents.)

17  Q    BY MR. WIESE:  Mr. Eby, I'm showing you what's been marked

18  General Counsel Exhibits 11, 13 and 40.

19       Mr. Eby, do you recognize these documents?

20  A    Yes, I do.

21  Q    What is General Counsel Exhibit 11?

22  A    Final labor relations minutes for February 2015.

23       MR. WIESE:  I'll offer General Counsel Exhibit 11.

24       JUDGE CARISSIMI:  Is there any objection to GC 11?

25       MR. BUTTRICK:   No objection.

1        JUDGE CARISSIMI:  GC 11 admitted.

2  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 11.)

3  Q    BY MR. WIESE:  What is General Counsel Exhibit 13, Mr. Eby?

4  A    Final labor relations minutes for March 2015.

5        MR. WIESE:  I'll offer General Counsel Exhibit 13.

6        JUDGE CARISSIMI:  Any objection to 13?

7        MR. BUTTRICK:  No objection.

8        JUDGE CARISSIMI:  GC 13 admitted.

9  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 13.)

10  Q    BY MR. WIESE:  And, finally, General Counsel Exhibit 40 --

11  what is this document?

12  A    Final labor relations minutes for April of 2015.

13        JUDGE CARISSIMI:  Is there any objection to GC 40?

14        MR. BUTTRICK:  No.

15        JUDGE CARISSIMI:  GC 40 is admitted.

16  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 40.)

17  Q    BY MR. WIESE:  Mr. Eby, what is the process for creating

18  the labor relations meeting minutes?

19  A    After the actual meeting takes place, then, traditionally,

20  the practice has been for Pat Drahos to do a company draft about

21  what was discussed and, if there were agreements or positions

22  for either party, that would be wrote into it.  Then she would

23  e-mail it to me as President, and I would make the Union's first

24  edits.  And I would e-mail it back to her and, basically,

25  sometimes, that was it; otherwise, it would go back and forth a

1    few times till we agreed upon what the minutes were going to be.

2    Q    When the minutes were final, had they been jointly agreed

3    on by the parties?

4    A    Yes.

5    Q    Directing your attention to General Counsel Exhibit 13,

6    right above the old text, "safety shoe addendum," that line

7    references a request to begin negotiations early.  Do you recall

8    receiving a response to that request?

9    A    At a later date.

10   Q    And what was the response that you got?

11   A    "No."

12   Q    Who did you make or who responded from the company

13   regarding the request to negotiate early?

14   A    Pat Drahos.

15   Q    When was the most recent labor relations meeting to your

16   knowledge?

17   A    I believe the last labor relations meeting happened on --

18   in August of 2015.

19   Q    Do you recall in April of 2015, a meeting between

20   representatives of the Union and Ingredion?

21   A    Yes.

22   Q    What date did that meeting occur?

23   A    April 6th.

24   Q    How did you find out about that meeting?

25   A    From Pat Drahos.  She had said -- she had contacted me and

1   said that individuals, including Ken Meadows from Ingredion,

2   were going to be in town that week or those few days, and they

3   had requested to see if we'd basically come up and do a meet-

4   and-greet.

5   Q    Where did that April 6th meeting take place?

6   A    In a conference room.

7   Q    And who was present at that meeting from the Union?

8   A    Myself, Renita Shannon, Matt Maas, Vaude Wilford.

9   Q    What was Mr. Maas' position in the Union at that time?

10  A    Vice President.

11  Q    What about Vaude Wilford?

12  A    Third member.

13  Q    Who do you recall being present at the employer from that

14  meeting?

15  A    Pat Drahos, Ken Meadows, a lady from corporate Human

16  Resource -- corporate Human Resources, I believe, by the name of

17  Becky Tinkham.  And then here was a gentleman, and I believe --

18  well, I know his last name was Madsen, and I think his first

19  name was Mark.  I understand is he was -- handled all the North

20  American operations.

21  Q    Okay.  What do you recall happening at the start of that

22  meeting on April 6th?

23  A    We essentially went around the table and introduced

24  ourselves.  Ken also asked when we were introducing ourselves,

25  if we would kind of say where we are from, and --

1  Q    Go on, Mr. Eby.

2  A    So we went around the table and said our names, where we

3  were from and when it got to Ken, Ken said he was from New

4  Jersey.  And Matt Maas was over here shaking his head, "no."

5  Ken was smiling and said, "No, you don't think so?"  And Matt

6  Maas was saying, "No, not with that accent."

7         JUDGE CARISSIMI:  Mr. Eby, if you can try to remember to

8  use last names.  I know who you mean at this point, but --

9         THE WITNESS:  Oh, I'm sorry.

10        JUDGE CARISSIMI:  -- sometimes there's more than one person

11 with a name in a record, so it's always good to use last names.

12        THE WITNESS:  Yes.

13 Q    BY MR. WIESE:  So after that exchange about where Mr.

14 Meadows was from, what do you recall happening next in the

15 meeting?

16 A    Well, we had a discussion that -- on a few of the items

17 that I had sent a letter to Pat Drahos, and then she had replied

18 that she would send it to Ken.  They were related to issues that

19 took place after Ingredion took over in March.  One of the

20 conversations was about the business code of conduct.  And it --

21 in the discussion of it, I was -- my point being that these were

22 terms and conditions of employment, but they needed to be

23 negotiated.  And Ken had apologized for that.  He said that --

24 he looked at Becky, you know, looking for a reason, saying he

25 didn't know how it got out there, so he would apologize for

1  that; and then threw in a "however," if -- all I have to do is

2  put it on a PowerPoint in a meeting, and I have it -- I have

3  you, you know, trained.  This is a reference to people having to

4  sign.

5  Q    You mentioned that you had written a letter before that

6  meeting.  Do you recall any discussion regarding that letter?

7  A    At what point?

8  Q    Prior to talking about the specific subjects in the letter.

9  A    With like Pat Drahos.

10  Q    Okay.

11       All right, well, let's pick up then after the discussion of

12  the business ethics policy.  What do you recall the parties

13  discussing next in the meeting?

14  Q    Well, after he told me he could put it on the PowerPoint,

15  he took -- he said that in addressing my letter, that I needed

16  to watch my tone and my words.

17       JUDGE CARISSIMI:  Your reference to "he" is who?

18       THE WITNESS:  Ken Meadows, I'm sorry.

19       JUDGE CARISSIMI:  Thank you.

20  Q    BY MR. WIESE:  And go on, Mr. Eby.

21  A    And he turned to the discussion of manlifts and shutting

22  them down without any notice.  Ken had told me he would not

23  apologize for shutting them off, that he didn't want to have to

24  go to an employee's house and tell somebody they were hurt, but

25  he did offer an apology that they could have done a better job

1  on the notice; and then proceeded to tell me that he wasn't

2  going to be asking permission to do things.

3  Q    Do you recall the topic of contract negotiations coming up

4  in that meeting?

5  A    Yes.

6  Q    What do you recall about that?

7  A    Ken said that there was going to be radical changes.

8  Pension was brought up, and he said that, "Well, we'd have to do

9  something about that."  Health care was brought up, and Mr.

10  Meadows told us that they were going to have to do a lot of

11  changes on that, that he didn't want to, but the Affordable Care

12  Act was making him do it.  And I tried to point out to Mr.

13  Meadows that I had already done the research into by our

14  numbers, it wasn't going to affect us.  And he told me my

15  numbers were wrong; and then, again, proceeded to say he was

16  going to have to do it because of the Affordable Care Act, and

17  then he cut off of that, and he said, "I'll tell you what I'll

18  do, I'll tell you what I'll do, I'll let you have it, but you're

19  not going to like it, you're not going to like it."  Then he

20  said, I'll let you keep your insurance, but then you'll have to

21  pay the taxes on it.

22  Q    And after that discussion about the parties' health

23  insurance, what do you recall the parties discussing next about

24  negotiations?

25  A    Well, Pat Drahos had pointed out that our deductibles were

1   200 and 400.

2   Q    Okay.

3   A    And Mr. Meadows looked at us all, waved and said "Bye,

4   bye", while smiling.

5   Q    And after that, the closing of the discussion -- excuse me,

6   was that the end of the discussion regarding the health care?

7   A    Yes.

8   Q    And after that discussion regarding the health care, what

9   do you recall being discussed next at that meeting as it relates

10  to contract negotiations?

11  A    Yah, I had pointed out to Mr. Meadows that when he was

12  talking about there would be radical changes, that our contract

13  puts out that -- or actually spells out how you present your

14  proposals, that you outline, you know, specific items, and that

15  -- what they reference to and what you propose changing, and

16  everything else stays close.  And he said to me, he said, "Fine"

17  -- or, first, he said he didn't agree; but then he said, "Fine,"

18  and with the wave of his hand, says, "Everything's open."

19  Q    What else do you recall being discussed at that meeting

20  regarding negotiations?

21  A    Yes, he proceeded to tell us that he had been through a lot

22  of these negotiations, he knows how it works, and, "eventually,

23  I can replace you."

24  Q    That statement about replace --

25       MR. WIESE:  Strike that, Your Honor.

1    Q    BY MR. WIESE:  Was that the end of the meeting, after Mr.

2    Meadows made that statement?

3    A    Not quite.

4    Q    Okay, what do you recall happening after that?

5    A    Mr. Meadows informed me that if I wanted to get into a

6    pissing match, he would get into a pissing match, he would be

7    happy to get into a pissing match.

8    Q    Was that the end of the meeting?

9    A    Yeah, outside of some minor other stuff.  I told the story

10   about wine, that's how Ken knows I like wine.

11   Q    All right.  Let's move past that meeting.

12        Did the parties schedule negotiations after the April 6th

13   meeting?

14   A    Yes.

15   Q    And when were those negotiations scheduled for?

16   A    June 1st.

17   Q    And do you recall approximately when the parties actually

18   scheduled that June 1st negotiating date?

19   A    Yes, mid or later May.

20   Q    And who did you schedule those negotiations with?

21   A    Well, Pat Drahos and I were kind of intermediaries between

22   Ken and Jethro -- Ken Meadows and Jethro Head, in that Ken

23   Meadows sent some dates.  I think Pat sent them to me and I sent

24   them to Jethro.  And so then we sent back January 1st -- or June

25   1st, I'm sorry.

1   Q    Do you recall when the employer first sent you dates for

2   negotiations?

3   A    Some time in May -- it was more of a -- I don't know if

4   they had like a bunch of specific dates or just requests of when

5   available.

6        MR. WIESE:  Could we go off the record for just a minute,

7   Your Honor.

8        JUDGE CARISSIMI:  Off the record.

9   (Off the record.)

10       JUDGE CARISSIMI:  Back on the record.

11  (EXHIBIT MARKED:  GENERAL COUNSEL'S 8.)

12  (Witness proffered the document.)

13  Q    BY MR. WIESE:  Mr. Eby, I'm going to show you what's been

14  marked as General Counsel Exhibit 8.

15       Do you recognize this document, Mr. Eby?

16  A    Yes.

17  Q    What is it?

18  A    It's a copy version of my bargaining notes.

19  Q    What was your role at negotiations -- at contract

20  negotiations?

21  A    Well, I was the Chair of the Local's bargaining committee,

22  and I sat next to Jethro Head, and would answer his questions,

23  communicate anything that needed to be communicated to him; and

24  I would, you know sometimes spiel at the table.

25       MR. WIESE:  I'll offer General Counsel Exhibit 8.

1    JUDGE CARISSIMI:  Any objection to GC 8?

2    MR. BUTTRICK:  No, no objection.

3    JUDGE CARISSIMI:  GC 8 admitted.

4    (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 8.)

5    Q    BY MR. WIESE:  Who was at -- at the first negotiations on

6    June 1st, who was on the table for the employer's side?

7    A    Ken Meadows, Erwin Froehlich and Levi Wood.

8    Q    Who is Erwin Froehlich?

9    A    He was -- the title at the time, I believe, was Director of

10   Operations; now he's currently Plant Manager.

11   Q    How long has Mr. Froehlich been with Penford and Ingredion?

12   A    I would say approximately since 2009.

13   Q    To your knowledge, in the Union's previous contract

14   negotiations had Mr. Froehlich ever been at the table?

15   A    No.

16   Q    How often was -- or had Mr. Froehlich ever attended joint

17   labor relations meetings, labor relations committee meetings?

18   A    He was requested by the former President, Dave Holmes, and

19   myself to attend on a regular basis, but, no, he showed up maybe

20   in 8 years time, maybe a handful.

21   Q    What about Levi Wood?  How long has he been with Penford,

22   to your knowledge, and Ingredion?

23   A    That one is a little more difficult to answer.  Levi

24   started as a production worker for maybe a year, became a

25   supervisor for a couple of years, and left to a job either in

1  the State of Washington or Oregon.  And Mr. Wood returned I

2  think a couple of years ago.

3  Q    And how -- was Mr. Wood a regular participant at the labor

4  relations committee meetings?

5  A    He has appeared before, but he was not a regular

6  participant.

7  Q    Did you have any conversations with either Levi Wood or

8  Erwin Froehlich about their role in contract negotiations?

9  A    Nothing Mr. Froehlich.  With Mr. Wood, yes.

10  Q    And when did that conversation take place?

11  A    This would be approximately -- less than a week before the

12  June 1st bargaining.

13  Q    And where did that conversation take place?

14  A    At the plant, Building 13.

15  Q    And do you recall anybody else being present for this

16  conversation?

17  A    No.

18  Q    What did Mr. Wood tell you about his role in contract

19  negotiations during this discussion?

20  A    Well, he told me that he had just learned that he would be

21  participating.

22  Q    To your knowledge, prior to the June 1st negotiations, who

23  had been involved in contract negotiations in the past for the

24  employer?

25  A    That would be Pat Drahos and Eric Tupper.

1 Q    Were these individuals, to your knowledge, still employed

2 by the company on June 1, 2015?

3     MR. BUTTRICK:  I'm just going to object, Your Honor, about

4 the relevance of this line of questioning.

5     JUDGE CARISSIMI:  Yes, what is the relevance?

6     MR. WIESE:  Well, it's not relevant to the argument, you

7 know, that the Union should be able to dictate who is at that

8 table, but I do believe that it's relevant to the impasse

9 argument.  I mean, we're dealing with a compressed amount of

10 bargaining before the employer declared impasse.  The fact that

11 all of the -- none of the participants at the table had engaged

12 in previous contract negotiations with this union is relevant

13 and pertinent.

14     JUDGE CARISSIMI:  Well, what I know so far is I know who is

15 on the bargaining committee at the meeting.  Ms. Drahos

16 testified.  I know, you know, when she was -- what she did

17 beforehand and how she came not to be involved.  So do we need

18 anything more on that for you to make any argument you want to.

19     MR. WIESE:  It depends on your view of Ms. Drahos'

20 testimony.

21     JUDGE CARISSIMI:  Well, I mean, you can say that about any

22 witness.  I mean, if I need to make credibility resolutions,

23 obviously, I will.  But there are certain indisputable facts

24 about who was present and who wasn't.

25     MR. WIESE:  Okay, all right.

1        I can move on, Your Honor.

2        JUDGE CARISSIMI:  I think so.  I think you've established

3   those facts in the record, so it's not that I'm saying the

4   questions you are asking are not relevant, it's just that I

5   think at this point, they are somewhat superfluous because those

6   facts have been established.

7        MR. WIESE:  Okay.

8   Q    BY MR. WIESE:  Mr. Eby, I'm going to direct your attention

9   to Joint Exhibit 7 -- or excuse me, GC Exhibit 7.

10       MR. WIESE:  Can we go off the record?

11       JUDGE CARISSIMI:  Off the record.

12  (Off the record.)

13       JUDGE CARISSIMI:  Back on the record.

14       The witness has been shown General Counsel Exhibit 7.

15       Correct, Mr. Wiese?

16       MR. WIESE:  That's correct, Your Honor.

17       JUDGE CARISSIMI:  You may proceed.

18  Q    BY MR. WIESE:  Do you recognize General Counsel Exhibit 7?

19  A    Yes.

20  Q    What is that?

21  A    That is Renita Shannon, our recording secretary's notes.

22  Q    And did you -- have you reviewed those notes?

23  A    Yes.

24  Q    So let's turn to negotiations then on June 1st.  What's the

25  first thing that you recall happening that day?

1  A    The Union was already at its seat, and the company came in,

2  came over and we shook hands.  And then they went to their

3  table, and I believe I was carrying a binder, and he opened the

4  binder.  And Ken sat down and reached over and closed the binder

5  on him.

6  Q    And after that, what did he parties do next?

7  A    Some brief courtesy discussion, and then we were going to

8  exchange proposals.

9  Q    Did the parties, in fact, exchange proposals that day?

10  A    Yes.

11  Q    Directing your attention to Joint Exhibit 10 and Joint

12  Exhibit 1 and GC Exhibit 2(a).

13  (Witness proffered the documents.)

14     JUDGE CARISSIMI:  Let's go off the record.

15  (Off the record.)

16     JUDGE CARISSIMI:  Back on the record.

17     You may proceed, Mr. Wiese.

18  Q    BY MR. WIESE:  Directing your attention to Joint Exhibit

19  10, do you recognize this document, Mr. Eby?

20  A    Yes.

21  Q    What is it?

22  A    Well, outside of the notes and the checkmarks, if you took

23  that away, it would be the Union's contract proposal.

24  Q    What process did the Union go through in putting together

25  this proposal?

1    A    It involved the results from the membership survey, along

2    with experience from existing officers as to things that needed

3    to be addressed.

4    Q    Could you explain what the article and section numbers are

5    in reference to in this proposal?

6    A    Sure.  It would be -- you take the first one, and it's got

7    3.1, that's Article 1, Section 1 of at the time, the Union's

8    existing contract.

9    Q    What, if anything -- or what do you recall from when the

10   Union handed this proposal out to the employer?

11   A    I recall --

12   Q    Or what happened when the Union handed this proposal out to

13   the employer?

14   A    Well, we -- I mean, we, the Union, and Jethro had mainly,

15   but went through it.  The intent was to go through it, each

16   item.  It wasn't to negotiate, but it was to explain the meaning

17   of it and for clarification.

18   Q    Are there any specific terms that you recall being

19   discussed at that meeting?

20   A    Yes.

21   Q    Which ones?

22   A    One of them would have been related to the proposal to

23   eliminate the reduction for early retirees.

24   Q    What do you recall about that discussion?

25   A    Ken asked for some clarification on it because he wanted to

1  know -- I mean, whether or not or that he didn't -- was

2  surprised, put it that way, that there was a reduction.  I mean,

3  that's the way it appeared.  And they said that "That ain't

4  right, that's stupid. We'll have to talk about that."

5  Q    What other terms -- what, if any, other terms do you recall

6  being discussed at that meeting?

7  A    The military leave or the insurance for when an employee is

8  on active duty.

9  Q    And what do you recall about that discussion?

10  A    I believe it was just a comment from Ken Meadows that he

11  believed that that was illegal to provide that.

12  Q    Any other topics that you recall being discussed from the

13  Union's initial proposal at that June 1st bargaining session?

14  A    Yes, there was one more.

15  Q    And which one was that?

16  (Pause.)

17  A    Without going through it, it was on the top of my head --

18  Q    But you do recall one more proposal being discussed?

19  A    Yah, there was another clarification.

20  Q    Okay, all right.

21       Let's turn to the company's proposal, Mr. Eby.  What do you

22  recall -- actually before we get there, do you recall General

23  Counsel Exhibit 2(a) being -- this cover sheet being a part of

24  Joint Exhibit 1, the company's initial proposal, when it was

25  given to you?

1    A     Yes.

2    Q     What do you recall happening when the company gave out

3    their initial proposal?

4    A     Again, Ken Meadows reiterated that there would be radical

5    changes.  He actually looked between Levi and Erwin and said he

6    actually probably ought to apologize to these guys, because they

7    had very little input and they're going to take the flack from

8    it.  And, I'm sorry, I did remember the item that was discussed,

9    but -- a minute ago.

10   Q     What was that item?

11   A     It was related to our pay and where we got paid, because I

12   believe it was on the item that the employees who didn't have

13   the pension, that they would get paid the defined contribution

14   on their pay day.  And Ken asked when we got paid; although,

15   when he directed it, he directed it more to Levi and Erwin.  And

16   there was a brief pause, and Erwin couldn't answer.  And Ken

17   asked, "Like weekly?"  And then I had to point out to Erwin that

18   we got paid every two weeks.

19   Q     Turning back to the company's proposal, did -- when Ken

20   Meadows gave you this comprehensive proposal in Joint Exhibit 1,

21   did he go through the entire proposal?

22   A     No.

23   Q     Are there any items that you recall him highlighting in

24   that proposal?

25   A     I know that we had, you know, a few discussions or

1    clarifications.  I think one of them was on the extra crew, what

2    that led -- his meeting was there.

3    Q    What do you recall Mr. Meadows having to say about the

4    extra crew?

5    A    He just gave an explanation of it.  I mean, basically, it

6    relates to having -- and we're kind of understaffed at our

7    plant, and that by having an extra crew, these would be

8    employees that are essentially hired -- that aren't filling

9    actual jobs, because our jobs would be filled -- to operator,

10   but the -- they actually got a lot of the initial training done,

11   whether it's safety policies, this and that, they are familiar

12   with the plant, that type of thing; and they might train them in

13   a few jobs, but, you know, in the interim, to use them for

14   vacation and that type of stuff.

15   Q    After Mr. Meadows discussed the extra crew, did the Union

16   have any response to the employer's initial proposal?

17   A    Yes.  I asked Mr. Meadows why he didn't address our

18   contract.

19   Q    What was Mr. Meadows' response when you brought this up?

20   A    He told me I don't have a contract.

21   Q    And how did you respond to that?

22   A    Jethro Head clarified that we did have a contract, that

23   it's an existing contract that's in place right now.  And I just

24   recall Ken saying, basically saying -- I know at one point, he

25   did say that "I'm basically giving you a new contract."

1  Q    Okay.  And after that exchange about whether the parties

2  actually had a contract, what do you recall being discussed

3  next?

4  A    I remember that he told us that he had worked with many

5  union proposals.

6       JUDGE CARISSIMI:  "He" is Mr. Meadows?

7       THE WITNESS:  I'm sorry, Your Honor.

8       Mr. Meadows told us that he would work with very many union

9  proposals and he was fine with going to impasse.

10  Q    BY MR. WIESE:  Is there any -- at the time Mr. Meadows

11  brought up impasse, had the parties started negotiating over the

12  Union's initial proposal?

13  A    No, that wasn't the purpose of the meeting.

14  Q    Had the parties negotiated over the company's initial

15  proposal?

16  A    No.

17  Q    Is there anything else that you recall from that meeting

18  after Mr. Meadows threatened impasse?

19  A    Well, I know that we -- and that although it was mainly Ken

20  and Jethro, but they went through scheduling dates for further

21  negotiations.  Jethro had -- I said "Jethro" --

22  Q    Mr. Eby, turning your attention to the parties' next

23  negotiations on June 29th, I'm going to direct your attention to

24  General Counsel Exhibit 9(b).

25  (Witness proffered the document.)

1   Q    Do you recognize this document, Mr. Eby?

2   A    Yes, I do.

3   Q    What is it?

4   A    It is the Union's second request for information that we

5   provided across the table to the company.

6   Q    When did you provide it across the table?

7   A    On 6/29.

8   Q    Who do you recall from the Union providing it across the

9   table?

10   A    Jethro Head.

11   Q    Who did Mr. Head give that information request to?

12   A    Ken Meadows for sure, but a bulk of the time the practice

13   was to make copies for everybody.

14   Q    What, if any, response do you recall the company having to

15   this June 29th information request?

16   A    Mr. Meadows said that he would address it, but he wouldn't

17   necessarily provide the information.

18   Q    Did he provide any specific examples of information that he

19   wasn't intending to provide?

20   A    Yes, after Jethro Head asked what he meant, Mr. Meadows

21   specifically pointed out to our pension multiplier that his

22   proposal contract doesn't have it in it, so there wasn't a need

23   for it.

24       Additionally, the projected rates on this request for

25   information both for active employees' insurance and retirees --

1  he said that they wouldn't be available until September or

2  October.

3  Q    Looking at General Counsel's Exhibit 9(b), are you looking

4  at the second and third bullet points on that document?  Is that

5  what your testimony is in reference to?

6  A    Yes.

7  Q    After the --

8  A    It would also be the final bullet point, because it's

9  projected rates there too.

10 Q    Okay, thank you, Mr. Eby.

11      After the information request exchange, did the Employer

12 respond to the Union's proposal, initial proposal?

13 A    Yes.  Mr. Meadows said that he could respond to our

14 proposal.

15 Q    And what do you recall regarding that response?

16 A    He went down through it like it was, you know, just a quick

17 read list.  His answers were, "Not interested, not interested,

18 not interested, addressed in my proposal."  This isn't verbatim,

19 just a sample, but "not interested, not interested."  So,

20 basically, it came down to most things were "not interested"

21 without any discussion, "addressed in my proposal" -- there were

22 a couple items, and "agreed to" for a couple of items.

23 Q    When Mr. Meadows said that he agreed with an item, what did

24 you understand that to mean?

25 A    To be honest with you, I didn't really know, because we

1    weren't -- I was waiting for a discussion on it, he just agreed,

2    like it was agreed.  I mean, "agreed" is agreed to the item, I

3    guess.

4    Q    Okay.

5         Do you recall there being any discussion about any of the

6    terms -- any further negotiations of any of the responses that

7    Mr. Meadows had to the Union's initial contract proposal on June

8    29th?

9    A    What are you looking for?  What --

10   Q    Let me rephrase the question, Mr. Eby.

11        Beyond -- did Mr. Meadows explain anything beyond saying,

12   "Not interested."

13   A    Not for the things he wasn't interested in.

14   Q    What about the proposals that he said "agreed to"?

15   A    Not at that time.

16   Q    What about the proposals where he said, "addressed"?

17   A    I think -- you know, I'd have to read -- review the notes,

18   but he may have said where or what it did.

19   Q    How long do you recall it taking for Ken Meadows to provide

20   his initial response to the Union's contract proposal?

21   A    Five minutes or under.

22   Q    What do you recall the parties doing after Mr. Meadows

23   provided this response?

24   A    Taking a caucus.

25   Q    And following that caucus, what did the union

1  representatives do at the bargaining table?

2  A     The Union gave the company our non-economic proposals, and

3  it included incorporating some of the language from Mr. Meadows'

4  contract.

5       MR. WIESE:  Directing the witness' attention to Joint

6  Exhibit 11.

7  (Witness proffered the document.)

8  Q     BY MR. WIESE:  Do you recognize this document, Mr. Eby?

9  A     Yes.

10 Q     What is it?

11 A     It Is the Union's proposal of non-economic changes given on

12 6 May -- 6/29, with the exception, of course, the writing on it.

13 Q     Okay.

14      What did the Union do with this offer at negotiations on

15 June 29th?

16 A     Jethro Head gave out copies to the company and then he gave

17 a brief description of what we did, which was to take our -- the

18 Union's proposals and put them into the language of the existing

19 contract, and, also, to take some items out of Mr. Head's

20 contract and incorporate them in.  And then, from there -- I

21 mean, so it was briefly explained like that.  And then from

22 there, then, of course, Mr. Head read it.

23 Q     Okay.

24      JUDGE CARISSIMI:  You made a reference to Mr. Head's

25 contract.  Is that what you meant to say?

1       THE WITNESS:  To -- oh, I'm sorry, no.

2       It would be the Union's proposal to Mr. Meadows' contract,

3  the incorporation part.

4       JUDGE CARISSIMI:  Thank you.

5  Q    BY MR. WIESE:  Okay.

6       And after Mr. Head read through the Union's proposal, did

7  the company have a response to the proposal?

8  A    Yes.  I mean there were --

9  Q    What do you recall happening?

10 A    I mean, there were responses in brevity.  You know, I mean,

11 whether it was "not interested" or just like the notes indicate

12 even here, that -- that's "I'll take it in my contract," but, of

13 course, that's his language.  And then -- but he basically told

14 us that we needed to address his contract.

15 Q    So as Mr. Head was explaining this proposal, was --

16      MR. WIESE:  Strike that, Your Honor.

17 Q    BY MR. WIESE:  Now, directing your attention to the first

18 proposal on this document, the joint labor relations committee

19 provision, did this topic come up at negotiations on June 29th,

20 to the best of your knowledge?

21 A    The negotiating part or -- I mean, well, both the

22 negotiating part, but just the substantive of joint labor

23 relations came up.

24 Q    Okay.  And what do you recall about the subject -- the

25 discussions regarding labor relations?

1  A    Mr. Meadows' proposal eliminated joint labor relations, and

2  while we tried to have a discussion over the importance of joint

3  labor relations, Mr. Meadows told us it was non-existent.

4  Q    As you were describing the importance of labor relations at

5  the bargaining table, did you speak at that time?  As the Union

6  was describing it, did you speak at that time?

7  A    I don't specifically recall at that time.  I know for sure

8  at a later date, I spoke.

9  Q    Okay.

10      Do you recall Mr. Meadows saying anything else in response

11  to the discussion about -- or during the discussion about the

12  labor relations committee?

13  A    Not that I recall at this moment.

14  Q    What if -- after the discussion about the labor relations

15  committee, do you recall Mr. Meadows providing an explanation

16  about how he wanted labor relations  handled at the Cedar Rapids

17  facility?

18      MR. BUTTRICK:  Objection:  leading question.

19      JUDGE CARISSIMI:  I don't think that suggested an answer.

20      I'm going to overrule he objection.

21      You may answer, sir.

22      THE WITNESS:  I know that there was a discussion during

23  negotiations related to labor relations and this is the one

24  that, you know, I was referring to that I was -- I know that I

25  was speaking, but it was related to the labor relations and the

1  importance of it that when there was a discussion on grievance,

2  that, you know, it -- labor relations helped keep down, you

3  know, the resolution of grievances kept down arbitrations.

4      JUDGE CARISSIMI:  Who said that?

5      THE WITNESS:  I did.

6      JUDGE CARISSIMI:  All right, thank you.

7  Q    BY MR. WIESE:  During this exchange that you're talking

8  about, this extended exchange regarding labor relations, what,

9  if any, response do you remember Ken Meadows having?

10 A    Ken Meadows said that there was no need for labor

11 relations, that they have an open-door policy, you can meet any

12 time.  And I questioned him -- "but this is where you resolve

13 stuff, and you actually have -- you know, you have notes."  And

14 he told me, "Well, you can take notes any time."  And in the

15 discussion, he even said that the people at that plant -- "he,"

16 being Ken Meadows -- that the managers at the plant wouldn't

17 have permission to do anything without him anyways.

18 Q    And do you recall what day or -- as you testify today, can

19 you recall during what session that exchange took place?

20 A    I would think the more I think about it that the grievances

21 was early on, and the other one was at a later date in July.

22     JUDGE CARISSIMI:  When you say "the other one," Mr. Eby --

23     THE WITNESS:  Oh, I'm sorry, the rest of it as related to

24 the no need for labor relations, that it's an open door and can

25 meet any time, and that Ken also said that, of course, the

1   managers couldn't make a decision without him anyways.

2       JUDGE CARISSIMI:  So that did not occur on June 29th?  That

3   --

4       THE WITNESS:  No, that portion of it did not.

5       JUDGE CARISSIMI:  okay.

6       THE WITNESS:  Because when he asked the question originally

7   --

8       JUDGE CARISSIMI:  Yes, that's okay, you answered my

9   question.  Mr. Wiese will pursue it if he wishes to.

10  Q    BY MR. WIESE:  So what portion of this discussion do you

11  recall occurring on June 29th?

12  A    I believe that's the part related to the grievances.

13  Q    Okay.

14      JUDGE CARISSIMI:  Well, I think there's a little -- at

15  least in my mind, the record is not clear.

16      On June 29th, was there a discussion about grievances?

17  It's a question to you, sir.

18      THE WITNESS:  Yes.

19      JUDGE CARISSIMI:  All right.

20      How did that come up?

21      THE WITNESS:  That was in the conversation related to a Mr.

22  Meadows saying that labor relations was non-existent.

23      JUDGE CARISSIMI:  All right.

24      And was there something said by somebody in the Union prior

25  to Mr. Meadows making that statement?

1    THE WITNESS:  Yes.

2    JUDGE CARISSIMI:  What?

3    THE WITNESS:  Jethro Head had said something about

4  addressing Mr. Meadows initial contract proposal, that he was

5  eliminating labor relations.

6    JUDGE CARISSIMI:  All right.

7    Now tell me again what, if anything, you said about labor

8  relations at this meeting?

9    THE WITNESS:  It would have been about the -- that a -- it

10  assisted in keeping grievances to a minimal and avoiding

11  arbitration.

12    JUDGE CARISSIMI:  All right.

13    Did you say anything else about that topic at this meeting?

14    THE WITNESS:  No.

15    JUDGE CARISSIMI:  Thank you.

16    Mr. Wiese, you may continue.

17    MR. WIESE:  Thank you, Your Honor.

18  Q    BY MR. WIESE:  Is there anything else that you recall from

19  this meeting on June 29th?

20  A    Yes.  I mean, there was a few minor discussions related to

21  some of these -- well, our proposal; and then there was a

22  conversation for clarification -- just addressed my notes, but

23  it's about Mr. Meadows' contract proposal, talking about when

24  probation ends, which is -- he was using the words "last hire

25  date."  And we asked for clarification on it, and it was

1  explained to us, "last hire" would have been like his original

2  hire, provided they had 4 months in.

3      And we also had -- Mr. Meadows addressed our proposal in

4  the active -- for active military, the insurance, and said he

5  was willing to pay insurance for both the family and them.

6  Q    Okay.

7      MR. WIESE:  Your Honor, can we take a 5-minute recess, a

8  brief recess?

9      JUDGE CARISSIMI:  Yes, we'll be in adjournment for 5

10 minutes.

11     MR. WIESE:  Okay, thank you.

12     JUDGE CARISSIMI:  Off the record.

13 (Brief recess taken.)

14     JUDGE CARISSIMI:  On the record.

15     Mr. Wiese, you may proceed.

16 Q    BY MR. WIESE:  Mr. Eby, directing your attention to Joint

17 Exhibit 2.  Do you recognize this document?

18 (Witness proffered the document.)

19 A    Yes.

20 Q    Do you recall that proposal being provided by the Employer

21 at negotiations on June 30th?

22 A    Yes.

23 Q    And when do you recall that proposal being provided at

24 negotiations that day?

25 A    On June 30th?

1  Q    Yes, when during those negotiations?  Beginning?  Middle?

2  End?

3  A    Well, I believe it was towards the beginning.  That

4  bargaining session was only about an hour long.

5  Q    Okay.  And what, if anything, do you recall the Employer

6  saying when this Joint Exhibit 2 was presented to the Union?

7  A    That Ken had told us some changes, but when he presented

8  them, he was telling us the agreements, the things that we

9  agreed to he put in here.

10 Q    Had the parties reached any tentative agreements at that

11 point?

12 A    No.

13 Q    Looking at Joint Exhibit 2, how could tell changes that had

14 been made in this offer from the Employer's previous offer?

15 A    The -- I mean, the changes that we're aware of were in

16 bold.

17 Q    Are you aware of whether there were any other changes that

18 were not in bold in Joint Exhibit 2?

19 A    No.

20 Q    What, if any, issues do you recall the Union bringing up in

21 response to the Employer's June 30th proposal?

22 A    Issues.

23 Q    Yes, or discussion.  What discussion occurred after Ken

24 Meadows presented the Employer's proposal?

25 A    He pointed out a few of the items that he had changed in --

1  he referred to including what was agreed.  Jethro Head had

2  responded that "We do not have any tentative agreements at this

3  time."  And Ken had responded, "I can't count any."

4   Q   Okay.  And what, if any, response did the Union have to

5  that?

6  A   That we didn't have any at this time.

7  Q   After that exchange, what did the parties discuss next?

8  A   Jethro Head went on about some of his experience

9  negotiating at other plants, and that we -- and when he's

10  talking "we," he's referring to both parties at the table, "need

11  to get a process, an agreed upon process, so that, you know, we

12  can actually have negotiations."  Jethro was trying to get --

13  Mr. Head was trying to get Mr. Meadows to take his proposal and

14  submit them in relation to our existing contract; at least in

15  the very minimal, so it is red-lining and pointing out what he's

16  changing.

17  Q   Looking at your bargaining notes, Mr. Eby, on page 4 of 19,

18  the first item on those bargaining notes, what do you recall

19  about the discussion regarding those items?

20  A   Jethro Head had pointed out that those were permissive

21  subjects of bargaining in reference to the recognition clause,

22  and also, to out-sourcing, and that the Union was not going to

23  negotiate over them, and that --

24  Q   Well, what, if any, response did the company have to that?

25  A   Mr. Meadows said he didn't necessarily see it that way.

1   Q      Did Mr. Meadows provide any further explanation about why

2   he didn't see it that way?

3   A      No.

4   Q      Let's see.

5          After Mr. Head discussed a process for the parties'

6   negotiations, what, if any, response did the Employer have to

7   that item?

8   A      Mr. Meadows said that he was not going to accept our

9   contract as written, and he was not coming off that.

10  Q      Okay.  When Mr. Meadows said -- well, what, if anything, do

11  you recall Mr. Meadows saying after that?

12  A      That Mr. Meadows said that he was going to -- he was

13  willing to put together an LBF and that he would -- that we

14  would see work or activity going on in the plant directly

15  related to that.

16  Q      Did he explain any further what he meant by "activity"?

17  A      I don't recall.

18  Q      Okay.

19          JUDGE CARISSIMI:  Did he use the term "LBF" or is that your

20  shorthand reference?

21          THE WITNESS:  No, he used "LBF."

22          JUDGE CARISSIMI:  All right.

23          Did anybody ask him what "LBF" meant?

24          THE WITNESS:  No.

25          JUDGE CARISSIMI:  All right.

1          Thank you.

2    Q    BY MR. WIESE:  What did you understand "LBF" to mean?

3    A    Last, best, final.

4    Q    Is that what the Union understood that term to mean?

5    A    Yes.

6    Q    What, if anything, do you recall the Union saying in

7    response to Meadows' statement regarding the LBF?

8    A    Jethro Head had went into -- or discussed that August 1st

9    was not a drop dead date.  Then he explained it a little further

10   as he leaned back, and he was pointing to the rest of the Union

11   officers, and said that, "They are used to, you know, at this

12   point, you know, having something by August 1st."  You know,

13   they may be used to it, but where Jethro negotiates, the

14   expiration of a contract, that's not a drop dead date, that

15   negotiations can go on for a long time after that.  And then he

16   cited one place that was six -- 8 months working on their -- you

17   know, just going along on the terms of their existing contract.

18   Q    After Mr. Head brought up the drop dead date, what did the

19   parties do next?

20   A    Mr. Meadows responded that it may be drop dead date for

21   him, and then backed off on that, and said it's not necessarily

22   a drop dead date for him.

23   Q    And after Mr. Meadows responded to that -- after Mr.

24   Meadows provided that response, what did the parties do?

25   A    They took a caucus.

1  Q    And what happened after that caucus?

2  A    During the caucus, Mr. Head planned to contact Mr. Meadows

3  and to call an end to the day.   And then Mr. Head returned back

4  to the -- because the company at this time was in their off-

5  room, and we were in the conference room.  So Mr. Head returned

6  back to us and said that the company had asked if they could,

7  you now, present their medical proposals, to which Head had

8  agreed.

9  Q    Is that what happened after the caucus?

10  A    Yes.  After Mr. Head went up and had that discussion and

11  then it was agreed that they were going to do that, the company

12  wasn't in the room yet, so I went to the restroom and went out

13  to smoke a cigarette; and when I came back in, they -- it was

14  almost wrapped up as far as the discussion.

15  Q    And what happened after the discussion regarding the health

16  care plan?

17  A    That was the end.

18  Q    Okay.

19       And when you were outside smoking a cigarette that day,

20  approximately how long were you outside?

21  A    A total of 5 minutes.  I inhale.

22  Q    All right.

23       Turning to the parties' next negotiations on July 27th --

24  first I'd like to look at your notes for that day, on page 5.

25  Do you have anything of substance written for negotiations that

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1  day?

2  A    No.

3  Q    Do you recall whether there was anyone new at negotiations

4  that day?

5  A    The mediator.

6  Q    How do you recall the meeting beginning that day?

7  A    Well, the mediator had showed up.  His name I believe is

8  Jim Tuecke, and Mr. Tuecke spent a little time separately with

9  each party, getting up to date before the parties met together.

10 Q    What do you recall happening when the parties met together?

11 A    Then Jethro, again, gave a brief rehash of, you know, kind

12 of where we were at, so the mediator understood.  And Mr. Head

13 had provided, you know, I believe any documents to date to the

14 mediator.

15 Q    When you say the "documents to date to the mediator," what

16 --

17 A    The propose -- Ken's contracts and the Union's proposals.

18 Q    All right.  After the discussion about -- or after the

19 proposals were brought up and provided to the mediator, what do

20 you recall happening next?

21 A    Mr. Head told the company that between the last bargaining

22 session and this one, that the Union negotiating committee went

23 together -- or got together and compared Mr. Meadows' contract

24 with our existing contract, and came up with over 120

25 concessions.

1  Q    How did the Union come up with that, 120 concessions?

2  A    The negotiating committee, the local negotiating committee

3  went through Mr. Meadows' 6/30 contract and our existing

4  contract and did a comparison.

5  Q    I'm going to direct your attention to General Counsel

6  Exhibit 21.

7  (Witness proffered the document.)

8  Q    Do you recognize this document, Mr. Eby?

9  A    Yes, I do.

10  Q    And what is it?

11  A    It is the outline of the concessions that the bargaining

12  committee came up with when doing a cross-comparison.

13  Q    And is this the concession list that Jethro had derived,

14  the 120 concessions that he was talking about on July 27th?

15  A    Yes.

16  Q    How long did it take the Union to create the list of

17  concessions in General Counsel Exhibit 21?

18  A    It took all four of us at least two full days, plus.

19  Q    Why did it take so long?

20  A    There was a significant amount, and, plus, there was --

21  there's not a reference, you know, what his contract proposal is

22  in comparison to ours, so we had to search for them.

23  Q    Was this list in General Counsel Exhibit 21 -- was this

24  presented at the negotiations on July 27th?

25  A    No.  Jethro may -- or Mr. Head may have intro -- or talked

1    a few subject items, but the list was not given to the company.

2    Q    What, if any, reaction did the Employer have when Mr. Head

3    brought up the 120 concessions?

4    A    Just that Mr. Meadows said he didn't see -- he didn't see

5    that many.

6    Q    After the discussion about the concession, what do you

7    recall happening next in negotiation?

8    A    On the 27th?

9    Q    Yes.

10   A    I'm not sure if they gave us a proposal or not.

11   Q    Okay.  Directing your attention to page 8 of General

12   Counsel Exhibit 7.

13        THE WITNESS:  What's that?

14        JUDGE CARISSIMI:  General Counsel Exhibit 7 are Ms.

15   Shannon's notes.

16        MR. WIESE:  Oh, sorry, Your Honor.

17   Q    BY MR. WIESE:  After taking a minute to review page 8 of

18   General Counsel Exhibit 7, does that help refresh your

19   recollection about what happened after the discussion about the

20   120 concessions?

21   A    Yes.

22   Q    Okay, and what do you recall happening next?

23   A    That there was just a discussion from Mr. Head, again,

24   about a process, and that Mr. Meadows had told Head that we

25   addressed your proposals in his contract, you know, and that Mr.

1    Meadows did make the comment that our contract, our existing

2    contract, did not allow the company to grow.  So Mr. Head asked

3    Mr. Meadows how our existing contract didn't allow the company

4    to grow, and Mr. Meadows wouldn't respond.

5    Q    Did -- do you recall whether Mr. Head repeated his

6    question.

7    A    I'm not sure.

8    Q    Okay.

9         JUDGE CARISSIMI:  Let me ask you something, sir.

10        Did Mr. Meadows say he wasn't going to respond, or did he

11   just sit silently when that question was asked?

12        THE WITNESS:  He didn't say he wasn't going to respond.  He

13   just didn't respond.

14        JUDGE CARISSIMI:  All right.  Thank you.

15   Q    BY MR. WIESE:  Is there anything else that you recall from

16   those negotiations on July 27th?

17   A    I mean, if you're -- I mean, if you reference those notes,

18   I mean, there is a question that Jethro puts across the table

19   that -- "Is that a new proposal that you have?"  And Kim

20   Villegas gets up -- says, "No, that's in the other room," and

21   gets up to get it, and Ken told her to sit down.  As far as

22   that, I don't recall any.

23   Q    Anything further?

24        Okay.  Let's turn then to the negotiations on July 28th.

25   And I'd like to direct your attention to Joint Exhibit 3.

1    (Witness proffered the document.)

2    Q    Do you recognize this document, Mr. Eby?

3    A    Yes, I do.

4    Q    And what is it?

5    A    It is Mr. Meadows' contract that he gave us on 7/28.

6    Q    Was the Union able to determine the changes in this offer

7    from the Employer's previous proposals?

8    A    Yes, as far as I know.

9    Q    How were you able to do that?

10   A    They are in red.

11   Q    I'd like to look at the gap insurance provision in this

12   contract.  It's on page 32.  And the Bates number is PF2069.  Do

13   you see that?

14   A    Yes.

15   Q    What was the provision for gap insurance under the Red

16   Book?

17   A    The gap insurance under the existing contract was that

18   anybody hired prior to August 1, 2004, and had 60 points at that

19   -- 60 points by August 1st -- yeah, of 2004 -- they would have

20   retiree insurance, gap insurance.  And what that did was that

21   there was -- the insurance that you retired on, that's the

22   insurance you would get, with the exception of there'd no longer

23   be vision and dental.  But you would pay.  And they're single

24   policies.  So like if there's, you know, a spouse, you gotta do

25   two individual policies.  But each policy was a multiplier of

1   whatever the pension multiplier was at the time.  So currently

2   at that time it was $51, so each person 51.  And so you would

3   have that insurance.  You'd have all that insurance until you

4   reached Medicare.  And after that, then there was a company-paid

5   supplement for Medicare and the option to have a drug card.  And

6   the drug card was a real complicated formula, but it's based

7   over usage on all the retirees, and it was subsidized by active

8   employees.

9   Q    How much did employees have to pay for gap insurance under

10  the Red Book, the employees who qualified?

11  A    They -- again, they paid at that time $51.

12  Q    Okay.  And what had the company been proposing, generally,

13  regarding gap insurance, prior to July 28th?

14       MR. BUTTRICK:  I'm just going to object because the

15  documents will speak for them self.

16       JUDGE CARISSIMI:  I'm going to sustain that, unless there's

17  something -- a statement that you want to bring forth different

18  than what's already in the exhibits.

19       MR. WIESE:  I'll rephrase, Your Honor.

20  Q    BY MR. WIESE:  How did the Union view the Employer's

21  proposals regarding gap insurance prior to July 28th?  Did the

22  Union view the Employer's gap insurance proposals prior to July

23  28th as a concession?

24  A    Yes.

25  Q    Why is that?

1    A    Because instead of paying $51 and having good health

2    insurance, they were put -- those who had that gap insurance

3    were be put on the hook for 50-percent payment -- you know, 50

4    percent of the premium per month of insurance that was much

5    worse.

6    Q    Prior to the July 28th negotiations had the Union

7    communicated the changes that the Employer was proposing to the

8    gap insurance to employees?

9    A    Yes.

10   Q    What, if any, reaction do you recall getting from employees

11   when you brought this up to them?

12   A    There was a lot of concern.  There was I believe it was 43

13   individuals that would be affected by it and basically were

14   going to have to make a decision, a life-altering decision one

15   way or another, if it didn't change by August 1st.

16       JUDGE CARISSIMI:  Mr. Wiese, let me ask you a question.  Is

17   it going to be necessary for me to understand what the reference

18   to accumulating 60 points or more in order to assess these

19   proposals?  Because I don't know what that means.

20       MR. WIESE:  Well, I'm sure Mr. Eby can explain that to you.

21   Q    BY MR. WIESE:  Could you explain that, Mr. Eby, the 60 --

22       JUDGE CARISSIMI:  If the parties say I don't need to

23   understand that -- I don't want to make this any more involved

24   than it is, but it's there.

25       MR. BUTTRICK:  Yes.  I don't think that's important for you

1    to understand, from our perspective, Your Honor.

2        JUDGE CARISSIMI:  All right.

3        THE WITNESS:  It's real easy.

4        JUDGE CARISSIMI:  You say it's easy?

5        THE WITNESS:  Yes.

6        JUDGE CARISSIMI:  All right.  Well, if it's easy, you can

7    explain it.

8        THE WITNESS:  All it was, whether or not -- in order to

9    have that insurance, you had to have 60 points on that date,

10   August 1, 2004, and the points are a combination of years of

11   service and age.

12       JUDGE CARISSIMI:  All right.  Fine.  Thank you.

13   Q    BY MR. WIESE:  At negotiations had the Employer discussed

14   changing anything in the gap insurance proposal prior to July

15   28th?

16   A    Not with us at the table.  No.

17   Q    At negotiations on July 28th, do you recall Mr. -- do you

18   recall the Employer providing any explanation for its change in

19   the gap insurance proposal?

20   A    Yes.  I recall a brief discussion about it.

21   Q    And what do you recall from that discussion?

22   A    Well, I mean, we went over what the meaning was, because

23   that's where we learned, I mean, he is not putting back -- the

24   company is proposing -- it's still not including the supplement

25   and the drug card for the retirees, and the insurance would be

1  the insurance of whatever the active employees were at whatever

2  time going forth.  So 10 years -- you know.

3  Q    During this exchange, did the -- do your recall Mr. Meadows

4  providing any justification for why the Employer hadn't changed

5  the gap insurance proposal?

6  A    I don't specifically recall.

7  Q    I'd also like to direct your attention to the wage

8  provision in Joint Exhibit 3.  It starts on page 25 and carries

9  over to page 26.  What were the major differences between this

10 wage provision and what was in the Red Book?

11     MR. BUTTRICK:  I'm just going to object, Your Honor,

12 because the documents will speak for them self.

13     JUDGE CARISSIMI:  They are, but perhaps there's a quick

14 reference that may be helpful.  So I'm going to overrule the

15 objection.  I'll let the witness answer the question.

16     THE WITNESS:  Yes.  Basically, there's two major

17 differences.  One was that the -- we had three different --

18 outside of maintenance and janitors, we had three different pay

19 classifications.  And so they had three pay grades.  And the

20 Employer's proposal was to make it flat, all one pay grade.  And

21 then the second major change is that the -- our existing

22 contract at the time had a -- employees started out at 82

23 percent but stair-stepped over 4 years to full wages.  And the

24 Employer was presenting us with permanent in perpetuity wage

25 tier differences of approximately 20 percent, 18 percent.

1     JUDGE CARISSIMI:  All right.  Thank you.

2     You may continue, Mr. Wiese.

3  Q    BY MR. WIESE:  When the Employer presented this proposal on

4  July 28th, what explanation, if any, did the Employer provide

5  for creating a two-tier wage system?

6  A    No real explanation that I recall.

7     JUDGE CARISSIMI:  Let me ask you this, sir.  When this

8  issue came up, did the Union explain to the Employer the present

9  tier system and the ability to come up to the higher wage?

10    THE WITNESS:  We would've had a brief discussion at some

11 point during negotiations, but we went ahead --

12    JUDGE CARISSIMI:  My question is when this was presented by

13 the company.

14    THE WITNESS:  No, because how this was presented was

15 matter-of-factly "This is what I did" and he went through it.

16 There's not this in-depth discussion, except for the

17 clarification like with the Medicare.

18    JUDGE CARISSIMI:  Okay.  Thank you.

19    You may continue, Mr. Wiese.

20 Q    BY MR. WIESE:  Going to direct your attention to General

21 Counsel Exhibit 23.

22 (Witness proffered the document.)

23 Q    Do you recognize this document, Mr. Eby?

24 A    Yes, I do.

25 Q    Did the Employer -- do you recall the company presenting

1  this document at negotiations on July 28th?

2  A    Yes.

3  Q    And what discussion, if any, do you recall regarding this

4  document?

5  A    This is -- Mr. Meadows gave us this and told us it was in

6  response to the Union's request that the company put their

7  proposals into relation to the Union's contract.

8  Q    How did the Union view this document?

9  A    Wasn't what we were looking for.

10 Q    And after the -- was this document, General Counsel Exhibit

11 23, presented at the same time as Joint Exhibit 3, the

12 Employer's July 28th contract offer?  Or about the same time?

13 A    About the same time.

14 Q    After the Employer presented General Counsel Exhibit 23 and

15 Joint Exhibit 3, did the Union -- what did the parties do?

16 A    Took a caucus.

17 Q    And coming out of that caucus, did the Union have a

18 response to the Employer's proposal?

19 A    Yes.

20 Q    Direct your attention to General Counsel Exhibit 24.

21 (Witness proffered the document.)

22 Q    Do you recognize this document, Mr. Eby?

23 A    I wrote it.

24 Q    And what is it?

25 A    It's a Union's offer for a 3-year contract extension.

1 Q    Was this offer presented to the Employer at negotiations on

2 July 28th?

3 A    Yes.

4 Q    And who presented it?  Do you recall?

5 A    Jethro Head.

6 Q    When was it presented during negotiations?

7 A    After the caucus.

8 Q    Let me direct your attention to -- I believe it's Joint

9 Exhibit 23.

10 (Witness proffered the document.)

11 Q    Do you recognize this document, Mr. Eby?

12 A    Yes.

13 Q    What is it?

14 A    It is a Union's request for information that we gave them

15 on July 28th, to the company.

16 Q    Do you recall about when during negotiations on July 28th

17 the Union gave this to the company?

18 A    Well, it was midday.  It was after that caucus and after we

19 gave the -- I believe it was after we gave the proposal

20 extension -- extension proposal.

21 Q    Did Mr. Head provide this information request to the

22 Employer?

23 A    Yes.

24 Q    Is he the one who did that?

25 A    Yes.

1  Q    Okay.  And after -- or did Jethro -- or do you recall

2  Jethro Head saying anything as he gave the Employer the contract

3  extension and then the information request?

4  A    Yes.

5  Q    What did he say, as best you can recall?

6  A    That he went on to -- was sending a message to Ken that,

7  you know, "This is heading for a train wreck."  And, you know,

8  from there, I mean, explaining, you know, the consequences of --

9  how the lack of negotiation is going on, as far as getting

10  anything besides "Interested," "Not interested."

11  Q    Do you recall what response, if any, the company had at the

12  table to General Counsel Exhibit 24?

13  A    Later in the day, Mr. Meadows will reject it.

14  Q    All right.  So you mentioned that --

15      MR. WIESE:  Strike that, Your Honor.

16  Q  BY MR. WIESE:  During that, during those discussions about

17  the -- or while -- what else do you recall Mr. Head saying when

18  he mentioned the "train wreck"?

19  A    Again, he talked about his experience at different plants.

20  Talked about Crystal Sugar, how there was a lockout for 2 years.

21  And that nobody wins -- nobody.  I mean, there -- he elaborated

22  much more than that, but it was on the same type of thing.

23  Q    And what response, if any, did the company have to Mr.

24  Head's statements?

25  A    I don't recall.  I mean, I don't know that there was any.

1  Q    At that time did Mr. Meadows make any reference to his --

2  to the contract offer that the Employer had put on the table?

3  (Pause.)

4       MR. BUTTRICK:  I'm just going to object that it's unclear

5  what offer to which the question is referring.  We had the

6  company's offer, we had the Union's offer, so I don't know which

7  offer the question is in reference to.

8       JUDGE CARISSIMI:  The witness --

9       MR. WIESE:  The company's offer.

10      JUDGE CARISSIMI:  The witness seems to have some difficulty

11  with the question also.  So perhaps you can rephrase that, since

12  we haven't had an answer.  So I don't need to rule on the

13  objection.  I'm just going to ask you to ask another question,

14  since our witness seems to have some difficulty following it.

15  Q    BY MR. WIESE:  After the -- moving on from the discussion

16  about the train wreck.  After that, do you recall Mr. Meadows

17  having any discussion about the Employer's July 28th proposal?

18  A    That it was a fair contract.  That he thought it was a fair

19  contract.

20  Q    Do you recall him saying anything after that?

21  A    I would have to check my notes.

22      MR. WIESE:  Could we go off the record for just a second,

23  Your Honor?

24      JUDGE CARISSIMI:  Let's go off the record.

25  (Off the record.)

1      JUDGE CARISSIMI:  Back on the record.

2      Mr. Wiese, you may proceed.

3  Q   BY MR. WIESE:  Mr. Eby, if I showed you a copy of your

4  affidavit, would that help refresh your recollection about what

5  occurred at negotiations that day?

6  A   Yeah.

7  Q   Or what, specifically, Mr. Meadows said?

8      All right.  I'm going to direct your attention to --

9      JUDGE CARISSIMI:  Well, first, remember what my practice

10 is.  If you're going to show the witness his affidavit, you need

11 to have it marked as a GC exhibit, regardless of whether you're

12 going to introduce it, so the record will reflect what document

13 you're showing him.

14     Does counsel for the Respondent have a copy of the

15 affidavit?

16     MR. BUTTRICK:  We do not, Your Honor.

17     MR. WIESE:  Is that the steps we need to go down to do

18 this?

19     JUDGE CARISSIMI:  Yes.  And any document you're going to

20 show the witness you have to show the opposing party.

21     MR. WIESE:  Okay.

22     JUDGE CARISSIMI:  Do you have copies available?

23     MR. WIESE:  Just one second, Your Honor.

24     JUDGE CARISSIMI:  All right.  Let's go off the record.

25 (Off the record.)

1     JUDGE CARISSIMI:  On the record.

2     Yes?

3     MR. WIESE:  With your procedure of marking the affidavit as

4  a General Counsel exhibit and having to provide a copy to

5  opposing counsel, can I retrieve that copy after I refresh the

6  witness's recollection, or does opposing counsel --

7     JUDGE CARISSIMI:  Yes.

8     MR. WIESE:  -- get to retain a copy?

9     They do.

10     JUDGE CARISSIMI:  Because, again, my view is anytime you

11  show a witness anything, the other side has a chance to see it.

12  Now, it's an affidavit, it's <u>Jencks</u> material, so in the normal

13  course of things the Respondent is going to get it after the

14  witness's direct for purposes of cross.  But he gets to have it

15  now because I don't know what you're going to do with that

16  affidavit.  I don't know if it's just refreshing recollection or

17  it may go beyond that.  So my view is the Respondent needs to

18  have the affidavit when you do whatever you're going to do with

19  the witness.  All right?

20     MS. OHAERI:  Sorry.  Just to clarify, after we're done

21  refreshing recollection, do we get the affidavit back while the

22  --

23     JUDGE CARISSIMI:  Yes, as I said.

24     MS. OHAERI:  Okay.

25     MR. WIESE:  All right.  Well, let's -- could we go off the

1  record for just one more second?

2      JUDGE CARISSIMI:  Off the record.

3  (On the record.)

4      JUDGE CARISSIMI:  Let's go on the record.

5  (EXHIBIT MARKED:  GENERAL COUNSEL'S 76.)

6      JUDGE CARISSIMI:  Mr. Wiese, you've marked for

7  identification a document.  Is that correct?

8      MR. WIESE:  That's correct, Your Honor.  I have marked for

9  identification a copy of one of Mr. Eby's affidavits, dated

10 October 16, 2015.

11 Q   BY MR. WIESE:  And, Mr. Eby, I'd like to direct your

12 attention --

13     JUDGE CARISSIMI:  And what number have you given that?

14     MR. WIESE:  Oh.  Thank you, Your Honor.  It's General

15 Counsel Exhibit 76.

16     JUDGE CARISSIMI:  Seventy-six.  And a copy has been given

17 to Respondent for purposes of -- since you're giving it to the

18 witness and my view is the Respondent has a right to see any

19 document you show a witness.

20     So Respondent has a copy.  Correct, Mr. Buttrick?

21     MR. BUTTRICK:  That's correct.

22     JUDGE CARISSIMI:  Very good.

23     You may proceed, Mr. Wiese.

24 Q   BY MR. WIESE:  Directing your attention to page 9, lines 17

25 and 18.  Do you see?

1   A      Yeah.

2   Q      Could you read that?

3          JUDGE CARISSIMI:  How, hold it.  Read it to himself,

4   correct?

5          MR. WIESE:  Read it to yourself.  Yes.

6          JUDGE CARISSIMI:  Right.

7          MR. WIESE:  Yes.

8          THE WITNESS:  I already have.

9          MR. WIESE:  Okay.

10         JUDGE CARISSIMI:  All right.

11         MR. WIESE:  All right.

12         JUDGE CARISSIMI:  Are you going to retrieve the affidavit?

13  Q      BY MR. WIESE:  Is your recollection refreshed --

14  A      Yes.

15  Q      -- as to the response?

16         Okay.  Thank you.

17         JUDGE CARISSIMI:  Counsel for the General Counsel has now

18  retrieved the affidavit from the witness.  And I would ask

19  Respondent to give the copy back, which he has.  So the witness

20  now has no copy of the affidavit before him.

21  Q      BY MR. WIESE:  Having read your affidavit, what do you

22  recall about Mr. Meadows' response to Jethro Head's discussion

23  about a train wreck?

24  A      In response to Mr. Head's discussion about a train wreck,

25  what's happened at other places, and that we haven't got, you

1  know, a process, Ken had said that he had given us a fair offer.

2  But he made it clear that it was his contract.  In other words,

3  when he was saying that, to put it in the text, we don't have a

4  contract, it's going to be his contract.

5  Q    And after Mr. Meadows said this, what did the parties do?

6  A    Took a caucus.

7  Q    What happened after that caucus?

8  A    The company came back in with responses to the -- to some

9  of the information requests that we gave earlier that day.

10  (Pause.)

11  Q    Let me direct your attention to Joint Exhibit 24.

12  (Witness proffered the document.)

13  Q    Do you recognize this document, Mr. Eby?

14  A    Yes.

15  Q    And what is it?

16  A    It is what the company gave the Union for a response to a

17  request for information.  So, like, if you go through it, you'll

18  see in bold where they answered some of the questions.

19       Do you recall the parties discussing any of these responses

20  at the bargaining table on July 28th?

21  A    Yes.  We went through the -- I believe it's 21 questions.

22  Yah, 21 questions that are at the back.

23  Q    Using the PF numbers, what page numbers do those start at?

24  A    It would start on the bottom of PF912.

25  Q    Why were the parties discussing those specific responses on

1  July 28th?  Do you recall?

2  A    Yeah, I mean, these specific questions -- part of them --

3  they were coming out of our concessions list.  And it was one,

4  to find out the information, but it was the Union's attempt to

5  open a dialogue to, you know -- I mean, to see what was going

6  on, what's the problem.  I mean, these are directly related to

7  our concessions.

8  Q    Okay.  And do you recall the parties going through these 21

9  items?

10  A    Yes.

11  Q    Okay.  And as the parties went through these 21 items,

12  what, generally, do you recall about those discussions?

13  A    Well, I remember, you know, the atmosphere on our side of

14  the table.  I mean, people were for once a long time were

15  holding their heads up high, you know, I mean, smiling, and as

16  we looked over it.  And then during the discussions with -- when

17  Mr. Head and Mr. Meadows were going through it, I ended up

18  giggling.  And I remember that, because then Ken, in the process

19  of talk -- Mr. Meadows, in the process of talking to Mr. Head,

20  noticed he had stopped his conversation and looked at me and

21  started giggling, like -- and then after seeing that, I adjusted

22  myself in the chair and leaned back, like this, and I didn't

23  mean it to be insulting or whatever, but Ken did the exact same

24  thing I did, mimicked me.

25       JUDGE CARISSIMI:  You need to use words to describe what

1  you --

2      THE WITNESS:  Well, he --

3      JUDGE CARISSIMI:  Because you showed us how you sat back in

4  your chair, but you need to use words to describe that so it

5  shows up in the record.

6      Do you understand me?

7      THE WITNESS:  Yes, sir.

8      JUDGE CARISSIMI:  Yes.

9      THE WITNESS:  After Mr. Meadows giggled, in response to my

10  giggling, I leaned back in my chair and crossed my arms, and

11  then Mr. Meadows did the same thing while staring at me.

12      JUDGE CARISSIMI:  Mr. Eby, what did you find funny about

13  this?

14      THE WITNESS:  I just -- it's a point in reference that

15  sticks out, and the reason is is, you know, they're talking a

16  serious thing, Jethro and them, and, here, their lead negotiator

17  with all this experience and like -- is like mocking me or

18  something.

19      JUDGE CARISSIMI:  Oh, you said you started giggling.  I

20  don't want to repeat your testimony, but is it true that you

21  started to giggle?

22      THE WITNESS:  Yes.

23      JUDGE CARISSIMI:  Why did you giggle?

24      THE WITNESS:  I found this -- I found humor -- as I was

25  going through it, that you can read, and most of them, it says

1  there's no cost savings.

2      JUDGE CARISSIMI:  Correct, I saw it.

3      THE WITNESS:  When one, you know -- I don't buy the -- that

4  numbers of it, okay, so I don't buy that.  But then the other

5  thing is -- which is what we will end up asking him, Mr.

6  Meadows, is, you know, if there's no cost savings to you and

7  we're viewed as a concession, why don't you give it to us.

8      JUDGE CARISSIMI:  All right, thank you.

9      You may continue. Mr. Wiese.

10 Q   BY MR. WIESE:  So looking at these 21 items, are there any

11 -- are there discussions regarding any of these items that stand

12 out to you as you review them?

13     JUDGE CARISSIMI:  Mr. Wiese, when you say "these items,"

14 we're talking about --

15     MR. WIESE:  There are the 21 items at the end of Joint

16 Exhibit 24, starting on page number --

17     JUDGE CARISSIMI:  912?

18     MR. WIESE:  -- 912.

19     JUDGE CARISSIMI:  Very good, thank you.

20     THE WITNESS:  On PF913, the item number 3 says, "No savings

21 projected related to reduction in funeral leave.

22 Q   BY MR. WIESE:  What discussion do you recall happening then

23 at the table regarding that item?

24 A   Just an exchange between Mr. Head and Mr. Meadows.  I mean,

25 when Mr. Head is asking for his response and Ken -- Mr. Meadows

1   is saying, you know, that there's no -- you know, there's no

2   projected savings.

3   Q    Do you recall -- or did Mr. Meadows provide any further

4   explanation of why the company wasn't projecting savings for

5   reducing the number of bereavement days?

6   A    Nothing more than what's in the response.

7   Q    Okay.  And after item number 3, on page 913 of Joint

8   Exhibit 24, are there any other items on this page that you

9   recall the parties' discussions about?

10  A    Well, it would have went through the process in and of

11  itself to discuss, you know, individually, but they wouldn't be

12  long discussions, just a response.  But there was a large

13  discussion on -- related to PF914, item 21, the flower account.

14  Q    Okay, before we get to there, Mr. Eby, you mentioned

15  besides item number 3 on page 913, and item number 21 on page

16  914, how long would you say the discussions were regarding the

17  other items or each item?

18  A    The exchange back and forth?

19  Q    Yes.

20  A    Just a matter of a few minutes.

21  Q    All right.

22       Let's turn then to -- directing your attention to item 21

23  on PF914, what is that item in reference to?

24  A    It's in reference to something that was in our existing

25  contract at the time, called "the flower account."

1   Q    And tell me what you recall about that exchange regarding

2   the flower account that evening?

3   A    That I explained it in depth, what it did, includes -- you

4   know, I gave a definition of what it was, and that was where

5   either money from the pop cans, you know, employees drank, goes

6   into it, but then also no punches, that employees, if they

7   forget to punch in or out, there's a half hour docked.  This was

8   something that was negotiated before I, you know, got there.

9   But what happened with that is it went into an -- well, it was

10  called "the flower account," that the company financially

11  handled, but that the Union then used on behalf of its members.

12  Like, specifically, flowers account, so death in the family, the

13  Union would send flowers -- call up and order and send flowers

14  to the funeral; and then the bill would get sent and the company

15  paid the flower account -- do anything from -- we did a joint --

16  yearly joint United Way drive, the company and the Union.  And

17  so then what we'd do is like, the Union would say "$500.00 were

18  the prizes, you know, for participants out of there, and then

19  the company would match for company participants.  And same

20  thing, when we had members that were flooded in 2008, and I

21  think we even did I with company, you know, we contributed.

22  Q    How much of that testimony occurred or reflects what you

23  said at the bargaining table on July 28th?

24  A    Well, all that and more.

25  Q    Okay.  And what response, if any, did you get from the

1    company regarding the flower fund after you said that?

2    A    That it wasn't needed, that Mr. Meadows said that the

3    company will pay for flowers; you know, we'll just send flowers.

4    All you have to do is tell us.  And I told Mr. Meadows that that

5    wasn't really the point.  The point was that this was members

6    doing things on behalf of members.

7    Q    And after you explained this to Mr. Meadows, how did he

8    respond?

9    A    Essentially, he wasn't interested.

10   Q    What happened after he said he that he was not interested?

11   A    An argument.

12   Q    Between who?

13   A    It began mainly with the -- jointly between -- with Mr.

14   Meadows and Ken -- or Mr. Meadows and Jethro Head.

15   Q    And what do you recall from that argument?

16   A    The actual argument --

17   Q    Yes.

18   A    -- itself?  After Ken had said he wasn't -- Mr. Meadows

19   said  he wasn't interested in it, Mr. Head had pointed out that

20   he was disappointed that Chris had gone through this effort, you

21   know, where we've tried to have discussions before and we

22   couldn't get it.  We actually had a real discussion.  Jethro

23   used the words, "Chris elegantly explained it and you just

24   rejected it."  And Mr. Meadows said, "Why is it that if I tell

25   you 'no,' I'm the bad guy?"  And Jethro tried to say something,

1    and it kind of got intermeshed a little bit.  And then what it

2    basically broke down to is Jethro called -- Mr. Head called Mr.

3    Meadows an idiot; Mr. Meadows called himself an idiot.  Jethro

4    Head called Mr. Meadows a fucking idiot; Mr. Meadows called

5    himself a fucking idiot.  And they were getting out to leave the

6    room, and Mr. Meadows said, "I don't know why you're yelling at

7    me, I'm the one giving you stuff."  And the conversation, "No,

8    you're not give" -- from Jethro and from myself basically saying

9    the same thing, "You're not giving us things, you're just giving

10   us what you took from us."  And then, again, there was another

11   exchange about fucking idiot, and Mr. Meadows was standing

12   halfway out in the hall with the door open at the hotel, and

13   said, "I'm a fucking idiot," I mean, referring to himself, and

14   that was the end.

15   Q    So let's turn to the next day of negotiations, then, Mr.

16   Eby.  How do you recall negotiations beginning that day?  Or how

17   did negotiations begin that day?

18   A    I believe the company gave us a new proposal.

19   Q    Directing the witness' attention to General -- or, excuse

20   me, Joint Exhibit 4.

21   (Witness proffered the document.)

22        THE WITNESS:  Your Honor, may I revise my last statement?

23        JUDGE CARISSIMI:  You want --

24        THE WITNESS:  About how it started.

25        JUDGE CARISSIMI:  You want to clarify something you've

1  testified about?

2      THE WITNESS:  Yes, he --

3      JUDGE CARISSIMI:  Go ahead.

4      THE WITNESS:  When asked how it started, because I just

5  referred to my notes and it was about the proposal, but there

6  was actually -- earlier in the morning, Mr. Meadows came and

7  apologized about the flower fund.

8      JUDGE CARISSIMI:  Well, I think that's the day that --

9  you're going to ask the witness about July 29?

10      MR. WIESE:  Right.  We were just starting about it.

11      JUDGE CARISSIMI:  So we haven't gotten to that meeting yet.

12      THE WITNESS:  I thought he asked how it started.

13      MR. WIESE:  Yes, you're right, Your Honor.

14      JUDGE CARISSIMI:  Okay.

15      MR. WIESE:  I mean, the record will be clear.

16  Q  BY MR. WIESE:  But just to clarify the record, Mr. Eby --

17  so this apology -- when do you recall this happening?

18  A  Right away in the morning on the 29th.

19  Q  Okay.

20      And let's turn your attention, again, to Joint Exhibit 4.

21  Looking through these proposals, were the changes between this

22  proposal and the previous proposal marked in Joint Exhibit 4?

23  A  Not all of them.

24  Q  All right.  Are there any that you can point out that were

25  not marked in that document?

1   A     Yes.  On page 3.

2   Q     What specifically?

3   A     Over the -- Mr. Meadows' contract' recognition clause.

4   Before it had the word "define" -- that's all -- well, "define"

5   is gone and it's filled in.

6   Q     Okay, I'd like to direct your attention to a couple --

7   actually, before we move on from the recognition clause, was the

8   recognition clause a big issue for the Union in this contract?

9   A     Yes.

10  Q     Why is that?

11  A     Because it defines the Union body, who we represent.

12  Q     Okay.  Moving on from that, let's take a look at page 20 of

13  Joint Exhibit 4, Bates number 2095.  Looking at Section 6, what

14  is that section about?

15  A     Jury duty.

16  Q     What did the Red Book have to say about jury duty?

17  A     Well, it clarified jury leave on it; also, but, you know,

18  it used the words, "jury" or "grand jury."

19  Q     Do you recall this change to the jury duty proposal in the

20  Employee's July 29th proposal -- what, if any, discussion do you

21  recall regarding this topic at negotiations on July 29th?

22  A     Jury duty?

23  Q     Yes.

24  A     There was some ask for clarification; the Union did.  One

25  of the things, and it was myself talking, but -- was pointing

1  out to Mr. Meadows that, you know, his contract says, "jury

2  duty," and our says "jury duty or grand jury," you know,

3  pointing the difference and asking, you know, what is meant or

4  why it's left off.

5  Q    And what was his response?

6  A    He told me that they are the same thing, including -- so

7  jury duty, grand jury and then also like getting called for a --

8  as a witness.

9  Q    And what, if any, response did you have to that?

10 A    I don't think I had a specific response to this one.

11 Q    Okay.

12      All right, I'd like to direct your attention to Article 13,

13 Section 8.  It's on page 23 of the document.

14      Are you there, Mr. Eby?

15 A    Yes.

16 Q    Okay.  The red portion of this Section 8 -- what is this

17 proposal?  What does that proposal mean?

18 A    My understanding of it is that it is -- you have full weeks

19 of vacation, and then the ability to use weeks as single days;

20 and so what that section is referring to is banking or setting

21 aside those weeks to be used as single days.

22 Q    How did that proposal differ from what had been in the Red

23 Book?

24 A    It's a significant concession.  It -- the Red Book didn't

25 have a limitation on single days.  You could use -- if you had 6

1   weeks' vacation, you could use 42 days, single days, and, also,

2   there wasn't -- if you decided to use single days, you didn't

3   get penalized.  As in here, a week is 7 days if you take it; but

4   if you take a week as individual days, they give you 5 days off

5   to use individually, as opposed to 7.

6   Q    What, if any discussion do you recall at the bargaining

7   table on July 29th regarding the Employer's changes to the

8   banking or to Article 13, Section 8, the single day vacation?

9   A    Well, I brought up that that was a major concession, and

10   that Mr. Meadows responded that single days are an

11   administrative nightmare.  And I had pointed out to Mr. Meadows

12   that I had been there -- well, at that time, 24 years, and

13   that's how we've always done it and never had a problem, to

14   which he just responded, "Don't want it."

15   Q    Did Mr. Meadows provide any elaboration on why he didn't

16   want it, after he said that?

17   A    Nothing further that I recall.

18   Q    Okay.

19       MR. WIESE:  Your Honor, could we go off the record for just

20   a minute so I can find the next one?

21       JUDGE CARISSIMI:  Off the record.

22   (Off the record.)

23       JUDGE CARISSIMI:  Back on the record.

24       Mr. Wiese, you may continue.

25       MR. WIESE:  Okay.

1  Q    BY MR. WIESE:  Directing your attention to page 17 of Joint

2  Exhibit 4, Bates number 2092.

3  A    What page?

4  Q    Page 17.  It's the section in red beneath "holidays."

5  A    Yes.

6  Q    Do you recall having the discussion regarding this change

7  on July 29th?

8  A    Yes, we had a discussion.  Again, it was a discussion for

9  some clarification initiated by me.  And that was the fact that

10 I explained to Mr. Meadows that in our Red Book, the -- as far

11 as -- because even in his proposal, it has, you know, you've got

12 to work -- well, his proposal, I'm sorry -- Mr. Meadows'

13 proposal -- has you have to work the day before, the scheduled

14 day before and the scheduled day after of a holiday, you know,

15 on your day off in order to get paid.  And so what I did was ask

16 for some clarification.  I explained exactly how ours worked,

17 which was that what constitutes the word "working" or the

18 meaning of "working" for your day before or your day after.  And

19 I brought up, you know, sickness, vacation, those type of items,

20 okay.  And I explained to him -- you know, they defined them,

21 and actually they were negotiated.  The vacation one wasn't

22 there my entire time, that came after.  And Mr. Meadows

23 explained to me that, "oh, yah, it's exactly the same, it ain't

24 any different."

25 Q    And did you have a response to that?

1   A    Yes.  I asked him, "If if isn't any different, why don't

2   you accept our existing contract language, and we actually

3   finally have a tentative agreement and we can move on."

4   Q    And what, if any, response did Mr. Meadows had on this?

5   A    He wasn't accepting any of our language.

6   Q    With regard to this July 29th proposal, are there any other

7   items that you recall being discussed in negotiations that day?

8   A    Well, I'm sure some were in brevity, but nothing major

9   negotiated.  I do remember bringing -- pointing out myself that

10  our prior contract had a same sex affidavit, which would allow

11  the same sex partner to have all the benefits and that was

12  something that was negotiated.  And Mr. Meadows' response to me

13  was that it wasn't needed, and "we just accept people at their

14  word."

15  Q    After this proposal was presented at the bargaining table,

16  what did the parties do next?

17  A    We took a caucus.

18  Q    And what happened after that caucus?

19  A    The Union gave the company our compiled list of concessions

20  or our concession sheet that we had made.

21  Q    Directing your attention to General Counsel Exhibit 21.

22         JUDGE CARISSIMI:  I have mine available, Mr. Wiese, if

23  you'd like to give that to the witness.

24         MR. WIESE:  Okay.

25         Can I borrow yours?

1     JUDGE CARISSIMI:  Certainly.

2     MR. WIESE:  Thank you.

3  (Witness proffered the document.)

4     JUDGE CARISSIMI:  Mr. Eby now has a copy of GC 21.  And he

5  has located the one he had previously.

6  Q     BY MR. WIESE:  Was this the concessions list that the Union

7  presented to the Employer at negotiations on July 29th?

8  A     yes.

9  Q     Why had the Union not given this concessions list to the

10  Union previously?

11  A     Why did the Union didn't give it to the Union?

12  Q     Sorry, Mr. Eby.  Why had the Union not given this to the

13  company previous to negotiations on July 29th?

14  A     Well, at the time that we discussed on July 27th, we didn't

15  feel the need to.  I mean, if the company would have did an

16  actually comprehensive review or -- they should know what they

17  have taken out.

18  Q     And so why did the Union then decide to present the

19  concession list on July 29th?

20  A     Just another approach to see if we could actually begin

21  some true negotiations, something besides, "My contract" -- "Not

22  interested."  We thought that by actually just giving the

23  document, maybe he could see it.

24  Q     Okay.  What do you recall the Union doing with this

25  concession list at negotiations on July 29th?

1  A    Well, we gave it to the company or Mr. Head handed it out,

2  but -- and then we explained how it was put together.

3  Q    And who did that?

4  A    I believe Jethro Head.

5  Q    And after Mr. Head explained how the Union -- or how the

6  list had been put together, what did the parties -- or what did

7  you do next with the list?

8  A    I believe that there was a -- they went through it.

9  Q    And as Mr. Head went through this list, what do you recall

10  those exchanges being like between the parties?

11  A    Well, I wouldn't say they --

12      JUDGE CARISSIMI:  Before you answer, are you -- I'm not --

13  that question has a tendency to elicit subjective reactions.

14      MR. WIESE:  Okay.

15      JUDGE CARISSIMI:  I want something that brings forth

16  objective evidence, counsel.

17      MR. WIESE:  Okay.

18  Q    BY MR. WIESE:  As the Union was going through this list,

19  how long was the typical -- how long do you recall it taking to

20  go through this --

21      MR. WIESE:  Strike that, Your Honor.

22  Q    BY MR. WIESE:  So for the bullet items on here that were --

23  or did the parties discuss every bullet item on this list as you

24  recall at negotiations on July 29th?

25  A    I can't recall that we discussed every one of them.

1  Q    For the bullet items that were discussed, how long were

2  those typical discussions?

3  A    Well, some were short, but, if I recall, this is like the

4  real first time that there was.  There wasn't like negotiation,

5  there was no proposals exchanged or anything else, but there was

6  some actual discussions and some conversations.  I mean, you

7  know -- and then even, you know, even some of the things that we

8  perceived, you know, as a concession, you know; because I'll use

9  an example, on page 3, at the very top item, it says "eliminate

10  paid lunches and breaks," all right; well, the Red Book

11  specifically spelled out that they were paid.  And, of course,

12  this section is concessions by omission, and so Ken explained

13  that, "No everybody got paid lunches."  And this is the problem

14  with not dealing with a mature contract and a starting anew,

15  because unless you actually discuss the article with open

16  attention and real communication about what the problem is and

17  what the issue is, and you put it in language, it has no

18  meaning.  And that's a prime example of that.

19  Q    Are there any other particular items on this bullet list,

20  and you can take the time to go through it if you need to, that

21  you recall having discussions about?  Or let me rephrase -- that

22  you recall having particular discussions about?

23  A    Well, you know, as the notes reflect, we had discussions on

24  several, but I would point out that there was a discussion

25  because one of our concessions was that -- as the removal of

1  discipline.

2  Q    okay.

3  A    Progressive discipline.  And so there was a discussion on

4  that.  And that, basically, first, Ken's response was, "Are you

5  sure you guys want progressive discipline?  I was just going to

6  leave it open; that way you're not locked into something."

7  Q    And what was the Union's response, if any?

8  A    That we wanted our proposal, that "wide open" is leaving it

9  open to the company.

10 Q    Okay.

11 A    And so he said something about he would get something

12 together.

13 Q    Okay.

14       Any other items that you recall particular discussions on?

15 (Pause.)

16       JUDGE CARISSIMI:  Mr. Wiese, if there's something on that

17 list that you want to direct the witness' attention to, I don't

18 consider that leading just to direct his attention to an issue.

19       MR. WIESE:  Okay, all right.

20 Q    BY MR. WIESE:  Directing your attention to --

21       JUDGE CARISSIMI:  And if there's not, there's not, but, I

22 mean, rather than having -- you know, that's a really open-ended

23 question and we're not -- we're having a long pause, so if

24 there's something you have in mind, you can get to it.

25       MR. WIESE:  Okay.

1 Q  BY MR. WIESE: Looking at page 2 of General Counsel Exhibit

2 21, the eighth bullet down, starting with limits on Union's

3 Officers off.

4 A  Oh, yes.

5 Q  Do you recall having any particular discussion over that

6 provision on July 29th?

7 A  Yes.

8 Q  What do you recall about that?

9 A  That was one of them that the Union highlighted in the

10 concessions; actually, there's multiple with it. We told Mr.

11 Meadows that, you know -- well, and he wanted us to point it out

12 to him, but these concessions -- I mean, they directly affect

13 the functioning of the Union, and that includes increased notice

14 of telling them the notified to be off for union business.

15 There's restrictions -- see, our constitution, the Union

16 Constitution, is --

17   JUDGE CARISSIMI: No, let's just -- we're just restricting

18 it to discussions at the meeting, unless you talked about the

19 Union Constitution at the meeting.

20   THE WITNESS: Okay.

21   JUDGE CARISSIMI: Okay, that's what the question was. What

22 was discussed at the meeting.

23   THE WITNESS: All right.

24   The fact that there was also that the -- there was a

25 limitation on how many people could be off for union business in

1  the same classification, and that would restrict us if, you

2  know, we had two elected officers from the same classification.

3      Then we also brought up it pretty much outlines and

4  restricts exactly what you've put on the Union bulletin board.

5  Q     BY MR. WIESE:  And what response, if any, do you recall the

6  company having to the Union's issues with this item?

7  A     Mr. Meadows' response was that he thought the company had a

8  right to control propaganda going up on the bulletin boards.

9  Q     As the parties went through this list of concessions, how

10 did these discussions differ from what had happened previously

11 at the bargaining table?

12 A     Like I was saying before, that these were actual kind of

13 discussions, they weren't just cut off, "not interested," so it

14 was discussions.  It wasn't negotiations, but it was something.

15 Q     As the parties went through this concessions list, did they

16 reach any tentative agreements?

17 A     No, the parties, as we went through it, never, you know,

18 got to the point where we were discussing language or, you know,

19 that type of thing.

20 Q     And what do you recall happening after the Union finished

21 explaining or going through concessions list?

22 A     Mr. Head reiterated the issue with the union security or

23 recognition clause.

24 Q     After Mr. Head said this, what did the parties do?

25 A     I believe we were done.

1      JUDGE CARISSIMI:  Let's go off the record for a minute.

2  (Whereupon, a brief discussion was held between the parties off

3  the record.)

4      JUDGE CARISSIMI:  Let's go back on the record.

5      It's 6:28.  Mr. Wiese indicated he had no further questions

6  about that particular negotiating meeting.  So it seems like

7  consistent with our agreement, we are going to adjourn for the

8  day, and the hearing will resume tomorrow at 9 a.m.

9      Let's go off the record.

10  (Whereupon, at 6:30 p.m., the trial adjourned for the evening,

11  to resume tomorrow, April 20, 2016, at 9:00 a.m. in the same

12  place.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>C E R T I F I C A T E</u>

2          This is to certify that the attached proceedings before the

3    National Labor Relations Board, Region 18, Case 18-CA-160654 and

4    18-CA-170682, Ingredion, Inc, d/b/a Penford Products Co. and

5    BCTGM Local 100G, affiliated with Bakery, Confectionary, Tobacco

6    Workers, and Grain Millers International Union, AFL-CIO, in

7    Cedar Rapids, Iowa on April 19, 2016, was held according to the

8    record, and that this is the original, complete and true and

9    accurate transcript that has been compared to the recording, at

10   the hearing; and that the exhibits are complete and no exhibits

11   received in evidence or in the rejected exhibit files are

12   missing.

13

14                    *Christopher Walls*

15                    Christopher Walls

16                    Official Reporter

17

18

19

20

21

22

23

24

25

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

            Respondent,

and                             Case No. 18-CA-160654
                                        18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLRS INTERNATIONAL UNION,
AFL-CIO,

            Charging Party.

Pages:  469 through 676 (Volume 3 of 4)

Date:  April 20, 2016

Place:  Cedar Rapids, Iowa

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

           Respondent,

and                             Case No. 18-CA-160654
                                      18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLERS INTERNATIONAL UNION,
AFL-CIO,

           Charging Party.

The above entitled matter resumed trial pursuant to

adjournment, before The Honorable Mark Carissimi, Administrative

Law Judge, in Room 008, Board of Supervisors Formal Board Room

of the Jean Oxley Linn County Public Service Center, 935 Second

Street SW, Cedar Rapids, Iowa, on Wednesday, April 20, 2016, at

9:14 a.m.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1 <u>**A P P E A R A N C E S**</u>

2 <u>**On behalf of the NLRB, Counsel for the General Counsel:**</u>

3 TYLER J. WIESE, ESQ.

4 CHINYERE C. OHAERI, ESQ.

5 National Labor Relations Board, Region 18

6 212 Third Avenue South, Suite 200

7 Minneapolis, Minnesota 55401

8 Tyler Wiese: (612)348-1784 /Chinyere Ohaeri: (612)348-1766

9 Tyler.Wiese@nlrb.gov / Chinyere.Ohaeri@nlrb.gov

10 <u>**On behalf of the Charging Party:**</u>

11 SETH MARLING,

12 BCTGM Local 100G

13 5000 J Street SW

14 Cedar Rapids, Iowa 52404

15

16 <u>**On behalf of the Respondent:**</u>

17 STUART R. BUTTRICK, ESQ.

18 RYAN J. FUNK, ESQ.

19 Faegre Baker Daniels

20 300 N. Meridian Street, Suite 2700

21 Indianapolis, Indiana 46204

22 Stuart Buttrick: (317)237-1038

23 Ryan Funk: (317)237-1131

24 stuart.buttrick@FaegreBD.com/ryan.funk@FaegreBD.com

25

1                          **I N D E X**

2  **WITNESSES**           **DIRECT**  **CROSS**   **REDIRECT** **RECROSS** **VOIR DIRE**

3  Christopher Eby           473      553         580        585        584

4  (Resumed)                                      586        587

5  Todd Railsback            589      605         609

6  Richard Heath             611      629         639        642

7  Adam Beitz                643      652         655

8  Brandon Morris            656      665

9  Jeff Kuddes               668

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

```
 1                    E X H I B I T S

 2   EXHIBIT                   IDENTIFIED              IN EVIDENCE

 3   General Counsel's

 4     5(f)                      535                      537

 5    34 (Offer withdrawn – pg 511)   506

 6    37                                                  534

 7    39                         539                      542

 8    54                         526                      527

 9    77                         527                      629

10    78                         660

11    79                         624                      626

12    80                         611                      612

13    82                         616                      617

14    83                         622                      623

15    84                         623                      624

16    85                         617                      618

17    86                         618                      622

18    87                         583                      585

19   Respondent's

20    104                        565

21

22

23

24

25
```

Veritext National Court Reporting Company
1250 Eye Street NW – Suite 350
Washington, DC 20005
(888)777-6690

1                    P R O C E E D I N G S

2                                        9:14 a.m.

3        JUDGE CARISSIMI:  On the record.

4        This is a continuation of the Ingredion hearing.

5        We are in the direct examination of Mr. Eby, and Mr. Wiese,

6    you may continue your direct examination.

7        MR. WIESE:  Thank you, Your Honor.

8                    DIRECT EXAMINATION RESUMED

9    Q    BY MR. WIESE:  Mr. Eby, picking up with the July 30th

10   negotiations, how do you recall negotiations beginning that day?

11   A    It began with Union's verbal request for company's

12   attendance policy and work rules.

13   Q    Why was the Union requested these documents at this time?

14   A    Because Ken's contract makes references to attendance

15   policy and work rules, but they are -- it is not actually in the

16   contract.

17   Q    Do you recall discussing this issues at negotiations on

18   July 30th?

19   A    Yes.

20   Q    And what do you recall about those discussions?

21   A    In reference to the attendance policy, Mr. Meadows said

22   that he had no intention to change the existing attendance

23   policy, that wasn't his intent.  So it would be the same as

24   before.

25   Q    Did the Union eventually receive a copy of that attendance

1  policy?

2  A    Yes.

3  Q    I am going to direct your attention to General Counsel

4  Exhibit 28.

5  (Witness proffered document.)

6       THE WITNESS:  Your Honor?

7       JUDGE CARISSIMI:  Yes?

8       THE WITNESS:  He never asked me if I did talk to anybody.

9       JUDGE CARISSIMI:  No, that's --

10      THE WITNESS:  No problem?

11      JUDGE CARISSIMI:  That is not a problem.

12  Q    BY MR. WIESE:  Mr. Eby, do you recognize General Counsel

13  Exhibit 28?

14  A    Yes, I do.

15  Q    And what is it?

16  A    It is the company's attendance policy, given to the Union

17  on July 31st.

18  Q    Was it provided at negotiations that day?

19  A    Yes.

20  Q    How does this attendance policy compare to what was in the

21  parties' existing contract?

22  A    Compared to the one that was in the existing contract, this

23  is Draconian.

24  Q    Well, how so?

25  A    This one, they introduced a -- if you look at the fourth

1  bullet point -- they introduced a point system.  And, basically,

2  the point system is at seven points you are terminated.  Our

3  existing attendance policy, at the time, separated unexcused

4  absences from tardies, so they were their own, individual

5  systems.  And it would take nine of one, in its own system, in a

6  year, in order to be terminated.  The other difference is, on

7  the second page, the -- I mean, it is all different, but the

8  major difference is the third bullet point.  It says that doctor

9  slips won't be accepted unless they are qualified for FMLA or

10  S&A.  That is a major shift, as it used to be excused absences,

11  as long as you went to a doctor.

12  Q    Was the existing attendance policy, in the contract at the

13  time, was that -- was that in the collective bargaining

14  agreement?

15  A    Yes.

16  Q    What was your understanding of what it would take to change

17  that attendance policy -- the one that was in the contract?

18  A    To change it?  I guess I don't understand your question.

19  Q    Okay, we can -- we will move on.  So turning back to the

20  negotiations on July 30th, what do you recall occurring after

21  the verbal information request?

22  A    Two items.  The Union presented the company with a request

23  for information.  And then the Union gave an answer to a prior

24  question that the -- the company had wanted, from like the day

25  before.

1   Q    What was that question?

2   A    I don't recall at this moment.

3   Q    Okay.  I am going to direct your attention to Joint Exhibit

4   5.

5   (Witness proffered document.)

6   Q    Do you recognize this document, Mr. Eby?

7   A    Yes.

8   Q    What is it?

9   A    This is the company's proposed contract given to us on

10  7/30, later in the day.

11  Q    Okay, so looking at this proposal, were the changes

12  highlighted in it?

13  A    At least some of them were.

14  Q    And when the Employer presented this contract to the Union

15  at negotiations on July 30th, do you recall the Employer saying

16  anything as they did that?

17  A    Yes.  I recall the Employer pointing out some of the

18  changes, and specifically that the discipline procedure was

19  inserted there I gave you -- Mr. Meadows said, "There, I gave

20  you progressive discipline."

21  Q    Looking at page 9 of Joint Exhibit 5 -- are you there?

22  A    Yes.

23  Q    Okay.  Is it your understanding that this is the discipline

24  procedure that Mr. Meadows was talking about?

25  A    Yes.

1  Q    What other things do you remember the Employer saying when

2  they presented this July 30th proposal?

3  A    I would have to -- I mean, I don't have it, like, recorded

4  in my notes, I would have to look to see the changes.  I mean,

5  you know, that there were changes pointed out.

6  Q    Okay.  After the Employer presented this July 30th contract

7  offer, what do you recall -- what else do you recall discussing

8  that day?

9  A    Well, that day, like I said, we discussed our Union's

10  information request.  The company gave a proposal.  We did

11  discuss some language on the intent of the word, you know, the

12  Union -- in their proposal, the Union "indemnifying" the company

13  for anything related to the financial, like the dues and

14  transmissions, things like that.  And then the company gave the

15  Union the medical rates comparison for their health insurance

16  plan versus our existing plan.

17  Q    Was there any discussion, about the health insurance

18  information, at negotiations on July 30th?

19  A    Yes.

20  Q    What do you recall about that discussion?

21  A    I pointed out to Mr. Meadows, after looking at it, that the

22  existing health insurance for family was actually -- the premium

23  was actually cheaper for ours than theirs, and ours was

24  significantly better insurance.

25  Q    What response, if any, do you recall the company having

1    when you made that statement?

2    A    I don't recall any response.

3    Q    Let's turn, then, to the next day of negotiations, on July

4    31st.  So at the start of negotiations that day, had the parties

5    reached any tentative agreements?

6    A    No.

7    Q    And what were the Union's concerns coming into negotiations

8    on July 31st?

9    A    The contract was set to expire at 7 a.m. on August 1st, and

10   we had those 43 members, who were eligible to retire, that had

11   the medical retiree insurance, and we needed to kind of give

12   them guidance and heads-up as to -- so they could make the best

13   decision they could make.

14   Q    When did you need to let the retirees have that information

15   by?

16   A    We -- the company had given, essentially, a deadline to

17   these employees, of 5 p.m. on Friday, so the office lady could

18   go home for the weekend.

19   Q    How do you recall negotiations beginning on July 31st?

20   A    The -- I believe both parties met briefly, in the morning,

21   although there really was no substantive discussion.  And then

22   there was a caucus, and after the caucus, Mr. Meadows and an

23   attorney came into the room to discuss some gap insurance

24   clarification.

25   Q    Do you recall whom that individual was who came in with Mr.

1    Meadows that morning?

2    A    His name is Mike, and I believe it is Robilotto now, but, I

3    mean, he said it so fast -- because I remember Jethro Head

4    asking Ken -- well, no, that was after the meeting -- but didn't

5    know how to spell it.  But I believe it is Robilotto.

6    Q    Had you seen Mr. Robilotto before July 31st?

7    A    Yes.

8    Q    Where?

9    A    Pretty much at all bargaining dates at the location,

10   because the individual -- Mr. Robilotto smoked cigarettes, so I

11   would see him outside every day.  And then, while we were -- all

12   the way up through August 1st, the negotiations at the Homewood

13   Suites, the company's breakout room was directly across from our

14   conference room, so I would see him enter in there.

15   Q    What, if anything, do you recall from that discussion when

16   Mr. Robilotto and Ken Meadows were in the room?

17   A    Well, at first, it was a little huffy, and the reason for

18   that is I think there was a misunderstanding, because the

19   arbitrator -- or, I am sorry -- the mediator initiated it, but I

20   believe it must have been presented, like, both sides had

21   something to present.  So it was like, "What are we here for?"

22   Q    Is there anything else -- or what do you recall happening

23   after that?

24   A    Yes, there was -- well, Mr. Meadows introduced Mr.

25   Robilotto, said that he was the attorney working on

1    restructuring organizing in the plant, but was a prior labor

2    attorney.  And we discussed some clarification on the gap

3    insurance, as far as that, basically, what the company was

4    talking about was that everything -- well, the gap insurance

5    would be the same health insurance through December 31st, at the

6    $51, and then after, on January 1st, it would be their health

7    insurance.  But, at this point, it wasn't with the supplement,

8    the Medicare supplement at 65.

9    Q    Okay, are there anything else you recall from those

10   discussions, when Mr. Robilotto and Mr. Meadows were speaking

11   with the Union?

12   A    I don't recall anything related to the gap insurance.  It

13   was those -- it was either with Mr. Robilotto in the room, or

14   that brief meeting before with the group, but Jethro Head had

15   reiterated that August 1st was not a drop-dead date.

16   Q    Um-hmm.

17   A    And Mr. Meadows said it was a drop-dead date for him.

18   Q    What did the parties do after the discussion with Mr.

19   Robilotto and Ken Meadows that morning?

20   A    Well, we had a caucus.

21   Q    Directing your attention to Joint Exhibit 6.

22   (Witness proffered document.)

23   Q    Do you recognize this document, Mr. Eby?

24   A    Yes.

25   Q    What is it?

1  A    It is another contract Mr. Meadows presented on 7/31.

2  Q    What, if anything -- and when did the Employer present this

3  proposal?

4  A    Approximately, I believe, mid-day.

5  Q    Okay.  Could you tell what the changes were in this offer?

6  A    No, it was very difficult, because while there are changes,

7  and he put them in redline, it appears that a lot of the redline

8  from the prior one was still -- was still in red.

9  Q    What, if anything, do you recall the company saying when

10  this proposal was presented?

11  A    I recall Mr. Meadows pointing out some of -- what the

12  changes were.

13  Q    What changes do you recall Mr. Meadows highlighting?

14  A    I would have to go through the document in order to do it,

15  because I didn't record it.

16  Q    Okay.  Directing your attention to Joint Exhibit 12.

17  (Witness proffered document.)

18  Q    Do you recognize this document, Mr. Eby?

19  A    Yes, I do.

20  Q    Okay, what is it?

21  A    It is the Union's July 31st pension proposal, given to the

22  company.

23  Q    What did the parties do after the Union presented this

24  proposal?

25  A    Took a caucus.

1  Q    All right.  And after that caucus, what do you recall

2  happening?

3  A    Well, when we re-met, the company essentially did a

4  document dump.

5  Q    How much material do you recall the Employer providing when

6  they gave that information?

7  A    It was extensive.  If I -- I mean, I didn't have a tape

8  measure or anything, but, you know, if you put it together it

9  might have been a foot and a half.

10 Q    What information was being provided at that time?

11 A    Well, an excessive amount, it would go back to outstanding

12 information requests from May and June.

13 Q    What, if anything, did the Employer say when they provided

14 this information?

15 A    They just pointed out that they have provided it, along

16 with some of the other documents that they provided.

17 Q    And approximately what time of day, on July 31st, do you

18 recall this information being provided?

19 A    Mid-day, you know, pretty close to -- I think it was right

20 after lunch, if I am not mistaken.

21 Q    How did receiving the information at this time affect the

22 Union's ability to bargain?

23 A    Significantly, because this is the first time we were given

24 material we had requested for months.

25 Q    What response, if any, did the Union have when the Employer

1  provided this information?

2  A    I don't know if there was a specific response, maybe,

3  "Thanks."

4  Q    What do you recall the parties discussing next?

5  A    That Jethro had said, "Given where we are in the process,

6  and given we're running up against a deadline, that if Ken --

7  Mr. Meadows wanted to put something together, we would present

8  it to our members."  And this is in relation to, at that time,

9  right before that Ken asked, or telling him, "Well, I have my

10  contract on the table, you haven't responded to it.  I assume

11  you like it, otherwise tell me what you want."  And then, so Mr.

12  or -- I am sorry -- Mr. Head reiterated again that August 1st

13  was not a deadline for the Union, but said that -- in reply to

14  Ken's request, he said -- Mr. Head said, "Give us our pension,

15  our insurance, our bidding procedure, and your best wage

16  proposal."

17  Q    And what did the parties do after Mr. Head said that?

18  A    We took a caucus as Mr. Meadows said he would put something

19  together.

20  Q    Directing your attention to Joint Exhibit 7.

21  (Witness proffered document.)

22  Q    Mr. Eby, do you recognize this document?

23  A    Yes, I do.

24  Q    What is it?

25  A    It is the company's final offer contract that they gave us

1  approximately 3:20 in the afternoon on 7/31.

2  Q    Looking at this document, Mr. Eby, are any of the changes

3  highlighted in there?

4  A    No.

5  Q    Did the Union ever receive a version of this proposal, with

6  the changes highlighted in it?

7  A    No.

8  Q    What, if anything, do you recall happening at the

9  bargaining table when the Employer presented this proposal on

10  the afternoon of July 31st?

11  A    I believe Mr. Meadows pointed out there was just a couple

12  items that he had changed.

13  Q    Do you recall which items, in particular?

14  A    I know, specifically, I believe, he -- they put the two-

15  dollar wage increase for the mechanics.  I would have to

16  confirm, but I believe he changed from his bidding process, from

17  bidding classification and then plant, to department bidding and

18  then plant.  I believe there was -- I think, maybe one other

19  item or something.

20  Q    Okay.  And with regard to the bidding change, did that

21  change the bidding back to how it was under the current

22  contract?

23  A    That reflected one tiny portion of what our existing

24  bidding process -- how it actually had existed before Mr.

25  Meadows contract.

1  Q    Okay.  Did the final offer include a response on the

2  pension proposal -- on the Union's pension proposal?

3  A    No, just what was initially in there, or elimination.

4  Q    Do you recall having any substantive discussions about this

5  proposal at the bargaining table on July 31st?

6  A    No.

7  Q    After the Employer presented this final offer, what did the

8  parties do?

9  A    Well, there was some minor discussion about logistics as to

10  the -- you know, the Union would request so many copies of the

11  proposal, the different life insurance policies, the work rules,

12  the attendance policies, you know, so they could deal with the

13  members.  So there was discussion about that, and how, you know,

14  how to get it -- that kind of thing, that transition.

15  Q    And after those discussions, what did the Union do?

16  A    Well, then, essentially negotiations were over, I mean, we

17  broke.

18  Q    And after negotiations were over, what did the Union do?

19  A    Well, we had just over an hour to contact 43 members, and

20  tell them that, you know, what the -- consisted of the retiree

21  insurance, to tell them that the Union wasn't going to be

22  recommending this contract.  We didn't know what the membership

23  would do, and we did not know what would transpire after that.

24  So -- and by the time we got done with the last phone call, I

25  believe the individual had about 20 minutes to make a life-

1  altering decision and notify the company.

2  Q    What happened with those 40 employees?  How many of them

3  retired, do you know?

4  A    I believe 22 did, prior to the expiration of the contract.

5  Q    Did the Union take the Employer's final offer to a vote?

6  A    Yes -- I am sorry --

7  Q    Did you have something you wanted to talk about?

8  A    Well, I just wanted to say that while we were doing those

9  phone calls -- because you asked what we did afterwards -- when

10  I was looking through the contract a little bit earlier in the

11  day, Mr. Meadows did say that the supplement would still exist

12  through the end of the year.  And -- but it didn't say that in

13  the contract, so I had to call Mr. Meadows back into the room

14  and ask him about it.  And so he gave us a letter, just

15  verifying that the supplement would continue until the end of

16  the year.

17  Q    Okay.  So let's pick up, Mr. Eby, then, with that contract

18  vote.  When did that vote occur?

19  A    In the morning of August 1st.

20  Q    And where did that occur?

21  A    At the IBEW's hall on Wiley Boulevard in Cedar Rapids.

22  Q    What do you recall happening at that meeting?

23  A    After the meeting was called to order, we read through --

24  well, first of all, as everyone was signing in, we gave them a

25  bag -- a plastic bag -- and there was, you know, so it had the

1    contract proposal, the two insurance plans -- all the documents.

2    So they all got a handout, you know, a bag that was several

3    inches thick.

4    Q    Okay.  And after you handed out the contract, or the

5    proposal -- excuse me -- and those materials, what generally

6    happened during that meeting?

7    A    We -- the bargaining group read through the entire

8    contract.  I mean, there was a couple motions to, you know, cut

9    it off and go to a vote, but we told them we had to read the

10   whole thing.  And then, basically, gave our recommendation, and

11   then we voted.

12   Q    What were the results of that vote, as best you can recall?

13   A    It was 95 percent rejecting.

14   Q    And after the Union vote -- after the Union members voted

15   down the contract at that meeting, what happened next?

16   A    We took a strike authorization vote.  It was presented that

17   our intent that day was to send them back to work, but had

18   authorized the bargaining committee to call a strike, if

19   necessary.

20   Q    After the strike vote, was that the end of the meeting?

21   A    Yes.

22   Q    And after that meeting, on the morning of August 1st, did

23   you contact the Employer to tell them about the results?

24   A    Yes.

25   Q    Who did you talk with?

1    A    Mr. Meadows.

2    Q    What do you recall from that conversation with Mr. Meadows?

3    A    He said he didn't understand why it was rejected, because

4    he thought he had given a fair offer.  Then he told me that we

5    have no contract, that therefore he is not bound to honor

6    anything.  And I asked him, "So are you saying that we are at

7    impasse and you are implementing?"  And he told me, "No, but I

8    am not obligated to follow any of the terms and conditions."

9    Q    And after that exchange, what else do you recall from that

10    conversation?

11    A    We had further discussion, because Ken tried to explained,

12    well, they would have to make some alterations to the contract,

13    because they were concerned about filling all these jobs, now,

14    for these people retired.  And -- pardon my language, Your Honor

15    -- but I said, "Who the fuck's fault is that, Ken?"  And Ken

16    told me, "Now Chris, it is water under the bridge," then brought

17    up the fact that -- I brought up the fact that we had offered a

18    contract extension for three years, and that Mr. Head had told

19    him that it was ongoing, it was open.  And Mr. Meadows told me

20    he couldn't do three years, and I asked him for, well, you know,

21    to counter.  Ken --

22    Q    Did --

23    A    -- oh.

24    Q    Continue.

25    A    Well, I didn't get a response as far as, you know, an

1    acceptance of the extension offer. I did -- Mr. Meadows did

2    tell me that he was, you know, wanting to negotiate, and that we

3    could come down to the plant that day and start. And while I

4    told him that -- I did tell him that the Union wanted to

5    negotiate, too, but that we would -- Mr. Meadows and I would get

6    together here in the next few days, and schedule dates for

7    negotiations.

8    Q    Why -- or did you negotiate with Ken Meadows that day?

9    A    No.

10    Q    Why not?

11    A    I -- one, Jethro Head, after the vote, said that he would

12    call Ken on his way out, but he had another venue he had to

13    drive to. And the other thing was that we were -- after the

14    contract vote, we went out to our union hall, because I had

15    members giving depositions for NLRB charges.

16    Q    Let's turn to the next negotiations, then, on August 17th.

17    Coming into negotiations that day, what was the Union's frame of

18    mind?

19    A    Hopeful.

20    Q    Why was that?

21    A    Well, we believed that, you know, with the overwhelming,

22    you know, rejection, that the company would come to the table

23    and actually -- I mean, we would actually negotiate. And, you

24    know, and then -- I mean, that is basically why.

25    Q    Between July 31st and the negotiations on August 17th, had

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 492 of 1141

1   the company issued any public statements about negotiations?

2   A    Yes.

3   Q    And what do you recall from those statements?

4   A    It was pretty much a simple statement that they were

5   looking forward to getting back to the negotiating table, and

6   reaching a fair offer -- or a fair settlement.

7   Q    How do you recall negotiations beginning on August 17th?

8   A    I recall, for the most part, that it was Mr. Meadows went

9   through a chronological order of what had essentially transpired

10  at the previous negotiations.  And what I mean by that is, "On

11  this date we met, on this date we gave a proposal," and he just

12  went, you know, right down it.

13  Q    After Mr. Meadows went through the dates and proposals,

14  what, if anything, do you recall him saying?

15  A    Well, I recall Jethro Head having, you know, talking to

16  Ken, about Ken's way of doing it wasn't working, again, a

17  reiteration of a process.  And that Jethro had told Ken that he

18  gutted our contract, and Ken said, "I didn't gut your contract."

19  Q    When Jethro -- you mentioned a process for negotiations --

20  what was he talking about, specifically?

21  A    That -- that is a very fluid word, in the sense that it was

22  -- basically it translated as something that both sides could

23  work with, that actually would have a negotiation, going back

24  and forth, outside of, you know, "Interested," "Not interested,"

25  or I mean "Not interested," without -- you know, that is just "I

1  don't want it," you know, discussion like that.  At one point in

2  time, when we are talking --

3      JUDGE CARISSIMI:  Let's stop there.  Let me ask you a

4  question:  Is that what Mr. Head said, or is that your

5  interpretation of what he meant by "process"?

6      THE WITNESS:  I can't speak for specifically what Mr. Head

7  said that day.  I just know that he has said those things

8  throughout the negotiations, that's defining "process," but --

9      JUDGE CARISSIMI:  Okay, so those are words that he used in

10  defining what he said was "process," is that correct?

11      THE WITNESS:  During the series of negotiations, yes.

12      JUDGE CARISSIMI:  All right.  Counsel asked you about this

13  specific meeting, though.

14      THE WITNESS:  I just remember he went over it again on the

15  process -- developing a process that would work.

16      JUDGE CARISSIMI:  All right.

17      You may continue.

18  Q   BY MR. WIESE:  And so, leading up to negotiations on August

19  17th, what do you recall Mr. Head saying about the process for

20  negotiations?

21      JUDGE CARISSIMI:  Is there a particular meeting, or are you

22  asking about every meeting?

23      MR. WIESE:  Well, I want to pick up where he was at with

24  his previous answer about --

25      JUDGE CARISSIMI:  All right --

1    MR. WIESE:  -- the discussions that occurred, at that point

2    --

3    JUDGE CARISSIMI:  -- you may do that.

4    MR. WIESE:  -- about the process.

5    THE WITNESS:  There was -- I mean, there were multiple

6    discussions on it.  But at one of the times, in Jethro's

7    discussion of the process, pointed out to Ken that you give this

8    whole entire contract --

9    JUDGE CARISSIMI:  You know, I hate to keep interrupting

10   you, but it is very important for me to have some sense of

11   timing.  Now, you may not remember a date, but I need some

12   indication.  Was this early on?  Was it in the middle?  Was it

13   in July?  Anything you can do to help me understand, the

14   testimony that you are going to give, when it happened.  Because

15   if I can't determine when it happened, I can't place it in

16   chronology when I write my decision, all right?  So do your best

17   to tell me -- when you are going to tell me something Mr. Head

18   said -- the best you can do about when it was said.

19   THE WITNESS:  Yes, sir.

20   JUDGE CARISSIMI:  Okay.

21   THE WITNESS:  The -- the one I am going to speak about --

22   JUDGE CARISSIMI:  Yes.

23   THE WITNESS:  -- this minute, I remember it specifically at

24   Homewood Suites, which would be all of our negotiations prior to

25   August 1st.

1      JUDGE CARISSIMI:  Okay, thank you.

2      THE WITNESS:  And on that one, Mr. Head pointed out to

3  Meadows that the way the company was presented with their

4  contract, in entirety, that in was hard to gauge what the

5  company's priorities were.  And then Mr. Head actually asked Mr.

6  Meadows, "What are your priorities?"  And Mr. Meadows said he

7  had none.

8  Q      BY MR. WIESE:  What other discussions do you recall

9  occurring regarding the process, prior to the August 17th

10  negotiations?

11  A      Again, prior to August 1st, the Homewood Suites, it was

12  pointed out that -- it was just about an actual way to document

13  back and forth in order to have a discussion on it instead of it

14  just being put into a contract, in Ken's words.  And Mr.

15  Meadows, in reply -- I mean, it wasn't a specific, "You have to

16  do it this way," because Mr. Meadows replied that his proposals,

17  he was going to continue to address as his contract.  And Mr.

18  Head said, "Well, that's fine, you do it that way, and we will

19  do it the way that we are doing it."

20  Q      I know you said that that conversation -- can you be any

21  more specific about when that conversation occurred?

22  A      Well, I can tell you it wasn't on July 31st, I mean, so it

23  would be earlier.  And it should be -- it would be after June

24  30th.

25  Q      Okay.  All right, are there any other specific discussions

1   that you can recall, regarding the process, again, before August

2   17th?

3   A    No, just a lot of continuation of the same sort of thing.

4   Q    And directing your attention back to negotiations on August

5   17th.  Why was the Union talking about process on that date?

6   A    Because we -- I mean, we went to a contract vote, it was

7   resoundingly rejected, and it was because we were -- the parties

8   hadn't even achieved one tentative agreement.

9   Q    And do you recall, when Mr. Head brought up the process for

10  negotiations, was this before or after Mr. Meadows was talking

11  about the dates the parties had met and the proposals they had

12  exchanged?

13  A    I don't recall the exact order, because it was all within a

14  matter of approximately maybe 5 minutes or so, 10 minutes at

15  most.

16  Q    All right.  Picking up, then, with Mr. Meadows' discussion

17  about the dates and proposals.  What do you recall happening

18  after that?

19  A    Mr. Meadows said, "Give us some time and we will have

20  something for you."  And then went -- so it went to,

21  essentially, a caucus.  We were told it would be a little while.

22  Q    And during that -- during Mr. Meadows' discussion about the

23  dates and times, was that different than how he had been

24  speaking at the negotiating table at that point?

25  A    Yes.

1  Q    How so?

2  A    When -- nobody ever came in and did a chronological order,

3  you know, systematically laying out what they did before.  At

4  the very most, it might have been, "Where are we at?"

5  Q    After the Employer declared that caucus, did the parties

6  come back to the table, that evening?

7  A    No.

8  Q    Okay.  Why not?

9  A    Because after the initial request for give them some time,

10  about two hours later they come back and asked for some more

11  time.  And then about two hours later, they come back and asked

12  for more time, which, at that point in time, Mr. Head said,

13  "Well, we will just re-adjourn in the morning."

14  Q    All right.  Let's turn, then, to the next day of

15  negotiations on August 18th.  How do you recall negotiations

16  beginning on August 18th?

17  A    The company gave us an LBF.

18  Q    Directing your attention to Joint Exhibits 8 and 9.

19  (Witness proffered documents.)

20  Q    First of all, starting with Joint Exhibit 8, do you

21  recognize this document, Mr. Eby?

22  A    Yes.

23  Q    And what is it?

24  A    It is the company's last, best, final offer given to the

25  Union on 8/18.

1  Q    And are any of the changes highlighted in this document?

2  A    No.

3  Q    Prior to this offer being presented, had the parties

4  discussed taking another contract offer to a vote with

5  employees?

6  A    No.

7  Q    After the final offer?

8  A    No.

9  Q    And directing your attention to Joint Exhibit 9, do you

10 recognize this document?

11 A    Yes, I do.

12 Q    What is it?

13 A    It is the addendum that was attached to the company's LBF

14 contract.

15 Q    Was this presented -- this addendum -- presented along with

16 the last, best and final offer on August 18th?

17 A    Yes.

18 Q    What, if anything, do you recall, Mr. Meadows -- or

19 actually -- when was this offer presented at negotiations on

20 August 18th?

21 A    In the morning.

22 Q    What, if anything, do you recall the Employer saying when

23 they presented this offer?

24 A    They pointed out the addendum, and then there was a

25 discussion on the changes.

1  Q    Was the Union expecting to receive a last, best and final

2  offer on August 18th?

3  A    No, I mean, we were there, we were told, for negotiations.

4  Q    And what was the Union's response when you received the

5  last, best and final offer?

6  A    Mr. Head asked Mr. Meadows what the changes were.

7  Q    What, if any, response did Mr. Meadows have?

8  A    He would say a change, and Mr. Head would ask, "Where is

9  at?"  I mean, "Point it out."  And, "Is that it?"  And it would

10  continue like that.  There were -- with the same thing, "Is that

11  it?" "Where is at?"  And so there was five items that were --

12  that the company said were changed in the document.  And when

13  asked again if that was it, Mr. Meadows said, "Yes."

14  Q    Do you recall what those five items were?

15  A    There was a change related to the eligibility with the S&A.

16  They threw in some sort of procedure on the discipline, where at

17  the end of the year the Union and the company would meet to talk

18  about removing discipline, but it would be at the sole

19  discretion of the company.  I would have to check.

20      JUDGE CARISSIMI:  Well, don't look at anything until the

21  attorney asks you to.

22      THE WITNESS:  Okay.  Those are the two that are popping out

23  of my head.

24  Q    BY MR. WIESE:  Directing your attention to GC Exhibit 7, at

25  pages 24 and 25, if you read -- glance at those notes, and then

1   let me know when you are done?

2   (Pause.)

3        JUDGE CARISSIMI:  Ready?

4        MR. WIESE:  Okay.

5   Q    BY MR. WIESE:  Mr. Eby, do you now recall the other items

6   that were discussed?

7   A    Mr. Meadows removed the negotiating committee limit.  They

8   had four people before, and he removed that, saying, "That is

9   you guys' business, you should determine that."

10  Q    What other changes?

11  A    Changed the management -- their proposal had all along been

12  that -- to have the bargaining unit employees handle overtime,

13  and he changed that.

14  Q    Do you recall what the fifth change was?

15  A    I just had it -- oh, yeah, our recognition clause.  He put

16  our actual recognition clause in that we had been talking all

17  along, requesting -- saying we wouldn't negotiate over it.

18  Q    Jumping back a little bit in negotiations on August 18th,

19  did the parties -- or did anything happen in terms of discussion

20  before Mr. Meadows present the LBF?

21  A    No.

22  Q    Is that the first thing you recall happening at

23  negotiations that day, the last, best and final offer being

24  presented?

25  A    Yes, outside of shaking hands.

1   Q    And prior to the LBF being presented, do you recall Mr.

2   Meadows saying anything about impasse?

3   A    I don't recall that.

4   Q    What about the day before that, did impasse come up?

5   A    No.

6   Q    When Mr. Meadows was talking about the changes in the last,

7   best and final offer, did he mention any other changes than the

8   five that he discussed?

9   A    Inside the contract, no, just on the addendum.

10   Q    Okay.  And after the company the last, best and final

11   offer, what did the parties do?

12   A    I believe Mr. Head asked Mr. Meadows about vibration

13   analysis.

14   Q    And what do you recall from that discussion?

15   A    That -- well, Mr. Head asked Meadows if he knew anything

16   about vibration analysis, and the prior agreement to negotiate

17   it, and Mr. Meadows said no.  And Jethro Head had reminded -- or

18   told him that Erwin would know about it.

19   Q    What --

20       JUDGE CARISSIMI:  Erwin's last name?

21       THE WITNESS:  Oh, I am sorry, Erwin Froehlich.

22   Q    BY MR. WIESE:  Did Mr. Froehlich say anything, at the

23   table, at this point?

24   A    No.

25   Q    What did the parties do after this exchange over the

1    vibration analysis?

2    A    Took a caucus.

3    Q    Did the parties return to the bargaining table after the

4    caucus?

5    A    Yes.

6    Q    Directing your attention to Joint Exhibit 13.

7    (Witness proffered document.)

8    Q    Do you recognize this document, Mr. Eby?

9    A    Yes, I do.

10   Q    What is it?

11   A    This is the proposal after the caucus on August 18th, that

12   the Union presented the company.

13   Q    When the Union presented this proposal, what was the

14   Employer's initial response?

15   A    The --

16   Q    Do you recall?

17   A    Oh, after --

18   Q    Or what --

19   A    -- I guess I am having --

20   Q    -- let me rephrase.

21   A    -- when you say "proposed," oh, after it is read, or --

22   Q    Okay, let me rephrase the question, Mr. Eby.  What is the

23   first thing you recall happening at the bargaining table, after

24   coming back from caucus?

25   A    I don't recall.

1  Q    Okay.  What about when this proposal was presented?  What

2  do you recall, at that time, happening?

3       JUDGE CARISSIMI:  And "this proposal" is Joint 13, correct?

4       MR. WIESE:  Yes, correct, Your Honor, thank you.

5       THE WITNESS:  I mean what I recall is that, you know, Mr.

6  Head, when we give it to the company, is explaining what we were

7  doing and what we did with it, and that would be that, you know,

8  how we -- it is the existing contract's preamble, Article I, II,

9  and III, and that we were going by Article and Section, and we

10 were going to make modifications and incorporate some of the

11 items from the company's proposal, and that -- and would be

12 modifying some of our own.

13 Q    BY MR. WIESE:  And after explaining this proposal, did Mr.

14 Head start to read through the proposal?

15 A    Yes.

16 Q    As the Union was going through the offer -- through the

17 changes in the offer -- was the company responding to each

18 change?

19 A    Yes.

20 Q    And how was the company responding to these changes?

21 A    It was pretty consistent.  It was, "Not interested."  And -

22 - or "It was addressed in my proposal."

23 Q    And who from the company indicated that?

24 A    Mr. Meadows.  Jethro would ask for some clarification, "Why

25 aren't you interested in it?"

1  Q    And what was the response to that?

2  A    "Mr. Meadows, we don't want it, don't want any of your

3  existing language."

4  Q    Did he give -- do you recall him giving -- when I say

5  "him," do you recall Mr. Meadows giving any more substantive

6  responses to any of the Union's changes in this offer?

7  A    No, I don't recall anything substantive.

8  Q    What did the parties do after the discussion of this

9  proposal, Joint Exhibit 13?

10 A    Took a caucus.

11 Q    Did the parties return to the table after that caucus?

12 A    Yes, we did.

13 Q    I am going to direct the witness's attention to Joint

14 Exhibit 14.

15 (Witness proffered document.)

16 Q    Mr. Eby, do you recognize this document?

17 A    Yes.

18 Q    What is it?

19 A    It is the Union's next proposal, given to the company on

20 8/18.

21 Q    Do you recall when this document was presented to the

22 Employer that day?

23 A    Well, it would have been after the other presentation, and

24 I would guess it was near 4 or 5, maybe.

25 Q    What did this proposal address?

1    A    This one specifically addresses a lot of the economic

2    terms, mainly like wages and that type of thing, pay.

3    Q    And in crafting this offer, what was the Union's intent?

4    A    To again do the same thing, you know, attempt to make

5    movement and incorporate some of the company's things, you know,

6    but also have benefits for our members.

7    Q    What do you recall happening, at the bargaining table, when

8    the Union presented this offer?

9    A    Well, again, Mr. Meadows explained what, you know, what we

10   did -- or, I am sorry, Mr. Head explained what we did.  And then

11   was going to go through it, and Mr. Meadows cut it off and says

12   he wasn't going to listen to any of it.

13   Q    Do you recall -- what do you recall Mr. Meadows doing with

14   the proposal before he said that?

15   A    I don't recall him doing anything specific with it.  I

16   don't think -- I don't know that he reviewed it.

17   Q    Did you see him open up the proposal?

18   A    I didn't, no.

19   Q    After Mr. Meadows said this, what did the Union do in

20   response?

21   A    Well, we took another caucus.

22   Q    But prior to the caucus, did Mr. Head talk about this offer

23   at all?

24   A    Well, he attempted to, but was cut off,

25   Q    What do you recall happening when -- when you say he was

1   "cut off," tell me what are you talking about, what do you

2   recall happening at that time?

3   A    That Mr. Meadows wasn't interested in any of it, wanted us,

4   you know, to address his own contract.

5   Q    How far did the Union get into the offer, Joint Exhibit 14,

6   before Mr. Meadows cut off discussion?

7   A    I don't -- I don't think we got past the first page of un-

8   struck items.

9        JUDGE CARISSIMI:  I have a question on those lines, Mr.

10  Eby.  On the first page, there's a lot of classifications, and

11  they are struck through entirely.  What is going on there?  Was

12  the Union attempting to reduce the number of classifications?

13  Or why were all those stricken out?

14       THE WITNESS:  No, Your Honor.  This is a contract with two

15  extensions on it.

16       JUDGE CARISSIMI:  Um-hmm.

17       THE WITNESS:  And so some of this is clean up.  As we look

18  at the first page, there's something that existed in 2004.

19       JUDGE CARISSIMI:  All right.

20       THE WITNESS:  And then the next one was from one of the

21  extensions, with wage classifications.  So we struck all that

22  out.  And then on the PF543, then, it would just have the

23  current one.

24       JUDGE CARISSIMI:  I see.

25       THE WITNESS:  With, you know --

1    JUDGE CARISSIMI:  All right.

2    THE WITNESS:  -- what they're proposing --

3    JUDGE CARISSIMI:  So the Union's proposal, you look at

4    PF543, and it goes through A, B, C, D, [1B:368 (reliability)]

5    grandfathered, and has wage proposal there.  Now, so the

6    classifications on page 541 still existed, but in order to

7    determine what wage the Union was proposing, you look at the

8    grade, if you will, for each of those classifications, is that

9    correct?

10   THE WITNESS:  Well, most of it -- I mean, some of the names

11   were changed by -- so on 543, it would be what the current

12   classifications and pay grades were, A, B, C.

13   JUDGE CARISSIMI:  Um-hmm.

14   THE WITNESS:  The only thing would be, say, on 543, under

15   "Classification," that first one, and there's one struck out,

16   "chemical handlers"?

17   JUDGE CARISSIMI:  Yes, I see that.

18   THE WITNESS:  And there's a thing, so that's -- all those

19   were current wages, existing wages, but we struck that out and

20   put our initial proposal, which was to create a D rate there.

21   JUDGE CARISSIMI:  Okay.

22   THE WITNESS:  And then, if you go further down the page,

23   near the end, Your Honor, then it says "Increase wages across

24   the board," and then they are addressed by pay grade.

25   JUDGE CARISSIMI:  Okay.

1          THE WITNESS:  So it is mostly existing rates like that.

2          JUDGE CARISSIMI:  All right.

3          THE WITNESS:  And then we will continue to clean some of

4    this stuff up, like on 544, "Cost of living clause," that has

5    been in our contract, and that was something that our initial

6    proposal actually was, I believe, to put it back into effect.

7    But, you know, we just cut it out.

8          JUDGE CARISSIMI:  All right, thank you.

9          You may continue, Mr. Wiese.

10   Q     BY MR. WIESE:  Mr. Eby, what do you recall the parties

11   doing after the Union presented this proposal?

12   A     Well, we took a caucus, and then re-adjourned and Jethro

13   had offered some dates in October.

14   Q     I am going to direct -- I am going to show you what has

15   been marked as General Counsel Exhibit 34.

16   (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 34.)

17         JUDGE CARISSIMI:  Mr. Wiese, this is a new exhibit?

18         MR. WIESE:  Yes, yes, it is, Your Honor.

19         JUDGE CARISSIMI:  So I don't look through things --

20         MR. WIESE:  Would you like me to indicate going forward?

21         JUDGE CARISSIMI:  You know, that would be helpful, and for

22   all parties to.  Respondent only has one exhibit, but if

23   something is not introduced, if the General Counsel -- because

24   there's a lot of GC exhibits and they are not in order

25   numerically, so it is helpful.  I am using a guide, as when I

1    see you turn around and bend behind your table and look through

2    things, as a signal it is a new exhibit.  But maybe we could

3    have a more efficient way of you letting me know, all right?

4         MR. WIESE:  Understood, Your Honor.

5         JUDGE CARISSIMI:  Thank you.

6         MR. WIESE:  Yes.

7    (Witness proffered document.)

8    Q    BY MR. WIESE:  Do you recognize this document, Mr. Eby?

9    A    Yes, I do.

10   Q    What is it?

11   A    It is a settlement agreement in July of 2013, related to

12   the Union filing NLRB charges on a few items.  And it is

13   specifically related to this vibration analysis.

14   Q    And is that your signature on the second page of the

15   document?

16   A    Yes, it is.

17   Q    And as it relates to the vibration analysis grievance, what

18   was the settlement reached by the parties?

19   A    The settlement was that the company could continue to

20   outsource vibration analysis for the duration of the contract,

21   provided they maintained -- which was an additional mechanic --

22   but they maintained a specific amount of mechanics.  And if

23   there was a reduction in force, then the outsourcing would come

24   back to the house.  And, on top of that, the agreement was then,

25   at the next negotiations, it would be negotiated, in good faith,

1 to reach an agreement on vibration analysis.

2 Q    Do you recall this vibration analysis settlement coming up

3 in negotiations on August 18th?

4 A    Yes.

5 Q    Okay.  And when did that happen?

6 A    I believe it was, like I said, somewhere in the morning or

7 the middle of the day.

8 Q    Okay.  And what do you recall about the discussions

9 regarding the vibration analysis work?

10    MR. BUTTRICK:  I am just going to object at this point,

11 Your Honor.  There's no allegations in the Complaint related to

12 the vibration analysis, so I think all of this is irrelevant.

13    JUDGE CARISSIMI:  What is the relevance of this line of

14 questioning and this exhibit?

15    MR. WIESE:  Well, first of all, Your Honor, it explains --

16 I mean, it is something that came up continually at bargaining,

17 so I think it is important to understand, just in the context of

18 what is going on at the bargaining table, to have this

19 settlement agreement in the record.  Also, the testimony I am

20 going to elicit about the parties' discussions regarding this

21 document and this specific settlement, I believe, are relevant

22 to the Employer's intent at the bargaining table.

23    JUDGE CARISSIMI:  All right.  There is no allegation in the

24 Complaint, but there has been testimony that it is part of the

25 bargaining, that is all true.  My question is:  Are you going to

1 argue, in your brief, that somehow this issue is evidence of the
2 Employer's bad-faith bargaining?  Or what is the point of this,
3 I guess, why am I hearing this?  What are you going to do with
4 it?  Before we go down this road with an objection, I would like
5 to know.
6 　　　MR. WIESE:  Okay.  Well --
7 　　　JUDGE CARISSIMI:  Because --
8 　　　MR. WIESE:  -- can I have Mr. Eby leave the room before I
9 make this --
10 　　　JUDGE CARISSIMI:  Yes, that is a good idea.
11 　　　Mr. Eby, this happens when there's a legal discussion.
12 Sometimes it is better if the witness is not in the room when
13 this discussion occurs, all right?  So we are going to ask you
14 to step outside, okay?
15 　　　THE WITNESS:  Okay.
16 　　　JUDGE CARISSIMI:  All right, and we will let you know when
17 we are done.
18 (Witness temporarily excused from the stand.)
19 　　　JUDGE CARISSIMI:  Okay, go ahead, Mr. Wiese.
20 　　　MR. WIESE:  Your Honor, the General Counsel's theory
21 regarding this, why the vibration analysis work is important in
22 this case, is because it is another attempt by the Union to open
23 up bargaining.  You know, everything up to this point has not
24 been moving things at the table, and so the Union is pointing to
25 this document, saying, "Hey, you said you are going to negotiate

1  in good faith over this work.  Let's have a discussion about

2  it."  And the testimony that I am going to elicit right now is

3  that when the Union brought up this grievance, Mr. Meadows'

4  response was, "Look at my contract."  That was his only response

5  to it.  And his contract says that the vibration analysis work

6  is going to be outsourced.  And so that is what the testimony

7  is, that's --

8       JUDGE CARISSIMI:  All right.  I think it is sufficiently

9  related to the allegations of the Complaint, so I am going to

10  overrule the objection.

11      We will bring Mr. Eby back in and you can continue.  So

12  let's go off the record and you can retrieve Mr. Eby.

13      MR. WIESE:  Okay, thank you, Your Honor.

14  (Witness resumed the stand.)

15      JUDGE CARISSIMI:  Let's go on the record.

16      Mr. Buttrick, you raised a point that this GC l34 is

17  actually already included in the Joint Exhibits, is that

18  correct, sir?

19      MR. BUTTRICK:  That is correct.

20      JUDGE CARISSIMI:  Could you indicate, for the record, where

21  it is located?

22      MR. BUTTRICK:  Sure, let me find it here.  It is at PF9684

23  in Joint Exhibit 16.

24      JUDGE CARISSIMI:  And, Mr. Wiese, did you have an

25  opportunity to check that?

1          MR. WIESE:  Yes, Your Honor.

2          JUDGE CARISSIMI:  And you agree that GC 34 is already

3   included in the record as part of Joint Exhibit 16?

4          MR. WIESE:  That is correct, Your Honor.

5          JUDGE CARISSIMI:  Okay, so we won't -- do you want to

6   withdraw your motion to admit GC 34.

7          MR. WIESE:  Yes, I would, Your Honor.

8          JUDGE CARISSIMI:  And then when you -- if you pursue

9   further examination of Mr. Eby, you can use Joint Exhibit 16,

10   since that is the document that we have entered into evidence,

11   all right?

12          MR. WIESE:  Yes.

13          JUDGE CARISSIMI:  Very good, you may proceed.

14   (Witness proffered document.)

15   Q    BY MR. WIESE:  Mr. Eby, I am going to direct your attention

16   to Joint Exhibit 16.

17          JUDGE CARISSIMI:  Let's go off the record.

18   (Off the record.)

19          JUDGE CARISSIMI:  On the record.

20          You may continue, Mr. Wiese.

21   Q    BY MR. WIESE:  Mr. Eby, if you turn to pages -- or turn to

22   page 9, PF9684 of Joint Exhibit 16?  It is at the very end of

23   the document, the last two pages.

24   A    Okay.

25   Q    Do you recognize this document?

1    A    Yes.

2    Q    Okay.  Is this the vibration analysis settlement that we

3    were discussing earlier?

4    A    Yes.

5    Q    Okay.  And was this settlement, was it actually included in

6    the physical contract?

7    A    It would be -- I mean, it wasn't printed in the one at the

8    time, because it is an amendment afterwards.

9    Q    Was it considered by the parties to be part of the

10   collective bargaining agreement?

11   A    Yes, it is an agreement and contract amendment.

12   Q    So, again, what do you recall -- what discussions do you

13   recall the parties having regarding this vibration analysis

14   settlement at negotiations on August 18th?

15   A    Jethro asking Mr. Meadows if he is aware of the vibration

16   analysis agreement.

17   Q    Um-hmm.

18   A    And Mr. Meadows saying no.  And Mr. Head responding that

19   Mr. Froehlich was aware of it.

20   Q    Do you recall the parties having any other discussions

21   about the vibration analysis grievance that night?

22   A    Not that -- off the top of my head.

23   Q    Up to that point, what had the Employer been offering

24   regarding the vibration analysis work in its contract offers?

25   A    To outsource it.

 1   Q    And do you recall, did Mr. Meadows make any reference to

 2   this on August 18?

 3   A    No.

 4   Q    Okay.  Did he make any reference to that at a later

 5   negotiation?

 6   A    Yes.

 7   Q    Okay.  All right.  Let's turn, then, to the parties' next

 8   negotiations, on September 9th.

 9        MR. BUTTRICK:  I am just going to interpose an objection

10   here, Your Honor, if I may?

11        JUDGE CARISSIMI:  Yes, sir, yes.

12        MR. BUTTRICK:  I am looking at the vibration analysis

13   agreement, it is PF9684 --

14        JUDGE CARISSIMI:  Yes.

15        MR. BUTTRICK:  -- Section 3B.  It says, among its terms,

16   that, "The company and the Union agree that this Agreement shall

17   not be used against either party in any future proceedings,

18   negotiations or discussions except due to failure to execute

19   Agreement or under the conditions set forth in this Agreement."

20   So, as a matter of contract, I am going to move to strike all

21   discussion of the vibration analysis pursuant to the terms of

22   this contract.

23        JUDGE CARISSIMI:  Well, you can make that argument in your

24   brief, and I will consider what weight, if any, I am going to

25   give to this, given the language of the agreement, all right?

1   Q      BY MR. WIESE:  Mr. Eby, picking up with the negotiations on

2   September 9th, how long do you recall the on-the-record

3   discussions lasting that day?

4   A      Approximately three minutes.

5   Q      How did negotiations begin that day?

6   A      Mr. Meadows said that he was on his LBF.  Jethro Head

7   responded, "That is fine, but the Union is going to continue to

8   go through its contract, article by article, section by section,

9   and change -- strike things out, incorporate some of the

10  company's language into it."  And that is when Mr. Meadows said,

11  "I won't sit through that."  And Jethro had asked, "What do you

12  want to do, Ken?" referring to Mr. Meadows.

13  Q      And what was Mr. Meadows' response to that?

14  A      Mr. Meadows' response was, "I am going to be giving you --

15  we are going to be implementing our LBF on Monday, 9/14, and I

16  will be getting you a letter."

17  Q      Do you recall getting a letter at that meeting?

18  A      No.

19  Q      And was that the end of the on-the-record discussions that

20  day?

21  A      Yes.

22  Q      After those three minutes of on-the-record discussions,

23  what did the Union bargaining committee do on September 9th?

24  A      Began working on our next proposal.

25  Q      All right.  Why did the Union begin working on a proposal

1   at that time?

2   A    The Union did not believe we were at impasse, and that we

3   were set to negotiate the next day.

4   Q    Let's turn, then, to the next day of negotiations, on

5   September 10th.  How do you recall negotiations opening on that

6   day?

7   A    Jethro had asked Mr. Meadows if we were on the record or

8   not.  Meadows responded he didn't care, yes.  And then Jethro

9   had asked if Mr. Meadows had a response to the vibration

10   analysis.  Mr. Meadows' response was, "It is in the company's

11   proposal."

12   Q    Did he explain any further -- did Mr. Meadows explain any

13   further what he meant by this?

14   A    No.

15   Q    And, in your understanding, what was in the company's LBF,

16   or strike that.  What did the company's LBF say about the

17   vibration analysis work?

18   A    Outsource it, with no negotiation.

19   Q    Did the Union's efforts in preparing an offer on September

20   9th come up at negotiations on September 10th?

21   A    Yes, at a later time.

22   Q    Okay.  Well, what do you recall the parties discussing

23   after the vibration analysis?

24   A    That Mr. Meadows told -- responded to Jethro that, "We are

25   not in normal negotiations," and that, while he could massage

1   things to his contract, he would not accept individual

2   discussions or individual items.  He wanted all our issues with

3   his contract at one time.

4   Q    While Mr. Meadows was speaking, did he provide any

5   explanation about what he meant by the parties not being in

6   "normal" negotiations?

7   A    Did he provide an explanation?  No.

8   Q    And did Mr. Meadows explain any further what he meant by

9   "massaging" his last, best and final offer?

10  A    Yeah, he could take a look at his LBF and make changes to

11  it, he would look at it.

12  Q    What response, if any, did the Union have to Mr. Meadows'

13  response to massage his final offer?

14  A    Mr. Head asked Mr. Meadows, that if the Union were to take

15  a comprehensive review of everything so far at the table -- of

16  Mr. Meadows' contract, the Union's existing contract -- if we

17  took and did a whole comprehensive review on it, would Mr.

18  Meadows keep an open mind?

19  Q    Did Mr. Meadows have a response?

20  A    He said, "Yes."

21  Q    Do you recall him saying anything else?

22  A    That he would be open.

23  Q    What did the Union do after Mr. Meadows said that?

24  A    Took a long caucus.

25  Q    Directing your attention to Joint Exhibit 15.  Do you

1  recognize this document?

2  (Witness proffered document.)

3  A    Yes, I do.

4  Q    When was this -- or what is it?

5  A    It is the Union's -- we titled it, "Offer of Settlement."

6  It was given to -- the Union gave it to the company on 9/10, a

7  little after 9:00 that night.

8  Q    And when did the Union create this offer?

9  A    We began working on in on 9/9, spent several hours that day

10  on it.  And then, ever since the beginning of the caucus on

11  9/10.

12  Q    Approximately how long was that caucus on 9/10, do you

13  recall?

14  A    Well, it was after the brief discussion -- I would say, you

15  know, nine hours -- longer, probably.

16  Q    What were some of the major issues that you recall the

17  Union moving on in their offer of settlement?

18  A    One of them was that we bit the bullet, and eliminated

19  labor relations.  And that, you know, is significant, even

20  including making the changes in here, because you have to go

21  through and modify anything that referenced labor relations

22  committee.

23  Q    What other changes?

24  A    We modified and accepted the company's grievance procedure.

25  Q    Any other changes that you recall making?

1 A    Well, yes, I mean, it is significant.  Our original

2 contract was like 87 pages, and if you take all the strikes out

3 of it, in pages, it would be down -- we cut about 30 pages.  But

4 it included eliminating, you know, a lot of letters of

5 understanding related to, like, substance abuse policy; a whole

6 bunch of different things.

7 Q    Did the Union make any progress on the "extra crew"

8 proposal?

9 A    Yes, we -- well, we incorporated the extra crew proposal,

10 but -- and then -- and in here our proposal, we incorporated it

11 so that they could use it like how it was originally portrayed

12 to us.  But then we went through and found sections that needed

13 that language into it, and modified it so it would work within

14 the context of how you line up overtime and stuff for what we

15 were proposing.

16 Q    Um-hmm.  And after the -- after the Union finished creating

17 this proposal in Joint Exhibit 15, did the parties go back to

18 the bargaining table?

19 A    Yes.

20 Q    And what do you recall happening when the parties went back

21 to the bargaining table?

22 A    Jethro went through and notified -- Mr. Head went through

23 and notified the company of a multitude of items that we were

24 dropping off our original proposal list.

25 Q    What items do you recall -- what, if any, items do you

1    recall him highlighting from that evening?

2    A    I don't specifically, right off the top of my head.

3    Q    Okay.

4    A    It was several.

5    Q    Okay.

6    A    I mean, I know car wash was one.

7    Q    Directing your attention to General Counsel Exhibit 7, page

8    30 of that document, the Union's bargaining notes.

9    Q    Please take a minute to review that page, Mr. Eby, and let

10   me know when you are finished.

11   A    I mean -- I see it on here, I mean --

12   Q    Okay.  And do you recall -- what do you recall, now, about

13   what Mr. Head highlighted that evening?

14   A    This is Mr. Head going through --

15        JUDGE CARISSIMI:  You know, there are some technical rules

16   on this kind of testimony, Mr. Eby, so if you, looking at that,

17   if your memory is refreshed, put that document aside, all right,

18   GC 17, all right?  And we will see what you can testify to from

19   memory, okay, now that you have looked at the document?  So I

20   want the record to reflect that Mr. Eby has set aside GC Exhibit

21   7, he is no longer looking at it.

22        Go ahead, counsel.

23   Q    BY MR. WIESE:  Do you recall any other items, besides the

24   car wash, now that Mr. Head highlighted that evening?

25   A    In reviewing it, I mean, Mr. Head is citing it by the

1 article and the section of the proposals off our proposal.

2 Q    What proposal are you talking about?

3 A    The June 1st list of our complete proposals.

4 Q    If you direct your attention to Joint Exhibit 10.

5 (Witness proffered document.)

6 Q    Is this -- is this document, Joint Exhibit 10, the one that

7 Mr. Head was referring to on the evening of September 10th?

8 A    Yes.

9 Q    After Mr. Head presented the proposal and highlighted some

10 of the changes, what response, if any, do you recall the company

11 having?

12 A    Ah --

13 Q    Oh, excuse me.  Did the Union -- let me rephrase.  Did Mr.

14 Head pass out this document before he highlighted it, or in what

15 order?

16      JUDGE CARISSIMI:  What document are you referring to,

17 counsel?

18      MR. WIESE:  Sorry, Joint Exhibit 15.

19      THE WITNESS:  I don't recall.

20 Q    BY MR. WIESE:  Okay.  Do you recall Mr. Head distributing

21 Joint Exhibit 15 to the parties on September 9th?

22 A    Yes.

23 Q    Okay.  And what, if any, response do you recall the

24 Employer having when Mr. Head distributed the document?

25 A    As Jethro was attempting to explain what he did with the

1    contract, Mr. Meadows did a corner page flip, like a five-second

2    flip, like how thick it is, and said, that he was disappointed,

3    and go up and gave us pre-signed and dated letters of

4    implementation for 9/14.

5    Q    How long -- to the best of your recollection -- how long

6    did Mr. Meadows spend flipping through the offer before he said

7    he was disappointed?

8    A    He didn't open the pages, he flipped the corner, like --

9         JUDGE CARISSIMI:  You have to use words, sir, gestures

10   don't show up.

11        THE WITNESS:  Well, you know, just a flip of the corner

12   thing, running it through with your fingers.

13   Q    BY MR. WIESE:  For how long?

14   A    Two seconds.

15   Q    Did you have a clear view of Mr. Meadows when he did this?

16   A    Yes.

17   Q    How far away from him were you?

18   A    There was probably 15 feet separating the tables, at most.

19   Q    From your view, did it look like Mr. Meadows read any of

20   the offer as he was flipping through it?

21   A    No.

22        MR. WIESE:  Could we go off the record for just a minute,

23   Your Honor?

24        JUDGE CARISSIMI:  Off the record.

25   (Brief recess taken.)

1    JUDGE CARISSIMI:  On the record.

2    Mr. Wiese, you may continue.

3  (Witness proffered document.)

4  Q    BY MR. WIESE:  Mr. Eby, directing your attention to General

5  Counsel Exhibit 35.  Do you recognize this document?

6  A    Yes, I do.

7  Q    What is it?

8  A    It is the notice of implementation that Mr. Meadows gave a

9  copy to myself and Mr. Head on the evening of 9/10.

10  Q    Okay.  And after this letter was presented to the Union

11  what, if any, discussions do you recall the parties having?

12  A    During that same brief meeting, Mr. Head pointed out two

13  outstanding requests for information.  One related to a request

14  on some production information, and another related to visitors'

15  logs.

16  Q    Okay.  After the discussion about those information

17  requests, did the parties discuss anything else that evening?

18  A    Yes.  Mr. Head pointed out to the company that our -- the

19  Union's existing contract had two letters of understanding in

20  it, related to retirees, for medical.  And that Mr. Meadows' LBF

21  didn't have them in it, but that these were permissible subjects

22  of bargaining and we weren't bargaining over them.

23  Q    And what was -- what, if any, response did Mr. Meadows have

24  on that point?

25  A    I don't recall that he had any discussion.

1  Q   Okay.  After Mr. Head brought up the letters of

2  understanding, was that the end of negotiations on September

3  10th?

4  A   Mr. Head offered an October date.

5  Q   Okay.  And what do you recall about the discussions

6  regarding that date?

7  A   At that time, Mr. Meadows' response wasn't sure if -- to

8  accept them or not.

9  Q   Okay.  Did the parties have any further discussion that

10  evening over Joint Exhibit 15, the Union's offer of settlement?

11  A   No.

12  Q   Did Mr. Meadows provide any other response to this offer on

13  September 10th, other than what you have already discussed?

14  A   No, I don't recall any.

15  Q   Directing your attention to the next day of negotiations on

16  September 11th.  What is the first thing you recall happening at

17  negotiations that day?

18  A   Being it was 9/11, Mr. Head asked for a moment of silence

19  in remembrance.

20  Q   And after that moment of silence, what do you recall the

21  parties discussing next?

22  A   There were discussions, brief discussions, on the LOUs

23  discussed the prior night, and also on the information requests.

24  Q   What, if anything, do you recall Mr. Meadows saying with

25  regard to the letters of understanding?

1   A    That they were not in his contract, but that he wasn't

2   changing anything or taking anything away for the retirees.

3   Q    And after the discussion of the letters of understanding

4   and the information requests, what did the parties discuss next?

5   A    Jethro Head had talked about the fact that he was, you know

6   unhappy that -- with Mr. Meadows' response to the offer of

7   settlement, because the committee had worked hard on it, and

8   that the Union was not at impasse.

9   Q    When you say "it," what are you talking about?  When you

10  use --

11  A    The offer -- the offer of settlement.

12       JUDGE CARISSIMI:  Was there any discussion about the

13  information requests at that meeting?

14       THE WITNESS:  There was -- the night before, there was

15  clarification of, like, the production one was -- there was talk

16  about, you know, whether it was confidential and needed a non-

17  disclosure.  And --

18       JUDGE CARISSIMI:  Let me stop you there.  So there was

19  discussion on the evening of September 10th?

20       THE WITNESS:  Yes.

21       JUDGE CARISSIMI:  And who was involved in that discussion?

22       THE WITNESS:  Well, all parties were at the table, and it

23  was Mr. Meadows responding from the company.  And Jethro Head

24  related to both items, and I discussed a little bit of the

25  visitor information request.

1    JUDGE CARISSIMI:  All right.  Now was there further

2  discussion on September 11 about the information requests?

3    THE WITNESS:  Jethro asked him about him about, Mr. Head

4  asked him about it, and Mr. Meadows said that he would look at

5  getting the information.

6    JUDGE CARISSIMI:  All right, thank you.

7    I don't think you got an answer to your question.  You

8  raised it, but there wasn't anything specific about the

9  information requests, that is why I asked.

10    MR. WIESE:  Okay.  And, just for an explanation for the

11  record, I mean, the reason that we didn't get into that, it is

12  not alleged in the Complaint.

13    JUDGE CARISSIMI:  All right.

14    MR. WIESE:  There is only the delay theory for the earlier

15  information.

16    JUDGE CARISSIMI:  Okay.  Well, perhaps I was asking about

17  something that didn't need to be asked, then, but I appreciate

18  you pointing that out to me.

19  Q    BY MR. WIESE:  Okay, so after the -- after the -- Mr. Eby,

20  did the company have any response to Mr. Head's statement about

21  impasse, if you recall?

22  A    Not that I can recall.

23  Q    After Mr. Head asserted that the parties were not at

24  impasse, what did they discuss next?

25  A    Mr. Meadows' response to the -- to those statements of "not

1  at impasse," but also of how we worked hard -- the committee

2  worked hard on that settlement.  Mr. Meadows said he was

3  disappointed in the contract, and what we were offering he

4  wasn't interested in.

5  Q    And after that, what, if any, discussions do you recall the

6  parties having?

7  A    There was a reiteration from Mr. Head of, you know, "The

8  Union tried real hard to get some sort of process that would

9  work."  And Mr. Head again offered -- well, he offered October

10  dates, the 8th and 9th, and Mr. Meadows responded that they

11  would look and he'd respond back in an e-mail with Mr. Head.

12  Q    And after that exchange over dates, was that the end of

13  negotiations that day?

14  A    Yes.

15  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 54.)

16      MR. WIESE:  Showing the witness a new exhibit.  It has been

17  marked as General Counsel Exhibit 54.

18  (Witness proffered document.)

19  Q    BY MR. WIESE:  Do you recognize this document, Mr. Eby?

20  A    Yes, I do.

21  Q    And what is it?

22  A    It is a letter that I wrote to the company in response to

23  their 9/10 letter of notice of implementation.  This is the

24  Union's response to it.

25  Q    Okay.  And did you draft this letter?

1  A    Yes.

2       MR. WIESE:  I will offer General Counsel Exhibit 54 into

3  evidence.

4       JUDGE CARISSIMI:  Any objection to GC l54?

5       MR. BUTTRICK:  No objection.

6       JUDGE CARISSIMI:  GC l54 is admitted.

7  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 54.)

8  Q    BY MR. WIESE:  Did the Employer end up implementing at

9  least portions of its last, best and final offer on September

10 14th?

11 A    Yes.

12 (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 77.)

13      MR. WIESE:  Showing the witness a new exhibit.  It has been

14 marked as General Counsel Exhibit 77.

15 (Witness proffered document.)

16      MR. BUTTRICK:  If I could go off the record for a moment?

17      JUDGE CARISSIMI:  Off the record.

18 (Brief discussion held off the record.)

19      JUDGE CARISSIMI:  So let's go back on the record.

20      Mr. Buttrick, you indicated you had no objection, and

21 General Counsel 54 has been introduced into evidence.  Is there

22 anything further you wish to express about that document?

23      MR. BUTTRICK:  Thank you, Your Honor.  We have no objection

24 to it, that it was properly authenticated by the witness.  Our

25 concern is that we do not believe, after our review of the

1    documents provided by the Union pursuant to our subpoena, that

2    this was provided pursuant to that.  And so our concern is that

3    the Union may not have complied fully with our subpoena request.

4         JUDGE CARISSIMI:  All right, very good.  As I indicated,

5    off the record, the General Counsel is the one offering the

6    document, so I am going to continue to keep the document in

7    evidence.

8         Mr. Wiese, you may proceed.

9         MR. WIESE:  Yes, and, Your Honor, I would also like to make

10   a statement on the record that I received this document directly

11   from Mr. Eby after he was no longer the Local president.

12        JUDGE CARISSIMI:  All right, thank you.

13   Q    BY MR. WIESE:  Mr. Eby, do you recall sending -- or what

14   did you do with this letter after you drafted it, do you recall?

15   A    I believe 9/14 would have been a Monday, so I e-mailed it

16   on 9/13.

17        JUDGE CARISSIMI:  To whom, sir?

18        THE WITNESS:  Definitely to Irwin Froehlich.  I may have

19   carbon-copied, but I would have to actually look to see.

20        JUDGE CARISSIMI:  So you sent it as an attachment to an e-

21   mail?

22        THE WITNESS:  Yes.

23        JUDGE CARISSIMI:  Did you send it to the company in any

24   way, did you actually put it into the United States mail?

25        THE WITNESS:  I never put it into the mail.

1    JUDGE CARISSIMI:  Okay.  So the way you communicated this

2  document to the Employer was as an attachment to an e-mail to

3  Mr. Froehlich, is that correct?

4    THE WITNESS:  Yes.

5    JUDGE CARISSIMI:  All right, thank you.

6  Q    BY MR. WIESE:  Mr. Eby, I am going to show you another odd

7  new exhibit that has been marked as General Counsel Exhibit 77.

8  Do you recognize this document, Mr. Eby?

9  (Witness proffered document.)

10 Q    A    Give me just a moment?

11 Q    Yes.

12 (Pause.)

13 A    Yeah, I am ready.  Yes, I recognize it.

14 Q    Okay.  And what is it?

15 A    It is a company's response to our -- the Union's 9/11 offer

16 of dates.

17 Q    Okay.

18    MR. WIESE:  All right, I will offer General Counsel Exhibit

19 77.

20    JUDGE CARISSIMI:  Is there any objection to GC l77?

21    MR. BUTTRICK:  No objection.

22    JUDGE CARISSIMI:  GC 77 is admitted.

23 (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 77.)

24 Q    BY MR. WIESE:  Mr. Eby, directing your attention back to

25 General Counsel Exhibit 54 for a moment, the second paragraph in

1  that letter represents posting to members.  Do you recall that

2  posting?

3  A    Yes.

4  Q    How is that posting given to members?

5  A    That was posted on Union bulletin boards throughout the

6  plant.

7  Q    All right.  Mr. Eby, did the parties meet for negotiations

8  after September 11th?

9  A    Yes.

10  Q    That you were involved in.  When did the parties next meet?

11  A    October 8th.

12  Q    Do you recall who was present at those negotiations?

13      MR. BUTTRICK:  I am just going to object, at this point,

14  Your Honor, that there's no allegations in the Complaint about

15  bargaining after September 14.

16      JUDGE CARISSIMI:  Mr. Wiese, do you want to be heard to

17  that?

18      MR. WIESE:  Yes, Your Honor.  As we discussed yesterday

19  with Ms. Shannon's notes, these -- the session on October 8th

20  was shortly after the Employer implemented its final offer.  The

21  parties' positions at this meeting, and the movement that they

22  may or may not have made is relevant, I believe, to whether they

23  were at impasse.

24      JUDGE CARISSIMI:  All right, I am going to overrule the

25  objection.  Since it is closely related to the allegations of

1    the Complaint and to the declaration of impasse and the

2    implementation of the final offer, I think it has got sufficient

3    relationship for it to be admitted.

4          So you may proceed.

5    Q    BY MR. WIESE:  Who was present at those negotiations, Mr.

6    Eby, do you recall?

7    A    It would be myself, Matt Maas, Kelly Yeisley, Renita

8    Shannon, Jethro Head; and, for the company it was Ken Meadows,

9    Erwin Froehlich, Levi Wood, and Andy Sullivan.

10   Q    And what do you recall -- what is the first thing you

11   recall being discussed at negotiations at that --

12   A    The letters of understanding for retiree benefits.

13   Q    What discussion do you recall having over that topic?

14   A    Again, Jethro was telling Ken that that was part of our

15   existing contract, and that he has not included them into his

16   contract, but these are things that we weren't going to

17   negotiate over.

18   Q    Besides the letters of understanding, what other topics do

19   you recall the parties discussing that day?

20   A    There was some pointing out of things that weren't, like,

21   correct in this contract.  One being, again, pointing out that

22   they had Union dues going to the International treasurer, as

23   opposed to the Local.

24   Q    Why did the Union point that out?

25   A    Because that is incorrect, that would be more along the

1  lines of Steelworkers.

2  Q    And what response, if any, did the company have when the

3  Union pointed out this issue?

4  A    That when they go to -- Mr. Meadows, when we would go to

5  print a contract, will change that.

6  Q    Are there any other topics that you recall coming up in

7  negotiations that day?

8  A    Sure, I mean, there are several other items related to the

9  implementation, one of them being vacation.

10 Q    What do you recall about vacation discussions?

11 A    That was a big issue, because after implementation, the

12 company, they didn't actually notify the Union, but were telling

13 employees that effective January 1st, that vacation, a week,

14 would no longer follow your seven days working, but would

15 instead go Monday through Sunday, regardless of your days off.

16 Q    Okay.

17 A    And that was counter to a discussion in June, with Mr.

18 Meadows, related to our proposal, our proposal that all

19 employees have seven days vacation.  And the reason for that,

20 Your Honor, is that the ones hired after August 1, 2004, only

21 got five paid days vacation, whereas the others had seven.  And

22 during that discussion, Mr. Meadows agreed that if you worked

23 seven days, that is a week.

24 Q    Do you recall the parties having any discussion about

25 overtime at that meeting on October 8th?

1   A    Yes.

2   Q    Okay, and what do you recall about those discussions?

3   A    That was an issue the company brought up.

4   Q    Did the company explain why they brought it up?

5   A    Well, yes.  I mean, since the implementation of Mr.

6   Meadows' contract, the overtime process doesn't work.  There are

7   significant issues with it.

8   Q    Okay.  And what was the Union's response?  Or did the

9   Employer have anything else to say about the overtime, that you

10  recall?

11  A    The problem with Mr. Meadows' contract was that overtime

12  was lined up by classification, where the Union's contract was

13  by qualification.  And, initially, after implementation, the

14  company attempted to go by qualification until told that we

15  would grieve.  And so what they were presenting was to take jobs

16  in every department, even though the jobs would be separate, it

17  would still be the same job, but they would all be classified as

18  one job so that they could get around that.

19  Q    Showing you what has been marked as General Counsel Exhibit

20  37.

21       MR. WIESE:  And this is a new exhibit, Your Honor.

22  (Witness proffered document.)

23  Q    BY MR. WIESE:  Mr. Eby, do you recognize this document?

24  A    Yes, I do.

25  Q    Is this something that you received from the company?

1  A    Yes, on October 8th.

2  Q    Do you recall who gave it to you that day?

3  A    I don't recall a specific individual.

4  Q    Was it given during negotiations that day, to the best of

5  your recollection?

6  A    Yeah.

7       MR. WIESE:  I will offer General Counsel Exhibit 37 into

8  evidence.

9       JUDGE CARISSIMI:  Is there any objection to General Counsel

10  37?

11      MR. BUTTRICK:  No objection.

12      JUDGE CARISSIMI:  General Counsel 37 is admitted.

13  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 37.)

14  Q    BY MR. WIESE:  After negotiations on October 8th, did the

15  parties -- did you attend another negotiation session?

16  A    Yes.

17  Q    And when was that?

18  A    That was November 4th.

19  Q    Okay.

20      MR. BUTTRICK:  I am just going to object about this again,

21  Your Honor, that I think we are getting pretty far afield.

22  November 4th is now two-plus some months since the unilateral

23  implementation of the last, best and final.

24      JUDGE CARISSIMI:  Mr. Wiese?

25      MR. WIESE:  Well, I believe that certain conduct at this

1   meeting, specifically the document that I am going to be

2   entering here, is relevant.

3        JUDGE CARISSIMI:  How many more meetings after --

4        MR. WIESE:  This is it, Your Honor.

5        JUDGE CARISSIMI:  I thought that might be the case.  All

6   right, I am going to let the General Counsel produce evidence on

7   this meeting, since this is the last one at that point.  There

8   is no other meetings that you are going to attempt to introduce

9   evidence on, is that correct, Mr. Wiese?

10       MR. WIESE:  That is correct --

11       JUDGE CARISSIMI:  All right.

12       MR. WIESE:     -- Your Honor.

13       JUDGE CARISSIMI:  You may proceed.  I overrule the

14  objection.

15  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 5(f).)

16  (Witness proffered document.)

17  Q    BY MR. WIESE:  I am showing the witness what has been

18  marked as General Counsel Exhibit 5(f).  Mr. Eby, do you

19  recognize this document?

20  A    Yes.

21  Q    And what is it?

22  A    This is a proposal given from Jethro Head to Mr. Meadows on

23  11/4.  And what it is is an actual -- addressing Mr. Meadows'

24  contract directly, by actually going directly off his contract

25  and making proposal modifications.

1    Q    And that --

2        MR. WIESE:  Can we go off the record for just a second,

3    Your Honor?

4        JUDGE CARISSIMI:  Off the record.

5    (Brief discussion held off the record.)

6        JUDGE CARISSIMI:  Back on the record.

7        While we were off the record, the General Counsel was able

8    to obtain another version of what the record shows is identified

9    as General Counsel Exhibit 5(f), and you may proceed, Mr. Wiese.

10       MR. WIESE:  Yes, Your Honor.  I am showing the witness what

11   has been marked as General Counsel Exhibit 5(f).

12   (Witness proffered document.)

13   Q    BY MR. WIESE:  Mr. Eby, do you recognize this document?

14   A    Yes.

15   Q    What is it?

16   A    This is the Union's -- well, the Union refers to it as

17   "merged proposal," but it is the first four articles that -- of

18   taking -- actually addressing or attempting to negotiate through

19   Mr. Meadows' contract -- and taking -- and offering proposals

20   through that.  So it is articles 1 through 4 given to -- from

21   Jethro Head -- to Mr. Meadows on 11/4.

22       MR. WIESE:  I will offer General Counsel Exhibit 5(f).

23       JUDGE CARISSIMI:  Any objection to General Counsel Exhibit

24   5(f)?

25       MR. BUTTRICK:  No objection, although I will note, for the

1 record, that we do not believe we were provided this document

2 pursuant to our subpoena to the Union, and we will continue to

3 explore that issue.

4     JUDGE CARISSIMI: All right. I am going to admit General

5 Counsel Exhibit 5(f), it is relevant, and from the witness's

6 testimony, it was a document given to the Employer. The

7 Employer, of course, will have the right to contest that

8 testimony if they wish to do so. I don't see prejudice to the

9 Employer at this point, regardless of the subpoena production

10 issue, and that is the basis for my admitting it. Also, the

11 document is offered by the General Counsel and not the Union,

12 and counsel did indicate he has no objection. But, given the

13 circumstances, I thought there should be some further

14 explanation on my behalf as to why I am admitting the document.

15 (EXHIBIT RECEIVED: GENERAL COUNSEL'S EXHIBIT NO. 5(f).)

16     JUDGE CARISSIMI: You may proceed, Mr. Wiese.

17     MR. WIESE: And, Your Honor, just for the record again,

18 both version of GC Exhibit 5(f) were provided directly from Mr.

19 Eby to us.

20     JUDGE CARISSIMI: All right.

21 Q   BY MR. WIESE: Mr. Eby, do you recall -- Mr. Eby, do you

22 recall the discussions that led to General Counsel Exhibit 5(f)

23 being presented at negotiations on November 4th?

24 A   Are you asking --

25 Q   And negotiations --

1   A   -- do you want me to read from this?

2   Q   Yes.  Or what I am asking is, what was said at the table on

3   November 4th that led to this new contract -- or new offer being

4   presented, if you can recall?

5   A   Just to continue that statement by Mr. Meadows that he is

6   on his LBF, but he may be able to massage, and, you know, but

7   you have to address my contract.

8   Q   Is that something you specifically recall him saying on

9   November 4th, that he could "massage" his final offer?

10  A   "Massage," yes.

11  Q   Directing your attention to page 19 of your bargaining

12  notes?

13  A   Yes.

14  Q   That is marked as General Counsel Exhibit 8?

15  A   Yes.

16  Q   This, about halfway down the document, there is a reference

17  to a list "(Ken's)," of seven items.  What is that in reference

18  to, do you recall?

19  A   Yes.  This is a -- Mr. Kelly Yeisley, throughout August,

20  and I believe even in July, but going forward, there was a

21  manager by the name of Jon Swails who would approach Mr.

22  Yeisley, on a regular basis, saying that this is what the --

23  they were items that the company was willing to give if we just

24  asked for them.

25      MR. BUTTRICK:  I am going to object that that is hearsay.

1    It is multiple levels of hearsay.

2         JUDGE CARISSIMI:  That would be hearsay.

3    Q    BY MR. WIESE:  Right, and I don't, Mr. Eby, need to

4    necessarily know the entire back-story of that list, but in

5    terms of negotiations on November 4th, what do you recall being

6    discussed?

7    A    Yes, this was a list generated by Mr. Yeisley, of specific

8    items that -- to questions related to Mr. Meadows' contract.

9    And so, I mean, it was seven items, and we went through the

10   items.  Mr. Head went through the items to see if Mr. Meadows

11   would agree to any of them.

12   (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 39.)

13   (Witness proffered document.)

14   Q    BY MR. WIESE:  I am showing you what has been marked as

15   General Counsel Exhibit 39.  Do you recognize this document, Mr.

16   Eby?

17   A    Yes.

18   Q    What is it?

19   A    This is the actual questions that those bargaining notes on

20   11/4 reflect to the answers when asked to Mr. Meadows.

21   Q    So items 1 through 7 of page 19 of your bargaining notes,

22   General Counsel Exhibit 8, correspond to the seven items on

23   General Counsel Exhibit 39?

24   A    Yes.

25        MR. WIESE:  I will offer General Counsel Exhibit 39.

1        JUDGE CARISSIMI:  Well, Mr. Eby, who prepared General

2   Counsel Exhibit 39?

3        THE WITNESS:  The Union did.

4        JUDGE CARISSIMI:  Who in the Union?

5        THE WITNESS:  Either myself or Renita Shannon typed it, we

6   were there with Mr. Yeisley, it would have been the three of us

7   that Mr. Yeisley brought his handwritten note -- or handwritten

8   question that resembled this.  And then we just put it into

9   typing.

10       JUDGE CARISSIMI:  And who is Yeisley?

11       THE WITNESS:  Mr. -- that would be Kelly Yeisley, he was on

12  the negotiating committee.

13       JUDGE CARISSIMI:  For the Employer?

14       THE WITNESS:  For the Union.

15       JUDGE CARISSIMI:  For the Union, all right.  Now, this

16  document, so what was done with it?  Was it given to the

17  company?

18       THE WITNESS:  It was -- the specific items were asked

19  verbally across the table.

20       JUDGE CARISSIMI:  All right, these are -- this document

21  reflects items that were discussed at the November 4 meeting?

22       THE WITNESS:  Yes, sir.

23       JUDGE CARISSIMI:  All right.

24       So you are offering GC l39?

25       MR. WIESE:  That is correct, Your Honor.

1     JUDGE CARISSIMI:  Is there any objection to GC l39?

2     MR. BUTTRICK:  There is, Your Honor, it is hearsay, because

3  it purports to be, on its face, a list that Ken told supervisors

4  he would give if we asked.  So certainly Mr. Eby, although I

5  object to all of the discussion --

6     JUDGE CARISSIMI:  Right.

7     MR. BUTTRICK:  -- of the November 4 stuff.  But if he were

8  to talk about what was discussed at the table, putting aside my

9  objection, that is one thing.  But to offer a document that

10  purports to be a list that Ken told supervisors he would do, I

11  believe this document is hearsay and is objectionable.

12     JUDGE CARISSIMI:  I -- counsel, do you wish to be heard on

13  that?  If not, I am prepared to make a ruling on it.  But if you

14  want to say anything further?

15     MR. WIESE:  Well, Your Honor, I mean, I think the -- I

16  think to the extent that, you know, that this document is, you

17  know, what it purports to be on the top is probably a subject of

18  some dispute.  But the seven items that were discussed at the

19  bargaining table that day, I mean, Mr. Eby has testified that

20  those seven items correspond to the seven items in his notes.

21  And so I think that, in my view, given that it was discussed

22  between the parties at the bargaining table, that there were

23  responses made, that that is -- that it is relevant.

24     JUDGE CARISSIMI:  I am going to overrule the objection.  I

25  am going to admit GC l39, but I will say that my inclination, at

1   this point, is to consider 1 through 7, but not to give any

2   consideration to the line at top that starts with "List."  That

3   appears to be clearly hearsay and I don't think I am going to

4   give any weight to that aspect of it.

5        So, with that proviso, I am admitting GC Exhibit 39.

6   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 39.)

7   Q    BY MR. WIESE:  Mr. Eby, how long do you recall negotiations

8   lasting on November 4th?

9   A    Including caucuses, it was approximately three hours.

10  Q    Was that the last negotiation session that you attended?

11  A    Yes.

12  Q    During all the negotiation sessions that you attended,

13  starting on June 1st and going through November 4th, what

14  subject do you recall having the most substantive back-and-forth

15  discussions over?

16  A    The flower fund and the concessions list.

17  Q    Okay.  Mr. Eby, do you recall having a face-to-face meeting

18  with Ken Meadows, around the end of September, after the

19  Employer implemented its last, best and final offer?

20  A    Yes, I do.

21  Q    When did this meeting occur?

22  A    On September 28th, around, you know -- it started around 2

23  or 3 p.m.

24  Q    Why were you meeting -- or what led to this meeting with

25  Mr. Meadows on September 28?

1    A      There was a meeting set up, related to a termination

2  hearing.

3        MR. BUTTRICK:  I am just going to object to this line of

4  questioning as well, because it seems to be outside the scope of

5  the allegations in the Complaint.  It is past the unilateral

6  implementation date, and there's no allegations about

7  terminations.

8        JUDGE CARISSIMI:  Mr. Wiese?

9        MR. WIESE:  Can I make -- I mean, it's -- this meeting is

10  two weeks after it was implemented.  Can I have Mr. --

11        JUDGE CARISSIMI:  You're going to elicit --

12        MR. WIESE:  There's going to be testimony that I believe is

13  relevant to whether the Employer -- I don't want to say it with

14  Mr. Eby here in the room.

15        JUDGE CARISSIMI:  Well -- all right.

16        Well, let me ask you this:  Are you trying -- are you going

17  to elicit testimony about the bargaining?

18        MR. WIESE:  Well, it is a conversation between --

19        JUDGE CARISSIMI:  Okay, let's --

20        Mr. Eby, you are going to have to step outside again.

21  (Witness temporarily excused from the stand.)

22        MR. WIESE:  Your Honor, it is a conversation between the

23  two of them, where we are going to assert that Mr. Meadows

24  stated, essentially, that his LBF is all open to interpretation,

25  that there's, you know -- essentially saying that even two weeks

1  after it is implemented, there's room to move.  And there's also

2  discussion about these unfair labor practice charges, and

3  Respondent's view of those charges.

4      JUDGE CARISSIMI:  All right, so there's going to be

5  testimony that relates to the bargaining?

6      MR. WIESE:  Yes, yes.

7      JUDGE CARISSIMI:  All right, that was my --

8      MR. WIESE:  Okay.

9      JUDGE CARISSIMI:  -- once again, I mean, as counsel

10  correctly points out, there's nothing in the Complaint involving

11  terminations, so we heard -- the witness starts talking about a

12  meeting about a termination, there's an objection, so I need to

13  find out where this is going before I permit it.

14      MR. WIESE:  Right.

15      JUDGE CARISSIMI:  So I am satisfied now that it is

16  sufficiently related and I will let you pursue it.  And if

17  counsel has further objections, and no doubt he will make them,

18  and I will deal with them.  But, for right now, I am satisfied

19  that you proceed, based on your representation.

20      So, let's go off the record and we will retrieve Mr. Eby.

21  (Off the record.)

22      JUDGE CARISSIMI:  Back on the record.

23  (Witness resumed the stand.)

24      JUDGE CARISSIMI:  Mr. Wiese, you may proceed.

25  Q   BY MR. WIESE:  Mr. Eby, I believe -- could you pick back up

1   with what led to this face-to-face meeting with Mr. Meadows on

2   September 28?

3   A    The initial reason was related to an employee termination

4   hearing.

5   Q    And where did that face-to-face meeting with Mr. Meadows

6   take place?

7   A    The initial meeting took place in a conference room up

8   front.

9   Q    Okay.  And after that initial face-to-face meeting that you

10  had with Mr. Meadows, did you have a subsequent one-on-one

11  meeting with him later in the day?

12  A    Yes, very shortly after.

13  Q    And where did that -- so that one-on-one meeting is what I

14  would like to talk about.  Where did that meeting take place?

15  A    It took place down in our -- like our ethanol control room

16  office.  We have a large office, and then two individual, you

17  know, for like computer equipment, things like that, with closed

18  doors.  So it took place in one of the smaller, attached offices

19  to it.

20  Q    Was there anybody else present in the control room during

21  that conversation?

22  A    In the operator control room, yeah, there was a couple

23  operators.

24  Q    And where did the meeting take place, relative to the

25  operator control room?

1  A    Right next to it.  I mean, there's a wall and a door

2  separating it.

3  Q    And was that meeting a closed-door meeting?

4  A    Yes.

5  Q    Was anybody else present?

6  A    No.

7  Q    At that meeting, do you recall having a discussion about

8  the Employer's implemented last, best and final offer?

9  A    Yes.

10  Q    And what do you recall about that discussion?

11  A    There were discussions over several items.  The first thing

12  that started out with was that, you know, trying to open up some

13  dialog, you know, that somehow we got off on the wrong foot.  So

14  there was a little bit of discussion about that.  There was a

15  discussion about the retiree health care, and making sure

16  there's no changes.  And that led to Mr. Meadows telling me

17  there would not be any changes.  But when I asked him about the

18  deductibles -- these are past retirees and also current retirees

19  -- he told me, oh, well, he couldn't tell me that, you know, for

20  sure.

21      And then we discussed how the actual insurance was.  And he

22  told me that our contract didn't read that way.  And I referred

23  him to that's because the actual plan for it is in our

24  disability plan book.

25  Q    And after the discussion about insurance, what did the

1 parties discuss next?

2 A    Sure.  Mr. Meadows told me that we were going to get a

3 contract.  And asked him, "If you are at impasse," you know,

4 "how are we going to get a contract?"

5 Q    And what was his response?

6 A    He told me negotiations were over.  I was sitting -- he was

7 sitting just a couple feet away from me, but I was sitting next

8 to a desk, and I had a copy of the implemented contract.  He

9 pointed to the implemented contract and said, "We can interpret

10 that."

11 Q    Okay.  Did Mr. Meadows clarify his statement about what he

12 meant by interpreting the final offer?

13 A    Just meant that we could interpret what the meaning of it

14 was.  And my response was that the Union needed actual language.

15 Q    Did you explain anything further, beyond that?

16 A    Not particular to that.  I mean, we had a conversation

17 about trying to get negotiations just so, you know, we could get

18 somewhere.  I pointed out that, you know, the position we are

19 at.  And I was using the thing, "Well, you may have what you

20 consider leverage over here, and we may consider we have

21 leverage over here, but it is really -- it is not going to get

22 us anywhere," that "We just need to get to a discussion."  And

23 when I was using that as -- you know -- and "There's charges out

24 there.  We don't know which way it would go."

25 Q    Okay.  And when you mention "charges," what charges were

1    you talking about?

2        MR. BUTTRICK:  I am just going to object about any

3    discussion of the charges.  There's no 8(a)(4) allegations in

4    this Complaint, either.

5        JUDGE CARISSIMI:  How is discussion of the charges

6    relevant?

7        MR. WIESE:  Well, Your Honor, the testimony about Mr.

8    Meadows' response to the charges, I believe, is relevant to show

9    a --

10       JUDGE CARISSIMI:  All right, you don't need to, because I

11   am going to overrule the objection.

12       I will let you ask the question.

13   Q    BY MR. WIESE:  What was Mr. Meadows' response when you

14   brought up the unfair labor practice charges?

15   A    That he was not worried about the charges; that if they

16   ruled against him, referring to the Board, he would come back to

17   the table and do the exact same thing and get to impasse.

18   Q    Was that the end of the conversation that day?

19   A    Yes, pretty much.

20   Q    Mr. Eby, after the Employer implemented its contract --

21   well, during the period of time that you were the Union

22   president -- could you say what period of time that was?

23   A    That they implemented on 9/14/2015, and I served, Union

24   president, through December 31, 2015.

25   Q    So during the period of time between the Employer's

1    implementation and the time that you stopped serving as Union

2    president, did the Union and company reach any agreements to

3    modify the overtime provisions of its implemented offer?

4    A    No.

5    Q    During the same period of time, did the Union reach any

6    agreements with the Employer to modify the vacation proposal in

7    its implemented offer?

8    A    No.

9    Q    Finally, during this same period of time, did the Employer

10   provide notice to the Union that it was going to change the

11   rules regarding employees leaving the Penford Ingredion facility

12   during lunch?

13   A    No.

14   Q    Mr. Eby, have you spoken with any managers about your

15   involvement in this unfair labor practice hearing?

16   A    A brief discussion with Levi Wood.

17   Q    And approximately when did this conversation occur?

18   A    I believe it was the last week of March, 2016.

19   Q    And where did that conversation take place?

20   A    Outside in the plant yard, near building 13.

21   Q    Was anybody else present for that conversation?

22   A    No.

23   Q    How long did the conversation last, approximately?

24   A    Five, 10 minutes.

25   Q    As best you can recall, what happened during that

1    conversation?

2    A    He gave condolences to my son's passing.  And I asked Levi

3    if he was looking forward to the trial, or if he was ready -- if

4    he was ready for the trial.

5    Q    And what do you recall, after that?

6    A    He said, "No, not really.  Are you?  Oh, you are probably

7    looking forward to it."

8         MR. BUTTRICK:  And I am just going to object.  I don't see

9    the relevance of any of this at all.

10        JUDGE CARISSIMI:  Yes, what is the relevance of this,

11   counsel?

12        MR. WIESE:  It touches on, I mean, testimony that we have

13   elicited.

14        JUDGE CARISSIMI:  All right, I will let -- I am going to

15   overrule the objection rather than having Mr. Eby leave.

16        If you are telling me it is going to touch on the

17   testimony, I expect that to happen --

18        MR. WIESE:  It will happen --

19        JUDGE CARISSIMI:  -- relatively soon.

20        MR. WIESE:  -- shortly, Your Honor.

21        JUDGE CARISSIMI:  All right.  The objection is overruled.

22   You may proceed.

23   Q    BY MR. WIESE:  And as it relates to this hearing and these

24   charges, what do you recall from that conversation?

25   A    Levi said that one, that he was going to tell the truth,

1    that he had discussions with local management, there were

2    conversations between them, and Levi was telling me he'd tell

3    the truth.  And the other thing was that Levi told me that the

4    company believes it was going to lose, and was going to end up

5    appealing.

6         MR. BUTTRICK:  Again, object to the relevance of any of

7    that.  I mean, move to strike it.

8         JUDGE CARISSIMI:  No, I am going to deny the motion to

9    strike.  What weight I attach to it is subject to argument, but

10   it is admissible evidence.  It is a named supervisor.  Now,

11   along with that, I mean, it is opinion from a layperson.  It is

12   not that meaningful, but I am not going to strike the testimony.

13   Q    BY MR. WIESE:  Do you recall Mr. Wood saying anything about

14   --

15        MR. WIESE:  Actually, nothing further, Your Honor.

16        JUDGE CARISSIMI:  Very good.

17        No further questions for Mr. Eby?

18        MR. WIESE:  No.

19        JUDGE CARISSIMI:  Very good.

20        All right, so we -- it is 12:15.  Mr. Buttrick, how much

21   time would you want for preparation for your cross, plus time to

22   get something to eat?

23        MR. BUTTRICK:  We will -- I would like to see his

24   statements, of course.  I don't know how long his are.

25        JUDGE CARISSIMI:  Yes, let's find out that. That plays into

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1    it.

2        How many statements and how long?

3        MR. WIESE:  Mr. Eby has three affidavits, the longest of

4    which is from October -- it was signed and sworn on October 24,

5    2015.  That affidavit is 23 pages in length, and is related to

6    this charge.  Mr. Eby also has an affidavit that is five pages

7    in length, dated August 1, 2015, related to this charge.  Mr.

8    Eby also has an affidavit that is 11 pages in length, dated --

9    excuse me, 12 pages in length, Your Honor, dated 6/21/2013.

10   That affidavit is from the vibration analysis charge and is not

11   -- is not in response to the charges in this case.

12       JUDGE CARISSIMI:  All right.

13       MR. WIESE:  And then --

14       JUDGE CARISSIMI:  But you are going to furnish that one,

15   correct?

16       MR. WIESE:  Yes, yes, we are intending to.

17       JUDGE CARISSIMI:  Then I commend you for that.  I have had

18   issues with some Regions on closed cases or other cases, but I

19   certainly agree with your turning it over.

20       MR. WIESE:  And then it looks like there are approximately

21   -- I believe there are 21 page of e-mails and other documents.

22       JUDGE CARISSIMI:  All right, very good.

23       Well, Mr. Buttrick, what do you think?

24       MR. BUTTRICK:  Two and a half hours?

25       JUDGE CARISSIMI:  It is a lot of material, so I am going to

1  grant that request.

2      So -- well, why don't we say this, Mr. Buttrick, why don't

3  we say two hours, and if you -- let's have everybody back here

4  in two hours.  If you need more time, you tell me, and I will

5  grant you that, because you have been very efficient in

6  operating within timeframes.  So I am confident maybe you will

7  get through all of that in two hours.  But, if not, that is

8  fine, you tell me, and we will give more time.

9      So, we are going to be in recess until 2:20, and then we

10  will see where we go, all right?

11      Off the record.

12  (Whereupon, at 12:19 p.m., the hearing was recessed for lunch,

13  to reconvene at 2:20 p.m., in the same place.)

14      JUDGE CARISSIMI:  On the record.

15      Mr. Buttrick, you may cross-examine.

16      MR. BUTTRICK:  Great.

17      Mr. Eby, I am Stuart Buttrick, we have met before.  I am

18  counsel for Ingredion, and I want to thank you, again, for your

19  time here the last several days.  I know it is a big imposition,

20  so thank you for coming.

21      I am just going to be asking you some questions about your

22  direct testimony for the next couple moments.

23                        CROSS-EXAMINATION

24  Q    BY MR. BUTTRICK:  I would like to begin by asking:  How

25  long has a union represented the employees at the Cedar Rapids

1  plant?

2  A    I know, on our wall in the office, we have our Grain

3  Millers charter, 1948.

4  Q    1948, okay.  And so how long has a version of the Red Book

5  been in effect at the Cedar Rapids plant?

6  A    Since at least 1948.

7  Q    Okay.  And you worked, at least for some part of your

8  employment, in the lab, correct?

9  A    Correct.

10  Q    And the lab is in the starch/service department, correct?

11  A    Yes.

12  Q    And that is a production capacity, correct?

13  A    Yes.

14  Q    And so you looked at Ingredion contracts prior to the

15  bargaining, when you learned that Ingredion was going to

16  purchase the Penford plant, correct?

17  A    Yes.

18  Q    And why did you do that?

19  A    Just preparation.

20  Q    And so you were thinking that, perhaps, you might get

21  proposals from Ingredion that looked like these other contracts,

22  correct?

23  A    We were looking to see if there was main, common issues.

24  Q    Okay.  And none of those contracts -- that were from

25  Ingredion's other plants -- none of them looked like the Red

1 Book, correct?

2 A    They all varied.

3 Q    Well, did you see any Ingredion contracts with any other

4 plants that were similar in form or substance to the Red Book?

5 A    In -- they all talked about terms and conditions of

6 employment, if you talk about substance.  There is not one that

7 said "Penford Products" on it.

8 Q    Did any of them have provisions, substantively, terms

9 similar to what are found in the Red Book?

10 A    I guess I don't understand, unless you can ask a specific

11 one.  I mean, it was not a contract with Penford Products --

12 Q    No, I --

13 A    -- that was negotiated.

14 Q    -- I am not asking about that.  I am asking about the

15 provisions in the contract themselves, the provisions that you

16 are really used to, working at Penford.  Those Ingredion

17 contracts didn't have those similar types of provisions in them,

18 did they?

19 A    They had overtime provisions -- we didn't read them, word

20 for word, to compare every one of them.  We looked for major

21 issues.

22 Q    All right.  You say you were trying to find themes between

23 all the contracts, correct?

24 A    Yes.

25 Q    Okay.  And so what themes did you see?

1    A    The main themes was that, in North America -- well, with

2    the exception of Canada -- that the pensions were frozen, and

3    the trend was to move to high-deductible health insurance.  And

4    it looked, in the last couple contracts, I believe it was

5    Indianapolis and Argo, the company desired to move the lab out

6    of the recognition unit.

7    Q    Okay.  And so, at Cedar Rapids, you had a pension, correct?

8    A    Yes.

9    Q    And at Cedar Rapids you did not have a high-deductible

10   health plan, correct?

11   A    Correct.

12   Q    And Cedar Rapids, the lab is in the unit, correct?

13   A    Yes.

14   Q    So these are things that are all different than what was at

15   Cedar Rapids, correct?

16   A    Yes.

17   Q    And did you find these differences to be a concern?

18   A    Yes.

19   Q    And so, because of that concern, the Union brought in

20   International Representative Jethro Head to assist with the

21   negotiations, correct?

22   A    We had planned on that prior to it --

23   Q    Okay.

24   A    -- but that is another reinforcement of our decision to do

25   it.

1  Q    Because he is a skilled negotiator, correct?

2  A    He has experience that I didn't, yes.

3  Q    And so the last negotiations at Penford, when the Red Book

4  was substantively bargained over, was in 2004, correct?

5  A    Yes, although the book wasn't red at the time.

6  Q    But since 2004, you just had a series of extensions,

7  correct?

8  A    Yes.

9  Q    And so, because they were just extensions, even though you

10  were in a management capacity with the Union, and you weren't

11  even really involved in those discussions, correct?

12  A    No, no.

13  Q    Sorry, what was the answer?

14  A    No.

15  Q    No, you weren't involved?

16  A    No.

17  Q    Now, the Red Book, in the spring of 2015, it didn't have

18  any terms that required the parties to bargain prior to its

19  expiration, correct?

20  A    My understanding is that the Union's contract did require

21  the exchange of proposals, as outlined 60 days prior, you know,

22  or they would be closed.

23  Q    And both parties complied with that, in this circumstance,

24  correct?

25  A    I wouldn't characterize that at all.

1    Q    Well, the company gave you a whole series of new proposals,

2    correct?

3    A    They didn't address it according to how it was outlined in

4    the contract.

5    Q    But they gave you something, correct?

6    A    They gave me something, yes.

7    Q    Okay.  But my question was that the Red Book doesn't

8    require the parties to sit down and begin bargaining early,

9    correct?

10   A    Outside of the exchange on 60 days, I don't believe it

11   lists anything else.

12   Q    Okay, so there's nothing that said that the parties had to

13   begin negotiations at the table in March, for example?

14   A    No.

15   Q    The company didn't ultimately require -- excuse me, strike

16   that.  In labor relations meetings in the spring of 2015, the

17   company agreed with the Union that it wouldn't require -- and

18   when I am speaking of the company, I am speaking of Ingredion --

19   require employees to sign the code of business ethics, correct?

20   A    The actual agreement came from Mr. Meadows on April 6th.

21   Q    Okay.  So there was no requirement that employees had to

22   sign the code of business ethics in the spring of 2015, correct?

23   A    No, not after April 6th.

24   Q    And no employees got disciplined for signing the code of --

25   or not signing the code of business ethics, correct?

1  A    I wasn't aware of any.

2  Q    Okay.  And, also in the spring of 2015, in labor relations

3  meetings, the Union and the company discussed manlifts, correct?

4  A    Yes.

5  Q    And turning to Mr. Meadows' April 6th meeting with you, you

6  didn't take any notes as he was talking during this meeting,

7  correct?

8  A    No.

9  Q    And you didn't tape-record the meeting, correct?

10  A    No.

11  Q    And so your testimony about that is based upon your own

12  memory, correct?

13  A    Yes.

14  Q    And there's -- you can't recall the exact words that every

15  person said at every part of that meeting, correct?

16  A    Correct.

17  Q    And so, talking about the parties' bargaining in the summer

18  of 2015, it is fair to say that the parties couldn't agree on a

19  bargaining process, correct?

20  A    Yes.

21  Q    The Union wanted the Employer to be bargaining off the Red

22  Book, correct?

23  A    That is an oversimplification.

24  Q    Well, what do you mean by that?

25  A    Well, you said -- there was no intention to force them to -

1  - that we wouldn't entertain any proposals outside of that.  We

2  would like them, and continued to request the company to address

3  their proposals with some sort of relationship to our existing

4  contract.

5  Q    That's right, you always wanted it to relate back to the

6  Red Book, correct?

7  A    Much easier to follow that way.

8  Q    Okay.  And the company, on the other hand, always wanted to

9  work from its proposed format, correct?

10 A    Yes.

11 Q    And the Union had no intention, in its bargaining, to throw

12 out the Red Book and to adopt the company's format, correct?

13 A    The Union never ruled out any specific items or subjects.

14 The Union's only position is that negotiation is not an all-or-

15 nothing proposition.

16 Q    And from June 1, 2015 until the company gave the Union its

17 last, best and final on August 18, 2015, did the Union adopt any

18 of the company's proposals?

19 A    The -- from June 1st --

20 Q    That is correct.

21 A    -- until when?

22 Q    Until August 18th, when the company gave you --

23 A    Yes, I -- sorry, go ahead and finish.

24 Q    -- and until the company gave the Union the last, best and

25 final, did the Union agree to any of the company's proposals?

```
1   A     The Union, on 6/29, incorporated some of the company's

2   proposals in their proposal.

3   Q     Which were they increased the size of the bargaining

4   committee, correct?

5   A     That was one of them.

6   Q     And to provide space for the Union to hold meetings,

7   correct?

8   A     Yeah, I would have to see the document.

9   Q     Well, if you can turn to -- it is Joint 11, and if you look

10  at Article II, section 2, and then also section 4?

11  (Witness proffered document.)

12  A     Yes.

13  Q     So those were the two company proposals that the Union

14  agreed to, correct?

15  A     Those are -- those two, yes, we did agree to.

16  Q     And you didn't agree to any other company proposals between

17  June 1 and August 18, correct?

18  A     I think on Article V, modified section 1, I would have to

19  look through it, but I believe we changed the language there.  I

20  believe the 7 and 14 days were in the company's proposal, but I

21  would have to confirm it, but from my just recollection --

22  Q     So, as you sit here, you don't know as you sit here today?

23  A     As I glance over this, I don't recall that as one of our

24  proposals.

25  Q     Would you like to look at one of the Union's -- company's
```

1 proposals to see if, in fact, the Union adopted it?

2 A    Sure, if you want to point out.

3 Q    Yeah, and so why don't you look at what would be the

4 company's first proposal, which would be from June 1st, which is

5 Joint 1?  And we can go off the record if you need some time.

6 (Witness proffered document.)

7    THE WITNESS:  Well, if you could just point out to me, you

8 know, Ken's contract section that it is in.

9    MR. BUTTRICK:  It is not in there, that is why I am asking

10 the question.

11 (Pause.)

12    MR. WIESE:  Which document are we looking at here?

13    MR. BUTTRICK:  Joint 1.

14    MR. WIESE:  I am sorry to interrupt.

15    JUDGE CARISSIMI:  That's all right, you need to know.

16 Joint Exhibit 1 is what Mr. Eby has.  And he also has in front

17 of him Joint Exhibit 11, correct, Mr. Eby?  If you look at the

18 front page, it says the exhibit number?

19    THE WITNESS:  Yes.

20    JUDGE CARISSIMI:  Okay.

21    Do you have those, Mr. Wiese?

22    MR. WIESE:  Yes.

23    JUDGE CARISSIMI:  Okay.

24 (Pause.)

25    JUDGE CARISSIMI:  Let's go off the record.

1    (Off the record.)

2    JUDGE CARISSIMI:  Let's go back on the record.

3    Mr. Buttrick, what was the question again?

4    MR. BUTTRICK:  The question was:  Is from the period of

5    June 1, 2015, to August 18, 2015, the only two proposals that

6    company provided to the Union, that the Union accepted, were to

7    increase the size of the Union's negotiating committee and to

8    provide the Union with in-house space for elections, correct?

9    JUDGE CARISSIMI:  Can you answer that, sir?

10   THE WITNESS:  Sure, I can address that.

11   On Joint Exhibit No. 1, page number 9, section 1, number D,

12   "The failure of" -- reading from the company's June 1 proposal -

13   - "The failure of an employee, after a layoff, to notify the

14   company within seven days and to actually report back to work

15   within 14 days" -- do I need to finish the rest of the

16   sentences?

17   JUDGE CARISSIMI:  Well --

18   THE WITNESS:  I mean, I am just pointing out that is where

19   it came from, Your Honor.

20   JUDGE CARISSIMI:  But can you answer counsel's question?

21   THE WITNESS:  That is where it is incorporated from.

22   MR. WIESE:  Your Honor, the question that was posed to the

23   witness was comparing these two specific contract proposals,

24   that's what Mr. Eby was answering.

25   THE WITNESS:  Yes, that is one of the adoptions --

1   adaptations.  I believe, also, the bottom of your Joint Exhibit

2   11, "Seniority for each employee shall start the first day of

3   employment on their last hiring," that there.  And the

4   continuation through to ending with "Seniority will be

5   established drawing by numbers."  That is another incorporation

6   from the company's proposal, with the item left over drawing

7   numbers, as Mr. Meadows left in his contract, that last part

8   open, that he didn't care how it was.  You know, I could

9   continue to delve through this.  I imagine there may be more

10  incorporated into it.

11  Q    BY MR. BUTTRICK:  Okay, so you have identified what you

12  believe to be four things, correct?

13  A    Yes, you asked me if there were more than two.

14  Q    Okay.  And so how many proposals did the Union withdraw,

15  from the period of June 2, 2015, until August 18, 2015?

16  A    Officially, that I know of, two.

17  Q    And those were for stirrer sticks, correct?

18  A    Correct.

19  Q    And herbal tea, correct?

20  A    Correct.

21  Q    Now, during the summer of 2015, the company continued to

22  make various changes to its proposals, throughout many of the

23  bargaining sessions, correct?

24       MR. WIESE:  I am going to object, Your Honor:  vague.

25  And, again, the proposals speak for themselves.  I mean, the

1  changes are --

2      JUDGE CARISSIMI:  Overruled.

3      You may answer the question.

4      THE WITNESS:  The company, on multiple occasions, gave us

5  an entire new contract, and pointed out changes that they put in

6  it.

7  (Witness proffered document.)

8  Q    BY MR. BUTTRICK:  Okay.  And so, if you can turn your

9  attention to GC Exhibit 21, and this is, I believe, the Union's

10  -- what is commonly called the Union's list of concessions.  Do

11  you have that in front of you?

12  A    Yes.

13  Q    And so after receiving the list of concessions, the company

14  ultimately changed or modified a number of its proposals in

15  response, correct?

16  A    The company did include a few items back in, however, in

17  their own sections, in their own language.

18  Q    Okay.  And so they actually changed at least 25 of them,

19  correct?

20  A    I don't have a count of them but, as far as I know, I don't

21  ever recall sitting across the table and the company, at one

22  time, presenting 25 changes.

23  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 104.)

24      MR. BUTTRICK:  Okay.  Well, I am going to -- if I may

25  approach the witness, Your Honor?

1      JUDGE CARISSIMI:  You may.

2      MR. BUTTRICK:  I am going to show him what has been marked

3 as Penford 104, which is the witness's affidavit to the NLRB,

4 dated August 1, 2015.  I direct his attention to lines 20 and

5 21.

6 (Witness proffered document.)

7 Q    BY MR. BUTTRICK:  Can you read those?

8      JUDGE CARISSIMI:  What is the date of this affidavit?

9      MR. BUTTRICK:  August 1, 2015.

10 Q    BY MR. BUTTRICK:  Have you read it?

11 A    Can I read -- oh, yes.

12 Q    And so, looking at Penford 104, I will ask you the question

13 again.  After receiving the concessions, the company changed or

14 modified at least 25 of those, correct?

15 A    No, that is not what it states.  That is an approximation.

16 And -- and some of them would be clarification that turned out,

17 you know, in Ken's discussion, just like when we went over the

18 list with the lunch, that he originally proposed.  So that

19 wouldn't be a change.

20      MR. BUTTRICK:  Okay, well, I am go ahead and then read into

21 the record, if I could?

22      JUDGE CARISSIMI:  And here is my approach to that.  You

23 need to indicate "quote" --

24      MR. BUTTRICK:  Okay.

25      JUDGE CARISSIMI:  -- when you start whatever the affidavit

1   says, and then "end quote," so the record is clearly going to

2   indicate what the affidavit states.  And, Counsel for the

3   General Counsel, you have the affidavit?

4       MR. WIESE:  We are trying to gather that, Your Honor, just

5   one second.

6       JUDGE CARISSIMI:  All right, we will go off the record.

7   (Off the record.)

8       JUDGE CARISSIMI:  Let's go back on the record.

9       The parties have stipulated that Penford Exhibit -- or

10  Respondent Exhibit 104 is, in fact, the affidavit of Mr. Eby

11  that was produced by the General Counsel.

12      Mr. Buttrick, you may proceed.

13      MR. BUTTRICK:  Just let the record reflect that in an

14  affidavit, signed August 1, 2015, on lines 20 and 21, Mr. Eby

15  informed the Board, under oath, that from his initial proposal,

16  Meadows wanted -- and I quote, sorry, I will start over and I

17  will quote.

18      JUDGE CARISSIMI:  Start over.

19      MR. BUTTRICK:  Yes.  "From his initial proposal, Meadows

20  wanted 125 concessions.  From that list we are down to about 100

21  concessions."

22      MR. WIESE:  I am going to object, Your Honor.  I mean, that

23  --

24      JUDGE CARISSIMI:  To what, sir?

25      MR. WIESE:  -- as to what I understand, that

1    mischaracterizes the testimony on the record.  I mean, it is

2    improper -- okay.

3        JUDGE CARISSIMI:  It is in his affidavit.  There's rules,

4    sir, if you want to address that issue, but what counsel did is

5    perfectly appropriate.  I overrule your objection.

6    Q    BY MR. BUTTRICK:  And if you can look at Joint Exhibit 10,

7    which is the Union's first proposal?

8    (Witness proffered document.)

9    Q    And do you have that in front of you?

10   A    Yes.

11   Q    Okay.  The company said yes to at least one of these items

12   in the Union's first proposal, as well, correct?

13   A    Yeah, if I recall right, it was the word "agree," as going

14   through with no language discussion.

15   Q    And looking at Joint Exhibit 10, in this proposal the Union

16   brings up, on page 5, which is -- actually, let me find it.  No,

17   it is page 4, which is PF574.  The Union proposes that the

18   company will return the vibration analysis to the bargaining

19   unit, as a resolution to July 2013 agreement.  That was one of

20   the proposals, correct?

21   A    Yes.

22   Q    And Mr. Meadows did not agree to that proposal, correct?

23   A    It was in their June 1st proposal, saying "outsourcing."

24   Q    So there was no agreement to the Union's proposal about

25   vibration analysis as --

1  A    Was there any sort of tentative agreement?  No.

2  (Witness proffered document.)

3  Q    And so looking at Joint Exhibit 7, which is the company's

4  final offer, the company agreed to at least three of the Union's

5  proposals in this final offer, correct?

6  A    Which ones?

7  Q    Well, the company agreed to the amount of time that someone

8  on active military duty can receive health insurance, correct?

9  A    To a portion of that proposal.  My understanding -- I mean

10  we were requesting for the family and the individual, and in

11  negotiation early on, I believe it was June, Ken said that he

12  would give both.  And then his next proposal had just for the

13  family, it just made mention of family.

14      MR. BUTTRICK:  Well, I am going to -- if I may approach

15  again?

16      JUDGE CARISSIMI:  You may.

17  (Witness proffered document.)

18  Q    BY MR. BUTTRICK:  I hand you again what is marked as

19  Exhibit 104, the affidavit you gave on August 1, 2015, to the

20  NLRB.  If you look on line 22, and it goes to 23, if you can

21  read that as it relates to the military?

22      JUDGE CARISSIMI:  Mr. Eby has returned the affidavit to Mr.

23  Buttrick.

24  Q    BY MR. BUTTRICK:  So I will ask you again, Mr. Eby, did the

25  Employer agree to extend the amount of time that someone on

1  active military duty can receive health insurance?

2  A    The company -- yeah -- the company put a proposal in.

3  Q    Did they actually agree to this Union proposal?

4  A    That is an oversimplification, I guess.  I mean, yeah, I

5  know what my affidavit says, and yeah, that is a version of our

6  proposal in there, yes, I can testify to that.

7       MR. BUTTRICK:  Well, if I may, Your Honor, I would like to

8  then read into the record what Mr. Eby's affidavit said in that

9  regard?

10      JUDGE CARISSIMI:  You may.

11      MR. BUTTRICK:  Okay, I am reading from Mr. Eby's August 1,

12  2015 affidavit to the NLRB, which he provided, under oath, and

13  he says, and I quote, "In the Employer's final offer, which was

14  given at 4 p.m. on July 31, 2015, the Employer agreed to three

15  of the Union's items, which were agreeing to extend the amount

16  of time that someone on active military duty can receive health

17  insurance...."

18  Q    BY MR. BUTTRICK:  Now, Mr. Eby, in that final offer, the

19  company also agreed to one of the Union's proposals about a two-

20  dollar pay increase for maintenance employees, correct?

21  A    Correct.

22  Q    And, in the final offer, the company also agreed to have

23  long-term disability, which is something that the Union

24  proposed, correct?

25  A    We proposed it, and yes, they gave it to us.  There was no

1    negotiation over it, as far as discussion of what it be.

2    Q    Regarding the discussion of the flower fund that occurred

3    in the bargaining, do you recall Mr. Meadows expressing his

4    concern about whether that fund would be legal?

5    A    Yes.

6    Q    And that was part of the basis for why he was reluctant to

7    agree to the flower fund, correct?

8    A    Yes.

9    Q    With regard to your bargaining notes, as you sit here today

10   you can't recall exactly what was said during each of the

11   parties' bargaining meetings, correct?

12   A    I can't recall every single thing that was said, no.

13   Q    Okay.  And so, in part, you are relying on your own notes

14   to refresh your recollection from time to time, correct?

15   A    Yes.

16   Q    And you are not a certified Court Reporter, correct?

17   A    That is correct.

18   Q    And you don't know shorthand, correct?

19   A    No.

20   Q    And you didn't tape-record the bargaining, correct?

21   A    No.

22   Q    Okay, so your bargaining notes are not a verbatim

23   transcription of the things that were said in the bargaining,

24   correct?

25   A    That is correct.

1   Q    There's likely things that were said by the parties, during

2   the negotiations, that are not reflected in your notes, correct?

3   A    Yes.

4   Q    And so, on the notes that you took, were they all taken by

5   you when you were at the table, at the time the words were said?

6   A    Yes.

7   Q    Okay.  So if you can look at -- I have got to find it.  I

8   think it is --

9       MR. FUNK:  GC 18.

10     MR. BUTTRICK:  -- GC 18 --

11     MR. FUNK:  GC 18.

12     MR. BUTTRICK:  -- and I have to find it myself, though.  GC

13   18.

14   (Witness proffered document.)

15   Q   BY MR. BUTTRICK:  And if you go to pages 11 through 13 --

16     JUDGE CARISSIMI:  Let's take a break for a second.  We are

17   on the record, but counsel, do you have it?

18     MR. WIESE:  Yes, Your Honor.

19     JUDGE CARISSIMI:  All right, I wanted to make sure that

20   opposing counsel has an exhibit before we go further.

21     You may continue.

22     MR. WIESE:  From now on, I will make sure to note my

23   objection if I need more time.

24     JUDGE CARISSIMI:  All right.  And what I will do, because

25   there's a lot of documents, I will make sure, if counsel is

1    going to examine about a document, I will ask you, "Do you have

2    it in front of you?" all right?

3        MR. WIESE:  Thank you, Your Honor.

4        MR. BUTTRICK:  My apologies.

5        JUDGE CARISSIMI:  That's all right.  It is up to me to

6    monitor what is going on here.

7        You may continue, Mr. Buttrick

8    Q    BY MR. BUTTRICK:  Mr. Eby, looking at page 11 of 19, I see

9    in the left-hand margin, it says "Eby Notes 1 of 3," did you

10   write that?

11   A    Yes.

12   Q    And so when did you write that?

13   A    Some time after that.

14   Q    Okay, so you modified your notes some time after the notes

15   were taken?

16   A    These aren't my original notes.

17   Q    These are not your original notes?

18   A    These are photocopies of my original notes.

19   Q    Okay.

20   A    So are my notes, but --

21   Q    But -- so you wrote on the notes here, though, some part of

22   it, that was after the parties left the bargaining table?

23   A    Yes.

24   Q    If you can look at General Counsel Exhibit 9(b)?  I,

25   myself, also need to find that.

1   (Witness proffered document.)

2        MR. BUTTRICK:  Do you have that in front of you, everyone?

3        MS. OHAERI:  Yes.

4        MR. BUTTRICK:  Okay.

5        MR. WIESE:  Yes.

6   Q    BY MR. BUTTRICK:  This is the Union information request

7   from June 29, 2015, correct?

8   A    Yeah, 6/29, yeah.

9   Q    And if you could look at Joint Exhibit 19?

10  (Witness proffered document.)

11       MR. BUTTRICK:  Do you have that in front of you, Mr. Eby --

12  and I will wait for Tyler, too.

13       MR. WIESE:  I have it, Your Honor.

14       JUDGE CARISSIMI:  You have it?

15       MR. WIESE:  Yes.

16       JUDGE CARISSIMI:  Very good, you may continue.

17  Q    BY MR. BUTTRICK:  This was an e-mail, looking at the top,

18  that Mr. Meadows sent to Mr. Head and you on June 29, 2015,

19  correct?

20  A    Yeah, I see a -- from Meadows to carbon-copy me in.

21  Q    And this contains some information about insurance rates

22  for hourly employees, correct?

23  A    This is the current -- was the current insurance rates.

24  Q    That is correct.

25  A    Yeah, it was our current insurance rates for our existing

1 health plan.

2 Q    And so the parties, between bargaining sessions -- the

3 "parties," I mean Mr. Meadows and Mr. Head and you -- would

4 oftentimes communicate via e-mail or via letter, correct?

5 A    I would say that "oftentimes" is a mischaracterization, but

6 was there some communication?  Yes.

7 Q    And so it wouldn't be unusual for the parties to

8 communicate with each other via e-mail or hard copy letter

9 between bargaining sessions, correct?

10 A    Actually, I would have to call it more unusual than

11 regular, but --

12 Q    But it happened, though, correct?

13 A    Yes.

14 Q    Okay.  So if you could look back at GC Exhibit 21, which is

15 the list of concessions --

16     JUDGE CARISSIMI:  Mr. Buttrick, the air is on, so you are

17 going to have to keep your voice up a little bit, okay?

18     MR. BUTTRICK:  I am sorry.

19 Q    BY MR. BUTTRICK:  Do you have that in front of you, Mr.

20 Eby?

21     MR. FUNK:  You already have it.

22     THE WITNESS:  Oh, I am sorry, what was it then?

23     MR. BUTTRICK:  GC 121.

24     THE WITNESS:  What one was it?

25     MR. BUTTRICK:  This is the list of concessions.

1      THE WITNESS:  Oh, I'll find it.  Yes, I have it now.

2      MR. BUTTRICK:  Okay.

3      MR. WIESE:  Yes, I have it, Stuart, thank you.

4   Q    BY MR. BUTTRICK:  So the Union prepared this document on or

5   about July 10th, as noted on the document, correct?

6   A    That is correct.

7   Q    And the Union provided this document to the company in

8   bargaining on or about July 29th, correct?

9   A    Yes.

10  Q    The membership gave the leadership the authority to call a

11  strike, at any time, in the summer of 2015, correct?

12  A    On August 1st.

13  Q    And when was the last time, if ever, the membership gave

14  the Union leadership the ability to call a strike at any time?

15  A    On August 1st.

16  Q    It never happened before?

17  A    Oh -- I thought you said -- restate the question, please.

18  Q    So, prior to August 1, 2015, when was the last time, if

19  ever, the membership gave the Union's leadership the authority

20  to call a strike at any time?

21  A    So are you asking prior, because when you -- my definition

22  of when last --

23      JUDGE CARISSIMI:  Counsel is asking you before August 1,

24  2015, that is the question.

25      THE WITNESS:  They -- we took in -- I believe it was July -

1  - a preauthorization strike -- I mean to seek preauthorization,

2  which is basically a technical functional thing to seek approval

3  for the International to be approved should our members vote to

4  go on strike.

5  Q   BY MR. BUTTRICK:  And that happened in July of 2015?

6  A   Yes.

7  Q   If you can turn to Joint Exhibit 14.

8  (Witness proffered document.)

9      JUDGE CARISSIMI:  Mr. Wiese, have you located that one?

10     MR. WIESE:  I have not, yet, Your Honor.

11     MR. BUTTRICK:  I have not located it, either, so --

12     JUDGE CARISSIMI:  All right, let's go off the record.

13 (Off the record.)

14     MR. BUTTRICK:  Are we back on?

15     JUDGE CARISSIMI:  We are now.

16     MR. BUTTRICK:  Thank you, Your Honor.

17     JUDGE CARISSIMI:  You may proceed, counsel.

18 Q   BY MR. BUTTRICK:  Before I get to Joint 14, actually, I

19 forgot to ask another question.  In 2004, if you recall or if

20 you know, did the membership authorize the Union leadership to

21 have the ability to call a strike at any time?

22 A   The way it was presented in 2004, August 1st, was to go on

23 strike that day.

24 Q   Now looking at Joint 14, which is the Union's pay proposal

25 -- looking at Union 14, the Union's pay proposal, the Union

1    provided this to the company after the company had given it its

2    last, best and final offer, correct?

3    A    Yes.

4    Q    And this was the first pay proposal that the Union provided

5    to the company, correct?

6    A    The what -- the -- yes, outside of the initial of what we

7    planned on proposing during the negotiation process given on

8    June 1st, yes, this is.

9    Q    Okay.  This was the first time that the Union identified,

10   with specificity by job title, a wage rate for that job title,

11   correct?

12   A    Yes.

13   Q    The Union hasn't filed any grievances in 2015, regarding

14   the vibration analysis, correct?

15   A    No.

16   Q    After the company unilaterally implemented the last, best

17   and final, the Union filed grievances related to overtime

18   issues, correct?

19   A    Yes.

20   Q    You would agree that the Union canceled bargaining meetings

21   during the summer of 2015, correct?

22   A    I know that there was, I believe, a July 13 through 15

23   session that Jethro Head had to cancel.

24        MR. BUTTRICK:  Can we just go off the record for a moment,

25   Your Honor?

1    JUDGE CARISSIMI:  Off the record.

2  (Off the record.)

3    JUDGE CARISSIMI:  Back on the record.

4    Anything further?

5    MR. BUTTRICK:  Nothing further, Your Honor.

6    JUDGE CARISSIMI:  Very good.

7    Is there any redirect, Mr. Wiese?

8    MR. WIESE:  Could I have five minutes to review my notes?

9    JUDGE CARISSIMI:  Certainly

10    MR. WIESE:  Thank you.

11    JUDGE CARISSIMI:  We will be in recess for five minutes.

12  (Brief recess taken.)

13    JUDGE CARISSIMI:  On the record.

14    Mr. Wiese, do you have any questions on redirect?

15    MR. WIESE:  Actually, Your Honor, there's one -- there's an

16  exhibit issue that I would like to enter through Mr. Eby, but we

17  don't have it printed yet.  That's --

18    JUDGE CARISSIMI:  I am sorry, sir, I missed the last part.

19    MR. WIESE:  I apologize, Your Honor.

20    JUDGE CARISSIMI:  Yes.

21    MR. WIESE:  I am speaking too quickly.  The -- so there's

22  an exhibit that we would like to enter through Mr. Eby on

23  redirect, if possible, that we haven't an opportunity to print.

24  I neglected to --

25    JUDGE CARISSIMI:  All right, so you need some additional

1 time?

2 MR. WIESE: Yes, yes.

3 JUDGE CARISSIMI: All right. Now, again, I am certain that

4 you know, I mean, that obviously if you are going to introduce a

5 document, it has to be squarely within what was raised on cross

6 examination?

7 MR. WIESE: Yes.

8 JUDGE CARISSIMI: All right, very good, let's go off the

9 record and you can tell me when you are ready.

10 (Off the record.)

11 JUDGE CARISSIMI: On the record.

12 You may redirect, Mr. Wiese.

13                    REDIRECT EXAMINATION

14 Q    BY MR. WIESE: Mr. Eby, I would like to direct your

15 attention to Penford Exhibit 104?

16 MR. WIESE: Do we -- is there a copy of that with the

17 witness?

18 JUDGE CARISSIMI: No, Mr. Eby does not have it in front of

19 him.

20 MR. WIESE: Is there a copy that I could provide to him?

21 MR. BUTTRICK: This is ours, the only one that we have. We

22 don't have an extra.

23 JUDGE CARISSIMI: If you have an extra one, if not, if it

24 is going to be a brief exchange, I will give you permission to

25 come up to the witness stand and show the witness the document.

 1     MR. WIESE:  I believe we have an extra copy here.

 2  (Pause.)

 3     MR. WIESE:  Okay, this will be a brief exchange, Your

 4  Honor.

 5     JUDGE CARISSIMI:  All right, you may approach.  On the

 6  record, if I didn't say otherwise.

 7  (Witness proffered document.)

 8  Q    BY MR. WIESE:  Mr. Eby, could you turn to the last page of

 9  that document?  The very last page.  When did you provide that

10  affidavit?

11  A    August 1, 2015.

12  Q    And what else was going on that day?

13  A    We had just got done with the contract vote and rejection

14  on the final offer.  And also, you know, I was having

15  conversations on the phone with Jethro Head, and also with Mr.

16  Meadows.

17  Q    And about how much time do you recall it took to take that

18  affidavit?

19  A    Ten, 20 minutes?  I am not 100 percent sure.  It was later

20  in the day, I couldn't remember.

21  Q    Okay.  All right, I will take that back.

22     JUDGE CARISSIMI:  And what witness was shown was Respondent

23  Exhibit 104, correct, Mr. Wiese?

24     MR. WIESE:  Yes, that is correct, Your Honor.

25     JUDGE CARISSIMI:  I just wanted to make sure that the

1    record clearly reflected that.

2        MR. WIESE:  Showing the witness what has been marked as

3    Joint Exhibit 6.

4    (Witness proffered document.)

5        MR. WIESE:  Directing the witness's attention to page 31 of

6    that document.

7        JUDGE CARISSIMI:  Mr. Buttrick, do you have it in front of

8    you?

9        MR. BUTTRICK:  I do.  I am flipping to the page right now,

10   Your Honor.

11       JUDGE CARISSIMI:  Very good.

12   Q    BY MR. WIESE:  Mr. Eby, do you see the section in red on

13   that document?

14   A    Yes.

15   Q    Do you recall that change being made in the company's July

16   31st proposal?

17   A    I know it is highlighted here.  I mean, I would have to

18   look at the very last one to state which, but it is an

19   inclusion.

20   Q    Do you recall whether this change was made before the

21   Employer's final offer?

22   A    Yes, this isn't the final offer.  This would be prior to

23   that.

24   Q    And when you provided the affidavit, marked as Respondent's

25   104 --

1    (Pause.)

2        MR. WIESE:  Your Honor, nothing -- oh, yeah, yeah.

3    (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 87.)

4        MR. WIESE:  Your Honor, I have -- I am going to show the

5    witness a new exhibit marked as General Counsel Exhibit 87.

6        JUDGE CARISSIMI:  Eighty-seven?

7        MR. WIESE:  Yes.

8        JUDGE CARISSIMI:  All right.

9    (Witness proffered document.)

10   Q    BY MR. WIESE:  Mr. Eby, do you recognize this document?

11   A    Yes.

12   Q    What is it?

13   A    This is -- I forwarded this chain today to --

14   Q    Well, let's exclude the forwarding.

15   A    Okay.

16   Q    But, excluding the top part, what is the e-mail below that?

17   A    This is the e-mail that I -- with the Union's response to

18   the company's notice of implementation, it was the letter that I

19   made on 9/13, and I attached it and e-mailed, as you can see.  I

20   e-mailed it to Erwin Froehlich, at 9:08 p.m., and then carbon-

21   copied Jethro Head and myself.

22   Q    And the letter that you are referring to, is that -- I am

23   going to direct you to General Counsel Exhibit 54.

24   (Witness proffered document.)

25       JUDGE CARISSIMI:  You may proceed.

1     MR. WIESE:  Okay, I was -- do you have that document?

2     JUDGE CARISSIMI:  Oh, counsel for Respondent, do you have

3  GC l54?

4     MR. BUTTRICK:  GC l54, no.

5     JUDGE CARISSIMI:  Let's go off the record.

6  (Off the record.)

7     JUDGE CARISSIMI:  Back on the record.

8     Mr. Wiese, you may proceed.  Counsel for Respondent now has

9  GC l54.

10  Q    BY MR. WIESE:  Mr. Eby, when you spoke -- or, excuse me.

11  Is GC l54 the attachment to General Counsel Exhibit 87?

12  A    Yes.

13  Q    Is it?  Okay.

14     MR. WIESE:  I will offer General Counsel Exhibit 87.

15     JUDGE CARISSIMI:  Is there any objection to GC l87?

16     MR. BUTTRICK:  Yes, Your Honor.  I guess, if I can do a

17  little voir dire of the witness on this?

18     JUDGE CARISSIMI:  You may, yes.

19                    VOIR DIRE EXAMINATION

20  Q    BY MR. BUTTRICK:  Mr. Eby, what is your e-mail address?

21  A    My e-mail address?

22  Q    Yes.

23  A    bctgml00g@gmail.com.

24  Q    Is your e-mail address not christopher.macaw@gmail.com?

25  A    Yes, I have two.  I have one for -- generally, for Union,

1    and then generally one for myself.

2    Q    Okay.

3        MR. BUTTRICK:  No further questions.

4        And, with that, no objection, although I will note for the

5    record that this is another document we were not given pursuant

6    to our subpoena to the Union, which we will address later.

7        JUDGE CARISSIMI:  I am going to admit GC 187.

8    (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 87.)

9        JUDGE CARISSIMI:  Is there anything further, on redirect,

10   Mr. Wiese?

11       MR. WIESE:  No, Your Honor.

12       JUDGE CARISSIMI:  Very good.

13       Within that very limited range, Mr. Buttrick, do you have

14   anything?

15       MR. BUTTRICK:  Yes, one question, Your Honor, if I may

16   approach?  May I?

17       JUDGE CARISSIMI:  Yes, you may, yes.

18                          RECROSS-EXAMINATION

19   Q    BY MR. BUTTRICK:  I am going to show you PF-104, and I ask

20   you to read the last paragraph, right there, good.

21   (Witness proffered document.)

22   A    "I have read this" --

23       JUDGE CARISSIMI:  No, read it to yourself.

24       THE WITNESS:  Oh, I am sorry.

25       JUDGE CARISSIMI:  You have it, Mr. Wiese?

1      MR. WIESE:  Yes.

2      JUDGE CARISSIMI:  Okay.

3      MR. WIESE:  Are we -- Mr. Buttrick, are you talking about

4  the paragraph beginning "I have read"?

5      MR. BUTTRICK:  Yes.

6      MR. WIESE:  Okay, yes, on page 5.

7  Q    BY MR. BUTTRICK:  So, Mr. Eby, when you completed your

8  affidavit to the Board on August 1, 2015, you affirmed, under

9  penalty of perjury, that it was true and correct, correct?

10  A    Yes.

11  Q    And you also affirmed that, after review the affidavit, if

12  you remember anything of importance, or you want to make

13  changes, you will immediately notify the Board, correct?

14  A    Yes.

15  Q    Okay.

16      MR. BUTTRICK:  Nothing further.

17      JUDGE CARISSIMI:  Very good.

18      There's nothing further, Mr. Wiese?

19      MR. WIESE:  Just very limited.

20      JUDGE CARISSIMI:  All right.

21      MR. WIESE:  Very limited, Your Honor.

22                  FURTHER REDIRECT EXAMINATION

23  Q    BY MR. WIESE:  Mr. Eby, do you recall providing a

24  subsequent affidavit, related to this case?

25  A    Yes.

1  Q    And that affidavit was dated October 24, 2015, is that

2  right?

3  A    Sounds right.

4  Q    And that document covered the bargaining in much more

5  detail than your prior affidavit, is that right?

6  A    Yes.

7       MR. WIESE:  Nothing further.

8       MR. BUTTRICK:  All right, I have got one, too.

9       JUDGE CARISSIMI:  All right.

10                    FURTHER RECROSS-EXAMINATION

11 Q    BY MR. BUTTRICK:  So in that subsequent affidavit, did you

12 ever specifically correct your statements in lines 22 and 23, on

13 page 2, and pages 1 through -- lines 1 through 3 on page 3?

14      JUDGE CARISSIMI:  Well, I think, counsel, if you are going

15 to ask that specific of a question, the witness needs to see the

16 lines that you are referring.  I can't expect him to remember

17 the lines.

18      MR. BUTTRICK:  May I approach?

19      JUDGE CARISSIMI:  You may.

20 (Witness proffered document.)

21 Q    BY MR. BUTTRICK:  In the subsequent affidavit, which Mr.

22 Wiese referenced, did you ever specifically indicate that there

23 was an error in lines 22 and 23 of your August 1, 2015

24 affidavit?

25 A    I don't understand where there is an error.

1    JUDGE CARISSIMI:  I am sorry, what was your answer, sir?

2    THE WITNESS:  No, I don't understand what referring to as

3    an error.

4    JUDGE CARISSIMI:  You don't understand the question?

5    THE WITNESS:  No, I have not, I didn't.

6    JUDGE CARISSIMI:  You did not --

7    THE WITNESS:  Oh, I am sorry, I didn't contact the Board

8    and say that there was an error.

9    JUDGE CARISSIMI:  All right.

10   Q    BY MR. BUTTRICK:  And then the same question, on page 3,

11   lines 1 through 3, did you contact the Board and say there was

12   an error on those lines?

13   A    Of Union items?  No.

14   MR. BUTTRICK:  Nothing further.

15   JUDGE CARISSIMI:  All right, very good.

16   I take it there is nothing further, Mr. Wiese?

17   MR. WIESE:  No, Your Honor.

18   JUDGE CARISSIMI:  Mr. Eby, you are excused as a witness,

19   you may step down.

20   THE WITNESS:  All right.

21   (Witness excused from the stand.)

22   JUDGE CARISSIMI:  And I take it that General Counsel has

23   another witness for us?

24   MS. OHAERI:  We do, Your Honor.  Would it be possible for

25   us to take a break?

1    JUDGE CARISSIMI:  Yes.  How much time do you want?

2    MS. OHAERI:  Five minutes?

3    JUDGE CARISSIMI:  Sure, we will be in recess for five

4  minutes.

5  (Brief recess taken.)

6    JUDGE CARISSIMI:  Let's go on the record.

7    Ms. Ohaeri, you may call your next witness.

8    MS. OHAERI:  General Counsel calls Todd Railsback.

9    JUDGE CARISSIMI:  Mr. Railsback, if you would please step

10 up to the witness stand, sir?  Before you take your seat, I am

11 going to swear you in as a witness, so if you would please raise

12 right hand?

13 (WITNESS SWORN:  TODD RAILSBACK.)

14    JUDGE CARISSIMI:  Please have a seat.

15    THE WITNESS:  Thank you, sir.

16                    DIRECT EXAMINATION

17 Q    BY MS. OHAERI:  Hello, Mr. Railsback, can you please spell

18 your last name?

19 A    R-A-I-L-S-B-A-C-K.

20 Q    Thank you.  Where are you currently employed?

21 A    Ingredion.

22 Q    And when were you hired?

23 A    Ironically, 24 years ago today, April 20, 1992.

24 Q    And what position do you currently hold?

25 A    First shift product handler position.

1  Q    What department is that in?

2  A    It is in the starch department.

3  Q    And how long have you been there?

4  A    Since November.

5  Q    What do you do in that department?

6  A    We load trailers for semis, boxcars, and loading of super-

7  sack bags, and running a palletizer that packs 50-pound bags of

8  starch.

9  Q    I want to ask you about the period of time since the

10  Employer implemented its last, best and final offer --

11  A    Okay.

12  Q    -- since September 14 of 2015, okay?

13  A    Okay.

14  Q    Since that time, how have employees been notified that they

15  are going to be working overtime?

16  A    Well, they haven't been.  The way the -- since the

17  implemented contract, they have initiated a rotational overtime

18  that is nine days out.  So when they do that, they don't tell

19  you if you are in, over, or which day.  If it is an overtime

20  that comes up within 48 hours, then they will notify you.  But

21  if it is 20 days from now, and they have got the schedule made

22  20 days out in advance, and they put your name down, they don't

23  tell you if you are in or over.  But within their implemented

24  contract it says that management will keep track and notify

25  employees of overtime.

1    Q    So how do the employees find out their schedules?

2    A    The luck of the draw, looking at the schedule yourself to

3    protect yourself.

4    Q    And where do the employees access that schedule?

5    A    There's computers in the facility that you log there.

6    Their lineups are online.

7    Q    And is that where you have gone to check your scheduled

8    overtime?

9    A    Yes.

10    JUDGE CARISSIMI:  What does the term "lineup" mean, sir?

11    THE WITNESS:  The term "lineup" is, each department you

12    have a list of jobs.  So first shift starch, there's 20

13    individuals that work 20 different positions.  So that -- what I

14    am considering -- the lineup, that I call the lineup.  It is the

15    work schedule --

16    JUDGE CARISSIMI:  All right.

17    THE WITNESS:  -- for -- and it is the same throughout each

18    department and each shift.

19    JUDGE CARISSIMI:  Thank you.

20    THE WITNESS:  You are welcome.

21    Q    BY MS. OHAERI:  Under the Employer's implemented contract,

22    what is the maximum number of overtimes that an employee can

23    work in a row?

24    A    It says "two consecutive days of overtime, you will not be

25    forced on a third."

1  Q    Have you ever been forced on a third overtime?

2  A    Yes, I have.

3  Q    And what are the circumstances of that occasion?

4  A    The circumstances of that was it was a Wednesday, Thursday,

5  Friday scenario.  I was prescheduled on a Friday overtime, and

6  then within the 48-hour time frame an opening come up on

7  Thursday and Friday -- or, excuse me, I misspoke -- Wednesday

8  and Thursday.  I was prescheduled on Friday.  So on Wednesday I

9  signed up for that overtime, and then on Thursday I was the only

10  one available, so I did not sign up, so I was forced.  So I had

11  my two consecutive overtimes in, and then on Friday I was forced

12  on my third.  Now, what I was told by management was the

13  Wednesday overtime did not consist of the two consecutive days,

14  because I volunteered for that by signing up, but it doesn't

15  state that within their language.

16  Q    When you said "management" told you, who was that?

17  A    That was -- the individual I was talking to on that

18  occasion was Levi Wood.

19  Q    I want to turn now to the -- oh, sorry, just to go back to

20  the three times in a row.  Do you recall when that was?  If you

21  don't know the date, the month or the part of the year or the

22  season?

23  A    It was within the last month.

24  Q    I want to turn now to vacation scheduling.

25  A    Okay.

1  Q    How does the vacation scheduling work, at the plant, under

2  the Employer's last, best, final offer?

3  A    It is confusing to me, because they have a freeze day in

4  December, and then they have another freeze day in March, and I

5  have never really gotten a definite explanation to any of that

6  reasoning.  But you are supposed to sign up for vacation during

7  those freeze dates, and then you are locked into those.  Or --

8  excuse me -- or after the freeze dates you can sign up any time

9  and you still get your vacation.  So I don't -- I don't get the

10  freeze date part of it.  So the way vacation has been, pretty

11  much what I have seen, is first-come, first-served, but it has

12  been done by seniority at times.

13      When the contract was implemented in September, they talked

14  about they had switched our vacation days.  And it used to be

15  where our vacation was on our anniversary date, which mine was

16  in April, so I had until April to use my vacation.  Well, they

17  said you had to use your vacation by January 1st.  So within --

18      JUDGE CARISSIMI:  Stop right there, sir.  That change is in

19  the implemented terms in September?

20      THE WITNESS:  Yes.

21      JUDGE CARISSIMI:  All right.

22  Q    BY MS. OHAERI:  And when you said January 1st, what year

23  were you referring to?

24  A    January 1, 2016.  From September to January, you had to use

25  your vacation up by January 1st -- well, excuse me -- December

1  31st, and then you got reloaded on your vacation on January 1st.

2  So, during that time frame, we were told, "You got to use it or

3  you will get paid for it," okay?  Well, there was a lot of

4  negotiations going on and a lot of people did not use their

5  vacation, because, "What if we go back to what we had before?

6  What if the terms of that change?"  You know, there's always

7  that possibility.  And --

8       JUDGE CARISSIMI:  Okay, sir, you have answer the question -

9  -

10      THE WITNESS:  Okay.

11      JUDGE CARISSIMI:  -- and you went a little bit beyond it,

12  so what I am going to ask you to do is listen to counsel's

13  question carefully, and then just answer the question.

14      THE WITNESS:  Okay.

15      JUDGE CARISSIMI:  All right.

16  Q    BY MS. OHAERI:  Did you still have vacations days during

17  the time period of September to December 31 of 2015?

18  A    Yes, I did.

19  Q    And when did you want to use that time?

20  A    I really wanted to use it -- I had it allotted between

21  January and April, but when I got scrunched up, there was days

22  that I wanted to use it that I couldn't use it.

23  Q    Do you recall what the days you wanted to use it were?

24  A    I asked for vacation on Thanksgiving and on Christmas.  And

25  when they implemented it, they said -- and "they" was from

1  management -- said that vacation, there was going to be above

2  the quota, that they were going to go above the quota, and then

3  after it got closer to the holidays, they said, "No, we are not

4  going above the quota." So it was a different situation almost

5  every day you went in.

6  Q    And --

7       JUDGE CARISSIMI:  I need to know something.  So you

8  mentioned a "quota."  Can you explain that to me?

9       THE WITNESS:  Okay, quickly, the company, in the past, set

10 vacation quotas for each department.  And the way I understand

11 the quota was done in the past was for every 20 or 25 weeks of

12 vacation, you were allowed one person off on vacation in that

13 department.  So that set the quota, every 25 you got a person

14 off.  So last year, on first shift in the starch department,

15 they were allowed five people off.  This year, when they come

16 out with the quota, they said three people off, even though the

17 calculation was 4.25 or something, it was still above the quota.

18 Q    BY MS. OHAERI:  And when you say "five people off" or

19 "three people off," what is that in reference to?  Is that per

20 month, per week, per day?

21 A    Per day.

22 Q    And so you were talking about the holiday you wanted to

23 take.  So what were the days you had wanted to take off?

24 A    I asked, when I went to -- I entered into the starch

25 department, the first shift production handler job, in November.

1    I asked for -- the first part of November -- I asked for

2    Thanksgiving Day off for vacation, and Christmas Day off for

3    vacation.

4    Q    And what happened with regard to your request?

5    A    They said no, because it was above the quota.  And I said,

6    to Levi Wood, I said, "Well, originally, when this was

7    implemented, there was -- you guys were saying that you were

8    going to go above the quota to accommodate everybody's needs.

9    We know that it is going to an issue, but we are going to work

10   through it.  We are going to be understanding that that is going

11   to happen until we get to January."  And then they reversed what

12   they said on that.  So, when he told me no, I asked for a

13   floating holiday, instead of a vacation day, and I was denied

14   the floating holiday, also.

15   Q    Did you end up working on Thanksgiving?

16   A    No.

17   Q    Why not?

18   A    I took an unexcused absence on Thanksgiving.

19   Q    What about Christmas?

20   A    Same thing.

21   Q    And are you aware of whether other employees were granted

22   either Thanksgiving -- let's start with Thanksgiving.  Are you

23   aware of other employees being allowed off on Thanksgiving, who

24   were less senior than you?

25   A    On Thanksgiving, I don't recall, but on Christmas I do.

1  Q    And what was the reason for those employees to have off?

2  A    They were granted leave of absence.

3  Q    Were they more senior than you, same seniority, less senior

4  than you?

5  A    Less senior, and I would -- I have a pretty good idea that

6  they didn't even have their probation in at the time.  I mean,

7  they didn't even have vacation --

8       MR. BUTTRICK:  I object, calls for speculation.

9       JUDGE CARISSIMI:  Yes, I will agree with that.  I am not

10  going to consider that last answer.

11       THE WITNESS:  Okay.

12  Q    BY MS. OHAERI:  Had they worked for the Employer for less

13  than five years?

14  A    Yes.

15  Q    And how do you know that they were granted the time off?

16  A    Because it is stated on the schedule or the lineup, "LOA,"

17  which is short for "leave of absence."

18  Q    And how do you have access to that?

19  A    On the company-wide computer, the computers that are at the

20  facility, there's terminals that you can log onto to view the

21  schedule or lineup.

22  Q    And the two unexcused absences that you took to have off on

23  Thanksgiving and Christmas, what are those unexcused absences a

24  part of or what --

25  A    It is really the start of their disciplinary program.  I

1   mean, for -- because they have a point -- this unexcused

2   absence, each unexcused absence then constitutes a point.  And

3   then -- I don't know it by heart yet, because I am still trying

4   to understand it -- but I think it is 6 points, then you receive

5   a written document, or a written warning.  And then 7, there's

6   another; then 8 might be termination.

7   Q    Do you recall who from -- either a manager or a supervisor

8   -- told you that the Employer was going to allow people to go

9   over the quota during the post -- between September and December

10   of 2015?

11   A    At that time, I was in the specialty department, between

12   September and November, and the person that was in charge at

13   that time was Scott Maki.

14   Q    And do you recall who had denied your vacation request and

15   your request to use a floating holiday for Thanksgiving and --

16   A    Levi Wood.

17   Q    Do you recall whether the Employer has gone over the

18   vacation quota since January 1, 2015?

19   A    Yes.

20   Q    And how do you know that?

21   A    Because two weeks ago, on the schedule, there was five

22   people off on vacation.  They went over their quota.

23   Q    And what was the quota?

24   A    Four -- or excuse me -- three.  Here we go again, I am

25   getting confused because they changed.  At the January 1st, on

1  the first shift, we had three people off.  And then, I believe

2  the middle of February, they allowed four people off on

3  vacation.  But two weeks ago, they allowed five.

4  Q    I want to turn now to how -- to the lunchtime.  So, since

5  the Employer implemented its last, best and final offer, how has

6  lunchtime changed?

7       MR. BUTTRICK:  I am just going to object, that there are no

8  allegations in the various versions of the Complaint about

9  lunchtime.

10      JUDGE CARISSIMI:  Yes, this -- Mr. Railsback's testimony

11  goes to paragraph 14 of the Order Consolidating and the

12  Amendment to the Complaint, is that correct?

13      MS. OHAERI:  It is with regard to the implementation, and

14  the changes made since implementation.

15      JUDGE CARISSIMI:  And so that is paragraph 14?

16      MS. OHAERI:  Oh, I have to check, one second, Your Honor.

17  I believe that is right.

18  (Pause.)

19      JUDGE CARISSIMI:  So how does the lunch hour fit within

20  what is in the Complaint at 14(a)?

21      MS. OHAERI:  Sorry, Your Honor, it wasn't 14; it was 16,

22  with regard to post-implementation changes.  I do see that it

23  lists several sections --

24      JUDGE CARISSIMI:  Okay, now 16 of which of our many

25  documents that constitutes the Complaint in this case?

1          MS. OHAERI:  Let's see --

2          JUDGE CARISSIMI:  Because we have the --

3          MS. OHAERI:  -- I believe it is the one, the first

4     amendment --

5          JUDGE CARISSIMI:  -- we have the Complaint, we have the

6     Order Consolidating and Amendment, then we have the second

7     Amendment, so --

8          MS. OHAERI:  I believe it is the consolidation one, where

9     it added the new charge.

10          JUDGE CARISSIMI:  Okay.  So it is in the Order

11     Consolidating and Amendment to Complaint, dated March 8?  Is

12     that the document I should look at?

13          MS. OHAERI:  I have to check the Formal Papers.

14          JUDGE CARISSIMI:  Let's go off the record.

15     (Off the record.)

16          JUDGE CARISSIMI:  Back on the record.

17          Counsel for the General Counsel, can you explain how the

18     testimony that you began to elicit about lunch-hour policies

19     fits within the confines of paragraph 16 of the Complaint,

20     specifically the Order Consolidating Cases and Amendment to

21     Complaint dated March 8 of 2016?

22          MS. OHAERI:  I am going to elicit questions of the witness

23     to establish how lunchtime is -- what the practice is with

24     regard to lunchtime -- to elicit testimony with regard to

25     whether it does fit within the method of scheduling of hours.

1    JUDGE CARISSIMI:  All right, so your contention is that you

2  are going to see if you can develop evidence to determine

3  whether it falls within the claim that there's been a unilateral

4  change in the method for scheduling hours?  Is that correct?

5    MS. OHAERI:  That is correct.

6    JUDGE CARISSIMI:  I will let you do that.

7    I am going to overrule the objection.  But, of course, if

8  you feel that there's need to make other objections, I will

9  certainly consider those.

10    So you may continue.

11  Q    BY MS. OHAERI:  Mr. Railsback, how is -- how do employees

12  know when they can eat lunch?

13  A    Now, currently, now?  Could you repeat the question,

14  please?

15  Q    Sure, sure.  When you are at work, and you want to go on

16  lunch, what do you have to do?

17  A    We just go on lunch.

18  Q    Is that -- is it a set time or is it --

19  A    No.

20  Q    -- you can go whenever you want?

21  A    Yes.

22  Q    When you are working an 8-hour shift, is there a -- any

23  restrictions on when you can take that lunch?  Can you take it

24  at any point in time in the eight hours?

25  A    There's nothing in their implemented contract that states

1    that.  There's nothing there.

2    Q    States as to when you can leave?

3    A    When you take lunch.

4    Q    Do you need permission to leave your area?

5    A    No -- no.

6    Q    So you can get up and leave whenever you want, to take

7    lunch?

8    A    Yes.

9         MR. BUTTRICK:  So I am just going to stop here, Your Honor.

10        I have heard nothing about how this relates to scheduling

11   hours, when the witness just testified there's nothing in the

12   contract that has an hours requirement of when they can take

13   lunch.

14        JUDGE CARISSIMI:  I agree that is what the witness'

15   testimony was.

16        MR. BUTTRICK:  So I object to further questioning on it.

17        JUDGE CARISSIMI:  All right.

18        MS. OHAERI:  Can I ask --

19        JUDGE CARISSIMI:  Counsel, I know you were conferring.

20        There was an objection to further questioning, because

21   counsel pointed out that there's nothing in the testimony so far

22   to indicate that there's a change in scheduling, because

23   employees in his department can go to lunch when they wish.

24        Now, I have a question before we go on, just so that I

25   understand the nature of this testimony.  As I understand

1   paragraph 16, the claim is that since -- after September 14 and

2   continuing to date, the Respondent unilaterally changed certain

3   enumerated matters, alleged in the Complaint, from its

4   unilaterally implemented August 18, 2015, last, best and final

5   offer.  So am I understanding that this testimony is these are

6   things that the Employer did since the implementation of the

7   last, best and final offer, that haven't been discussed with the

8   Union?

9       MS. OHAERI:  Correct.

10      JUDGE CARISSIMI:  All right, I just wanted to make sure.

11      MS. OHAERI:  And we are going to seek to amend paragraph

12  16(a) to include --

13      MR. WIESE:  Let's go off the record for a second.

14      JUDGE CARISSIMI:  Off the record.

15  (Off the record.)

16      JUDGE CARISSIMI:  Counsel for the General Counsel has

17  reviewed matters and has decided to proceed.

18      As I understand it, there won't be any further questioning

19  about lunch hours, is that correct, Ms. Ohaeri?

20      MS. OHAERI:  Yes.

21      JUDGE CARISSIMI:  Very good.

22      MS. OHAERI:  That is it for Mr. Railsback, then.

23      JUDGE CARISSIMI:  No further questions?

24      MS. OHAERI:  No.

25      JUDGE CARISSIMI:  Very good.

1      Cross-examination?

2      MR. BUTTRICK:  We would like to see any statements of Mr.

3  Railsback.

4      JUDGE CARISSIMI:  Is there any affidavits for Mr. Railsback

5  or other Jencks material?

6      MS. OHAERI:  Yes.

7      JUDGE CARISSIMI:  And what do you have, Ms. Ohaeri?

8      MS. OHAERI:  I have first, one affidavit, given by Mr.

9  Railsback, it is dated on February 25th of 2016.  It is five

10  pages in length.  And a print-out of an article that he wrote.

11  The article itself is one page, but it is from the Internet, so

12  there's a total of four pages because the other pages are ads.

13      JUDGE CARISSIMI:  Okay.

14      MS. OHAERI:  And a one-and-a-half-page statement.  It is

15  undated, handwritten, from Mr. Railsback, as well.

16      JUDGE CARISSIMI:  Very good.

17      How much time would you want?

18      MR. BUTTRICK:  Fifteen minutes?

19      JUDGE CARISSIMI:  Fifteen minutes you can have.  So we will

20  be in --

21      MS. OHAERI:  I just wanted -- sorry --

22      JUDGE CARISSIMI:  Yes, go ahead, Ms. Ohaeri.

23      MS. OHAERI:  That all of the items are with regard to the

24  impact of the unilateral changes and implementation of the last,

25  best and final offer.

1      JUDGE CARISSIMI:  All right, very good.

2      So we will be in recess for 15 minutes.

3  (Brief recess taken.)

4      JUDGE CARISSIMI:  Let's go back on the record.

5      Mr. Funk, you may cross-examine.

6      MR. FUNK:  Okay, Mr. Railsback --

7      JUDGE CARISSIMI:  I am sorry, yes, Mr. Funk, I was correct

8  in the first instance.

9      MR. FUNK:  Yes, thank you, Your Honor.

10                  CROSS-EXAMINATION

11  Q    BY MR. FUNK:  Mr. Railsback, my name is Ryan Funk; I am an

12  attorney for Ingredion and I am going to be asking you some

13  questions about the testimony that you just gave, okay?

14  A    Okay.

15  Q    You testified that it is very confusing the way -- strike

16  that.  It is very confusing the way that overtime is supposed to

17  happen under the last, best and final contract, is that correct?

18  A    Yes.

19  Q    And you don't fully understand exactly how it is supposed

20  to happen, right?

21  A    Yes.

22  Q    Have you seen the last, best and final proposal?

23  A    Yes.

24  Q    You have switched departments since September 14th, is that

25  correct?

1   A    Yes, sir.

2   Q    And you have reported to different people, is that correct?

3   A    Yes.

4   Q    And different supervisors do things different ways,

5   correct?

6   A    Yes.

7   Q    The company has -- different supervisors have done things

8   different ways with regard to overtime, correct?

9   A    They have, but it should be done the same.

10   Q    Some --

11   A    In every area, under the contract, it should be handled the

12   same, not -- it shouldn't matter which supervisor you are

13   dealing with.

14        JUDGE CARISSIMI:  Let me ask you:  Is that what the

15   contract says or is that your opinion?

16        THE WITNESS:  My opinion, I guess.

17        JUDGE CARISSIMI:  All right, I thought so.  You know what I

18   want you to do, sir, is just answer the questions.

19        THE WITNESS:  Okay.

20        JUDGE CARISSIMI:  Really, opinions don't really help me,

21   okay?

22   Q    BY MR. FUNK:  Sometimes they have followed some of the

23   language in the last, best, final about overtime, is that

24   correct?

25   A    Yes.

1  Q    They have freeze dates, is that correct?

2  A    Yes.

3  Q    And you have been unhappy when you have thought that they

4  haven't followed the last, best and final, is that correct?

5  A    Yes.

6  Q    You are a member of the bargaining unit, represented by

7  BCTGM, is that correct?

8  A    Yes, sir.

9  Q    As a member of that unit, you have a right, under the last,

10  best and final, to file a grievance?

11  A    Yes, I do.

12  Q    And you can do that if you are unhappy, right?

13  A    Yes.

14  Q    You can do that if you are unhappy with overtime rules,

15  correct?

16  A    Yes.

17  Q    Have you done that?

18  A    Yes.

19  Q    Do you know what happens with grievances once you have

20  filed them?

21  A    I -- yes and no.  I mean, it is two-fold.  I write the

22  grievance, and I do understand where it goes from there now.

23  Yes, I do.

24  Q    What happens with the grievance is that the company and

25  Union try to work out the problem, is that correct?

1  A    The way I understand it, yes.

2  Q    You were formerly a steward, is that correct?

3  A    Yes.

4  Q    So you especially should understand the importance of the

5  grievance procedure, right?

6  A    Yes.

7  Q    In regards to vacation, that language, in the last, best

8  and final about vacation, you find that confusing as well, is

9  that correct?

10  A    Yes, I do.

11  Q    And sometimes the company has followed that language, is

12  that correct?

13  A    Sometimes.

14  Q    And sometimes you have been unhappy with the way that the

15  company has done it, right?

16  A    Yes, because it has changed.

17  Q    It changed in the September 14th last, best and final

18  offer, right?

19  A    And every day since.

20  Q    And so when you are unhappy, and you think that it has

21  changed, you can file a grievance, right?

22  A    Yes, you can.

23  Q    Have you done that?

24  A    I haven't.

25  Q    Why not?

1   A   Because there's been other people that have.

2   Q   Okay, so other people have filed grievances?

3   A   Yes.

4   Q   And so the company and Union should be working that out,

5   pursuant to those grievances, correct?

6   A   Should be, yes.

7   Q   Have you talked to other witnesses, or potential witnesses,

8   about the testimony that they have given, or intend to give, at

9   this proceeding?

10  A   No.

11      MR. FUNK:  Nothing further, Your Honor.

12      JUDGE CARISSIMI:  Is there any redirect, Ms. Ohaeri?

13      MS. OHAERI:  Yes.

14      JUDGE CARISSIMI:  You may go ahead.

15                      REDIRECT EXAMINATION

16  Q   BY MS. OHAERI:  Are you aware that people can file charges

17  with the National Labor Relations Board?

18  A   Yes, I am aware of that.

19  Q   And that those charges can include violations of the

20  contract, or other things that occur that could also be covered

21  by a grievance?

22  A   Yes.

23  Q   Why is it that you don't fully understand how overtime is

24  supposed to work post-implementation?

25  A   Because I look at the language, and it is the

1  interpretation is confusing.  If it says, "Two consecutive days

2  you cannot be forced a third," then how is people being forced a

3  third overtime?  It doesn't say anything about "mandatory,"

4  "voluntary," "involuntary."  It doesn't state that.  If it

5  doesn't state it, it can't be interpreted.

6      MS. OHAERI:  Nothing further, Your Honor.

7      JUDGE CARISSIMI:  Very good.

8      In that limited range, do you have anything, Mr. Funk?

9      MR. FUNK:  No, Your Honor.

10     JUDGE CARISSIMI:  Thank you, Mr. Railsback, you are excused

11 as a witness, you may step down, sir.

12     THE WITNESS:  Thank you.

13 (Witness excused from the stand.)

14     JUDGE CARISSIMI:  Ms. Ohaeri, you can call the next

15 witness.

16     MS. OHAERI:  Thank you.

17     JUDGE CARISSIMI:  Let's go off the record.

18 (Off the record.)

19     JUDGE CARISSIMI:  On the record.

20     Ms. Ohaeri, you may call your next witness.

21     MS. OHAERI:  General Counsel calls Rich Heath.

22     JUDGE CARISSIMI:  Sorry, what is the name again?

23     MS. OHAERI:  Rich Heath.

24     JUDGE CARISSIMI:  Rich Heath.

25     Mr. Heath, if you would please stand for a moment, and

Case 1:16-cv-00038-LRR-CJW     Document 19-1     Filed 05/13/16     Page 613 of 1141

1   raise your right hand?

2   (WITNESS SWORN:  RICHARD HEATH.)

3       JUDGE CARISSIMI:  Please have a seat.

4                           DIRECT EXAMINATION

5   Q    BY MS. OHAERI:  Mr. Heath, can you please state and spell

6   your name for the record?

7   A    My name is Richard Heath, R-I-C-H-A-R-D H-E-A-T-H.

8   Q    And where are you currently employed?

9   A    Ingredion.

10  Q    And when were you hired there?

11  A    2004.

12  Q    And what position do you currently hold?

13  A    I am in conversion utilities.

14  Q    And how long have you been in that position?

15  A    For about seven years.

16  Q    What shift do you work?

17  A    I am on fourth shift.

18  Q    Do you hold any positions with the Union?

19  A    I am a fourth-shift steward and sergeant of arms.

20  Q    And what are the responsibilities of those two positions?

21  A    Fourth-shift steward, I go around, and if people have

22  grievances, or try to work out stuff with management if we feel

23  that they are not going by the rules.

24  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 80.)

25  (Witness proffered document.)

1  Q    BY MS. OHAERI:  Mr. Heath, I am showing you a document that

2  has been marked for identification as General Counsel's Exhibit

3  80.  Do you recognize this?

4  A    Yes, I do.

5  Q    And what is it?

6  A    It is the starch/service lineup for Friday, November 27th.

7  Q    So I want to go through some things with this document, but

8  before we do that, in the top corner of the page there's some

9  handwriting, towards the center, do you see that?

10  A    That identifies the department.

11  Q    Is that your handwriting on there?  I think it says, "non"

12  something "OT"?

13  A    Oh, I am sorry.  That is my handwriting.

14       JUDGE CARISSIMI:  Next to Jason Neely's name?

15       THE WITNESS:  Yeah, next to Jason Neely's name.

16       JUDGE CARISSIMI:  Can you tell us what that says, sir?

17       THE WITNESS:  That says, "non-classified OT."

18       JUDGE CARISSIMI:  Thank you.

19       MS. OHAERI:  I am going to offer General Counsel's Exhibit

20  80.

21       JUDGE CARISSIMI:  Is there any objection to General Counsel

22  80?

23       MR. FUNK:  No objection, Your Honor.

24       JUDGE CARISSIMI:  General Counsel 80 is admitted.

25  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 80.)

 1   Q    BY MS. OHAERI:  Okay, Mr. Heath, I want to go through and

 2   have you explain how this document works, and then I will ask

 3   specific questions about it.  Let's start with:  How can you

 4   tell what department this schedule is for?

 5   A    That would be on the top of the page, middle.

 6   Q    And what are the -- what is identified in the "Job" column

 7   to the far left?

 8   A    That would be the job classification job.

 9   Q    And how can you tell what date the schedule is for?

10   A    On the bottom left-hand corner.

11   Q    And across at bottom, there's three columns that have a

12   series of different names in them.  Why are they located there?

13   A    They are located there to show that people are off.

14   Q    Okay, and I see that there's three columns with times at

15   the top?

16   A    Those are each shift.

17   Q    Then there's a column with a series of numbers in it, just

18   right to the "Job" column.  What are those numbers for?

19   A    Those are for payroll, for pay scales.

20   Q    And then, in between the shift time columns, there's a

21   column with "Xs" in them, do you see that?

22   A    Yes, I do.

23   Q    What do the "Xs" indicate?

24   A    They indicate that there's an opening on the shift.

25   Q    And let me use one as an example.  The first-shift column,

1   there's -- in the "Product Handler" row, there's an "X" there.

2   What does that indicate?

3   A    That indicates that there's an opening for the prior and

4   on-coming shifts.

5   Q    And does this schedule tell you anything about whether that

6   opening was filled?

7   A    Yes, it does.  On that particular one, it shows that

8   "Holmes" stayed over for eight hours.

9   Q    And how can you tell that?

10  A    They have "Holmes" on the top "X," and underneath it says

11  "8hrs."

12  Q    Okay.  What about the same first column for first shift,

13  under "Lab"?  There's two "Xs" in the first lab row.  What does

14  that show?

15  A    All right, it shows that -- the particular lab, on the top

16  one, that "Rafael" stayed over and "Ian Dye" came in early.

17  Q    And how can you tell which one -- how can you tell that one

18  stayed over and one came in early?

19  A    Usually the top one is the stay-over, and the bottom one is

20  the people that come in early.

21  Q    And how -- does this document show how long, let's say,

22  Rafael stayed over?

23  A    If they don't usually have a time on it, it is usually four

24  hours.

25  Q    And what about for the coming in early?

1  A    Four hours, also.

2  Q    Okay, I want to turn now to the handwriting section, in the

3  top quarter of the page, near Mr. Jason Neely's name.  Do you

4  see that?

5  A    Yes, I do.

6  Q    What does those two rows, where your handwriting is

7  written, indicate?

8  A    Jason Neely stayed over for eight hours, and that was in

9  his non-classification job.

10  Q    And how can you tell that he stayed over, as opposed to

11  coming in early?

12  A    If you work on the first shift -- it shows Jason Neely as a

13  day-shifter, and he was transferred to 61 operation that day.

14  Q    Okay, and where do you see that?

15  A    It would be to the left of the overtime and down one.

16  Q    Under "Bldg 61 Operator," --

17  A    Correct.

18  Q    -- the middle one?  How can you tell that Mr. Neely was

19  transferred?

20  A    There is "T" next to his name for "8hr."

21  Q    And what does your handwritten "non-classified OT" mean?

22  A    Well, Jason Neely is a 61 helper, for his classified job,

23  and they held him over on 61 operator, which is his non-

24  classified job.

25  Q    And does that violate the Employer's implemented last,

1    best, final offer?

2    A    Yes, it does.  According to the contract, it says that to

3    allocate -- or for overtime purposes, it goes to the qualified

4    person in the classification job.

5    Q    What does page 2 of the document indicate, with regard to

6    Mr. Neely?

7    A    On Saturday, November 28th, he also stayed over for eight

8    hours in his non-classified job.

9    Q    And I see, to the left of that, you have another

10   handwritten "Non-classification OT."  What is that for?

11   A    That is for Edward Coverdill.  He -- his classification is

12   conversion utilities.  He got transferred over to operator on

13   the day before.

14   Q    On?

15   A    On the 27th, he got transferred over, which they can do in

16   the contract.  But he was held over for eight hours on his non-

17   classified job.

18   Q    And that is the building 61 operator position?

19   A    Correct.

20   (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 82.)

21   (Witness proffered document.)

22   Q    BY MS. OHAERI:  I am showing you what has been marked as

23   General Counsel's Exhibit 82.  Do you recognize this?

24   A    Yes, I do.

25   Q    And what is this?

1  A    This is the grind daily schedule.

2  Q    I want to direct you to Mr. T. Halvorson.  Do you see

3  anything odd about Mr. Halvorson's schedule on this day,

4  September 30th?

5  A    Yes, I do.  Trent Halvorson was -- came in early on dryers,

6  his classification is relief.

7  Q    And how do you know that Mr. Halvorson's classification is

8  relief?

9  A    If you look over on the first shift, they have him

10  underneath "Relief No. 1."

11  Q    Okay.

12      MS. OHAERI:  Your Honor, I am going to offer General

13  Counsel's Exhibit 82.

14      JUDGE CARISSIMI:  Any objection to GC 182?

15      MR. FUNK:  No objection, Your Honor.

16      JUDGE CARISSIMI:  GC 182 is admitted.

17  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 82.)

18  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 85.)

19  (Witness proffered document.)

20  Q    BY MS. OHAERI:  I am showing you what has been marked for

21  identification as General Counsel's Exhibit 85.  Mr. Heath, do

22  you recognize that?

23  A    Yes, I do.

24  Q    And what is that?

25  A    That is the starch/service daily schedule.

1  Q    I want to direct your attention to a Mr. Luke Gronewold.

2  Am I pronouncing that right?

3  A    I believe so.

4  Q    What do you notice about Mr. Gronewold's schedule?

5  A    On here he stayed over in the lab, which is his non-

6  classified job.  His classified job is warehouse helper for

7  product handler.

8  Q    And how do you see -- how do you know that from looking at

9  this document?

10  A    If you look over on first shift, they have him under

11  "Warehouse Helper."

12  Q    And what about the second page, for September 18, also with

13  regard to Mr. Gronewold?

14  A    He came in early for lab, which is his non-classified job.

15       MS. OHAERI:  I offer General Counsel's Exhibit 85.

16       JUDGE CARISSIMI:  Is there any objection to GC l85?

17       MR. FUNK:  No objection, Your Honor.

18       JUDGE CARISSIMI:  GC l85 is admitted.

19  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 85.)

20  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 86.)

21  (Witness proffered document.)

22  Q    BY MS. OHAERI:  I am offering you what has been previously

23  marked at General Counsel's Exhibit 86.  Do you recognize that

24  document?

25  A    Yes, I do.

1    Q    And what is that?

2    A    That is the grind daily schedule.

3    Q    I want to direct your attention to the highlighting on the

4    first page of that document, where, I believe it's Meister?

5    A    Meister, all right.

6    Q    There's two highlighted sections there, do you see that?

7    One in the second shift and one in the third shift?

8    A    Yeah, I know what you are talking about, but it doesn't

9    really show as highlighted on my copy.

10    Q    Okay.

11        JUDGE CARISSIMI:  Yes, I was going to say, Ms. Ohaeri,

12    there's -- now that the name has come up, there's a little bit

13    of a blur there, but it is not -- I wouldn't have known is as a

14    highlight.

15        MS. OHAERI:  Okay.

16    Q    BY MS. OHAERI:  Well, Mr. Meister on the second shift and

17    third shift is what I want to ask you about.  What do you notice

18    about Mr. Meister's schedule on November 5 of 2015?

19    A    I notice that he stayed over on by-products operator, when

20    his classification is a relief.

21    Q    And so, when you are using the term "staying over," what

22    does that mean exactly?

23    A    Meaning that you are being held over for overtime.

24    Q    So does that mean that the employee has worked a full

25    shift?

1  A    Yes, he has.

2  Q    And then they are asked to worked additionally, either

3  before or after?

4  A    Before or after, correct.

5  Q    What about on the second page of --

6      JUDGE CARISSIMI:  Excuse me, before we go to the second

7  page, looking at Mr. Meister, as I look at his -- is he

8  scheduled on the day shift that day?  I see the 3 p.m. to 11

9  p.m., where he is a by-products operator; and then I see 11 p.m.

10  to 7 a.m., where he is a by-products operator again.  Isn't that

11  correct?

12      MS. OHAERI:  Your Honor, are you referring to the first --

13  the second column and the third column, or the first column and

14  --

15      JUDGE CARISSIMI:  I am -- there was testimony about him

16  being a relief operator, but I don't see him -- I don't see his

17  name on first shift.  I may be missing it.

18      THE WITNESS:  Well, he is on second shift, and they didn't

19  put down the "T," but he was actually transferred from relief to

20  by-product operator for his shift.

21      JUDGE CARISSIMI:  But it doesn't show that on this

22  document, correct, sir?

23      THE WITNESS:  That is correct, they didn't mark it down

24  that way.

25      JUDGE CARISSIMI:  And how do you know that?

1          THE WITNESS:  If I --

2          JUDGE CARISSIMI:  And how do you know what Mr. Meister's

3     regular classification is?

4          THE WITNESS:  I know with -- I don't have it with me, but

5     they have a plant lineup sheet that tells everybody what their

6     classification jobs are.

7          JUDGE CARISSIMI:  And you observed this document?

8          THE WITNESS:  I have observed it before, yes.

9          JUDGE CARISSIMI:  In your position as steward?

10         THE WITNESS:  Yes.

11         JUDGE CARISSIMI:  All right.

12         You may continue, counsel

13    Q    BY MS. OHAERI:  And so what is Mr. Meister's

14    classification?

15    A    He is classified as a relief on fourth shift.

16    Q    And on Thursday, November 5th, what was he working as?

17    A    He was working as a by-product operator.

18    Q    And turning to the second page, on November 6th, also with

19    Mr. Meister?

20    A    They show that he worked 16 hours that day, eight regular

21    shift and eight on overtime.  And the eight overtime is in his

22    non-classified job.

23    Q    That is the by-products operator?

24    A    Correct.

25         MS. OHAERI:  I offer General Counsel's Exhibit 86.

1      JUDGE CARISSIMI:  Any objection to GC l86?

2      MR. FUNK:  No objection, Your Honor.

3      JUDGE CARISSIMI:  GC l86 is admitted.

4  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 86.)

5  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 83.)

6  (Witness proffered document.)

7  Q    BY MS. OHAERI:  I am offering you what has been previously

8  marked as General Counsel's Exhibit 83.  Do you recognize this

9  document?

10  A    Yes, I do.

11  Q    And I want to direct your attention, again, to Mr. Meister,

12  in the third column on that page, there's additional

13  handwriting.  Whose handwriting is that?

14  A    That is my handwriting.

15  Q    And what do you notice with regard to Mr. Meister here?

16  A    I notice that he came in early on his non-classified job,

17  elevator.

18  Q    And how do you know that he came in early?

19  A    If you flip the page, on the next day, he was on day shift

20  but he did get a pass out, and they just didn't mark it off, but

21  his name is on the bottom columns.

22  Q    On the bottom of the first column?

23  A    Correct.

24  Q    Okay.  And so what is indicated, with regard to this

25  document, and the non-classification of overtime?  On page 1 and

1  2.

2  A    One and two, well, that Shannon came in early, for four

3  hours in the non-classified job.

4  Q    Is -- is Shannon a first name or a last name?

5  A    Shannon is his first name.

6  Q    Is that Mr. Meister?

7  A    Yes, correct.

8       MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

9  83.

10      JUDGE CARISSIMI:  Is there any objection to GC l83?

11      MR. FUNK:  No, Your Honor.

12      JUDGE CARISSIMI:  GC l83 is admitted.

13  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 83.)

14  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 84.)

15  (Witness proffered document.)

16  Q    BY MS. OHAERI:  I am showing you what has been marked for

17  identification as General Counsel's Exhibit 84.  Mr. Heath, do

18  you recognize this document?

19  A    Yes, I do.

20  Q    And what is this?

21  A    This is the grind daily schedule.

22  Q    And, again, I want to direct you to the handwriting in the

23  right-hand side of the page.  Whose handwriting is that?

24  A    That is my handwriting.

25  Q    The "non-classification OT" section?

1  A    Correct.

2  Q    And I want to specifically direct your attention to D. --

3  is it Ties-Rodriguez, in the third column?

4  A    Correct.

5  Q    What is indicated by page 1 and 2 of this document?

6  A    On page 1, she came in early on her non-classified job.

7  Her classified is starch refinery dryers.

8  Q    And how do you know that her classified job is starch --

9  sorry, what was it, starch refinery dryer?

10  A    She is working under dryers, plus on the plant lineup

11  sheet, she is under starch refinery dryers.

12     MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

13  84.

14     JUDGE CARISSIMI:  Any objection to GC 184?

15     MR. FUNK:  No, Your Honor.

16     JUDGE CARISSIMI:  GC 84 is admitted.

17  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 84.)

18  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 79.)

19  (Witness proffered document.)

20  Q    BY MS. OHAERI:  I am showing you what has been marked for

21  identification as General Counsel's Exhibit 79.  Do you

22  recognize this document?

23  A    Yes, I do.

24  Q    And what is it?

25  A    It is the grind daily schedule.

1 Q    And, specifically, I want to direct your attention to --

2      MS. OHAERI:  Sorry, one second, Your Honor, I just want to

3 check.  Did I offer General Counsel Exhibit 86, was that

4 admitted yet?

5      JUDGE CARISSIMI:  Eighty-six?  Yes, 86 is admitted.

6 Everything that you have identified so far has been admitted.

7      MS. OHAERI:  Okay, thank you, Your Honor.

8 Q    BY MS. OHAERI:  Mr. Heath, I want to direct your attention

9 to A. Beitz, B-E-I-T-Z.

10 A    Beitz?

11 Q    Beitz.  Do you see that, in the first column?

12 A    Yes, I do.

13 Q    And with respect to Mr. Beitz, what is indicated on the

14 October 19 date, page 1 of General Counsel's Exhibit 79?

15 A    It indicates that he came in early that day, for overtime.

16 Q    And turning the page to October 20, still Mr. Beitz, what

17 is indicated with regard to Mr. Beitz' schedule on that page,

18 page 2?

19 A    It also shows that he came in early.

20 Q    And turning now to page 3, October 21st, what is indicated

21 with regard to Mr. Beitz on that day?

22 A    That he worked eight-hour shift, and if you flip over, it

23 looks like he stayed over.

24 Q    Now, does that mean that he worked over eight hours those

25 days, those three days in a row?

1  A    It indicates that he worked three overtimes in a row.

2  Q    And I want to -- I have a question about Mr. Beitz'

3  schedule.  I see that, on the first page, he -- on October 19,

4  he started -- he was scheduled to start, rather, at 3 p.m.  Do

5  you see that, in the middle column?

6  A    Yeah, he was scheduled to start at 3 p.m.

7  Q    And then on the second page, on October 20th, he is

8  scheduled at 11 p.m.?

9  A    That is correct.

10  Q    And on the third page, also 11 p.m.?

11  A    Correct.

12  Q    Is there a reason that Mr. Beitz would move from the second

13  shift to the third shift in the middle of the week?

14  A    He is on fourth shift, which is a rotating shift.

15       MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

16  79.

17       JUDGE CARISSIMI:  Is there any objection to GC l79?

18       MR. FUNK:  No, Your Honor.

19       JUDGE CARISSIMI:  Seventy-nine is admitted.

20  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 79.)

21  Q    BY MS. OHAERI:  Okay, I want to go back and discuss General

22  Counsel's Exhibit 80 with regard to Ed Coverdill on November 27.

23  Did you have any conversation with Mr. Coverdill about his

24  schedule on November 27?

25  A    Yes, I have.

1   Q    And when did that occur?  When did that conversation

2   happen?

3   A    When I came in -- I was also on the same shift he was on --

4   when he came in -- I can't remember if he called or texted me --

5   but he told me that he had a problem and he wanted me to come on

6   over to building 61.  I get over there, and he explains to me

7   that they are going to hold him over eight hours and make him do

8   a 16-hour day, in his non-classified job.

9   Q    And what did you do upon receiving that information from

10  Mr. Coverdill?

11  A    I quickly went over to building 61 to have a chat with him

12  and the facilitator, Greg Schmidt.

13  Q    And Greg Schmidt, is he -- what is his job title, do you

14  know?

15  A    He is the facilitator, or a facility manager.

16  Q    Is that a supervisory position?

17  A    That is a supervisory position.

18  Q    And did you speak with Mr. Greg Schmidt?

19  A    I did have a conversation with him, yes.

20  Q    What happened during your conversation with Mr. Schmidt?

21  A    When I asked him about why Ed was going to be held over

22  eight hours on his non-classified job, he told me that they know

23  they are going against the rules, and he is going to have to

24  stay over.

25  Q    And with regard to those rules, where are those rules

1  located?

2  A    That would be in the contract.

3  Q    Is that the last, best and final implementation?

4  A    Yes, it is the last, best and final implemented.

5  Q    And what happened after Mr. Schmidt said that to you?

6  A    Well, I talked to Ed, and he said he will do it, pretty

7  much under protest because he didn't feel he should have to do

8  it.  But the issue, that night, was he was -- let me get back to

9  that.  There were two jobs on 61 operator.  He was the only one

10 doing the job.  And they told Ed he had to run both jobs, the

11 mill and blend and the dryer part.  When Ed told Greg he was

12 only going to run one of the jobs -- and he asked what he was

13 required for -- he said if he didn't run both jobs, it would be

14 insubordination with disciplinary up to termination if he didn't

15 do both jobs.

16 Q    And who is the "he" who said that?

17 A    Greg Schmidt said that, and he said he heard that from Levi

18 Wood.

19 Q    Did -- did Greg Schmidt tell you anything about who told

20 him to do that?

21 A    Yeah, he said that Levi Wood -- he talked to Levi Wood that

22 night, and he told him to tell Ed that he had to run both jobs.

23      MS. OHAERI:  Can we go off the record, Your Honor?  I need

24 to sort something out with the exhibits.

25      JUDGE CARISSIMI:  Let's go off the record.

1 (Off the record.)

2     JUDGE CARISSIMI:  Back on the record.

3     Ms. Ohaeri you may continue.

4     MS. OHAERI:  I am done.

5     JUDGE CARISSIMI:  Very good.

6     Cross examination, Mr. Funk?

7     MR. FUNK:  Beforehand, can we see any affidavits or other

8 Jencks statements?

9     MS. OHAERI:  I do not have any Jencks statements from this

10 witness.

11     MR. FUNK:  Okay.

12     JUDGE CARISSIMI:  Are you ready to go, or do you want some

13 time to prepare?

14     MR. FUNK:  I am ready, Your Honor.

15     JUDGE CARISSIMI:  All right, very good.  You may cross-

16 examine.

17     MR. FUNK:  Hello, good afternoon.

18     THE WITNESS:  Hello.

19     MR. FUNK:  My name is Ryan Funk, I am an attorney for

20 Ingredion, and I am going to be asking you a few questions about

21 the testimony you just gave.

22     THE WITNESS:  All right.

23                   CROSS-EXAMINATION

24 Q   BY MR. FUNK:  First of all, have you talked to any other

25 witnesses or potential witnesses about their testimony that they

1    have given or that they intend to give here?

2    A    No, I have not.

3    Q    Okay, thank you.  You are a steward, right?

4    A    Correct.

5    Q    A steward on the fourth shift --

6    A    On fourth shift.

7    Q    -- is that right?  Fourth shift rotates among the various

8    shifts, correct?

9    A    Correct.

10   Q    So you get to know lots of different people on the various

11   shifts, is that right?

12   A    Mainly just the fourth shift.

13   Q    Do you rotate, also, through different departments?

14   A    Me? No, I am always in the same department.

15   Q    So, as a steward, are you able to file grievances in any

16   department?

17   A    Yes, I am.

18   Q    And in any shift?

19   A    I can do it any shift, I usually just do it on the fourth

20   shift.

21   Q    Okay, but if somebody on a different shift has a problem,

22   they can come to you, right?

23   A    Yeah.

24   Q    And when you work overtime, you work not on your shift,

25   right?

1    A    Correct.

2    Q    And do you sometimes work overtime?

3    A    Sometimes I do, yeah.

4    Q    So sometimes you are working with employees from other

5    shifts, right?

6    A    Correct.

7    Q    And you can file grievances for them too, right?

8    A    Correct.

9    Q    You can file grievances if employees have problems with the

10   way the company is interpreting the overtime provision of the

11   last, best and final, correct?

12   A    Correct.

13   Q    Have you done that?

14   A    I have done a couple of them, yes.

15   Q    Are you aware of whether the Union has filed other

16   grievances that you haven't, about overtime?

17   A    Not off-hand, no.

18   Q    So these couple that you filed, were they before or after

19   the September 14 last best final?

20   A    They were after September 14th.

21   Q    Are you aware of whether the Union had filed grievances

22   before September 14th of 2015?

23   A    I am not really aware of that, no.

24   Q    You are unaware of whether the Union has filed grievances

25   ever?

1   A    Oh, ever, I am sorry.  I thought you were talking about the

2   overtime.  Yeah, they have filed grievances before that.

3   Q    Okay.  Overtime is one of the important provisions in a

4   collective bargaining agreement, right?

5   A    Yeah.

6   Q    And the Union has filed grievances over overtime, before

7   September 14, 2015, correct?

8   A    Yes, they have.

9   Q    The exhibits -- are they still in front of you -- that

10  General Counsel has introduced?

11  A    Yes, they are.

12  Q    Seventy-nine, 80, 82, 83, 84, 85, and 86?

13  A    Eighty-four, 85, 86 -- yep.

14  Q    What are these documents?

15  A    These are the daily schedules.

16  Q    And so, in the plants, on any given day, is there just one

17  daily schedule?

18  A    For a given day, there's actually three of them, because

19  there's three different departments.

20  Q    So every day there are three different daily schedules?

21  A    Correct.

22  Q    What we have in front of us, then, are a sampling of daily

23  schedules from the time starting with September 14th to present,

24  is that correct?

25  A    Correct.

1  Q    And so there are a bunch more out there that aren't in

2  front of us, right?

3  A    Yes, there is.

4  Q    What you have indicated here, with these documents, are

5  isolated examples of when you think the company has not

6  interpreted the last, best and final the way you thought they

7  should, correct?

8  A    Correct.

9  Q    Have you seen the last, best and final before?

10  A    Yes, I have.

11  Q    Have you reviewed it?

12  A    I reviewed it, yeah.

13  Q    You said you filed grievances over the overtime provisions

14  of that contract, right?

15  A    Correct.

16  Q    So I assume you have reviewed those provisions in

17  particular detail, correct?

18  A    Correct.

19  Q    You know that the company has interpreted the temporary

20  transfer language of that last best final --

21  A    Correct.

22  Q    -- to permit the sort of scheduling -- overtime scheduling

23  -- that you have testified about, correct?

24      MS. OHAERI:  Objection.

25      JUDGE CARISSIMI:  Your basis?

1      MS. OHAERI:  I am going to go as to lack of foundation.  He

2  has already explained he doesn't know about all the overtime; he

3  has already explained that his knowledge is limited to mostly

4  his shift; and also has limited knowledge of other grievances

5  that are filed.  He -- there's nothing to establish that he has

6  knowledge as to how the Employer has implemented or interpreted

7  that provision, other than what he has already testified he

8  knows about, on his shift, and with the documents, and with what

9  grievances he has already filed.

10     JUDGE CARISSIMI:  Overruled.  Mr. Heath is a steward.  He

11 has some knowledge.  We will find out what he knows.

12     THE WITNESS:  Can you repeat that question?

13 Q    BY MR. FUNK:  Yes.  You know that the company has

14 interpreted the temporary transfer language of the last, best

15 and final to permit the sort of overtime scheduling that we have

16 discussed here today, correct?

17 A    Are you talking about like off shift or on shift?  Because

18 I know on shift, they can transfer.

19 Q    Well, let me direct you to the last, best and final.

20     MR. FUNK:  If I may approach?

21     JUDGE CARISSIMI:  You may.

22 (Witness proffered document.)

23 Q    BY MR. FUNK:  I direct you to what is marked as Joint

24 Exhibit 8.

25     JUDGE CARISSIMI:  Let's make sure the General Counsel has

1    it in front of her.  You can let me know when you have located

2    it, Ms. Ohaeri.

3         Do you have it now?

4         MS. OHAERI:  What page are we on?

5         MR. FUNK:  Well, we haven't --

6         JUDGE CARISSIMI:  We haven't gotten to that point, yet.

7         MS. OHAERI:  Oh.

8         JUDGE CARISSIMI:  All right, Mr. Funk, you may continue.

9    Q    BY MR. FUNK:  I direct you, in Joint Exhibit 8, to article

10   6, section 3.

11        JUDGE CARISSIMI:  What page is that, Mr. Funk?

12        MR. FUNK:  That is page 10.

13        MS. OHAERI:  Bates number 2235?

14        MR. FUNK:  Yes, Bates number 2235.

15   Q    BY MR. FUNK:  Can you read that to yourself, for just a

16   second, Section 3?  Are you --

17   A    I am still trying to find it real quick.  You said page 10,

18   2235?

19        JUDGE CARISSIMI:  It is page 10 of the contract.

20   Q    BY MR. FUNK:  Have you finished reading that?

21   A    Just one second.

22   (Pause.)

23   A    All right.

24   Q    Is that language about temporarily assigning employees to

25   classifications other than their own?

1    A    Yes, it is.

2    Q    And can I direct you to article 15, section 6?  I will give

3    you a page number in just a second.  It is page 24 of the

4    contract, and that is, in the bottom right-hand corner, the

5    number is 2249.  And just read section 6 to yourself and let me

6    know, please, when you have finished?

7    (Pause.)

8    A    I think I was reading the wrong part, what section was that

9    again?

10   Q    It is on page 24, section 6.

11   A    Six, all right.

12   (Pause.)

13   A    All right.

14   Q    So you would agree that that section is also about

15   transferring employees, working them outside of their

16   classifications, correct?

17   A    Yeah, it says they can do that.

18   Q    Okay, thank you.  Now let me direct you to a third section

19   of the last, best and final, that is article 11, section 4.  It

20   is page 15, and the number in the right-hand corner is 2240.

21   Are you there?

22   A    2240?

23   Q    Yeah, 2240.  At the bottom of that page, that paragraph no.

24   4, could you read that to yourself, please?

25        MS. OHAERI:  Are we on Bates page 2240?

1      JUDGE CARISSIMI:  Let me make sure you are on the right

2  page, Mr. Heath.  It is page 15 of the contract, then there's

3  this number system that says "2240" down in the lower right-hand

4  corner.  Is that the one you are on?

5      THE WITNESS:  Yeah.

6      JUDGE CARISSIMI:  Okay.

7  (Pause.)

8      THE WITNESS:  All right.

9  Q    BY MR. FUNK:  Do you notice, in this provision, where it

10  says overtime will be attempted to be filled?

11  A    Yes, I do.

12  Q    It doesn't say that overtime will be filled by splitting

13  eight-hour shifts, does it?

14      JUDGE CARISSIMI:  It says what it says, Mr. Funk, I can

15  read it.  I don't need the witness to tell me what it says.

16      MR. FUNK:  Okay, Your Honor, I agree.

17  Q    BY MR. FUNK:  Would you agree that the company -- if the

18  company interpreted this provision to allow somebody coming in

19  both four hours before and four hours after their shift, the

20  Union could file a grievance about that if it wanted to?

21      JUDGE CARISSIMI:  Do you understand the question, Mr.

22  Heath?

23      THE WITNESS:  I don't really understand that, to be honest.

24      JUDGE CARISSIMI:  You are going to have to --

25      MR. FUNK:  Let me --

1      JUDGE CARISSIMI:  -- repeat that.  It was very long and

2  compound and --

3      MR. FUNK:  Let me repeat it.  Or I could break it up, that

4  may be even better.

5  Q    BY MR. FUNK:  The company -- strike that.  The Union can

6  file grievances if it disagrees with the way the company

7  interprets the contract, correct?

8  A    Correct.

9  Q    And so, if the company interpreted this provision of the

10  contract in a way the Union disagreed with, it could file a

11  grievance, correct?

12  A    Correct.

13  Q    So if the company interpreted this to mean that it could

14  hold somebody over after their shift, even when they had already

15  called them in early, before their shift, the Union could file a

16  grievance over that, too, correct?

17  A    Are you talking about if like I came in early and they made

18  me stay over?

19  Q    Yes.

20  A    Well --

21  Q    The Union could file a grievance over that, correct?

22  A    We haven't done that because I was told that you guys were

23  allowed to do that.

24  Q    Who told you?

25  A    I was -- we were told, by management, that if we come in

1   early we can be forced over, but it would count as two

2   overtimes, not one overtime.

3   Q    Okay.  On these documents that are in front of us, that the

4   General Counsel put in front of you, that's GC 182 -- let's

5   start with 79, 80, 82, 83, 85, and 86.  Is there a way to tell,

6   from these documents, whether somebody volunteered for overtime

7   versus being forced?

8   A    Not on these documents.  There's a -- our overtime tracking

9   sheet.

10  Q    So we can't tell, from these documents, whether somebody

11  has been forced a certain number of times in a row, correct?

12  A    You can't really tell if they were forced or volunteered --

13  Q    Okay.

14  A    -- by looking at them, no.

15  Q    Okay.

16       MR. FUNK:  Nothing further, thank you.

17       JUDGE CARISSIMI:  Is there any redirect?

18       MS. OHAERI:  Can we take a couple minutes for redirect,

19  Your Honor?

20       JUDGE CARISSIMI:  Yes.

21       Off the record.

22  (Off the record.)

23       JUDGE CARISSIMI:  On the record.

24       You may have redirect examination, Ms. Ohaeri.

25                         REDIRECT EXAMINATION

1    Q    BY MS. OHAERI:  Who said, from management, that if you come

2    in early, voluntarily, and are forced late, that it counts as

3    two overtimes?

4    A    Well, if you come in voluntarily, it doesn't count as a

5    forced overtime.

6    Q    Right.  Who said that if you come early, voluntarily, and

7    then you are forced late, it counts as two overtimes?

8    A    Well, I might have misheard what he said.  If you come in

9    early, and if it is voluntarily, it does not count as a forced

10   overtime.

11   Q    Right.

12   A    It is considered a voluntary.

13   Q    Right.

14   A    And if you were to stay over and be forced, that would

15   count as a forced overtime, so that would be a one.

16   Q    You were asked about contract language regarding transfers.

17   The documents in front of you -- General Counsel's Exhibits 79

18   to 86, excluded 81, I believe -- are those transfers?  Are the

19   overtimes for transferring, or is the transfer provision related

20   to that?

21   A    My understanding of the contract is, when you -- they can't

22   transfer you on overtime.  They can transfer you on your own

23   shift, but not for overtime.

24   Q    The documents that you have in front of you, are any of

25   those for voluntary overtime?

1  A    As far as I know, they are not.

2  Q    What process did you use in gathering the document General

3  Counsel's Exhibit 80, which is for the November 27 schedule in

4  the starch department?

5       JUDGE CARISSIMI:  Ms. Ohaeri, I didn't hear any questions

6  on cross examination about the process of how these records were

7  gathered.

8       MS. OHAERI:  It relates to Mr. Funk's question about this

9  being an isolated -- isolated incident from months ago, and I am

10  asking questions to elicit evidence with regard to the isolated

11  nature.

12      JUDGE CARISSIMI:  I am going to let you do that, but I will

13  tell all of you, the fact that the question said "isolated," I

14  will determine whether or not this is substantial, and if it is

15  a change.  I will determine whether it is substantial and

16  material.  The fact that counsel used a question that contained

17  the word "isolated" doesn't really mean much to me.  I will make

18  that determination.

19      But I think it is sufficiently related, I will let you ask

20  that question to his cross.

21      MS. OHAERI:  Okay.

22  Q    BY MS. OHAERI:  Well, let me -- what was the process that

23  you gathered in getting -- that you used, rather, in getting

24  General Counsel's Exhibit 80?

25  A    "Process" as in figuring out, like, that he got transferred

1    or stayed over?

2    Q    In getting the physical document.

3    A    Physical document?

4    Q    Um-hmm.

5    A    Printed it off the computer.

6    Q    And were you directed to do that by anybody?

7    A    No.

8    Q    What about these four, General Counsel's Exhibit 83, 84,

9    and 86?  They are all in the month of November.  Why did you

10   gather these particular documents?

11   A    Well, when Rich -- or not Rich, but Adam Beitz -- when he

12   was talking to me about he stayed over three in a row, being

13   forced, when I went and looked that up, I just started noticing

14   the other ones on there.

15   Q    Did you look through the schedules in the grind and starch

16   for all the months since the Employer implemented its last,

17   best, final offer?

18   A    I didn't go through all the months.

19        MS. OHAERI:  That is all.

20        JUDGE CARISSIMI:  Well, within that range, Mr. Funk, do you

21   have any further cross examination?

22        MR. FUNK:  Just one question.

23        JUDGE CARISSIMI:  Go ahead, sir.

24                        RECROSS-EXAMINATION

25   Q    BY MR. FUNK:  You would agree that the issue we have been

1  discussing is about how the Union interprets the contract

2  language versus how the company interprets the contract

3  language, is that correct?

4  A    Correct.

5       MR. FUNK:  No further questions, thank you.

6       JUDGE CARISSIMI:  Very good.

7       Mr. Heath, you are excused as a witness, so you may step

8  down.

9       THE WITNESS:  What should I do with this?

10      JUDGE CARISSIMI:  You can just leave that there.

11      THE WITNESS:  Leave it there, okay.

12 (Witness excused from the stand.)

13      JUDGE CARISSIMI:  Let's go off the record.

14 (Off the record.)

15      JUDGE CARISSIMI:  On the record.

16      Ms. Ohaeri, you may call your next witness.

17      MS. OHAERI:  General Counsel calls Adam Beitz.

18      JUDGE CARISSIMI:  Mr. Beitz, if you would please stand for

19 a moment and raise your right hand?

20 (WITNESS SWORN:  ADAM BEITZ.)

21      JUDGE CARISSIMI:  Please have a seat.

22                      DIRECT EXAMINATION

23 Q    BY MS. OHAERI:  Mr. Beitz, can you please state and spell

24 your last -- first and last -- sorry, just your last name, for

25 the record?

Case 1:16-cv-00038-LRR-CJW   Document 19-1   Filed 05/13/16   Page 646 of 1141

1    A    Yes, Adam Beitz, B-E-I-T-Z.

2    Q    Mr. Beitz, where are you currently employed?

3    A    Ingredion.

4    Q    And what position do you work?

5    A    I am a grind operator.

6    Q    And what are your job duties?

7    A    Operate machinery in the grind.

8    Q    Who is your direct supervisor?

9    A    Brad Bumba.

10    Q    Have you ever held any positions with the Union?

11    A    No.

12    Q    I want to direct your attention to the summer of 2015.

13    During that time, did you have any conversations with managers

14    or supervisors about the contract negotiations?

15    A    Yes.

16    Q    And when was that?

17    A    The first one was shortly before the implementation of the

18    contract.

19    Q    And do you recall what time of day that was?

20    A    Between noon and 3:00.

21    Q    And where did that conversation take place?

22    A    In the millhouse control room.

23        THE REPORTER:  In the what?

24        THE WITNESS:  Millhouse control room.

25        THE REPORTER:  Would you please move a little bit closer to

1    the microphone?

2         THE WITNESS:  Yeah.

3         THE REPORTER:  Thank you.

4    Q    BY MS. OHAERI:  And were you alone in the millhouse control

5    room?

6    A    No, it was me and two other employees.

7    Q    And how did -- what happened in the millhouse control room?

8    A    Me and two other employees were having a discussion about

9    the contract, and Jon Swails entered the room.

10   Q    And who is Jon Swails?

11   A    He is our maintenance supervisor.

12   Q    What happened when Mr. Swails entered?

13   A    He overheard us talking about the contract and some of the

14   issues that we were discussing with it, and interjected himself

15   into the conversation.

16   Q    What do you recall Mr. Swails saying?

17   A    He started off saying that he thought that the company was

18   offering a good contract, and that he had been on the Union side

19   of this before, and that he knows how negotiations work.  And he

20   felt that we were the reason -- the Union -- was the reason why

21   we weren't moving forward, and that Chris was holding us back

22   due to not negotiating, and also his relationship with Ken

23   Meadows.

24   Q    When you say "Chris," Chris who?  Do you know his last

25   name?

 1   A    Chris Eby.

 2   Q    What, if anything else, do you recall from your

 3   conversation that day with Mr. Swails?

 4   A    Just -- basically just that, just the fact that he thought

 5   that the Union was the one holding us back from not reaching a

 6   contract.

 7   Q    What happened -- strike that.  Did you, or any of the other

 8   employees, respond to Mr. Swails' statements?

 9   A    Yes.  I don't recall what the other two people in the room

10   responded to what he was saying.

11   Q    Did you respond, at all, to what Mr. Swails said?

12   A    Yeah, I asked him, you know, why he thought that Chris was

13   holding us back.  And basically, he just said, you know, he

14   mentioned the relationship with Ken Meadows and that we -- we

15   wanted everything and that we weren't willing to give anything

16   up.  And that he thought that they were offering us a fair

17   contract.

18   Q    You mentioned that that was the first conversation you had

19   with a manager or supervisor?

20   A    Correct.

21   Q    When was the second one, or the next one?

22   A    Shortly after they implemented the contract?

23   Q    And who was the manager or supervisor that you were talking

24   to?

25   A    Brad Bumba.

1   Q    What were the circumstances of you and Mr. Bumba speaking?

2   A    Me and another co-worker had questions about the way they

3   were doing scheduling.  We were unclear on exactly how that was

4   being done, so we asked him to come and explain it to us once

5   again.

6   Q    And did Mr. Bumba accept your request?

7   A    Yes.

8   Q    And what happened when you spoke with Mr. Bumba?

9   A    He also came into the millhouse to discuss it with us.  We

10  asked him once again to explain to us how the scheduling was

11  being handled.  And he told us that he was doing it the way that

12  he interpreted the language in the contract.  We stated that he

13  wasn't doing it the same as other managers in the plant.  And he

14  said that he was doing it how he interpreted it, and that is the

15  way that it was going to be done.

16  Q    And what, if anything, did you respond to his statement

17  about that is how he was going to be doing it?

18  A    I told him that I didn't think that the contract was open

19  to interpretation, that it should be black and white, and that

20  everybody should do it the same way, and he disagreed with me.

21  Q    What did he say when he disagreed with you?

22  A    He asked me how long I had been involved in a union

23  situation, and I answered him, four years.  And then he made the

24  statement that he had been involved in more than seven different

25  jobs involving unions, and that he thought that he more

1  knowledge than me on the topic.

2  Q    What happened when the conversation ended?

3  A    When he was exiting the room, he made a comment, that he

4  said, "Just remember why things are the way they are."

5  Q    And did you respond to his statement?

6  A    I asked him if he was blaming us, the Union, for the way

7  things -- for the way things they are -- the way they are.

8  Q    And do you recall whether Mr. Bumba responded?

9  A    He responded with, "I am not saying it is your fault, I am

10  just making a statement."

11  Q    Do you recall what time of day the conversation occurred?

12  A    About the same -- between noon and three.

13  Q    Were any other employees present?

14  A    Yes, Austin Coufal.

15  Q    I want to turn to the time period after the Employer

16  implement its last, best and final offer, and I want to talk --

17      JUDGE CARISSIMI:  Ms. Ohaeri, before we go there, what

18  Complaint allegation did Mr. Beitz' testimony go to?

19      MS. OHAERI:  Complaint paragraph 5(f) and 5(g).

20      JUDGE CARISSIMI:  Okay, and which of our many documents is

21  that contained in?

22      MS. OHAERI:  That is in the Second Amendment to Complaint.

23      JUDGE CARISSIMI:  Okay.

24      MS. OHAERI:  On page 2.

25      JUDGE CARISSIMI:  Okay, very good.  You may continue with

1   your examination.

2   Q    BY MS. OHAERI:  I want to specifically discuss notification

3   of overtime since the Employer implemented its last, best and

4   final offer.  How have you been notified of overtime since that

5   period -- since September 14, 2015?

6   A    Basically, we have a daily overtime and grind schedule, on

7   a computer in our control rooms, that lists our overtime and our

8   daily job routines.

9   Q    And if you are assigned to work overtime, how do you --

10  since the implementation -- how have you found that out?

11  A    It was left up to us to check the schedule several times a

12  day to see if anything had changed.

13  Q    Have you ever been scheduled to work overtime with less

14  than 48-hours notice?

15  A    Yes.

16      MR. FUNK:  Your Honor, I will object to the line of

17  questioning as being cumulative.  This is the third witness we

18  have had about overtime, alleged unilateral changes about

19  overtime.

20      JUDGE CARISSIMI:  As much as I would like to move things

21  along, I can't determine at this point that it is cumulative,

22  because General Counsel's burden is to show a substantial

23  material change, and I think you are going to argue that there

24  isn't one, even if there was a change.  So I can't say that it

25  is cumulative, at this point.  I am not prepared to make a

1    finding on it right now, so I am going to have to let it

2    continue.

3         You may continue.

4         MS. OHAERI:  May I respond to that at all, or is there no

5    need?  Do you want me to elaborate as to anything with regard to

6    the --

7         JUDGE CARISSIMI:  No, not when you are ahead.  You don't

8    need to say anything.

9    Q    BY MS. OHAERI:  Since the implementation of the contract,

10   have you been scheduled for overtime less than 48 hours?

11   A    Yes.

12   Q    And in advance, sorry, with less than 48-hours notice?

13   A    Yes.

14   Q    And how have you found out that you were scheduled for that

15   overtime?

16   A    Just by checking the schedule.

17   Q    Did any supervisor or manager call you, or come up to you

18   at work and tell you that you were scheduled?

19   A    No.

20   (Witness proffered document.)

21   Q    I want to direct your attention to General Counsel's

22   Exhibit 79.  Do you recognize that?

23   A    Yep.

24   Q    And what is that?

25   A    This is a couple days of our daily overtime and job

1   schedule.

2   Q    And do you see your name on that?

3   A    Yes.

4   Q    Did you work any overtime during those days, the October 19

5   to 22?

6   A    Yes.

7   Q    Was that overtime, during that time frame, forced overtime?

8   A    Yes.

9   Q    Was all the overtime you worked that week forced?

10  A    Yes.

11       MS. OHAERI:  That is all, Your Honor.

12       JUDGE CARISSIMI:  Mr. Funk, cross examination?

13       MR. FUNK:  Are there any Jencks statements or affidavits?

14       MS. OHAERI:  There are no affidavits.  There are two

15  written statements, of several sentences each, with regard to

16  impact evidence.

17       JUDGE CARISSIMI:  They are a page each, Ms. Ohaeri, or less

18  --

19       MS. OHAERI:  Yeah, a quarter of a page each.

20       JUDGE CARISSIMI:  -- than a page, all right.

21       How much time would you like, Mr. Funk?

22       MR. FUNK:  Just a few minutes.

23       JUDGE CARISSIMI:  Very good, we are off the record.

24  (Off the record.)

25       JUDGE CARISSIMI:  On the record.

1      Mr. Funk, you may cross-examine.

2      MR. FUNK:  Okay, thank you.  Mr. Beitz, my name is Ryan

3  Funk, I am an attorney for Ingredion.  I am going to ask you

4  some questions about your testimony.

5      THE WITNESS:  Yep.

6                    CROSS-EXAMINATION

7  Q    BY MR. FUNK:  First of all, have you talked to other

8  witness in this matter, or potential witnesses, about their

9  testimony that they have given or intend to give?

10 A    No.

11 Q    Okay, thank you.  When was it that the conversation you

12 described, with Mr. Swails, took place?

13 A    Shortly before the implementation of the contract.

14 Q    So that was before September 14, 2015?

15 A    Correct.

16 Q    And what about the conversation with Mr. Bumba, when was

17 that?

18 A    Shortly after the implementation.

19 Q    Within how long of implementation?

20 A    Less than a month.

21 Q    So that was before October 14th of 2015?

22 A    Correct.

23 Q    Can you recall more precisely when it was, within that

24 month?

25 A    No.

1  Q    Why didn't you like being forced with less than 48-hours

2  notice?

3  A    If -- I mean, if we weren't called to be notified,

4  especially if we were off, we had no idea whether we had

5  overtime or not.

6  Q    Did you think the company wasn't allowed to do that under

7  the contract?

8  A    To force us --

9  Q    With less than 48-hours notice?

10  A    From what I understood, from what I understand, that we

11  were to be told, by management, of our overtime.

12  Q    Was that something that was in the last, best and final

13  offer?

14  A    I believe so.

15  Q    Have you ever seen the last, best and final offer?

16  A    Yes, I have.

17  Q    Do you know if the last, best and final offer -- from your

18  memory -- do you know if the company has the right, on less than

19  nine days of notice, to change work schedules for employees?

20  A    I am uncertain.

21  Q    Okay.  Let me show you the last, best and final offer, it

22  is Joint Exhibit 8.

23       MR. FUNK:  If I may, Your Honor?

24       JUDGE CARISSIMI:  Yes.

25  (Witness proffered document.)

1    Q    BY MR. FUNK:  Right here, turn to somewhere around page 15

2    -- page 14, that the page of the contract, and there is a bottom

3    right-hand corner you will also see number 2239.  If you could

4    read section 3, at the bottom of that?

5    A    It says, "The company reserves" --

6         JUDGE CARISSIMI:  No, you --

7         MR. FUNK:  Just to yourself, sir.

8         JUDGE CARISSIMI:  -- don't need to read it out loud, sir,

9    just read it to yourself at this point.

10        MS. OHAERI:  Sorry, what page are we on?

11        JUDGE CARISSIMI:  On page --

12        MR. FUNK:  On 2239.

13        JUDGE CARISSIMI:  -- yes.  Let us know when you have it,

14   counsel.

15        Do you have it, Ms. Ohaeri?

16        MS. OHAERI:  Yes.

17        JUDGE CARISSIMI:  Okay, very good.

18        Mr. Funk, you may proceed.

19   Q    BY MR. FUNK:  So after you have read -- you have read that

20   section 3 to yourself, is that correct?

21   A    Correct.

22   Q    Then I will ask you to turn the page to page 15, that is

23   2240 in the bottom right-hand corner, and read overtime rule

24   number 1.

25   A    It says --

1  Q    To yourself.

2  A    Okay.

3  Q    So after reading its provisions, you would agree that the

4  company does have the right to have people work overtime with

5  less than 48-hours notice, is that correct?

6  A    Correct.

7       MR. FUNK:  No further questions, thank you.

8       JUDGE CARISSIMI:  Any redirect, within that limited range?

9       MS. OHAERI:  Yes.

10      JUDGE CARISSIMI:  You may proceed.

11                      REDIRECT EXAMINATION

12   Q   BY MS. OHAERI:  Prior to the implementation of the

13  Employer's last, best and final offer, how were -- how were you

14  notified that you were going to be working overtime, if it was

15  less than 48 hours ahead of time?

16  A    We were called by management.

17  Q    And since the implementation of the last, best and final

18  offer, if it is less than 48 hours, are you called?

19  A    No.

20      MS. OHAERI:  That is all I have, Your Honor.

21      JUDGE CARISSIMI:  I take it there's nothing, within that,

22  Mr. Funk.

23      Mr. Beitz, you are excused as a witness, you may step down,

24  sir, thank you.

25      THE WITNESS:  All right.

1   (Witness excused from the stand.)

2        JUDGE CARISSIMI:  We can call our next witness.

3        Off the record.

4   (Off the record.)

5        JUDGE CARISSIMI:  On the record.

6        Ms. Ohaeri, you may call your next witness.

7        MS. OHAERI:  Your Honor, I am calling Brandon Morris.

8        JUDGE CARISSIMI:  Sir, if you could please stand for a

9   moment and raise your right hand?

10  (WITNESS SWORN:  BRANDON MORRIS.)

11       MS. OHAERI:  And he will be testifying with regard to

12  Complaint paragraph 16(a).

13       JUDGE CARISSIMI:  Did you say 15(a)?

14       MS. OHAERI:  Sixteen, 1, 6, (a).

15       JUDGE CARISSIMI:  Sixteen(a).

16                          DIRECT EXAMINATION

17  Q    BY MS. OHAERI:  Mr. Morris, where are you currently

18  employed?

19  A    The starch department at Ingredion.

20  Q    And what position do you currently hold?

21  A    General utilities.

22  Q    And what do you as a general utility?

23  A    I clean up the starch side of the department, and I work on

24  the food route.

25  Q    What shift do you work?

1   A    Third shift.

2   Q    Have you ever held any positions with the Union?

3   A    No, I haven't.

4   Q    I want to direct your attention to the summer of 2015.

5  During that time, did any supervisor or manager talk to you

6  about contract negotiations?

7   A    Dave Vislisel did.

8   Q    And do you recall when that was?

9   A    It was the night we came back, after the vote.

10   Q    The vote on the contract?

11   A    Yes.

12   Q    Were you alone with Mr. Vislisel?

13   A    No, I wasn't.

14   Q    How many other employees were with you?

15   A    There was two other employees.

16   Q    And where were you?

17   A    We were standing next to the packer in building 57.

18   Q    And what happened?

19   A    We just came in and were just kind of thumbing through the

20  contract that we had with us.  And Dave Vislisel approached us

21  and he said that he couldn't believe that we voted this down,

22  and he tried to convince us how great it was.

23   Q    Do you recall what Mr. Vislisel said?

24   A    Not all the exact words.

25   Q    What do you recall about what he said?

1  A    He just asked us our thoughts on why we would turn it down,

2  and we kind of explained to him about the health care and the

3  hours and pay, and how we would lose our seniority in the

4  overtime.

5  Q    And what happened after you told Mr. Vislisel why you voted

6  it down?

7  A    He just walked away.

8  Q    Since the -- scratch that.

9      JUDGE CARISSIMI:  Ms. Ohaeri, did you say 16(a)?

10      MS. OHAERI:  I think I did.

11      JUDGE CARISSIMI:  Isn't that the implementation of the

12  unilateral changes?  Is there another Complaint paragraph that

13  testimony went to?

14  (Pause.)

15      MS. OHAERI:  Yes, Your Honor, sorry.  I left out that I was

16  soliciting the testimony with regard to the notice and the

17  undermining.  But he is also going to testify about 16(a).

18      JUDGE CARISSIMI:  All right, so the testimony I just heard,

19  now what does that go to?

20      MS. OHAERI:  It goes to the notice reading, the undermining

21  -- which I believe is in Complaint paragraph 14 as one of the

22  bullet points --

23      JUDGE CARISSIMI:  All right.

24      MS. OHAERI:  -- and the 16(a), I haven't solicited any

25  testimony on, yet.

1    JUDGE CARISSIMI:  All right, let me take a look at 14.

2    MS. OHAERI:  Sure.  It is the third bullet from the bottom.

3    JUDGE CARISSIMI:  All right, now, we are looking at the

4    Complaint Notice of Hearing, the original one?

5    MS. OHAERI:  No, it is not in the original, Your Honor,

6    sorry, it is in the second amended.

7    JUDGE CARISSIMI:  See, that is the problem with this

8    approach, but I didn't say anything previously.  It would be

9    much better if there was a consolidated document.  So which one

10   should I look at, Ms. Ohaeri.

11   MS. OHAERI:  The Second Amendment to Complaint --

12   JUDGE CARISSIMI:  All right.

13   MS. OHAERI:  -- dated April 16.

14   JUDGE CARISSIMI:  All right, there's Roman numeral IV,

15   paragraph 14, as amended.  This is not easy to search through

16   here, as you can see, but I have it now.  Go ahead, I

17   understand.

18   Go on to your next subject.

19   (Witness proffered document.)

20   Q    BY MS. OHAERI:  I am showing you what has been previously

21   marked as General Counsel's Exhibit 86.  Do you recognize that?

22   JUDGE CARISSIMI:  Yes, sir, that is a question to you.

23   THE WITNESS:  That schedule, that is what you are asking

24   about?

25   MS. OHAERI:  Sorry, that is the wrong one.

1    Could we go off the record, Your Honor?

2    JUDGE CARISSIMI:  Oh, certainly, off the record.

3 (Off the record.)

4    JUDGE CARISSIMI:  On the record.

5    MS. OHAERI:  I retracted General Counsel's Exhibit 86 from

6 the witness, and I have now given the witness General Counsel's

7 Exhibit 78.

8 (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 78.)

9 (Witness proffered document.)

10 Q    BY MS. OHAERI:  Mr. Morris, do you recognize that document?

11 A    Yes, I do.

12 Q    And what is that?

13 A    It is a schedule for a few days.

14 Q    And do you see your name on this schedule?

15 A    Yes, I do.

16 Q    And where is it?

17 A    It is on the third column, on the right, down to the

18 bottom, under "General Utility."

19 Q    And turning to page 2 of that document, where is your name

20 located there?

21 A    It is in the first column under "General Utility," and also

22 in the third column.

23 Q    And turning to page 3 of that document, do you see your

24 name?

25 A    Yep, it is also in the first column.

1  Q    And what happened with regard to your schedule on November

2  11?

3       MR. FUNK:  Your Honor, I would make that objection about

4  cumulative testimony, to the extent that the documents speak for

5  themselves, and we have already testimony that explains how to

6  read these documents.  Now that we have established that his

7  name is on this document, I think further questions are

8  cumulative.

9       JUDGE CARISSIMI:  I agree.  It seems to me -- the only

10 issue I have, is whether it is forced or unforced overtime.

11      MS. OHAERI:  Okay, I will ask that.

12      JUDGE CARISSIMI:  Okay.

13 Q    BY MS. OHAERI:  Mr. Morris, were you -- November 11, the

14 first page, and looking at the first page and the second page,

15 November 12 -- were you forced to work the overtime, the staying

16 over at 7 a.m.?

17 A    On November 12th, yes, I was.

18 Q    And what about on November 13?

19 A    Yes, I was.

20 Q    And how many hours of overtime did you work on the 13th?

21 A    I worked eight.

22 Q    And I want to direct you to the overtime you worked -- the

23 day, rather, you worked on November 12.

24 A    Yep.

25 Q    What happened that day?

 1    A    On the 12th, it was just a regular day.

 2    Q    And what happened at the end of your day?

 3    A    I just went home, like I usually would, on the 12th.

 4    Q    And what about on the 13th?

 5    A    On the 13th, I wasn't aware of the overtime until after my

 6    clock-in hours.

 7    Q    And --

 8         JUDGE CARISSIMI:  Mr. Morris, you are going to have to keep

 9    your voice up a little bit, okay?

10         THE WITNESS:  Sorry, I am not a very loud talker.

11    Q    BY MS. OHAERI:  How did you become aware of the overtime?

12    A    I was actually on my way out of the building and a co-

13    worker stopped me and told me that I was supposed to stay over.

14    Q    What happened when you were told that?

15    A    I called the facilitator and asked if I was supposed to be

16    over.

17    Q    And who was the facilitator that you called?

18    A    That was Greg Schmidt.

19    Q    And what happened when you called Mr. Schmidt?

20    A    He said he had to go over it, originally, for four hours.

21    Q    And what was your conversation, with Mr. Schmidt, with

22    regard how you found out you were scheduled to work the

23    overtime?

24    A    I had told him, originally, I wasn't even scheduled for it,

25    Brett Roehlk was.  They moved him off of his job to fill another

1  position.

2  Q    What was your conversation, with Mr. Schmidt, with regard

3  to the way in which you found out you were scheduled for the

4  overtime?

5  A    I just asked him if he needed me to stay, and he said,

6  "Yes."  And I told him that, "I have clocked out, and I can

7  clock back in if you need me."

8  Q    Did you have any conversation, with him, with regard to the

9  short notice?

10 A    Yes, I wasn't very happy with him.

11 Q    What did you say to him?

12 A    I told him that, you know, I had no one lined up to watch

13 my kids, and my wife needs to be at work in a few minutes, and

14 that was about it.

15 Q    Did you check the schedule prior to walking out to return -

16 -

17 A    Yes, I did.

18 Q    And when you checked the schedule before you left, were you

19 scheduled to work the overtime?

20 A    No, I was not.

21 Q    How much time passed between when you checked the schedule

22 and when you were told by your co-worker that you were

23 scheduled?

24 A    I checked the five minutes prior to when I was originally

25 leaving.

1  Q     Did you tell Mr. Schmidt that?

2  A     Yes, I did.

3  Q     What did he say?

4  A     He says he had no choice, he had to have me over.

5  Q     Did he say anything about -- or did you ask him anything

6  about why he didn't tell you?

7  A     I did, and he said that's how they were doing it now.

8        JUDGE CARISSIMI:  Mr. Morris, I want you to talk loud

9  enough so that the people sitting in the back can hear you, all

10 right?

11       THE WITNESS:  I will try.

12       JUDGE CARISSIMI:  Try your best.

13       THE WITNESS:  Yeah.

14       JUDGE CARISSIMI:  We want to hear what you have to say.

15       THE WITNESS:  Yeah, I will try.

16       MS. OHAERI:   That is it, Your Honor.

17       JUDGE CARISSIMI:  Cross examination?

18       MR. FUNK:  Are there any affidavits or other Jencks

19 statements?

20       MS. OHAERI:  Yes.  There is one affidavit, dated February

21 27, 2016, signed by Mr. Morris.  It is three pages long, with

22 regard to impact evidence.  And there is a one-page statement,

23 undated, by Mr. Morris, also with regard to impact evidence.

24       JUDGE CARISSIMI:  Very good.

25       Mr. Funk, how much time would you like?

1      MR. FUNK:  Could I have five minutes?

2      JUDGE CARISSIMI:  Certainly.

3      MR. FUNK:  Thank you.

4      JUDGE CARISSIMI:  We are going to be in recess for five

5  minutes.

6  (Off the record.)

7      JUDGE CARISSIMI:  On the record.

8      Mr. Funk, you may cross-examine.

9      MR. FUNK:  Okay, thank you.

10      Hello, my name is Ryan Funk, I am an attorney for

11  Ingredion.  I am going to ask you a few questions about the

12  testimony you just gave.

13      THE WITNESS:  Yeah.

14                        CROSS-EXAMINATION

15  Q    BY MR. FUNK:  First of all, did you speak -- have you

16  talked to other witnesses or potential witnesses about their

17  testimony that they have given here in this --

18  A    No, I haven't.

19  Q    -- proceeding, or that they are about to give in this

20  proceeding?

21  A    No.

22  Q    You testified about a conversation with Dave Vislisel?

23  A    Yes.

24  Q    And, can I ask you:  Who were the other two employees that

25  were present for that conversation?

1    A    That was Rick Holmes and Craig Hartman.

2    Q    About overtime, do you still have in front of you GC

3    Exhibit 78?

4    A    Yes, I do.

5         MR. FUNK:  Do you guys have it?

6         MS. OHAERI:  Yep.

7    Q    BY MR. FUNK:  If you look at this document, does it show

8    that you are forced for overtime on the first page, Wednesday,

9    November 11th?

10   A    No, I am not.

11   Q    But you are forced for overtime on the second and third

12   pages, is that correct?

13   A    That is correct.

14   Q    And each page represents a different date, is that correct?

15   A    Yep.

16   Q    So this document shows that you were forced for two days of

17   overtime, is that correct?

18   A    Correct.

19   Q    Two day in a row?

20   A    Yes.

21   Q    Are you familiar with the company's last, best and final

22   offer it gave to the Union?

23   A    Slightly.

24   Q    Have you seen it before?

25   A    I have seen it in the past.

1  Q    Do you know whether there is any language in that document

2  about how many days in a row employees may be forced for

3  overtime?

4  A    I believe it was two.

5  Q    You believe that two days in a row is the most that

6  employee can --

7  A    That can be forced.

8  Q    So it allows employees to be forced up to two days of

9  overtime in a row?

10  A    Correct.

11      MR. FUNK:  Nothing further, thank you.

12      JUDGE CARISSIMI:  Any redirect?

13      MS. OHAERI:  I mean, General Counsel stipulates -- okay,

14  never mind.

15      No, I don't have anything more for this witness.

16      JUDGE CARISSIMI:  Very good.

17      Mr. Morris, you are excused as a witness, you may step

18  down, sir.

19      THE WITNESS:  Thank you.

20      JUDGE CARISSIMI:  Thank you.

21      General Counsel, you may call your next witness.

22      JUDGE CARISSIMI:  Off the record.

23  (Off the record.)

24      JUDGE CARISSIMI:  On the record.

25      Ms. Ohaeri, you may call your next witness.

 1      MS. OHAERI:  General counsel calls Mr. Kuddes, Jeff Kuddes.

 2      JUDGE CARISSIMI:  Sir, if you please stand for a moment and

 3 raise your right hand?

 4 (WITNESS SWORN:  JEFF KUDDES.)

 5      JUDGE CARISSIMI:  Please have a seat.

 6                     DIRECT EXAMINATION

 7   Q   BY MS. OHAERI:  Mr. Kuddes, can you please state and spell

 8 your last name for the record?

 9   A   State my last name, or my whole name?

10   Q   State and spell.

11   A   Kuddes, K-U-D-D-E-S.

12   Q   And where are you currently employed?

13   A   Ingredion.

14      JUDGE CARISSIMI:  Sir, I don't know if we got your first

15 name on the record.

16      THE WITNESS:  Jeff.

17      JUDGE CARISSIMI:  Jeff, okay, thank you.

18   Q   BY MS. OHAERI:  What position do you hold?

19   A   Maintenance mechanic or reliability specialists, they call

20 it.

21      JUDGE CARISSIMI:  And, Ms. Ohaeri, what testimony -- what

22 Complaint paragraphs does Mr. Kuddes' testimony go to?

23      MS. OHAERI:  Oh, sorry.  I skipped that.

24      JUDGE CARISSIMI:  That is all right.

25      MS. OHAERI:  It is Complaint paragraph 13(c) of the

1 original Complaint.

2   JUDGE CARISSIMI:  Okay.

3   MS. OHAERI:  Complaint paragraph 16(a) of the Order

4 Consolidating and Amending.

5   JUDGE CARISSIMI:  Okay.

6   MS. OHAERI:  Complaint paragraph 14, with regard to the

7 undermining bullet, which is part of the Second Amended

8 Complaint, as well as the notice of reading that is part of the

9 Second Amended ???--

10   JUDGE CARISSIMI:  Okay.  All right, thank you.

11   You may proceed.

12 Q BY MS. OHAERI:  And what department do you work in?

13 A Maintenance.

14 Q How long have you been employed by the Employer at Penford?

15 A About eight and a half years.

16 Q And what are your job duties?

17 A All maintenance, simple light replacement to pumps, motors,

18 electrical.

19 Q And who is your direct supervisor?

20 A Chad Reid.

21 Q Have you ever met Mr. Meadows?

22 A Yes.

23 Q How many times have you met Mr. Meadows?

24 A I met him once, but kind of twice, during -- there's a

25 second time we met for insurance reasons.

1  Q    I want to talk about the first time.  Do you recall

2  approximately when that was?

3       MR. FUNK:  Your Honor, I would like to object about this

4  cumulative testimony.  It is not a unilateral change allegation,

5  it is an 8(a)(1) allegation, and we have already heard from a

6  number of witnesses about this particular allegation in the

7  Complaint.

8       JUDGE CARISSIMI:  No, I am going to overrule the objection.

9       You may continue.

10  Q    BY MS. OHAERI:  Do you recall when that was --

11  A    Early --

12  Q    -- that you met Mr. Meadows?

13  A    -- summer, like May, April, or something.

14  Q    And where did you meet him?

15  A    The control room of building 13 for ethanol.

16  Q    And how did you come to be in the control room of building

17  13?

18  A    I needed to get a permit from the operators.

19  Q    And were you alone?

20  A    No, I was with my partner, Jason Nemec.

21  Q    And who was there when you arrived in the control room?

22  A    The two operators, Jeff Rausch and Dave Fuchs, and then Mr.

23  Meadows, Phil Kluetz, Levi Wood.

24  Q    And what happened when you entered the control room?

25  A    Well, at first, I thought I was interrupting something, so

1    I kind of started to back out.  And then Phil Kluetz said,

2    "There's two of your six-day-a-week employees."

3    Q    And what happened after Mr. Kluetz said that?

4    A    Ken said something about he didn't -- he shook his head

5    like he didn't like that, that schedule was a bad schedule, too

6    many hours of work, need more time with your family, made a

7    comment if I had a family.  Obviously, I did, but you know, like

8    with children and what-have-you.

9    Q    And then what happened?

10   A    I think those guys were still talking, like when I said

11   that, Jeff and Dave were finishing up, maybe something that they

12   were talking about.  And then there was --

13        JUDGE CARISSIMI:  Mr. Kuddes, I am going to interrupt.  If

14   you could try to remember to use last names?

15        THE WITNESS:  I am sorry.

16        JUDGE CARISSIMI:  That is all right.  I know these are

17   people you know, but it is helpful, in the record, if their last

18   names are present, okay?

19        THE WITNESS:  Okay.  Mr. Rausch and Mr. Fuchs were -- I

20   think there was a conversation finishing up.  And Levi Wood

21   asked me if I had any questions for Ken, or concerns.  Which I

22   did, and I asked a few of them.

23   Q    BY MS. OHAERI:  And what were they?

24   A    One was if I had a job after August 1st.

25   Q    And what, if anything, did Mr. Meadows say?

1  A    I think, if I remember correctly, more along the lines with

2  maintenance, because sometimes companies come in and they hire

3  out maintenance and don't have in-house.  So I had asked that

4  more specific.  He assured me that that wasn't an issue, and I

5  am probably --

6        JUDGE CARISSIMI:  Who is "he"?

7        THE WITNESS:  Ken Meadows assured me that that wasn't an

8  issue, sorry.

9        JUDGE CARISSIMI:  That is all right.

10       THE WITNESS:  I don't want to get this wrong, but he either

11 came from like National Oats or Corn Products, whichever, and

12 that they had the in-house maintenance there, and that is what

13 Ken Meadows preferred.

14 Q    BY MS. OHAERI:  What was discussed after the in-house

15 maintenance issue?

16 A    One other point, or question, I brought up was money, pay

17 raise, because we had voted several years ago to freeze our

18 raises.  I was concerned about that.

19 Q    And what do you recall the conversation was about the

20 raises?

21 A    To the best of my knowledge, I think Ken Meadows said

22 something along the line that they were going to be looking into

23 the area, to kind of see what the standard was.

24 Q    What other issues did you and Mr. Meadows discuss?

25 A    Insurance -- or not insurance, I am sorry.  Vacation --

1    there was kind of two parts to that. The first part was for new

2    hires. When you started at Penford Products, at the time, you

3    only got four personal days. And I suggested, you know, it

4    would be nice to -- we are losing employees because other

5    companies have two weeks of vacation to start with, and that is

6    something I would have liked to see to help keep employees. The

7    other one was there was a break with the seniority, I believe,

8    that started after '04, where employees had seven days of

9    vacation that was previous there. Hired after that, you only

10   got five days of vacation for a workweek.

11   Q    Do you recall anything that Mr. Meadows said?

12   A    There was some conversation between Phil Kluetz, me, I

13   think Ken Meadows maybe didn't quite understand because, you

14   know, he just was there about some of the process. So I know

15   that something like that was brought up, because I remember

16   arguing with Phil, a little bit, Phil Kluetz, sorry.

17   Q    Do you recall what you were disagreeing with Mr. Kluetz

18   about?

19   A    Yeah, he had said, Phil Kluetz said that there was the two

20   days that they granted the other people to use. For example, if

21   I wanted to take five days off, but I work six, we had free --

22   two free days to use. You don't get paid for them, but it would

23   allow you to take your seven days off. And my comment was,

24   "Well, but I am not getting paid for those two, you know, like

25   everybody else." I just wanted to make it, you know, straight

1    across the board.  If you work a six, or seven -- work a seven-

2    day schedule, I would like to have seven days paid, you know,

3    for my time off.

4    Q    Did you have any idea that Mr. Meadows was at the plant, or

5    was going to be at the plant?

6    A    Yes.

7    Q    And how did you know that?

8    A    I believe during -- we have a morning meeting every meeting

9    -- or every Monday -- or, can't talk, sorry.  Every morning at 7

10   a.m., we have a safety meeting in the maintenance department.

11   And I believe Chad Reid announced that there was -- that Ken was

12   in the plant, Ken Meadows was in the plant and might be walking

13   around, sort of just FYI.

14   Q    Did he say what Mr. Meadows was going to be doing?

15   A    I don't recall if he did or not.

16   Q    How long was the portion of the conversation with Mr.

17   Meadows that you were present for?

18   A    Fifteen, 20 minutes, maybe.

19   Q    And were Mr. Wood and Mr. Kluetz present the entire time?

20   A    Correct.

21   Q    Other than your disagreement with Mr. Kluetz, do you recall

22   Mr. Wood or Mr. Kluetz saying anything else during that

23   conversation?

24   A    There was stuff said, but I don't remember details, I mean.

25   Q    Do you recall whether Mr. Nemec said anything during the

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 677 of 1141

1  conversation?

2  A    Nemec, no.

3  Q    Nemec.

4  A    He didn't say much.

5  Q    What was the second time that you met Mr. Meadows?

6  A    When they imposed their contract, our insurance was going

7  to change, so we were told by our supervisor -- which Chad Reid

8  was my supervisor -- to go up to the conference room, up in

9  building 31, to be kind of briefed on the insurance.

10  Q    And how did you come to see Mr. Meadows there?

11  A    He was the one that was giving the class, or the

12  information.

13  Q    Were you there by yourself with Mr. Meadows?

14  A    No, there was probably 20 or 30 people in there.

15      MS. OHAERI:  Your Honor, I think this is a natural break

16  for his testimony, and we are going to go on to a completely

17  different subject.

18      We do only have five minutes left, and we have an issue

19  with an exhibit that I also need to work out with Mr. Funk.

20      JUDGE CARISSIMI:  All right.  I would agree that it is an

21  appropriate time.  So we will go off the record and will be in

22  adjournment until 9 a.m. tomorrow morning.

23  (Whereupon, at 6:36 p.m., the trial adjourned to reconvene

24  tomorrow, April 21, 2016, at 9:00 a.m. in the same place.)

25

1 <u>C E R T I F I C A T E</u>

2     This is to certify that the attached proceedings before the

3 National Labor Relations Board, Region 18, Case 18-CA-160654 and

4 18-CA-170682, Ingredion, Inc, d/b/a Penford Products Co. and

5 BCTGM Local 100G, affiliated with Bakery, Confectionary, Tobacco

6 Workers, and Grain Millers International Union, AFL-CIO, in

7 Cedar Rapids, Iowa on April 20, 2016, was held according to the

8 record, and that this is the original, complete and true and

9 accurate transcript that has been compared to the recording, at

10 the hearing; and that the exhibits are complete and no exhibits

11 received in evidence or in the rejected exhibit files are

12 missing.

13

14        *Christopher Walls*

15        Christopher Walls

16        Official Reporter

17

18

19

20

21

22

23

24

25

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

        Respondent,

and                          Case No. 18-CA-160654
                                    18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLRS INTERNATIONAL UNION,
AFL-CIO,

        Charging Party.

Pages: 677 through 749 (Volume 4 of 4)

Date: April 21, 2016

Place: Cedar Rapids, Iowa

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC 20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

        Respondent,

and                           Case No. 18-CA-160654
                                      18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLERS INTERNATIONAL UNION,
AFL-CIO,

        Charging Party.

      The above entitled matter resumed trial pursuant to

adjournment, before The Honorable Mark Carissimi, Administrative

Law Judge, in Room 008, Board of Supervisors Formal Board Room

of the Jean Oxley Linn County Public Service Center, 935 Second

Street SW, Cedar Rapids, Iowa, on Thursday, April 21, 2016, at

8:56 a.m.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

```
 1                   A P P E A R A N C E S

 2      On behalf of the NLRB, Counsel for the General Counsel:

 3      TYLER J. WIESE, ESQ.

 4      CHINYERE C. OHAERI, ESQ.

 5      National Labor Relations Board, Region 18

 6      212 Third Avenue South, Suite 200

 7      Minneapolis, Minnesota  55401

 8      Tyler Wiese: (612)348-1784 /Chinyere Ohaeri: (612)348-1766

 9      Tyler.Wiese@nlrb.gov / Chinyere.Ohaeri@nlrb.gov

10      On behalf of the Charging Party:

11      SETH MARLING,

12      BCTGM Local 100G

13      5000 J Street SW

14      Cedar Rapids, Iowa   52404

15

16      On behalf of the Respondent:

17      STUART R. BUTTRICK, ESQ.

18      RYAN J. FUNK, ESQ.

19      Faegre Baker Daniels

20      300 N. Meridian Street, Suite 2700

21      Indianapolis, Indiana   46204

22      Stuart Buttrick:  (317)237-1038

23      Ryan Funk:  (317)237-1131

24      stuart.buttrick@FaegreBD.com/ryan.funk@FaegreBD.com

25
```

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 682 of 1141

1                          <u>I N D E X</u>

2    <u>WITNESSES</u>          <u>DIRECT</u>  <u>CROSS</u>    <u>REDIRECT</u> <u>RECROSS</u> <u>VOIR DIRE</u>

3    Jeff Kuddes            697    717      719

4    (Resumed)

5    Michael Sarchett      722    728      732      733

6    Jeff King             734    742      745

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

|  | **E X H I B I T S** | |
|---|---|---|
| **EXHIBIT** | **IDENTIFIED** | **IN EVIDENCE** |

1

2

3 **General Counsel's**

| 4 | 3 | 689 | 690 |
|---|---|---|---|
| 5 | 56 | 690 | 692 |
| 6 | 67 | 684 | 689 |
| 7 | 78 | | 681 |
| 8 | 88 | 699 | 700 |
| 9 | 89 | 712 | 714 |
| 10 | 90 | | |

11

12 **Respondent's**

| 13 | 83 | 731 |
|---|---|---|
| 14 | 86 | 743 |
| 15 | 106 | 744 |

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC 20005
(888)777-6690

1                    P R O C E E D I N G S

2                                                    8:56 a.m.

3        JUDGE CARISSIMI:  On the record.

4        In my review of the exhibits yesterday, and was confirmed

5    by our Reporter, Mr. Walls, that GC 78 was identified but not

6    admitted.

7        General Counsel, do you wish to move to admit that document

8    into evidence now?

9        MS. OHAERI:  Yes.

10        JUDGE CARISSIMI:  Is there any objection to GC 78?

11        MR. FUNK:  No objection, Your Honor.

12        JUDGE CARISSIMI:  GC 78 is admitted.

13   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 78.)

14        JUDGE CARISSIMI:  Mr. Wiese, you indicated, off the record,

15    there are some other matters that you would like to bring up

16    before we have Mr. Kuddes return to the witness stand?

17        MR. WIESE:  Yes, Your Honor.

18        The first matter is related to the discipline pursuant to

19    the unilateral changes.  I am going to offer that discipline.

20    It is the Regional Director's position that this is a remedy

21    that flows from the rescission of the unilateral changes that we

22    feel are unlawful.  In support of that position, I would cite to

23    American Standard, 352 NLRB 644, 656 and 57.  That is a two-

24    member decision that was later affirmed by the Board in 356 NLRB

25    No. 4.  So I will be offering that, at this point, at this time.

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 685 of 1141

1     JUDGE CARISSIMI:  Just so that I understand, and I will

2     look at this case, your position is that the allegedly unlawful

3     unilateral implementation, that occurred in September of 2015,

4     contained a new grievance procedure?

5     MR. WIESE:  Yes, I mean that was --

6     JUDGE CARISSIMI:  Right.

7     MR. WIESE:  -- that was among many other changes.

8     JUDGE CARISSIMI:  Among many others?

9     MR. WIESE:  Yes.

10    JUDGE CARISSIMI:  And that this discipline occurred after

11    that time, pursuant to that implemented policy?

12    MR. WIESE:  Right and other policies.  For example, you

13    know that some of the disciplines that we have here are for

14    attendance, and there is -- you know, the attendance policy has

15    changed.  We would view that as flowing from that unlawful

16    implementation.

17    JUDGE CARISSIMI:  So this is, in your position, evidence of

18    implementation of that unilateral change -- allegedly unilateral

19    change?

20    MR. WIESE:  Yes, yes, yes, correct, Your Honor.

21    JUDGE CARISSIMI:  All right.

22    MR. WIESE:  And also discipline that, in our view again,

23    has to be part of the remedy if you find that unilateral changes

24    and implementation were, in fact, unlawful.

25    JUDGE CARISSIMI:  And your contention is <u>American Standard</u>

1  supports --

2      MR. WIESE:  Well, that was the case that I got from the

3  Region.

4      JUDGE CARISSIMI:  Right.

5      MR. WIESE:  And I just glanced at it briefly this morning.

6  I will obviously be briefing the issue and --

7      JUDGE CARISSIMI:  Right, and I will certainly look at it

8  carefully, but I am glad you have at least a case I can take a

9  look at on break.  I am sure that your recitation of this is

10 accurate, but, obviously, I will confirm that.

11     All right, on the Respondent's -- well, you have expressed

12 your position, I guess.  When you move these documents into

13 evidence, I will give the Respondent a chance to indicate if

14 they have any objections, and I will hear what they are.

15     MR. WIESE:  Well, I will offer them now, Your Honor.

16     JUDGE CARISSIMI:  Okay, let's list them and tell me what

17 they are.

18     MR. WIESE:  Okay, so the --

19     JUDGE CARISSIMI:  How many are there, Mr. Wiese?

20     MR. WIESE:  There are -- I believe it is 16, or at least

21 the document itself is 16 pages.

22     JUDGE CARISSIMI:  Okay.

23     So how many exhibits are you intending to introduce?

24     MR. WIESE:  There's just -- it is one exhibit.

25     JUDGE CARISSIMI:  Just one, okay.

1     MR. WIESE:  It is General Counsel Exhibit 67, 16 pages.

2     JUDGE CARISSIMI:  So it is General Counsel 67?

3     MR. WIESE:  Yes.

4  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 67.)

5     JUDGE CARISSIMI:  Can you -- well, first of all, has the

6  Respondent's counsel had a chance to take a look at these?

7     MR. BUTTRICK:  I don't have them in front of me, no, Your

8  Honor.

9     JUDGE CARISSIMI:  Okay, what we are going to do is we are

10  going to go off the record, and I want Respondent's counsel to

11  have a chance to review them.  And then we will -- when he is

12  ready, we will go forward and we will discuss, number one,

13  authenticity, and we will find out if there is any relevancy

14  objections.

15     With that, we are off the record.

16  (Off the record.)

17     JUDGE CARISSIMI:  On the record.

18     Mr. Buttrick and other Respondent counsel, Mr. Funk, have

19  had a chance to look at the document that the General Counsel

20  has identified for us as General Counsel 67.

21     And that is a 16-page document, Mr. Wiese?

22     MR. WIESE:  That is correct, Your Honor.

23     JUDGE CARISSIMI:  And I know you have had some discussion

24  of this, but I want to make sure the record indicates what it

25  is.

1      So could you tell us, again, what this document shows?

2      MR. WIESE:  Yes, Your Honor.

3      These are -- I believe -- the document is 16 pages.  It is

4  various discipline that has been issued to employees post-

5  implementation of the Employer's last, best and final offer on

6  September 14th.

7      JUDGE CARISSIMI:  All right.  And --

8      MR. WIESE:  And just to be clear, Your Honor, we aren't

9  going to be arguing the facts of any of these disciplines or

10  anything, you know, anything factual disputing what has occurred

11  with these specific employees.  It is just the General Counsel's

12  contention that part of the remedy, if the implementation is

13  found to be unlawful, is rescinding these disciplines.

14      JUDGE CARISSIMI:  All right.

15      So there will no further testimony about this document.

16  This document will constitute the sum total of your contention

17  with respect to that issue?

18      MR. WIESE:  That is correct, Your Honor.

19      JUDGE CARISSIMI:  All right, very good.

20      Is there any objection to the introduction of General

21  Counsel 67?

22      MR. BUTTRICK:  There is, Your Honor.

23      I think the objection is based upon two different reasons;

24  one is procedural and the second is substantive.  With regard to

25  the procedural, there's been no foundation laid, either through

1    the people who received the documents, or through company

2    representatives, to get these in evidence.  And so I think it is

3    improper for either counsel to submit a document and try to

4    admit it into evidence without having a foundation laid by a

5    witness.

6        JUDGE CARISSIMI:  Let me ask you this:  Is there any

7    question about the authenticity of the document?

8        MR. BUTTRICK:  I am not the company.  The documents appear

9    to be what they are, but I think, as a technical matter, when

10   one tries to get in documents that are company documents, you

11   either have to do it through a company representative or through

12   the person who received the document.

13       So there is a procedural issue about how these are being

14   introduced.

15       JUDGE CARISSIMI:  Well, I will stop you right there.

16       I mean, if there's not an agreement that they are

17   authentic, then you are going to have to authenticate.  If there

18   is no stipulation, counsel, you are going to have to

19   authenticate them.

20       MR. WIESE:  Okay.

21       JUDGE CARISSIMI:  And that is where we are at right now.

22   Counsel raised an objection.  So that is correct, if he doesn't

23   agree that they are authentic, then you are going to have to

24   authenticate them.

25       MR. WIESE:  Well, then, at some point this morning, Your

1   Honor, we would like to recall Mr. Andy Sullivan to

2   authenticate.

3       JUDGE CARISSIMI:  I am sorry, sir, you have to speak up.

4       MR. WIESE:  We would like to recall Mr. Sullivan, Andy

5   Sullivan, for purposes of authenticating this.  He is the HR

6   manager who was employed at the time that all these disciplines

7   issued.

8       JUDGE CARISSIMI:  All right.

9       Again, if there's no agreement, then we will have to have a

10  witness, and if your belief is that he is the witness, that is

11  what we will have to do.

12      Is Mr. Sullivan available?

13      MR. BUTTRICK:  We can make him available, and we will talk

14  about this on our break, too, to figure out that part of it.

15      JUDGE CARISSIMI:  Okay.

16      MR. BUTTRICK:  But that is the procedural issue, so --

17      JUDGE CARISSIMI:  Right, and then --

18      MR. BUTTRICK:  -- the second is the substantive one.

19      JUDGE CARISSIMI:  -- yes, let me hear your other objection,

20  and that way everything will be out there for me to consider.

21      Go ahead.

22      MR. BUTTRICK:  Yes.

23      So substantively, I think as we have talked about before,

24  there's no allegations in any of the, I think, four versions of

25  the Complaint, as it has evolved over time, nor an underlying

1  unfair labor practice charge about disciplinary-related issues.

2  And so we think it is beyond the scope of all of that, and thus

3  irrelevant for the proceeding.

4      I also noted that, among the disciplinary issues in these

5  documents, are things related to plant rules and quotas.  And

6  there's been no allegation in the Complaints themselves about

7  any kind of unlawful, unilateral implementation or

8  interpretation of plant rules --

9      JUDGE CARISSIMI:  Um-hmm.

10     MR. BUTTRICK:  -- or the quotas.  And so they are

11 introducing documents that are still beyond even the post-

12 implementation items that they have identified at this point,

13 and so I think it is irrelevant for those purposes as well.

14     JUDGE CARISSIMI:  Well, I am going to take that under

15 advisement.  Since we are going to not -- I am not going to make

16 a ruling on this issue now.  I am going to take a look at the

17 case that General Counsel has cited, and I will make a ruling on

18 the admission of the documents once we have the authentication

19 issue dealt with, and General Counsel is in a position to move

20 them into evidence again, then I will make a ruling, all right?

21     So let's go off the record briefly.

22 (Brief discussion held off the record.)

23     JUDGE CARISSIMI:  On the record.

24     Mr. Buttrick, you have had a chance to discuss the question

25 of authenticity with Mr. Meadows, and can you tell me now what

1 your position is with regard to the authenticity of the

2 documents that comprise General Counsel 67.

3     MR. BUTTRICK:  Yes, Your Honor.

4     So the company does not contest the authenticity of the

5 document, but there is still -- the objection I raised earlier

6 about the relevancy remains.

7     JUDGE CARISSIMI:  Very good.

8     What I am going to do is, I am going to admit the

9 documents, since there is no question now that they are

10 authentic, at least arguably.  I understand the General

11 Counsel's theory.  I think there is sufficient relevancy for

12 admission.  I am going to take a look at the case that the

13 General Counsel cited on a brief, and if that case tells me that

14 this ruling is wrong, I will reverse it.  But, at this point,

15 General Counsel 67 is admitted.

16 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 67.)

17     JUDGE CARISSIMI:  And, as I said, if it continues to be

18 admitted, which I expect that it will, then the weight that I

19 should attach to these, if any, can be subject of argument in

20 the parties' briefs.

21     So is there anything else, preliminarily, Mr. Wiese?

22     MR. WIESE:  Yes, Your Honor.

23 (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 3.)

24     MR. WIESE:  I would like to offer General Counsel Exhibit

25 3, which is a -- for demonstrative purposes, a consolidated

1  version of the Complaint, with all of the amendments just put

2  into one document so we can --

3      JUDGE CARISSIMI:  Thank you.

4      That is -- I am glad you did that.  It is going to be

5  helpful to me.  And this is something that -- this is really

6  for, as you say, demonstrative purposes?

7      MR. WIESE:  That is correct, Your Honor.

8      JUDGE CARISSIMI:  It's not something -- the Respondent's

9  answered the various complaints.

10     MR. WIESE:  Right.

11     JUDGE CARISSIMI:  So, just so that we all understand, this

12 is something that we can use in assessing the Complaint

13 allegations, but there is no requirement to answer this, this is

14 more or less an aid to me and the parties, so that when I ask

15 about a Complaint allegation, I don't have to look through three

16 documents, nor do counsel, to find out, "Well, where is this?"

17     MR. WIESE:  Yes.

18     JUDGE CARISSIMI:  So thank you.

19     MR. WIESE:  It has been shown to opposing counsel as well.

20     JUDGE CARISSIMI:  And is there any objection to General

21 Counsel 3?

22     MR. BUTTRICK:  No.

23     JUDGE CARISSIMI:  General Counsel 3 is admitted.

24 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 3.)

25 (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 56.)

1      MR. WIESE:  Your Honor, I also have another document for

2   admission.  It is marked as General Counsel Exhibit 56.  I have

3   also shown it to opposing counsel.

4      This is a red-line version, comparing the Employer's

5   initial offer to the last, best and final offer.  And I would

6   like to offer that into evidence as well.  It was something that

7   I -- that we created on our side, using Word and the "compare"

8   function in that program to create this document.

9      JUDGE CARISSIMI:  So this document -- tell me again what it

10  shows?

11     MR. WIESE:  So it shows the changes.  So it is comparing

12  the Employer's initial offer to the last, best and final offer.

13  It indicates all the changes that were made across those two --

14     JUDGE CARISSIMI:  Okay.  All right.

15     MR. WIESE:  -- two offers.

16     JUDGE CARISSIMI:  And this is General Counsel 56?

17     MR. WIESE:  That is correct, Your Honor.

18     JUDGE CARISSIMI:  Is there any objection to General Counsel

19  56?

20     MR. BUTTRICK:  Well, I don't object, as a demonstrative

21  exhibit created by counsel for the General Counsel, I don't

22  object to that.

23     JUDGE CARISSIMI:  Mm-hmm.

24     MR. BUTTRICK:  I think that, you know, whether or not it

25  accurately portrays all the changes or not is something that you

1  will have to decide --

2      JUDGE CARISSIMI:  Correct.

3      MR. BUTTRICK:  -- and that the testimony will have to

4  elicit.  So I don't object to their --

5      JUDGE CARISSIMI:  All right.

6      MR. BUTTRICK:  -- creation of a demonstrative exhibit.

7      JUDGE CARISSIMI:  Very good.  And what I will say is that,

8  obviously, the joint exhibits are the critical ones.  I

9  appreciate the effort, it may be of some help.  But I would

10 request counsel that if you, in your review, when you are

11 preparing your brief, if there is something inaccurate in that

12 summary, I expect you to tell me.  I am sure you will.  And if I

13 detect any discrepancy, obviously, I am going to rely on the

14 actual document.  But I do think, as the trial has shown, there

15 were enough changes, enough offers and counteroffers, that that

16 will probably be of some assistance to all of us in reviewing

17 the case.  And, in your case, filing briefs, and in my case,

18 writing the decision.

19      So, on that basis, I am going to admit General Counsel 56.

20 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 56.)

21      MR. BUTTRICK:  Tyler, we didn't actually get a copy of the

22 demonstrative complaint yet.

23      MR. WIESE:  Okay.

24      MR. BUTTRICK:  Thanks for -- thanks.

25      JUDGE CARISSIMI:  Is there anything further preliminarily?

1       MR. WIESE:  Yes, two more brief items.  The first is that

2   the General Counsel will be withdrawing Complaint allegation

3   4(b), which is related to Ms. Ann Junge's agency status; and

4   also Complaint allegation 7(d), which is an 8(a)(1) allegation

5   attributed to Ms. Junge.

6       JUDGE CARISSIMI:  Okay, let me just make sure that I -- so

7   it is 4(b), the allegation that Ms. Junge is an agent of the

8   Employer, correct?

9       MR. WIESE:  Yes.

10      JUDGE CARISSIMI:  All right, so I take it the Respondent

11  has no objection to that?

12      MR. BUTTRICK:  They can do some more, if they like.

13      JUDGE CARISSIMI:  And the other one, Mr. Wiese, was 7 --

14      MR. WIESE:  Seven (d), I believe.

15      JUDGE CARISSIMI:  Seven (d).  Corresponding, if you will,

16  allegation with regard to Ms. Junge?

17      MR. WIESE:  Yes.

18      MR. BUTTRICK:  I guess there's no 7(d) identified in the

19  demonstrative we just got?  We have a paragraph -- is it 5(d),

20  perhaps?

21      MR. WIESE:  It is 5(d), I am sorry, 5(d), yes.

22      JUDGE CARISSIMI:  Five (d), is that 5(d) -- is that

23  correct, Mr. Wiese?

24      MR. WIESE:  Yes, that is correct, Your Honor.

25      JUDGE CARISSIMI:  Five (d), all right.

1       Mr. Buttrick you are on --

2       MR. BUTTRICK:  We found that.

3       JUDGE CARISSIMI:  Found that?  Very good.  All right, and I

4  take it you also have no objection to that?

5       MR. BUTTRICK:  I do not.

6       JUDGE CARISSIMI:  All right.  And, again, I will say, for

7  my purposes, that I appreciate that.  I always advise parties,

8  at the end of a lengthy case like this -- and I will do it now,

9  since the issue came up -- that there are times that a Complaint

10  allegation, in the General Counsel's view, can't be sustained.

11  And I appreciate that decision being made early, and apprising

12  Respondent and myself, because, frankly, I have had cases where

13  I get a brief after I have dealt with an issue, and it is

14  withdrawn.  So this saves everybody time.

15       But, on the other side of the coin, there may be issues for

16  the Respondent that, when you review the record, it is like,

17  well, you really can't defend this.  And if that is the case, I

18  would appreciate you letting the General Counsel know, and me,

19  so that if I am working on this case before I get your briefs, I

20  don't spend time on things that ultimately are a waste of time.

21       So, once again, I commend you for making that decision and

22  advising of this now, rather than later in the game.  Thank you.

23       MR. WIESE:  Yes, you are welcome, Your Honor.

24       The last thing is a statement that I would like to make, on

25  the record, on behalf of Charging Party counsel.  I have been

1    authorized to do so by Ms. Virk.

2         JUDGE CARISSIMI:  Yes.

3         MR. WIESE:  So with regard to the subpoena issues that were

4    raised yesterday.  During the course of our negotiations -- all

5    three parties -- the discussions about the subpoena, there was

6    an agreement to limit the production of those documents to, I

7    believe it was 9/11/2015, September 11, 2015.  And so, to the

8    extent that there were documents introduced after, that were

9    provided by Mr. Eby to counsel for the General Counsel, that may

10   be an explanation as to why they were not included in the

11   Charging Party's submission to Respondent pursuant to the

12   subpoena.

13        JUDGE CARISSIMI:  All right.

14        And you can respond if you want to, but you don't have to.

15   I mean, as I said, the documents are admitted.  They weren't

16   offered by the Charging Party, so that is an issue I don't

17   really need to make any decisions regarding.  I understand your

18   concern, that you expressed yesterday, that you expect

19   compliance with subpoenas.  And I understand there was

20   discussion as to perhaps modifying what would be produced.

21        So, counsel has made his statement; if you want to, I will

22   give an opportunity.  But I don't -- if you choose not to, that

23   is fine.

24        MR. BUTTRICK:  I guess the only thing I would say is,

25   although the parties did certainly work collaboratively and well

1  together to modify the subpoenas and resolve any disputes and

2  questions about that -- and that was much appreciated, I think,

3  from both sides.  Some of those modifications were premised

4  upon, from our perspective, the understanding that documents

5  after those dates wouldn't be introduced into evidence, and so

6  that was the baseline, a foundational baseline, for some of the

7  modifications.  And so, from the company's perspective, some of

8  those documents that were in question yesterday should have been

9  produced if that was the approach that was going to be taken.

10  JUDGE CARISSIMI:  All right, very good.

11  Mr. Wiese, is there anything further before we go back to

12  the testimony?

13  MR. WIESE:  No, Your Honor.

14  JUDGE CARISSIMI:  Very good.

15  Let's go off the record.

16  (Off the record.)

17  JUDGE CARISSIMI:  On the record.

18  Mr. Kuddes, you have been sworn in as a witness yesterday,

19  so I won't you give you the oath again, sir.  I will just merely

20  remind you that you are still under oath.

21  THE WITNESS:  Okay.

22  (WITNESS PREVIOUSLY SWORN:  JEFF KUDDES.)

23  JUDGE CARISSIMI:  Counsel, you may continue.

24  MS. OHAERI:  Thank you.

25  DIRECT EXAMINATION RESUMED

1 Q     BY MS. OHAERI:  Good morning, Mr. Kuddes.

2 A     Good morning.

3 Q     I want to begin with the maintenance department employee

4 schedule, and I want to know:  What was the maintenance

5 department schedule before the Employer's last, best and final

6 offer was implemented in September of 2015?

7 A     The schedule was Monday through Sunday, eight-hour shifts,

8 with what they would call a "seventh day."  How that was broke

9 down is Sundays was a premium pay day, it was double-time pay,

10 and they would post a list on Thursday.  That would come down at

11 1:30 on Thursday, for people to sign up to work Sunday, based on

12 seniority.

13 Q     And when did you find out that that schedule was going to

14 be changing?

15 A     I don't remember the exact day or month.  It was after the

16 contract was implemented, I believe.

17 Q     And how did you find out that there was going to be a

18 change in the schedule?

19 A     My supervisor, Chad Reid, told us.

20 Q     And where were you when he told you that?

21 A     To the best of my knowledge, I believe it was in the

22 morning meetings that we have every morning in the break room.

23 Q     And do you recall what Mr. Reid said with regard to how the

24 schedule was going to be?

25 A     Yes.  At the time, we were told that Ken Meadows didn't

1    like our schedule and that it was going to change.  They asked

2    us to come up with our own schedule, Google it, do whatever, get

3    back with them, and kind of let them know what we thought.  And,

4    in the meantime, our schedule would be Monday through Friday.

5    They would post overtime again, like they normally did, on

6    Thursday.  And if there was no vacancies, no big deal.  If there

7    was vacancies they were going to cover it with outside

8    contractors.

9    Q    Do you recall what, if anything else, Mr. Reid said about

10   how the schedule the employees come up with should look, or

11   should work?

12   A    Just to look online, talk to -- if you have friends that

13   work at different factories in the area, to try to come up with

14   something that would work, obviously, 24/7.

15   Q    The meeting in which Mr. Reid gave the employees this

16   instruction, was any Union representative present?

17   A    No.

18   Q    What happened after the employees received the instruction

19   from Mr. Reid?

20   A    We all broke to do our jobs, lot of talking, people coming

21   up with their own ideas.  Nothing really, immediately, it was

22   probably three to four days later.  Nothing had been talked

23   about or presented.  I, personally, went into Chad Reid's office

24   and said, "Why don't you guys come up with something and give it

25   to us?  There's too many people.  I think it would just cause

1   some animosity between people if somebody said this," and I

2   could already hear some badgering between each other.

3   Q    And what, if anything, did Mr. Reid say?

4   A    I think he just acknowledged that maybe that wouldn't be a

5   bad idea.  I don't remember the details, but he just listened.

6   I don't know if he really said much at that time.

7   Q    And did Mr. Reid, or any other manager or supervisor, come

8   up with a schedule?

9   A    Yes, Darryl Norman did.

10       JUDGE CARISSIMI:  Sir, what was that name?

11       THE WITNESS:  Darryl Norman.

12       JUDGE CARISSIMI:  Thank you.

13  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 88.)

14  (Witness proffered document.)

15  Q    BY MS. OHAERI:  I am showing you what has been marked as

16  General Counsel's Exhibit 88.  Will you flip through that and

17  let me know when you are done?

18  (Pause.)

19  Q    Ready?

20  A    Yep.

21  Q    Do you recognize that document?

22  A    Yes.

23  Q    And what is it?

24  A    It was their first proposal for a schedule change.

25  Q    Who did you receive that from?

1   A    I believe Chad Reid and Darryl Norman both.

2   Q    And approximately when did you receive this?

3   A    Again, I don't remember exact times, maybe September-ish.

4        MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

5   88.

6        JUDGE CARISSIMI:  Is there any objection to GC 88?

7        MR. BUTTRICK:  No objection, Your Honor.

8        JUDGE CARISSIMI:  General Counsel 88 is admitted.

9   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 88.)

10  Q    BY MS. OHAERI:  At the time that you received General

11  Counsel's 88, approximately how many employees worked in the

12  maintenance department?

13  A    I believe there was only 12.

14  Q    And looking at page 4 of General Counsel's Exhibit 88, let

15  me know when you are there.

16  A    Okay.

17  Q    Was there any discussion, at the time that the employees

18  received this document, as to how many employees would work the

19  different crews identified on page 4 and page 5?

20  A    Yes, because our full staff has always been considered 16

21  employees.

22  Q    And starting with the A crew.  What was the discussion

23  about how many employees would work the A crew schedule?

24  A    What I remember is there would be eight people working -- I

25  am sorry to answer your question, most likely eight.

1   Q    Working which one?

2   A    The A crew, it would be --

3   Q    And --

4   A    -- well, hang on, let me -- four and four, "A" and "B"

5   would be four and four, sorry.

6   Q    Okay, four for the A crew on page 4?

7   A    Yes.

8   Q    And four for the B crew on page 4?

9   A    Yes.

10  Q    What about the A crew days on page 5?

11  A    There would be four on A crew.

12  Q    The A crew days or the A crew --

13  A    Correct.

14  Q    -- total?

15  A    Four for A crew days, four for A crew nights.

16  Q    Okay.  And that totals, I believe, 18 employees?

17  A    Should be 16.

18  Q    Sixteen, sorry, I meant 16.  Where were the extra four

19  employees supposed to come from?

20  A    Hopefully, hire them.

21  Q    What happened when the employees received the schedule,

22  General Counsel's Exhibit 88?

23  A    We were asked to review it and vote on which -- page 8 has

24  our vote sheet, and then turn that in to Chad Reid when you were

25  done with it.

1  Q    And when were the -- when was -- in relation to when you

2  guys received the General Counsel's Exhibit 88, when were you

3  asked to return the votes -- the vote sheet?

4  A    The same day.

5  Q    Did Mr. Reid or Mr. Norman provide any rationale for why

6  they had proposed the schedule that is in General Counsel's

7  Exhibit 88?

8  A    Yes, less time working at the -- you know, more days off.

9  With the -- on page 7, where it broke down the pay, they wanted

10 to keep the pay to be similar to what we were making with the

11 six-day-a-week stuff.  So I think that is why they implemented

12 the over --

13      JUDGE CARISSIMI:  Is that what they said --

14      THE WITNESS:  Yeah --

15      JUDGE CARISSIMI:  -- Mr. Kuddes?

16      THE WITNESS:  Yes.

17      JUDGE CARISSIMI:  Okay.

18      THE WITNESS:  Did I say something wrong?

19      JUDGE CARISSIMI:  Well, you said something about that is

20 what you thought they wanted, so I am interested in what they

21 actually said.

22      THE WITNESS:  No, I -- yes, that is exactly what they said,

23 I apologize.

24      JUDGE CARISSIMI:  Okay, that is quite all right.

25 Q    BY MS. OHAERI:  And, at the time that the schedule was

1  presented, and the employees were asked to vote, was any Union

2  representative present?

3  A    No.

4  Q    Were all of the maintenance employees at the meeting where

5  the schedule and the voting was requested?

6  A    No.

7  Q    Do you know what happened to those employees who weren't

8  present for the meeting?

9  A    Employees that weren't present were off shift, and they

10  were contacted by Chad Reid, at home.

11  Q    Do you know what the results were of the vote?

12  A    I know it passed.

13  Q    And how do you know that?

14  A    Chad Reid told us.

15  Q    And in relation to when you submitted the votes and when

16  Mr. Reid notified you that it was passed, how much time had went

17  by?

18  A    It was the same day, I don't remember the exact time, but

19  it was before I left at 3.

20  Q    What happened after the vote?

21  A    The next morning we were told that the Union vice president

22  at the time, Matt Maas, had filed a grievance against it, and

23  that that was not going to happen.  The schedule was not going

24  to happen.

25  Q    And who told you that the schedule wasn't going to happen?

1   A    Chad Reid.

2   Q    Did Mr. Reid say anything else about what was going to be

3  happening with the schedule, moving forward?

4   A    I don't believe right then, no.

5   Q    Did he, at some point after that?

6   A    Yeah, there was -- everyone was asking, so eventually, yes,

7  there was a talk about another proposal of some sort.

8   Q    And what did Mr. Reid say about what was going to be

9  happening with the schedule?

10   A    That they were going to try to come up with something that

11  would work according to the contract that was implemented from

12  the company.

13   Q    Did Mr. Reid provide any information as to why the 10-hour

14  schedule was not going to be used?

15   A    Because 10 hours wasn't mentioned in the company's

16  contract.

17   Q    After Mr. Reid informed the employees that the 10- and 12-

18  hour schedule wasn't going to be used, did he provide any

19  information about what the -- what potential schedule the

20  Employer was looking to implement, or what the terms of a

21  potential schedule would be?

22   A    As far as?  I am not quite sure what you are asking, I

23  apologize.

24   Q    After you found out that the 10- and 12-hour schedule

25  wasn't going to happen --

1   A      Okay.

2   Q      -- were you told, by either Mr. Reid or Mr. Norman, any

3   information about what the Employer was considering for

4   scheduling moving forward?

5   A      The schedule that we were actually working or a possible

6   change.

7   Q      A possible change?

8   A      Some time had went by, and then there was a spreadsheet

9   laying on Chad Reid's desk, that we were told to come in and

10  view, for a possible change of schedule.

11  Q      Okay, I want to back up.  What was the schedule --

12  actually, between the 10- and the 12-hour schedule being

13  rejected, what schedule were the maintenance employees working?

14  A      We were working the Monday through Friday, with fill-in

15  voluntary on the weekends, if it didn't get filled, outside

16  contractors.  After that was rejected, we were told that no

17  longer would we be covered by outside contractors, that we were

18  forced to work seven days a week, possibly.  It didn't matter if

19  you signed up.  If there was a vacancy, they were forcing

20  somebody to work it.

21  Q      And did Mr. Reid or Mr. Norman provide any explanation as

22  to why the outside contractors were no longer going to be used

23  on weekends?

24  A      From my understanding, that Mr. Meadows was upset about it.

25         JUDGE CARISSIMI:  What is your understanding based on, Mr.

1  Kuddes?

2      THE WITNESS:  My understanding, from hearing -- I don't

3  remember if it was from Chad Reid or Darryl Norman -- that Ken

4  Meadows said, "No more outside contractors, you guys are working

5  all this time.  We are not helping you out with that."  Whether

6  it was said by either one of them, I don't remember which one.

7      JUDGE CARISSIMI:  All right, thank you.

8  Q    BY MS. OHAERI:  You -- I want to turn to the schedule that

9  was on Mr. Reid's desk.  How did you find out that there was a

10 schedule on his desk?

11 A    Other employees told me that they had been -- there was one

12 on there, and that we were supposed to go in there and look at

13 it.

14 Q    And do employees normally go into Mr. Reid's office?

15 A    Yes.

16 Q    When he is not there?

17 A    Oh, he was there.

18 Q    Okay.

19 (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 90.)

20 (Witness proffered document.)

21 Q    BY MS. OHAERI:  I am showing you what has been marked as

22 General Counsel's Exhibit 90.  Let me know when you are done

23 looking at it.

24 A    Okay.

25 Q    Do you recognize that document?

1    A    Yep.  Yes, I do.

2    Q    And what is it?

3    A    It was -- it was broke down different than this is, it was

4    on a large spreadsheet, but basically it showed another proposed

5    schedule with 12- and eight-hour days.

6    Q    And the information that is on General Counsel's Exhibit 90

7    is that -- with regard to the schedule -- is that the same

8    schedule that was on the larger sheet of paper that was in Mr.

9    Reid's office?

10   A    Yes.

11        MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

12   90.

13        JUDGE CARISSIMI:  Is there any objection to GC 90?

14        MR. FUNK:  Yes, Your Honor.  I think there's a foundation

15   issue, in that the witness testified that what he saw was "broke

16   down" differently than this and showed another proposed schedule

17   with 8- and 12-hour days.

18        JUDGE CARISSIMI:  Do you wish to voir dire the witness, or

19   you can just -- you don't have to.  But I have some questions,

20   if you don't.

21        MR. FUNK:  I will let you ask your questions, Your Honor.

22        JUDGE CARISSIMI:  Mr. Kuddes, this document you have in

23   front of you, GC 90, have you ever seen this document before?

24        THE WITNESS:  Not this exact one, but --

25        JUDGE CARISSIMI:  All right.  But did you see something in

1    Mr. Reid's office?

2        THE WITNESS:  Yes.

3        JUDGE CARISSIMI:  What did you see?

4        THE WITNESS:  It was on 11 by 17, and if you look at top,

5    where it says "1 to 8 People," that was broke down largely

6    across it.  And then where it says, "More Than 8," was "Plan B,"

7    which was right below it.  That is the only difference.

8        JUDGE CARISSIMI:  Can you tell us whether the information

9    on this document was the same as the document you saw in Mr.

10   Reid's office?

11       THE WITNESS:  Yes.

12       JUDGE CARISSIMI:  All right.

13       Counsel for the General Counsel, where did you get this?

14   What is this?

15       MS. OHAERI:  So we had issued a subpoena requesting the

16   documents received, shown, or distributed to employees in the

17   maintenance department with regard to their scheduling.  We

18   received the first batch of that on Monday morning and went

19   through it.  It didn't include the schedule we were looking for,

20   that was on Mr. Reid's desk.  We talked with counsel several

21   times every day, and yesterday received a spreadsheet, went

22   through it with the witness, and this is the only thing that was

23   like what was on Mr. Reid's desk.  Our understanding, from

24   counsel for Respondent, is that we have now received everything

25   that they have, in the form that they have it.

1      JUDGE CARISSIMI:  So this actual document, GC 90, was

2  received pursuant to the subpoena?

3      MS. OHAERI:  Correct.

4      JUDGE CARISSIMI:  All right.  I am going to overrule the

5  objection and admit GC 90.

6  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 90.)

7  Q   BY MS. OHAERI:  Approximately how long was the schedule in

8  Mr. Reid's office?

9  A   I don't remember exactly, but I would say, for sure, two to

10  three days, maybe longer.

11  Q   And did Mr. Reid say why the schedule was there in his

12  office, or what he was waiting for to share it with employees,

13  or what he was going to do with it?

14      MR. FUNK:  Your Honor, I will object.  I think this

15  question, like many of the ones before it, is leading pretty

16  tightly about the alleged conversations.

17      JUDGE CARISSIMI:  I don't really think that question

18  suggested an answer, but I will pay close attention as we go

19  forward.  But I am going to overrule that objection.

20      MR. FUNK:  All right.

21      THE WITNESS:  Would you repeat the question, please?

22  Q   BY MS. OHAERI:  Did Mr. Reid say why it was sitting on his

23  desk, or what he was waiting for, or why he hadn't distributed

24  or given it to employees?

25  A   Yes.  They were waiting for approval from Ken Meadows

1  before we could actually consider voting on this.

2  Q    Looking at General Counsel's Exhibit 90, can you explain,

3  specifically, the top section where it says, "1 to 8 People,"

4  under "Schedule for 'Day' Mechanics"?  Can you explain at all

5  what that shows in terms of the schedule?

6  A    It is basically a one-month schedule.  So you would work

7  this shift, line 1, 2, 3, and 4 per week, and then you would

8  start back over at the 1 again.  The breakdown of who worked

9  where, or whatever, wasn't on there. It was going to be that

10  would come up later.  But that was the basics, just -- I am not

11  sure what else.

12  Q    What about the section that says "More Than 8"?

13  A    That was -- well, it has never happened, but that was

14  supposed to be after we had hired more people.

15  Q    And what about under where it says, "Night Shifts for 24/7

16  Coverage," "A Crew," what does that schedule show?

17  A    That you would work -- and this is two guys per shift.  The

18  two guys would work Monday and Tuesday, have Wednesday, Thursday

19  off, work, Friday, Saturday, and Sunday one week, and the next

20  week they would have Monday, Tuesday off, work Wednesday,

21  Thursday, have Friday, Saturday and Sunday off.

22  Q    And looking under still "Night Shift" under "A Crew, Week

23  1," would any maintenance employees be working Wednesday and

24  Thursday, week 1, on the night shift?

25  A    Yeah, the B Crew would cover the shaded in areas.

1    Q    You mentioned that the -- sorry -- I want to go back to the

2    "More Than 8" section under the day schedule.  What was said by

3    either Mr. Reid or Mr. Norman about the "More Than 8" section?

4    A    That it would -- we were short staffed, so after we hired

5    at least two people, then they would offer it from seniority top

6    down, if anybody wanted to switch to B schedule, and have up to

7    four people working that.

8    Q    Okay.  Did there come a time when you received your own

9    version of General Counsel's Exhibit 90?

10   A    No.

11   Q    And when was that?

12   A    No, we did not.

13   Q    Oh, you did not, sorry.  I thought you said yes.  Were the

14   maintenance employees ever asked to re-vote on a schedule?

15   A    Yes.

16   Q    And approximately when was that?

17   A    I would have to say -- I know we had to work a couple

18   weekends with the no-coverage, so I am going to guess and say it

19   was probably three weeks, roughly, after the 10 and 12 got shot

20   down, somewhere in there.  I don't remember exactly, but

21   something like that.

22   Q    And when you were asked to vote, did you receive any

23   documents for that meeting?

24   A    I believe we got another vote sheet like that, like what --

25         JUDGE CARISSIMI:  Can you tell us what document that is,

1   sir, what page?

2       THE WITNESS:  Yeah, on page 8 on 88, we received another

3   vote sheet like this.

4       JUDGE CARISSIMI:  Thank you.

5   (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 89.)

6   (Witness proffered document.)

7   Q   BY MS. OHAERI:  I am showing you what has been marked as

8   General Counsel's Exhibit 89.  Let me know when you have had a

9   chance to review that -- sorry, yes, 89.

10  (Pause.)

11  Q   Did you ever receive General Counsel's Exhibit 89?

12  A   Yes.

13  Q   When did you receive that?

14  A   I don't remember exactly.  I would say maybe a month after

15  the 10-hour day got shot down.

16  Q   And what were the circumstances of you receiving it?

17  A   I am not sure what you are asking me, I am sorry.

18  Q   Where did you get it?

19  A   Chad Reid.

20  Q   When was General Counsel's Exhibit 89 given to you, in

21  relation to the vote?

22      JUDGE CARISSIMI:  Which vote?

23      MS. OHAERI:  The second vote.

24      THE WITNESS:  This was given to us before we voted.  And if

25  you look back on page 7 on 89, we received this vote sheet, as

1   well.  So this was handed out, if I remember correctly, at a

2   7:00 meeting in the morning, which we always had every morning.

3        JUDGE CARISSIMI:  Mr. Kuddes, your reference to "this

4   document," is that General Counsel Exhibit 89?

5        THE WITNESS:  Yes, sir.

6        JUDGE CARISSIMI:  Thank you.

7   Q    BY MS. OHAERI:  What was the voting process at the second

8   vote meeting?

9   A    The same as the first.

10  Q    Did Mr. Norman or Mr. Reid provide any reason why they

11  created this second schedule, General Counsel's Exhibit 89?

12  A    Because it mentioned in the company's contract, 8-hour

13  days, 12-hour days.

14  Q    What was the outcome of the vote, the second vote?

15  A    It passed.  I was told 100 percent.

16  Q    And who told you that?

17  A    Chad Reid.

18  Q    Was anyone from the Union at the meeting when the vote took

19  place?

20  A    No.

21       JUDGE CARISSIMI:  Ms. Ohaeri, are you going to move to

22  introduce General Counsel 89?

23       MS. OHAERI:  Yes, sorry.  I offer General Counsel's 89,

24  Your Honor.

25       JUDGE CARISSIMI:  Is there any objection to GC 89?

1    MR. FUNK:  No, Your Honor.

2    JUDGE CARISSIMI:  GC 89 is admitted.

3  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 89.)

4  Q    BY MS. OHAERI:  How long after the vote did the 8- and 12-

5  hour schedule begin in the maintenance department?

6  A    If I remember correctly, within a week.

7  Q    And how long has the maintenance department been working

8  the 8- and 12-hour schedule?

9  A    Approximately, since the first of October, first week of

10 October, or something like that.

11 Q    What happened with the papers that the Employer passed out

12 during the voting meetings?

13 A    Which papers?  These documents?

14 Q    Yes, 89 and 88.

15 A    What happened to them?

16 Q    Yes.

17 A    I don't -- people kept them or threw them away, I don't

18 know what they did with them.

19 Q    And is the 8- and 12-hour schedule the same schedule that

20 the employees are currently working?

21 A    Correct.

22 Q    After the vote that -- for the 8- and 12-hour schedule, how

23 were employees notified, or what do employees have to do to

24 figure out what schedule they were working?

25 A    They walked around and asked, from seniority, top of

1  seniority down, whether you chose to work -- whether you chose

2  to work the 8 and 12 shift or if you wanted to work the 12

3  shift, which would be -- basically, the 12 shift full was night

4  shift.

5  Q    And when you say "they" walked around, who walked around?

6  A    Excuse me, Chad Reid walked around.

7  Q    Did Mr. Reid say anything about bidding on shifts?

8  A    We were told we could not bid our shift.

9  Q    Did he say why?

10 A    That Ken Meadows didn't want us bidding.

11 Q    Since the vote on the 8 and 12 schedule, has the Employer

12 hired any employees in the maintenance department?

13 A    Yes.

14 Q    How many?

15 A    As of Monday, six, with one more pending to start in May.

16 Q    And have any of those six passed their probationary period?

17 A    Yes.

18 Q    How many?

19 A    Two, because -- well, three, technically, but that one --

20 one of them quit and one of them was terminated.

21 Q    Since the 8 and 12 shift schedule passed the vote, have

22 there been at least two additional employees who had passed

23 their probationary period?

24 A    Yes.

25 Q    And did the Employer implement the second part -- 90 --the

1    "More Than 8" section of General Counsel's Exhibit 90?

2    A    No.

3    Q    Did you have any conversations with any supervisors or

4    managers about whether they were going to implement that "More

5    Than 8" section of General Counsel's Exhibit 90?

6    A    I had asked Chad Reid.

7    Q    What did he say?

8    A    That was Darryl's deal -- Darryl Norman's deal.

9         MS. OHAERI:  I am done, Your Honor.

10        JUDGE CARISSIMI:  Very good.

11        Cross-examination, Mr. Funk?

12        MR. FUNK:  We would request affidavits or Jencks

13   statements.

14        JUDGE CARISSIMI:  Let's go off the record.

15   (Off the record.)

16        JUDGE CARISSIMI:  Back on the record.

17        Are there any Jencks statements to provide?

18        MS. OHAERI:  There are none.

19        JUDGE CARISSIMI:  Very good.

20        Mr. Funk, do you need some time to prepare, or do you wish

21   to go forward?

22        MR. FUNK:  I could use just five minutes.

23        JUDGE CARISSIMI:  Certainly, off the record.

24   (Off the record.)

25        JUDGE CARISSIMI:  On the record.

1      Mr. Funk, you may cross-examine.

2      MR. FUNK:  Thank you.

3                    CROSS-EXAMINATION

4   Q   BY MR. FUNK:  Mr. Kuddes, my name is Ryan Funk.  I am an

5   attorney for Ingredion.  I am going to ask you some questions

6   about the testimony you gave this morning, and also yesterday

7   evening.  First of all, have you talked with other witnesses or

8   potential witnesses about the testimony that you gave yesterday,

9   or about testimony that they gave?

10  A   No.

11  Q   Or about testimony that they planned to give?

12  A   No.

13  Q   Okay, thank you.  When the Employer proposed -- strike

14  that.  The Union filed a grievance about a 10-hour maintenance

15  schedule, correct?

16  A   After it was voted on, yes.

17  Q   And that grievance got resolved, correct?

18  A   I am not sure what you are saying.

19  Q   The Union and company worked that grievance out, correct?

20  A   I am not sure exactly what you are asking, but the

21  grievance apparently worked because the schedule got declined.

22  Q   So the 10-hour schedule was never implemented, correct?

23  A   Correct.

24  Q   And why was that?

25  A   Because of the grievance.

1    Q    And the grievance was over the contract language about

2    maintenance shifts, is that correct?

3    A    From my understanding, yes.

4    Q    At the time that all this was going on, was there a

5    maintenance steward?

6    A    I believe, at that time, there still was a maintenance

7    steward, yes.

8    Q    And who was that?

9    A    Renita Shannon.

10   Q    And Renita Shannon, she was on the bargaining committee,

11   correct?

12   A    Yes.

13   Q    So she would understand the language of the last, best and

14   final contract, correct?

15   A    From my understanding, yes.

16   Q    Do you know what conversations Renita Shannon had, with Mr.

17   Reid or Mr. Norman, about the maintenance schedule?

18   A    No.

19   Q    You don't know what conversations she had with them about

20   the vote?

21   A    No.

22   Q    Now, turning your attention back to General Counsel Exhibit

23   90.  Do you still have that in front of you?

24   A    Yes.

25   Q    You saw this on --

1      MR. WIESE:  One moment, Your Honor.

2      JUDGE CARISSIMI:  Very good.  You let me know when you have

3  located it, Mr. Wiese.

4      MS. OHAERI:  Ready.

5      JUDGE CARISSIMI:  Very good.

6      You may proceed, Mr. Funk.

7  Q    BY MR. FUNK:  You saw this on a supervisor's desk, correct?

8  A    Like I said earlier, something similar, correct.

9  Q    You saw something similar to General Counsel Exhibit 90 on

10  a supervisor's desk?

11  A    Yes.

12  Q    And you said other employees told you to go in there and

13  look at it, is that correct?

14  A    Yes.

15  Q    The supervisor never called you into his office to ask you

16  to look at this, correct?

17  A    He did not.

18  Q    And he never gave you a copy of it for yourself, did he?

19  A    No.

20      MR. FUNK:  No further questions, thank you.

21      JUDGE CARISSIMI:  Is there any redirect?

22      MS. OHAERI:  Yes.

23                    REDIRECT EXAMINATION

24  Q    BY MS. OHAERI:  Do you know whether Mr. Reid or Mr. Norman

25  told employees to look at the schedule that was in his office?

1  A    Yes, because --

2      MR. FUNK:  I am going to object, Your Honor, on hearsay.  I

3  think she could ask if he told Mr. Kuddes, but not other

4  employees.

5      MS. OHAERI:  I asked does he know.

6      JUDGE CARISSIMI:  Overruled.  The objection is overruled.

7  You can ask your question again.

8  Q    BY MS. OHAERI:  Do you know whether Mr. Reid or Mr. Norman

9  told any employees to look at the schedule in Mr. Reid's office?

10 A    Yes, because we went over it with Chad.  I had questions

11 for him.  We had questions for Darryl.  They actually had

12 another meeting in the break room, at some point, going through

13 it for more details, so.

14 Q    Does Ms. Renita Shannon attend your morning maintenance

15 meetings?

16 A    She does.  But after -- there's Renita, there's two lube

17 specialists, and -- so Renita and our lube specialist and two

18 storeroom people -- after they leave, that is when we talked

19 about this.

20 Q    Why does Ms. Shannon leave the morning meetings?

21 A    The morning meeting is a safety meeting, and then they

22 break, and then Chad Reid or another supervisor may go through

23 and hand out our work for the day, jobs that need to be

24 addressed from maybe the shift before.

25 Q    Does Ms. Renita Shannon do the same job duties as you?

1  A    No.

2       MS. OHAERI:  That is all, Your Honor.

3       JUDGE CARISSIMI:  Nothing further?

4       MS. OHAERI:  Yes.

5       JUDGE CARISSIMI:  Any re-cross?

6       MR. FUNK:  No, Your Honor.

7       JUDGE CARISSIMI:  Very good.

8       Mr. Kuddes, sir, you are excused as a witness, you can step

9  down.  You can just leave that right there.

10      THE WITNESS:  Okay, thank you.

11 (Witness excused from the stand.)

12      JUDGE CARISSIMI:  So, General Counsel, do you have another

13 witness?

14      MS. OHAERI:  Yes.

15      JUDGE CARISSIMI:  Very good.  Ms. Ohaeri, General Counsel

16 90 is up here, so you might want to retrieve that.

17 (Pause.)

18      JUDGE CARISSIMI:  Whenever you are ready, you can let me

19 know.

20      MS. OHAERI:  One second, Your Honor.

21      JUDGE CARISSIMI:  Sure.

22 (Pause.)

23      MS. OHAERI:  Yes.

24      JUDGE CARISSIMI:  Very good.  On the record.

25      General Counsel, you may call your next witness.

1    MS. OHAERI:  Your Honor, I call Michael Sarchett.

2    JUDGE CARISSIMI:  Mr. Sarchett, if you would step up to the

3    witness stand, please, sir, which is located right here.  Before

4    you have a seat, I would like to ask you to raise your right

5    hand.

6    (WITNESS SWORN:  MICHAEL SARCHETT.)

7    JUDGE CARISSIMI:  Please have a seat.

8    MS. OHAERI:  Good morning, Mr. Sarchett.

9    THE WITNESS:  Good morning.

10   MS. OHAERI:  How are you?

11   THE WITNESS:  Good.

12                    DIRECT EXAMINATION

13   Q    BY MS. OHAERI:  Can you please state and spell your last

14   name for the record?

15   A    Michael Sarchett, S-A-R-C-H-E-T-T.

16   Q    And where are you currently employed?

17   A    Ingredion Products.

18   Q    When were you hired?

19   A    April 4, 1988.

20   Q    And what position do you currently hold?

21   A    LNP operator.

22   Q    What are your job duties?

23   A    We do cooks.  We load ethanol railcars.  We load ethanol

24   trucks.  We do toting, putting our product -- it is like an

25   adhesive product in totes, and it goes out on trucks.

1  Q    What shift do you work?

2  A    Days, first shift.

3       JUDGE CARISSIMI:  Mr. Sarchett, when you say you do

4  "cooks," what does that mean?

5       THE WITNESS:  We take corn and we get the starch, and we

6  convert it with enzyme and break it down and cook it, I like to

7  say, 237 degrees, to activate the enzyme.  And then we have --

8  have 300 on the back-end of the cook, it kills the enzyme.  And

9  then we get the RVA, it is called, where we want it, and it is

10  the thickness of the product that the customer wants that we try

11  to achieve by doing that.

12      JUDGE CARISSIMI:  All right, thank you.

13 Q    BY MS. OHAERI:  Did there come a time when you were

14 considering retirement?

15 A    Yes.

16 Q    And approximately when was that?

17 A    It would have been the end of June until the middle of

18 July, somewhere in that time frame.

19 Q    And did you have any conversations with any representatives

20 of Ingredion, at that time, about retirement?

21 A    I went up two -- I went up twice myself, with just myself,

22 and then once with my wife, I know.  Ann was supposed to give me

23 the numbers for retirement, on what my penalty would be.

24      JUDGE CARISSIMI:  Who is "Ann"?

25      THE WITNESS:  Ann Junge.

1        JUDGE CARISSIMI:  Thanks.

2        THE WITNESS:  Ann Junge, on what my percentage -- my

3    penalty would be on my pension.  And I have talked to her about

4    that and stuff.  Went over that with her, she had everything on

5    a piece of paper that I needed to know.

6        JUDGE CARISSIMI:  Ms. Ohaeri, what Complaint allegation is

7    Mr. Sarchett's testimony going to go to?

8        It is not 5(d), correct, because that has been withdrawn.

9        MS. OHAERI:  Yes, it is 5(c), not 5(d).

10       JUDGE CARISSIMI:  Five (c)?  Very good.

11       MS. OHAERI:  As well as the notice reading and the

12   undermining, Your Honor.

13       JUDGE CARISSIMI:  You may continue.

14   Q    BY MS. OHAERI:  So approximately how many meetings did you

15   have with Ms. Junge with regard to the retirement?

16   A    I met with Ann approximately three times.

17   Q    Of the three times that you met with Ms. Junge, did

18   anything unusual happen?

19   A    It did one time I was meeting with her, and this would be

20   approximately on the first part of July, probably, as near as to

21   my recollection is.  I thought something was strange that time

22   because I was in Ann's office talking to her, and David

23   Roseberry came in.  We had the door closed, but he came in while

24   I was talking to Ann about my retirement.  She was going over my

25   paper with me.  And he told me, "Do not sign that."  And I

1  thought that was strange that he would tell me that.  I don't

2  know why he would tell me that, but I didn't really get into

3  small talk with him about it.  I finished up with Ann and I

4  walked out of there.  And, in the hall, he grabbed my shoulder

5  and was telling me, "Don't sign that," and "There's a better

6  contract coming."  And I just thought that was really strange,

7  because, you know, at that time nobody was talking about

8  contractual things.  He talked about different things, a lot of

9  them that I can't recollect, but a lot of it was things that

10 would pertain to me about retirement and things like that.  And

11 --

12      JUDGE CARISSIMI:  Let me interrupt you for a second, Mr.

13 Sarchett.  I want you to do the best you can, and I want you to

14 tell us what you recall Mr. Roseberry telling you about your

15 retirement.

16      THE WITNESS:  He didn't really tell me about my retirement,

17 he just says, "You will like it."  And I asked --

18      JUDGE CARISSIMI:  You will like what?

19      THE WITNESS:  I will like the retirement that Ingredion is

20 going -- their proposal.

21      JUDGE CARISSIMI:  All right.

22      THE WITNESS:  And -- may I proceed?

23      JUDGE CARISSIMI:  You may.

24      THE WITNESS:  Then he -- I told Dave at the time, I says,

25 "Who gave you permission to tell me this, anyway?  Why are you

```
 1   getting this out?"  And he told me that Mr. Ken Meadows did,

 2   gave him permission to talk about it with people.  He didn't say

 3   what people he gave him permission to talk about, just that --

 4   and that is where it came from.  And I don't know why -- I went

 5   to school with Dave Roseberry.  I don't know why he would tell

 6   me this.

 7        JUDGE CARISSIMI:  No, all we want to know --

 8        THE WITNESS:  Okay.

 9        JUDGE CARISSIMI:  -- really, Mr. Sarchett, is what you said

10   and what he said in the conversation.

11        THE WITNESS:  Okay.

12        JUDGE CARISSIMI:  All right?

13        THE WITNESS:  That is what he said.

14        JUDGE CARISSIMI:  Okay, do you have more?  Or maybe,

15   counsel, do you have another question for Mr. Sarchett?

16   Q    BY MS. OHAERI:  Other than Mr. Roseberry, was any other

17   manager or supervisor present for your conversation with Mr.

18   Roseberry?

19   A    Levi Wood came in, but he dropped something off with Ann,

20   and he never said nothing about anything, really, just, "Hi,

21   Mike," and he dropped it off and then he left.  And it wasn't

22   until -- I got finished with Ann, and then I went out in the

23   hall, and that is when Dave approached me.

24   Q    What do you recall Mr. Roseberry saying about the

25   retirement benefits or retirement proposal?
```

1  A    He just said that I would like Ingredion's proposal.  He

2  said, "Don't" -- at that time, he told me, "Don't let a few

3  people on your union body sway you to what you want to do," is

4  what he told me.  He did not go into it about what the

5  retirement would be at that time, he just talked to me about,

6  "Don't let" -- and I don't know what he meant by that, that is

7  what he told me.  "Do not let a few people in the union body

8  sway what you want to do."

9        MS. OHAERI:  That's all.

10        JUDGE CARISSIMI:  Very good.

11        Cross-examination?

12        MR. FUNK:  I will ask for any affidavits or Jencks

13  statements.

14        MS. OHAERI:  No affidavits, Your Honor.  There's a one-page

15  letter, handwritten by Mr. Sarchett, which is undated.

16        JUDGE CARISSIMI:  Very good.

17        How much time would you like, Mr. Funk?

18        MR. FUNK:  Ten minutes?

19        JUDGE CARISSIMI:  Sure.

20        MS. OHAERI:  Ah, sorry, just, on the record, it is with

21  regard to impact evidence.

22        JUDGE CARISSIMI:  Thank you.

23        Let's go off the record for 10 minutes.

24  (Off the record.)

25        JUDGE CARISSIMI:  On the record.

1        Mr. Funk, you may cross-examine.

2        MR. FUNK:  Thank you.

3                     CROSS-EXAMINATION

4   Q    BY MR. FUNK:  Mr. Sarchett, my name is Ryan Funk.  I am an

5   attorney for Ingredion.  I am going to ask you some questions

6   about the testimony you just gave.  Do you recall -- what is the

7   best you can recall about when this conversation with Mike

8   Sarchett took place?

9   A    With Dave Roseberry, you mean?

10       JUDGE CARISSIMI:  This is Mr. Sarchett.

11  Q    BY MR. FUNK:  I am sorry, with Dave Roseberry?

12  A    The first week -- first or second week of July,

13  approximately.

14  Q    How many times did you go into Ann Junge's office?

15  A    Two or three.

16  Q    Can you remember which one of the two or three times this

17  was?

18  A    I don't know -- it wasn't the last one, probably the second

19  one.

20  Q    Okay.

21  A    The second time that I talked to Ann.

22  Q    Was there a particular date by which you were trying to get

23  your retirement figured out?

24  A    I was trying to get it done before August 1st.  And that is

25  why I went in there the two or three times, because I found out

1  that if you want to retire with your $51.00 a month for your

2  pension -- or your insurance -- then it --

3  Q    I -- I --

4  A    -- in case we went on strike --

5  Q    -- I will stop you there.  If you could just -- answer just

6  the question, and I can ask you another question if there's more

7  that I want to know.

8       JUDGE CARISSIMI:  Okay, Mr. Sarchett, so just listen

9  carefully to the question --

10      THE WITNESS:  Okay.

11      JUDGE CARISSIMI:  -- and just answer the question.

12  Q    BY MR. FUNK:  So these meetings with Ann Junge could have

13  taken place any time up to August 1st, is that correct?

14  A    Correct.

15  Q    And you don't recall exactly during which of these meetings

16  it was that you spoke with Dave Roseberry, correct?

17  A    The second one, the second meeting.

18  Q    You remember that it was the second one?

19  A    Not on that date, no, I don't.  But it was -- yes -- I

20  mean, yes, I don't remember if it was the second one or --

21  Q    A lot of this you can't recollect, correct?

22  A    No, I remember -- it has been so long ago I don't remember

23  the actual dates.  I am giving an approximate time that I did

24  it.

25  Q    And you also don't remember exactly what was said, is that

1   correct?

2   A    I remember everything that was said.

3   Q    Word for word, you remember --

4   A    With Dave Roseberry?

5   Q    Yes.

6   A    Yes.

7   Q    I would like to clarify when Levi Wood was around.  Was he

8   around when you were speaking to Mr. Roseberry about this

9   subject, or had he already come and gone at that point?

10  A    I was in with Ann Junge, talking to her about my

11  retirement, and David Roseberry came in.  And then Levi come in,

12  the same day, and dropped material off to Ann Junge, and then he

13  left.

14  Q    And where was it that you spoke with Mr. Roseberry about

15  retirement?

16  A    I was in Ann Junge's office and he come in.  And then I

17  left, I had to go back to my job, and Dave Roseberry followed me

18  out into the hall.

19  Q    So Levi wasn't around at that point?

20  A    No.

21  Q    Okay.  Ann wasn't around at that point, either, Ms. Junge?

22  A    Not after I left the office, no.  Not after I left Ann

23  Junge's office.

24  Q    So it was just you and Dave Roseberry, correct?

25  A    Yes.

1    Q    Did he pull you into some other office, or was it just out

2    in the hallway?

3    A    No, it was out in the hallway.

4    Q    Okay.  Dave Roseberry didn't go into a lot of detail about

5    what the retirement would be after August 1st did he?

6    A    No, he didn't, he just said, "You would like it," and that

7    is his exact words.

8    Q    And he didn't specify as to whether he was talking about

9    the vested part of the pension, or other parts of the proposal,

10   is that correct?

11   A    No, he did not get into the details of the contract.  He

12   just said that I would like it.

13   Q    Had anybody from the company ever told you that Dave

14   Roseberry was the one who could tell you about what the

15   company's proposals were?

16   A    I am not sure I understand your question.

17   Q    Okay, I will withdraw the question.

18   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 83.)

19        MR. FUNK:  May I approach the witness?

20        JUDGE CARISSIMI:  Yes.

21   Q    BY MR. FUNK:  I would like to show you an exhibit that has

22   been marked as Penford Exhibit 83.

23        JUDGE CARISSIMI:  What is the number?

24        MR. FUNK:  Eighty-three.

25        JUDGE CARISSIMI:  And what is the exhibit?

1      MR. FUNK:  It is a July -- it hasn't yet been introduced

2  into evidence.  It is a July 17th letter.

3      JUDGE CARISSIMI:  Okay, thank you.

4  (Witness proffered document.)

5  Q   BY MR. FUNK:  Mr. Sarchett, do you recognize this letter?

6  A   No, I do not.

7  Q   You never received this letter?

8  A   Yes, I do.

9  Q   What is this document?

10 A   It is Erwin Froehlich, regarding the rumors.

11 Q   And did you receive this letter?

12 A   I didn't receive one personally.  It was put up on our

13 Union board down at our -- in building 95, where I work.

14 Q   Did that --

15     MR. FUNK:  Your Honor, I won't move to introduce this into

16 evidence since he has seen it.

17     JUDGE CARISSIMI:  All right.

18     You can hand it back, Mr. Sarchett, thank you.

19     MR. FUNK:  No further questions.

20     JUDGE CARISSIMI:  Is there any redirect?

21     MS. OHAERI:  Yes, Your Honor.

22                         REDIRECT EXAMINATION

23 Q   BY MS. OHAERI:  Why does the conversation with Mr.

24 Roseberry stand out so much to you?

25 A   Why does it stand out so much to me?

1  Q    Yes.

2  A    I just thought it was awkward, at the time, that he would

3  be questioning me -- or telling me about the contract, and

4  trying to go over it with me, and letting it out that Ken

5  Meadows told him that he can do this.

6  Q    I just thought, from being a steward and stuff, that it was

7  out of character.  I didn't -- I have never seen that happen

8  before.

9       MS. OHAERI:  That is all, Your Honor.

10      JUDGE CARISSIMI:  Very good.

11      Within that one question, do you have anything?

12      MR. FUNK:  Just briefly, Your Honor.

13                          RECROSS-EXAMINATION

14  Q    BY MR. FUNK:  Were you a Union steward at the time?

15  A    Yes, I was.

16      MR. FUNK:  Nothing further, Your Honor.

17      JUDGE CARISSIMI:  Very good.

18      Mr. Sarchett, thank you for your testimony.  You can step

19  down, sir, you are done.

20      THE WITNESS:  Thank you.

21  (Witness excused from the stand.)

22      JUDGE CARISSIMI:  Does General Counsel have another

23  witness?

24      MS. OHAERI:  Yes.

25      JUDGE CARISSIMI:  Let's go off the record.

1  (Off the record.)

2      JUDGE CARISSIMI:  Let's go on the record.

3      General Counsel, you may call your next witness.

4      MS. OHAERI:  General Counsel calls Jeff King.

5      JUDGE CARISSIMI:  Sir, you can step right up here to our

6  witness stand, and I would like you to raise your right hand,

7  please.

8  (WITNESS SWORN:  JEFF KING.)

9      JUDGE CARISSIMI:  Please have a seat.

10      MS. OHAERI:  Ready, Your Honor.

11      JUDGE CARISSIMI:  You may proceed.

12                          DIRECT EXAMINATION

13  Q    BY MS. OHAERI:  Mr. King, are you currently employed?

14  A    Yes, I am self-employed.

15  Q    And what do you do for your business?

16  A    I have a screen-print company.

17  Q    Have you ever worked at Penford Products, now called

18  Ingredion?

19  A    Yes, for 33 years.

20  Q    And why did your employment at Penford end?

21  A    I retired, to keep the retirement benefits that I had.

22  Q    When did you retire?

23  A    I signed my papers the 23rd of July, for August 1st.

24  Q    At the time of your retirement, what position did you hold?

25  A    I was a mobile supply operator on the swing shift.

1  Q     Which department is that in?

2  A     The dry starch.

3  Q     Where is the dry starch department located?

4  A     It is on the south end of the plant, but my job pertains to

5  almost the whole plant, doing snow removal, moving railroad cars

6  throughout the plant, so I am all over, outside, inside.

7  Q     How long did you hold that position?

8  A     Probably a good 16, 17 years, something like that.

9  Q     Did there come a time when you decided that you were --

10  sorry.  When did you decide you were going to be retiring?

11  A     Started thinking about it, because of the rumors going

12  around, and what had happened at the last contract, that we had

13  had a labor dispute in 2004.  About mid-June, I decided that we

14  had better start thinking about it.

15  Q     Did there come a time that you spoke with a representative

16  of the Employer with regard to your retirement?

17  A     Yeah, to make a formal request to have my pension

18  calculated, yes, I did.

19  Q     And who was the person that you made that request of?

20  A     Ann Junge.

21  Q     And what was the process of having those communications

22  with Ms. Junge?

23        MR. FUNK:  Your Honor, I will object just on relevancy now.

24  If it is going to another allegation of the Complaint, I --

25        JUDGE CARISSIMI:  Let me ask:  What Complaint allegation

1    does Mr. King's testimony go to?

2        MS. OHAERI:  Five (c), the undermining, and the notice

3    reading, Your Honor.

4        JUDGE CARISSIMI:  Five (c)?  All right, very good.  You may

5    continue.

6        THE WITNESS:  I am sorry, could you repeat that question

7    now?

8        JUDGE CARISSIMI:  The objection is overruled.

9    Q    BY MS. OHAERI:  What was the process of you meeting with

10   Ms. Junge?

11   A    She had calculated some 40 pensions, I guess, and I had

12   calculated my own pension, so I wanted to go up and make sure

13   that my numbers were correct.  If I was going to make this

14   decision to retire, I wanted to make sure I had all my facts and

15   figures correct.

16   Q    Do you recall when you met with Ms. Junge?

17   A    On or about probably the 15th, the 17th of July.

18   Q    And what was the conclusion of your meeting with Ms. Junge

19   that day?

20   A    I had calculated pensions for other employees in the past,

21   so I calculated my own pension, and I was off by just pennies.

22   So it was kind of a nice thing to know that I actually knew what

23   I was doing.  So I calculated that, we had the information,

24   we've changed it, and I made the comment, "Is that it?"  And she

25   says, "No, you will have to have your wife come in and sign the

1  exclusion," because I was not going to put her on my pension, so

2  she had to sign off on that by law.  So I made the appointment

3  with her on that day, the 15th-ish.  I made the appointment to

4  do it on the 23rd of July, at 3:00, when I got off work.

5  Q    Did Ms. Junge say who, if anyone, she had to notify about

6  your decision?

7  A    Yeah, she said that she would have to notify the operations

8  manager, and that she would have to notify human resource

9  department.

10 Q    What happened after you concluded your meeting with Ms.

11 Junge?

12 A    I went back to work -- or went back out into the yard, I

13 was going to fill my end-loader up with fuel.  And I got a call

14 to go back up to her office, that I had left my calculation

15 papers up there.

16 Q    And do you recall who called you?

17 A    Phil Kluetz, the kind of operations manager at the time.

18 Q    Did you go back to retrieve your paperwork?

19 A    Yes, I did.

20 Q    And what happened when you did that?

21 A    She did -- she made some comment, "Boy, that got people

22 talking."  And the only reason I can assume that is I am 53

23 years old, and I don't think anybody else had actually signed

24 their papers at that time.  So I am assuming that that probably

25 --

1      JUDGE CARISSIMI:  Well, I don't want you to assume, sir.

2  You can tell us what you said, what she said --

3      THE WITNESS:  Okay.

4      JUDGE CARISSIMI:  -- but I don't want you to assume

5  anything.

6      THE WITNESS:  Okay.  So I just, once she told me, I just --

7  you know, that was about it then, for that then.

8  Q    BY MS. OHAERI:  Do you recall whether she said who was

9  talking, or who she was referring to?

10  A    The only thing she made a comment about --

11      MR. FUNK:  Your Honor, I will object.  This is hearsay.

12      JUDGE CARISSIMI:  Your position on that?

13      MS. OHAERI:  Well --

14      JUDGE CARISSIMI:  I know what I am going to do.  I am going

15  to admit it, because it appears to me this is preliminary to

16  another conversation.

17      MS. OHAERI:  It is.

18      JUDGE CARISSIMI:  And there's a recognized exception that

19  when hearsay testimony is leading to something, that is setting

20  the stage for another issue, it is admissible.  So I am going to

21  overrule the objection.

22      You may continue.

23  Q    BY MS. OHAERI:  My question was, Mr. King, do you recall

24  whether she said who they were that were talking, or who she had

25  spoke to?

1    A    When she called the operations, they asked why I was

2    retiring.  And she said that she didn't know, that they would

3    have to ask me because she could not ask me.

4    Q    What happened after you left Ms. Junge's office the second

5    time?

6    A    I -- by this time, I went up there, it was about 1:00 in

7    the afternoon, right after lunch, to make the original meeting

8    with her.  And then I went back out, was in the yard, so it was

9    about 1:30 that I got the first call to go up.  And then it was

10   probably, by the time I got back out into the yard to fill my

11   Cat up with fuel, it was about 2:30, because I was trying to get

12   it done by the end of the day.  So I was out in the middle of

13   the yard, filling up fuel, and that is when Dave Roseberry came

14   out.

15   Q    And what happened when Mr. Roseberry approached you?

16   A    He just approached me and made some comment about, "I heard

17   you are signing your papers or I heard you are making an

18   appointment to retire."  And he proceeded to tell me about, "We

19   need to get together."  I needed to go get a hold of my Union

20   executive board and get them to go in and negotiate, because --

21   there was some comment about, "You wouldn't buy a car without

22   knowing what the contract was for buying that car."  And

23   honestly, in my own mind, I had already made my decision, and so

24   I wasn't really listening to what he was saying, because it was

25   a very hard decision to make.  I had actually told some people,

1  "I jumped out of an airplane 32 times, and it was harder to make

2  the decision to quit work than it was to jump out of that

3  airplane every time I did it."  And so I wasn't really focused

4  on what he was saying, but I was -- as being a chief steward for

5  the Union for probably seven or eight years in the early '80s, I

6  knew he really shouldn't be out there talking.  So I was

7  wondering, it was like, "What is he doing?  Why is he in here

8  talking to me about this stuff?"

9      And so, with that being said, he was telling me that the

10  pension is negotiable, the hours, the wages are negotiable,

11  everything is negotiable.  I need to go call my reps and have

12  them get a hold of the company and start negotiating.

13  Q    And when he made that request, what did you say to Mr.

14  Roseberry?

15  A    I said, "Are you sure?"  And I think I asked him three

16  times, if I am not mistaken.  I asked him three times, "Are you

17  sure you want me to call the vice president?" -- or I said, "I

18  am friends with Matt Maas, the vice president."  I said, "Are

19  you sure you want me to call him and tell him what you are

20  telling me?"  "Yes, we need to get together, we need to get this

21  taken care of."  And I am like, "Okay."  And, by that time, it

22  was probably about quarter to three.  The conversation took

23  about 10 minutes, maybe 15 at the very most.

24  Q    Did Mr. Roseberry say why he came to speak to you?

25  A    He said he was instructed to come out and talk to us senior

1  people about it, and that was all I knew, that he was instructed

2  to do it.

3  Q    What happened after your conversation with Mr. Roseberry

4  ended?

5  A    Like I said, by that time it was probably about quarter to

6  three, closing up my day, and I finished up my job.  And I went

7  into the maintenance shop, which is where the safety meetings

8  are held, and Mike Sarchett, Karen Sarchett and Renita Shannon

9  were standing in that.  And I saw Mike Sarchett doing his hand

10  gesture, like that, and I thought, "Well, there's a conversation

11  I need to involve myself in."

12  JUDGE CARISSIMI:  You need to use words to describe the

13  hand gesture.

14  THE WITNESS:  Flailing?  I don't know what.  He was

15  excited, and he -- so I went in to hear what he was talking

16  about.  And he said that Dave Roseberry had just talked with

17  him.  And I am like, "Okay, well, so you guys all heard this,"

18  and basically, from what I got out of that two-minute to three-

19  minute conversation, because I had to get up to a safety

20  meeting, that it was almost about the same conversation, that

21  the Union is not telling us everything, that the company has got

22  a lot to give us, that we need to get together and negotiate.

23  Q    BY MS. OHAERI:  Going back to your conversation with Mr.

24  Roseberry, were any other employees present?

25  A    No, it was out in the middle of the yard.

1    Q    Prior to your conversation with Mr. Roseberry, during the

2    time you have been employed by Penford and Ingredion, had any

3    other manager or supervisor talked with you about the contract

4    negotiations?

5    A    Never.

6         MS. OHAERI:  That is all, Your Honor.

7         JUDGE CARISSIMI:  Cross examination?

8         MR. FUNK:  Any affidavits or <u>Jencks</u> statements?

9         MS. OHAERI:  Yes.  I have one affidavit from Mr. King,

10   signed on August 1, 2015.  It is four pages in length, and that

11   is all.

12        JUDGE CARISSIMI:  How much time would you like to prepare,

13   Mr. Funk?

14        MR. FUNK:  Ten minutes again?

15        JUDGE CARISSIMI:  Very good.

16        Let's go off the record for ten minutes.

17   (Off the record.)

18        JUDGE CARISSIMI:  On the record.

19        You may cross-examine.

20        MR. FUNK:  Okay, thank you.

21        Mr. King, my name is Ryan Funk.  I am an attorney for

22   Ingredion.  I am going to ask you just a few questions about the

23   testimony that you just gave.

24        THE WITNESS:  Okay.

25                        CROSS-EXAMINATION

1   Q     BY MR. FUNK:  First of all, have you spoken with any other

2   witnesses about the testimony that they have given in this

3   proceeding?

4   A     No.

5   Q     Or testimony that they are planning to give in the

6   proceeding?

7   A     No.

8   Q     Okay.  Dave Roseberry was not on the negotiating committee

9   for the successor's bargaining agreement, was he?

10  A     I do not think so.

11  Q     Okay.

12  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 86.)

13  Q     BY MR. FUNK:  Let me show you an exhibit that has been

14  marked as Penford Exhibit 86.

15        MR. FUNK:  May I approach?

16        JUDGE CARISSIMI:  Yes, you may.

17  (Witness proffered document.)

18  Q     BY MR. FUNK:  Mr. King, do you recognize this document?

19  A     Yes.

20  Q     What is it?

21  A     It is a letter that was sent to our homes.

22  Q     So this letter was sent to your home?

23  A     I -- yes, I am pretty sure it was.

24  Q     And that date on there, July 17th, does that seem right for

25  when this letter was sent to your home, based on your memory?

1  A    Well, actually, after looking at it, this is not sent to

2  me.

3  Q    Why do you say that?

4  A    Because I don't live in Lowden, Iowa.

5  Q    Okay.  Did you receive a letter like this one?

6  A    I -- yes, I think so.  Yes, I think so.  The only reason I

7  -- I don't know if I could recognize the letter, but I knew that

8  something was sent to my wife and I, and I am going to assume

9  that this is the same letter.

10     MR. FUNK:  Okay, I will withdraw this and get it from the

11 witness.

12     JUDGE CARISSIMI:  Very good.

13 Q    BY MR. FUNK:  At the time that you spoke with Dave

14 Roseberry, out in the yard, like you have been telling us about,

15 were you a Union steward?

16 A    No.

17 Q    Have you recently been a Union steward?

18 A    I have not.  The only committee that I was on was an

19 appointed Union safety committee position.  My last steward's

20 job was probably in early '90s.

21 (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 106.)

22     MR. FUNK:  If I may approach?

23     JUDGE CARISSIMI:  Yes, you may.

24 Q    BY MR. FUNK:  Mr. King, I would like to show you a

25 document.  I have just one copy, so if you don't mind I will

```
 1    just show it to you here.

 2    A    Sure.

 3    (Witness proffered document.)

 4    Q    Is this an affidavit that you gave --

 5    A    Yep.

 6    Q    -- to the National Labor Relations Board?

 7    A    Mm-hmm.

 8         JUDGE CARISSIMI:  What number are you assigning that?

 9         MR. FUNK:  It has been marked as Penford Exhibit 106.

10         JUDGE CARISSIMI:  106, okay.

11    Q    BY MR. FUNK:  Did you give this affidavit under oath?

12    A    Oh, yeah, maybe I was a steward at that time.  Yeah, I

13    might have been the steward, yeah, I probably was.  Because I

14    was on the off shift, I didn't do a lot, I am sorry, I probably

15    was a steward at that time.

16         MR. FUNK:  No further questions, thank you.

17         JUDGE CARISSIMI:  Is there any redirect?

18                        REDIRECT EXAMINATION

19    Q    BY MS. OHAERI:  Mr. King, is there a reason you would have

20    forgotten you were a steward?

21    A    On my shift, there's not a lot of activity, and I am a

22    department -- or a shift steward -- or department steward, not a

23    shift steward.  So there's very little activity, and I probably

24    hadn't processed a grievance in -- I didn't have the office that

25    long.  The only reason I took it was because, after the flood,
```

1  we went to a seven-day schedule versus a rotating fourth-shift

2  schedule.  And with that being said, we have a different set of

3  rules, called the swing shift or the seven-day rules.  I am

4  sorry, I am using gestures again.

5         JUDGE CARISSIMI:  That is okay.

6         THE WITNESS:  So in the seven-day schedule, a lot of the

7  junior employees would not know how that is administered.  So

8  they came to me and asked me if I would be the steward.  I

9  didn't run for it, that's why I probably have forgotten.  It was

10  a -- more of a symbolic appointment rather than, "Hey, I am

11  going to run for the shift steward's job," which I had done in

12  the past.  So that is probably why I had forgotten about that.

13  I keep good law and order on my shift, so I didn't have a lot of

14  grievances.

15         MS. OHAERI:  That is all.

16         THE WITNESS:  Thank you.

17         JUDGE CARISSIMI:  I take it there's nothing further?

18         MR. FUNK:  Nothing further.

19         JUDGE CARISSIMI:  Mr. King, thank you, you are excused as a

20  witness.  You may step down.

21         THE WITNESS:  All right, thank you.

22  (Witness excused from the stand.)

23         JUDGE CARISSIMI:  So let's go off the record.

24  (Off the record.)

25         JUDGE CARISSIMI:  On the record.

Case 1:16-cv-00038-LRR-CJW     Document 19-1     Filed 05/13/16     Page 750 of 1141

1      Before we proceed, I wanted to indicate that I had --

2  during a break -- had a chance to look at the American Standard

3  case that the General Counsel referred me to.  And I am going to

4  adhere to my ruling admitting General Counsel's exhibits

5  regarding the post-implementation discipline.  That case seems

6  to indicate, again in a brief review, that there is sufficient

7  relationship for admissibility.  The weight I should attach to

8  those exhibits, of course, will be the subject of argument in

9  the briefs.

10      Mr. Wiese, is General Counsel prepared to rest its case in

11  chief at this point?

12      MR. WIESE:  Yes, we are, Your Honor.

13      JUDGE CARISSIMI:  Very good.  And we are going to shortly

14  adjourn, but we are going to start the trial again next

15  Wednesday, is that correct?

16      MR. WIESE:  That is correct.

17      JUDGE CARISSIMI:  And, at that time, Respondent will begin

18  its case in chief.

19      And is there anything further on behalf of the General

20  Counsel in this session?

21      MR. WIESE:  No, Your Honor.

22      JUDGE CARISSIMI:  Anything from the Respondent?

23      MR. BUTTRICK:  No, Your Honor.

24      JUDGE CARISSIMI:  Very good.  So we are off the record

25  until next Wednesday.

1   (Whereupon, at 11:02 a.m., the trial in the above matter was

2   adjourned to reconvene on Wednesday, April 27, 2016, at 9 a.m.,

3   in the same place.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>C E R T I F I C A T E</u>

2          This is to certify that the attached proceedings before the

3    National Labor Relations Board, Region 18, Case 18-CA-160654 and

4    18-CA-170682, Ingredion, Inc, d/b/a Penford Products Co. and

5    BCTGM Local 100G, affiliated with Bakery, Confectionary, Tobacco

6    Workers, and Grain Millers International Union, AFL-CIO, in

7    Cedar Rapids, Iowa on April 21, 2016, was held according to the

8    record, and that this is the original, complete and true and

9    accurate transcript that has been compared to the recording, at

10   the hearing; and that the exhibits are complete and no exhibits

11   received in evidence or in the rejected exhibit files are

12   missing.

13

14                    *Christopher Walls*

15                    Christopher Walls

16                    Official Reporter

17

18

19

20

21

22

23

24

25

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

        Respondent,

and                       Case No. 18-CA-160654
                                   18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLRS INTERNATIONAL UNION,
AFL-CIO,

        Charging Party.

Pages: 750 through 1001 (Volume 5)

Date: April 27, 2016

Place: Cedar Rapids, Iowa

Veritext National Court Reporting company
1250 Eye Street NW - Suite 350
Washington, DC 20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

            Respondent,

and                          Case No. 18-CA-160654
                                     18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLERS INTERNATIONAL UNION,
AFL-CIO,

            Charging Party.

      The above entitled matter resumed trial pursuant to

adjournment, before The Honorable Mark Carissimi, Administrative

Law Judge, in Room 1B, Board of Supervisors Formal Board Room of

the Jean Oxley Linn County Public Service Center, 935 Second

Street SW, Cedar Rapids, Iowa, on Wednesday, April 27, 2016, at

8:57 a.m.

Veritext National Court Reporting company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1                    <u>A P P E A R A N C E S</u>

2    <u>**On behalf of the NLRB, Counsel for the General Counsel:**</u>

3    TYLER J. WIESE, ESQ.

4    CHINYERE C. OHAERI, ESQ.

5    National Labor Relations Board, Region 18

6    212 Third Avenue South, Suite 200

7    Minneapolis, Minnesota  55401

8    Tyler Wiese: (612)348-1784 /Chinyere Ohaeri: (612)348-1766

9    Tyler.Wiese@nlrb.gov / Chinyere.Ohaeri@nlrb.gov

10   <u>**On behalf of the Charging Party:**</u>

11   SETH MARLING, President

12   BCTGM Local 100G

13   5000 J Street SW

14   Cedar Rapids, Iowa   52404

15

16   <u>**On behalf of the Respondent:**</u>

17   STUART R. BUTTRICK, ESQ.

18   RYAN J. FUNK, ESQ.

19   Faegre Baker Daniels

20   300 N. Meridian Street, Suite 2700

21   Indianapolis, Indiana   46204

22   Stuart Buttrick:  (317)237-1038

23   Ryan Funk:  (317)237-1131

24   stuart.buttrick@FaegreBD.com

25   ryan.funk@FaegreBD.com

1                         I N D E X

2  OPENING STATEMENT:                                    PAGE:

3  By Mr. Buttrick, on behalf of the Respondent          755

4

5  WITNESSES          DIRECT  CROSS   REDIRECT  RECROSS  VOIR DIRE

6  Erwin Froehlich     766    793      816      816       778

7                                                         782

8                                                         789

9  Levi Wood           818    828

10 Brad Bumba          841    848

11 Phil Kluetz         854    869

12 Andy Sullivan       874    891      902      904       884

13 (Recalled)

14 David Roseberry     915    922

15 Jon Swails          924    926

16 Dave Vislisel       927

17 Ken Meadows         930                                949

18 (Recalled)                                             981

19

20

21

22

23

24

25

Veritext National Court Reporting company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

| 1 | | **E X H I B I T S** | |
|---|---|---|---|
| 2 | **EXHIBIT** | **IDENTIFIED** | **IN EVIDENCE** |
| 3 | **General Counsel's** | | |
| 4 | 64(a) | 814 | |
| 5 | 71(e) | 896 | 897 |
| 6 | 71(f) (Rejected-813) | 811 | |
| 7 | 71(f) | 897 | 899 |
| 8 | 81 (Rejected-852) | 849 | |
| 9 | 81 | 892 | 894 |
| 10 | **Respondent's** | | |
| 11 | 11 | 932 | 933 |
| 12 | 12 | 855 | 859 |
| 13 | 14 | 936 | 937 |
| 14 | 16 | 949 | 950 |
| 15 | 29 | 959 | 960 |
| 16 | 31 | 787 | 788 |
| 17 | 32 | 789 | 790 |
| 18 | 34 | 980 | 980 |
| 19 | 35 | | 981 |
| 20 | 36 | | 990 |
| 21 | 38 | 992 | 993 |
| 22 | 47 | 781 | 782 |
| 23 | 48 | 877 | 879 |
| 24 | 50 | 883 | 885 |
| 25 | 51 | 886 | 886 |

1             E X H I B I T S (continued)

2   EXHIBIT                    IDENTIFIED              IN EVIDENCE

3   Respondent's

4    52                           887                    887

5    63                           769                    770

6    64                           778                    779

7    66                           792                    792

8    67                           820                    820

9    73                           857                    858

10   74 (Reserved ruling- pg 953)  952

11   89                           773                    774

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1                    P R O C E E D I N G S

2                                        8:57 a.m.

3        JUDGE CARISSIMI:  On the record.

4        This is the continuation of the Ingredion, Incorporated,

5   D/B/A Penford Products company trial.

6        General Counsel has rested at our last session.  We are now

7   ready to begin the Respondent's case.

8        Mr. Buttrick, does Respondent care to make an opening

9   statement?

10       MR. BUTTRICK:  We do, Your Honor.

11       JUDGE CARISSIMI:  You may proceed.

12       MR. BUTTRICK:  Thank you, Your Honor.

13                    OPENING STATEMENT

14       BY MR. BUTTRICK:  As you heard last week, this case is, at

15   its core, a case about bargaining.  And from the company's

16   perspective, we think the facts will show that the company has

17   at all times bargained in good faith and fully fulfilled its

18   obligations under the National Labor Relations Act.  And, if

19   anything, the facts will show that it was the Union that has

20   been bargaining in bad faith by having a take-it-or-leave-it

21   bargaining position throughout the parties' negotiations in the

22   summer of 2014.

23       So the way I would like to structure my comments is I will

24   start by doing a little bit of background about Ingredion and

25   then I will move to the bargaining allegations and then, after

1    that, I will go to the allegations related to the post-
2    implementation issues after the company implemented its last,
3    best and final; and then I will close with some short comments
4    about the ancillary 8(a)(1)'s that are floating about.
5        So, first, let's talk a little bit about Ingredion.
6    Ingredion is an international company with plants all over the
7    world.  And, prior to its transaction with Penford, it had
8    approximately nine plants in the United States.  Of those,
9    approximately five are unionized, and so Ingredion is not a
10   company that is culturally hostile to organizing labor.  Rather,
11   the facts show that it has had a collaborative and long-standing
12   relationship in most of its plants with organizing labor.
13       So on or about March 12, 2015, Ingredion purchased Penford.
14   Now, upon the purchase, Ingredion assumed the collective
15   bargaining agreement; it retained all of the employees; it
16   didn't try to change initial terms and conditions of employment;
17   it didn't try to hire a new workforce.  And so, this was not a
18   company that was trying to run away from the Union.  It was a
19   company that fully embraced the Union and was looking forward to
20   having a collaborative and long-standing relationship with it.
21   As evidence of this, the facts will show that, in the spring of
22   2015 -- April, specifically -- Ken Meadows, who is the company's
23   Director of Human Resources, traveled to the Cedar Rapids plant.
24       Mr. Meadows is the company's chief contract bargainer at
25   all of its facilities, having done over 50-plus contract

1  negotiations during his career.  And, the facts will show, that

2  never once has he been found by the NLRB to have bargained in

3  bad faith.  The purpose of Mr. Meadows' visit was multifaceted,

4  and the facts will show that he wanted to go to the plant to,

5  one, meet the management leadership at the plant, but also to

6  start developing a rapport and a relationship with the Union's

7  leadership because of the upcoming contract negotiations; and

8  Mr. Meadows also wanted to get to know the hourly workers at the

9  plant, as well.

10     So let's talk about the parties' bargaining.  As we are all

11  familiar, the Board uses a multifaceted analysis when trying to

12  determine whether or not a party has been bargaining in good

13  faith.  And among the factors that the Board looks at are such

14  things as the willingness to meet, the consideration of

15  proposals, the making of counterproposals, responses to

16  information requests, explanations given for proposals and the

17  sincerity for which a party's position is taken and held.

18     In determining whether or not parties are at impasse, the

19  Board also looks at another facts-and-circumstances analysis

20  that encompasses such things as bargaining history, the good

21  faith of the parties, whether or not they used a mediator, the

22  length of the negotiations, the importance over the issues about

23  which there is disagreement, and the contemporaneousness of the

24  parties' understandings.

25     And so, from the company's perspective, we believe the

1 facts will show that there was a fundamental and foundational

2 issue about which the parties could not agree in their

3 bargaining in the summer of 2015. That was: The Union wanted

4 the parties off of what was called the "Red Book," which was the

5 pre-existing contract at Cedar Rapids. By contrast, the company

6 wanted to bargain from a whole new set of contractual proposals

7 that were more in sync with its other facilities in the United

8 States.

9 And so it is important to note that the Red Book is

10 something that has been in effect at the facility, in one form

11 or another, for over five decades. And the last time the Red

12 Book was fully renegotiated was in 2004, and the facts will show

13 that at that time the Union participated in a strike that lasted

14 approximately 11 weeks. And, since 2004, the facts will show

15 that Penford and the Union didn't engage in full-blown contract

16 negotiations over that agreement, they just, rather, did two

17 extensions. So the facts will show that the Red Book, from the

18 Union's perspective, was something that it had fought hard for,

19 and that had been in place at the facility for decades. And it

20 wasn't willing to walk away from that, simply because the

21 company -- or the facility -- had a new owner.

22 Now, by contrast, the facts will show that going to the

23 bargaining, the company's goals were to try to integrate the

24 Cedar Rapids facility into the broader Ingredion family of

25 facilities. They wanted to make its labor relations contract

1 more operationally efficient, and they also wanted to create

2 more consistency of the Cedar Rapids contract with those at its

3 other facilities in the United States.

4     Now, importantly, the facts will show that prior to going

5 into the negotiations, the company analyzed the Red Book to see

6 if it could work with the Red Book when doing the new

7 negotiations. And after doing a thorough analysis of it, Mr.

8 Meadows determined that it was just unworkable to use the Red

9 Book as the foundational starting place from the company's

10 negotiations. Of course, under the NLRA, the company had no

11 legal obligation to use the Red Book as the starting place if it

12 was not in its operational best interest.

13     And so the parties began bargaining on June 1. From the

14 period of June 1 until September 14, which is when the company

15 implemented its last, best and final offer, the parties had

16 approximately 27 bargaining sessions that lasted over 13 days.

17 Now, during this time, the company invited an FMCS mediator to

18 attend when it looked like bargaining was going to stall, and

19 the FMCS mediator was, in fact, present for the majority of the

20 sessions.

21     The facts will show that at the time the company

22 implemented its last, best and final, it had made approximately

23 46 changes to its bargaining proposals. And, notably, unlike

24 what is alleged in the Consolidated Complaint and its various

25 amendments thereafter, the company's changes to its proposals

1   were over such substantive and meaty items as wages and overtime

2   and benefits and leave and discipline.

3       The facts will show the company took into account the

4   Union's positions at the table, and modified its proposals

5   because of those; and that the company also explained its

6   proposals to the Union; and that it fully answered any and all

7   questions that the Union had about the company's proposals.  The

8   facts will also show that the company never cancelled a

9   bargaining meeting.

10      Now, by contrast, at the time the company presented the

11  Union with its last, best and final, the Union had withdrawn

12  only two of its bargaining proposals.  Those were for stirrer

13  sticks and herbal tea.  Accordingly, at all times prior to the

14  company's implementation of the last, best and final, the facts

15  will show that it was the Union that refused to consider the

16  company's proposal, as it was the Union that failed to modify

17  its own proposals; and it was the Union that insisted that the

18  company use the Red Book as a starting place for the parties'

19  negotiations.  So, in effect, in the summer of 2015, the company

20  was bargaining against itself because of the Union's take-it-or-

21  leave-it, bad faith bargaining position.  Further demonstrating

22  the Union's bad faith is the fact that it was the one that

23  cancelled multiple bargaining sessions.

24      So, on July 31, the company ultimately gave the Union a

25  final offer.  However, the facts will show that it only did so

1 because the Union asked for it.  And, in fact, after the company

2 gave the Union its final offer, but before it unilaterally

3 implemented its last, best and final, it had continued

4 negotiations with the Union for approximately eight more

5 sessions over approximately five more days.

6     And after giving the Union its final offer on July 31st,

7 during the August 17th bargaining session, the Union -- the

8 facts will show that the Union said that there would be no more

9 meaningful discussion unless the company agreed to start

10 bargaining off the Red Book.  Accordingly, on August 18th, the

11 company provided the Union with its last, best and final after

12 it was clear, from the Union's entrenched bargaining position,

13 that further negotiations were going to be futile.  Notably, the

14 company's last, best and final contained a host of provisions

15 that were beneficial for employees, including substantial wage

16 increases and a vacation pay-out that created a windfall for

17 many employees.

18     Now, although the Union ultimately did start revising its

19 proposals, it only did so after the company gave it its last,

20 best and final.  After the company gave it its last, best and

21 final, and the company started modifying its proposals, the

22 company -- those proposals were based upon the Red Book -- and

23 the company indicated that it wasn't willing to consider those

24 because we had already made the decision that the Red Book was

25 not a contract that was operationally in the best interests of

1    the company.  So after the company gave the Union its last, best

2    and final, the parties still began continued negotiations for

3    approximately one more month before it unilaterally implemented

4    it.

5         And, on September 9th, the Union said the parties were

6    "done" -- quote, unquote -- when the company reiterated that its

7    last, best and final was on the table.  On September 10th, the

8    facts will show that the Union again said that the parties were

9    done when the company would not agree to bargain from the Red

10   Book.  And on September 11th, the facts will show that the Union

11   told the company that each party could do what they want.

12        As a result, the company unilaterally implemented its last,

13   best and final on September 14th.  Accordingly, it is the

14   company's position that the facts will show that at all times it

15   has bargained in good faith with the Union, and only

16   unilaterally implemented its last, best and final when it was

17   clear that the parties were at impasse.

18        So let's turn now to the allegations in the Consolidated

19   Complaint and its amendments, related to the post-impasse

20   implementation.  So, specifically, the Consolidated Complaint

21   and its amendments allege that the company deviated from the

22   last, best and final on assigning overtime, scheduling hours,

23   bidding job openings and scheduling vacations.  However, the

24   facts will show that the company acted fully consistently with

25   the last, best and final, in that what, in effect, the Board and

1  the Union are complaining about are, at their core, nothing more

2  than contract interpretation issues, over which the Union can,

3  and has, filed grievances.  In fact, the facts will show that

4  the company and the Union actually resolved many of these

5  disputes through the grievance process.  Accordingly, it is the

6  company's position that the Union's claims related to the

7  company's post-implementation conduct are wholly without merit.

8       Finally, to turn to some of the allegations related to the

9  stray 8(a)(1)'s at issue, the Consolidated Complaint and its

10  amendments attributes unlawful conduct based upon comments

11  allegedly made by David Roseberry, Brad Bumba, David Vislisel,

12  Jon Swails, and Ken Meadows.  With regard to Mr. Roseberry, Mr.

13  Vislisel, Mr. Swails, and Mr. Bumba, the facts will show that

14  they had no role in or knowledge of the substance of the

15  parties' bargaining; and the facts will show that they did not

16  make the comments that were attributed to them.  In fact, they

17  had no way to even know what was going on at the bargaining

18  table.

19       With regard to Mr. Roseberry, even as alleged by Counsel

20  for the General Counsel's own witnesses, however, the facts have

21  shown that he made -- that it is alleged that he made these

22  comments to two union stewards, not to any rank-and-file

23  members, and that the comments were nothing more than Mr.

24  Roseberry's expressions of hope that the parties will hopefully

25  be able to reach an agreement.  And that the Union -- that the

1   hourly employees talked to the Union's leadership to make sure

2   that they were educated about the parties' current bargaining

3   proposals.

4        With regard to Mr. Bumba, the evidence will show an

5   employee accused him of thinking that the Union was at fault for

6   a lack of movement in negotiations.  But Mr. Bumba specifically

7   said that the Union was not at fault, and also quickly excused

8   himself from that conversation.

9        And, finally, with regard to Mr. Meadows -- about which we

10  heard much testimony last week -- the facts will show that it is

11  not unusual for Mr. Meadows to travel to a newly purchased

12  facility in order to get to know the people there, as I already

13  discussed.  And the facts will show that, during Mr. Meadows'

14  visit in April of 2007, he had what nothing more were innocuous

15  chats with various people around the facility.  That Mr. Meadows

16  did not directly bargain with these employees, and nothing that

17  came out of those conversations impacted, in any way, the

18  company's bargaining proposals.  If anything, Mr. Meadows should

19  be applauded for his efforts to develop a rapport with the

20  workers and the management team and the Union leadership at the

21  Cedar Rapids plant.  And so, certainly the facts will also show,

22  at no point during Mr. Meadows' visit, did he ever threaten

23  employees at all.

24       So, in sum, Your Honor, the company respectfully submits

25  that the facts will show that the company has more than

1    satisfied its obligations to bargain in good faith, and that it

2    only unilaterally implemented its last, best and final when it

3    was clear that the parties were at impasse.

4        The company denies that it has engaged in any unlawful

5    conduct, and that the Counsel for the General Counsel are unable

6    to meet their burden of proof.  As a result, the company

7    respectfully requests that the Consolidated Complaint and its

8    amendments be dismissed in their entirety.

9        Thank you.

10    JUDGE CARISSIMI:  Thank you, Mr. Buttrick.

11    You may call your first witness.

12    MR. BUTTRICK:  Great.  The company --

13    MR. WIESE:  Your Honor?

14    JUDGE CARISSIMI:  Yes?

15    MR. WIESE:  I apologize for interrupting, Mr. Buttrick.

16    I would like to renew my request for the Jencks statements

17    in this case at this time.

18    JUDGE CARISSIMI:  The trial isn't over.

19    MR. WIESE:  Okay.

20    JUDGE CARISSIMI:  My position is that when the trial is

21    over, Respondent then must return them.

22    MR. WIESE:  Okay.

23    JUDGE CARISSIMI:  Because it is possible that there's

24    something in those affidavits that may aid them with respect to

25    the presentation of their case.

1          MR. WIESE:  Okay.

2          JUDGE CARISSIMI:  So, at the conclusion of the trial,

3    remind me, and I will direct the Respondent, on the record, to

4    then return the affidavits.

5          All right?

6          MR. WIESE:  Thank you, Your Honor.

7          JUDGE CARISSIMI:  You are welcome.

8          MR. BUTTRICK:  And if I may just go off the record for a

9    moment to retrieve our witness?

10         JUDGE CARISSIMI:  Certainly.

11         Let's go off the record.

12   (Off the record.)

13         JUDGE CARISSIMI:  On the record.

14         Counsel for the Respondent, you may call your first

15   witness.

16         MR. BUTTRICK:  Respondent calls Erwin Froehlich.

17         JUDGE CARISSIMI:  Mr. Froehlich, if you would please raise

18   your right hand?

19   (WITNESS SWORN:  ERWIN FROEHLICH.)

20         JUDGE CARISSIMI:  Please have a seat.

21         MR. BUTTRICK:  Mr. Froehlich, good morning.

22         THE WITNESS:  Good morning.

23                          DIRECT EXAMINATION

24   Q    BY MR. BUTTRICK:  Could you please spell your name for the

25   record?

1  A    Sure.  First name is E-R-W-I-N, last name is F-R-O-E-H-L-I-

2  C-H.

3  Q    And Mr. Froehlich, where are you employed?

4  A    I am employed at Ingredion.

5  Q    And what is your role?

6  A    I am the plant manager.

7  Q    And how long have you been employed with Ingredion or its

8  predecessor?

9  A    I have been at the Cedar Rapids site for 10 years.

10  Q    And what are some of your duties at the plant manager?

11  A    I am responsible for the major functions at the site, which

12  include production, maintenance, quality, environmental health

13  and safety, human resources, and have indirect responsibility

14  for financial reporting.

15  Q    Are you the custodial of records for the operational

16  documents that are maintained, produced, and kept at the

17  facility?

18  A    Yes, I am.

19  Q    And so, briefly, what does the Cedar Rapids plant do?

20  A    The Cedar Rapids site is a corn wet milling plant.  At a

21  corn well milling facility, in the front half of the plant corn

22  is brought in, off the cob.  It is soaked in a mild acid

23  solution for a little over a day, and then the components of the

24  corn are separated -- the starch, fiber, meal, and protein.  The

25  meal, protein, and fiber are sold as agricultural byproducts,

1   and the starch is further processed into higher value-added end

2   products.  Now, at our site in particular, about half of the

3   starch is processed into cornstarch products for both food and

4   industrial use, and the other half of the starch is processed

5   into fuel-grade ethanol, which is an octane-enhancer in

6   gasoline.

7   Q    Approximately how many employees work at the Cedar Rapids

8   plant?

9   A    Approximately 230.

10  Q    And of those, approximately how many are represented by the

11  Union?

12  A    Approximately 165.

13  Q    Does the management at the Cedar Rapids plant keep

14  employees informed about what goes on at the plant?

15  A    Yes, we do.  There are discussions, on a daily basis,

16  verbally, between management and shop floor employees.  There

17  are also postings on bulletin boards around the site.  And there

18  are also periodic open meetings with management that are

19  referred to as "InfoShares."

20  Q    And please describe, what is an "InfoShare"?

21  A    An InfoShare is a meeting where a member of management

22  stands up in front of other employees and, basically,

23  communicates on issues that are relevant at the time.

24  Q    And how long have InfoShares been occurring at the Cedar

25  Rapids plant?

1    A    InfoShares were occurring when I joined -- when I came to

2    the site, so more than 10 years.

3    Q    And are employees permitted to ask questions about work

4    during the InfoShares?

5    A    Yes, they are.  In general, they can ask questions as

6    topics are covered.  And then, at the end of the session, it is

7    thrown open for questions on any topic.

8    Q    Who is invited to attend InfoShares?

9    A    All employees.

10   Q    Is it mandatory that they attend?

11   A    No, it is not.  It is strongly encouraged, but it is not

12   mandatory.

13   Q    So Ryan will come and hand you what has been marked as

14   Penford Exhibit 63.

15   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 63.)

16   (Witness proffered document.)

17   Q    BY MR. BUTTRICK:  Erwin, what is Penford Exhibit 63?

18   A    It appears to be the announcements of various InfoShares.

19   Q    And are these documents produced and kept in the normal

20   course of the company's business at the Cedar Rapids facility?

21   A    Yes, they are.

22   Q    And do they accurately reflect info meeting -- InfoShare

23   meeting dates and times?

24   A    Yes, they do.

25        MR. BUTTRICK:  So I move to admit Penford Exhibit 63.

1      JUDGE CARISSIMI:  Is there any objection to Respondent's

2  Exhibit 63?

3      MR. WIESE:  No objection, Your Honor.

4      JUDGE CARISSIMI:  Respondent's 63 is admitted.

5  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 63.)

6      MR. BUTTRICK:  And so looking at Penford Exhibit 63, I

7  notice that on the March 12th one, which is found on --

8  actually, if we could go off the record for just a moment?

9      JUDGE CARISSIMI:  Off the record.

10  (Off the record.)

11      JUDGE CARISSIMI:  On the record.

12  Q    BY MR. BUTTRICK:  Mr. Froehlich, if you can turn to

13  PF10156, which says it was posted on March 12, 2015?   Do you

14  see that?

15  A    Yes, I do.

16  Q    So I see there's a reference in this one to Catherine

17  Zimmerman and Robert Stefansic.  Do you see that?

18  A    Yes

19  Q    Who are they?

20  A    Catherine Zimmerman was the project manager for Ingredion

21  on the project to integrate Penford into the Ingredion

22  organization.  Robert Stefansic is the senior VP of operational

23  excellence sustainability, and the chief supply officer of

24  Ingredion corporate.  He reports to Ilene Gordon, the CEO.

25  Q    Were they involved, in any way, with collective bargaining

1 negotiations?

2 A    No, they were not.

3 Q    Why did they come to the plant?

4 A    The sale of Penford to Ingredion had closed the week

5 before, and there were what were called "day one activities"

6 that were held at every Penford site.  And Catherine and -- Ms.

7 Zimmerman and Mr. Stefansic were the two executives that visited

8 the Cedar Rapids site.

9 Q    And did they participate in an InfoShare?

10 A    They led the InfoShare.

11 Q    Did you attend that InfoShare?

12 A    Yes, I did.

13 Q    Did employees ask questions during that InfoShare?

14 A    Yes, they did.

15 Q    What were the nature of those questions?

16 A    The presentations centered, basically, around who Ingredion

17 was, their manufacturing processes, their businesses.  So there

18 were general questions related to what Ingredion made.  There

19 was a question as to how big the Cedar Rapids facility was

20 compared to other wet milling facilities in the Ingredion

21 network.  There was questions in regard to some of the products

22 that Ingredion produced.  Those are the ones I recall.

23 Q    Okay.  Now, as a plant manager, do you know when the most

24 recent Penford/Union collective bargaining agreement was set to

25 expire?

1  A    Yes, it expired on August 1, 2015.

2  Q    Okay.  And is this contract commonly called the "Red Book"?

3  A    Yes, it is.

4  Q    So if you can refer to Joint 16, which is the Red Book?

5  (Witness proffered document.)

6  Q    Do you have that in front of you?

7  A    Yes, I do.

8  Q    Do you recognize this to be the contract that expired on

9  August 1, 2015?

10  A    Yes, I do.

11  Q    And, as the plant manager, are you aware whether the Red

12  Book had a no-strike clause?

13  A    Yes, it had a no-strike clause.

14  Q    And, as the plant manager, did you think it was possible

15  that the Union would strike if the parties did not reach a

16  contract upon the contract's expiration?

17  A    Yes, I did.

18  Q    And had you ever heard of that happening before?

19  A    Yes, it happened in 2004.

20  Q    And are you aware how long the strike lasted in 2004?

21  A    I believe the strike lasted roughly 11 weeks.

22  Q    And until 2015, had the parties reopened and renegotiated

23  the entire contract since that time?

24  A    No, they had not.  There were several extensions negotiated

25  that just centered around specific contract issues.

1  Q    Now, in the summer of 2015, did any Union employees tell

2  you directly that they were planning on striking?

3  A    I -- no, they did.

4  Q    Did you receive an e-mail, from any employee, saying that

5  they were planning on striking?

6  A    I received an e-mail, from a bargaining unit employee,

7  implying that there was going to be picketing in my

8  neighborhood.  And, again, alluding to the fact that it could be

9  --

10      MR. WIESE:  Objection, Your Honor, hearsay.

11      JUDGE CARISSIMI:  Overruled.

12      Please continue.

13      THE WITNESS:  That it could be a small crowd or a large

14  crowd, and stating in the e-mail that, "When people are backed

15  against a wall, all bets are off."

16  Q    BY MR. BUTTRICK:  And do you remember the name of the

17  person who sent you this e-mail?

18  A    Yes, it was Dennis James.

19  Q    Okay, so I am -- Ryan will hand you what has been marked as

20  Penford Exhibit 89.

21  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 89.)

22  (Witness proffered document.)

23  Q    BY MR. BUTTRICK:  Mr. Froehlich, what is Penford Exhibit

24  89?

25  A    It is a copy of the e-mail I was just talking about.

1   Q    And this was the e-mail that you received?

2   A    That is correct.

3       MR. BUTTRICK:  I move to admit Penford Exhibit 89.

4       JUDGE CARISSIMI:  Is there any objection to Respondent's

5  89?

6       MR. WIESE:  No objection, Your Honor.

7       JUDGE CARISSIMI:  Respondent's 89 is admitted.

8  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 89.)

9   Q    BY MR. BUTTRICK:  Now, did the company prepare for a

10  possible strike if the Red Book were to have expired without the

11  parties reaching an agreement?

12   A    Yes, we did.

13   Q    And what role did you play in those preparations?

14   A    I was the manager that was ultimately accountable for the

15  planning and execution of the plan.

16   Q    And so why did the company prepare for a possible strike if

17  the Red Book were to expire in the summer of 2015?

18   A    Well, there were two reasons.  One of which being that the

19  bargaining -- the collective bargaining agreement that was going

20  to expire had a clause in it that the Union employees were

21  allowed to leave the plant and vote, for a period of time.  So

22  if we wanted to keep the plant running during that period of

23  time, we had to make plans to staff it.  And then, also, based

24  on the fact that the Union did strike for an extended period in

25  2004, we knew it was a distinct possibility.

1  Q    Did you consider scaling back the Cedar Rapids operations,

2  and not making all of its products, if a strike were to happen?

3  A    We did an analysis of every scenario, from a complete

4  shutdown during a strike, to maintaining operations of all

5  product lines at full rate.

6  Q    And what did you conclude?

7  A    So, with regard to shutting down the starch products, we

8  rejected that option, because essentially 100 percent of our

9  starch business is contracted.  So we had to deliver against

10  those contracts.  We did investigate buying in product from

11  competition, and we couldn't buy nearly enough to satisfy all

12  the contracts.

13      Now, in 2004, when we ran the plant during a strike, the

14  plant performed very poorly, especially in the first three weeks

15  of the strike.  We failed to deliver against our contracts and

16  ultimately were sued by a major customer.  And the damages that

17  -- the court ruled in the favor of the customer, and the damages

18  against the company were in excess of $3 million.  So that

19  option was rejected.

20      Now, with regard to the ethanol, we did look at a complete

21  shutdown of ethanol, but that would have reduced the grind

22  demand on the plant to about 50 percent of capacity.  The grind

23  is a very cost-intensive area of the plant, very maintenance

24  intensive, very energy intensive, and to have totally shut down

25  ethanol would have thrown us into a non-competitive situation

1  with regard to costs.

2  Q    Does the plant typically run 24 hours a day, 7 days a week?

3  A    Yes, it does.

4  Q    Was there a plan for operating the plant without bringing

5  employees in if there was to be a strike?

6  A    Yes, there was.  What we did was divided the plant into

7  three sections.  The first tier of employees were Cedar Rapids-

8  based employees that were in management, non-bargaining unit,

9  that were based in plant operations.  Either they were

10  production managers or they were maintenance coordinators or

11  they were process engineers that were dedicated to certain

12  operating departments.  Again, people who were fully trained in

13  environmental health and safety, site-specific aspects, and also

14  were very, very familiar with particular operations.

15      The second tier of employees were Cedar Rapids-based

16  employees, non-bargaining unit, but were in the office, were

17  either in human resources, or accounting, or finance,

18  departments like that; that, again, were accessible

19  geographically, but were not trained up in all of the

20  environmental health and safety aspects of the operation, and

21  maybe had little, if any, familiarity with particular

22  operations.

23      The third tier of employees were other Ingredion employees

24  that were based outside of Cedar Rapids, but had background in

25  operations, maybe were attached to starch drying, grinding,

1  utilities, operations like that, at other sites.  Again, in this

2  case, very familiar with the operation -- not at all, in some

3  cases, familiar with our particular equipment, and not familiar

4  with site-specific environmental health and safety topics -- but

5  trained up in basic policies that Ingredion had.

6  Q    And so you referenced training, what was the plan for

7  training the employees who would be present to work at the plant

8  if there was a strike?

9  A    The training was based on those tiers.  First of all, we

10  used the tier one employees -- the ones that were already

11  attached to operations based in Cedar Rapids -- to do a thorough

12  review of the environmental health and safety policies, and

13  standard operating procedures, and process flow diagrams, to

14  make sure they were up-to-date and accurate.

15        We then brought in the Cedar Rapids-based employees -- for

16  lack of a better term -- from the office, and we trained up the

17  tier two employees, utilized those tier one employees.

18        Lastly, we brought in the tier three employees, the ones

19  from other sites.  We did classroom environmental health and

20  safety training on site-specific topics.  We did classroom

21  training on the process flow diagrams and the standard operating

22  procedures, and then we did brief walks out in the field so that

23  they could be exposed to the specific, unique equipment that we

24  had at Cedar Rapids.

25  Q    So Ryan will be handing you what has been marked as Penford

1   Exhibit 64.

2   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 64.)

3   (Witness proffered document.)

4   Q    BY MR. BUTTRICK:  What is Penford Exhibit 64?

5   A    This is the agenda for the training of the out-of-town

6   employees that we brought in.

7   Q    And were you involved in this training?

8   A    Yes, I was.

9   Q    And is this document customarily kept in the regular course

10  of the company's business at the Cedar Rapids plant?

11  A    Yes, it is.

12       MR. BUTTRICK:  I move to admit Penford Exhibit 64.

13       JUDGE CARISSIMI:  Any objection to Respondent's 64?

14       MR. WIESE:  Could I briefly voir dire, Your Honor?

15       JUDGE CARISSIMI:  You may.

16                         VOIR DIRE

17  Q    BY MR. WIESE:  Mr. Froehlich, when was this document

18  created?

19  A    In early July 2015.

20  Q    Do you recall when in early July, any specifics beyond that

21  date?

22  A    I don't recall the specific date.

23  Q    Did you create this document?

24  A    I didn't create it personally.  It was created by a member

25  of the strike contingency team, and submitted to me for review.

1    Q    Do you know who created it?

2    A    I don't recall.

3         MR. WIESE:  No objection, Your Honor.

4         JUDGE CARISSIMI:  Respondent's 64 is admitted.

5    (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 64.)

6                        CONTINUED DIRECT EXAMINATION

7    Q    BY MR. BUTTRICK:  Where did the company conduct the

8    classroom training?

9    A    The classroom training was conducted in the office

10   building, which is up along First Street in front of the

11   manufacturing plant.

12   Q    Is that office building near any bargaining unit employees?

13   A    No, it is not.

14   Q    Why did the company take people out onto the plant floor?

15   A    People were taken out onto the plant floor because,

16   although, in some cases, employees -- contingency employees were

17   -- had been exposed to the process steps at other facilities,

18   they had not seen our particular equipment.  Again, our -- some

19   of our equipment, drying equipment and dewatering equipment is

20   very, very, unique compared to the other facilities.  They

21   hadn't seen it before.  Again, the piping systems, the

22   instrumentation systems are all unique from site to site, and

23   you can't get a full picture of it by just looking at it on a

24   piece of paper on a process flow diagram.

25   Q    How much of the training was classroom versus the walk-

1 around?

2 A    Well, the environmental health and safety training was 100

3 percent classroom.  The process training was two-thirds

4 classroom and one-third field.

5 Q    Did you instruct any of the trainees on whether or not they

6 were to do any bargaining unit work?

7 A    The trainees were specifically instructed not to do any

8 bargaining unit work.

9 Q    How did the company train the contingency workers for use

10 of equipment like forklifts?

11 A    With regard to forklifts, we took the employees that were

12 going to be operating the forklifts, took them to a warehouse,

13 again, in a remote location of the warehouse, tried to be as

14 inconspicuous as possible, and then utilized a manager from

15 Cedar Rapids, that had been previously qualified to do the

16 training, to then train the trainees.

17 Q    Did you instruct the contingency workers about how they

18 were to act around the bargaining unit employees who were

19 working?

20 A    Yes, we were fortunate.  We had been working with an

21 organizational development consultant at the time, that through

22 working with other clients had acquired licenses to deliver NLRA

23 awareness training.  And that training was delivered, in detail,

24 to all strike contingency workers.

25 Q    How was that training delivered?

1  A    It was delivered by the consultant using a PowerPoint deck.

2  Q    And why did you want to train the contingency workers on

3  how to comply with the NLRA?

4  A    Well, first of all, we had to be compliant with the Act.

5  And second of all, we kept stressing to employees that these --

6  we were potentially replacing other employees' positions, and,

7  again, we needed to maintain respectful and professional conduct

8  between the groups.

9  Q    So Ryan will hand you what has been marked as Penford

10  Exhibit 47.

11  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 47.)

12  (Witness proffered document.)

13  Q    BY MR. BUTTRICK:  Mr. Froehlich, what is Penford Exhibit

14  47?

15  A    It is a copy of slide deck from the training that was

16  delivered.

17  Q    And did you attend this training?

18  A    Yes, I did.

19  Q    And is this document maintained in the customary course of

20  the company's business?

21  A    Yes, it is.

22  Q    Does it accurately reflect the training that occurred?

23  A    Yes.

24      MR. BUTTRICK:  I move to admit Penford Exhibit 47.

25      JUDGE CARISSIMI:  Any objection to Respondent's 47?

1      MR. WIESE:  Voir dire, briefly, Your Honor?

2      JUDGE CARISSIMI:  You may.

3                          VOIR DIRE

4   Q    BY MR. WIESE:  Mr. Froehlich, do you know when this

5   document was created?

6   A    No, I don't.

7   Q    Do you know when this document was presented to the people

8   that you were talking about at the Ingredion facility?

9   A    Yes, I do.  There was -- it was presented in, I believe,

10  two separate sessions during July of 2015.

11  Q    Do you know what part of July?

12  A    I know one of the sessions was during the second half of

13  July, and the first session was -- I don't recall exactly.

14  Q    Okay.

15     MR. WIESE:  No objection, Your Honor.

16     JUDGE CARISSIMI:  Respondent's 47 is admitted.

17  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 47.)

18                  CONTINUED DIRECT EXAMINATION

19  Q    BY MR. BUTTRICK:  Did the company bring in any equipment

20  for purposes of operating during the strike?

21  A    Yes, we did.

22  Q    What did you bring in?

23  A    We brought in a food trailer.  And the reason we brought in

24  the food trailer is a learning, from the 2004 strike, that,

25  again, the plan for providing food for the contingency workers

1    did not work well at all.  So we decided to do something

2    different this time, and what we thought we would do is prepare

3    the meals on-site, and that was what the trailer was brought in

4    for.  And it was set right behind the office building in an

5    inconspicuous location.

6        The -- we also brought in several sleeping trailers.

7    Again, based on the 2004 strike, we were uncertain as to what

8    the security would be with regard to workers crossing the picket

9    line repeatedly.  And just to plan for any contingency, we

10   brought in those trailers.

11   Q    Does the plant customarily have security?

12   A    Yes, we do.

13   Q    Did the company bring in any additional security when it

14   brought in the trailers?

15   A    Yes, we did.

16   Q    Please explain.

17   A    We supplemented the existing on-plant security force for

18   several reasons.  First of all, during the 2004 strike, there

19   are a number of gates to the plant, and there were instances

20   where picketers attempted to enter the plant through gates other

21   than the ones that are typically open.  So we added security to

22   patrol those additional gates.

23       JUDGE CARISSIMI:  Mr. Froehlich, you did not work at the

24   facility in 2004, is that correct?

25       THE WITNESS:  That is correct.

1    JUDGE CARISSIMI:  What is the basis for your testimony

2  about what happened during the strike in 2004?

3    THE WITNESS:  My testimony is based on feedback from others

4  on the planning team that were present in 2004.

5    JUDGE CARISSIMI:  All right, thank you.

6    You may continue.

7  Q    BY MR. BUTTRICK:  If you can just finish your response, Mr.

8  Froehlich?

9  A    Yeah.  The second reason we brought in additional security

10  was the -- to patrol the -- or to monitor the trailers that we

11  brought in.  Thirdly, we had a plan to bring in the contingency

12  workers from remote sites, from remote parking sites and from

13  hotels, so we had security based there.  And, lastly, we had

14  security assigned to the homes of several key managers.

15  Q    Did the security contractors -- were they armed?

16  A    No, they weren't.

17  Q    Did they have any body armor on them?

18  A    No, they didn't.

19  Q    What were they wearing?

20  A    They were wearing street clothes, polo shirts and dress

21  slacks.

22  Q    Did the company ultimately have to use contingency workers

23  to operate the plant?

24  A    Yes, we did.  We operated the plant for, I believe, 10 to

25  12 hours on the -- on August 1st, while the Union voted on a

1 potential new collective bargaining agreement.

2 Q    In the summer of 2015, did you send in letters to employees

3 during the bargaining negotiations?

4 A    Yes, I did.

5 Q    And if you can reference what is already in evidence as

6 General Counsel Exhibits 20, 26, 32, and 36?

7 (Witness proffered document.)

8       MR. BUTTRICK:  Does everyone have them in front of them?

9       JUDGE CARISSIMI:  General Counsel, do you have them?

10       MR. WIESE:  Yes, Your Honor.

11       JUDGE CARISSIMI:  All right, very good.

12       You may proceed, Mr. Buttrick.

13 Q    BY MR. BUTTRICK:  Mr. Froehlich, are these the letters you

14 sent?

15 A    Yes, they are.

16 Q    Okay.  And so why did you send these letters?

17 A    We sent the letters because we had heard input from

18 bargaining unit employees regarding the company's positions on

19 the collective bargaining agreement that did not accurately

20 reflect those positions.

21 Q    And, in these letters, did you ever ask employees to talk

22 to the company about the negotiations?

23 A    No, we did not.

24 Q    In these letters, did you ever ask employees to talk to the

25 company about any terms and conditions of employment?

1  A    No, we didn't.

2  Q    Did you say whom the employee should talk to if they had

3  questions about the negotiations?

4  A    We advised employees to get in touch with their Union

5  representative if they had any questions or concerns.

6  Q    And I noticed the July 17th letter, if you can turn to that

7  one, which is GC Exhibit 20?  It references gap insurance.  What

8  is gap insurance?

9  A    Gap insurance is the ability for employees to obtain health

10 care under the company program when -- if they choose to retire

11 prior to age 65.

12 Q    And why did you reference gap insurance in this letter?

13 A    We references gap insurance because we had heard input from

14 bargaining unit employees that the company's position was that

15 we wanted to do away with gap insurance.

16 Q    And were you on the company's bargaining team?

17 A    Yes, I was.

18 Q    Was the company attempting to do away with gap insurance?

19 A    No, we were not.

20 Q    Please explain?

21 A    We were intending to actually extend gap insurance to

22 employees that were not covered under the -- covered with gap

23 insurance, in addition to maintaining it for employees that

24 already were.

25 Q    Looking at the July 17th letter, which is GC Exhibit 20, I

1  noticed you referenced something about removing classifications

2  from the bargaining unit, do you see that?

3  A    Yes, I do.

4  Q    And why did you write this?

5  A    I wrote that because I had actually had a bargaining unit

6  employee tell me that he understood that we were trying to do

7  away with that classification.

8  Q    And was the company attempting to do away with any

9  classifications of bargaining unit employees?

10  A    No, we were not.

11  Q    And if you can just please explain?

12  A    We were intending to maintain all of the current

13  classifications.

14  Q    Does the company have technical and professional employees?

15  A    Yes, we do.

16  Q    Who are they?

17  A    We have a fairly substantial onsite engineering team to do

18  both process engineering, or process support, as well as capital

19  projects.

20  Q    And is that engineering team in the bargaining unit?

21  A    No, they are not.

22  Q    So Ryan will hand you what has been marked as Penford

23  Exhibit 31.

24  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 31.)

25  (Witness proffered document.)

1  Q    BY MR. BUTTRICK:  And, Mr. Froehlich, what is Penford

2  Exhibit 31?

3  A    These are a series of organizational charts that start back

4  when -- start back in the Penford organization, and then proceed

5  to the organization under Ingredion.

6  Q    And are these records regularly kept as a part of Penford's

7  -- or, excuse me -- Ingredion, Cedar Rapids' business?

8  A    Yes, they are.

9  Q    And do they accurately reflect the organization of the

10  institution?

11  A    Yes, they do.

12  Q    Are you the custodian for this record?

13  A    Yes, I am.

14       MR. BUTTRICK:  I move to admit Penford Exhibit 31.

15       JUDGE CARISSIMI:  Is there any objection to Respondent's

16  31?

17       MR. WIESE:  No objection, Your Honor.

18       JUDGE CARISSIMI:  Respondent's 31 is admitted.

19  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 31.)

20  Q    BY MR. BUTTRICK:  So if you can, looking at Penford Exhibit

21  31, turn to its seventh page -- and I will tell you what page

22  number that is.  I believe it is 7712.  Are you there?

23  A    I am there.

24  Q    Is the head of the engineering department listed on this

25  document?

1    A    Yes, it is John Foubert.

2    Q    And do any bargaining unit members work in that department?

3    A    No, they don't.

4    Q    So Ryan will hand you what is marked as Penford Exhibit 32.

5    (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 32.)

6    (Witness proffered document.)

7    Q    BY MR. BUTTRICK:  And what is Penford Exhibit 32?

8    A    This is referred to as the plant lineup.  This shows where

9    every bargaining unit employee is assigned, by classification

10   and by shift.

11   Q    And are plant lineups regularly kept as a part of the

12   company's Cedar Rapids business?

13   A    Yes, they are.

14   Q    And does this accurately reflect, at the moment in time it

15   is printed, what the plant lineup is?

16   A    Yes.

17   Q    And are you the custodian of all the plant lineup records

18   at the company?

19   A    Yes, I am.

20        MR. BUTTRICK:  I move to admit Penford Exhibit 32.

21        JUDGE CARISSIMI:  Is there any objection to Respondent's

22   32?

23        MR. WIESE:  Voir dire, briefly, Your Honor?

24        JUDGE CARISSIMI:  You may.

25                         VOIR DIRE

1    Q    BY MR. WIESE:  Mr. Froehlich, if you turn to the last page

2    of this document, PF6694, and I guess, comparing it to the other

3    pages in this document, I notice that they are all dated in the

4    lower right-hand corner, do you see that?

5    A    Yes, I do.

6    Q    Is there a date on the last page of this document?

7    A    I don't see a date.

8    Q    Do you know when this last page -- when this lineup would

9    have been for -- what date?

10   A    I am not certain.

11        MR. WIESE:  Your Honor, I would object to the last page of

12   this document. It is -- without further foundation or an

13   understanding of when this page actually applies to.  I don't

14   know how we can determine its relevance.

15        JUDGE CARISSIMI:  It is true that, without a date, it is

16   not very meaningful.  I am going to admit the document in its

17   entirety, but your point in well taken.  I can't, from the face

18   of this -- and the Witness doesn't know -- attribute what period

19   of time this reflects the lineup.

20        So Respondent's 32 is admitted.

21   (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 32.)

22                    CONTINUED DIRECT EXAMINATION

23   Q    BY MR. BUTTRICK:  So, Mr. Froehlich, what do these

24   documents, Penford Exhibit 32, show?

25   A    They show the classifications.  They show three production

1   departments, starch service, grind, and specialty.  And then it

2   also shows the maintenance department and the janitor.

3   Q    And for the period of time noted on the document, do they

4   capture all bargaining unit employees?

5   A    Yes, they do.

6   Q    Are any engineering employees listed on these plant

7   lineups?

8   A    No.

9   Q    Are any of the departments, listed on the plant lineups,

10  production departments?

11  A    Yes, starch/service, grind, and specialty are the

12  production departments.

13  Q    And are any of them maintenance departments?

14  A    Yes, maintenance and janitor.

15  Q    And are all bargaining unit employees working in either

16  production or maintenance jobs?

17  A    Yes.

18  Q    Are any bargaining unit employees working in technical or

19  professional jobs?

20  A    No.

21  Q    And so which jobs at the plant are technical and

22  professional?

23  A    Again, those are the engineering jobs.

24  Q    Now, in the plant lineup, I see there is a classification

25  that is noted under starch/service called "Lab Tech," do you see

1  that?

2  A    Yes.

3  Q    Is a lab tech a technical job?

4  A    No, it is in the starch/service production department.

5  Q    Okay.  You referenced a moment ago that you participated in

6  the parties' bargaining in the summer of 2015.  Did you take

7  notes of those bargaining sessions?

8  A    Yes, I did.

9  Q    And were those notes taken at the time that the sessions

10  were occurring?

11  A    Yes.

12  Q    Okay.  So Mr. Funk will hand you what is marked as Penford

13  Exhibit 66.

14  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 66.)

15  (Witness proffered document.)

16  Q    BY MR. BUTTRICK:  And what is Penford 66?

17  A    These are my notes from the bargaining sessions in the

18  summer of 2015.

19  Q    And do they accurately reflect the sessions that you

20  attended?

21  A    Yes.

22      MR. BUTTRICK:  I move to admit Penford Exhibit 66.

23      JUDGE CARISSIMI:  Any objection to Respondent's 66?

24      MR. WIESE:  No objection, Your Honor.

25      JUDGE CARISSIMI:  Respondent's 66 is admitted.

1    (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 66.)

2        MR. BUTTRICK:  I have nothing further for Mr. Froehlich.

3        JUDGE CARISSIMI:  Very good.

4        Cross-examination by the General Counsel?

5        MR. WIESE:  Yes, Your Honor.  Could I have 15 minutes?

6        JUDGE CARISSIMI:  Yes, you may.

7        MR. WIESE:  Thank you.

8        JUDGE CARISSIMI:  We will be in recess for 15 minutes.

9    (Brief recess taken.)

10       JUDGE CARISSIMI:  On the record.

11       General Counsel, you may cross-examine.

12       MR. WIESE:  Good morning, Mr. Froehlich.

13       THE WITNESS:  Good morning.

14       MR. WIESE:  My name is Tyler Wiese, I am an attorney with

15   the National Labor Relations Board.

16                    CROSS-EXAMINATION

17   Q    BY MR. WIESE:  Mr. Froehlich, I would like to direct your

18   attention to Penford Exhibit 66, your bargaining notes?  Do you

19   have those notes in front of you?

20   A    Yes, I do.

21   Q    Okay, thank you.  Could you turn to page PF217?

22   A    Okay, I am at page 217.

23   Q    Okay.  The notes on this page, these indicate the company's

24   response to something, is that right?

25   A    That is correct.

1  Q    Do you recall what these are in response to?

2       MR. BUTTRICK:  I am just going to object that that is

3  beyond the scope of direct.

4       JUDGE CARISSIMI:  The notes were admitted, so cross-

5  examination on the notes is fair.

6       THE WITNESS:  These were responses to the original proposal

7  by the Union.

8  Q    BY MR. WIESE:  These are the company responses, is that

9  right?

10 A    That is correct.

11 Q    Okay.  And these notes represent the totality of those

12 responses?

13 A    I believe they do.

14 Q    Turning over to the next page, PF218?

15 A    Okay.

16 Q    Where it says, "company response to above"?  Do you see

17 where I am at on the document?

18 A    Yes.

19 Q    Is that also a company response to a Union proposal?

20 A    Yes, it is.

21 Q    And the two things that you have written below that, those

22 are the two things that you highlighted regarding the company's

23 response to the Union's proposal?

24 A    That is correct.

25 Q    I would like to direct your attention to PF229?

1   A    Okay.

2   Q    Below the "1345," in the middle of the page next to the

3   "U"?  Do you see that?

4   A    Yes.

5   Q    Okay.  The third hash mark down?

6   A    Yes.

7   Q    Does that -- am I reading it correctly, that it says that

8   the Union is requesting a copy of the attendance policy at that

9   time?

10  A    That is correct.

11  Q    And then the line next to that, is that Ken Meadows

12  speaking there?

13  A    Yes.

14  Q    And am I reading it correctly, that it says, "no change

15  from current"?

16  A    That is correct.

17  Q    And that line is in reference to the attendance policy, is

18  that right?

19  A    Yes.

20  Q    And the "current" that Mr. Meadows was talking about at

21  that time, that was the current collective bargaining agreement

22  that was still in effect, is that right?

23  A    That I don't recall.

24  Q    Okay.  Do you recall whether the "current" there was in

25  reference to the attendance policy?

1 A    The reason I am not sure is because we had already

2 discussed a proposed attendance policy, and, again, my comment

3 might have meant reference to that, or to the collective

4 bargaining agreement.  I am really not sure.

5 Q    Okay.  Looking at the top of that document, I notice some

6 cross-outs there.

7      JUDGE CARISSIMI:  What page, Mr. Wiese?

8      MR. WIESE:  Excuse me, page 229 -- PF229.

9      THE WITNESS:  Yes.

10 Q   BY MR. WIESE:  So it says, next to "banter," there's a word

11 that is crossed out there.  When did you cross out that word?

12 A    I believe while we were -- in the course of taking the

13 minutes.

14 Q    Is that the case for all the cross-outs on this page?

15 A    I am not certain about the one that is -- the cross-out

16 that is right below it.  I think I was -- that appears to be a

17 phone number for a person, another Ingredion employee.  And I am

18 not sure when I wrote that down.

19 Q    Are there any other -- all right, let's set the notes aside

20 for a second, Mr. Froehlich.  Regarding the company's conduct at

21 the bargaining table, who was responsible for presenting the

22 Union's -- or the company's proposals?

23 A    Ken Meadows.

24 Q    To your knowledge, was Mr. Meadows also the one who drafted

25 those proposals?

1   A    Yes.

2   Q    And he was responsible for making the changes in those

3   proposals, as well?

4        MR. BUTTRICK:  I am just going to object that this goes

5   beyond the scope of direct.  It is beyond notes.

6        JUDGE CARISSIMI:  Well, Mr. Froehlich testified he was

7   present during the bargaining, and his notes have been admitted,

8   so I think it is within the scope of the direct examination.  I

9   am going to permit the questions I have heard so far.

10  Overruled.

11       THE WITNESS:  Could you repeat the question, please?

12  Q    BY MR. WIESE:  Yes.  To your knowledge, was Mr. Meadows the

13  one responsible for making edits to the company's contract

14  proposals?

15  A    Mr. Meadows or others on the bargaining team.  I don't

16  believe he personally wrote all of the revisions.

17  Q    Okay.  Were you ever involved in making edits to contract

18  proposals for the company?

19  A    No, I wasn't.

20  Q    Do you know who the other individuals, who may have

21  assisted Mr. Meadows in doing this, were?  In making the changes

22  to the contract proposals?

23  A    I believe Levi Wood made some -- typed some revisions.

24  Q    Anybody else?

25  A    Not to my knowledge.

1   Q    Mr. Froehlich, had you ever attended collective bargaining

2   negotiations prior to these -- the negotiations in this case?

3   A    Yes.

4   Q    You had?

5   A    I have.

6   Q    Okay.

7   A    Yes, I have attended other -- I understand the question to

8   be:  Have I ever been part of other collective bargaining

9   negotiations?  The answer is yes.

10  Q    Okay.  Involving the Cedar Rapids facility here, or

11  different facilities?

12  A    Different facilities.

13  Q    Okay.  When were those negotiations?

14  A    Going back to the 1990s, I attended several regarding the

15  Corn Products, at the time, Argo facility.  And then in my

16  previous position, before I came to Cedar Rapids, I attended

17  several negotiations.

18  Q    What was your role in those negotiations?

19       MR. BUTTRICK:  Object.  That is beyond the scope of direct.

20       JUDGE CARISSIMI:  What is the relevance of that, sir?

21       MR. WIESE:  Just try to flesh out his role.  I mean, he has

22  spoken about -- I guess, I mean, he has answered the question

23  already, I am just trying to develop the scope of his --

24       JUDGE CARISSIMI:  I am going to sustain the objection to

25  your last question.

1    MR. WIESE:  Okay.

2  Q    BY MR. WIESE:  I would like to direct your attention to

3  General Counsel Exhibits 20, 26, 32 and 36.  Those are the

4  letters that were sent to employees under your signature.

5  A    I have those.

6  Q    Okay, thank you.  Mr. Froehlich, did you -- did you draft

7  General Counsel Exhibit 20, the July 17th letter?

8  A    Yes, I did.

9  Q    Did you draft General Counsel Exhibit 26?

10 A    Yes, I did.

11 Q    And did you draft General Counsel Exhibit 32?

12 A    Yes, I did.

13 Q    And did you draft General Counsel Exhibit 36?

14 A    Yes, I did.

15 Q    Turning your attention to General Counsel Exhibit 36.  Do

16 you recall when you drafted this letter?  This is the September

17 11th letter.

18 A    Right.  I believe I drafted this immediately prior to its

19 issue.

20 Q    Do you recall whether you drafted it before contract

21 negotiations on September 11th?

22 A    Oh, yes, I did, because contract negotiations on September

23 11th only lasted a few minutes.

24 Q    Did anyone review any of these letters before you sent them

25 out?

1    A    Yes.

2    Q    Was that the case for all of these letters?

3    A    Yes.

4    Q    Who reviewed them?

5    A    Mr. Buttrick.

6    Q    Did Mr. Meadows have any role in reviewing these letters

7    before they went out?

8    A    I am not sure.

9    Q    Mr. Froehlich, who was the bargaining unit employee who

10   spoke with you about doing away with the lab classifications?

11        MR. BUTTRICK:  Objection.  Mischaracterizes his prior

12   testimony.

13        JUDGE CARISSIMI:  Well, it didn't refer to prior testimony,

14   so I am going to overrule the objection.

15        Witness can answer.

16        THE WITNESS:  That would have been Leon Mehring.

17   Q    BY MR. WIESE:  Do you recall where that conversation took

18   place?

19   A    Took place in the quality control lab.

20   Q    And when did it happen?

21   A    I don't --

22   Q    To the best --

23   A    -- recall -- I don't recall the exact date.

24   Q    Do you recall -- did that conversation happen in June?

25   A    No.

1  Q    Did that conversation happen in the first week of July?

2  A    I don't recall.  It happened prior to the issuance of the

3  July 17th letter.

4  Q    Do you recall how soon that conversation occurred before

5  the issuance of the July 17th letter?

6  A    I don't recall.

7  Q    Did you initiate that conversation with the employee?

8  A    Yes, I did.

9  Q    Were you the one who brought up collective bargaining

10  negotiations in that conversation?

11  A    No, the reason I brought it up was because our quality

12  control manager had called me, earlier that day, somewhat upset

13  because she had heard from Mr. Mehring that we were doing away

14  with lab techs.  And that Mr. Mehring had told her we were doing

15  away with lab techs, and how come nobody had informed her about

16  that.  And I said, "Well, it is because we have no intention of

17  doing that."  Again, she told me that -- this would have been

18  Erica Schanbacher, our quality manager -- and she told me,

19  "Well, you better talk to Leon, because he believes you are

20  eliminating the lab techs."

21  Q    And then you went up to Mr. Mehring, you said the

22  employee's name was?

23  A    Yes.

24  Q    Okay.  And so you went up to Mr. Mehring, right?

25  A    Yes.

1 Q    And you spoke with him about whether the lab techs were

2 going to be eliminated?

3 A    I went up to Mr. Mehring and asked him if it was true that

4 he believed the lab tech classification was getting eliminated,

5 and he told me yes.

6 Q    And then you told him that that was not the case?

7 A    What I -- I believe what I actually told him was, "You need

8 to go talk to your Union representative again, because that is

9 not the company's position."

10 Q    And you didn't provide any information about what the

11 company's position was, during that conversation?

12 A    No.

13 Q    Remind me again, who was the name of that -- the quality

14 control manager who called you?

15 A    Her name is Erica Schanbacher.

16 Q    When Ms. Schanbacher called you, why didn't you just tell

17 her to talk with the employee directly?

18 A    I just felt I had to -- I had to approach him myself.

19 Q    And why did you feel that you had to approach him yourself?

20 A    Again, I just wanted to hear for myself whether that was

21 true or not, because, again, it wasn't reflective of what was

22 going on.

23 Q    Mr. Froehlich, at that time, are you aware -- at the time

24 this conversation occurred with the lab employee -- are you

25 aware of what the company was proposing to do with the

1  recognition clause in the collective bargaining agreement?

2  A    I was aware of the current position, yes.

3  Q    Okay.  And, in fact, that position was to change the

4  recognition language in the existing collective bargaining

5  agreement, isn't that right?

6  A    It was to offer different language, but not really change

7  what classifications were being represented.

8  Q    So it is your testimony that the language in the Employer's

9  contract proposal, at that time, was the same, substantially, as

10 what was in the collective bargaining agreement -- the existing

11 collective bargaining agreement?

12 A    My testimony is that the intent is the same.

13 Q    I am not asking about the intent; I am asking about the

14 language.

15      MR. BUTTRICK:  Objection:  asked and answered.

16      JUDGE CARISSIMI:  I am not so sure it has been answered.  I

17 will overrule it.

18      You can answer, sir.

19      THE WITNESS:  The language was different.

20 Q    BY MR. WIESE:  Mr. Froehlich, I would like to turn your

21 attention to the -- to General Counsel Exhibit 20.  That is your

22 July 17th letter to employees.

23 A    Okay.

24 Q    Who are the employees who spoke to you about gap insurance?

25 A    No employees spoke to me about gap insurance.

1   Q   And with regard to what the company was proposing for gap

2   insurance at that time, July 17th, are you aware of that

3   proposal?

4   A   Yes.

5   Q   What was it at that time?

6   A   I would have to refer to the proposal that was on the table

7   at the time to give you the specifics.

8   Q   Do you recall whether the gap insurance proposal on the

9   table, at that time, involved splitting the costs of the

10   premiums 50 percent with the company and 50 percent with the

11   employee?  Does that ring a bell?

12   A   I am aware of proposals like that.  I don't remember the

13   specifics of the proposal at that time.

14   Q   Are you aware of whether, at that time, the company was

15   intending to preserve the Medicare supplement insurance?

16   A   Yes, I am.

17   Q   Was the company intending to preserve that, at that time?

18   A   I believe, at that time, the company was intending to

19   eliminate the Medicare supplement.

20   Q   And the -- the drug card, are you aware of that benefit for

21   employees?

22   A   I am aware of that in general, I am not aware of the

23   specifics.

24   Q   Do you know whether the company was proposing to eliminate

25   the drug card as of July 17?

1   A    I don't recall.

2   Q    Mr. Froehlich, who -- you were not employed during the 2004

3   strike at the Cedar Rapids plant, is that right?

4   A    That is correct.

5   Q    Who did you speak with about the 2004 strike?

6   A    We had a number of employees, Phil Kluetz was one of the

7   people.  There were other managers that were around at that

8   time, also.

9   Q    Do you recall the names of those other managers?

10   A    Pat Drahos was the HR manager, at the time of the 2004

11   strike, spoke with her.  Tim Kortemeyer was the president of --

12   actually was in management at Penford at the time, he is now in

13   another role in Ingredion -- spoke to him.  Those are the names

14   I recall right now.

15   Q    When did you speak with Mr. Kluetz about the 2004 strike?

16   A    May -- May and June of 2015.

17   Q    And Ms. Drahos?

18   A    Same time period.

19   Q    And Mr. Kortemeyer?

20   A    Same time period.

21   Q    Did you have specific meetings, where you discussed the

22   2004 strike?

23   A    Not just specifically the strike.  All the conversations

24   happened in the context of formulating the contingency plan.

25   Q    During these discussions about the 2004 strike, Mr.

1  Kortemeyer never told you about any picket line violence at that

2  time, did he, in 2004?

3  A    He spoke about incidents at -- at the gates.

4  Q    Violent incidents?

5  A    Efforts to deter strikers -- or contingency workers from

6  crossing the line.

7  Q    Did he say --

8  A    He told me about a couple of incidents where the police

9  came in.

10 Q    Did he tell you about any arrests?

11 A    Yes.

12 Q    Were any of those arrests for violent activity?

13 A    I don't know what the charge was, I just know that there

14 were arrests.

15 Q    How many?

16 A    A handful.

17 Q    Can you be any more specific than "a handful"?

18 A    I don't recall.

19 Q    What, specifically, do you recall him telling you about

20 that?

21 A    I don't recall.

22 Q    What about in your conversations with Ms. Drahos?  Did she

23 mention any specific violent activities that you can recall at

24 this time?

25 A    She mentioned one arrest.

1   Q    What was that arrest for?

2   A    She didn't tell me.

3   Q    Did you ask her?

4   A    No, I just assumed it had to do with activity at the picket

5   line.

6   Q    And what about in your conversations with Mr. Kluetz?

7   A    He also told me about one arrest.

8   Q    Did he say whether that was for any violent activity?

9   A    He believed it was.

10  Q    What, specifically, do you recall him telling you about

11  that?

12  A    He believed it had to do with a police report, or filing a

13  police report for physical contact at the picket line.

14  Q    And he told you there was an arrest for that?

15  A    Yes.

16  Q    Mr. Froehlich, who was the consultant who conducted the

17  NLRA training for the company?

18  A    His name was Mike Robilotto.

19  Q    How long did that training last -- those -- strike that.

20  You mentioned there were two training sessions, is that right?

21  A    Um-hmm.

22  Q    How long was the first training session?

23       JUDGE CARISSIMI:  No. Hold it.  What was the answer to that

24  question, sir?

25       THE WITNESS:  The answer was yes.

1   Q    BY MR. WIESE:  How long was the first training session?

2   A    Each training session was roughly an hour, and there were

3   two sessions to make sure that anybody who couldn't go to the

4   first session was available to go to the second.

5   Q    Were there any follow-up training sessions, besides those

6   two hour-long sessions?

7   A    No.

8   Q    Was the training mandatory for all managers?

9   A    Yes.

10  Q    What type of analysis did you do in your process for strike

11  preparations?

12  A    Could you be more specific?

13  Q    When did you -- when did you begin strike preparations?

14  A    Formed the team in June of 2015.

15  Q    Was it in the beginning of June?

16  A    It was in the -- I believe it was, the beginning of June.

17  Q    And you hired an outside company for strike preparations,

18  is that right, to assist you in that?

19  A    No, that is not true.

20  Q    You -- there was never an outside consultant in the strike

21  preparations?

22  A    No.

23  Q    So all the security guards who were at the facility, those

24  were internal Ingredion employees?

25  A    Oh, we hired other contractors, yes, not -- we hired

1 contractors, yes.

2 Q   Okay, so just a semantic difference.  But you did hire

3 outside contractors?

4 A   Yes.

5 Q   And the name of the contractors that you hired was LBF, is

6 that right?

7 A   I believe that is correct.

8 Q   When did you hire LBF?

9 A   I don't recall.

10 Q   When did you bring in the food trailer?

11 A   Some time during the second half of July.

12 Q   And the sleeping trailers?

13 A   I believe, roughly, on or about the same time period.

14 Q   And the external security contractors?

15 A   They were brought in -- several additional security people

16 were brought in at the time the trailers were brought in.  And

17 then additional security was added later, the last week of July.

18 Q   Did you -- are you aware, did the company sign a contract

19 with LBF as part of its strike preparations?

20 A   I believe we issued them a purchase order.

21 Q   Do you still have that purchase order?

22 A   I believe we do.

23 Q   The contingency workers, from other Ingredion facilities,

24 the tier three individuals, when did they start arriving?

25 A   They arrived some time in mid-July.

1   Q    And where did those contingency workers stay?

2   A    We did their training in the office building.

3   Q    And when they weren't working, where did they stay?

4   A    They stayed at hotels in Cedar Rapids.

5   Q    Did they ever stay in the sleeping trailers?

6   A    No, they didn't.

7   Q    Do you recall about how many contingency workers were

8   brought in?

9   A    Roughly, 40.

10   Q    What was the name of the manager who trained those

11   contingency workers on how to operate a forklift?

12   A    That would have been Dave Vislisel.

13   Q    Do you attend InfoShare meetings?

14   A    Yes.

15   Q    Do you always attend the InfoShare meetings?

16   A    Yes, I do.

17   Q    Are you in charge of those InfoShare meetings?

18   A    I actually presented at the most recent ones -- several of

19   the most recent ones.

20   Q    When you say, "the most recent ones," what period of time

21   are you talking about?

22   A    Referring to Penford Exhibit 63, I presented the InfoShare

23   meeting that is documented on PF10158.

24   Q    Um-hmm.  What about the ones before that in that document?

25   A    I also presented the one on 10157.

1  Q    Okay.  How many employees typically attend an InfoShare

2  meeting?

3  A    We typically -- again, as documented here, we typically do

4  five sessions.  Attendance ranges from a handful to 25.

5  Q    Are there sign-in sheets for those meetings?

6  A    No.

7  Q    At the InfoShare meetings, managers never ask employees

8  want they want in a collective bargaining agreement, do they?

9  A    I -- no, I don't recall a question like that.

10  Q    Mr. Froehlich, turning back to the contingency workers for

11  a second, did the company pay for the hotel bills for those

12  workers?

13  A    Yes.

14  Q    Do you know whether the company still retains the records

15  for those bills?

16  A    I believe they do, I am not positive.

17  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 71(f).)

18      MR. WIESE:  I am showing the Witness what has been marked

19  as General Counsel Exhibit 71(f).

20  (Witness proffered document.)

21  Q    BY MR. WIESE:  Do you recognize thus document, Mr.

22  Froehlich?

23  A    Yes, I do.

24  Q    Is this an e-mail that was sent to your company e-mail

25  address, is that right?

1    A     Yes.

2    Q     And the attachment to this document, do you recognize this

3    as the attachment to that e-mail?

4    A     Yes.

5          MR. WIESE:  I will offer General Counsel Exhibit 71(f).

6          JUDGE CARISSIMI:  Is there any objection to 71(f)?

7          MR. BUTTRICK:  Yes, Your Honor, I am going to object due to

8    relevance, I think.  This appears to be something about

9    scheduling of people, which is beyond the scope of direct.

10         JUDGE CARISSIMI:  What is the relevance of this exhibit?

11         MR. WIESE:  It goes to the allegation regarding the

12   maintenance scheduling and the implementation of the maintenance

13   schedules after the Employer implemented its last, best and

14   final offer.

15         MR. BUTTRICK:  The Witness didn't testify about anything

16   like that.

17         JUDGE CARISSIMI:  There was no direct testimony about that.

18   That is something that is outside the scope of the direct

19   testimony.

20         MR. WIESE:  May I respond, Your Honor?

21         JUDGE CARISSIMI:  Sure.

22         MR. WIESE:  Okay.  So this document, this is part of a

23   supplemental production during the first week of trial.  I can't

24   recall whether we got it on Tuesday or Wednesday.  It may have

25   been Monday, but I am not sure.  I mean, this is a document that

1  we intend to enter into evidence through whatever means we need

2  to do that.

3      JUDGE CARISSIMI:  Why wasn't it done on your case in chief?

4      MR. WIESE:  Because we didn't have it prepared at that

5  time.  We didn't have enough time to do it then.

6      JUDGE CARISSIMI:  I am sorry, it is outside --

7      MR. WIESE:  Okay.

8      JUDGE CARISSIMI:  -- the scope of the direct examination,

9  and your case in chief is closed, so I am going to sustain the

10  objection to 71(f).

11  (EXHIBIT REJECTED:  GENERAL COUNSEL'S EXHIBIT NO. 71(f).)

12  Q    BY MR. WIESE:  Mr. Froehlich, you are the custodian of

13  records for the Respondent, is that correct?

14      MR. WIESE:  Could we go off the record for a second, Your

15  Honor?

16      JUDGE CARISSIMI:  Off the record.

17  (Off the record.)

18      JUDGE CARISSIMI:  On the record.

19      Mr. Wiese, you may proceed.

20  Q    BY MR. WIESE:  Mr. Froehlich, you were involved in helping

21  the employee respond to subpoena documents, is that correct?

22  A    That is correct.

23      MR. WIESE:  I will renew my offer of General Counsel

24  Exhibit 71(f).

25      JUDGE CARISSIMI:  I am sustaining the objection.  Let me

1   explain a little further.

2       MR. WIESE:  Okay.

3       JUDGE CARISSIMI:  By attempting to introduce documents that

4   apparently go to a case in chief, and it is far beyond the scope

5   of this Witness's examination, that really has an impact on the

6   orderly presentation of evidence in this case.

7       MR. WIESE:  Um-hmm.

8       JUDGE CARISSIMI:  And I am sustaining the objection.  This

9   is something that the Witness didn't testify to, and again,

10  there has to be order in cases like this or they don't get done.

11  And I am sustaining the objection.

12  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 64(a).)

13      MR. WIESE:  Showing the Witness what has been marked as

14  General Counsel Exhibit 64(a).

15  (Witness proffered document.)

16  Q   BY MR. WIESE:  Do you recognize this document, Mr.

17  Froehlich?

18  A   No, I don't.

19      MR. WIESE:  I will retrieve that document from the Witness,

20  and General Counsel Exhibit 71(f).

21      JUDGE CARISSIMI:  Let's go off the record, briefly.

22  (Off the record.)

23      JUDGE CARISSIMI:  Back on the record.

24      Mr. Wiese, you may proceed.

25  Q   BY MR. WIESE:  Mr. Froehlich, as part of your strike

1    preparations, did you produce any cost estimates?

2    A    Yes, I did.

3    Q    Do you still retain those cost estimates?

4    A    Yes.

5    Q    What other documents did you produce as part of your strike

6    preparations?

7    A    Other documents requested by subpoena.

8    Q    Since your testimony --

9          JUDGE CARISSIMI:  Just ask the question.  I don't like

10   references to --

11   Q    BY MR. WIESE:  Did you produce those cost estimates

12   pursuant to the subpoena?

13         MR. BUTTRICK:  I am just going to object that those were

14   revoked, pursuant to our petition to revoke, and so there is no

15   obligation to produce those.

16         JUDGE CARISSIMI:  Is that correct, counsel?

17         MR. WIESE:  I can't speak to that definitively, at this

18   point, Your Honor.

19         JUDGE CARISSIMI:  All right.  Well, in any event, I am

20   sustaining the objection.  I don't see the relevance with

21   respect to production of documents at this late date.

22         MR. WIESE:  Okay.  Nothing further.

23         JUDGE CARISSIMI:  Very good.

24         Is there any redirect examination?

25         MR. BUTTRICK:  Just one moment.

1          JUDGE CARISSIMI:  Off the record.

2     (Off the record.)

3          JUDGE CARISSIMI:  On the record.

4                         REDIRECT EXAMINATION

5     Q     BY MR. BUTTRICK:  Mr. Froehlich, the tier three people who

6     arrived in mid-July, did they return home after their training

7     was complete?

8     A     Yes, they did.

9          MR. BUTTRICK:  Nothing further.

10         JUDGE CARISSIMI:  I take it you have nothing further,

11    within that one question, Mr. Wiese?

12         MR. WIESE:  One more question, Your Honor.

13         JUDGE CARISSIMI:  All right.

14                         RECROSS-EXAMINATION

15    Q     BY MR. WIESE:  When did those contingency workers return

16    home, the tier three workers?

17    A     Immediately after their training was complete.

18    Q     Do you recall what date that was?

19    A     I don't recall.

20    Q     Can you give me an estimate of when that date was?

21         MR. BUTTRICK:  Objection, he says he can't recall.

22         JUDGE CARISSIMI:  Well, this is another question.  If that

23    was an objection, I am overruling it.

24         THE WITNESS:  The training lasted four or five business

25    days, after which all of the out-of-town workers returned back

1    to their home plants.

2    Q    BY MR. WIESE:  Was that before or after August 1st?

3    A    That was before August 1st.

4    Q    Did those tier three workers come back before August 1st?

5    A    Yes.

6    Q    When did they come back?

7    A    Immediately prior to contract expiration.

8    Q    And when did they leave that second time?

9    A    I don't recall.

10   Q    Was it before or after August 1st?

11   A    It was after August 1st.

12   Q    Do you recall how long after August 1st?

13   A    I am sorry, I don't recall.

14        MR. WIESE:  Nothing further.

15        JUDGE CARISSIMI:  Mr. Buttrick, anything further?

16        MR. BUTTRICK:  Nothing.

17        JUDGE CARISSIMI:  Mr. Froehlich, you are excused as a

18   witness, sir, thank you very much, you may step down.

19        THE WITNESS:  Thank you.

20   (Witness excused from the stand.)

21        JUDGE CARISSIMI:  Let's go off the record.

22   (Off the record.)

23        JUDGE CARISSIMI:  On the record.

24        Counsel for Respondent, you may call your next witness.

25        MR. FUNK:  Respondent calls Levi Wood.

1    JUDGE CARISSIMI:  Mr. Wood, if you would please stand for a

2  moment, and raise your right hand?

3  (WITNESS SWORN:  LEVI WOOD.)

4    JUDGE CARISSIMI:  Please have a seat.

5    MR. FUNK:  Thank you.

6                      DIRECT EXAMINATION

7  Q    BY MR. FUNK:  Mr. Wood, how do you spell your last name?

8  A    W-O-O-D.

9  Q    Where are you employed?

10 A    Ingredion.

11 Q    And how long have you been employed at Ingredion?

12 A    I have got about eight years of service.

13 Q    When did you first start working at Ingredion?

14 A    In 2003.

15 Q    And have you worked there continuously since then?

16 A    No, I have not.

17 Q    When did you not work at Ingredion?

18 A    I left between 2010 and returned in 2014.

19 Q    When you came back in 2014, what job were you placed in?

20 A    Supervisor, team leader job.

21 Q    And are you currently in that job?

22 A    I currently am in that job, yes.

23 Q    Have you been in that job the whole time, since you

24 returned to Ingredion?

25 A    No, I have not.

1   Q   What other jobs have you had since you came back in 2014?

2   A   I was an operations manager for approximately six months.

3   Q   And has it been "Ingredion" this whole time?

4   A   No, it has not.

5   Q   Since when has it been Ingredion?

6   A   March of 2015, the sale was announced.

7   Q   Before that, who was the Employer?

8   A   Penford Products.

9   Q   What are your job duties as operations manager?

10   A   In the operations manager role, I oversaw the maintenance

11 department in the starch-LNP-finishing end of the plant.

12   Q   So those were your operations when you were operations

13 manager?

14   A   That is correct.

15   Q   And as an operations lead --

16   A   Um-hmm.

17   Q   -- what are your job responsibilities?

18   A   The day-to-day operations of our starch drying areas,

19 putting in work orders, meeting with employees, doing safety

20 meetings.

21   Q   Were you involved, in any way, in negotiations for a

22 successor collective bargaining agreement in the summer of 2015?

23   A   Yes, I was.

24   Q   What was your role in those negotiations?

25   A   I was the lead note-taker.

1   Q    I will show you a document, which has been marked for

2   purposes of identification, as Penford Exhibit 67.

3   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 67.)

4   (Witness proffered document.)

5   Q    BY MR. FUNK:  Do you recognize this document?

6   A    Yes, I do.

7   Q    What is it?

8   A    These are my bargaining notes.

9   Q    Did you take these notes at the table while discussions

10  were going on?

11  A    Yes, I did.

12  Q    Do they reflect what happened at the table, as best as you

13  could record at the time?

14  A    Yes, they do.

15       MR. FUNK:  I will offer into evidence Penford Exhibit 67.

16       JUDGE CARISSIMI:  Do you have any objection to Respondent

17  67?

18       MR. WIESE:  No, Your Honor.

19       JUDGE CARISSIMI:  Respondent's 67 is admitted.

20  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 67.)

21  Q    BY MR. FUNK:  Okay, you can set those aside for now.  When

22  did you first see Ken Meadows at the Cedar Rapids facility?

23  A    Early April of 2015.

24  Q    Did you know in advance that he was coming?

25  A    No.

1  Q    Do you know why Mr. Meadows was at the plant that day?

2  A    Mr. Meadows and Mark Madsen, and, I believe, Becky Tinkham,

3  were at the plant that day for a meet-and-greet with employees

4  after the acquisition was announced.

5  Q    Do you know what Mr. Meadows did at the facility that day?

6  A    So we had the meet-and-greet of all salaried people.  I

7  believe that Mr. Meadows had a meeting with the Union executive

8  committee or labor relations committee that day.  We had a

9  smaller meeting of managers with Pat Drahos, and then Mr.

10  Meadows did a plant tour that day.

11  Q    And so, for which of these events were you present?

12  A    For the initial meet-and-greet with Mark Madsen, Becky

13  Tinkham, and Ken and several salaried people; and I was present

14  at the smaller group salaried meet-and-greet with Ken; and then

15  I was present for the tour.

16  Q    And "Ken" is Ken Meadows, correct?

17  A    "Ken" is Ken Meadows, that is correct.

18  Q    Okay.  Going forward, let's refer to him as "Ken Meadows"

19  or "Mr. Meadows."

20  A    Okay.

21  Q    When did you first hear that Mr. Meadows wanted to go on a

22  tour during that visit?

23  A    Five or 10 minutes before the tour started.

24  Q    And how did you hear that he wanted to go on a tour?

25  A    I got a phone call from Erwin Froehlich that said Ken was

1    wrapped up for the day and then he wanted to go out and see the

2    plant.

3    Q    Did he -- did Mr. Froehlich ask you to take him on a tour?

4    A    Yes, he did.

5    Q    Had you given tours before?

6    A    Yes.

7    Q    How frequently, in the past, had you given tours?

8    A    Several times, a lot.  As the operations manager, I did a

9    lot of tours, and new hire orientation did a lot of tours, so

10   really a primary tour-giver.

11   Q    Did Mr. Meadows tell you why he wanted to go on a tour?

12   A    Yeah.  Mr. Meadows said that as part of the acquisition --

13        MR. WIESE:  Objection, hearsay.

14        JUDGE CARISSIMI:  Something Ken Meadows said to him?  No,

15   overruled.  Ken Meadows has testified in this proceeding, so --

16   and he testified about these meetings.  So this would be

17   testimony that will either corroborate or not corroborate

18   testimony that has already been given.  Overruled.

19        MR. FUNK:  You may answer the question.

20        JUDGE CARISSIMI:  You can answer.  And let me just explain

21   the rules to you.  If I say, "Overruled," that means you can

22   answer; if I say, "Sustained," that means I didn't like the

23   question, and don't answer it.  And if you have any questions

24   about these rules, just ask me.

25        THE WITNESS:  Okay.

1    JUDGE CARISSIMI:  Okay.

2    THE WITNESS:  So Ken Meadows wanted to get out and see the

3    plant.  He was particularly interested in ethanol, that was a

4    new process to him.  So he really just wanted to see the plant.

5    Q    BY MR. FUNK:  Who else went on this tour?

6    A    Phil Kluetz.

7    Q    Anybody else?

8    A    No.

9    Q    Was there any preplanning about whether Mr. Meadows would

10   talk to employees?

11   A    No.

12   Q    Was there any preplanning about whether -- strike that.

13   Was there any preplanning about which employees Mr. Meadows

14   might talk to?

15   A    No.

16   Q    Where did you go on the tour?

17   A    On the tour, we went to ethanol.  He wanted to see ethanol,

18   that was a process new to him.  We left ethanol and went to the

19   Building 61 starch warehouse.  We left the Building 61 starch

20   warehouse, went along the dike -- which is along the river --

21   talked about the flood of 2008.  We went to Building 95, which

22   is our LNP process.  We went to Building 69, which is another

23   starch warehouse, we went there, and we went up to the grind, or

24   the mill.  And that was all the areas that we went to for the

25   tour.

1      JUDGE CARISSIMI:  Mr. Woods, what does "LNP," did you say?

2      THE WITNESS:  Liquid natural polymer, it is a process in

3  our plant.

4      JUDGE CARISSIMI:  Thank you.

5  Q    BY MR. FUNK:  When you were with Mr. Meadows on the tour,

6  did he call any employees into an office to talk to them?

7  A    No.

8  Q    About how many people were working in the plant at that

9  time?

10  A    Forty to 50 people.

11  Q    And how many employees did Mr. Meadows talk to?

12  A    Eight to 10 people.

13  Q    Do you recall who those employees were, and where they

14  were, when Mr. Meadows talked to them?

15  A    Yes.  Jeff Kuddes, Jeff Rausch, and Dave Fuchs were in

16  ethanol.  Kevin Smith was in the Building 61 warehouse.  Bruce

17  Bishop and Bill Ironside were in Building 95.  Matt Maas was in

18  the Building 69 warehouse.  Mike Nepple, Brad Bumba, and Jon

19  Swails were in the grind supervisor's office.  And I don't

20  remember who the employees were that we talked to in the

21  millhouse control room.

22  Q    Are all of these employees bargaining unit members?

23  A    No, they are not.

24  Q    Are any of them managers?

25  A    Yes.

1 Q   Who?

2 A   Brad Bumba is a manager in the grind; Mike Nepple is a

3 process engineer in the grind; and Jon Swails is a maintenance

4 coordinator in the grind.

5 Q   Are any of them Union officials?

6 A   Matt Maas is a Union official.

7 Q   Was he at the time?

8 A   Or was a Union official at the time.

9 Q   Where were these employees when you talked with them?

10 A   In their work area, either in a control room or the

11 warehouse, but they were all in their work areas.

12 Q   Did any of these employees approach you and Phil and Mr.

13 Meadows -- Mr. Kluetz?

14 A   Yes.  In the ethanol control room, we were talked with Dave

15 Fuchs and Jeff Rausch, and Jeff Kuddes came in and approached

16 Ken.

17 Q   What do you recall about all of these conversations?

18 A   They were all civil conversations.  We would introduce Ken

19 as the director of human resources for Ingredion.  And then,

20 generally, Ken would take over the conversation and talk about,

21 "How many years have you been with the company?"  "What outside

22 hobbies and interests do you have?"  We talked about fishing

23 with a couple employees.  Talked about, "In ethanol, it would be

24 nice if we could get a gas pump and put it in our cars."  So,

25 generally, civil conversations.

1   Q    And what shift were you on, at this point?

2   A    First shift.

3   Q    And so, these employees on first shift, are they generally

4   senior employees or junior employees?

5   A    They are generally senior employees.

6   Q    Was there any conversation, during these meetings, about

7   different things employees wanted in the plant, in their work?

8   A    Yes.

9   Q    And who initiated those conversations?

10  A    Employees.

11  Q    Did Ken ever initiate those conversations?

12  A    No.

13  Q    What do you recall about those topics?  How did they come

14  up and who brought them up, that you recall?

15  A    Oh, it was generally, throughout the conversation.  People

16  would be talking and say, "So you are the director of human

17  resources?"  Ken would say, "Yes."  And so people knew that it

18  was coming up on contract time, so they would talk about things

19  that were important to them upcoming in the contract.

20  Q    So what, specifically, do you recall about that?

21  A    Gap insurance.  The vacation for new hires.  I remember

22  Jeff Kuddes talking about days off, and Ken saying, you know,

23  "It sounds to me like we need to hire more people."  So that's -

24  -

25  Q    Do you recall any other topics like this, or who brought

1   them up?

2   A    Yeah.  So, in ethanol, Jeff Rausch brought up the gap

3   insurance.  In the Building 61 warehouse, Kevin Smith brought up

4   gap insurance.  In Building 95, Bill Ironside brought up pay

5   increases, and that they hadn't had a pay increase in a long

6   time.  And I think that's it.

7   Q    What do you recall about how Ken responded when employees

8   brought up these topics?

9   A    Generally, with gap insurance, he would, you know, kind of

10  be light-hearted about that like, "Well, you don't look like you

11  are old enough to retire, what are you worried about that for?"

12  With the pay, Ken said, "That is something that you will need to

13  talk to your Union about."  And really all the issues that were

14  brought up with vacation pay and gap insurance are items that

15  Ken said, "You know, that is something that you have got to talk

16  to your Union about."

17  Q    Did you hear Mr. Meadows say anything about the company

18  seeking concessions in bargaining?

19  A    No.

20  Q    Did you hear Mr. Meadows say anything about the company

21  replacing employees?

22  A    No.

23  Q    Did any employees bring that up?

24  A    No.

25  Q    Did you hear Mr. Meadows promise employees anything during

1   these conversations?

2   A    No.

3   Q    As far as you are aware, did the company provide any

4   bargaining unit employees with anything as a result of these

5   conversations?

6   A    No.

7   Q    Did you hear Mr. Meadows make any kind of threats to

8   employees during these conversations?

9   A    No.

10       MR. FUNK:  Nothing further, thank you.

11       JUDGE CARISSIMI:  Cross-examination by the General Counsel?

12       MR. WIESE:  Five minutes, Your Honor?

13       JUDGE CARISSIMI:  Certainly.  Let's go off the record for

14  five minutes.

15  (Off the record.)

16       JUDGE CARISSIMI:  On the record.

17       General Counsel you may cross-examine.

18                    CROSS-EXAMINATION

19  Q    BY MR. WIESE:  Mr. Wood, I would like to direct your

20  attention to Penford -- PF Exhibit 67.  Do you have that

21  document?  It is your bargaining notes.

22       JUDGE CARISSIMI:  Those are your notes, sir.

23       THE WITNESS:  Yes.

24  Q    BY MR. WIESE:  Directing your attention to page 1 of that

25  document, about three-quarters of the way down, "KM-7," and then

1  it says, "Jethro-12."  Do you see where I am pointing to in that

2  document?

3      JUDGE CARISSIMI:  Mr. Wood --

4      THE WITNESS:  Yes?

5      JUDGE CARISSIMI:  -- did you find it?

6      THE WITNESS:  Mm-hmm.

7      JUDGE CARISSIMI:  Okay, good.

8  Q   BY MR. WIESE:  Mr. Wood, do you recall what those numbers

9  are in reference to?

10 A   I do not.

11 Q   Directing your attention to PF3 of --

12     JUDGE CARISSIMI:  That is the third page of the document

13 you have in front of you --

14     MR. WIESE:  Yes.

15     JUDGE CARISSIMI:  -- Mr. Wood, down in the right-hand

16 corner there's a marking system to keep track of the pages.

17     THE WITNESS:  All right.

18 Q   BY MR. WIESE:  In the upper left-hand corner of the

19 document, do you see the initials "KM"?

20 A   Yes, I do.

21 Q   And the line going down there?

22 A   Yes.

23 Q   Does that indicate Mr. Meadows is speaking?

24 A   Yes, it does.

25 Q   And when -- did you mark that as Mr. Meadows was speaking

1  at the table?

2  A    I believe so.

3  Q    Did you make any changes to these notes, while you were

4  away from the bargaining table?

5  A    No.

6  Q    Before you testified today, did you speak with anyone

7  besides Mr. Buttrick and Mr. Funk about your testimony?

8  A    No, I have not.

9  Q    Okay.

10      Turning your attention to PF4 of Penford Exhibit 67.  About

11  three-quarters of the way down the page, where it says, "1:10

12  pm," do you see --

13  A    Yes.

14  Q    -- on -- okay.  That "Bullet #2" reference, do you see

15  that?

16  A    Yes, I do.

17  Q    Do you know what that is in response -- or what that is in

18  reference to?

19  A    I believe that was in reference to a Bullet #2, possibly on

20  a Union request for information.  And I believe it was said at

21  the table that the request for information was not based on the

22  offer.

23  Q    And who said that?

24  A    Ken Meadows.

25  Q    And the line below that, is that also Mr. Meadows?

1  A    Yes.

2      JUDGE CARISSIMI:  Could you read those two lines to me,

3  sir, so I'll make sure what is down there, starting with Bullet

4  #2?

5      THE WITNESS:  "Bullet #2 Request for info not based on

6  offer."  And "Insurance info will not be available till

7  October/November."

8      JUDGE CARISSIMI:  Thank you.  That was Mr. Meadows --

9      THE WITNESS:  Yes, it was.

10      JUDGE CARISSIMI:  -- speaking, in your notes?

11      THE WITNESS:  Yes, sir.

12      JUDGE CARISSIMI:  And you recall him making that statement?

13      THE WITNESS:  Yeah.

14      JUDGE CARISSIMI:  Thank you.

15  Q    BY MR. WIESE:  This reference to an information request --

16  this information request was given on 6/29, is that correct?  Or

17  do you recall?

18  A    I don't recall if it was given on 6/29.

19  Q    Okay.  Turning back to that statement next to "Bullet #2

20  Request for info not based on offer"?  Do you recall what offer

21  Mr. Meadows was talking about?

22  A    I believe that was the offer of the contract that was on

23  the table.

24  Q    And that "Request for info" that is mentioned in your

25  notes, was that a company request for info?

1  A    No, I believe that is a Union request for information.

2  Q    Let's turn your attention to PF8.  About two-thirds of the

3  way down the page, next to the initials "KM," it says, "Made

4  comments."  Do you see where I am talking about?

5  A    Yes, I do.

6  Q    You didn't write down what those comments were, did you?

7  A    I did not.

8  Q    Is there a reason you didn't write down those comments?

9  A    Other than maybe just trying to keep up with note taking,

10 there's no reason that I didn't include them.

11 Q    But you didn't write down what those comments were?

12 A    I did not.

13 Q    Directing your attention to PF11, again in Penford Exhibit

14 67.  Mr. Wood, were you at the bargaining table on July 27?

15 A    I was not.

16 Q    And that text starting with "Wood missed," is that your

17 handwriting?

18 A    Yes.

19 Q    And that is just an internal note to yourself, not

20 reflective of what happened at the bargaining table?

21 A    Correct.

22 Q    Directing your attention to PF12, next to the first

23 initials, "KM."  Do you see where I am talking about it?

24 A    Yes, I do.

25 Q    Okay.  Three lines down from that, what does that say

1  there, "Started working"?  Could you read what the rest of that

2  block says?

3  A    Sure.  It said, "Started working through and realized

4  contract was not the same that he was working from."

5  Q    Do you recall what that was in reference to?

6  A    Yes.  There were some things that had been brought up

7  through negotiations that the contract Ken was working on didn't

8  have.  So we realized that Ken didn't have the most recent

9  Penford contract.

10  Q    And when you say, "the most recent Penford contract," are

11  you talking about the Red Book?

12  A    Correct.

13  Q    I would like to direct your attention to PF21.  Do you see

14  the numbers in the left-hand side of the page, number 1, 2, 5,

15  8?

16  A    Yes, I do.

17  Q    And then those numbers continue on to PF22, do you see

18  that?

19  A    Yes.

20  Q    Do you recall what those numbers are in reference to?

21  A    Those were in reference to a document that the Union had

22  provided us.  I think number 1 was "Savings from excluding

23  probationary employees on holiday pay," so number 1 was a

24  response to that.  So it corresponded to a document that the

25  Union had provided us.

1    Q     Okay.  Do you recall what document that was, specifically?

2    A     I think that this was 22 points that the Union had

3    requested be removed from the proposal.

4    Q     So that was an offer that the Union had made at the

5    bargaining table?

6    A     It was a document that they had given us, correct.

7    Q     And it was something that they had proposed that the

8    company do, correct?

9    A     Correct.

10   Q     Okay.  Directing your attention to PF24.  Right about

11   halfway down the page, do you see the line, "layoffs not done by

12   seniority"?

13   A     Yes, I do.

14   Q     Who said that line?

15   A     Someone from the Union.

16   Q     And then looking at the top of that page, the first two

17   lines, "Economic adjustment overall is need for 2 tier."  Who

18   said that?

19   A     Ken Meadows.

20         JUDGE CARISSIMI:  Could you tell me what the reference to

21   "2 tier" means?

22         THE WITNESS:  Yes, 2 tier is an existing wage structure for

23   employees there.  And then the second tier is a lower wage

24   structure for employees that are hired in.

25         JUDGE CARISSIMI:  Thank you.

1   Q    BY MR. WIESE:  The reference to the 2 tier and the layoffs,

2   is that a Union proposal or a company proposal?

3   A    company proposal.

4   Q    And with regard to economic adjustment referenced in your

5   notes, Mr. Meadows didn't provide any further explanation of

6   that economic adjustment, did he?  Again, looking at the top of

7   page 24.

8   A    Not at this time.

9   Q    Directing your attention to PF33.  Do you see where it says

10  "2:03" in the left-hand margin?

11  A    Yes, I do.

12  Q    And then the line directly below that, starting with "Also

13  passed out," what does that say?

14  A    "Also passed out revision 12 of the contract."

15  Q    So that is what the "R12" is, revision 12?

16  A    That is correct.

17  Q    Had the company presented 12 proposals as of that time?

18  A    I don't believe that there was 12 proposals at that time.

19       JUDGE CARISSIMI:  Do you recall what your reference in your

20  notes to "revision 12" means?

21       THE WITNESS:  Yes.  So we kept a running revision number of

22  contracts, and so this is revision 12, but not all 12 offers

23  were passed across the table.

24       JUDGE CARISSIMI:  Thank you.

25  Q    BY MR. WIESE:  And then looking at the bottom of your

1 notes, on PF33, starting with the "At 6:38." If you could

2 review that and let me know when you are done?

3 (Pause.)

4 A    Okay.

5 Q    So these notes here indicate a conversation that occurred

6 while the parties were on caucus, is that right?

7 A    Yes.

8 Q    And, so, while the parties were on caucus, they were in

9 separate rooms, is that right?

10 A    That is correct.

11 Q    Okay. And so all the information that you have down here,

12 that came from the mediator, shuttling that information between

13 the rooms, is that right?

14 A    That is correct.

15       MR. WIESE:  Your Honor, I would ask that this portion of

16 Mr. Woods' notes be stricken from the record.

17       JUDGE CARISSIMI:  You mean physically strike them?

18       MR. WIESE:  Well, whatever we need to --

19       JUDGE CARISSIMI:  No.  I mean, we are not going to redact

20 the document.  I am not going to give -- and I made that

21 statement, I think, at the beginning of the trial, consistent

22 with the Board's long-standing policy -- I am not going to make

23 any reference, I am not going to rely on anything that is

24 attributed to a mediator.  For example, this.  If the references

25 in the notes, as Mr. Wood just told us, came from a mediator, I

1    am not going to give any consideration to that.  I am certainly

2    not going to consider the fact the note says that "Jethro did

3    not want to meet tonight," because that came from the mediator,

4    and that is not something that I am going to give any

5    consideration to in making a decision in this case.

6        All right, everybody understand?

7        MR. WIESE:  Your Honor, just one more point on that.  I

8    mean, so this record is going to be used for the 10(j)

9    proceeding, and that is partially where my request to strike

10   this portion of the notes comes from.  So I would renew my

11   request to physically redact this portion of --

12       JUDGE CARISSIMI:  I deny your request.

13       MR. WIESE:  Okay.

14       JUDGE CARISSIMI:  I think my comments make it very clear

15   what my position is.  And I don't have the cases at hand, but we

16   can get those if you want me to indicate on the record what

17   those cases are.  So if a district court judge has any question

18   about the Board's policy in not relying on any statements made

19   by a mediator in bargaining, they can look at the case.

20       MR. WIESE:  I would request that, Your Honor.

21       JUDGE CARISSIMI:  All right.  Remind me to do that on a

22   break, I think those cases are readily available.

23       You may continue.

24       MR. WIESE:  Okay.

25   Q    BY MR. WIESE:  So looking at the top of PF37, below the

1   initials "KM." Do you see where I am at?

2   A    Yes, I do.

3   Q    And those four hash marks there, those are in reference to

4   statements that Ken Meadows made, is that right?

5   A    Correct.

6   Q    And the second bullet point, that is in reference to the

7   company's bidding proposal, is that right?

8   A    Excuse me?

9   Q    The second -- or, excuse me, the third -- the third dash

10  there, starting with "look at 2 tier," that is in reference to

11  the company's bidding proposal, is that right?

12  A    That is correct.

13  Q    And this is -- and you can look at the date, if you need

14  to, but this is -- these bullet points here, these are all in

15  reference to the company's final offer, is that right?

16  A    That is correct.

17  Q    Do you recall Mr. Meadows saying that the 2 tier bidding

18  was -- in the company's final offer -- was basically like it was

19  in the existing contract?

20  A    Yes.

21  Q    Directing your attention to PF40. Actually, let's move on

22  to 42 and 43 -- PF42 and 43. So these notes on PF42 and 43,

23  these were notes that were taken after the Employer presented

24  its last, best and final offer at the bargaining table on August

25  18th, is that correct?

1  A    Correct.

2  Q    So what is going on, in the notes on these pages, is Mr.

3  Meadows is explaining the changes that were made in that last,

4  best and final offer, is that correct?

5  A    That is correct.

6  Q    And these were all of the changes that Mr. Meadows

7  explained at the bargaining table, to the best of your

8  recollection?

9  A    Could you ask that again?

10  Q    Um-hmm.  To the best of your recollection, these were all

11  of the changes that Mr. Meadows explained at the bargaining

12  table on August 18?

13  A    Correct.

14  Q    Do you recall the Union asking if there were any other

15  changes?  I direct your attention to the top of PF44.

16  A    Okay, could you ask the question again?

17  Q    Yes.  And the Union -- do you recall the Union asking at

18  the table if there were any other changes?

19  A    Yes.

20  Q    And Mr. Meadows said that these were all the changes, is

21  that right?

22  A    That is correct.

23  Q    Directing your attention to PF61.  Are you there, Mr. Wood?

24  A    Yes, sir.

25  Q    Okay, thank you.  So these are your notes from October 8th,

1  is that right?

2  A    Yes.

3  Q    And that was after the company implemented its last, best

4  and final offer?

5  A    Correct.

6  Q    And looking about maybe halfway down the page, starting

7  with "KM," it says "Make," and then, could you read what the

8  next two lines say -- or next three lines?

9  A    It says, "Make sense to combine the jobs because they are

10 doing the same thing and yes a result of that is relief on

11 overtime."

12 Q    And what Mr. Meadows was doing, at that point, was

13 proposing changing the job classifications, is that right?

14 A    Could you ask that question again?

15 Q    Yes.  What Mr. Meadows was doing, at that point, at the

16 bargaining table on October 8th, was proposing to change the job

17 classifications that were in effect, is that right?

18 A    Yes.

19 Q    And if you go down to the next "KM," there's a block of

20 text attributable to "JH," but the next "KM," starting with

21 "Making," do you see what I am talking about?

22 A    Yes, sir.

23 Q    Could you read those two lines?

24 A    "Making one classification to where all that is the same."

25      MR. WIESE:  Nothing further.

1        JUDGE CARISSIMI:  Very good.

2        Is there any redirect examination?

3        MR. FUNK:  No, Your Honor.

4        JUDGE CARISSIMI:  Very good.

5        Mr. Wood, you are excused as a witness, sir, you make step

6   down.  Thank you.

7        THE WITNESS:  Just leave these here?

8        JUDGE CARISSIMI:  You can just leave that right there.

9   (Witness excused from the stand.)

10       JUDGE CARISSIMI:  Off the record.

11  (Brief discussion held off the record.)

12       JUDGE CARISSIMI:  On the record.

13       Counsel for Respondent, you may call your next witness.

14       MR. FUNK:  Yes, the Respondent calls Brad Bumba.

15       JUDGE CARISSIMI:  Mr. Bumba, if you would please raise your

16  right hand, sir?

17  (WITNESS SWORN:  BRAD BUMBA.)

18       JUDGE CARISSIMI:  Please have a seat.

19                      DIRECT EXAMINATION

20  Q    BY MR. FUNK:  Hello, Mr. Bumba.  Could you please spell

21  your last name for the record?

22  A    B-U-M-B-A.

23  Q    Mr. Bumba, where are you employed?

24  A    Ingredion, Cedar Rapids, Iowa.

25  Q    How long have you been employed at Ingredion?

1  A    Going on 10 years.

2  Q    And has it been Ingredion that whole time?

3  A    No, sir.

4  Q    What was it before Ingredion?

5  A    Penford Products.

6  Q    Do you remember approximately when that transition

7  happened?

8  A    It would have been the spring -- last spring, I guess.

9  Q    What is your job title at Ingredion?

10  A    Operations lead.

11  Q    How long have you been in that position?

12  A    Around seven years.

13  Q    What are your duties as operations lead?

14  A    Manage the hourly workforce in the grind or wet starch

15  department.

16  Q    Did you have any role in negotiating a successor collective

17  bargaining agreement in the summer of 2015?

18  A    No, sir.

19  Q    Do you recall when the company implemented the terms of its

20  last, best and final offer to the Union during those

21  negotiations?

22  A    Early September of 2015.

23  Q    Do you know an employee named Adam Beitz?

24  A    Yes, sir.

25  Q    Do you recall having conversations with Adam Beitz, after

1    the implementation, about how overtime would be scheduled under

2    the terms of the last, best and final?

3    A    Yes.

4    Q    How many of these conversations do you recall having?

5    A    Five to 10, I would say.

6    Q    Does Mr. Beitz work in the area for which you have

7    responsibility?

8    A    Yes.

9    Q    So these conversations that you recall having, were any of

10   these in the millhouse control room?

11   A    Several of them were, yes.

12   Q    And was an employee by the name of Austin Coufal present

13   for any of those?

14   A    Yes.

15   Q    What do you recall from those conversations?

16   A    Initially, when the last, best and final was implemented, I

17   met with all grind employees to go over the differences in the

18   overtime, and how they would be administered, compared to how

19   they used to.  That was face-to-face.  And had several of those

20   conversations, because a lot of scenarios would come up, and

21   would seek answers for them if I didn't know, and get

22   clarification.  So, initially, it was really the difference in

23   how we were going to go from how it used to be, if you will,

24   into how it was going to be administered.  So that is generally

25   how the conversations went.

1  Q    Are you aware of whether the Union filed a grievance about

2  how the company was doing overtime?

3  A    I had heard that there was, in the starch department, that

4  there was a grievance going to be filed, or was filed.

5  Q    And was this after the last, best and final had been

6  implemented?

7  A    Yes, it was, yep.

8  Q    Did the company change the way overtime was done after the

9  Union filed that grievance?

10  A    Yes.

11  Q    Did that ever come up in your conversations with Adam

12  Beitz?

13  A    Yes, it did.

14  Q    What do you recall about that conversation?

15  A    Later, in September -- I would say a few weeks, just

16  ballpark -- when we first started changing the way we did

17  overtime, I got a call from Adam.  He was pretty upset about --

18  wanted me to come over to the millhouse control room to talk

19  about the schedule -- same thing as the overtime schedule, it is

20  all one schedule -- and I said I would be over.  I walked in the

21  east door of the control room.  Adam was to my 2 o'clock,

22  standing up next to his duffel bag; Austin was to my 11 o'clock,

23  sitting down.

24       JUDGE CARISSIMI:  What is Austin's last name?

25       THE WITNESS:  Coufal, C-O-U-F-A-L.

1    JUDGE CARISSIMI:  Thank you.

2    THE WITNESS:  Yep.

3    He was sitting there, and there was a couple or three other

4    people in there.  I can't recall exactly who it was, I would

5    assume it was a couple other fourth-shift employees, that is the

6    shift they were on.  And Adam was visibly upset.  And the reason

7    he was upset was our initial conversations with overtime, that I

8    talked to each employee separately, had changed in such a manner

9    that it affected him, what I would call in his opinion, more

10   negatively, because he would have more overtime based on the

11   changes.  He was very upset.

12   Actually, I remember apologizing to the group, because I

13   just said, "Guys, I am sorry.  We went over this, this is how it

14   was going to be.  There was changes made.  From my

15   understanding, there was a grievance filed, something that

16   happened in the other department, and that is why the changes

17   were made.  So this is how we are going to do it.  I will go

18   back and re-educate people, if you will."

19   And I even talked to them about, "And things could change

20   in the future."  It was new for all of us, and he was very

21   upset.  And then he asked about, you know, "Well, what happened?

22   What was the changes?"  I said, "From my understanding" -- and I

23   had heard this, I wasn't part of that grievance process, even if

24   it was an official one -- I just said that I had heard an

25   employee, and I mentioned who that employee's name was that I

1   heard, was forced either in early or on some overtime, and she

2   claimed that it wasn't it her classification.  And I just said,

3   "From my understanding, whatever happened with that discussion,

4   grievance or not, that is what triggered the change.

5       He was very upset, and when I used the word -- when I said

6   that, he really erupted and said, "Well, you are blaming this on

7   the Union."  He said, "Brad, you are saying it is the Union's

8   fault."  And I said, "Adam, I am not, I am just stating a fact."

9   And by saying -- it seemed like when I used the word "fact,"

10  that really set him off.  And I just said, "Talk to your Union

11  leadership."  I said, "That is my understanding," but I said,

12  "Going forward this is what we are going to do."  And I believe

13  I even mentioned if he had an issue with it, "You could talk to

14  your Union reps and file a grievance."

15      And he -- at that point, he grabbed what I will call the

16  "Red Book" out of his duffel bag, that is what I will call the

17  older contract, and he said -- and he was pretty much screaming

18  at this point.  He just said, "We never had problems with this

19  thing, it is crystal clear, never had" -- you know, there was no

20  room for interpretation, because I used the word

21  "interpretation" earlier on, on how you can interpret things.

22  And I said, "Well, that's not the case, Adam.  I have worked in

23  several union environments with different contracts," and I

24  said, "the book you have in your hand, there was a bookshelf

25  full of three-ring binders full of interpretations, called

1  Letters of Understanding, that tried to clarify what was in that

2  Red Book." So, I said, "Every Union contract has

3  interpretations. But I really had to continue to try to

4  emphasize the word "fact," you know, with him, that I am not

5  saying it is the Union's fault, I go, "This is the reason why it

6  was changing." But he was very, very upset.

7       And then I went out the same door I came in, and that was

8  pretty much that conversation.

9  Q    In any of these conversations with Adam Beitz, did you tell

10 employees to remember why things were the way they were?

11 A    No, I don't.

12 Q    Do you recall ever telling that to any employees?

13 A    No. No, sir.

14 Q    In any of these conversations with Adam Beitz, did you say

15 you were making a statement?

16 A    That conversation was all about using the word "fact" that

17 he was keyed on, so no, I did not.

18      MR. FUNK: No further questions.

19      JUDGE CARISSIMI: Cross-examination by the General Counsel?

20      Let's go off the record.

21 (Brief recess taken.)

22      JUDGE CARISSIMI: On the record.

23      General Counsel, you may cross-examine.

24      MS. OHAERI: Mr. Bumba, my name is Chinyere Ohaeri, I am

25 going to be asking you some questions.

```
 1              CROSS-EXAMINATION
```

 2   Q    BY MS. OHAERI:  Isn't it true that Mr. Adam Beitz worked

 3   significantly more overtime than almost every other employee on

 4   the fourth shift, between September and January?

 5   A    Him and probably three others, they are probably equally

 6   worked that amount of overtime, I would say?

 7   Q    On the fourth shift?

 8   A    Oh, not on the fourth shift, there was probably two others.

 9   Q    On the fourth shift?

10   A    Correct.  I don't know about the exact, but that were

11   getting hit more than the others, yes.

12   Q    Isn't it true that one of the people who worked more

13   overtime than Mr. Adam Beitz was his brother or his father, Rick

14   Beitz?

15   A    Rick is his brother, and he worked probably equal the

16   amount, and his dad worked in the -- or works in the millhouse,

17   different classification, and he was affected with a lot of

18   overtime as well.

19   Q    After Mr. Rick Beitz and Adam Beitz, on the fourth shift,

20   the next person who worked the most significant amount of

21   overtime worked about half as much overtime as Mr. Beitz, isn't

22   that correct?

23   A    Without doing the math -- it wouldn't surprise me, what you

24   are telling me.

25   Q    That is to the best of your recollection?

1   A    That's -- I mean, they did work significantly more than

2   some of the other classification, yes.

3   Q    Isn't it true that there was a grievance filed against you

4   for harassment?  Last fall?

5   A    I don't know if it was a grievance.  There was something

6   brought forward, a complaint, I guess, that we talked about,

7   yes.

8   Q    Alleging that you were harassing employees?

9   A    Yes.

10  Q    And as part of the Employer's response to the grievance or

11  the complaint, you signed a statement, didn't you?

12  A    I signed a statement that Kelly Yeisley gave me, yes.

13  Q    I am showing you what has been marked as General Counsel

14  Exhibit 81.

15  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 81.)

16  (Witness proffered document.)

17  Q    BY MS. OHAERI:  Do you recognize that?

18  A    Yeah, it looks -- yes.

19  Q    Is this what you signed?

20  A    Yeah, I talked to our HR manager and Kelly Yeisley, and he

21  asked that I sign it, like he has done with other managers when

22  there's been issues.  And yes, I signed it.

23  Q    And you signed this as a result of a complaint that

24  involved Mr. Adam Beitz, is that correct?

25  A    Well, there was --

1     MR. FUNK:  Your Honor, I will object on the basis of

2  relevance.  I waited to see if it was a complaint about some

3  sort of dishonesty, but given that it is not, I don't think it

4  can be used for impeachment.

5     JUDGE CARISSIMI:  What is the relevance of his document?

6     MS. OHAERI:  Can I have the Witness leave the room, Your

7  Honor?

8     JUDGE CARISSIMI:  Yes.  Mr. Bumba, you can step outside.

9  Sometimes this happens while we discuss a legal issue.  We will

10  call you when we are ready.

11  (Witness temporarily excused from the stand.)

12     JUDGE CARISSIMI:  Go ahead, counsel.

13     MS. OHAERI:  Your Honor, the Witness testified with regard

14  to a conversation.  He characterized Mr. Beitz' behavior,

15  demeanor, attitude during the conversation, as well as his

16  belief as to why Mr. Beitz was upset.  It also goes to the

17  credibility of the Witness, and indicates his dealings with the

18  person he was the conversation with.

19     JUDGE CARISSIMI:  You are saying that this document goes

20  to, specifically, the conversation he had with Mr. Beitz that he

21  testified to?

22     MS. OHAERI:  I am saying that it goes to how he

23  characterized the conversation, as well as his credibility.

24     JUDGE CARISSIMI:  No, answer my question.  Does it go

25  specifically to that?

1     MS. OHAERI:  No, this isn't something he signed

2     specifically as a result of the conversation with Mr. Beitz.

3     JUDGE CARISSIMI:  Then how is it relevant to the

4     conversation that he testified about, if this is another matter?

5     MS. OHAERI:  He testified that Mr. Beitz was -- erupted --

6     JUDGE CARISSIMI:  Yes, I know his testimony, all right.

7     How does this document relate to what he just told me here, if

8     it is not this incident that he is testifying about?  This is

9     some other incident?

10    MS. OHAERI:  It was a -- well, I think, and he said, this

11    was -- he received a complaint or a grievance that -- with

12    regard to him harassing employees.  I was going to ask him

13    whether Mr. Beitz was one of the people that was the one who

14    signed or issued the complaint or grievance.

15    JUDGE CARISSIMI:  Well, let's ask that question, because --

16    MS. OHAERI:  I just had and then he objected.

17    JUDGE CARISSIMI:  All right, let's have that.  But, I will

18    tell you -- well, I will see where this goes, but I want to

19    know, specifically, if this document, GC-81, was signed

20    specifically with regard to the incident with Mr. Beitz that he

21    testified to, all right?  That is my critical question in

22    determining whether or not I am going to admit this, and whether

23    or not I will permit further examination along this line, all

24    right?

25    Let's bring Mr. Bumba back in.

1    JUDGE CARISSIMI:  All right, counsel, you may proceed.

2  (Witness resumed the stand.)

3  Q    BY MS. OHAERI:  Was Mr. Adam Beitz one of the employees who

4  filed the either grievance or complaint?

5  A    He has filed a few of them.  I believe the one you are

6  talking about, Kelly Yeisley actually brought it forward when we

7  were up there, really, it had to do with two other employees and

8  not myself.  But Kelly is the one -- Kelly Yeisley was the one

9  who asked me to sign it so we could put this to bed.

10    JUDGE CARISSIMI:  Well, who is Kelly Yeisley?

11    THE WITNESS:  He is a steward.  He is the department

12  steward.

13    JUDGE CARISSIMI:  Does this document that you have in front

14  of you, GC-81, did that arise out of your conversation, that you

15  testified here today, involving Mr. Beitz?

16    THE WITNESS:  No, sir, it did not.

17    JUDGE CARISSIMI:  All right.  There was an objection to the

18  admission of the document.  I am going to sustain the -- I am

19  going to sustain the objection.  The document is not admitted,

20  and I am not going to permit any further questioning along this

21  line regarding this document.

22  (EXHIBIT REJECTED:  RESPONDENT'S EXHIBIT NO. 81.)

23    MS. OHAERI:  That is all.

24    JUDGE CARISSIMI:  No further questions?

25    MS. OHAERI:  No, that was it.  That was my last question.

1    JUDGE CARISSIMI:  Okay, very good.

2    I take it you have no redirect within that?

3    MR. FUNK:  That is right, Your Honor.

4    JUDGE CARISSIMI:  Mr. Bumba, thank you, you are excused as

5  a witness, sir.

6    THE WITNESS:  That's it.

7  (Witness excused from the stand.)

8    JUDGE CARISSIMI:  Before we go further, I wanted to

9  indicate, on the record, that the Board has held, clearly, in

10  the case Success Village Apartments, Incorporated 347 NLRB 1065

11  (2006), that no party can compel a mediator to testify in a

12  Board proceeding.  That decision makes reference to prior Board

13  cases, so the policy of the Board is very clear.  So that if the

14  policy is clear that a mediator can't be compelled to testify in

15  a proceeding, then, consequently, hearsay testimony about what

16  another party indicates an arbitrator said is of no real value,

17  and, for policy reasons, is not to be admitted in Board

18  proceedings.

19    So there is the basis for my position that I am not going

20  to give any consideration to statements made by either party as

21  to what a mediator said, or references to what a mediator said

22  in their notes.  The last thing that the NLRB and the FMCS wants

23  is mediators to be dragged into NLRB proceedings, and I think

24  that is very clear, based upon the case law.

25    So, we indicated that we were going to take our luncheon

1   recess after our witness, Mr. Bumba.  So we are going to be in

2   recess now, for an hour, until 1:15.

3        With that, we are off the record.

4   (Whereupon, at 12:15 p.m., the hearing was recessed for lunch

5   until 1:20 p.m.)

6        JUDGE CARISSIMI:  On the record.

7        Counsel for the Respondent, you may call your next witness.

8        MR. FUNK:  The Respondent calls Phil Kluetz.

9        JUDGE CARISSIMI:  Mr. Kluetz, if you would please rise for

10  a moment, and raise your right hand?

11  (WITNESS SWORN:  PHIL KLUETZ.)

12       JUDGE CARISSIMI:  Please have a seat.

13       MR. FUNK:  Hello, Mr. Kluetz.

14       THE WITNESS:  Hello.

15                    DIRECT EXAMINATION

16  Q   BY MR. FUNK:  Could you please spell your last name for the

17  record, please?

18  A   K-L-U-E-T-Z.

19  Q   Where are you employed?

20  A   Ingredion.

21  Q   How long have you been employed at Ingredion?

22  A   Over 16 years.

23  Q   Has it been Ingredion that whole time?

24  A   No, it has not.

25  Q   What was it before it became Ingredion?

```
 1   A      Penford Products.

 2   Q      What is your current job title at Ingredion?

 3   A      Currently, I am the training manager.

 4   Q      How long have you been in that position?

 5   A      Approximately four months, since January 1st of this year.

 6   Q      What position were you in before that?

 7   A      Operations manager.

 8   Q      How long were you in that position?

 9   A      Approximately four years.

10   Q      Currently, what are your duties as training manager?

11   A      Working on developing curriculums and different programs on

12   training for the process at the plant, whether it is in the

13   workforce or management.

14   Q      What were your duties as operations manager?

15   A      Primarily, it was the day-to-day operations of the

16   facility.  The front-line supervisors reported to me.  It

17   included the environmental health and safety of the facility,

18   the production, working with the bargaining unit.

19   Q      Have you ever seen the Union strike at the Cedar, Rapids

20   facility?

21   A      Yes, I have.

22   Q      When was that?

23   A      2004.

24   Q      What was your position at that time?

25   A      Maintenance manager.
```

1   Q    What do you remember about that strike?

2   A    It was a rough time.  We had to run the facility with the

3   management, and it was very stressful, long days, didn't fare

4   very well.

5   Q    How long did it last?

6   A    I think it was about 11 weeks.

7   Q    Were you able to provide all the product that you were

8   supposed to provide during that time?

9   A    No, I know we had some, you know, there was customers that

10  we missed orders on and caused some downtime for them.

11  Q    Were there any repercussions for that, that you recall?

12  A    Yeah, I recall, you know, in particular, there was one I

13  think we ended up getting sued.  It was about three and a half

14  million dollars, I think, we had to pay in some form of

15  restitution.

16  Q    Back in 2004, during that strike, was there a plan to

17  provide food for people who are running the plant during the

18  strike?

19  A    Yeah, the management team provided -- organized things to

20  be catered in, because we were still running the plant 24 hours,

21  seven days a week.

22  Q    How did that work?

23  A    Like I said, in some places we'd cater in, and sometimes it

24  wouldn't go so well or wouldn't be there.  I know there was one

25  establishment that publicly put something in the newspaper kind

1     of against the company and what was going on.

2     Q     That was one of the places you had contracted with to

3     provide food?

4     A     Yeah.

5     Q     What is a "manlift"?

6     A     A manlift is a vertical -- it is a belt with steps on it,

7     and it transfers personnel from floor-to-floor within a

8     building.

9     Q     Is it part of the company's facilities?

10    A     Yes, it is.

11    Q     Did Penford, before Ingredion purchased it, have a code of

12    business conduct?

13    A     Yes, we did.

14    Q     I am going to show you what has been marked as Penford

15    Exhibit 73.

16    (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 73.)

17    (Witness proffered document.)

18    Q     BY MR. FUNK:  Do you recognize this document?

19    A     Yes, I do.

20    Q     What is it?

21    A     It was Penford's policy, an ethics policy and code of

22    business conduct.

23         MR. FUNK:  I move to admit Penford Exhibit 73.

24         JUDGE CARISSIMI:  Is there any objection to Respondent's

25    73?

1      MS. OHAERI:  No objection, Your Honor.

2      JUDGE CARISSIMI:  Respondent's 73 is admitted.

3  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 73.)

4  Q    BY MR. FUNK:  Okay, thanks, you can set that aside for now.

5  When Ingredion bought Penford, did it discuss with the Union

6  whether employees had to sign its code of business conduct?

7  A    Yes, they had one as well, yes.

8  Q    Did it ultimately make employees sign its code of business

9  conduct?

10  A    No, we did not.

11  Q    Did the company discuss manlifts and the code of business

12  conduct with the Union?

13  A    Yes, we did.

14  Q    I am going to show you some documents, some of which have

15  already been introduced into evidence, and then also a new

16  exhibit marked Penford Exhibit 12.

17  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 12.)

18  (Witness proffered document.)

19  Q    BY MR. FUNK:  And then General Counsel Exhibits 11, 13, and

20  40.  Now looking, first, just at Penford Exhibit 12, do you

21  recognize those two pages?

22  A    Yes, I do.

23  Q    What are they?

24  A    They are the minutes from labor relations meetings we would

25  have.  We would meet monthly with the Union executive committee,

1  and the company would have a committee, and these are the

2  minutes from those meetings.

3  Q    Did you typically attend those meetings?

4  A    Typically, I did, yes.

5  Q    And if you did not attend those meetings, did you review

6  the minutes?

7  A    Yes, they would get sent out by our HR manager, and we

8  would review them to make sure we were -- that the input and

9  things were accurate, from our notes.

10     MR. FUNK:  I move to admit Penford Exhibit No. 12.

11     JUDGE CARISSIMI:  Any objection to Respondent's 12?

12     MS. OHAERI:  None.

13     JUDGE CARISSIMI:  Respondent's 12 is admitted.

14  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 12.)

15  Q    BY MR. FUNK:  So now looking at the documents marked

16  General Counsel 11 and 13 and 40, together with Penford Exhibit

17  12 -- so if you are looking at all five pages there?

18  A    Um-hmm.

19  Q    Do those documents show some of the results of the

20  company's conversation with the Union about manlifts and the

21  code of business conduct?

22  A    Yes, they do.

23  Q    Did Ingredion continue holding labor relations committee

24  meetings once it acquired Penford?

25  A    Yes.

1   Q    Okay, you can set those aside for me, thank you.  When did

2   you first see Ken Meadows at the Cedar Rapids facility?

3   A    It would have been the first week of April 2015.

4   Q    Did you know in advance that he was coming?

5   A    No, I did not.

6   Q    Do you know why Mr. Meadows was at the plant that day?

7   A    Well, once he arrived with the others, I did.  There was

8   other upper-level Ingredion personnel there, and they were

9   basically introducing themselves, welcoming us to the new

10  company in kind of a stand-up meeting, where we just -- general

11  discussion.

12  Q    What is a "stand-up meeting"?

13  A    A -- well, I call it a stand-up meeting, where just

14  everybody was kind of in a group, and they introduced themselves

15  and said, "Welcome to Ingredion."  We also met briefly with the

16  executive committee of the bargaining unit.

17  Q    So who was present for the stand-up meeting?

18  A    Just about every salaried person, I think, whoever was

19  there that day.

20  Q    And were you present for the meeting with the Union

21  committee?

22  A    Yeah, yes.

23  Q    Who else do you recall being at that meeting?

24  A    I recall Ken, Chris, I think --

25       JUDGE CARISSIMI:  Mr. Kluetz, if you can remember to use

1    last names?

2         THE WITNESS:  Oh, okay, I am sorry.

3         JUDGE CARISSIMI:  I know you know these people really well,

4    but we want to make sure, on the record, that someone who

5    doesn't know them knows who you are talking about, all right?

6         THE WITNESS:  Yes, sir.  Yes, sir.  Myself, Mr. Meadows,

7    Mr. Eby, I think Ms. Drahos was in there.  That's all I recall

8    off the top of my head.

9         MR. FUNK:  Okay.

10        THE WITNESS:  I think Renita Shannon was in there, sorry.

11        MR. FUNK:  Okay, thanks.

12   Q    BY MR. FUNK:  What do you recall from that meeting?

13   A    Again, general discussion, introductions, because it was

14   around April.  And just, again, introductions of who Mr. Meadows

15   was and, "This is the executive committee," and general -- what

16   issues, you know, "We are going to be talking soon."  And talked

17   about the manlifts a little bit, I think, if I recall correctly.

18   And I think we briefly talked about the code of conduct signing.

19   Q    Did Mr. Meadows go on a tour that day?

20   A    Yes, he did.

21   Q    Did you go on that tour with him?

22   A    Yes, I gave a lot of tours in that role, so I was asked to

23   take him on a short tour, which I had a general route for.

24   Q    Did anybody else go on that tour with you?

25   A    Levi Wood was with us.

1 Q    When did you first hear that Mr. Meadows wanted to go on a

2 tour during the visit?

3 A    I don't remember the exact time.  It was some time that day

4 when I first met him, probably after lunch or something.  And I

5 forget if Mr. Meadows asked me or Erwin Froehlich asked me --

6 who was my boss at the time -- to take him on a tour, which Mr.

7 Froehlich would often do when we had visitors or customers come.

8 Q    Did Mr. Meadows tell you why he wanted to go on a tour?

9 A    It was my understanding it was his first time at the plant

10 and wanted to see the site.  He had seen wet mills before, like

11 we have, but hadn't seen an ethanol facility or other things, so

12 it was kind of his first introduction to our plant here in Cedar

13 Rapids.

14      JUDGE CARISSIMI:  Mr. Kluetz?

15      THE WITNESS:   Yes?

16      JUDGE CARISSIMI:  What was your understanding based on?  Is

17 that what he said?

18      THE WITNESS:  Yeah, yeah.

19      JUDGE CARISSIMI:  Okay.

20      THE WITNESS:  Yes.

21      JUDGE CARISSIMI:  All right.  Just a word of caution, the

22 words "my understanding," I don't know what that is based on.

23      THE WITNESS:  Okay.

24      JUDGE CARISSIMI:  So if you are telling me what somebody

25 said --

1        THE WITNESS:  Yes.

2        JUDGE CARISSIMI:  -- make sure I know that is what they

3   said, okay?

4        THE WITNESS:  Okay.

5        JUDGE CARISSIMI:  All right.

6        THE WITNESS:  Yes.  He wanted to go on a tour of the

7   facility and see the plant since it was his first time visiting.

8   Q    BY MR. FUNK:  Mr. Meadows told you that?

9   A    Mr. Meadows did, yes.

10  Q    Do you recall whether there was any preplanning about which

11  employees Mr. Meadows wanted to talk to?

12  A    No.

13  Q    Where did you go on this tour?

14  A    I have a typical route, especially when it is just a short,

15  general tour.  We went into the grind area, cut through there,

16  looked at some of the equipment.  Went then -- came back around,

17  went to the ethanol area, ethanol control room.  We stopped in a

18  couple dry starch warehouses -- one was a food-grade area and

19  one wasn't -- and then our liquid product building, Building 95.

20  Q    When you were with Mr. Meadows, did he call any employees

21  into an office to talk to them?

22  A    No.

23  Q    And about how many people were working in the plant at that

24  time?

25  A    I would say about 50 --

1  Q    How many employees --

2  A    -- on the shift.  I am sorry, on that shift, I am sorry.

3  Q    On that shift?

4  A    Yes.

5  Q    At that time?

6  A    Yes.

7  Q    About how many employees did Mr. Meadows talk to on his

8  tour?

9  A    I would say it was about 10.

10  Q    Can you recall who they were?

11  A    Yes.

12  Q    Who were they?

13  A    When we were in the grind -- when we were going to leave

14  the grind, we walked by the offices and the area manager,

15  engineer, and maintenance coordinator were there.  We stopped in

16  there.

17  Q    Could you give me their names, if you recall?

18  A    Yes, Brad Bumba is the area process lead; Mike Nepple is

19  the area engineer; and Jon Swails is the area maintenance

20  coordinator.

21  Q    Who else do you recall Ken -- Mr. Meadows speaking with on

22  that day?

23  A    Then we went to ethanol, went to the control room.  The

24  first shift operators were there, Jeff Rausch, David Fuchs.  As

25  we were talking, making small talk, a Penford mechanic came in

1 with a work order, and that was Jeff Kuddes, so he joined the

2 conversation.

3 Q    Do you recall anybody else?

4 A    Yes.  When we -- when we went to dry starch, we talked to

5 Kevin Smith in the warehouse area.  When we were in the 69 area,

6 it was Matt Maas.  And in Building 95, it was Bruce Bishop and

7 Bill Ironside were in the control room, and we talked to them.

8 Q    Are any of these employees supervisors?

9 A    Yes.  The gentlemen I mentioned that were in the grind,

10 Bumba, Swails, and Nepple.

11 Q    And is Mr. Nepple also an engineer?

12 A    Yes, he is the area process engineer.  They are in the

13 management.

14 Q    Were any of these employees -- that Mr. Meadows spoke with

15 on the tour -- Union officials at the time?

16 A    At the time, Matt Maas, I believe, was -- Matt Maas was the

17 president -- the vice president of the Union at the time.

18 Q    What do you recall about all of these conversations during

19 the tour?

20 A    I recall they were all very similar.  I would introduce Mr.

21 Meadows.  I would introduce the employee that we would meet, no

22 matter who it was.  And then it would just kind of turn into --

23 it would just turn into small talk.  Ken would ask how long

24 people have been there.  I remember talking about things about

25 fishing -- boating, in particular -- with some folks.  Ask them,

1  you know, if they liked working there, like I said, about their

2  seniority, and he knew that, you know, that he realized they had

3  been there a long time.

4  Q     How did you introduce Mr. Meadows?

5  A     That it was Ken Meadows, with Ingredion, and he was here to

6  see the plant and see the facility since they bought us.  I

7  didn't really know him.

8  Q     Now which shift was this at the time?

9  A     First shift was on.

10 Q     And these first-shift employees that you spoke with, did

11 they generally have a similar level of seniority?

12 A     In general, first shift in a facility like this is the more

13 -- is the most senior folks in a plant, in general.

14 Q     And was that generally the case with the employees that Mr.

15 Meadows spoke with on that day?

16 A     Yes, several of the ones I mentioned are in the 25-, 30-

17 year or more category.

18 Q     Do you recall whether there was any conversation about

19 things that employees were looking for in collective bargaining

20 negotiations?

21 A     Yeah, I recall conversation about it.  There would be -- as

22 talk was happening, they would realize -- like when Mr. Kuddes,

23 in the ethanol control room, came in, introduced him, he said,

24 "Oh, you are Ken Meadows.  I want to talk to you."  And he sat

25 down and started talking to him, brought up gap insurance and

1    vacation, because we had a different vacation levels for

2    different people.  Some people, five days is a week, some seven.

3    "Hey, those guys should get their vacation back."  Generally,

4    pay would come up, "Hey, we would like a raise," like those

5    sorts of things.

6    Q    Do you recall who brought up pay?

7    A    I think just about every group we were in, because they

8    hadn't had a raise in a few years, because the last -- or last

9    contract, if I remember correctly.  So it would just come up as,

10   in general, they wanted a raise.

11   Q    Can you recall, specifically, other topics that employees

12   brought up?

13   A    Again, primarily about gap insurance, insurance, and

14   vacation came up.  Bruce Bishop, I remember saying, "Hey, just

15   don't touch my insurance, I think I am getting close to

16   retirement."  A lot of statement likes that.

17   Q    Did Ken bring up any of these topics?

18   A    No, it came from the employees, and then Ken would just

19   leave it with, "Well, make sure you talk to your executive

20   committee or your bargaining representatives."

21   Q    Did you hear Mr. Meadows say anything about the company

22   seeking concessions in bargaining?

23   A    No.

24   Q    Did you hear Mr. Meadows say anything about the company

25   replacing employees?

1   A     No.

2   Q     Do you remember any conversation about that topic?

3   A     No, I do not.

4   Q     Did you hear Mr. Meadows promise employees anything during

5   these conversations?

6   A     No.

7   Q     As far as you are aware, did the company provide any

8   bargaining unit employees with anything, as a result of these

9   conversations?

10  A     As -- no, not that I am aware of.

11  Q     Did you hear Mr. Meadows make any kind of threats to

12  employees during these conversations?

13  A     No.

14        MR. FUNK:  Nothing further, thank you.

15        THE WITNESS:  Thank you.

16        JUDGE CARISSIMI:  Cross-examination?

17        MS. OHAERI:  Could I have 15 minutes, Your Honor?

18        JUDGE CARISSIMI:  Yes, you may, Ms. Ohaeri.

19        Off the record.

20  (Off the record.)

21        JUDGE CARISSIMI:  On the record.

22        Ms. Ohaeri, you may cross-examine.

23        MS. OHAERI:  Hello, Mr. Kluetz.

24        THE WITNESS:  Hello.

25        MS. OHAERI:  My name is Chinyere Ohaeri, I am going to be

1   asking you some questions.

2        THE WITNESS:  Okay.

3                   CROSS-EXAMINATION

4   Q   BY MS. OHAERI:  When you were the operations manager, how

5   many managers or supervisors reported to you?

6   A   Eight and nine -- nine was the most at any -- at one time.

7   Q   And whom did you report to at that time?

8   A   I reported to Erwin Froehlich.

9   Q   And in your role as the training manager, do any managers

10   or supervisors report to you?

11   A   No, they do not.

12   Q   And who do you currently report to?

13   A   Andy Sullivan.

14   Q   And who does Mr. Sullivan report to?

15   A   I am not sure -- I think he reports to -- I am not sure who

16   he reports to, to be honest with you.

17   Q   Prior to the manlifts being shut off last spring, were you

18   involved in any conversations with the Union about the manlifts

19   being shut off?

20   A   Ever?  Or when --

21   Q   Last spring.

22   A   -- we shut them off before.

23   Q   Last spring I am talking about.

24   A   Yeah, we shut them off before, yes.

25   Q   Last spring, in April or March of 2015, you had a

1   conversation with the Union about shutting off the manlifts,

2   before the manlifts were shut off?

3   A    I personally did not, no.

4   Q    Last spring, when Ingredion instituted the business code of

5   conduct, were you involved in any conversations with the Union,

6   about that policy, prior to the Employer rolling that policy out

7   to employees?

8   A    Could you repeat that?

9   Q    Sure.  Last spring --

10  A    Yes.

11  Q    -- 2015, April or March, were you involved in any

12  conversations with the Union about the rollout of the business

13  code of conduct, prior to the business code of conduct being

14  rolled out to employees?

15  A    Again, I don't recall personally that I did, only in labor

16  relations meetings.  But I think that was after the fact, then.

17      JUDGE CARISSIMI:  Mr. Kluetz, I am going to ask you to keep

18  your voice up when you answer --

19      THE WITNESS:  Oh, okay.

20      JUDGE CARISSIMI:  -- to make sure everybody can hear you,

21  okay?  You kind of tailed off at the end of that last one.

22      THE WITNESS:  Okay.

23  Q    BY MS. OHAERI:  The labor relations meetings in which the

24  business code of conduct was discussed, that occurred after the

25  employees were given the business code of conduct, isn't that

1   correct?

2   A     Yes.

3   Q     Do you still do plant tours?

4   A     I am sorry?

5   Q     Do you still do plant tours?

6   A     Yeah, I do.  I gave some for some new employees just on

7   Monday.

8   Q     Did you talk to anyone about your testimony here today?

9   A     No, I did not.

10  Q     Did you talk to anyone about the April 6th meeting, in

11  order to prepare for testifying today, or since you knew that

12  that was going to be --

13  A     I have only talked to my lawyers.  Those are the only

14  people I have talked to.

15  Q     Including after you learned that the April 6th meeting was

16  going to be an issue at this trial?

17  A     I haven't talked to anybody about it.

18  Q     Did you review any documents or notes about that meeting in

19  April?

20  A     No, I don't have -- no.

21  Q     On April 6th, when Mr. Meadows came to the plant, you

22  didn't know that he was coming until after he arrived?

23  A     I didn't know who was coming, no.

24  Q     And you didn't know that you were going to be taking him on

25  a plant tour?

1  A    No.

2  Q    And you didn't know much about Mr. Meadows at all, at that

3  point?

4  A    No, I did not.

5  Q    Even though you were the operations manager?

6  A    Correct.

7  Q    How would Mr. Kuddes have known, when he walked into the

8  room, and said, "Oh, you are Ken Meadows.  I want to talk to

9  you," if you didn't know?

10  A    I have no idea.

11      MR. FUNK:  Objection, Your Honor.

12      JUDGE CARISSIMI:  Sustained.  Mr. Kluetz, I am going to ask

13  you, just pause for a moment before you answer a question.  That

14  way, if there is an objection, I will get a chance to hear it

15  and rule on it, okay?

16      THE WITNESS:  Understood.

17      JUDGE CARISSIMI:  That objection is sustained.

18  Q    BY MS. OHAERI:  How would Mr. Kuddes have known who Mr.

19  Meadows was, when he walked into the room, and what he did?

20      MR. FUNK:  Objection, Your Honor.

21      JUDGE CARISSIMI:  Sustained.  How would this Witness know

22  what Mr. Kuddes was thinking?  Anyway, you don't have to answer,

23  that is the basis for my ruling.

24  Q    BY MS. OHAERI:  The document that has been marked as

25  Penford 73 -- let me know when you have it.

1    A    Yes.

2    Q    Were employees required to sign that they read, understood,

3 accepted this document?

4    A    Yeah, every year we had to do a computer-based training

5 exercise, where it summarized, and at the end you would say,

6 "Agree and understand this."

7    Q    And if employees had marked, "No," that they didn't read or

8 understand, would they have to do the training again until they

9 marked yes?

10    A    I don't recall that we had many of those issues.  I think

11 it -- yes, we would want them to do it again, I believe.  But I

12 didn't deal with that a lot, that issue.

13    Q    So were employees required to do it again, as far as you

14 know?

15    A    I don't recall they were.

16    Q    When Ingredion implemented its business code of conduct, at

17 first employees were required to sign it, weren't they?

18    A    I don't know.

19    Q    Isn't it true that on August 1st, after the employees

20 rejected the contract offer, that you told employees that they

21 didn't have a contract, and they -- that the Employer didn't

22 have to honor the terms and conditions of employment?

23       MR. FUNK:  Objection, Your Honor, beyond the scope of

24 direct.

25       JUDGE CARISSIMI:  It is, so I am going to have to sustain

1   the objection.

2       MS. OHAERI:  That is all.

3       JUDGE CARISSIMI:  Very good.

4       Any redirect?

5       MR. FUNK:  No, Your Honor.

6       JUDGE CARISSIMI:  Mr. Kluetz, sir, you are excused as a

7   witness, so you can step down.

8       THE WITNESS:  Thank you.

9       JUDGE CARISSIMI:  Thank you.

10  (Witness excused from the stand.)

11      JUDGE CARISSIMI:  Let's go off the record.

12  (Off the record.)

13      JUDGE CARISSIMI:  On the record.

14      Counsel for Respondent, you may call your next witness.

15      MR. BUTTRICK:  Yes, Respondent calls Andy Sullivan.

16      JUDGE CARISSIMI:  Mr. Sullivan, you have previously been

17  administered the oath in this proceeding, so I will not give it

18  to you again.  I will merely remind you, sir, that you are still

19  under oath.

20      You may proceed.

21  (WITNESS PREVIOUSLY SWORN:  ANDY SULLIVAN.)

22      MR. BUTTRICK:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24  Q   BY MR. BUTTRICK:  Mr. Sullivan, where are you employed?

25  A   Ingredion.

1   Q    And how long have you been employed at Ingredion?

2   A    Eight months.

3   Q    When did you start?

4   A    September 21st.

5   Q    And what is your job title?

6   A    HR manager.

7   Q    And what are some of your job duties as HR manager?

8   A    Recruiting, hiring, employee relations, labor relations,

9  contract interpretation.

10   Q    Do you process grievances on behalf of the Employer?

11   A    Yes.

12   Q    Are you the custodian of all human resources-related

13  records?

14   A    Yes.

15   Q    If you can turn your attention to what has already been

16  introduced as Joint Exhibit 8, which is the company's last, best

17  and final offer?  Are you familiar with the company's last, best

18  and final offer?

19   A    Yes.

20   Q    Okay.

21     JUDGE CARISSIMI:  Counsel for General Counsel, do you have

22  that in front of you?

23     MR. WIESE:  Yes, Your Honor.

24     JUDGE CARISSIMI:  Okay, very good.

25     You may continue, Mr. Buttrick.

1　Q　　BY MR. BUTTRICK:　Did you have a role in implementing the

2　last, best and final offer?

3　A　　Yes.

4　Q　　And when did that implementation occur?

5　A　　September of 2015.

6　Q　　And what did the company do to implement the last, best and

7　final offer?

8　A　　Held sessions with leaders on various aspects of the last,

9　best and final.

10　Q　　And what happened in those sessions?

11　A　　Answered questions, went through provisions of the last,

12　best and final.

13　Q　　Does the last, best and final contain in it provisions

14　related to overtime?

15　A　　Yes.

16　Q　　And what article is that found in?

17　A　　I believe Article 11.

18　Q　　And how did the company implement the overtime provisions

19　of the last, best and final?

20　A　　By educating the various leaders in the facility on the

21　provisions of the last, best and final on overtime.

22　Q　　Did the Union complain about how the company implemented

23　the overtime provisions of the last, best and final?

24　A　　Yes.

25　Q　　What did it do?

1   A     Filed grievances.

2   Q     Mr. Funk will hand you what has been marked as Penford

3   Exhibit 48.

4   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 48.)

5   (Witness proffered document.)

6   Q     BY MR. BUTTRICK:  Do you recognize Penford Exhibit 48?

7   A     Yes.

8   Q     What is it?

9   A     Various grievances on overtime.

10  Q     And does the company maintain grievances filed by the Union

11  as a normal, customary part of its business?

12  A     Yes.

13  Q     Are you the custodian of these records?

14  A     Yes.

15        MR. BUTTRICK:  I move to admit Penford Exhibit 48.

16        JUDGE CARISSIMI:  Is there any objection to 48?

17        MS. OHAERI:  One second, Your Honor, while we review.

18        JUDGE CARISSIMI:  Sure, take a look at it.

19        One thing I would like to raise.  The first page is very

20  hard to read.  I take it that this is the best copy the

21  Respondent could generate?

22        MR. BUTTRICK:  It is, yes.

23        JUDGE CARISSIMI:  All right.  I might suggest, it is a

24  Union grievance, if there's a better copy, perhaps, that the

25  Union has, maybe we could substitute?  Because, frankly, unless

1   somebody tells me, if you think it is important, I really can't

2   read, particularly, the second line.

3       MR. BUTTRICK:  I could -- we could have the Witness read it

4   into the record, if that would be helpful.

5       JUDGE CARISSIMI:  If Mr. Sullivan can -- well, first of all

6   -- well, let's discuss this off the record a little bit.

7   (Brief discussion held off the record.)

8       JUDGE CARISSIMI:  On the record.

9       MR. BUTTRICK:  I think I had moved to admit Penford 48.

10      JUDGE CARISSIMI:  Well, first, we are going to --

11      We are on the record, Mr. Walls?

12      THE REPORTER:  Yes.

13      JUDGE CARISSIMI:  All right.  We have had an off-the-record

14  discussion, and counsel, you -- if you didn't move Penford 48,

15  you are now, correct?

16      MR. BUTTRICK:  I am, I am now.

17      JUDGE CARISSIMI:  All right.  While we were off the record,

18  Counsel for the General Counsel pointed out that the first page

19  of what has been marked for identification as Penford 48 is, in

20  fact, the first page of GC-59.  The first page of GC-59 is much

21  -- well, it is readable.  The first page of Penford 48 really

22  isn't, particularly the second and third lines.  So if anybody

23  thinks there's anything important on that page, direct me to GC-

24  59.

25      But, having said that, I am going to admit -- is there any

1   objection to the remainder of Respondent's 48?

2       MS. OHAERI:  No, Your Honor.  I would just state, for the

3   record, that all pages, with the exception of the one Bates-

4   stamped PF2370, are already in evidence as General Counsel's

5   Exhibits 59, 61, 62, 63, 64, 65, 66, I believe.

6       JUDGE CARISSIMI:  All right, thank you.

7       And, again, at this point, because there's only one page

8   difference, but, administratively, even though I am not a fan of

9   duplicative exhibits, I think we are going to save time if we

10  just move forward and allow counsel to use Respondent's 48.

11      So thank you for pointing that out Ms. Ohaeri, but I am

12  going to introduce Respondent's 48 at this time.

13  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 48.)

14      JUDGE CARISSIMI:  Counsel, you may proceed.

15      MR. BUTTRICK:  Thank you, Your Honor.

16  Q   BY MR. BUTTRICK:  And Mr. Sullivan, I don't want you to

17  read these grievances into the record but, generally speaking,

18  what is the nature of these grievances?

19  A   Forcing out of classification, overtime nine days in

20  advance, forcing someone in before or after their shift,

21  training in another classification, and nontraditional overtime

22  administrator position.

23  Q   Now, had the company actually done all of these things?

24  A   Yes.

25  Q   And why?

1    A    We were interpreting the last, best and final.

2    Q    And so, does the last, best and final have language related

3    to allowing people to work out of their classifications?

4    A    Yes.

5    Q    Where is that found?

6    A    Article 6, and I believe article 15.

7    Q    And does the last, best and final contain in it any

8    provisions allowing the company to work a worker four hours of

9    overtime both before and after their shifts?

10   A    Yes.

11   Q    Where is that found?

12   A    In article 11.

13   Q    And does the last, best and final contain in it any

14   provisions that did not require the company to inform people of

15   overtime scheduled more than nine days in advance?

16   A    Yes.

17   Q    Where is that found?

18   A    In article 11.

19   Q    And does the last, best and final contain in it provisions

20   that allow the company to schedule people for overtime less than

21   nine days in advance?

22   A    Yes.

23   Q    Where is that found?

24   A    Also in article 11.

25   Q    And does the last, best and final contain in it provisions

1   that require the company to use a rotational basis for

2   scheduling overtime?

3   A    Yes.

4   Q    Where is that found?

5   A    In article 11.

6   Q    Has the company changed whether it can force an employee,

7   for overtime, more than two days in a row?

8   A    No.

9   Q    Did the last, best and final contemplate that the company

10  would not always be able to follow the overtime provisions

11  perfectly?

12  A    Yes.

13  Q    Is there a provision in that respect?

14  A    Yes.

15  Q    Where is that found?

16  A    In article 11.

17  Q    How often was the company asking employees to work overtime

18  after it implemented its last, best and final?

19  A    Quite a bit.

20  Q    Why?

21  A    Effective July 31st, we had 20-plus long-tenured employees

22  retire, and it put quite a strain on the facility.

23  Q    Now, does the last, best and final contain in it terms

24  related to the scheduling of employees?

25  A    Yes.

1  Q    Where is that found?

2  A    That is also in article 11.

3  Q    And did the company implement the scheduling provisions --

4  A    Yes.

5  Q    -- of the last, best and final?

6  A    Yes.

7  Q    And what did it do?

8  A    In one circumstance, allowed the employees to have a

9  classification to change their schedule.

10  Q    What group of employees was that?

11  A    Maintenance employees.

12  Q    And did the Union complain about how the company

13  implemented the scheduling provisions of the last, best and

14  final?

15  A    Yes.

16  Q    If you can turn your attention to what is already in

17  evidence as GC-64?

18  (Pause.)

19  Q    Do you recognize GC-64?

20  A    Yes.

21  Q    And what is it?

22  A    It is a grievance filed on the maintenance schedules that

23  were put in play.

24  Q    Okay.  And did the company actually do the things that were

25  -- that it was accused of in GC-64?

1   A    Yes.

2   Q    Why?

3   A    Again, we were interpreting the last, best and final.

4   Q    What provision?

5   A    In article 11, the provision on scheduling, where employees

6   in a classification can elect to vote to change their schedules.

7   Q    And did the Union file any other grievances alleging that

8   the company hadn't followed the last, best and final?

9   A    Yes.

10   Q    So I will hand you what will be marked as Penford Exhibit

11   50.

12   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 50.)

13   (Witness proffered document.)

14   Q    BY MR. BUTTRICK:  Mr. Sullivan, what is Penford Exhibit 50?

15   A    Further grievances.

16   Q    And are these grievances kept in the customary course of

17   the company's business?

18   A    Yes.

19   Q    Are you the custodian of these records?

20   A    Yes.

21      MR. BUTTRICK:  I move to admit Penford Exhibit 50.

22      JUDGE CARISSIMI:  Is there any objection to Penford Exhibit

23   50?

24      MS. OHAERI:  Voir dire, Your Honor?

25      JUDGE CARISSIMI:  You may.

1      MS. OHAERI:  Mr. Sullivan, my name is Chinyere Ohaeri, I am

2   going to be asking you some questions.

3                        VOIR DIRE

4   Q    BY MS. OHAERI:  I just want to start with the document you

5   currently have in front of you.  The first page, at the bottom,

6   Bates-stamped 2373, do you see that?

7   A    Yes.

8   Q    Isn't this an information request?

9   A    Well, it was filed as a grievance.  And, to me, it looks

10  like it is more than one -- it is more that requesting

11  information.  It is about the administration of overtime, and

12  the overtime for the starch department for the previous three

13  days -- 30 days, I am sorry.

14  Q    Asking for documents related to those two issues?

15  A    Yes.

16  Q    And the pages after that, starting with Bates-stamped 2374

17  through what is marked as 2381, do you see those?

18  A    Yes.

19  Q    What is that?

20  A    That was information, as requested, as part of that

21  grievance.

22  Q    How does the last page of Penford Exhibit 50 relate -- the

23  last one, Bates-stamped 2385 -- how does that relate to the

24  other documents in this exhibit?

25  A    It is just another grievance filed.  It is in regard to

1   training.

2       MS. OHAERI:  No objection, Your Honor.

3       JUDGE CARISSIMI:  Respondent's 50 is admitted.

4   (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 50.)

5                   CONTINUED DIRECT EXAMINATION

6   Q    BY MR. BUTTRICK:  Mr. Sullivan, did the company process

7   these grievances?

8   A    Yes.

9   Q    Generally speaking, what -- does the last, best and final

10  have within in it a grievance procedure?

11  A    Yes.

12  Q    And what is that procedure?

13  A    There's various steps, the first step being the grievant or

14  the Union brings it forward verbally.  Then the supervisor or

15  leader has so many days to respond.  Then, at that point, the

16  Union has the right to advance it to the next step, which is

17  actually my response.  And then I have so many days to respond,

18  and then the Union can continue to advance.

19  Q    Now, since the company has implemented the last, best and

20  final, has it followed the grievance process identified in the

21  last, best and final?

22  A    Yes.

23  Q    Since the company implemented the last, best and final, has

24  the Union followed the time lines for its grievances?

25  A    No.

1 Q    If there is an untimely grievance, would the company

2 process it anyway?

3 A    Yes.

4 Q    You will be handed what is marked as Penford Exhibit 51.

5 (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 51.)

6 Q    BY MR. BUTTRICK:  Mr. Sullivan, what is Penford Exhibit 51?

7 A    Various grievance answers.

8 Q    And did you prepare these grievance answers?

9 A    Yes.

10 Q    Are these grievance answers kept in the customary part of

11 the company's business?

12 A    Yes.

13 Q    And are you the custodian of these answers?

14 A    Yes.

15     MR. BUTTRICK:  I move to admit Penford Exhibit 51.

16     JUDGE CARISSIMI:  Is there any objection to Respondent's

17 51?

18     MS. OHAERI:  I might need a little time to read these, Your

19 Honor, if we could go off the record?

20     JUDGE CARISSIMI:  Let's go off the record.

21 (Off the record.)

22     JUDGE CARISSIMI:  On the record.

23     Ms. Ohaeri?

24     MS. OHAERI:  No objection, Your Honor.

25     JUDGE CARISSIMI:  Respondent's 51 is admitted.

1  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 51.)

2  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 52.)

3      MR. BUTTRICK:  Mr. Sullivan, Mr. Funk will hand you what

4  is marked as Penford Exhibit 52.

5  (Witness proffered document.)

6  Q    BY MR. BUTTRICK:  Mr. Sullivan, what is Penford Exhibit 52?

7  A    Notes taken by me during grievance discussions with the

8  Union.

9  Q    And are these customarily maintained as a part of the

10 company's business?

11 A    Yes.

12     MR. BUTTRICK:  I move to admit Penford Exhibit 52.

13     JUDGE CARISSIMI:  Is there any objection to GC -- I am

14 sorry -- Respondent's 52?

15     MS. OHAERI:  We are going to have to go off the record

16 again, Your Honor.

17     JUDGE CARISSIMI:  Let's go off the record.

18 (Off the record.)

19     JUDGE CARISSIMI:  On the record.

20     Any objection to Respondent's 52?]

21     MS. OHAERI:  No objection.

22     JUDGE CARISSIMI:  Then Respondent's 52 is admitted.

23 (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 52.)

24 Q    BY MR. BUTTRICK:  Mr. Sullivan, has the company continued

25 to process grievances after the implementation of the last, best

1   and final, all the way to third step?

2   A    Yes.

3   Q    Now, did the company make any changes to the way it was

4   handling overtime, in response to the grievances?

5   A    Yes.

6   Q    What did it do?

7   A    We posted a nontraditional role, as an overtime

8   administrator, to alleviate some of the concerns.

9   Q    And was that nontraditional role done pursuant to a

10  provision of the last, best and final?

11  A    Yes.

12  Q    What article?

13  A    Article 9.

14  Q    Does the last, best and final contain in it articles

15  related to bidding?

16  A    Yes.

17  Q    And where are those found?

18  A    Article 7.

19  Q    Is there a limit on how long an employee must stay in a

20  classification, after bidding into that classification?

21  A    Yes.

22  Q    What is it?

23  A    Eighteen months.

24  Q    So since implementing the last, best and final, has the

25  company ever allowed an employee to bid out earlier than 18

1    months?

2    A    Yes.

3    Q    Please explain.

4    A    Mr. Huber was in a position that, medically, was causing

5    him issues in the position.  And, thus, I collaborated with Mr.

6    Eby to have him get out of his 18-month commitment to move to

7    another position.

8    Q    And what was Mr. Eby's title?

9    A    Union president.

10    Q    And was there a second person?

11    A    Yes, Mr. Grensteiner.

12    Q    Please explain.

13    A    He was an employee -- an extra crew employee -- who had

14    never been to his bid position yet, and was filling a long-term

15    vacancy.  And the Union approached me and asked if -- stating

16    they didn't feel it was adequate to keep him in his commitment,

17    and we agreed.

18    Q    Who, from the Union, approached you?

19    A    Chief steward, Mike Moore.

20    Q    In the last, best and final, are there provisions relating

21    to the scheduling of vacations?

22    A    Yes.

23    Q    Where are those found?

24    A    Article 14.

25    Q    And when did the vacation policy of the last, best and

1   final take effect?

2   A    Right away, but the actual taking of vacation, and that,

3   was not effective until January 1 of 2016.

4   Q    Has the company followed the vacation terms of the last,

5   best and final?

6   A    Yes.

7   Q    Did the company pay out employees for any accrued vacation

8   they had earned under the Red Book?

9   A    Yes.

10  Q    Please explain.

11  A    Since January 1 was going to start a new vacation, based on

12  a calendar year -- and previously employees were on an

13  anniversary year -- employees that had accrued and hit that

14  threshold before the end of the year were paid out all of their

15  vacation.

16  Q    Now, of all of the different terms of the last, best and

17  final we have discussed here, has the company changed any of

18  them since implementing it in September of 2015?

19  A    No.

20  Q    Has the company changed any terms of the last, best and

21  final since it unilaterally implemented them in September of

22  2015?

23  A    No.

24       MR. BUTTRICK:  Nothing further.

25       JUDGE CARISSIMI:  Cross-examination by General Counsel?

1    MS. OHAERI:  Twenty minutes, Your Honor?

2    JUDGE CARISSIMI:  All right, I will give you 20 minutes.

3    Let's go off the record, we will be in recess for 20

4    minutes.

5    (Brief recess taken.)

6    JUDGE CARISSIMI:  On the record.

7    Ms. Ohaeri, you may cross-examine.

8                    CROSS-EXAMINATION

9    Q    BY MS. OHAERI:  Isn't it true that the Union moved for at

10   least six of the grievances, as well as an additional

11   termination of employee to go to the third step of the grievance

12   process?

13   A    Yes.

14   Q    And isn't it true that, as of today, the Employer and the

15   Union have not had any third-step grievance meetings?

16   A    Yes.

17   Q    And isn't it true that the Union requested to have third-

18   step grievance meetings on more than one occasion?

19   A    Yes.

20   Q    Can you take out Penford Exhibit 51 and flip through it?

21   Let me know when you are done.

22   (Pause.)

23   A    Okay.

24   Q    Did you gather grievance documents and response -- the

25   Employer's responses to the grievance documents, in response to

1 the General Counsel's subpoena in this case?

2 A    Yes.

3 Q    And isn't it true that all of the responses to grievances

4 are not included in Penford's Exhibit 51?

5 A    I don't know if they are all in here or not?

6 (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 81.)

7 (Witness proffered document.)

8 Q    BY MS. OHAERI:  I am showing you what has been previously

9 marked as General Counsel's Exhibit 81.  Do you recognize that?

10 A    Yes.

11 Q    And what is it?

12 A    It was a discussion -- the result of a discussion that I

13 had with one of the Union representatives.

14 Q    With regard to Brad Bumba?

15 A    Um-hmm.

16 Q    Did Mr. Bumba sign this document?

17 A    Yes.

18 Q    And was that document given to either the Union or the

19 employees?

20 A    Yes.

21 Q    And, in response to our request for grievances and

22 grievance responses issued by the Employer, you provided this

23 document, correct?

24 A    Yes, but this was not a grievance.  This was never

25 presented as a grievance.

1 Q    What was it presented as?

2 A    Kelly Yeisley, from the Union, came to me in regard to a

3 discussion that an employee had raised, but it never came to me

4 in a grievance form.  This was the result of that discussion.

5 Q    Not all grievances that are filed come on a grievance form,

6 isn't that correct?

7 A    To me, they do.

8 Q    Directing your attention to Penford Exhibit 48.  Let me

9 know when you have that document.

10 A    Okay.

11 Q    If you look at Bates-stamped page 2360 and 2362?

12 A    Yes.

13 Q    Those aren't on grievance forms, either, is that correct?

14 A    But it is written.  Grievances, to me, in the collective

15 bargaining agreement, are supposed to be in written form and

16 have already done the first step.  Kelly Yeisley came to me on a

17 discussion, it was not a grievance.

18 Q    Didn't you say that one of the first steps of the grievance

19 process is that either the employee or a representative from the

20 Union goes to -- I think you said -- the supervisor or some sort

21 of team leader, someone else from management, and has a verbal

22 conversation?

23 A    They are supposed to go to their direct leader, yes.

24 Q    Wouldn't the direct leader, in this situation, be Mr. Brad

25 Bumba?

1 A    I believe Mr. -- I don't know if Mr. Yeisley had a

2 conversation with Mr. Bumba or not.

3 Q    But he would have been the direct lead, in that situation,

4 wouldn't he?

5    MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

6 81.

7    JUDGE CARISSIMI:  Is there any objection?

8    MR. BUTTRICK:  No objection.

9    JUDGE CARISSIMI:  GC-81 is admitted.

10 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 81.)

11    JUDGE CARISSIMI:  I expect something in the brief about

12 this.  We will see what General Counsel can argue.  But unless

13 there's something going to be argued in the brief, I don't see

14 why something is admitted into evidence.

15 Q    BY MS. OHAERI:  Do you have General Counsel's Exhibit 62 up

16 there with you?

17    JUDGE CARISSIMI:  Ms. Ohaeri, I don't want the Witness to

18 have to search around for exhibits.  If you want him to look at

19 something --

20    THE WITNESS:  I do not have it.

21    JUDGE CARISSIMI:  -- I would like you to give it to him.

22    THE WITNESS:  Did you say 62?

23    MS. OHAERI:  Yes

24    THE WITNESS:  I do not.

25 Q    BY MS. OHAERI:  Isn't it true that --

1    MS. OHAERI:  Oh, sorry, strike that, Your Honor.  I just

2  want to let the record reflect I did not hand the Witness

3  General Counsel's Exhibit 62.

4    JUDGE CARISSIMI:  He does not have --

5    MS. OHAERI:  He does not have General Counsel's Exhibit 62

6  in front of him.

7    JUDGE CARISSIMI:  Okay, very good, thank you.

8  Q    BY MS. OHAERI:  Isn't it true that, under the implemented

9  last, best and final offer, the company is required to verbally

10  notify employees of overtime that is scheduled less than 48

11  hours?

12  A    Yes.

13  Q    Were you involved with the 10-hour and 12-hour maintenance

14  shift schedule?

15  A    No.

16  Q    You were involved with the 8-hour and 12-hour maintenance

17  shift schedule?

18  A    No.

19  Q    There was a grievance filed over the 8 and 12 maintenance

20  shift schedule, correct?

21  A    Yes.

22  Q    And did you have anything to do with the processing of that

23  grievance?

24  A    I processed the grievance, but I was not involved with the

25  rollout or the vote or anything in regard to the maintenance

1   schedule.

2   Q   So you had no role or influence or involvement or

3   notification or anything, with regard to the 10 and 12 or the 8

4   and 12 maintenance schedules?

5   A   The 10- and 12-hour schedule was done before I was even

6   employed with Ingredion.  The other one was done -- I was not

7   involved.

8   (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 71(e).)

9   (Witness proffered document.)

10   Q   BY MS. OHAERI:  Showing you what has been marked as General

11   Counsel's Exhibit 71(e).  Do you recognize this document?

12   A   I believe -- well, I haven't looked all the way through.

13   JUDGE CARISSIMI:  Take your time, sir, take a look at it

14   and then you can let us know.

15   (Pause.)

16   THE WITNESS:  Okay.

17   Q   BY MS. OHAERI:  Do you recognize the document?

18   A   Yes.

19   Q   And what is it?

20   A   Various e-mails from Darryl Norman to various

21   representatives in regard to the maintenance schedule.

22   Q   And the last page, page 5 of that document?

23   A   Yes.

24   Q   That is one of the attachments to the e-mail chain?

25   A   I believe so, yes.

1     MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

2     71(e).

3     JUDGE CARISSIMI:  Is there any objection to 71(e)?

4     MR. BUTTRICK:  No objection.

5     JUDGE CARISSIMI:  Seventy-one(e) is admitted.

6   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 71(e).)

7   Q     BY MS. OHAERI:  I want to turn your attention to page 3 of

8   5 of that document, General Counsel' Exhibit 71(e).  Let me know

9   when you are there.

10  A     Okay.

11  Q     Are you the "Andrew Sullivan" that the e-mail is sent to,

12  on the bottom of page 3?

13  A     Yes.

14  Q     And similarly, in the various e-mails that are sent after

15  that, so earlier in the document on page 1, 2, and the top of

16  page 3, are you the "Andrew Sullivan"?

17  A     Yes.

18  (EXHIBIT MARKED:  GENERAL COUNSEL'S EXHIBIT NO. 71(f).)

19  (Witness proffered document.)

20  Q     BY MS. OHAERI:  I am showing you what has been marked as

21  General Counsel's Exhibit 71(f).  Do you recognize that

22  document?

23  A     I believe so.

24  Q     Are you, on page 1 of 71(f) --

25  A     Yes.

1   Q    -- there's -- on the bottom, there's an e-mail, "Andrew

2   Sullivan," is that you?  I guess, sorry, it is not the bottom,

3   it is the middle of page 1 of General Counsel's Exhibit 71(f).

4   A    Yes.

5   Q    Are you the "Andrew Sullivan" mentioned there?

6   A    Um-hmm, yes.

7   Q    And the last page of the document, page 3 of General

8   Counsel's Exhibit 71(f), if you open that up, do you see this

9   chart?

10  A    Yes.

11  Q    Was this the attachment that is shown on page 1 of General

12  Counsel's 71(f)?

13  A    I don't recall if it was or not.

14  Q    Are you aware that four new employees were hired in the

15  maintenance department in October --

16  A    Yes.

17  Q    -- of 2015?  And if you go to page 3 of the document, at

18  the top left-hand --

19  A    Can I -- there is no page 3.  I mean, are you talking about

20  the attachment?  Okay.

21  Q    Yes.  It is marked on the bottom, "page 3 of 3."

22  A    Okay.

23  Q    On the top left-hand column, there's a list of names, and

24  there's four names that are in black, "Travis O., Tim V., Terry

25  M., Danny V."  Do you see where I am reading?

1   A     Yes.

2   Q     Are those the four new people who were hired in

3   maintenance?

4   A     Yes.

5         MS. OHAERI:  Your Honor, I offer General Counsel's Exhibit

6   71(f).

7         JUDGE CARISSIMI:  Is there any objection to 71(f)?

8         MR. BUTTRICK:  Well, the Witness did testify that he didn't

9   remember if -- that there was an attachment or not, so I don't

10  think you have a complete recollection to authenticate whether

11  or not this document was completely sent to him as it is being

12  provided.

13        JUDGE CARISSIMI:  Where did you get page 3, General

14  Counsel?

15        MS. OHAERI:  It was attached to page 1 and 2, which I

16  received from the Employer pursuant to subpoena, I believe,

17  either on Tuesday or Wednesday last week.

18        JUDGE CARISSIMI:  Okay.  I have no question about the

19  authenticity then, so I am going to admit 71(f).

20  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S EXHIBIT NO. 71(f).)

21  Q     BY MS. OHAERI:  As part of your processing of the grievance

22  filed by the Union regarding the 8- and 12-hour shift, which is

23  General Counsel 64 -- you don't need it to answer my question --

24  A     Okay.

25  Q     -- did you have any conversations with any supervisors or

1   managers about statements the Union may have made?

2   A     Yes.

3   Q     And was one of those managers Darryl Norman?

4   A     Yes.

5   Q     Did you review any e-mails that Mr. Norman, or any other

6   manager, may have written documenting conversations with the

7   Union?

8   A     I did not.

9   Q     Are you aware that -- strike that.  There are maintenance

10  employees who work eight hours on a shift on some days of the

11  week, and then 12 hours on their shift other days of that same

12  week.  Are you aware of that?

13      MR. BUTTRICK:  I am just going to object that that is

14  beyond the scope of direct.  He testified he processed the

15  grievance but had no role in the actual implementation of that

16  schedule.

17      MS. OHAERI:  I can respond to that, Your Honor.

18      JUDGE CARISSIMI:  Yes, you can tell me what your argument

19  is.

20      MS. OHAERI:  He did say he processed the grievance; he said

21  he is involved in conversations with managers and supervisors.

22  General Counsel's Exhibits 71(e) and (f) show that he was on e-

23  mail, about that schedule, even before the vote took place.

24      JUDGE CARISSIMI:  What is your point beyond this?  What are

25  you going to argue to me, in your brief, the relevancy of this

1    is?

2         MS. OHAERI:  Well, my understanding is that there's

3    documents, already in the record, with regard to the 8 and 12

4    schedule, and whether -- including the grievances and the

5    Employer's responses on the grievances with regard to that

6    schedule.  So I am just asking -- this is actually my last

7    question about it, but --

8         JUDGE CARISSIMI:  All right.

9         MS. OHAERI:  -- I am just asking him to confirm it.

10        JUDGE CARISSIMI:  If that's your last question, I am going

11   to overrule the objection, and you can answer, sir.

12        THE WITNESS:  Can you repeat the question?

13        MS. OHAERI:  Sure.

14   Q    BY MS. OHAERI:  Are you aware that there are maintenance

15   employees who work eight-hour shift on one or two days of the

16   week, and then, in that same week, they will work a 12-hour

17   shift on other days?

18   A    Yes.

19        MS. OHAERI:  I don't have anything else, Your Honor.

20        JUDGE CARISSIMI:  Is there any redirect?

21        MR. BUTTRICK:  Just a little bit, Your Honor.

22        JUDGE CARISSIMI:  You may proceed, Mr. Buttrick.

23        MR. BUTTRICK:  Mr. Sullivan, if you can turn to what has

24   been marked as Penford Exhibit 51, and Mr. Funk will help you

25   find it.  You got it?  Mr. Sullivan has it, all right.  That is

1    an expert witness up there.

2         THE WITNESS:  It was right on top.

3                        REDIRECT EXAMINATION

4    Q    BY MR. BUTTRICK:  If you can turn to PF2386 and let me know

5    when you have gotten there?

6    A    Okay.

7    Q    What is this document?

8         MS. OHAERI:  Objection.  This is outside my questioning of

9    the Witness, I never asked him about this page or anything

10   related to this page.

11        MR. BUTTRICK:  Well, she had expansive testimony about

12   third-step grievance processing, and that is exactly what this

13   is about.

14        JUDGE CARISSIMI:  Yes, third-step grievances came up, so

15   the objection is overruled.

16        You can answer, sir.

17        THE WITNESS:  It was a letter that I sent the Union in

18   regard to scheduling third-step grievances.

19   Q    BY MR. BUTTRICK:  Why did you send it?

20   A    When the transition of Union leadership occurred, we had a

21   lot of outstanding grievances that just sat there, and we

22   continually tried to schedule these grievances.  And, at one

23   point, the Union was waiting a very long period of time to hear

24   back from their International representative if he needed to be

25   present at those third-step grievances or not.  And it took a

1   long time waiting to get a response back if he needed to be

2   present, because the language says at a third-step hearing there

3   is a management -- a corporate HR representative to be present

4   and an International union representative present.  So we

5   waiting to get response back whether or not he was going to be

6   present.  So that is why we delayed in getting a lot of those

7   scheduled.

8   Q    And have you subsequently, then, scheduled third-step

9   grievance reviews?

10  A    We have not.

11  Q    Why not?

12  A    We just recently got response back that we could schedule

13  those.  And, with us being in bargaining, we have been

14  concentrating more on bargaining than trying to get the

15  grievances scheduled.  But both parties have agreed we need to

16  sit down and do it.

17  Q    If you can turn your attention to what has been introduced

18  into evidence as GC Exhibit 71(f)?  Do you have that in front of

19  you?

20  A    Yes.

21  Q    And so you were only copied on this e-mail, correct?

22  A    Correct.

23  Q    Did you have any role in the implementation of maintenance

24  schedules?

25  A    I did not.

1    Q    Did you have any role in the vote related to maintenance

2    schedules?

3    A    I did not.

4         MR. BUTTRICK:  Nothing further.

5         JUDGE CARISSIMI:  Within that limited range, is there any

6    further cross-examination?

7         MS. OHAERI:  There is, Your Honor.  May I go off the record

8    for five minutes, at the most?  I just need to have a

9    conversation.

10        JUDGE CARISSIMI:  All right, we are off the record for five

11   minutes.

12   (Off the record.)

13        JUDGE CARISSIMI:  On the record.

14        You may proceed, Ms. Ohaeri.

15                        RECROSS-EXAMINATION

16   Q    BY MS. OHAERI:  Isn't it true that the Union requested a

17   third-step meeting on at least six grievances and the

18   termination back in December of 2015?

19   A    I don't recall.

20   Q    Do you recall whether there was a request from the Union in

21   2015 to schedule the third-step grievances?

22   A    I don't recall, there may have.

23   Q    Are you aware that the International rep of the Union

24   hadn't attended grievance meetings before?

25   A    Well, these were the first grievances under the last, best

1 and final.

2 Q    Are you aware that, prior to the last, best and final, the

3 International rep for the Union didn't attend grievance

4 meetings?

5 A    I did not.  We were just following the provisions of the

6 grievance procedure.

7 Q    Are you aware that the International rep for the Union

8 doesn't live in Iowa?

9 A    I understand that.  Again, we were following the

10 provisions, and we asked the Union, in order to schedule those,

11 was he needed to be present or not.  And we continued to get the

12 answer that they were trying to reach out to him to find out if

13 he was going to attend.  That's the answer we just kept getting.

14 Q    So you did know he wasn't located in Iowa?

15 A    Yes.  Either was our corporate HR person that needed to be

16 involved in the third-steps, as well.

17       JUDGE CARISSIMI:  Mr. Sullivan, I am just going to remind

18 you to just --

19       THE WITNESS:  Sorry.

20       JUDGE CARISSIMI:  -- answer the question that is asked.

21       THE WITNESS:  Yep.

22       MS. OHAERI:  Your Honor, we would like to enter a document,

23 and so I need to print it and have it e-mailed, with regard to -

24 -

25       JUDGE CARISSIMI:  What is it?

1      MS. OHAERI:  Can I ask the Witness to leave the room, so we

2  can talk about it?

3      JUDGE CARISSIMI:  Yes, let's do that.  Mr. Sullivan --

4      THE WITNESS:  Sure.

5      JUDGE CARISSIMI:  -- if you could step outside?

6  (Witness temporarily excused from the stand.)

7      JUDGE CARISSIMI:  I have a question about this area before

8  we go forward, and I am going to ask my question.  Depending

9  upon the answers, then we will see where we go.  All right.

10      Is it the General Counsel's position, as set forth, in

11  general, in the Complaint in paragraph 14, that after September

12  14, when the offer was implemented, that there was yet another

13  change in the specified issue alleged in the Complaint, and that

14  that additional change is another violation of Section 8(a)(5)

15  and (1) of the Act?  Do I correctly understand the Complaint?

16      MR. WIESE:  I am sorry, Your Honor, which paragraph was

17  that?

18      JUDGE CARISSIMI:  This would be --

19      MR. WIESE:  Paragraph --

20      JUDGE CARISSIMI:  -- I am sorry, paragraph 16.

21      MR. WIESE:  Paragraph 16.

22      JUDGE CARISSIMI:  Paragraph 16.

23      MR. WIESE:  Yes.

24      JUDGE CARISSIMI:  Again, I said 14, I think, but it is 16.

25      So that is -- I understand the Complaint correctly?  That

1  there's an implemented offer in September, and then the

2  Complaint -- at least the way I read this -- says that after

3  that, after September 14th, there was unilateral changes in the

4  method of assignment for overtime, scheduling hours, the bidding

5  process, and the scheduling of vacation from its unilaterally

6  implemented offer -- from its unilaterally implemented August 18

7  last, best and final offer, right?

8      So there's a second change you are alleging, correct?

9  (Pause.)

10     MS. OHAERI:  So, to clarify, Your Honor --

11     JUDGE CARISSIMI:  That is what I am trying to do.

12     MS. OHAERI:  -- right --

13     JUDGE CARISSIMI:  And I have read the words, and I just

14  want to make sure that I understand these words.

15     MS. OHAERI:  Right.  So we are not saying that there was

16  something in writing or some other contract proposal or a new

17  version of last, best and final, we are saying that --

18     JUDGE CARISSIMI:  And the evidence is going to show that,

19  but I am talking about your theory.

20     MS. OHAERI:  Right, the theory is that they --

21     JUDGE CARISSIMI:  This Complaint says -- tell me.

22     MS. OHAERI:  -- that they were not following the last, best

23  and final offer, meaning that they -- it was implemented and

24  then they were not following the provisions of the implemented

25  contract.

1    JUDGE CARISSIMI:  Well, the language says that there was a

2    unilateral change in the specified subjects, from its

3    unilaterally implemented August 18, 2015, last, best and final

4    offer --

5        MS. OHAERI:  Correct --

6        JUDGE CARISSIMI:  -- correct?

7        MS. OHAERI:  -- so it was implemented, then they decided to

8    do something different with regard to the provisions that are --

9        JUDGE CARISSIMI:  And you contend, in this paragraph 16,

10   that that is another unilateral change, correct?  Because --

11       MS. OHAERI:  Yes, the --

12       JUDGE CARISSIMI:  -- it was done without bargaining.

13       MS. OHAERI:  -- the last, best and final offer itself is

14   one, and then --

15       JUDGE CARISSIMI:  Right.

16       MS. OHAERI:  -- with respect to not following it, that is

17   another, or others, multiple --

18       JUDGE CARISSIMI:  Okay.  All right, so I correctly

19   understand.  That is the way I am understanding this.

20       Counsel for Respondent, do you agree that that's the way

21   you understand the Complaint allegation?

22       MR. BUTTRICK:  We think it is all wrong, of course, but --

23       JUDGE CARISSIMI:  Right.

24       MR. BUTTRICK:  -- we understand that is what the Complaint

25   says.

1     JUDGE CARISSIMI:  Okay.  Now my question to you, counsel

2    for the respondent.  We spent a lot of time on these grievances.

3    Is your defense to that allegation that, "Well, it was a

4    question of implementation, and they filed grievances and we

5    responded to grievances.  It wasn't a unilateral change, this is

6    merely a question of contract interpretation involving the

7    implementation of our last, best and final offer."  Is that your

8    position?

9     MR. BUTTRICK:  That is.

10    JUDGE CARISSIMI:  All right.

11     Now, we have a lot of information about grievances being

12    filed and being processed.  We are in the weeds now about where

13    we are going with the third-step.  Tell me, General Counsel,

14    this information that you want to bring up, how is it going to

15    assist me in resolving this case?

16    (Pause.)

17     MS. OHAERI:  Sorry, Your Honor, I had to talk to Mr. Wiese

18    about it.

19    JUDGE CARISSIMI:  I understand, certainly.

20     MS. OHAERI:  So there's two rationales, two reasons.  One

21    is to rebut their defense, and two is because our contention is

22    that there was no meaningful bargaining at the table with regard

23    to the contract, but also with regard to grievance processing.

24    And that the process, as outlined in the last, best and final

25    offer, had no relation to the conversations at the bargaining

1   table, and, in fact, had no relationship to how this particular

2   union processes grievances, and how -- in terms of the steps and

3   process that the Union would have to go through -- wasn't

4   negotiated, discussed, or feasible, even.

5       JUDGE CARISSIMI:  Well, counsel for the Respondent, again,

6   these are minute factual issues, but I don't want to spend any

7   more time on this than I have to.  Am I correct that the

8   unilaterally implemented offer, there was a change in the

9   grievance procedure as opposed to what existed in the existing

10  contract?

11      MR. BUTTRICK:  I believe that to be correct.

12      JUDGE CARISSIMI:  All right.  So, if that's the case, they

13  put into effect a new system, all right?  Now, if you are right,

14  initially, that the unilateral -- the final offer being

15  implemented was done without a valid impasse, that is unlawful,

16  correct?  Now, they don't concede that, of course.  They say,

17  "Look, that offer was valid, but, you know, we don't know what

18  you are going to do, so we are going to defend the second part

19  of this Complaint, in paragraph 16, where you say we made

20  another unilateral change.  And we are going to show, or try to

21  show, that wasn't really a change, that wasn't really something

22  new.  That was just the implementation of the final offer."

23  Correct, Mr. Buttrick?

24      MR. BUTTRICK:  Exactly right.

25      JUDGE CARISSIMI:  All right.  So I don't understand why I

1  need all this detail on the way the grievances are being

2  processed one by one.  You are either going to prove that,

3  "Look, this wasn't interpretation, this was changes done without

4  bargaining," or you are not, right?  So I don't know why I need

5  to know what is going on with the disputes at the third step.

6  It is a new procedure.  They admit it is a new procedure, all

7  right?  So how are these details going to help me resolve the

8  basic questions I have with respect to this Complaint

9  allegation?  I just don't see it, and I don't want to spend a

10 lot of time on something that I can't see right now, as to how

11 this is going to be material to me in resolving that Complaint

12 allegation.

13 (Pause.)

14      MS. OHAERI:  Your Honor, there may be a way to resolve it,

15 we think, by Respondent stipulating to the fact that the Union

16 hasn't consented or waived its arguments with regard to the

17 grievances that it filed, or with regard to the various articles

18 related to the grievances that were filed.  So, if we are in

19 agreement, that the Union hasn't consented or waived any rights

20 with regard to the grievances that have been filed and/or

21 processed, then I think that is enough for us, today, on this

22 grievances issue.

23      MR. BUTTRICK:  I don't understand that.  I don't understand

24 that stipulation.

25      JUDGE CARISSIMI:  Yes, I mean, let's -- you would like a --

1    what are you proposing in terms of a stipulation?

2        MR. WIESE:  Your Honor, to the extent that Respondent is

3    attempting to point to these third-step meetings, or lack

4    thereof, or where the grievances are in the grievance process,

5    as some sort of waiver argument to the unilateral change --

6        JUDGE CARISSIMI:  Let me stop you there.

7        Are you making that argument, Mr. Buttrick?

8        MR. BUTTRICK:  No, our argument is that the parties are

9    resolving disputes related to the interpretation of the contract

10   and the grievance process.

11       JUDGE CARISSIMI:  You are not contending that there has

12   been any waiver, on behalf of the Union, with respect to those

13   grievances, is that correct?

14       MR. BUTTRICK:  No, the grievances are being processed

15   through the system, and they are what they are.

16       JUDGE CARISSIMI:  All right.

17       MR. WIESE:  Is this part of a deferral argument, I mean --

18       JUDGE CARISSIMI:  No, no, that is an affirmative defense

19   and hasn't been raised and so --

20       MR. WIESE:  Okay, okay.

21       JUDGE CARISSIMI:  -- and again, now I don't know, you tell

22   me.  Since there is an implemented offer, are you going to

23   arbitrate these things if they get to the third step and there's

24   no resolution?

25       MR. BUTTRICK:  I haven't talked about it with the company,

1    but I don't think they ruled it out.

2        JUDGE CARISSIMI:  Right.  So, and again, there's no

3    deferral because there's no agreed-upon arbitration proceeding -

4    -

5        MR. WIESE:  Right.

6        JUDGE CARISSIMI:  -- that I see --

7        MR. WIESE:  Right.

8        JUDGE CARISSIMI:  -- so far in this case.

9        MR. WIESE:  Right.

10       JUDGE CARISSIMI:  Okay?

11       MR. WIESE:  Yes.

12       JUDGE CARISSIMI:  So that allays that.

13       MR. WIESE:  Right.

14       JUDGE CARISSIMI:  But I wanted to bring this issue up now,

15   because we have been through these grievances a lot, and I

16   wanted everybody to be guided in the future, in terms of the

17   rest of Respondent's case and any rebuttal that you have, I

18   wasn't to flush this out.  And it just seems to me -- and now,

19   again, I don't mean to preclude you.  If you want to try to

20   introduce another document, I am going to let you, but I wanted

21   to share with you -- I wanted to share with you my view, I

22   wanted to get some answers, and I wanted to have a better

23   understanding of why we are spending so much time on all these

24   grievances, okay.

25       So let's bring Mr. Sullivan back in.  General Counsel can

1   decide what they want to do.

2       MS. OHAERI:  One second, we may be able to stipulate to

3   something.

4       JUDGE CARISSIMI:  All right, let's go off the record at

5   this point.

6   (Off the record.)

7       JUDGE CARISSIMI:  On the record.

8       Now we can bring Mr. Sullivan back in.  Thank you.

9       MR. WIESE:  Thank you, Your Honor.

10      JUDGE CARISSIMI:  You are welcome.

11      Ms. Ohaeri, you may proceed.

12  Q   BY MS. OHAERI:  Who held your role as human resource

13  manager before you were hired?

14  A   Pat Drahos.

15  Q   What about between when -- between Ms. Drahos and when you

16  were hired?

17      MR. BUTTRICK:  I am going to object.  That is beyond the

18  scope of my redirect.

19      JUDGE CARISSIMI:  It is.  Sustained.

20      MS. OHAERI:  Nothing further.

21      JUDGE CARISSIMI:  Mr. Sullivan, you are -- oh, do you have

22  anything within that very limited --

23      MR. BUTTRICK:  No, nothing.

24      JUDGE CARISSIMI:  Mr. Sullivan, you are excused as a

25  witness.  I am sorry that you had to wait, but sometimes these

1  things happen --

2       THE WITNESS:  Sure.

3       JUDGE CARISSIMI:  -- and legal issues come up.  And you may

4  step down, sir.

5       THE WITNESS:  Thank you.  Do I leave these here?

6       JUDGE CARISSIMI:  Yes, you can leave those there.

7       Let's go off the record.

8  (Off the record.)

9       JUDGE CARISSIMI:  On the record.

10      Counsel for the Respondent, you may call your next witness.

11      MR. FUNK:  Thank you, Your Honor.  Respondent calls David

12  Roseberry.

13      JUDGE CARISSIMI:  Mr. Roseberry, if you would please raise

14  your right hand?

15  (WITNESS SWORN:  DAVID ROSEBERRY.)

16      JUDGE CARISSIMI:  Please have a seat, sir.

17      THE WITNESS:  Thank you.

18      MR. FUNK:  Hello, Mr. Roseberry.

19      THE WITNESS:  Hello.

20                       DIRECT EXAMINATION

21  Q    BY MR. FUNK:  Could you please spell your last name for the

22  record?

23  A    R-O-S-E-B-E-R-R-Y.

24  Q    Mr. Roseberry, where are you employed?

25  A    Ingredion Incorporated, Cedar Rapids.

1 Q    How long have you been employed at Ingredion?

2 A    About four and a half years.

3 Q    Has it been Ingredion that whole time?

4 A    No, it was Penford Products LLC prior to that.

5 Q    What is your job title at Ingredion?

6 A    Operations manager.

7 Q    How long have you been in that position?

8 A    Approximately six months.

9 Q    What position were you in before that?

10 A    Customer service operations manager.

11 Q    How long were you in that position?

12 A    Approximately four years.

13 Q    What are your duties as operations manager?

14 A    Day-to-day operation, making starch, ethanol, food-grade

15 starches as well as industrial starches.

16 Q    What were your duties as customer service operations

17 manager?

18 A    Basically, customer service, production scheduling,

19 managing logistics, third-party warehouses -- basically

20 everything in and out of the plant.

21 Q    Did you have any role in negotiating a successor collective

22 bargaining agreement in 2015?

23 A    No, I did not.

24 Q    Did you go to any bargaining sessions?

25 A    No.

1 Q    Do you know who, from the company, was going to bargaining

2 sessions in the summer of 2015?

3 A    Yes.

4 Q    Who was it?

5 A    Ken Meadows, Erwin Froehlich, Levi Wood, Kim Villegas, and

6 Andy Sullivan, once Andy come on-board.  He was hired later last

7 year.

8 Q    Did anyone from the company ask you for input about what

9 positions to take in bargaining?

10 A    No.

11 Q    Did anyone from the company keep you updated about what was

12 happening in bargaining?

13 A    Nope.

14 Q    Did anyone show you Union or company proposals, while the

15 parties were negotiating?

16 A    No.

17 Q    To this day, have you seen any of the Union or company's

18 proposals?

19 A    Yes, only the last, best and final, when it was presented.

20 Q    Have you seen any Union or company proposals, other than

21 the company's last, best and final proposal?

22 A    No.

23 Q    And when did you first see that?

24 A    I don't remember the exact date.  It was last summer, but I

25 don't remember the exact date.  It was right before we

1    implemented it.  I don't remember the exact date.

2    Q    Okay.  Did you ever discuss retirement with Mike Sarchett

3    or Jeff King?

4    A    Yes, I did.

5    Q    About when was this?

6    A    Approximately July.

7    Q    July of last year?

8    A    Of '15, yes.

9    Q    Where do you recall these conversations taking place?

10   A    The one with Mike Sarchett was in the front office, in kind

11   of a shared area in the accounting area.  And the one with Jeff

12   King was out in the middle of the plant.

13   Q    Was it indoors or outdoors?

14   A    That was outdoors.

15   Q    Were you trying to find these employees to speak with them

16   at this time?

17   A    No.

18   Q    Had you heard that they were considering retiring?

19   A    Yes.

20   Q    How had you heard that?

21   A    Just general talk in the plant, as there was lots of

22   conversation going on about several people contemplating

23   retirement.

24   Q    What do you recall about the conversation with Mr.

25   Sarchett?

1    A    I happened to be in the accounting area and seen Mike up

2    there.  I, personally, have known Mike for over 50 years.  I

3    grew up in Center Point, Iowa, the same place Mike grew up at.

4    And I just said, "Hey, how's it going?" struck up a

5    conversation.  And he said, "Not so well.  Have to make a

6    decision whether to retire or not."  And I said, "Well, you

7    know, Mike, just make sure, you know, as a friend, talk to your

8    financial advisor and then, also if you could get the Union

9    committee to present what the company is offering, then you can

10   make an education decision, you know, what's best for you and

11   your family."

12   Q    When you say, "present," did you mean present that to him?

13   A    Right.

14   Q    Show him --

15   A    Right.  Have the Union committee show the members what the

16   company was offering.

17   Q    What do you recall about the conversation with Mr. King?

18   A    That would have been out in the middle of the plant.  I was

19   going from Building 69, one starch production operation, to

20   Building 61, and Jeff was a mobile supply operator.  And he was

21   filling the Cat with fuel, and I was walking across the plant

22   and Jeff was there.  I stopped to see how things were going, and

23   we struck up a conversation -- and, you know, asked him how it

24   was going.  And he was talking about having to make a tough

25   decision whether to retire or not -- and talked to Jeff kind of

1 similar to the conversation I had with Mike -- was, you know,

2 "Make sure you talk to your financial advisor and try to find

3 out from your Union committee what the company is offering so

4 you can make an educated decision on your retirement."

5 Q    Do you recall whether this was before or after August 1st?

6 A    This would have been before, because they had to make a

7 decision, whether they were going to retire, prior to the vote

8 on the offer.

9 Q    Did you tell Mr. Sarchett, Mr. King, or any other employees

10 that you were sent to talk to them?

11 A    No, I did not.

12 Q    Did you tell Mr. Sarchett, Mr. King, or any other employees

13 that the company would retain their current retirement benefits

14 in the next collective bargaining agreement?

15 A    No, I did not, because I had never seen what the company

16 was offering.

17 Q    Did you tell Mr. Sarchett, Mr. King, or any other employees

18 to not retire?

19 A    No.  I advised them to gather as much information as they

20 could to make an educated decision.

21 Q    Did you tell Mr. Sarchett, Mr. King, or any other employees

22 that a better contract was coming?

23 A    No, because I had never seen the contract.  I didn't know

24 what was being offered.

25 Q    Did you tell Mr. Sarchett, Mr. King, or any other employees

1   that they would like the company's proposal?

2   A    No.

3   Q    Okay.  Did you tell Mr. Sarchett, Mr. King, or any other

4   employees anything to try to put pressure on the Union

5   committee?

6   A    No, I just advised them, if I was in their shoes, that I

7   would go to my committee and try to get -- to see what the offer

8   was, so they could make a good decision on whether to retire or

9   not.

10  Q    Did you say anything to Mr. Sarchett, Mr. King, or any

11  other employees about what was negotiable and what was not?

12  A    No.

13  Q    Did you tell Mr. Sarchett, Mr. King, or any other employees

14  to get the Union to start negotiating?

15  A    No.

16       MR. FUNK:  Nothing further, Your Honor.

17       JUDGE CARISSIMI:  Very good.

18       I have one question, Mr. Roseberry.

19       THE WITNESS:  Sure.

20       JUDGE CARISSIMI:  Tell me what a "Cat" is?

21       THE WITNESS:  It is a piece of equipment we use to move

22  railcars around with in our plant.

23       JUDGE CARISSIMI:  Is it made by Caterpillar?

24       THE WITNESS:  Yes.

25       JUDGE CARISSIMI:  Thank you.

1      THE WITNESS:  Yep.

2      JUDGE CARISSIMI:  Cross-examination?

3      MS. OHAERI:  Can I have three minutes, please?

4      JUDGE CARISSIMI:  Absolutely, off the record.

5  (Off the record.)

6      JUDGE CARISSIMI:  On the record.

7      Ms. Ohaeri, you may cross-examine.

8                      CROSS-EXAMINATION

9  Q    BY MS. OHAERI:  Prior to you being hired at Penford, did

10 you have regular contact or communications with Mike Sarchett?

11 A    I had seen Mike, in passing.  He was also married, at one

12 time, to my cousin, so I wouldn't say it was a real close

13 relationship, but I have been in contact with Mike over the

14 years.

15 Q    Do you spend time with Mr. Sarchett outside of work?

16 A    No.

17 Q    Do you call him on a cell phone, when he is not at work, to

18 talk about non-work things?

19 A    No.

20 Q    Do you ever go out with Mr. Sarchett, to spend time

21 together, to hang out, go have beers, or anything like that?

22 A    No.

23 Q    Did Jeff King ever report to you as the customer service

24 operations manager?

25 A    No.

1  Q    How often -- sorry, strike that.  At the time that Mr. King

2  worked at Penford, prior to his retirement, how much time did

3  you spend talking to Mr. King at work -- about work?

4  A    Probably a couple times a week, maybe.

5  Q    Were these long conversations?

6  A    Not necessarily.  Most of the time it was -- since I was

7  responsible for everything related to the customer and what we

8  needed to get moved from place to place within the plant, and

9  Jeff was in that role as mobile supply, had conversations as far

10  as what we needed to get moved around, sometimes, and thinks

11  like that.  So it was more of a work-related than it was on a

12  personal relationship.

13        MS. OHAERI:  That is all.

14        JUDGE CARISSIMI:  Very good.

15        Any redirect?

16        MR. FUNK:  No, Your Honor.

17        JUDGE CARISSIMI:  Mr. Roseberry, thank you, you may step

18  down.  You are excused as a witness, sir.

19        THE WITNESS:  Thank you.

20        JUDGE CARISSIMI:  Thank you.

21  (Witness excused from the stand.)

22        JUDGE CARISSIMI:  Do you have another witness for us?

23        MR. FUNK:  We do.

24        JUDGE CARISSIMI:  Very good.

25        Let's go off the record.

1   (Off the record.)

2       JUDGE CARISSIMI:  On the record.

3       Counsel for Respondent, you may call your next witness.

4       MR. FUNK:  Respondent calls Jon Swails.

5       JUDGE CARISSIMI:  Mr. Swails, if you could please stand for

6   a moment and raise your right hand, sir?

7   (WITNESS SWORN:  JON SWAILS.)

8       JUDGE CARISSIMI:  Please have a seat.

9       MR. FUNK:  Mr. Swails, could you please spell your last

10  name for the record?

11      THE WITNESS:  S-W-A-I-L-S.

12                      DIRECT EXAMINATION

13  Q   BY MR. FUNK:  Where are you employed?

14  A   Ingredion.

15  Q   How long have you been employed at Ingredion?

16  A   Thirty-four years, eight months, 21 days.

17  Q   Has it been Ingredion that whole time?

18  A   No.

19  Q   Before Ingredion, who was the Employer?

20  A   Penford Products.

21  Q   What is your job title at Ingredion?

22  A   Maintenance planner, wet starch.

23  Q   Did you say "maintenance planner in wet starch"?

24  A   Wet starch, yep.

25  Q   Okay.  How long have you been in that position?

 1    A      Twenty-three months.

 2    Q      What are your duties as maintenance planner in wet starch?

 3    A      Coordinate the maintenance, coordinate the outages, see if

 4    there is equipment to keep the plant running, fill in for the

 5    process specialist or the process engineer if they are off.

 6    Q      Did you have any role in negotiating a successor collective

 7    bargaining agreement in summer, 2015?

 8    A      No.

 9    Q      Do you know an employee named Adam Beitz?

10    A      Yes.

11    Q      Have you ever told Adam Beitz that the company offered the

12    Union a good contract?

13    A      No.

14    Q      Have you ever told Adam Beitz that the Union wanted

15    everything and wasn't willing to give anything up?

16    A      No.

17           MR. FUNK:  No further questions.

18           JUDGE CARISSIMI:  Cross-examination?

19           MS. OHAERI:  May I have five minutes, Your Honor?

20           JUDGE CARISSIMI:  Yes, off the record.

21    (Off the record.)

22           JUDGE CARISSIMI:  Let's go on the record.

23           Ms. Ohaeri, you may cross-examine.

24           MS. OHAERI:  Hello, Mr. Swails.

25           THE WITNESS:  Hello.

```
 1                    CROSS-EXAMINATION

 2  Q    BY MS. OHAERI:  You are familiar with the -- what is

 3  commonly referred to as the Red Book contract, right?

 4  A    Yes.

 5  Q    And you have negotiated contracts in the past, is that

 6  correct?

 7  A    Yes.

 8  Q    And you were a Union official, as well?

 9  A    Yes.

10  Q    You were the Union recording secretary?

11  A    Yes.

12       MS. OHAERI:  That is all.

13       JUDGE CARISSIMI:  Very good.

14       Mr. Swails, thank you, you are excused -- well, you don't

15  have anything further, right?

16       MR. FUNK:  That is right.

17       JUDGE CARISSIMI:  Okay, I just wanted to make sure.  I

18  didn't think so, but I wanted to give you the opportunity.

19       Thank you, sir, you are excused.

20  (Witness excused from the stand.)

21       JUDGE CARISSIMI:  All right, we can bring in another

22  witness.

23       Let's go off the record.

24  (Off the record.)

25       JUDGE CARISSIMI:  Let's go off the record.
```

1      Counsel for Respondent, you may call your next witness.

2      MR. FUNK:  Thank you, Your Honor.

3      Respondent calls Dave Vislisel.

4      JUDGE CARISSIMI:  Mr. Vislisel, if you would please stand

5  for a moment and raise your right hand, sir?

6  (WITNESS SWORN:  DAVE VISLISEL.)

7      JUDGE CARISSIMI:  Please have a seat.

8      Counsel, you may proceed.

9                  DIRECT EXAMINATION

10  Q    BY MR. FUNK:  Mr. Vislisel, could you please spell your

11  last name for us?

12  A    V as in Victor-I-S-L-I-S-E-L.

13  Q    Thank you.  Where are you employed?

14  A    Ingredion.

15  Q    How long have you been employed at Ingredion?

16  A    May of '87, so 29 years.

17  Q    Has it been Ingredion that whole time?

18  A    No.

19  Q    What was it before Ingredion?

20  A    Penford and Penick & Ford before that.

21  Q    What is your job title at Ingredion?

22  A    Plant coordinator.

23  Q    How long have you been in that position?

24  A    Since -- I think it was '09, when they switched.

25  Q    What are your duties as plant coordinator?

1   A    Basically, to help coordinate the facility for

2  manufacturing, safety, environmental health.

3   Q    Can you give us a little more detail about what you do?

4   A    Day-to-day operation, taking the area specialist -- they

5  usually have a list of things that's going on in their areas,

6  and we carry out what they started during the day, and make sure

7  that the facility keeps running smoothly.

8   Q    Did you have any role in negotiating a successor collective

9  bargaining agreement in summer, 2015?

10   A    No.

11   Q    Do you know an employee named Bruce Bishop?

12   A    Yes.

13   Q    Do you recall ever having any conversations with Bruce

14  Bishop about a potential strike?

15   A    No.

16   Q    Have you ever told employees that they would never return

17  to work if they went on strike?

18   A    No.

19   Q    Have you ever told employees that they might want to think

20  long and hard about walking out on Ingredion?

21   A    No.

22   Q    Have you ever told employees that Ingredion has "deep

23  pockets"?

24   A    No.

25   Q    Have you ever told employees that if they went on strike,

1    they might not get back in the door?

2    A    No.

3    Q    Do you know an employee named Brandon Morris?

4    A    Yes.

5    Q    Do you recall ever talking to Brandon Morris about voting

6    on a contract in the summer of 2015?

7    A    No.

8    Q    Do you recall ever telling Brandon Morris that the

9    company's contract was a good offer?

10   A    No.

11   Q    Do you recall ever asking Brandon Morris why employees

12   voted down the company's proposed contract?

13   A    No.

14   Q    Do you recall ever telling Brandon Morris that you couldn't

15   believe that they voted down the company's proposed contract?

16   A    No.

17        MR. FUNK:  No further questions.

18        JUDGE CARISSIMI:  Cross-examination?

19        MS. OHAERI:  Nothing.

20        JUDGE CARISSIMI:  Very good.

21        Mr. Vislisel, you are excused as a witness, sir, you may

22   step down.  Thank you very much.

23        THE WITNESS:  Thank you.

24   (Witness excused from the stand.)

25        JUDGE CARISSIMI:  Off the record.

Veritext National Court Reporting company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1   (Off the record.)

2        JUDGE CARISSIMI:  On the record.

3        Respondent, you may call your next Witness.

4        MR. BUTTRICK:  Thank you, Your Honor.  Respondent calls Ken

5   Meadows.

6        JUDGE CARISSIMI:  Mr. Meadows, please step up and take a

7   seat.  And, sir, since you have already been sworn as a witness,

8   I won't repeat the oath.  I will just remind you that you are

9   still under oath, sir.

10       THE WITNESS:  Yes, sir.

11  (WITNESS PREVIOUSLY SWORN RECALLED:  KEN MEADOWS)

12       MR. BUTTRICK:  Mr. Meadows --

13       JUDGE CARISSIMI:  Mr. Buttrick, you may proceed.

14       MR. BUTTRICK:  -- oh, sorry.

15       JUDGE CARISSIMI:  That is all right.

16                      DIRECT EXAMINATION

17  Q    BY MR. BUTTRICK:  Mr. Meadows, what is your name?

18  A    Ken Meadows.

19  Q    And where are you employed?

20  A    Ingredion.

21  Q    And how long have you been employed at Ingredion or its

22  predecessor?

23  A    Fourteen -- sixteen years.

24  Q    And what is your job title?

25  A    Director of human resources.

1   Q    And what are some of your job duties as the director of

2   human resources?

3   A    As I said the other day, approximately 80 percent is

4   handling labor, union contracts, labor negotiations at our union

5   facilities.  Ten percent at just general human-resource

6   functions at some of the other plants, and 10 percent just

7   overall management.

8   Q    Are you the custodian of the company's bargaining

9   proposals?

10  A    Yes, I am.

11  Q    Are you also the custodian of the company's bargaining

12  notes?

13  A    Yes, I am.

14  Q    Prior to Ingredion's purchase of Penford's Cedar Rapids

15  facility, approximately how many plants did Ingredion operate in

16  the United States?

17  A    Nine.

18  Q    And approximately how many plants were unionized, prior to

19  the purchase of the Penford Cedar Rapids facility?

20  A    Five.

21  Q    When did Ingredion come to own the Cedar Rapids facility?

22  A    March 11th of 2015.

23  Q    Did Ingredion attempt to hire new employees at the Cedar

24  Rapids plant upon the closing of the transaction?

25  A    No.

1 Q     Did Ingredion try to set initial terms and conditions of

2 employment, at the Cedar Rapids plant, upon the closing of the

3 transaction?

4 A     No.

5 Q     Did Ingredion take any steps to try to make the Cedar

6 Rapids plant non-union as a part of the transaction?

7 A     No.

8 Q     Why not?

9 A     The company has no problem with unionized plants.  We have

10 had good working relationships with our union facilities.

11 Q     Approximately how many employees are in the bargaining unit

12 at the Cedar Rapids plant?

13 A     I think, at the time, it was about 155, 160.

14 Q     Ryan will hand you what has been marked as Penford Exhibit

15 11.

16 (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 11.)

17 (Witness proffered document.)

18 Q     BY MR. BUTTRICK:  Mr. Meadows, what is Penford Exhibit 11?

19 A     This is the letter of notification that I sent to Chris

20 Eby, informing him that Ingredion had taken over possession of

21 the company.

22 Q     And did you draft this letter?

23 A     Yes, I did.

24 Q     And is this letter kept as a customary part of the

25 company's business?

1  A    Yes, it is.

2       MR. BUTTRICK:  I move to admit Penford 11.

3       JUDGE CARISSIMI:  Is there any objection to Penford 11?

4       MR. WIESE:  No objection, Your Honor.

5       JUDGE CARISSIMI:  Exhibit 11 is received.

6  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 11.)

7  Q    BY MR. BUTTRICK:  Did Ingredion continue to honor the

8  Penford collective bargaining agreement after it purchased the

9  Cedar Rapids plant?

10 A    Yes, it did.

11 Q    Did you communicate that to the Union?

12 A    Yes, I did.

13 Q    How did you do that?

14 A    In this letter.

15 Q    And if you can look at what has already been introduced

16 into evidence as Joint Exhibit 16 -- Mr. Funk will help find

17 that for you.

18 (Witness proffered document.)

19 Q    Do you recognize Joint Exhibit 16 as the Penford collective

20 bargaining agreement?

21 A    Yes, I do.

22 Q    And was it also commonly called the Red Book?

23 A    Yes, it is.

24 Q    So how much longer -- or when did the Red Book expire?

25 A    August 1, 2015.

1 Q    Did you ever tell the Union that the company was no longer

2 going to recognize the Union as the employees' collective

3 bargaining representative?

4 A    No.

5 Q    Did you ever tell the Union that company was not going to

6 continue to honor the Red Book, for the rest of its duration?

7 A    No.

8 Q    So did the company continue to honor the Red Book until it

9 expired?

10 A    Yes.

11 Q    Tell me about that.

12 A    All the terms and conditions, everything that was in the

13 book, the plant was still operating under.

14 Q    Did the company continue to hold labor relations meetings?

15 A    Yes, they did.

16 Q    And if you could just turn your attention to what has

17 already been introduced into evidence as GC Exhibits 11, 14, 40,

18 and Penford 12?  And you can tell me when you have those in

19 front of you.

20 A    I have them in front of me.

21     MR. WIESE:  Just one moment, Your Honor.

22     JUDGE CARISSIMI:  Yes, General Counsel, you can tell me

23 when you are ready.

24 (Pause.)

25     MR. WIESE:  Thank you, Your Honor.

1      JUDGE CARISSIMI:  Very good.

2      You may proceed, Mr. Buttrick.

3      MR. BUTTRICK:  Thank you, Your Honor.

4  Q   BY MR. BUTTRICK:  Mr. Meadows, do you recognize these as

5  labor relations meeting minutes for the meetings that the

6  company continued to have with the Union after Ingredion

7  purchased Penford?

8  A   I do, except one of them is actually before we purchased

9  the company.

10 Q   Which one is that?

11 A   The one that says February 19th.

12 Q   Okay, thank you.  If you can refer to what is introduced

13 into evidence already as GC Exhibit 15?

14 A   I have it.

15     MR. BUTTRICK:  Does everyone have it in front of them?

16 Okay.

17 Q   BY MR. BUTTRICK:  What is this document?

18 A   This was the notice that's sent to Jethro Head and Chris

19 Eby concerning our opening the collective bargaining agreement.

20 Q   And is this notice required under the terms of the Red

21 Book?

22 A   Yes, it is.

23 Q   And do you recall where, in the Red Book, it requires this

24 notice?

25 A   I would have to look at the contract to give you the exact

1    article or if it's in the preamble.

2    Q    Okay, that is all right, it is not that important.

3    A    Okay.

4    Q    So no worry.

5    A    Now, did the Union say anything to you, during this period,

6    to suggest that it thought that Ingredion was not going to

7    continue to honor the contract for the rest of its duration?

8    A    No.

9    Q    If you can turn your attention to -- or, actually, Ryan

10   will hand you what has been marked as Penford Exhibit 14.

11   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 14.)

12   (Witness proffered document.)

13   Q    BY MR. BUTTRICK:  Mr. Meadows, what is Penford Exhibit 14?

14   A    This is the document that Chris Eby sent from the Union, to

15   the company, to open up the contract.

16   Q    And as the company's lead negotiator, did you ultimately

17   get a copy of this letter?

18   A    Ultimately, I got a copy of it.

19   Q    And is this letter kept in the customary course of the

20   company's business?

21   A    Yes, it is.

22       MR. BUTTRICK:  I move to admit Penford Exhibit 14.

23       JUDGE CARISSIMI:  Is there any objection to Respondent's

24   14?

25       MR. WIESE:  No objection, Your Honor.

1     JUDGE CARISSIMI:  Respondent's 14 is admitted.

2   (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 14.)

3   Q    BY MR. BUTTRICK:  So, Mr. Meadows, when did you first go to

4   the Cedar Rapids facility?

5   A    It was April 6th of 2015.

6   Q    And did you go there with others from Ingredion?

7   A    I did.

8   Q    Who?

9   A    The vice president of manufacturing, Mark Madsen and the

10  vice president of human resources, Becky Tinkham, were my

11  traveling.

12  Q    And why did you go there?

13  A    We went there to do a general introduction, meet-and-greet

14  scenario with the -- we met with all the salaried individuals,

15  opened it up for questions about their concerns about the new

16  company.  And we had actually reached out to Pat Drahos and

17  asked her if she could set up a meeting with us for the Union

18  committee, that we would like to meet with them for

19  introductions.

20  Q    Is it your practice to visit newly purchased facilities?

21  A    Always.

22  Q    Have you done this in the past?

23  A    Yes.

24  Q    What are some examples?

25  A    Argo, Winston-Salem, Stockton, Richland, Mapleton, pretty

1    much every plant that we possess.

2    Q    And when you have gone to visit newly purchased plants,

3    have you greeted employees directly?

4    A    Yes.

5    Q    And, so, when you went to the Cedar Rapids plant, what did

6    you do?

7    A    When we got in there that morning -- the three people that

8    I just mentioned -- they had set up a meeting with all of the

9    salaried people, just for introductions, and then --

10        MR. WIESE:  Objection, Your Honor, vague.  Who are the --

11   this is more for clarity than anything -- who are the three

12   people?

13        THE WITNESS:  I am sorry.

14        JUDGE CARISSIMI:  Well, perhaps counsel would be getting to

15   that.  But, once again, if there is something that you are

16   unclear about there is always cross-examination to clear it up.

17        But you may proceed, you can answer the question, sir.  Do

18   you remember the question?

19        THE WITNESS:  I do.

20        JUDGE CARISSIMI:  Okay.

21        THE WITNESS:  Becky Tinkham, Mark Madsen, and myself met

22   with all the salaried people, basic introductions.  Mark Madsen

23   had a PowerPoint presentation that he went through, just to kind

24   of do an overview of the company.  And then we talked about some

25   -- the fact that we were going to be doing some reorganization.

1    Becky Tinkham spoke on what some of the processes that we'd be
2    using for opening it up for people to -- for jobs, and jobs that
3    are at some of other facilities.  And I also talked about that.
4    And then it was pretty much opened up for questions from the
5    group.  And we finished that meeting.
6        We did have a minor meeting with some of the supervisors
7    that -- there was some people that could not make it to the
8    meeting, that were out on the floor supervising.  And when they
9    got a chance, we had another little group meeting with those
10   people.  And then we had a meeting with the Union committee.
11   Q    BY MR. BUTTRICK:  And so, who did you meet with in the
12   Union committee?
13   A    Chris Eby was there, Ms. Shannon was there, Matt Maas.
14   There was another gentleman from the Union and I just cannot
15   remember his name.  In that meeting, Mark Madsen was there.  He
16   was only there for a short period, because he had to get to
17   another meeting, so he introduced himself and left, just very
18   shortly after he introduced himself.  Becky Tinkham was there,
19   Pat Drahos was there, and Phil Kluetz was there.
20   Q    So what did you discuss with the Union bargaining
21   committee?
22   A    It was opened up, general introductions as to who was who,
23   and general conversation, "Where are you from?  How long have
24   you been with the company?" type thing.  And kind of pushed it
25   to the Union members about questions they had.  And got in some

1    -- answered some of the questions that they had.

2    Q    What were their questions?

3    A    One of the questions -- Mr. Eby, you know, did mention the

4    fact we had negotiations coming up, and was interested in what -

5    - where we may be coming from.  And we did have discussions, and

6    I explained that, you know, you could probably figure a lot of

7    the standard stuff will be there.  Medical insurance -- medical

8    insurance is an issue for us.  I mentioned the fact that -- why

9    it was an issue for us, because of some of the laws that were

10   changing, the Cadillac tax that was coming, and explained that.

11   I explained to him that probably, you know, that pensions were

12   always a risk factor for us, and that was probably something to

13   be discussed.  Wages, of course, and all the standard-type

14   stuff, from that standpoint.

15       There was a discussion about the code of conduct, about

16   signing off on it.  And I know there was discussion on it, and

17   remember Mr. Eby explaining that the company wanted to have

18   people sign off on it, you know, it wasn't right.  And I agreed

19   with him, but I thought that was handled.  And he said, "Yes, it

20   was handled," but, you know, didn't think it was done right, but

21   it was handled and taken care of.

22       Then there was a discussion about the manlifts, and that

23   was the first time I had been hit with the manlifts.  And Mr.

24   Eby explained to me that the company had done that wrong.  That

25   we couldn't shut down manlifts without their permission.  And,

1  "What do you mean, without your permission?" and he explained

2  that we had to get permission from them before we did that.  And

3  I had a discussion with him that Ingredion, we have had a bad

4  experience with those manlifts, they are very, very dangerous.

5  And in all of our facilities they have been shut down, because

6  there's no safety harness, there's nothing to protect people,

7  and that Ingredion did not like them.  I explained to Mr. Eby

8  that -- and he made another comment, "Okay, but you have to have

9  our permission."  And I remember making a comment that "Some

10  things are not negotiable, and Ingredion will not negotiate a

11  man's life."  And that if the company -- that part of the

12  process, decided to shut it down, we wouldn't seek permission to

13  shut it down, it was going to get shut down.

14       However, I did agree that maybe if -- they should have told

15  the Union, talked to them about it, and let them know that it

16  was going to happen.  And my understand, from Mr. Eby, was that

17  they had not talked to him, they just had done it.  And I agreed

18  with him, that, "Yeah, we should communicate that type of stuff

19  with you as it is being done."

20  Q    At any point, during this meeting with the Union's

21  bargaining committee, did you use a hand gesture to cut anybody

22  off?

23  A    Did I use a hand gesture?  Yes, I have a tendency to talk

24  with my hands.  And there was a discussion on the medical

25  insurance, and I told the Union that I had really not looked at

1   their contract yet, that I had only had a chance to glance at

2   it.  And I do not remember who, from their side, somebody made a

3   comment about their deductible and all.  And Pat Drahos started

4   going through what the deductible was, and going through stuff

5   and all.  And she started going on, and I did raise my hand to

6   say, you know, "Stop," and kind of waved my hand to "Stop,"

7   because I didn't really want to get into that much detail about

8   it, because I hadn't even had a chance to look at it.

9   Q    Was there any discussion in the meeting from the Union's

10  bargaining committee about things that they wanted from the

11  company to make their jobs easier?

12  A    Ms. Shannon made a comment about -- that she was telling me

13  she was in lubrication, and that she had to move a lot of

14  equipment, or supplies, or stuff around the plant, from one area

15  to another, and some kind of a cart or vehicle to move this

16  stuff around would sure be nice.

17  Q    And so what happened from that?

18  A    I told her I'd mention that up, and I did mention it to the

19  plant manager, that, "Hey, you know, they said something like

20  this would make their job easier," because carrying these big

21  things around was hard.

22  Q    In this meeting with the Union's bargaining committee, did

23  you threaten that the company would replace employees if the

24  Union failed to give the company concessions?

25  A    No.

1  Q    Have you -- prior to this meeting, had you reviewed the Red

2  Book?

3  A    I am sorry, say that again?

4  Q    Prior to this meeting with the Union, had you reviewed the

5  Red Book?

6  A    I had gotten it.  I had glanced at it, but I had really not

7  looked into any depth on it.

8  Q    Based upon your review of the Red Book, did you understand

9  that the company had the management right to shut down the man

10 elevators?

11 A    Yes.

12 Q    Why is that?

13 A    Under the management's right clause, anything in the

14 process is -- the company has the right to make the decision on.

15 Q    Now, after a meeting with the Union's bargaining committee,

16 did you ultimately talk to other employees that day?

17 A    I did.

18 Q    Please talk about that.

19 A    Those meetings went a little bit faster than the time that

20 we allowed, so I had some extra time.  And I got ahold of Erwin

21 Froehlich and asked him if he could set up -- get some people to

22 take me around the plant, just to see it.  And -- because there

23 was one area that I actually wanted to see, which was ethanol,

24 because that is something I was not used to.  I actually wanted

25 to see about the flood, and what they had told me about how the

1    water had come over, and all.  And I just wanted to take a tour

2    of the plant.  And he said he could get some people to do it.

3    Q    And so who gave you a tour of the plant?

4    A    Phil Kluetz and Levi Wood came and gave me my equipment and

5    took me around the plant.

6    Q    Was there any preconceived plan on what employees you

7    wanted to talk to?

8    A    No.

9    Q    Did you talk to salaried people?

10    A    Talked to salaried and hourly, yes.

11    Q    So was the tour something you had planned in advance?

12    A    It is something that I do every time I go to a plant, but

13    it was not pre-planned.  In this particular case, I had the time

14    and took advantage of it.

15    Q    So where else have you done plant tours?

16    A    There's not a facility that we have that I don't do plant

17    tours at them.  Any time we purchase a facility, I tour the

18    plants.  When I go and visit the plants, I always try to do a

19    plant tour of the plant.

20    Q    And did you call any employees into an office to talk to

21    them as a part of this tour?

22    A    No.

23    Q    Approximately, how many employees would you say you talked

24    to on the tour?

25    A    I would say I ran into about 10 to 12 people.

1  Q    And approximately how many of those were salaried

2  employees?

3  A    Three to four of them.

4  Q    Where were these employees when you talked to them?

5  A    The first place we stopped at was -- I thought it was

6  ethanol.  And I talked to two individuals in there -- actually,

7  three, because I was talking to two and one gentleman came in

8  while we were talking.

9  Q    Do you know the names of these individuals?

10  A    I don't remember their names.

11  Q    What do you recall about the conversation in the ethanol

12  control room?

13  A    I mean, there was a lot of general conversation and all.

14  There was introductions as to who I was, what I did, and all,

15  and conversations just went around.  I asked them if there was

16  any particular questions they had about it, and the statement I

17  used was that, "I know, a lot of times, when a company gets

18  bought out, the employees have a lot of questions about the

19  company that bought them.  And if there's any questions you've

20  got, you know, that I an answer, I will be more than happy to

21  answer.  If there's one I can't, don't know the answer to, I

22  will try to get a response back to you on it."  And there was a

23  lot of different questions about different things, some of them

24  about product and all.  "What product do you make at Indy?  What

25  product do you make?  What do you make compared to us?"  In the

1   ethanol group, one of the questions was did we make ethanol

2   anywhere else, and my response was, "No, this is the only

3   facility that has ethanol."

4       And then there was some comments made by one individual,

5   about getting ready to retire, you know, "We don't want to lose

6   our gap insurance."  I listened, and then the other guy jumped

7   in on that, but, I mean, it was -- that was just -- I heard it,

8   but there was no discussion on it.

9   Q    So after those employees brought up gap insurance, what was

10  your response?

11  A    That if -- you know, bargaining was coming up, and if that

12  is something that was of importance to them, they needed to get

13  a hold of their bargaining committee and make sure they let them

14  know.

15  Q    In any of your conversations, when you took the tour of the

16  plant, did you say anything to employees that the company was

17  seeking concessions in bargaining?

18  A    No.

19  Q    Did you ever say anything about the company wanting to

20  replace employees?

21  A    No.

22  Q    Did you promise employees anything during these

23  conversations?

24  A    No.

25  Q    Did you make any kinds of threats to employees during these

1   conversations?

2   A    No.

3   Q    Did you take any notes about these conversations with

4   employees?

5   A    I took no notes on that.

6   Q    Let's turn your attention to the company's and the Union's

7   collective bargaining for a new contract that started last year.

8   Did you participate in that collective bargaining?

9   A    Yes, I did.

10  Q    What was your role?

11  A    I was the lead negotiator.

12  Q    Did you prepare all of the company's bargaining proposals?

13  A    Yes, I did.

14  Q    And did the company make or modify any of its proposals

15  based upon any feedback you received directly from the

16  bargaining unit employees?

17  A    No.

18  Q    Had you ever been a lead negotiator for contract

19  negotiations before?

20  A    Yes.

21  Q    Approximately how many times?

22  A    If you take in consideration places outside of the U.S. --

23  Canada, Mexico, Brazil, Germany, Australia -- 50 plus.

24  Q    Have you ever been found by the National Labor Relations

25  Board to have been bargaining in bad faith?

1  A    Never.

2  Q    In any of these negotiations, did you work from the

3  previous collective bargaining agreement, if there was one?

4  A    Yes.

5  Q    Please explain.

6  A    Every contract that we do, especially on the places that we

7  have purchased, I have always taken their contract and see what

8  is in it, and work from it.  If it can be enhanced and improved,

9  I work from it and move on.

10 Q    Did you consider working from the Red Book in your

11 negotiations for the Cedar Rapids facility?

12 A    Yes, I did.

13 Q    And what did you conclude?

14 A    There was -- the consistency within that contract did not

15 meet the consistency of a lot of our other contracts.  And where

16 we needed to take this plant to, that contract just did not fit

17 for where we needed it to.  There was a lot of changes that

18 needed to be made in it that -- I looked at it and said, "I'm

19 better off just starting fresh."

20 Q    What were the company's goals, going into the 2015

21 negotiations?

22 A    Well, to get a contract, but we wanted to make sure the

23 contract was consistent with our other contracts, that what we

24 were doing -- I always try to make sure that what we are doing

25 at the other facilities, that we are treating the people the

1    same as we are doing at -- would be doing the same at Cedar

2    Rapids.  And we wanted to make sure that the contract allowed

3    for us to grow the business.

4    Q    Ryan will hand you what has been marked as Penford Exhibit

5    16.

6    (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 16.)

7    (Witness proffered document.)

8    Q    BY MR. BUTTRICK:  What is Penford Exhibit 16?

9    A    This is actually my first draft, taking their current

10   contract book and putting company proposal together.  And this

11   was the first draft.

12   Q    Did you prepare this document?

13   A    I did.

14   Q    And does the company maintain this document as a part of

15   its normal business records?

16   A    Yes, they do.

17        MR. BUTTRICK:  I move to admit Penford Exhibit 16.

18        JUDGE CARISSIMI:  Any objections to Respondent's 16?

19        MR. WIESE:  Voir dire, briefly, Your Honor?

20        JUDGE CARISSIMI:  You may.

21                          VOIR DIRE

22   Q    BY MR. WIESE:  Looking at page PF3160?

23   A    I am sorry?

24   Q    PF3160.

25   A    Okay.

1   Q    The handwriting in the lower right-hand corner, whose

2   handwriting is that?  It is the second page of the document.

3   A    That would be mine.

4   Q    When did you create this document?

5   A    This was probably right at the middle of May-ish.

6   Q    Can you be any more specific than that?

7   A    The exact date, no, I know it was probably during that

8   second week of May into the -- portion.

9       MR. WIESE:  No objection, Your Honor.

10      JUDGE CARISSIMI:  Respondent's 16 is admitted.

11  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 16.)

12               CONTINUED DIRECT EXAMINATION

13  Q   BY MR. BUTTRICK:  So, Mr. Meadows, did you ultimately,

14  then, use the Red Book as a basis for your contract proposals?

15  A    I am sorry, can you say that again?

16  Q    Did you ultimately use the Red Book as the starting point

17  for your contract proposals?

18  A    Yes, I did.  Did I use the Red Book as my -- I am sorry,

19  ask the question again.

20  Q    Did you use the Red Book as the starting point for all of

21  your contract proposals, after reviewing it?

22  A    No.  I put a new proposal together.

23  Q    And why did you do that?

24  A    After going and looking at this document and, you know, you

25  just saw where this -- to get some consistency and get where we

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 955 of 1141

1    needed to, started deleting this and deleting this, and moving

2    this and moving that, it just was getting convoluted, and it was

3    just, to me, simpler to take and put a new document together.

4    Q    And who else was on the company's bargaining committee in

5    the summer of 2015?

6    A    Erwin Froehlich was there.  Levi Wood was on the committee.

7    Kim Villegas joined at one point.  There was a session she

8    couldn't make, and Kris Nisavic, a trainee in our group, joined

9    for a day or day and a half.  And then when Andy Sullivan joined

10   on board, he came in.

11   Q    Do you recall who was on the bargaining committee for the

12   Union?

13   A    Yeah, I have to do it based upon how they were sitting

14   across from me.  There was Kelly Yeisley, Chris Eby, Jethro

15   Head, Renita Shannon, and Matt Maas.

16   Q    Did you take any notes at the table?

17   A    No, I did not.

18   Q    Did anyone else take notes?

19   A    Yes.

20   Q    Who?

21   A    Levi Wood was the main person responsible for taking notes,

22   and then Erwin Froehlich was taking notes, also.

23   Q    If you can turn your attention to what has already been

24   introduced into evidence as Penford Exhibits 66 and 67?

25   (Witness proffered document.)

1   A      Okay.

2   Q      Did you review Mr. Wood's and Mr. Froehlich's notes during

3   the bargaining?

4   A      Yes.

5   Q      And do you recognize these to be the notes that they took?

6   A      Yes, PF67 is Levi Wood's and this PF66 was Erwin

7   Froehlich's.

8      MR. BUTTRICK:  I am going to now move to introduce a

9   demonstrative exhibit, so Ryan will hand everybody what is known

10  as Penford Exhibit 74.

11  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 74.)

12     MR. BUTTRICK:  And I apologize that the font is small.  I

13  appreciate that it is a little hard to read.  But let me explain

14  what this is.  Just as the Counsel for the General Counsel did a

15  demonstrative exhibit or two last time, what we did here is we

16  charted out -- at the top you will see all of the different

17  proposals that the parties gave during their bargaining, from

18  June 1st until the last, best and final.  Top to bottom, on the

19  left-hand side, you will see the subject matter of what those

20  proposals were.

21     And so what this chart shows is it reflects movement.  And

22  so it reflects in blue, Union movement; it reflects in green,

23  company movement.  And if you see, for example -- and yellow is

24  an expression of when the company expressed a willingness to

25  move.  And so, Federal Rule of Evidence 1006 says you can have

1  summaries of voluminous documents, so long as the underlying

2  documents themselves are in evidence.  The proposals are all in

3  evidence.  The bargaining notes are all in evidence.  And so it

4  is the company's position that this demonstrative exhibit is

5  properly admissible into evidence.

6      JUDGE CARISSIMI:  So you are moving to admit Respondent's

7  74 at this time?

8      MR. BUTTRICK:  That is correct.

9      JUDGE CARISSIMI:  Is there any objection to Respondent's

10  74?

11      MR. WIESE:  Well, Your Honor, we have had -- this is the

12  first time I am seeing this document.  There's a lot of

13  information on there, it is difficult for me to say, without

14  having a chance to compare it to the underlying documents,

15  whether the summary is accurate.

16      JUDGE CARISSIMI:  Well, what I would propose is this:  I

17  will reserve ruling on Respondent's 74, and if you could let me

18  know tomorrow what your position is on that?

19      MR. WIESE:  Yes.  We can do that, Your Honor.

20      JUDGE CARISSIMI:  Counsel makes -- counsel for Respondent

21  makes a point, that I will discuss on the record.

22      There are summaries, like this, that are based upon

23  evidence that is already in the record.  And then there are

24  summaries that are not based on record evidence, it is a

25  voluminous bunch of records and, you know, some party comes in

1  with a summary, and of course, in that situation, the opposing

2  party must be given an opportunity to check the records from

3  which the summary is made.

4      So this is a little bit different than that situation,

5  because the documents are already here, and -- if I admit this

6  document -- any party, and I would assume, since it is the

7  Respondent's summary, it won't be them -- but the General

8  Counsel could say, "Our position is that summary isn't accurate

9  in this respect, because it says this, but if you look at this

10  piece of evidence it shows otherwise."

11      So I want you to keep that in mind when you review the

12  records and make your decision about whether you are going to

13  object to it, because the underlying documents from which it,

14  necessarily, has been prepared, are already admitted into

15  evidence.  All right?

16      MR. WIESE:  Understood, Your Honor.

17      JUDGE CARISSIMI:  Very good.  But we will take that up

18  tomorrow, and I do -- I understand that there was a lot of

19  bargaining meetings, I mean, not as many as in some cases, but

20  enough that you need an opportunity to look at this before you

21  can express an intelligent position regarding it.  So we will

22  take that approach.

23      So I will reserve ruling until tomorrow morning.

24      MR. WIESE:  Okay, thank you.

25      MR. BUTTRICK:  Thank you, Your Honor.

1   Q     BY MR. BUTTRICK:  Mr. Meadows, did the Union make any

2   requests for information before the parties' first bargaining

3   session?

4   A     Yes, they did.

5   Q     And Mr. Funk will hand you what is already in evidence as

6   Joint Exhibit 17.

7   (Witness proffered document.)

8   Q     Do you recognize this document?

9   A     Yes, I do.

10   Q     And were you involved in helping compile the company's

11   response to this information request?

12   A     I directed the individuals at the facility to get the

13   information together for them.

14   Q     And are you aware whether or not the company did, in fact,

15   respond to this information request?

16   A     Yes, they did.

17   Q     Mr. Funk will reference -- call your attention to Joint

18   Exhibit 18.

19   (Witness proffered document.)

20   Q     Do you understand this to be the company's response to

21   Joint Exhibit 17?

22   A     Yes, I do.

23   Q     So, when did the parties' first bargaining session take

24   place?

25   A     June 1, 2015.

1  Q    And who all was there?

2  A    On that day, from the company, it was Erwin Froehlich, Levi

3  Wood, and myself; and, from the Union was Kelly Yeisley, Chris

4  Eby, Jethro Head, Renita Shannon, and Matt Maas.

5  Q    Did you identify who would be the lead negotiator for the

6  company?

7  A    Yes, I did.

8  Q    What did you say?

9  A    Explained that I would be the lead negotiator, went through

10  an explanation about the fact that there was a lot of

11  transitional items going on, and that the people that were on my

12  side, Erwin and Levi, that depending on a day that we set as

13  negotiation, could something interfere with them being there

14  that day.  There was always that possibility, and somebody might

15  substitute, but that I was the consistent, and I was the lead

16  negotiator, and I would always be there.

17  Q    Did you have any conversation with the Union about the

18  company's goals in the bargaining?

19  A    Yes, I did.  I -- during statements, you know, I have

20  explained that the company's goal was to get a contract, that we

21  wanted to get a contract.  I did explain that, you know, there

22  was some radical changes coming -- what people may consider

23  radical changes -- because of where we needed to take the plant.

24  I also, in that meeting, talked -- the initial June 1st meeting

25  -- talked about the aspect that the way that Penford would have

 1  been organized didn't fit our model, and that we were going to

 2  have to change the organizational structure -- management

 3  structure.  And that the plant actually had -- before we

 4  purchased it, the way they were set up -- two plant managers.

 5  We changed that to one plant manager, and I introduced Erwin

 6  Froehlich as the, going-forward, plant manager of the facility,

 7  and all would report in to him.

 8  Q    Did the Union have any response about what it wanted its

 9  goals to be during the bargaining?

10  A    The Union didn't make a lot of comments.  He did make one

11  from the standpoint that they had not had a raise in -- and I

12  forget the length of time, the last two bargaining sessions and

13  all, had not had a raise, and that they weren't leaving the

14  table without a substantial wage increase.  And if there was a

15  lot of changes -- we were asking for a lot of changes -- we

16  weren't going to get very far.

17  Q    You said, "he," who is the "he"?

18  A    I am sorry, Jethro Head.

19  Q    Did the Union present any proposals at this meeting?

20  A    Yes, they did.

21  Q    If you can just turn your attention to what is already in

22  evidence as Joint Exhibit 10?

23  (Witness proffered document.)

24  Q    Do you recognize this as the Union's first proposal?

25  A    Yes, I do.

1  Q    Do you know whose handwriting is on this document?

2  A    That is Levi Wood's.

3  Q    And he was the chief note-taker for the company?

4  A    Yes.

5  Q    Did the company review the Union's first proposal?

6  A    Yes.

7  Q    And approximately how long did that review that?

8  A    Well, the Union passed out this proposal, and Jethro Head

9  went through it.  And before going through it, he stated that

10  there should not be a lot of discussion -- didn't need a lot of

11  discussion -- and he was going to go through it.  As he went

12  through it, I did ask some questions on some certain items.

13  There was some certain things, "Hey, this makes sense to me," "I

14  see what you are saying here," and made comments.  But response

15  to this total proposal we did not make that day.

16  Q    Do you recall what particular parts of the Union's proposal

17  you had comments about?

18  A    I remember, I think, 4 -- section 4(1) -- that, you know, I

19  made a comment that, "Okay, I understand what you are looking at

20  and I don't really have any questions."  And then there was, I

21  believe, a part on the 80 points that's on page 572, about the -

22  - there was a comment about 80 points, and I didn't have a

23  problem with the 80-point rule -- aspect.  And there was a

24  couple places I asked questions and Mr. Head just asked if we

25  would hold the questions.

1  Q    Did you make any comments regarding the company's need for

2  outside contractors?

3  A    Yes, I did.  When he brought up about the aspect on

4  contractors, I explained to him, at that point in time, that I

5  would have an issue with that one, simply because the plant

6  needed consistent contractors just to maintain the business.

7  Q    Did the company present any proposals to the Union at this

8  meeting?

9  A    Yes, we did.

10  Q    So you can reference, Ryan will hand you Joint Exhibit 1.

11  (Witness proffered document.)

12  Q    Do you recognize that to be the company's first proposals?

13  A    Yes, it is.

14  Q    Did you say anything, when you gave the Union the first

15  proposals, what parts of the Red Book that the company was

16  reopening?

17  A    Yes, I did.

18  Q    What did you say?

19  A    I had prepared another document that I read to the Union

20  about -- that we were looking at opening up every section, every

21  article, of the contract.

22  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 29.)

23  (Witness proffered document.)

24  Q    BY MR. BUTTRICK:  So I will hand you what is marked as

25  Penford Exhibit 29.  Mr. Meadows, do you recognize Penford

1  Exhibit 29?

2  A    Yes, I do.  These are the talking points that I actually

3  went through when I passed out our proposal to the Union, and I

4  am thinking they also got a copy of it.

5  Q    Did you prepare these talking points?

6  A    Yes, I did.

7  Q    Whose handwriting is that on the bottom right-hand corner?

8  A    That is Levi Wood's.

9     MR. BUTTRICK:  So I move to admit Penford 29.

10     JUDGE CARISSIMI:  Any objection to Respondent's 29?

11     MR. WIESE:  No objection, Your Honor.

12     JUDGE CARISSIMI:  Respondent's 29 is admitted.

13  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 29.)

14  Q    BY MR. BUTTRICK:  Did you ever tell the Union, during that

15  June 1st day, that the Union did not have a contract?

16  A    No.

17  Q    Did you say anything else about the company's proposal when

18  you gave it to the Union?

19  A    I explained they were -- that our intent with these

20  proposals was to keep things consistent with our other

21  facilities, and that -- open for discussion and questions about

22  it.

23  Q    In your presence, did the Union read the company's

24  proposal?

25  A    I am sorry, say that again?

1  Q    In your presence, did the Union read the company's

2  proposal?

3  A    No, they did not.  When I presented it to them, I explained

4  that I knew there was a lot of material here, and asked them if

5  they wanted me to go through it, or did they prefer to take the

6  time to read it, and then get back with me and ask me questions

7  -- but give them time to go through it first.  And Mr. Head

8  immediately told me that he was not going to accept our

9  proposals -- he wasn't going to accept this proposal, and it was

10  not written in the format that he wanted.  And I explained to

11  him that this was our proposal, and this is the way I was

12  presenting it -- and discussion back and forth on whether he was

13  going to accept it or not.  And asked him, "What do you want to

14  do?"  And he told me, "You do what you want to do."  So, at that

15  point, I wanted to cover it, so I went through the document,

16  line item by line item.

17  Q    When you went through the document, line item by line item,

18  did you explain the proposal as you read it to the Union?

19  A    Some of it was about -- didn't need to be explained.  I did

20  talk about the fact that some of the stuff that was in their

21  current contract would show up in here.  And I tried to point

22  out some of those items.  I tried to explain some areas that I

23  had questions about, that I put in here, that I wasn't sure

24  about on their -- that was from their Red Book, and that I

25  called some of those things out.  Some things that were

1  definitely different than what they had been used to in the

2  past, definitely pointed those things out to them as I went

3  through this.

4  Q    Do you recall any particular items that you pointed out?

5  A    Yes.  I mean, right off the bat, on the very first page.

6  One of the things that I had a problem, a concern about, I just

7  wanted to make sure that we got it right.  And if you look at

8  this document, you will see that on the section 2 of article 1,

9  that where the recognition clause is, that I was not 100 percent

10 sure about that, so I kind of wrote something in there.  And

11 then I put in bold on it, the word "Define," and I explained to

12 them that I wanted to have discussion about this to make sure

13 that it was correct.

14       The aspect on the -- how their dues was paid, that, you

15 know, definitely needed to double-check that.  There was a

16 section over -- under seniority, that how do you determine

17 seniority?  And I told them that was kind of unclear to me.

18 There was all kind of different ways people did it.  I wrote a

19 method in there, but, "Hey, you know, you guys have been doing

20 something a certain way, I need to understand, how is it you

21 want it?" -- mentioned that.

22       Another area that was -- while they explained to me that

23 they thought that they had it, and I am not sure we were talking

24 the same thing -- was nontraditional work.  Another area that I

25 got into a little bit of detail on, because I knew it was new,

1    was the extra crew, and took a little bit of time on the --

2    talking about the extra crew, and what our concept of the extra

3    crew was.

4    Q    What is the extra crew?

5    A    I am sorry?

6    Q    What is the extra crew?

7    A    The extra crew, as I explained to them, we knew, based upon

8    my looking at the plant, talking to Erwin Froehlich, and the way

9    that the plant was set up, and from -- actually looked at the

10   Union's request off of the May 13th, in looking at those

11   documents, and looked at the age/seniority aspect of it.  And

12   all indications were that you were going to start seeing a

13   number of people retire in that plant.  And so, what we had done

14   at our other facilities, we tried not to work -- what a lot of

15   companies do -- what you call "lean in head count."  I don't

16   have a problem putting extra head count in that plant, because

17   in the long run you are better off.  So we wanted to add extra

18   head count to the plant so the people were trained and able to

19   move -- be able to take over a position as people retired, and

20   you didn't have that lag in trying to get people hired and all.

21   So that is kind of what we looked at extra crew for.  They are

22   really and truly extra people

23   Q    When you were going through Joint Exhibit 1 with the Union,

24   did you highlight any issues about overtime?

25   A    Yes, I did.  The initial proposal was that overtime would

1   be paid after 40.

2   Q    Did you highlight any issues regarding leave?

3   A    On leave, there was something on leave on the S&A, moving

4   it from 52 weeks down to 26 weeks, on that.  There was also --

5   and so when you say "leave," sometimes people look at leave in

6   different ways.  But I also pointed out, under the vacation

7   language, I had been used to referring to a day of vacation as

8   in planning for it, as what I always called a "bank" day, so you

9   bank a day.  And looking at their former language, I realized

10  that they had called it "single-day vacation."  So I did point

11  out that what I had referred to as "bank" days was the same as

12  "single-day vacations."

13  Q    Did you say what you thought the parties ought to do if

14  they got stuck on any particular issue?

15  A    Yeah, we had -- there was a discussion about the fact of,

16  you know, some of this was going to be hard to get through and

17  all.  And, you know, been through too many of these, I know

18  there's times that happens, and you get stuck on -- you get

19  stalemated on an item.  And I made a comment, "Guys, you know,

20  if we are blocked on a certain item, we hit a brick wall, and

21  basically we are at impasse on that item, we just need to move

22  on and keep talking and getting the other stuff done."

23  Q    Who ended this session?

24  A    The Union.

25  Q    So was there another bargaining session that day?

1  A    Yes, we met back for a little bit again.

2  Q    Did the Union respond to the company's proposal in that

3 session?

4  A    No.

5  Q    What did the parties discuss in that session?

6  A    I am sorry?

7  Q    What did the parties discuss in that session?

8  A    When the next bargaining sessions would be.

9  Q    And do you recall what those dates were?

10  A    Yeah, Jethro Head asked me what I thought about dates, and

11 I threw out, I believe, June 10th and 11th as the initial.  And

12 Jethro came back with, you know, the 27th and 28th, I believe

13 were the date that he -- that he stated for June, as the next

14 dates.  Then he also said we could do July 13th, 14th, 15th, for

15 those days, and then, "Let's hold the last week of July 27th

16 open."

17  Q    At any point, on June 1st, did you threaten the Union with

18 impasse?

19  A    No.

20  Q    Did the union bring up vibration analysis on June 1st?

21  A    They did in their proposal.

22  Q    And did you have a response to that?

23  A    Not that day.

24  Q    Okay.  When was the next day of bargaining?

25  A    June 27th -- 28th -- I got to look at my notes to make

1    sure, but it was in the latter part of June.

2    Q    Feel free to look at your notes if you need to refresh your

3    recollection.  And they are not your notes, I understand, they

4    would be Levi's or Erwin's notes.

5         JUDGE CARISSIMI:  Which exhibit are you looking at, sir?

6    It is on the first page there?

7         THE WITNESS:  Sixty-seven.

8         JUDGE CARISSIMI:  Sixty-seven, okay.

9         THE WITNESS:  I am sorry, it is June 29th.

10   Q    BY MR. BUTTRICK:  Okay.  And do you recall who was there?

11   A    Kelly Yeisley, Chris Eby, Jethro Head, Renita Shannon, Matt

12   Maas, and then myself, Erwin, and Levi.

13   Q    Was --

14        JUDGE CARISSIMI:  Let me interrupt for a second, counsel.

15   I want to make the record clear that Mr. Meadows' testimony that

16   he just gave was without reference to his notes.  He clearly was

17   not looking at his notes when he testified to that last

18   question.  But I think it would probably be best to have the

19   notes removed somewhat from him, so there's no question about

20   when his testimony is from memory and when he may refresh by his

21   notes.

22        THE WITNESS:  I am sorry.

23        MR. BUTTRICK:  Got it.

24        JUDGE CARISSIMI:  No, no, you didn't do anything wrong, I

25   just want to make sure because, you know, in my experience,

1    sometimes if notes are up there, then there's issues raised by

2    counsel about reference to the notes.  And I want to make it

3    clear when you are testifying without the notes, and when you

4    look at the notes.  So I think we will certainly be clear now,

5    all right?

6        MR. BUTTRICK:  Fair enough, thank you, Your Honor.

7    Q    BY MR. BUTTRICK:  Was there any discussion, at the session

8    on June 29th, about the Union's May 13th request for

9    information?

10   A    Yes.

11   Q    Tell us about that.

12   A    There was a statement that they had not gotten everything

13   that they had asked for.  And I was not aware that they hadn't,

14   and told them to let me know what it was they hadn't received,

15   and I would work on it.

16   Q    Now, until this point, on June 29th, had anyone from the

17   Union told you that they had a problem with the documents the

18   company produced -- had already produced -- in response to that

19   information request?

20   A    No.

21   Q    And so, did you have any particular response at the table

22   about the Union's concerns about the information?

23   A    I am sorry, I --

24   Q    Did you have any particular response about any specific

25   items, that the Union was looking for in that information

1  request, that they say we did not provide?

2  A    The Union did make some comments -- make some comments, and

3  I believe it was at that session -- and I responded.  One of

4  them was a request for medical insurance, for what the cost of

5  insurance was going to be, in 2016, for medical insurance.  And

6  I explained to them that that was going to be -- that I had an

7  issue with that one, because I had actually reached out to the

8  insurance company to try to get some quotes, and they were

9  telling me they were not going to be able to get me those quotes

10  until the latter part of September, October.  Which is, I knew,

11  was pretty much standard in the industry, that that's when they

12  do those actuarials, but I tried, but I was having trouble

13  getting those quotes.  And then -- because I was working with

14  two different places trying to get it, and it just was trouble.

15  Q    Do you recall if you had any other specific responses in

16  response to the Union's questions about information requests?

17  A    I would have to look at my notes to remember.

18  Q    Feel free.  If you need to look at notes, that is fine.

19       JUDGE CARISSIMI:  Which -- do you want to look at Mr.

20  Froehlich's or Mr. Wood's?

21       THE WITNESS:  Mr. Wood's is fine.

22       JUDGE CARISSIMI:  All right.

23       Mr. Funk has produced -- and the exhibit number on the

24  front, again, Mr. Meadows, could you tell us, on that first

25  page?

1   (Witness proffered document.)

2       THE WITNESS:  PF67.

3       JUDGE CARISSIMI:  Okay.  Mr. Meadows is looking at PF67.

4   (Pause.)

5       THE WITNESS:  Ah --

6       MR. BUTTRICK:  And I guess, Mr. Meadows, when you are done,

7   if you could give those notes back to Mr. Funk?

8       THE WITNESS:  Yeah, I will stick it over here.

9       JUDGE CARISSIMI:  That would be fine.

10      THE WITNESS:  The -- about vacation cost, I believe, per

11  hour.

12  Q    BY MR. BUTTRICK:  And what was your response?

13  A    That I would get it as soon as I could.

14  Q    Okay.  Now, during the June 29th, 1 p.m. bargaining

15  session, did the Union respond to any of the company's proposals

16  that the company gave the Union back on June 1st?

17  A    No, they did not.

18  Q    Did the company respond to any of the proposals the Union

19  gave the company back on June 1st?

20  A    I am sorry, say it again?

21  Q    Did the company respond to the Union's proposal that it

22  gave the company back on June 1st?

23  A    Yes, they did.

24  Q    What did you do?

25  A    I took the company's -- I mean, excuse me -- the Union's

1   proposals, and I went through it, line item by line item, and

2   gave them the response on it.  And those responses varied from

3   "This we could do" or -- "This we could do."  I referred them to

4   places in -- on their proposal that we had made a proposal

5   already on that, and I referred them to our article and page

6   number where that proposal was.  Then there was some that we

7   were not interested in.  Where I could, I explained, you know,

8   where it was at where we weren't interested in it, be it a cost

9   aspect or just a burdensome aspect that went to it.  Every item.

10  Q    Did you have a response with regard to the Union's proposal

11  for vibration analysis?

12  A    Yes, I did.

13  Q    What was your response?

14  A    That we weren't -- were not interested in that, that

15  vibration analysis was something that we looked at at a little

16  bit more technical aspect, that we needed somebody on -- that we

17  had been doing engineers in that arena -- and that we are not

18  looking at making that part of the bargaining unit.

19  Q    Was there another bargaining session later that day?

20  A    Yes, there was.

21  Q    Who was there?

22  A    Same people.

23  Q    And did the Union present any proposals to the company

24  during this session?

25  A    Yes, they did.

1  Q    Mr. Funk will turn your attention to what has already been

2  introduced into evidence as Joint Exhibit 11.

3  (Witness proffered document.)

4  Q    BY MR. BUTTRICK:  Do you recognize Joint Exhibit 11?

5  A    Yes, I do.

6  Q    And was this the proposal they gave you at that session?

7  A    Yes, it is.

8  Q    Were there things in Joint Exhibit 11 that the Union had

9  never mentioned in its June 1st proposal?

10  A    Yes, there was.

11  Q    There were areas on this proposal, yes, that was not

12  mentioned in their initial proposal.  And I would have to go

13  through it to do comparison, but yes, there is -- there was

14  things, such as the article 5, under the seniority, was one.  To

15  explain this document a little bit easier, there was actually

16  items on here, that were in our original proposal, that they

17  actually had brought over, based on our recommendation.  So you

18  look at the front of it, like article 2 and that modified

19  section 4, those were things that were in my original proposal

20  that they had brought over into this, and not an issue.

21       Start looking at the rest of the document, a lot of the

22  items that -- on here, were rewritten, redone, and pretty much

23  the stuff that was underlined was things that they were

24  presenting that weren't necessarily on the first proposal.

25  Q    Did the Union explain the proposals to you when they gave

1  them to you?

2  A    No, not this one, no.

3  Q    And so did you respond to these proposals?

4  A    Yes, I did.

5  Q    What did you say?

6  A    Can I back up just a second, because I want to be straight.

7  When you say that the Union -- did they explain, they didn't go

8  down through it, but Jethro Head, I think, he made a comment

9  about the stuff that was underlined and the stuff that was

10 crossed out.  He did comment that way.

11 Q    What did he say about that?

12 A    Well, that the changes were based upon the fact that if it

13 was crossed out, they were taking it out; and if it was

14 underlined, they were adding it.

15 Q    Did you respond to these new proposals?

16 A    Yes, I did.

17 Q    What did you say?

18 A    I went down through each one of them and gave a response.

19 Q    Did you make any comments related to the coverage of plan

20 premiums for active military service?

21 A    Yes, we did.  We said we would -- that that we would cover.

22 Q    Did you make any comments related to the company's

23 willingness to retain provisions from the Red Book?

24 A    That -- we talked about the fact that they really needed to

25 take their -- they need to be looking at our document, and that

1    -- and looking at the language we put in there.  And Jethro Head

2    basically said they are not going to do that, they were going to

3    work from their book.

4    Q    Was there another bargaining session that day?

5    A    Yes.

6    Q    Who was there?

7    A    The same group.

8    Q    And do you recall anything from this session?

9         THE WITNESS:  Your Honor, I need to refer to my notes

10   again.

11        JUDGE CARISSIMI:  Yes.

12        THE WITNESS:  I need to refer to the notes again.

13        MR. BUTTRICK:  Sure.

14        JUDGE CARISSIMI:  Mr. Meadows is reviewing --

15        THE WITNESS:  Sorry, PF-67.

16        JUDGE CARISSIMI:  -- PF-67.

17        THE WITNESS:  Sorry, Your Honor.

18        JUDGE CARISSIMI:  That is all right, no problem.

19   (Pause.)

20        THE WITNESS:  Yes, I recall it.  That was a very short

21   meeting.  And that was the last session of the day, just a few

22   minutes, and Jethro said they were making movement, and they

23   were going to drop two items.  And they dropped herbal tea and

24   stirrer sticks.

25   Q    BY MR. BUTTRICK:  Did you subsequently provide further

1   information in response to the Union's concerns about the

2   company's response to the May 13th information request?

3   A    Yes, I did.

4   Q    What did you do?

5   A    I got the information from the people at the plant.  They

6   e-mailed it to me and I e-mailed it to Mr. Head and Mr. Eby.

7   Q    I call your attention to what is already in evidence as

8   Joint Exhibit 19.

9   (Witness proffered document.)

10        JUDGE CARISSIMI:  Do you have that, General Counsel?

11        MR. WIESE:  Yes, Your Honor.

12        JUDGE CARISSIMI:  Very good.

13        You may proceed.

14   Q    BY MR. BUTTRICK:  Was this the e-mail response about what

15   you just referred?

16   A    Yes, it is.

17   Q    And did you believe this addressed the Union's request for

18   total dollar cost and cents per hour for fringe benefits?

19   A    Yes, I do.

20   Q    When was the next day of bargaining?

21   A    The 30th.

22   Q    Of what month?

23   A    Of June, next day.

24   Q    And do you recall who was there?

25   A    The same people that was there the day before, and I

1    believe Kim Villegas joined us that day.

2    Q    Did the company present any proposals to the Union during

3    this session?

4    A    Yes, we did.

5    Q    So if you can reference what is already in evidence as

6    Joint Exhibit 2?

7    (Witness proffered document.)

8    Q    Do you have that in front of you?

9    A    Yes, I do.

10   Q    So, I note that this document says at the top, "6/29/2015."

11   If it was provided on the 30th, why does it say June 29th?

12   A    Actually, after discussions and listening -- in the

13   conversations that we had and some of the things that the Union

14   was pointing out, during our discussions on the 29th, actually

15   went back and worked on this document that night and happened to

16   date it the night that I did it, not when I gave it to them.

17   Q    How does this document reflect language changes that you

18   are now proposing for the first time?

19   A    This particular document, the changes that we were

20   offering, based on that conversation, were highlighted in black,

21   bold print.

22   Q    Did you explain why the company was making this proposal to

23   the Union when you gave it to them?

24   A    Yes, I did, and I explained -- and went through the

25   document and explained where we had made changes, and that it

1   was based up on things that they had said before, and we agreed

2   with them, so we were presenting it back.  At which point,

3   Jethro Head said, "No, we don't have any agreements, it is

4   nothing but discussion."

5   Q    And so what did you say in response to that?

6   A    That I thought it was things that we had -- that they were

7   asking for, and that we had agreed to, and we -- I was

8   presenting it back.

9   Q    Did you explain your proposals to the Union?

10  A    Yes, I did.

11  Q    How did you do that?

12  A    Went through each one of the changed items that we made.

13  Q    What was the Union's response after you walked through the

14  changes with them?

15  A    That it needed to go back to the Red Book and address

16  things there, and not through this.

17       JUDGE CARISSIMI:  Do you recall who said that?

18       THE WITNESS:  I am sorry, Jethro Head.

19  Q    BY MR. BUTTRICK:  Do you recall if there was any

20  conversation at the table, at this time, about the extra crew?

21  A    There was discussion about the extra crew.  We walked back

22  through the extra crew again, pretty much covered a lot of what

23  we had covered before.  With, after the end of that, Jethro

24  telling me that -- Jethro Head telling me that he was not

25  interested in the extra crew.

1   Q     At this meeting, did the parties discuss which contract

2   they would be working from?

3   A     There was a lot of discussion. The Union insisted upon the

4   fact that we had to work from their Red Book, and we explained

5   that we would work from our proposal, from our document. And

6   both sides were, "I am doing this," and "I'm working here."

7   Q     Did you suggest anything, at the table, that you thought

8   might help get the parties moving forward?

9   A     Yeah, just -- it was getting to the point that just things

10   didn't seem to be going. And I suggested that maybe we needed

11   to get a Federal mediator to come join us.

12   Q     Had anyone mentioned using a mediator before you did?

13   A     No. And when I did mention it, Jethro Head said, "We don't

14   need a mediator."

15   Q     Was there any discussion, during this session, of whether

16   or not August 1st was a drop-dead date?

17   A     Jethro mentioned -- he made the statement that -- no, you

18   know, okay, I heard it.

19   Q     What statement did Jethro make?

20   A     That August the 1st was not a drop-dead date.

21   Q     And what was your response?

22   A     "I didn't say it was a drop-dead date."

23   Q     During your bargaining, in the summer of 2015, did you ever

24   say August 1st would be a drop-dead date?

25   A     No.

1  Q     On this day of bargaining, did Jethro -- Mr. Head, excuse

2  me -- say anything about a possible strike?

3  A     Jethro -- Jethro Head indicated that the bargaining unit

4  was stronger than it had ever been, and talked about the fact

5  that they had gone on strike in 2004, and referenced things of

6  that nature, which everybody can make their assumptions on what

7  that meant.

8  Q     Was there another bargaining session that day?

9  A     Yes.

10 Q     Did the company provide the Union with any information

11 during this session?

12 A     Yes.

13 Q     So Ryan will hand you what is already entered into evidence

14 as Joint Exhibit 20.

15       THE WITNESS:  I'm going to stick this over here.

16       JUDGE CARISSIMI:  All right.  The notes are far away from

17 Mr. Meadow.

18       THE WITNESS:  That was the contract, not the notes.

19 (Witness proffered document.)

20 Q     BY MR. BUTTRICK:  Do you recognize Joint Exhibit 20?

21 A     Yes, I do.

22 Q     What is it?

23 A     It is a comparison for the medical coverage plans that the

24 company had, that we were putting on the table.

25 Q     And did you give this document to the Union at this

1    bargaining session?

2    A    Yes, I did.

3    Q    Did you explain this document at all?

4    A    Yeah, we went down through it, and, again, you know, I put

5    something like this on somebody and you kind of walk down

6    through it.  Pretty much let guys take a look at it, "You are

7    probably going to have more questions.  Let me know what they

8    are."

9    Q    On this day, did the Union make any proposals?

10   A    No.

11   Q    On this day, did the Union agree to any of the company's

12   proposals?

13   A    No.

14   Q    On June 30th, did the company tell the Union that it

15   intended to prepare a last, best and final?

16   A    No.

17   Q    So did you subsequently take any steps to try to bring in a

18   mediator?

19   A    Yes, I did.

20   Q    And what did you do?

21   A    It just so happened that the mediator sent me an e-mail,

22   introducing himself, in July.  And I responded to his e-mail,

23   that I would like to talk to him, and he sent me back an e-mail

24   setting up a time and his phone number, and we made contact.

25   Q    So Ryan will hand you what is marked as Penford Exhibit 34.

1   (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 34.)

2   (Witness proffered document.)

3   Q    BY MR. BUTTRICK:  Mr. Meadows, what is Penford Exhibit 34?

4   A    This is the e-mail communication that was between the

5   mediator and myself.

6        MR. BUTTRICK:  I move to admit Penford Exhibit 34.

7        JUDGE CARISSIMI:  Any objection to Respondent's 34?

8        MR. WIESE:  Yes, Your Honor.  I would like to raise an

9   objection to the mediator privilege that we discussed earlier.

10        JUDGE CARISSIMI:  This doesn't go to any substantive

11   issues.  It is only that there was contact with the mediator,

12   which, there is evidence, in fact, in Joint Exhibit 29 that

13   makes reference to the meetings that the mediator was present

14   at.  So to my way of thinking, this doesn't get into the area

15   that the Board wishes to preclude, with mediator testimony

16   regarding substantive issues in bargaining.

17        So I am going to overrule the objection and admit

18   Respondent's 34.

19   (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 34.)

20        MR. BUTTRICK:  Thank you, Your Honor.

21   Q    BY MR. BUTTRICK:  Did the parties end up meeting on July

22   13th, 14th, and 15th?

23   A    No, we did not.

24   Q    Why not?

25   A    Mr. Head contacted me to say that something had come up,

Veritext National Court Reporting company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1   and wouldn't be able to meet, and pushed the date to the week of

2   July 27th.

3   Q    How did Mr. Head contact you?

4   A    E-mail.

5   Q    Mr. Funk will hand you what has been marked as Penford

6   Exhibit 35.

7   (Witness proffered document.)

8   Q    BY MR. BUTTRICK:  Mr. Meadows, what is Penford Exhibit 35?

9   A    This is the e-mail that Mr. Head sent me to notify me that

10  he couldn't make the 13th, 14th, 15th of July.  And that, after

11  the June 29th and 30th session, that we would meet the entire

12  week of the 27th.

13        MR. BUTTRICK:  I move to admit Penford Exhibit 35.

14        JUDGE CARISSIMI:  Any objection to Respondent's 35?

15        MR. WIESE:  Voir dire, Your Honor?

16        MR. WIESE:  Voir dire?

17        JUDGE CARISSIMI:  Yes.

18                              VOIR DIRE

19  Q    BY MR. BUTTRICK:  Mr. Meadows, do you know why there's this

20  blank space at the top of this document?

21  A    No, I do not.

22        MR. WIESE:  No objection, Your Honor.

23        JUDGE CARISSIMI:  Respondent's 35 is admitted.

24  (EXHIBIT RECEIVED:  RESPONDENT'S 35.)

25                    CONTINUED DIRECT EXAMINATION

1  Q    BY MR. BUTTRICK:  Now, after the parties' June 30th

2  bargaining session, did the Union subsequently make any further

3  requests for information?

4  A    Yes, they did.

5  Q    Do you recall when that was, approximately?

6  A    I need a second, let me think.  Middle of July, around the

7  13th, 14th, I think.

8  Q    Now Mr. Funk will direct your attention to Joint Exhibit

9  21.

10 (Witness proffered document.)

11 A    Yeah.

12 Q    Do you recognize this to be the Union's information

13 request?

14 A    Yes, I do.  It was on the 14th.

15 Q    Now, from the time that the company provided information to

16 the Union in response to its earlier FI -- RFIs, until July

17 14th, had the Union mentioned that it was not satisfied with the

18 company's responses to its earlier information requests?

19 A    No.

20 Q    Did the company ultimately respond to Joint Exhibit 21?

21 A    Yes, we did.

22 Q    So turning your attention to what is already in evidence as

23 Joint 22.

24 (Witness proffered document.)

25 Q    Do you recognize Joint 22?

1   A   Yes, I do.

2   Q   Was this the company's response?

3   A   This is the company's response to that request.

4   Q   Looking at Joint 22, did the company provide information

5   about the cost per hour for a one-year credit in the pension

6   benefit plan?

7   A   Yes, they did, in response to request no. 1.

8   Q   If you can turn your attention back to the Red Book, which

9   is Joint Exhibit 16?

10  (Witness proffered document.)

11  Q   And I don't want you to read, in terms of the Red Book, at

12  all, but do you recall whether or not the Red Book had any

13  provisions about gap insurance?

14  A   Yes, it is.

15  Q   Do you recall what they were?

16  A   In general, 2004 was a date factor, and people before 2004

17  had gap insurance at a certain rate, people after 2004 did not

18  have gap insurance.  So it -- some had it, some didn't.

19  Q   Now, in the company's Joint Exhibit 1, its first proposal,

20  did the company propose gap insurance?

21  A   Yes, we did.

22  Q   Do you recall what the company's proposal was?

23  A   It was for all employees to have the gap insurance.

24  Q   Okay.  And Joint Exhibit 2, which is the company's second

25  proposal, did the company make a proposal about gap insurance?

1  A    Yes, all -- everybody had gap insurance.

2  Q    Did the company ever seek to eliminate gap insurance?

3  A    No, not at all.  It -- that is one of those areas that --

4  we want to talk about consistency of our contracts.  While

5  salaried people don't have it, I have put gap insurance in all

6  my contracts, and I wanted to make sure that everybody had it

7  here, so it was consistent with my other contracts.  And the

8  other thing I didn't like was the fact that they had segregated

9  out, "This group has it, this group doesn't," and I wanted to

10  try to get everybody treated equally and make sure everybody got

11  it.

12  Q    Turning your attention back to Joint Exhibit 1, which is

13  the company's first proposal, was the company proposing to

14  change the way the bargaining unit was described?

15  A    No, that was not the intent.

16  Q    What was the company's intent?

17  A    It goes back, as I said earlier.  The -- I wanted to make

18  sure, as we put this new contract in place, that we had the

19  recognition clause correct.  I had heard some things that didn't

20  make sense to me that, over the years, that some things had

21  changed, that what the -- that they changed, and I just wanted

22  to make sure that we captured it correctly.  Yes, I put some

23  information in there, but I had put that "Define," and told the

24  Union, "I want to make sure we are clarified on this."  I wasn't

25  trying to change it, just, "Guys, let me know what it should

1   actually be," because I -- I was trying to actually find, from

2   the -- from the Act, what the original -- what "recognition"

3   was.  I never could find it.  So I was reaching out, saying,

4   "Help me."

5   Q    Were you intending to exclude any bargaining unit employees

6   from the bargaining unit?

7   A    No.

8   Q    In Joint Exhibit 1 and 2, it references an exclusion for

9   technical and professional employees.  Who did you intend that

10  to be?

11  A    Technical is engineers.

12  Q    Are any bargaining employees engineers?

13  A    No.

14  Q    Do you recall when the parties' next bargaining session was

15  -- or day of bargaining, excuse me?

16  A    The 29th and 30th of June, and then we went to July the

17  27th.

18  Q    Do you recall who was there?

19  A    You know, we've referenced it, and I know a couple times I

20  have said, "The same," and that I probably need to define the

21  question.  But, on that day, I don't remember Mr. Yeisley being

22  there, so I am questioning that one.  But Chris Eby, Jethro

23  Head, Renita Shannon, Matt Maas were there; and then from our

24  side it was Levi Wood, Erwin Froehlich, myself, and Kim

25  Villegas.

1   Q    Was the mediator there?

2   A    And the mediator was there.

3   Q    Did either side present any new proposals on this day?

4   A    No.

5   Q    Did the Union ask for any proposals from the company?

6   A    No.

7   Q    Did you ask for any proposals from the Union?

8   A    Yes, I did.

9   Q    What did you say?

10   A    You know, I had talked several times that the fact that the

11   -- that I had put our proposal out there, and that they had not

12   responded to any of our proposals, and that I, you know, I am

13   looking for responses to the proposals.

14   Q    And what was the Union's response to that?

15   A    "Until you work off our Red Book, you are not getting any."

16       JUDGE CARISSIMI:  Who said that?

17       THE WITNESS:  Oh, excuse me, Jethro Head.

18   Q    BY MR. BUTTRICK:  Did you begin a discussion about any

19   areas of the contract that you wanted to talk about?

20   A    Yes, I did.

21   Q    Do you recall what that was?

22   A    We wanted to talk about the medical insurance, we wanted to

23   talk about -- we needed to have more discussion on that -- just

24   different areas.  I was trying to get the Union to start talking

25   about some of these issues.  And, you know, we would get to

```
 1    talking about some things, and it would shut down.  Mr. Head --
 2    and he used the word "process" a lot.  Until you get to a
 3    process, to their process, and we talked about the process
 4    several times.  And what does that process mean?  And, you know,
 5    their definition -- the way I was hearing it, was their process
 6    was to go by the Red Book and we just -- we kept telling them,
 7    "You got to give us responses to our offer -- to our proposals."
 8    Q    Did either side agree to anything that day?
 9    A    No.
10    Q    When was the next day of bargaining?
11    A    The 28th.
12    Q    Of what month?
13    A    July.
14    Q    Do you recall who was there?
15    A    Mr. Yeisley was there that day -- I believe that day.  And
16    then Chris Eby, Jethro Head, Renita Shannon, Matt Maas; on our
17    side, Levi Wood, myself, Erwin Froehlich, and Kim Villegas.
18    Q    Was the mediator there?
19    A    And the mediator was there.
20    Q    Did the Union give the company any proposals during this
21    session?
22    A    No.
23    Q    Did the company give the Union any proposals this session?
24    A    Yes, they did.
25    Q    So Mr. Funk will hand you what has already been marked as
```

1    Joint Exhibit 3.

2    (Witness proffered document.)

3    Q    Do you recognize Joint Exhibit 3?

4    A    Yes, I do.

5    Q    What is it?

6    A    This is a new set of proposals, and on this one you will

7    note that the top is in red.  And on this set of proposals, you

8    go through it, everything that we were changing, adding,

9    countering -- things that we were making change on based upon

10   several things, the comments that we had had from the days

11   before on random items.  There's actually some things that were

12   probably -- that were changed in here due to some of the news

13   media that the Union was putting out.  You know, they weren't

14   necessarily telling us, at the table, but we were hearing from

15   them on the news media, and we made, you know, changes based on

16   that.  So what you will see is those are -- all those things,

17   and I walked through every one of them -- are in red on this

18   document.

19       JUDGE CARISSIMI:  Could you explain your reference to "news

20   media"?

21       THE WITNESS:  The Union had done some informational pickets

22   and had the media out.  And they were making comments to them

23   about what our contract proposals were, and things that we were

24   doing, and they didn't like this.

25       JUDGE CARISSIMI:  These reports, was it to television or

1  print?

2      THE WITNESS:  To television.

3      JUDGE CARISSIMI:  Okay, so there was television coverage?

4      THE WITNESS:  Yes, sir.

5      JUDGE CARISSIMI:  Were there pickets at the plant?

6      THE WITNESS:  They had an informational picket one

7  afternoon.

8      JUDGE CARISSIMI:  Okay.  Do you recall when that was?

9      THE WITNESS:  The exact day, I don't remember.

10      JUDGE CARISSIMI:  All right, thank you.

11  Q    BY MR. BUTTRICK:  Did you provide the Union anything to

12  help compare the company's current proposals to what was in the

13  Red Book?

14  A    Yes, I did.  One of the things that Mr. Head had kept

15  saying was that we had gutted their contract.  And I kept trying

16  to explain to him that I disagreed with that, and, again, that

17  there was all kind of stuff -- stuff that was in this contract

18  was a lot of the type -- was the same stuff that was in the

19  original contract, that we didn't get rid of stuff.  You know,

20  the seniority was there.  Didn't necessarily agree with the way

21  we had done seniority, we had a lot of discussion on that.  But

22  to try to help out, I actually worked up a document that was

23  kind of a summary of, "All right, here's where your article is,

24  and here's where it is in our contract."  And we did a summary

25  and gave it to the Union.

1  Q    So Mr. Funk will hand you what has been marked as Penford

2  Exhibit 36.

3  (Witness proffered document.)

4  Q    Mr. Meadows, what is Penford 36?

5  A    This is the document I was talking about, that we gave him,

6  that compared their articles to our articles.  And, I mean, just

7  as an example, you go down to the fourth line, "Article 2,

8  Section 5 is included in Article 4 of the company proposal."

9  And so it was just that comparison.

10 Q    Did you create this document?

11 A    Yes.

12 Q    Whose handwriting is that in the top right-hand corner?

13 A    That is Levi's.

14 Q    Is that Mr. Wood?

15 A    Yes, excuse me, Mr. Wood.

16      MR. BUTTRICK:  I move to admit Penford 36.

17      JUDGE CARISSIMI:  Is there any objection to Respondent's

18 36?

19      MR. WIESE:  No objection, Your Honor.

20      JUDGE CARISSIMI:  Respondent's 36 is admitted.

21 (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 36.)

22 Q    BY MR. BUTTRICK:  So what did you tell the Union when you

23 gave them this document?

24 A    That we had taken, you know, that we hadn't gutted their

25 contract, and to try to help explain that, that here is where

1  you can find things that were in your original contract that is

2  addressed in our proposal.

3  Q    And what was the Union's response?

4  A    They didn't really care, that this is not the process they

5  wanted to go through, and we needed to go back to their Red

6  Book.

7      JUDGE CARISSIMI:  Who said that?

8      THE WITNESS:  Jethro Head.

9  Q    BY MR. BUTTRICK:  Did the Union accept any of the company's

10  proposals on this day?

11  A    No.

12  Q    Did the Union offer any proposals of its own?

13  A    No.

14  Q    Did the Union say anything about the upcoming contract

15  expiration date?

16  A    Yes, they did.

17  Q    What did they say?

18  A    I believe Mr. Head said that Mr. Eby was going to give us a

19  -- they had a meeting coming up on Saturday, the 1st, and he was

20  going to give us a notice of that meeting.

21  Q    Mr. Funk will direct you to what is already in evidence as

22  Penford 37.

23  (Witness proffered document.)

24  Q    Do you recognize Penford 37?

25  A    Yes, I do.

1  Q    What is it?

2  A    This is that -- the notice that Mr. Eby gave us about the

3  contract meeting notice.

4  Q    Please draw your attention to the bottom of it, where it

5  has a reference to "Employees removing their personal property

6  from the plant," do you see that?

7  A    Yes.

8  Q    What did you interpret that to mean?

9  A    That if we didn't get a contract, that they were going to

10  go on strike.

11  Q    Was there another bargaining session that day?

12  A    Yes.

13  Q    Do you recall who was present?

14  A    All the same people.

15  Q    In this session, did anyone from the Union say anything

16  about how they thought negotiations were going?

17  A    Yes, Mr. Head made comments that negotiations were not

18  going good, that basically it was a train wreck.

19  Q    Did you receive anything from the Union, in this meeting,

20  about a contract extension?

21  A    Yes, I did.

22  Q    So Mr. Funk will turn your attention to what is already in

23  evidence as Penford 38.

24  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 38.)

25       MR. FUNK:  I think it not yet in evidence.

1      MR. BUTTRICK:  Oh, it is not in evidence?  Okay.

2  Q    BY MR. BUTTRICK:  Well, he will hand you what has been

3  marked as Penford 38.

4  (Witness proffered document.)

5  Q    Mr. Meadows, do you recognize Penford 38?

6  A    Yes, I do.

7  Q    What is it?

8  A    This is a offer for a contract extension that Mr. Eby gave

9  us.

10     MR. BUTTRICK:  Move to admit Penford 38.

11     JUDGE CARISSIMI:  Any objection to Respondent's 38?

12     MR. WIESE:  No objection, Your Honor.

13     JUDGE CARISSIMI:  Respondent's 38 is admitted.

14  (EXHIBIT RECEIVED:  RESPONDENT'S EXHIBIT NO. 38.)

15  Q    BY MR. BUTTRICK:  Did the company agree to this Penford 38?

16  A    No, we did not.  We were interested in getting a contract;

17  we weren't interested in extending the current contract.

18  Q    Did the Union bring up any new requests for information on

19  this day?

20  A    Yes, they did.

21  Q    So Mr. Funk will turn your attention to what is already in

22  evidence as Joint 23.

23  (Witness proffered document.)

24  Q    Do you recognize Joint 23?

25  A    Yes, I do.

1  Q    Is this the information request they gave you?

2  A    Yes, it is.

3  Q    And prior to receiving this information request, which is

4  Joint 23, when was the last time that anyone from the Union had

5  mentioned anything about requests for information?

6  A    On 7/14.

7  Q    And did the company respond to this information request in

8  Joint 23?

9  A    Yes -- I mean, yes, it did, but also, in the process, as we

10  went to gather all this data, I didn't mention some problems

11  with it right up front.

12  Q    What did you say?

13  A    Well, they had asked for data for 11, 12, 13, 14, 15.  And,

14  in most cases, we were able to get 13, 14, 15, but 11 and 12, we

15  weren't able to get.  And one of the problems with getting some

16  of this information request, of some of that data, was due to

17  the sale of the company.  And a lot of that -- some of that old

18  data was not available to us.  It did not transfer over in the

19  sale of the company.

20  Q    Did the company ultimately provide a written response to

21  this request for information?

22  A    Yes, it did.

23  Q    Mr. Funk will turn your attention to what is Joint 24.

24  (Witness proffered document.)

25  Q    And also Joint 25.

1    (Witness proffered document.)

2    Q    Do you have Joint 24 and 25 in front of you?

3    A    Yes, I do.

4    Q    What are those?

5    A    You will see, in bold print, our answers to some of the

6    requests on the document itself.  When we recalled -- you know,

7    reminded them that we provided some of that stuff back on May

8    13, they were asking for it again.  But we made comments on the

9    sheet of responses, and then JT-25?

10   Q    Um-hmm.

11   A    That is documents for a lot of these other items that's on

12   the sheet.

13        JUDGE CARISSIMI:  What sheet are you referring to?

14        THE WITNESS:  On the PF -- JT-24, the -- there is -- that

15   you will see on here that "See documents," or "See attached,"

16   and that is all in JT-25.

17   Q    BY MR. BUTTRICK:  And when did the company give the Union

18   responses to that information request?

19   A    We gave it to them that night.  We went back and busted

20   bones to get it done, and we got it to them.

21   Q    Was there another bargaining session that day?

22   A    Yes.

23   Q    Do you recall who was present?

24   A    All the same people that were there, and again, if I need

25   to say all the names again, I can.

1 Q    That is okay, don't worry about that.

2      In this session, did the Union say anything about the

3 responses the company had given to its RFI?

4 A    That they were going to be reviewing them.

5 Q    During this session, did the Union ask the company to

6 withdraw any of its proposals?

7 A    The Union referred to a list of 21 items that they had

8 presented to us, and that we should consider withdrawing those.

9 Q    So where is this list of 21 items?

10     THE WITNESS:  May I?

11     JUDGE CARISSIMI:  Yes.

12     THE WITNESS:  If you go to JT-24, it was attached -- let's

13 see -- it was attached to this document.  And if you go to JT-

14 24, and you go to PF912, and you go down to the bottom on that

15 page.  And you start with that "1, 2" and then go to page 914,

16 that is the 21 items that we are referring to.

17 Q    BY MR. BUTTRICK:  And so after the Union asked you to

18 withdraw topics covered by the 21 items, what did you do in

19 response?

20 A    In response to the request, actually, we went back and we

21 started looking at it, and making adjustments to our proposals

22 in response to these 20-something items.  But I responded to

23 each one of them on there, and some of them we agreed to put

24 back, you know, agreed to put back into the original.  So

25 that's, I guess, you could say, we were pulling them.

1 Q    Was there any discussion in this session about the flower

2 fund?

3 A    Yes, there was.

4 Q    Tell me about that.

5 A    That became an emotional issue.  The flower fund was a --

6 call it a program, that they had in the contract and the money

7 was managed by the Union, but it was in an account on the

8 company's side.  And there were a couple different ways money

9 went in there, but one of the problems that we had with it was

10 that the money that was going into the account, what was

11 happening was, for somebody not to get an absentee point, got

12 get a "late," if somebody did not clock in, okay, then they

13 didn't get any kind of a point for being late or for anything.

14 But what would occur is that -- I believe it was 30 minutes of

15 pay -- they actually got pay taken out of their paycheck and put

16 into this account.

17     And when I looked at that, originally, when I was doing the

18 original draft proposals, I reached out to the Department of

19 Labor, because it was something that was just not sitting right

20 with me on this.  And I checked with the Department of Labor,

21 and they made it perfectly clear -- as I figured it was -- they

22 made it perfectly clear that this was illegal, and that you

23 could not just arbitrarily take people's money.  If somebody was

24 at work, you had to pay them, you couldn't take money out.

25     So I tried to explain to the Union that we could not do

1   this, the flower fund had to go.  And, you know, they rightfully

2   took a lot of pride in that account and how they were using the

3   money, and about that that's what they used to show respect to

4   their membership.  And I explained to them that, "You know,

5   guys, I don't have a problem showing respect to your membership,

6   but the company -- we do this everywhere -- we don't pay for

7   flowers.  I mean, you just come up and tell us where -- who

8   needs -- where you want the flowers to go to, we will pay for

9   it, we will take care of it for you."

10      And there was an issue about, "But we want it to come from

11  us."  And I even pointed out I didn't have a problem with that.

12  "If you need the -- if you want the slip of paper to say 'From

13  the Union,'" didn't have a problem with that, "We will make that

14  happen."  But the aspect -- "I cannot legally sit here and put

15  something in the contract that is breaking the law," and the

16  flower fund had to go.  And there was discussion on that flower

17  fund, about that they used the money for United Way campaigns,

18  and they buy gifts, and for people that joined, they'd pay.  I

19  explained to them that we didn't have a problem with that, that

20  if they wanted to committee up, and you wanted to buy gifts to

21  ration -- for drawings or whatever, the company, we would do

22  that.  But that money could not go into that account that way.

23      It got to be a discussion on the -- "Well, what is going to

24  happen to the money that is there?"  And there were several

25  thousands of dollars in that account.  The way it had come out

1  of the people's paychecks, and that is not company money, I

2  didn't know what to do with the money.  And I explained to them,

3  "I don't know what to do.  I mean, we could leave it there and

4  you continue to pay it on out but I can't fund that thing that

5  way anymore."  And there was something about, "It is our money."

6  And I said, "You know what, get me a letter, and I will write

7  the check over to you, because I want this thing closed down

8  because it is not our money.  It is not money that I can do

9  anything with, and this thing is illegal."

10      It got a little emotional, because, I think -- I felt like

11  the Union was thinking I was trying to take recognition for

12  their membership away from it, and that is not what I was trying

13  to do.  I was trying to close this thing down.  And it got

14  somewhat emotional, and then Jethro jumped in there and started

15  calling me an idiot.  And I responded, "Okay, I am an idiot."

16  And then he took it another step, saying I was an "f'ing" idiot.

17  And I said, "Okay, I hear you, I am a 'f'ing' idiot."  And then

18  it just kind of went back and forth, and I was -- that was it,

19  it was time to break this heated conversation up, so I said,

20  "Look, let's go and caucus," and, you know, got my group up to

21  leave the room.  And as I was getting ready to leave the room,

22  Mr. Head again, you know, "You idiot."  And I said, "Okay, I am

23  an idiot."  "No, you didn't hear me, "You are an 'f'ing' idiot."

24  "Okay, I am an 'f'ing' idiot."  And we just left.

25      JUDGE CARISSIMI:  All right, we are going to stop there

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 1004 of 1141

1   because we agreed that it was 6 o'clock.

2       MR. BUTTRICK:  I only have like five more questions for

3   this day, if we can -- and they are short.

4       JUDGE CARISSIMI:  This will be the end of the direct?

5       MR. BUTTRICK:  Well, no, no, for this day, not the end of

6   the direct for all time, but just for this particular day.

7       JUDGE CARISSIMI:  Well, but there's overtime implications

8   if we go beyond here.

9       MR. WIESE:  That is my understanding, Your Honor.

10      JUDGE CARISSIMI:  All right.

11      Well, I think we are going to have to cut it off here,

12  pursuant to our agreement.

13      You can finish that up tomorrow morning, Mr. Buttrick.

14      So we are going to go off the record at the present time.

15  (Whereupon, at 6:00 p.m., the trial adjourned until tomorrow,

16  April 28, 2016, at 9:00 a.m. in the same place.)

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

```
 1                    C E R T I F I C A T E

 2        This is to certify that the attached proceedings before the

 3   National Labor Relations Board, Region 18, Case 18-CA-160654 and

 4   18-CA-170682, Ingredion, Inc, d/b/a Penford Products Co. and

 5   BCTGM Local 100G, affiliated with Bakery, Confectionary, Tobacco

 6   Workers, and Grain Millers International Union, AFL-CIO, in

 7   Cedar Rapids, Iowa on April 27, 2016, was held according to the

 8   record, and that this is the original, complete and true and

 9   accurate transcript that has been compared to the recording, at

10   the hearing; and that the exhibits are complete and no exhibits

11   received in evidence or in the rejected exhibit files are

12   missing.

13

14                    *Christopher Walls*

15                    Christopher Walls

16                    Official Reporter

17

18

19

20

21

22

23

24

25
```

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

        Respondent,

and                      Case No. 18-CA-160654
                               18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLRS INTERNATIONAL UNION,
AFL-CIO,

        Charging Party.

Pages:  1002 through 1135 (Volume 6)

Date:  April 28, 2016

Place:  Cedar Rapids, Iowa

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

INGREDION, INC., d/b/a PENFORD PRODUCTS
CO.,

               Respondent,

and                         Case No. 18-CA-160654
                                 18-CA-170682

BCTGM Local 100G, affiliated with BAKERY,
CONFECTIONARY, TOBACCO WORKERS, AND
GRAIN MILLERS INTERNATIONAL UNION,
AFL-CIO,

               Charging Party.

The above entitled matter resumed trial pursuant to

adjournment, before The Honorable Mark Carissimi, Administrative

Law Judge, in Room 1B, Board of Supervisors Formal Board Room of

the Jean Oxley Linn County Public Service Center, 935 Second

Street SW, Cedar Rapids, Iowa, on Thursday, April 28, 2016, at

8:45 a.m.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1                    **<u>A P P E A R A N C E S</u>**

2     **<u>On behalf of the NLRB, Counsel for the General Counsel:</u>**

3     TYLER J. WIESE, ESQ.

4     CHINYERE C. OHAERI, ESQ.

5     National Labor Relations Board, Region 18

6     212 Third Avenue South, Suite 200

7     Minneapolis, Minnesota  55401

8     Tyler Wiese: (612)348-1784 /Chinyere Ohaeri: (612)348-1766

9     Tyler.Wiese@nlrb.gov / Chinyere.Ohaeri@nlrb.gov

10    **<u>On behalf of the Charging Party:</u>**

11    SETH MARLING

12    BCTGM Local 100G

13    5000 J Street SW

14    Cedar Rapids, Iowa   52404

15

16    **<u>On behalf of the Respondent:</u>**

17    STUART R. BUTTRICK, ESQ.

18    RYAN J. FUNK, ESQ.

19    Faegre Baker Daniels

20    300 N. Meridian Street, Suite 2700

21    Indianapolis, Indiana   46204

22    Stuart Buttrick:  (317)237-1038

23    Ryan Funk:  (317)237-1131

24    stuart.buttrick@FaegreBD.com

25    ryan.funk@FaegreBD.com

Case 1:16-cv-00038-LRR-CJW    Document 19-1    Filed 05/13/16    Page 1009 of 1141

1                        **I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Ken Meadows | 1007 | 1064 | | | |
| (Resumed) | | | | | |
| Christopher Eby | 1126 | 1130 | | | |
| (Recalled in rebuttal) | | | | | |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 350
Washington, DC  20005
(888)777-6690

1    **E X H I B I T S**

2    **EXHIBIT**                    **IDENTIFIED**                    **IN EVIDENCE**

3    **General Counsel's**

| | EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| 4 | 61(b) | 1120 | 1121 |
| 5 | 61(c) | 1120 | 1121 |
| 6 | 71(a) – (d) | 1088 | 1094 |
| 7 | 91 | 1097 | |
| 8 | 92 | | 1125 |
| 9 | 94 (Withdrawn-pg. 1103) | 1102 | |

10

11

12    **Respondent's**

| | EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| 13 | 39 | 1011 | 1012 |
| 14 | 40 | 1022 | 1023 |
| 15 | 45 | 1053 | 1055 |
| 16 | 74 | | 1007 |

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                                                          8:45 a.m.

3        JUDGE CARISSIMI:  On the record.

4    This is the continuation of the Ingredion, Incorporated, d/b/a

5    Penford Products Company trial.

6    (WITNESS RECALLED:  KEN MEADOWS)

7        Mr. Meadows is on the witness stand.

8        Mr. Meadows, I'll just remind you, sir, that you are still

9    under oath.

10       Before we continue the testimony, there was an exhibit

11   proffered by the Respondent yesterday, Respondent's 74.  It's in

12   the nature of a summary of evidence that's already been

13   admitted.  I gave the General Counsel last evening in order to

14   review that document and any underlying documents that he wished

15   to or that they wished to examine and to state a position on the

16   exhibit this morning.

17       So, Mr. Wiese, we've had some off-the-record discussion,

18   but on the record can you tell me what the General Counsel's

19   position is with regard to the admission of Respondent's 74?

20       MR. WIESE:  Yes, Your Honor.  To the extent that this

21   summary reflects proposals that are in evidence, I've reviewed

22   that portion of the summary.  At first blush, it appears to be

23   relatively accurate.  The portion of the summary that reflects

24   statements or alleged agreements that were made at the

25   bargaining table, some of that testimony we haven't gotten to

1  yet.  The other portions that we have covered, I'm not sure

2  whether this document accurately reflects that testimony.  But

3  that being said, with the understanding that this is merely a

4  demonstrative exhibit and not substantive evidence, we don't

5  have any objection to the document being entered for that

6  purpose.  And in our case, or, excuse me, our rebuttal, we will

7  be entering a different summary of the Company's proposals.

8      JUDGE CARISSIMI:  All right.  Very good.

9      I'm going to admit Respondent's 74.  It seems that under

10  Federal Rule of Evidence 1006 it's a summary of evidence already

11  in the record.

12      If there is something that's inaccurate with regard to this

13  summary, since it's based on record evidence, the parties can

14  address that; particularly General Counsel, since it is a

15  respondent exhibit.  If you feel there's something inaccurate in

16  it, when you file your brief you can point that out to me and

17  indicate why that is your contention.

18      So I'm going to admit Respondent's 74.

19  (EXHIBIT RECEIVED:  RESPONDENT'S 74.)

20      JUDGE CARISSIMI:  And at this point, Mr. Buttrick, you can

21  continue your examination of Mr. Meadows.

22      MR. BUTTRICK:  Thank you, Your Honor.

23              RESUMED DIRECT EXAMINATION

24  Q   BY MR. BUTTRICK:  Mr. Meadows, where we left off, we were

25  talking about the day of July 28th.  Who decided to end the

1    session on July 28th?

2    A    The Union.

3    Q    Did the Union modify any of its proposals on the 28th?

4    A    No, they did not.

5    Q    Did the Union agree to any of the Company's proposals on

6    this day?

7    A    No, they did not.

8    Q    Did the Union express any willingness to move in any

9    particular areas?

10   A    No.  Their point was we needed to go back to their

11   contract, which we were not willing to do.  Before we broke, I

12   did again tell the Union that, you know, my proposal was still

13   on the table, that they hadn't addressed any of those issues.

14   And we also talked about the fact that -- you know, they kept

15   talking about these 124 concessions, and I had not received

16   anything on that and I was still looking for something.

17   Q    During the course of the parties' bargaining, in all the

18   bargaining that you participated in, did you ever personally

19   attack anyone on the union bargaining committee?

20   A    No, sir.

21   Q    So when was the next day of bargaining?

22   A    The next day, the 29th.

23   Q    Do you recall who was there?

24   A    Mr. Yeisley, Mr. Eby, Mr. Head, Ms. Shannon, Mr. Maas; from

25   our side, Levi Wood, myself, Erwin Froehlich, and Kim Villegas.

1  Q    Did the Union present any proposals during this session?

2  A    No, they did not.

3  Q    Did the Company present any proposals during this session?

4  A    Yes.

5  Q    So Mr. Funk will direct your attention to Joint Exhibit 4.

6  (Witness proffered the document.)

7  Q    Do you recognize Joint Exhibit 4?

8  A    Yes, I do.

9       MR. BUTTRICK:  I'm sorry.  Tyler, do you have yours handy?

10      MR. WIESE:  Yes.  One second.

11      MR. BUTTRICK:  Yes.

12      JUDGE CARISSIMI:  Yes.  Let us know when you're ready, Mr.

13 Wiese.

14 (Pause.)

15      MR. WIESE:  I have it, Your Honor.  Thank you.

16      JUDGE CARISSIMI:  Very good.

17      You may proceed, Mr. Buttrick.

18 Q    BY MR. BUTTRICK:  Are these the proposals you gave the

19 Union on July 29th?

20 A    Yes, it is.

21 Q    How does Joint Exhibit 4 delineate any changes in your

22 proposals?

23 A    Any of the changes that we made we highlighted in red.

24 Q    And what was the rationale for making the changes in this

25 proposal?

1   A    These changes were addressing some of the items that they

2   had mentioned, that they had brought up in the request about the

3   21 issues that we -- that they asked us to remove, and were

4   addressing those 21 issues.

5   Q    Did you explain these proposals to the Union?

6   A    Yes, I did.

7   Q    How did you do that?

8   A    Verbally went and walked them through the changes that we

9   had made.

10  Q    Did you compare this proposal with the Union's 21 topics

11  that it mentioned at the end of its July 28th RFI?

12  A    Yes.  Yes, I did, as we went through it.  And any item that

13  we changed that was specifically to the one of those 21 items,

14  we pointed it out and went through it -- you know, "This is one

15  of your items.  This is what we've done in response to that."

16  Q    Did the Union modify any of its proposals during this

17  session?

18  A    No, they didn't.

19  Q    Did the Union express a willingness to move in any

20  particular areas during this session?

21  A    No.  Not at all.

22  Q    Was there another bargaining session that day?

23  A    Yes, there was.

24  Q    Do you recall who was there?

25  A    The same group that I just mentioned.

1  Q     Did the Union make any bargaining proposals during this

2  session?

3  A     They did not make any proposals, but they finally gave me

4  the document that listed what they said were concessions.

5  (EXHIBIT MARKED:  RESPONDENT'S 39.)

6  Q     BY MR. BUTTRICK:  So Mr. Funk will hand you what's been

7  marked as Penford Exhibit 39.

8  (Witness proffered the document.)

9      MR. BUTTRICK:  And I'll just note for the record I am aware

10  that a version of this document is already in evidence, but the

11  reason why we're introducing this second document is because it

12  has handwritten notes on it.  So it's actually technically a

13  separate document, and so we thought it appropriate to try to

14  introduce this document.

15      JUDGE CARISSIMI:  All right.  You may proceed.

16  Q     BY MR. BUTTRICK:  So, Mr. Meadows, what is this document,

17  Penford Exhibit 39?

18  A     This is the list that they presented to us saying that

19  these were the concessions, the 124 concessions.

20  Q     And did you get this list across the bargaining table?

21  A     Yes, sir.

22  Q     And is this list, this document, maintained as a customary

23  part of the Company's business?

24  A     Yes, it is.

25      MR. BUTTRICK:  So I move to admit Penford Exhibit 39.

1    JUDGE CARISSIMI:  Before you do so, you mentioned

2    handwriting.  Are you going to do anything to authenticate that

3    handwriting?

4    MR. BUTTRICK:  Oh.  I'm sorry.  I forgot to ask that

5    question.

6    Q    BY MR. BUTTRICK:  Mr. Meadows, I notice there is some

7    handwriting on page 1.  Do you recognize that handwriting?

8    A    That's Levi Wood's handwriting.

9    Q    And is he the chief note taker for the Company?

10   A    He was the chief note taker.

11   MR. BUTTRICK:  Now I move to admit Penford 39.

12   JUDGE CARISSIMI:  Is there any objection to Respondent's

13   39?

14   MR. WIESE:  No objection, Your Honor.

15   JUDGE CARISSIMI:  Respondent's 39 is admitted.

16   (EXHIBIT RECEIVED:  RESPONDENT'S 39.)

17   Q    BY MR. BUTTRICK:  Now, when you received this list from the

18   Union, Mr. Meadows, did you express any willingness to move in

19   any particular areas?

20   A    When this document was presented, Jethro Head -- we started

21   discussions on this, on the sheet, and he went down through it

22   item by item.  And we had discussions on these items.  And there

23   was comments from the standpoint that we didn't feel like this

24   was concessions, that we could take a look at this and possibly

25   do something here -- you know, take consideration on it.  But we

1  walked down through it item by item.

2  Q    Do you recall any particular points where you expressed the

3  Company might be willing to make changes based upon the list of

4  concessions?

5  A    There was one on FMLA that was mentioned.  There was one on

6  the -- about the vacation for senior people.  There was one on -

7  - we talked about seniority.  And there was a -- we had a little

8  bit of discussion on the seniority aspect on more than one

9  occasion, but -- because we had a -- there was an item on here

10  that they had talked about that we were doing away with plant-

11  wide seniority, and we actually felt like we were giving plant-

12  wide seniority.  And a lot of discussion on, well, they wanted

13  this departmental seniority and then it went to plant-wide.  And

14  tried to explain, well, that's not plant-wide seniority, but if

15  that's the way they want it, you know, okay, we can go that way.

16  But we didn't consider that to be plant-wide seniority.

17  Q    Do you recall if there was any discussion about severance

18  language?

19  A    There was a discussion on severance language from the

20  standpoint that they wanted severance language in the contract.

21  And, you know, I gave them my philosophy about severance

22  language in a contract, that I didn't think that it really

23  needed to be there, but that if we wanted to because there was

24  always the obligation for effects bargaining and that if they

25  wanted a statement in there about, you know, that the Company

1   would always do effects bargaining and all, I had no problem

2   putting that in there.  But I really wasn't keen on limiting

3   dollar amounts in a contract about what a person was going to

4   get on severance when really and truly that should be brought up

5   in effects bargaining, if you were at that point.

6   Q    Did the Union say anything in this session about what it

7   thought needed to happen to move the bargaining forward?

8   A    Yes, they did.  I mean, it was again back to the same

9   discussion that to move forward I needed to switch and go back

10   to their contract.  And I explained to them that I just wasn't

11   willing to do that.

12   Q    Was there another bargaining session that day?

13   A    Yes, there was.

14   Q    Do you recall who was there?

15   A    Same group.

16   Q    Now, during this bargaining session did the Company agree

17   to modify any of its proposals?

18   A    Yes, we did.

19   Q    Do you recall which ones?

20   A    To be a hundred percent accurate, I'd have to go back and

21   look at it, but I -- at notes.  But, I mean, there were items

22   about I believe on this one that -- about the vacation.  You

23   know, agreed that we'd put some kind of a disciplinary process

24   in there.  There was -- trying to remember if this is the one

25   that -- about the bidding procedure that we were looking at that

1   -- because we had originally proposed I think 24 months that a

2   person had to be locked into a position and we were agreeing to

3   come down to 18 months.  There was a good five or six items, and

4   I just don't remember every one of them right off the top of my

5   head.

6   Q    And do you recall whether or not there was an agreement

7   from the Company to move the probationary period?

8   A    Probationary period was what we talked about.  That was a

9   moving it from 6 months down to 4 months.

10  Q    Did you also express a willingness that you might be able

11  to move on any other areas?

12  A    That I needed to take a little bit more look at some of the

13  other stuff and would get back with them.  But this was the

14  initial that, you know, felt like we could move on, and I'd get

15  it written up and present it back.

16  Q    Do you recall what the others area were you indicated you

17  might be flexible on work?

18  A    Whew.  STD was one.  The bumping language -- that was one

19  that was talked about.  And we talked about it from the

20  standpoint I was not a big believer.  Bumping could be very --

21  in a layoff situation can be very disruptive.  And we had a

22  little bit of discussion about that.  And I think the words I

23  used, I wasn't a hundred percent in favor of bumping, but I was

24  open to looking at it.  If maybe we could put in a stopgap on

25  the bumping, but that I was open to looking at that.

1    Q    Do you recall whether or not you said you might be flexible

2    about the bidding procedure?

3    A    The bidding procedure again was something that we could

4    definitely look at.  And again that had to do -- also tied back

5    in with the -- with that seniority aspect and about how they bid

6    it for departmental versus plant-wide.

7    Q    Did the Union agree to modify any of its proposals during

8    this bargaining session?

9    A    No, sir.

10   Q    Did the Union say anything about what other proposals it

11   might be able to make?

12   A    I would need to check my notes on that to bring that back

13   to light.

14   Q    That's fine.

15        JUDGE CARISSIMI:  Mr. Funk, if you want to --

16   (Witness proffered the document.)

17        THE WITNESS:  I'll try to be quick, Your Honor.

18        JUDGE CARISSIMI:  No, take whatever time you need, Mr.

19   Meadows.

20        MR. WIESE:  Your Honor, which document is the witness

21   looking in?

22        THE WITNESS:  I'm sorry.

23        MR. WIESE:  Oh.  No.

24        THE WITNESS:  PF 67.

25        MR. WIESE:  Thank you.

1    THE WITNESS:  I'm sorry.

2  (Pause.)

3    JUDGE CARISSIMI:  Let's go off the record.

4  (Off the record.)

5    JUDGE CARISSIMI:  On the record.

6    THE WITNESS:  Could you repeat that question again?

7    MR. BUTTRICK:  Sure.

8  Q    BY MR. BUTTRICK:  Did the Union express any willingness to

9  move on any of its proposals?

10  A    No, sir.

11  Q    Did the Union say anything about what it wanted in order to

12  have the bargaining move forward?

13  A    Yes, they did.  They wanted us to go back to their contract

14  and put what items we wanted into their contract.

15    JUDGE CARISSIMI:  And who said that, sir?

16    THE WITNESS:  I'm sorry.  Jethro Head.

17  Q    BY MR. BUTTRICK:  And did you give a response about what

18  you thought was needed to move the bargaining forward?

19  A    I explained that our proposal was on the table, that they

20  had not addressed our proposals, we've had a lot of discussion

21  about things that were concerns to them, and that, you know, I

22  had been making modifications to ours but that they needed to

23  address my proposals and let me know where there were issues.

24  Q    Who decided to end the bargaining on that day?

25  A    The Union.

1    MR. WIESE:  Your Honor?

2    JUDGE CARISSIMI:  Yes, sir?

3    MR. WIESE:  I'd just like the record to reflect that the

4    witness was looking at his notes as he gave that previous

5    answer.

6    THE WITNESS:  I wasn't.  Okay?

7    JUDGE CARISSIMI:  I have to say, I did not detect it, sir.

8    MR. WIESE:  Okay.

9    JUDGE CARISSIMI:  And, again, this is an issue that I'm

10   sensitive to, as I've indicated before.  And the notes are

11   clearly, at least right now, about 3 feet away from Mr. Meadows.

12   But, again, I'm not saying that that wasn't the case.  All I can

13   say is that I did not detect that.

14   MR. WIESE:  Okay.

15   JUDGE CARISSIMI:  All right?

16   MR. WIESE:  That's how it looked from my perspective.

17   JUDGE CARISSIMI:  I understand.  And, again, I will be

18   alert to after -- if Mr. Meadows needs to refresh his

19   recollection, I'll ask him to clearly set the notes aside,

20   outside of his field of vision.  All right?

21   Q    BY MR. BUTTRICK:  Mr. Meadows, were you looking at notes

22   when you answered that last question?

23   A    No, sir; I wasn't.

24   Q    When was the next day of bargaining?

25   A    On the 30th.

1  Q    And do you recall who was there?

2  A    Again Mr. Yeisley, Mr. Eby, Mr. Head, Ms. Shannon, Mr.

3  Maas.  From our side, Mr. Wood, myself, Mr. Froehlich, and Ms.

4  Villegas.

5  Q    Was the mediator present?

6  A    The mediator was there.

7  Q    During this session did the Union continue to insist that

8  the Company negotiate from the Red Book?

9  A    Yes, they did.

10 Q    What did they say?

11 A    That if we wanted to make any progress that we had to go

12 back to their document.

13      JUDGE CARISSIMI:  And, again, Mr. Meadows --

14      THE WITNESS:  Mr. Head.  Sorry.  I'm so sorry, sir.

15      JUDGE CARISSIMI:  Because I'm sure you understand that when

16 you say "the Union," since there was several people there, I'm

17 not certain.  And I know Mr. Head is the chief negotiator, but

18 other people were there.  So try to remember to, if somebody

19 said something, to tell me who that person was.

20      THE WITNESS:  Sorry, sir.

21      JUDGE CARISSIMI:  All right?

22      THE WITNESS:  Yes.

23      JUDGE CARISSIMI:  Thank you.

24 Q    BY MR. BUTTRICK:  Did the Union provide the Company with

25 any requests for information on this session?

1  A    Yes, they did.

2  Q    Mr. Funk will hand you what's been -- already in evidence

3  as Joint Exhibit 26.

4  (Witness proffered the document.)

5       JUDGE CARISSIMI:  Mr. Wiese, you have it?

6       MR. WIESE:  Yes, Your Honor.

7       JUDGE CARISSIMI:  All right.  Very good.

8  Q    BY MR. BUTTRICK:  Mr. Meadows --

9  A    You did say "JT 26"?

10 Q    That's right.  "JT 26."

11 A    Okay.

12 Q    Do you have that in front of you?

13 A    I have it.

14 Q    Do you recognize Joint 26?

15 A    Yes, I do.

16 Q    And what is it?

17 A    This is a modified request from the Union from an earlier

18 request.

19 Q    Did the Union say anything to you when they gave you this

20 modified request?

21 A    They said that they were giving us a modified request.  And

22 at the time they gave it to me, I did make a verbal response

23 that, you know, we would have to go and get some of this

24 information.  I had felt like that some of this information we

25 had already provided.  And I also advised them that there was

1 some of this information that I had already reached out and it
2 was -- we were unable to get and couldn't get it provided.
3 Q   And what information was that?
4 A   Well, for example, on this sheet, they had -- were asking
5 for to provide a "statement from BCBS of Iowa", "anticipated
6 rate increases for the next 4 years." And I was reading it from
7 the document.
8     JUDGE CARISSIMI: Can you tell us what "BCBS of Iowa" is?
9     THE WITNESS: That meant -- that stood for "Blue Cross Blue
10 Shield of Iowa."
11    JUDGE CARISSIMI: Thank you.
12    THE WITNESS: And that I was having trouble getting an --
13 to find out what the increase was for even for 2016. That there
14 was nothing they could provide me, what the anticipated
15 increases were for the next 4 years. I did not have that data.
16 Q   BY MR. BUTTRICK: Was there anything else that you
17 responded to verbally that you can recall?
18 A   We went down through it, but exactly off the top the head
19 there was -- there was one item that we had provided, I know
20 this, that I had talked to them about that I would get for them,
21 but it had to do with the -- a plant diagram. And we had
22 provided in one of our information requests -- they wanted a
23 list of cameras and a plant diagram. And we had given them a
24 plant diagram on a -- it was a regular sheet of -- you know, 8½-
25 by-11 sheet of paper. And on this document request, they had

1  wanted a large piece -- which "large" is as large as we could

2  get it, I guess.

3  Q    Now, until this point had the Union said anything to you

4  about being dissatisfied with the Company's responses to the

5  July 28th information request?

6  A    No, they had not.

7       THE WITNESS:  I'm going to set these aside.

8       JUDGE CARISSIMI:  Thank you.

9  Q    BY MR. BUTTRICK:  Did you hand any documents to the Union

10 at the table that was responsive to the information request?

11 A    At that time, yes, because they had requested -- it was the

12 -- I think it was the medical insurance rates and what our

13 current medical insurance rates were.  And we, I think, provided

14 that.

15 (EXHIBIT MARKED:  RESPONDENT'S 40.)

16 Q    BY MR. BUTTRICK:  So Mr. Funk will hand you what's been

17 marked as Penford Exhibit 40.

18 (Witness proffered the document.)

19 Q    Mr. Meadows, do you recognize Penford Exhibit 40?

20 A    Yes, I do.

21 Q    What is it?

22 A    This is the document that I gave them with our current

23 medical cost.

24 Q    And I notice there's handwriting in the top right-hand

25 corner.  Do you recognize that handwriting?

1   A    Levi Wood.

2   Q    And is this document maintained as a customary part of the

3   Company's business?

4   A    Yes, it is.

5        MR. BUTTRICK:  I move to admit Penford 40.

6        JUDGE CARISSIMI:  Is there any objection to Respondent's

7   40?

8        MR. WIESE:  No objection, Your Honor.

9        JUDGE CARISSIMI:  Respondent Exhibit 40 is admitted.

10  (EXHIBIT RECEIVED:  RESPONDENT'S 40.)

11  Q    BY MR. BUTTRICK:  Did the Company present the Union with

12  any proposals during this session?

13  A    Yes, we did.

14  Q    So Mr. Funk will direct your attention to what's already in

15  evidence as Joint 5.

16  (Witness proffered the document.)

17  Q    Mr. Meadows, what is Joint 5?

18  A    This is an updated proposal that we presented to the Union

19  and that addressed again back to some of the 21 issues and also

20  was addressing some of the what they said were the concessions.

21  And we were addressing those items.  And again we went through

22  it, pointed out where we had made the changes and how they

23  related to an item that they had presented to us.  And it's the

24  -- all those items again were in red.

25  Q    Did the Union respond to any of the Company's proposals

1    during this session?

2    A     No, they did not.

3    Q     Did the Union offer any proposals of its own during this

4    session?

5    A     No, they did not.

6    Q     Who decided to end the bargaining on this day?

7    A     The Union.

8    Q     When was the next day of bargaining?

9    A     The 31st.

10   Q     Do you recall who was there?

11   A     Again on that day it was from the Union side Mr. Yeisley,

12   Mr. Eby, Jethro Head, Ms. Shannon, and Mr. Maas.  And again from

13   the Union it was Mr. Wood, myself, Mr. Froehlich, and, I

14   believe, Kim Villegas, I believe is who it was.  On the --

15   actually, that was the 31st.  Kris Nisavic came in at a point.

16   And again, he was a guest.  Then he was there one day Kim wasn't

17   there.  And I'd have to go back and look, but I think that that

18   day might have been switched out with Kris Nisavic instead of

19   Kim Villegas.

20   Q     Did you provide any documents in response to the Union's

21   July 30th RFI?

22   A     Yes, we did.

23   Q     So Mr. Funk will refer to you what's already in evidence as

24   Joint Exhibit 27.

25   (Witness proffered the document.)

1  Q     Mr. Meadows, do you recognize Joint 27?

2  A     Yes, I do.

3  Q     What is it?

4  A     This is a response to the request for information they had

5  given us.  And you look at the document, it is -- what's in bold

6  is what we provided, information-wise.

7  Q     And I notice the handwriting on the top right-hand corner

8  of the first page.  Do you recognize that handwriting?

9  A     Levi Wood.

10  Q     And Mr. Funk will reference you to what's already in

11  evidence as Joint Exhibit 28.

12  (Witness proffered the document.)

13  Q     Do you have that in front of you?

14  A     I do.

15  Q     Okay.  Do you recognize Joint 28?

16  A     This was attachments for -- again, on this, on JT 27, where

17  we could just answer on the sheet of paper, we did.  For an

18  example, the "cents per hour of an individual cost", we just

19  put, you know, the "31 cents", so it's on this document.  But

20  where there was -- where we couldn't answer it on here and it

21  needed a document, these are the documents that were provided

22  along with this.

23  Q     Did the Company make any bargaining proposals during this

24  session?

25  A     Yes.

1  Q      So Mr. Funk will direct your attention to Joint Exhibit 6.

2  (Witness proffered the document.)

3  Q      Do you have that in front of you?

4  A      Yes, I do.

5  Q      What is Joint 6?

6  A      Again the changes are in red on this document, which we

7  covered with the Union, but -- and went through it.  And they

8  were again some movement and responses to the 20 -- the

9  concessions list and the 21 issues that they had.

10 Q      Did you explain to the Union the Company's latest proposals

11 when you gave it to them?

12 A      Yes, we did.

13 Q      Did the Union ask any questions about them?

14 A      No, sir.

15 Q      Did you express any willingness to further change any of

16 your proposals beyond what's memorialized in Joint 6?

17 A      Again we explained to the Union that we would like for them

18 to take a look at this document and, if they had questions or

19 issues at with what we presented, to let us know.

20 Q      Did you discuss in this session about the gap supplement?

21 A      There was a discussion on gap insurance, and we discussed

22 the fact that -- the end date of the current gap insurance.  And

23 what that had to do with is the fact that the previous gap

24 insurance was -- a person could get the gap insurance, and it

25 was at $51 per person.  So if it was for a husband and a spouse,

1  it was $51 for each one of them for gap insurance.  And our

2  proposal was changing that to the employee paid 50 percent of

3  whatever the premium rate for whatever the premium rate was.

4  And we had discussion about it.  And one of the things that said

5  that we could do was, wouldn't change at the start of a -- at

6  the contract, we could put language in here that moved the --

7  that gave people an opportunity to decide whether they wanted to

8  retire or not and move that to where it was -- our proposal

9  moved it to January the 1st of 2016, so anybody that retired

10  between now and December the 31st could still get under the old

11  program and the new program didn't change until January 1st.

12  Q    Did you say anything about whether or not there was a drop-

13  dead date from your perspective?

14  A    No, I did not.  Just the opposite.  Because there was

15  discussion about timing and where we were going to go next.

16  And, I mean, I indicated to Jethro Head and the -- to the Union

17  that, you know, we wanted to get a contract, but if it meant

18  continuing on and staying with this process, that, you know, I

19  was there for the duration, I wasn't going anywhere, I was there

20  to negotiate and keep going.

21  Q    Did the Union adjust any of its proposals during this

22  session?

23  A    No, they did not.

24  Q    Did the Union express a willingness to move in its

25  positions?

1    A    No, they did not.

2    Q    Did the Union offer any proposals during this session?

3    A    No, they did not.

4    Q    Was there another session that day?

5    A    Yes, there was.

6    Q    Do you recall who was there?

7    A    The same people were there.  You asked the question, and,

8    you know, I'm trying to remember and I want to be as accurate as

9    possible, but maybe I need to check the notes to be a hundred

10   percent accurate.  But I do remember that there was -- Erwin

11   Froehlich did have an issue, a medical issue.  And I'm trying to

12   remember whether it was that day or the day before, but there

13   was a day that he actually wasn't there for the full

14   negotiations because of a situation, and I just don't remember

15   exactly which day it was.

16   Q    That's fine.

17        During this session, did the Union present any proposals to

18   the Company?

19   A    No, they did not.

20   Q    Well, Mr. Funk will hand you what's marked as Joint Exhibit

21   12.

22   (Witness proffered the document.)

23   Q    Do you recognize Joint Exhibit 12?

24   A    Oh.  I'm sorry.  Yes, I do.

25   Q    What is Joint --

1     JUDGE CARISSIMI:  Mr. Wiese, do you have Joint Exhibit 12?

2     MR. WIESE:  Yes, I do, Your Honor.  Thank you.

3     THE WITNESS:  Yes, I do.  They did present this that

4  afternoon.

5  Q     BY MR. BUTTRICK:  And did the Union explain this proposal

6  to you?

7  A     No.  They did not explain it.  They just presented it as

8  their pension proposal.

9  Q     Did the Union say anything about the prospects of getting a

10  contract before the contract expired?

11  A     Mr. Head stated that he didn't think we were going to be

12  able to get to a contract agreement.

13  Q     Did the Union make any suggestions about how they wanted to

14  handle negotiations for the rest of that day, in light of the

15  upcoming contract vote that they were going to have?

16  A     Yes.  I got thrown a little bit, because I thought we were

17  going to, you know, get into talking about a lot of issues.  And

18  they presented this proposal, and then Mr. Head threw me for a

19  loop, because he stated that they had a meeting the next day and

20  he wanted us to present to him our final proposal or final

21  offer.  And we had discussion that we were -- you know, "I'm

22  willing to sit here and continue negotiating."  He says, "No.

23  We want your final offer, and I want you to give us your best

24  wages, medical insurance, and provide it to us, because we got a

25  meeting tomorrow and we're not going to stay here all night."

1  So I told him that if that's what he wanted, you know, I'd put

2  it together, but I was going to need a little bit of time.  And

3  then he reiterated, "Just give us your final offer with your

4  best wages and all."  And I said, "Okay."  So I went back and

5  put a final together.

6  Q    Mr. Funk will direct your attention to what's already in

7  evidence as Joint Exhibit 7.

8  (Witness proffered the document.)

9  Q    Do you recognize this document?

10  A    Yes, I do.

11  Q    What is it?

12  A    It was the Company's final offer that the Union had

13  requested.

14  Q    And so when you gave the Union the final offer did you

15  explain to them what changes were in it?

16  A    Yes, I did.  The changes on this document, because I was

17  presenting what I considered to be a clean document, I didn't

18  make the -- highlight the changes in red.  Did it as, you know,

19  a final document.  But went through it and, based on his request

20  about the best wages, the medical insurance, and so forth, did

21  go through here and point out things that we had made -- that I

22  had made changes on, one of them being that -- was the --

23  probably one of the key ones, the maintenance wages.  And the

24  Union's original June 1st proposal had in there about a 2-dollar

25  increase on maintenance.  And I pointed that one out, that on

1  the -- on the wages, that, you know, we presented our best wages

2  but I had made a change in -- back to their original proposal

3  and put -- adjusted the maintenance wages by $2, and then the

4  regular percentage increases.

5       There was another item.  And to be -- I'd have to look at

6  like that chart or back to the notes as to exactly what the

7  other one was.  If you want --

8  Q    Feel free.

9       JUDGE CARISSIMI:  He may look at the notes.

10      So that is Penford 57, correct?

11      THE WITNESS:  Sixty-seven.

12      JUDGE CARISSIMI:  Sixty-seven.  I'm sorry.

13  (Pause.)

14      JUDGE CARISSIMI:  Mr. Meadows has put the notes again

15  approximately 3 feet away from himself.

16      You may continue.

17      THE WITNESS:  Yeah.  Did mention to them -- did give them a

18  response to the pension document that they had presented to us

19  that we were remaining with our pension proposal that's in the

20  document.  There was a discussion about the two-tier in wage,

21  that it was still there, but again covered and walked through

22  it.  The gap insurance aspect -- you know, that we had made the

23  change there that -- till the January 1st date.  Made the change

24  there.

25  Q    BY MR. BUTTRICK:  Do you recall if you made any changes to

1  bidding?

2  A    The bidding, we had taken -- we had -- did take it down,

3  stepped it down on it, that -- the exact change on it.  But

4  there was a change on the bidding.

5  Q    Did the Union ask any questions when you gave them the

6  Company's final offer?

7  A    No, they did not.  They proceeded to tell me that they

8  needed 155 copies of it and they needed the attachments to it,

9  which was the absentee program.  They wanted the medical program

10  attachments to go with it.

11  Q    Did the Union make any proposals of its own during this

12  particular session?

13  A    No, they did not.

14  Q    Did the Union express any willingness to move on its

15  proposals during this session?

16  A    No.

17  Q    After the bargaining unit voted down the Company's final

18  offer, did you ever tell the Union that you are not obligated to

19  follow any of the terms and conditions of the Red Book?

20  A    No.

21  Q    Do you recall what you might have told them?

22  A    I don't remember a specific conversation with them about

23  that.

24  Q    What is your understanding about a company's obligation to

25  follow the terms of an expired contract when the contract

1  expires?

2  A    The --

3       MR. WIESE:  Objection, Your Honor.

4       JUDGE CARISSIMI:  Basis?

5       MR. WIESE:  Relevance.

6       JUDGE CARISSIMI:  Normally I'm not interested in a

7  witness's opinion, but I think in this instance there's some

8  relevance.  So I'm going to overrule the objection and I'll let

9  the witness answer.

10       THE WITNESS:  We had an obligation to continue to

11  bargaining, and while we're bargaining we continue to have to

12  maintain the current provisions of the contract.

13  Q    BY MR. BUTTRICK:  When was the parties' next day of

14  bargaining?

15  A    August 18th.

16  Q    If I were to tell you August 17th, does that refresh your

17  recollection?

18  A    Yes.  August 17th.

19  Q    And do you recall who was there?

20  A    Again Kelly Yeisley, Chris Eby, Jethro Head, Ms. Shannon,

21  Mr. Maas.  And I think it was our standard group: Mr. Wood,

22  myself, Mr. Froehlich, and Kim Villegas.

23  Q    Do you recall if the mediator was present?

24  A    The mediator was present.

25  Q    During this session did the Union make any counterproposals

1    to the Company's final offer?

2    A    No, they did not.

3    Q    At this point did you believe you had any tentative

4    agreements with the Union?

5    A    I thought, based upon the fact of this discussion that we

6    had had, the things they had put down as issues, our responses

7    back to them making adjustments, I thought we had tentative

8    agreements.

9    Q    Did the Union express an opinion about that?

10   A    The Union -- Mr. Head said that we had no tentative

11   agreements.

12   Q    By your count, approximately how many tentative agreements

13   do you think that there were?

14   A    Right at about 46.

15   Q    Did the Union explain to you which of its proposals were

16   still on the table?

17   A    The Union stated that all of their proposals were still on

18   the table.

19        JUDGE CARISSIMI:  Who said that?

20        THE WITNESS:  Sorry.  Sorry, sir.

21        JUDGE CARISSIMI:  That's all right.

22        THE WITNESS:  Mr. Head stated that all of their proposals

23   were still on the table, except for herbal tea and stirrer

24   sticks.

25   Q    BY MR. BUTTRICK:  Did anyone from the Union say anything

1  about what it thought was going to be required to get a

2  contract?

3  A    Mr. Head again stated that we needed to go back to their

4  contract.  You know, he started on that day explaining to me

5  about Kellogg, that what had gone on with Kellogg.  And he

6  brought up Roquette -- you know, lock them out -- the lockout at

7  Roquette.  He brought up American Sugar.  And now Ingredion was

8  up shit creek.  And that we had bought the company and we had

9  bought this contract and that we had to go to their contract.

10 Q    Did anyone from the Union say anything to you about

11 violence during this session?

12 A    During that meeting, Mr. Head made a comment that -- about

13 displeasure with the aspects and that if he was Chris Eby he'd

14 have come across the table and cut me.

15 Q    During the course of the parties' bargaining did you ever

16 physically threaten any member of the Union's bargaining team?

17 A    Never.

18 Q    Did the Company or Union present any proposals to each

19 other on this day?

20 A    Yes.

21     I'm sorry.  You're on -- on the 18th?  No, we did not.  No,

22 not on the 18th.

23 Q    Did the Company or the Union show any willingness to move

24 on any particular issues on this day?

25 A    None whatsoever.

1  Q    Did the Union provide any feedback on the Company's final

2  offer on this day?

3  A    No, they didn't.

4  Q    So, after this bargaining session, what did you think it

5  would take to get an agreement?

6  A    Based on what was being stated by Mr. Head, and if we

7  didn't go back to the original contract, we were not going to be

8  able to get an agreement.

9  Q    And did you think that was going to be possible?

10  A    No, sir; I did not.

11  Q    Did you ever tell the Union during any of the bargaining

12  that you had no priorities in your bargaining?

13  A    Mr. Head asked me what our priorities were.  My comment to

14  that is "I don't understand the question."

15  Q    Did you have priorities in the bargaining?

16  A    Didn't have priorities.  I didn't under -- no.

17  Q    Did you have priorities, though, in the bargaining?  Did

18  you have goals in the bargaining?

19  A    We had goals in the bargaining.  Yes.

20  Q    What were your goals?

21  A    And that was to get a contract.  And, you know, we talked

22  about the fact that my only goal was to get a contract.  We both

23  want -- that it was in our best interest and we wanted to get a

24  contract.

25  Q    Was there a -- when was the next day of bargaining?

1    A    The 18th.

2    Q    And do you recall who was there?

3    A    Same group.

4    Q    Was the mediator there as well?

5    A    The mediator was there too.

6    Q    Did you present the Union with a last, best, and final

7    during this session?

8    A    Yes, I did.

9    Q    So Mr. Funk will turn your attention to Joint 8 and Joint

10   9, which are already in evidence.

11   (Witness proffered the documents.)

12   Q    Do you recognize --

13        MR. BUTTRICK:  Does everyone have Joint 8 --

14        MR. WIESE:  One moment, Your Honor.

15        JUDGE CARISSIMI:  Let us know when you're ready, Mr. Wiese.

16        MR. WIESE:  Thank you.

17        All right.  I'm ready to go.

18        JUDGE CARISSIMI:  Very good.

19        You may proceed, Mr. Buttrick.

20   Q    BY MR. BUTTRICK:  Mr. Meadows, do you recognize Joint 8 and

21   Joint 9?

22   A    Yes, I do.

23   Q    What are they?

24   A    After the session on the 17th, I went back that night and

25   looked at everything that we could possibly do.  They had asked

1  for our final offer.  We had given it to them.  And that day it

2  was made very clear to me by Mr. Head that we were not going to

3  move forward if I didn't go back to their contract.  I had

4  expressed to them that they needed to refer to our offer and

5  give us feedback on it, that it wasn't going to happen, and

6  that.  So I went back that night and looked at everything that -

7  - if there was anything possibly that I could do to get this

8  thing moved forward.  And I put together this document, which

9  was our last, best, and final offer, and presented it to them on

10  the 18th.

11  Q    What items did you look at in preparing the last, best, and

12  final?

13  A    I had looked at the 21 issues.  I had looked at the --

14  again I went back and looked at the what they said was a

15  concession list.  I went back and referred to the Red Book.  You

16  know, I went back and thought about all the different TV media

17  events that they had had and made comments over the news media

18  about statements that they were making that they weren't

19  necessarily making at the table.  And just tried to think

20  through all the stuff that had been done and what can I do as

21  the best offer I can put on the table, and put this together.

22  Q    Did you make any comments to the Union about your belief

23  whether or not you were at impasse?

24  A    Yes, I did.  Yeah.  We had a discussion that, you know,

25  "You're not willing to move from your standpoint.  You're not

1  giving us anything."  And --

2      JUDGE CARISSIMI:  Who said that, Mr. Meadows?

3      THE WITNESS:  I'm so sorry.  Mr. Head.

4  Excuse me.  I was telling them, the Union.  I was telling

5  the Union that they were not willing to move off of where they

6  were.  That we had, you know, put our stuff together.  And with

7  the fact that the Union was not willing to move and that we

8  weren't getting anything in return and that we were at our final

9  spot that, you know, I don't see that we're at anything but at

10  impasse.  And that with no movement from either party and both

11  parties locked into where they're at that I was going to present

12  this final offer.

13  Q    BY MR. BUTTRICK:  Did you explain the terms of the last,

14  best, and final to the Union when you gave it to them?

15  A    Yes, I did.  I walked down through it with changes.  I made

16  sure they understood that in this last, best, and final that

17  what had been an item up front that I never really got total

18  clarification on -- just to try to put it to bed -- I made sure

19  that they understood that their recognition clause was exactly

20  what they had from the Red Book.  And went through any and all

21  of any of the changes in it.  Then also, if you look at JT 9,

22  also discussed what we were willing to do to try to get to this

23  final agreement.  And putting a signing bonus offer on the table

24  and defining what the medical insurance seed money was.

25  Q    Do you recall, besides the signing bonus, the seed money,

1    and the recognition clause, what other changes you made in the

2    last, best, and final?

3    A    Yes, I recall some other changes.  To be specific with

4    them, I would need to go -- probably go -- need to go back and

5    check the notes.  But there were a couple of items that I did go

6    through and explain to them.  We had originally -- and the

7    Union, as far as I was concerned, had agreed to it, because they

8    had actually put it into one of their original upfront -- that

9    non-economic proposal -- was the -- you know, they had a deal in

10   the contract that talked about the number of people on their

11   bargaining committee.  And I had suggested raising it.  And when

12   it got down to this -- and I actually went back and really took

13   a real depth look at and tried to figure out "Okay.  What is" --

14   "What should we do?"  I actually, going through it, said, "You

15   know, I know this has been in their contract, but do I really

16   care how many people they have on their bargaining committee?  I

17   really don't."  And I took out any -- the reference to the

18   number of people in their bargaining committee because that was

19   -- as far as I was concerned, that was their portion.  As I went

20   through the final offer and putting the last, best, and final

21   together, I got down to a point where I -- under S&A.  There was

22   a statement in there under S&A that had to do with that a -- if

23   they went on strike or a layoff and a person was on S&A, that

24   their S&A benefit stopped.  And I took that out of there.  That

25   if they were on S&A at the time of any event, that they

1   continued on.  So several items I went through like that and

2   massaged.  Took some things out, you know, and massaged it to

3   come up with this last, best, and final.

4   Q    Do you recall whether the last, best, and final changed any

5   terms of overtime?

6   A    Could you repeat the question?

7   Q    Sure.  Do you recall whether the last, best, and final

8   changed any overtime terms related to whose responsibility it

9   was to track such things?

10  A    There was an overtime aspect that -- when I -- as, again,

11  when I got through it, I was struggling with understanding why

12  the Union -- and I -- but I was apparently not getting across to

13  the Union what I was trying to do.  But what I had done, which

14  we do at a lot of our facilities, is that the hourly people call

15  in their own overtime.  So if someone was not coming in and they

16  called in -- and the union people know the overtime procedure as

17  well as anybody -- that they had the right to pick up the phone

18  and call somebody that "Hey, I need you to come in because so-

19  and-so is not coming in."  I was letting the -- had a provision

20  in there that the Union could do their own overtime and move it

21  along.  And Mr. Head indicated that they didn't like that.  Re-

22  thought-through that and I changed it back over to that

23  management was responsible for dealing with -- for calling in

24  overtime, not the Union.

25  Q    Do you recall whether the last, best, and final had any

1  changes related to how long discipline stays in a person's file?

2  A    Yes.  It did.  There had been discussion with the Union

3  that they didn't want disciplinary action to stay in a person's

4  file forever.  And so re-thought-through that portion of it,

5  when I got down there, and did put in a statement that the Union

6  and the Company would review disciplinary action on a -- and

7  consider removing it after a year in the file.

8  Q    Do you recall whether the last, best, and final had any

9  changes related to effects bargaining?

10  A    Again, as I had stated earlier, I didn't -- we never came

11  to an agreement on whether -- about the severance language.  But

12  based on that conversation, I did go back and put a statement in

13  there that if an event occurred that the Company would do

14  effects bargaining.

15  Q    Do you recall whether the last, best, and final had any

16  changes related to bargaining committee members being employees

17  of the Company?

18  A    Yeah.  I didn't think a lot of that one.  It didn't make a

19  lot of sense to me.  But there was a change in there that said -

20  - which was not the norm, by any means, in my opinion -- but

21  that a person didn't have to be a member of -- they could be on

22  the bargaining committee without being a member of the business.

23  And about the only time that I've ever been involved in that was

24  -- is when I've seen it where it's an amalgamated organization.

25  And, again, it was not a big issue for me, so I did make a

1    change that they didn't have to be members.

2    Q    At the time of presenting the last, best, and final to the

3    Union, by your count how many of the Union's proposals had it

4    withdrawn?

5    A    None.

6    Q    Did the --

7    A    Excuse me.  Well, as I said earlier, there was the two --

8    the herbal sticks -- I mean the herbal tea and the stirrer

9    sticks -- but that was it.

10   Q    Was there another bargaining session that day?

11   A    No.  They on -- let's see.  Hang on.  August 18th.

12        Yeah.  I believe there was.

13        THE WITNESS:  Can I double-check the notes, sir?

14        JUDGE CARISSIMI:  Sure.

15        THE WITNESS:  PF 67.

16        JUDGE CARISSIMI:  Mr. Meadows is reviewing PF 67.

17        Let's go off the record.

18   (Off the record.)

19        JUDGE CARISSIMI:  On the record.

20        Mr. Meadows has set the bargaining notes aside,

21   approximately 3 feet from him.

22        Counsel, you may proceed.

23   Q    BY MR. BUTTRICK:  Do you recall if there was another

24   bargaining session on that same day?

25   A    Yes, there was.

1  Q    Did the Union present the Company with a proposal at this

2  session?

3  A    No, they didn't.  It was mainly just discussion about our

4  LBF.

5       I'm sorry.  Could you repeat that question one more time?

6  Q    Did the Union present the Company with a proposal at this

7  session?

8  A    On the 18th.  Yes.

9  Q    So Mr. Funk will hand you what's been marked as Joint

10 Exhibit 13 that's actually in evidence as Joint Exhibit 13.

11 (Witness proffered the document.)

12      JUDGE CARISSIMI:  Mr. Wiese, you can let us know when

13 you've located it.

14      MR. WIESE:  Thank you, Your Honor.  I have it.

15      JUDGE CARISSIMI:  Very good.

16      You may proceed, Mr. Buttrick.

17 Q    BY MR. BUTTRICK:  Do you recognize Joint 13?

18 A    Yes, I do.

19 Q    What was -- what is it?

20 A    This was the Union going back their original Red Book

21 contract and starting to -- Mr. Head said, "We're going to start

22 presenting you stuff article by article from our book," and he

23 started presenting this to us.

24 Q    And what was your response upon receiving Joint 13?

25 A    Initially, he went through this and read it.  And upon

1   finishing it, I explained to Mr. Head again that this was going

2   back to the Red Book, that a lot of the language that we had

3   issues with is all still there and we're not interested in going

4   back to the Red Book, and that if there is issues to our

5   contract proposals that we put out there, to please let us know

6   and we would address them, but we weren't interested in going

7   down this path.

8   Q    Did you tell the Union what document you were willing to

9   work from?

10  A    I told them that I was willing to work from our last, best,

11  and final.

12  Q    And did anyone from the Union say whether they were willing

13  to work from the last, best, and final?

14  A    They were not.  They were going to do it this way or no

15  way.

16       JUDGE CARISSIMI:  And who said that?

17       THE WITNESS:  I'm sorry.  Mr. Head explained that they were

18  going to go from their contract.

19  Q    BY MR. BUTTRICK:  Did anyone from the Union identify at

20  that time any mistakes they saw in the last, best, and final?

21  A    Mr. Head did.

22  Q    What did he say?

23  A    That there was a mistake in the who the dues went to.  And

24  I told him if it was a mistake that we would definitely correct

25  it.

1 Q    When the Union gave you Joint Exhibit 13, did you tell the

2 Union where they could find provisions in Joint 13 in the

3 Company's last, best, and final?

4 A    Yes, we did.

5 Q    Did the Union agree to any of the Company's bargaining

6 proposals during this session?

7 A    No, they did not.

8 Q    Did the Company agree to any of the Union's bargaining

9 proposals at this session?

10 A    No, we did not.

11 Q    Was there another bargaining session on this day?

12 A    Yes, there was.

13 Q    And do you recall who was there?

14 A    Same group, including the mediator.

15 Q    Did the Union present any proposals in this session?

16 A    Yes, they did.

17 Q    Mr. Funk will hand you what's already in evidence as Joint

18 14.

19 (Witness proffered the document.)

20        MR. BUTTRICK:  Do you have it, Tyler?

21        MR. WIESE:  Yes, I do.

22        MR. BUTTRICK:  Okay.

23        MR. WIESE:  Thank you.

24 Q    BY MR. BUTTRICK:  Mr. Meadows, what is Joint 14?

25 A    This was them presenting another article from the Red Book,

1 on wages, to us.

2 Q    Was this the first wage proposal the Union ever gave you?

3 A    Yes.

4 Q    What was your response upon receiving Joint 14?

5 A    That there was comment about the fact that, you know, "You

6 asked for our final.  You asked for our best wages.  I gave you

7 them," and we weren't interested in going through this process,

8 that our wage proposal was on the table in our last, best,

9 final, and you needed to refer to it.

10 Q    What was the Union's response?

11 A    That they weren't going to refer to my last, best, and

12 final and that they need to -- I needed to go back to the Red

13 Book.

14 Q    Did the Union agree to any of the Company's proposals at

15 this session?

16 A    No, they did not.

17 Q    Did the Company agree to any of the Union's proposals at

18 this session?

19 A    No, it did not.

20 Q    When did you agree to meet next?

21 A    We were actually supposed to meet on the next day, the

22 19th, but Mr. Head said, "There's no use in" -- "There's no

23 reason for us to meet anymore.  We're not going to meet

24 tomorrow."  So the 19th didn't happen, and they scheduled

25 October 8th and 9th for the next sessions.

1  Q    Did you ultimately meet in September?

2  A    I'm sorry.  We're at August.  September.  Yes.  We met in

3  September.  The scheduled dates were 9th, 10th, and 11th.

4  Q    And so was the next meeting date September 9th?

5  A    September 9th.

6  Q    Okay.  And do you recall who was there?

7  A    From the union side was Mr. Yeisley, Chris Eby, Jethro

8  Head, Ms. Shannon, and Mr. Maas.  From the union side, it was

9  me, Mr. Wood.  Mr. Froehlich was there.  I'd have to check the

10  notes for sure, but again it may have been Kris Nisavic at that

11  session, versus Kim.  But I'd have to double-check that.

12  Q    And those people were there on behalf of the Company,

13  correct?

14  A    Correct.

15  Q    Was the mediator there?

16  A    Yes.

17  Q    Did the Company present any proposals at this session?

18  A    On September the 9th?

19  Q    This is after you've given the last, best, and final.

20  A    No.

21  Q    Did the Union present any proposals at this session?

22  A    No.

23  Q    Did the Union say what its plan was for moving forward with

24  negotiations?

25  A    That we needed to go back to their contract.

1    JUDGE CARISSIMI:  And who made that statement?

2    THE WITNESS:  Mr. Head explained that they needed to go

3  back to his contract if we were going to get anywhere.

4  Q    BY MR. BUTTRICK:  And what was your response?

5  A    That last, best, and final was on the table; if there was

6  issues with things in that, that they needed to tell me what the

7  issues were, but that I had not gotten anything back from them

8  on what the problems or concerns were.

9  Q    Did you recall what Mr. Head's response was to that?

10 A    The exact response, I'd need to double-check the notes on

11 that.

12   JUDGE CARISSIMI:  Mr. Meadows is taking a look at --

13   THE WITNESS:  PF 67.

14   JUDGE CARISSIMI:  -- PF 67.

15   Let's go off the record.

16 (Off the record.)

17   JUDGE CARISSIMI:  Back on the record.

18 Q    BY MR. BUTTRICK:  The question was -- you had just

19 testified that you said the last, best, and final was on the

20 table, or words to that effect.  And my question was, "Did the

21 Union have a response to that?"

22 A    Mr. Head stated that they were going to continue with the

23 way they left off and continue to give us article by article by

24 their contract, the Red Book.

25 Q    Did anyone in this session say that they're done?

1   A     Mr. Head did.

2   Q     When did he say that?

3   A     Well, when I explained to him that basically I found that

4   unacceptable, that we had already stated that we weren't

5   interested in that contract, the current contract book, and that

6   we had our proposals on the table and that I had not received a

7   response for them, Mr. Head said, "Okay, then we're done."

8   Q     Did you say in this session whether you were planning to

9   implement the terms of your last, best, and final?

10  A     I believe at that point that I explained to Mr. Head that

11  "Then, if we're done and we're not going to be moving further,

12  then I got no alternative left but to go ahead and implement our

13  last, best, and final," and that I would plan on doing that

14  Monday if we could not get movement.

15  Q     Did the Union agree to any to any of the Company's

16  bargaining proposals at this session?

17  A     No, sir.

18  Q     Did the Company agree to any of the Union's bargaining

19  proposals at this session?

20  A     No.

21  Q     When was the parties' next day of bargaining?

22  A     Next day, on the 10th.

23  Q     And do you recall who was there?

24  A     Same group, including the mediator.

25  Q     Did the Company present any proposals at this session?

1  A    No, we did not.

2  Q    Did the Union present any proposals at this session?

3  A    No, they didn't.

4  Q    Did the Company say what its plan was to move forward with

5  negotiations?

6  A    I'm sorry.  Ask the question again?

7  Q    Did the Company say what its plan was to move forward with

8  negotiations?

9  A    That if the Union had issues to -- that they wanted to

10  present to our last, best, and final, that we were more than

11  interested in taking a look at them, but it was up to them to

12  give us something.

13  Q    What was the Union's response?

14  A    That if we didn't go back to the Red Book and go from

15  theirs that -- you know, Mr. Head kept talking about that, you

16  know, "You're not working a process.  You're not establishing a

17  process."  And we had a lot of discussion back and forth that,

18  you know, what -- "The process you want and the process we're" -

19  - "We can't agree on a process?  Okay.  You're not defining

20  process.  I'm not defining process.  It's -- our contract book

21  is out there, our offer, and our last, best and final."  Went

22  through all that again, and, you know, "If you've got issues

23  there, fine."  And was not willing to do it.

24  Q    Did the Union withdraw any of its original proposals during

25  this session?

1    A     Yes.

2    Q     Do you recall approximately how many?

3    A     It was approximately a dozen.

4    Q     Did the Union make a formal contract proposal during this

5    session?

6    A     What Mr. Head did is he -- what -- he came up and said,

7    "Okay.  We're going" -- and he went back to the June 1st

8    proposal and he started dropping some items.  And it was -- or

9    not dropping necessarily in their entirety.  I think there were

10   some that where he modified it.  And then, after he did that,

11   then he presented us with a document that I believe was entitled

12   "Union Settlement Offer" or something of that nature.

13   Q     Did the Company agree to any of the Union's proposals in

14   this session?

15   A     No.

16   Q     Why not?

17   A     They -- as I explained to them, that "Our last, best and

18   final is on the table, and I need you to address the concerns

19   there."  They weren't addressing them.

20   Q     Mr. Funk will turn your attention to what's already in

21   evidence as Joint 15.

22   (Witness proffered the document.)

23        JUDGE CARISSIMI:  Mr. Buttrick, what exhibit was that?

24        MR. BUTTRICK:  Joint 15.

25        JUDGE CARISSIMI:  Fifteen.

1   Q    BY MR. BUTTRICK:  Do you recognize Joint 15?

2   A    Yeah, it's -- this is that Union Offer of Settlement.

3   Q    When the Union gave you this offer of settlement, did they

4   explain it to you?

5   A    No.  They actually said that they were too tired to explain

6   it.

7   Q    Did the parties continue bargaining after you got the Joint

8   15 on that day?

9   A    No.

10  Q    Now, at this point did you think continued bargaining might

11  get a contract?

12  A    No.

13  Q    Why not?

14  A    Again, Mr. Head made it perfectly clear that if we didn't

15  go to their original contract, we weren't going to move -- they

16  weren't going to move.  And I told him our last, best, and final

17  was on the table and we wanted our issues addressed, and he

18  refused to address them.

19  Q    Did you give the Union a document indicating your intention

20  to unilaterally implement your last, best, and final in this

21  session?

22  A    Yes, I did.

23  (EXHIBIT MARKED:  RESPONDENT'S 45.)

24  Q    BY MR. BUTTRICK:  I'm going to hand you what's marked as

25  Penford 45.

1    MR. BUTTRICK:  And this is a question.  Is this in

2  evidence?

3    JUDGE CARISSIMI:  Respondent's 45?

4    MR. BUTTRICK:  Yes.

5    JUDGE CARISSIMI:  I don't believe so.

6    MR. BUTTRICK:  Okay.

7    JUDGE CARISSIMI:  My notes reflect it doesn't.

8    Mr. Walls?

9    THE REPORTER:  I agree.

10    MR. BUTTRICK:  Thank you.

11    MR. WIESE:  Just to clarify, are you talking about this

12  exact version of this letter or are you talking about a version

13  of this letter?

14    MR. BUTTRICK:  This exact version.

15    MR. WIESE:  Okay.  Thank you.

16  (Witness proffered the document.)

17  Q   BY MR. BUTTRICK:  Mr. Meadows, do you recognize Penford 45?

18  A   Yes, I do.

19  Q   What is it?

20  A   We had talked about the fact of where we were in

21  negotiations and that if weren't going to move, then my intent

22  to implement our last, best, and final.  And we got to that

23  point on the 10th that I told them that, you know, that I'd be

24  providing that.  And next day nothing went anywhere and I

25  actually presented this letter to them.

1  Q    Okay.  I notice there's handwriting up in the top right-

2  hand corner.  Whose handwriting is that?

3  A    Levi Wood.

4  Q    And does the Company maintain Penford 45 as a customary

5  part of its business?

6  A    Yes.

7       MR. BUTTRICK:  So I move to admit Penford 45.

8       JUDGE CARISSIMI:  Is there any objection to Respondent's

9  45?

10      MR. WIESE:  No objection, Your Honor.

11      JUDGE CARISSIMI:  Respondent's 45 is admitted.

12  (EXHIBIT RECEIVED:  RESPONDENT'S 45.)

13  Q    BY MR. BUTTRICK:  So after you gave the Union Penford 45

14  did you offer to continue bargaining from the last, best, and

15  final?

16  A    Yes, I did.

17  Q    What did you say?

18  A    I told them if they wanted to review our last, best, and

19  final and present us with their concerns that we would

20  definitely take them under consideration.

21  Q    Did the parties schedule any additional bargaining dates?

22  A    We met the next day, on the 11th.

23  Q    And so who was there?

24  A    All the same people, including the mediator.

25  Q    Did the Company present any proposals on this session?

1  A    No, we did not.

2  Q    Did the Union present any proposals during this session?

3  A    No, they did not.  But I did mention to them that, you

4  know, that I had gone through document JT 15 and that we were

5  not interested in going back to that original contract.

6  Q    Did the Union indicate whether or not it was willing to

7  work from the last, best, and final?

8  A    They said they were not going to work from the last, best,

9  and final.

10    JUDGE CARISSIMI:  And who said that?

11    THE WITNESS:  Excuse me.  Mr. Head.

12  Q    BY MR. BUTTRICK:  Did the Union say anything about where

13  they thought the parties were going to go from here?

14  A    Mr. Head went through a lot of comments that -- and then,

15  right towards the end, made the comment that "You can lock us

16  out, or we can strike.  You do what you want to do."

17  Q    Did the Company adjust its proposals during this session,

18  based upon the Union's bargaining proposals?

19  A    No, sir.

20  Q    Did the Union adjust its proposals during the session,

21  based upon the Company's proposals?

22  A    No, sir.

23  Q    Did the Company ultimately unilaterally implement its last,

24  best, and final?

25  A    Yes, we did.

1   Q      Approximately when was that?

2   A      Monday, September the 14th.

3   Q      At the time of implementing the last, best, and final, by

4   your count approximately how many of the Company's proposals had

5   the Company withdrawn or modified since the bargaining began?

6   A      That's -- you're -- boy, you're really going back from

7   memory now.

8   Q      And if you don't recall, that's fine.

9   A      It was around 40 -- could you repeat the question again?

10  Q      At the time the Company implemented the last, best, and

11  final, by your count approximately how many of the Company's

12  proposals had the Company withdrawn or modified since the

13  bargaining began?

14  A      It was somewhere between 35 and 40.  Somewhere in that

15  area.  I don't -- I'd have to go back and take another look at

16  it.  I don't recall the exact number off the top of my head.

17  Q      That's fine.

18         Did you have occasion to meet with Mr. Eby in the ethanol

19  control room in late September of 2015?

20  A      Exact date I do not remember, but I did meet with Mr. Eby

21  in the control room at one point.

22  Q      Can you describe that meeting?

23  A      There was an issue that had come up with an individual and

24  that actually was a disciplinary scenario and kind of going to a

25  third-step mode.  Mr. Eby had called me on the phone, and we had

1    -- he presented it and we talked through it.  And I explained I

2    would get to the plant and then we would get it resolved.  And

3    so a meeting was set up.  And I do not remember the gentleman's

4    name that was involved in it.  But we met, and the grievance --

5    the issue was resolved and all, and we split up.  And a little

6    later on I got a call from Mr. Eby, asking me if I could come

7    out to the control room and we could talk.

8    Q    So tell us about that conversation.

9    A    I went out.  And I don't know that it's an office, it's --

10    whether it's a storeroom.  I don't know what the room actually

11    is, but off of that control room there was another little room.

12    And Chris said, "Let's go in here and talk."  So I don't want to

13    say that it was office, because I don't think -- I'm not sure

14    what it -- it was a room.  I'm not sure what it was.

15         And we went in there.  And basically a lot -- general

16    conversation, talking to Chris.  Comments made, you know, that,

17    you know, this -- basically off-the-record conversation that

18    "Hey," you know, "what are we going to do?"  We both agreed that

19    we wanted to get a contract done.  Talked about some of the

20    issues, that overtime was a problem.  And, you know, talked

21    about, you know, "What can we do?  How can we get," you know,

22    "things resolved?"  And kind of just conversations about what it

23    was going to take to get the contract and all.

24         And then there was -- Chris asked me that -- or made a

25    statement and then asking a question about some retirees that

1  had retired and if there was -- would we consider bringing them

2  back.  And during that conversation, it was, "Well, look.  Maybe

3  not" -- you know, not everybody wants to come back, but there's

4  some that may want to, and if we could offer those people that

5  want to come back the ability to come back.  And I was not a

6  hundred percent familiar with the pension documents of what

7  could and couldn't be done, once somebody retired, about

8  bringing them back.  And I told Chris that I didn't know if

9  anything could be done, that I would have to check with the

10  pension group to see if something could be allowed.  Because if

11  you -- once something was done, based upon the plan document, if

12  you made a change on there, it had to be an addendum-type thing

13  to the pension.  But -- and you couldn't just do and single out

14  people.  It would have to be opened up to everybody for

15  equality.  And I didn't know how that was -- how that even

16  affected people that had retired way before.  So I didn't know

17  what could be done, but if something could -- I'd take a look at

18  it and ask, and if something could be done, I'd get back with

19  him, but if he didn't hear from me, it was basically couldn't be

20  done.

21  Q    Did you ever say that -- was there any discussion of the

22  NLRB charges?

23  A    I don't remember any real discussion about that.

24  Q    Did you ever say in this conversation that if the NLRB

25  ruled against the Company you'd the same thing and get to

1    impasse?

2    A    No.

3    Q    Did the parties have any bargaining in October?

4    A    Yes.

5    Q    Do you recall what day?

6    A    The 8th and 9th was scheduled, so we met on the 8th.

7    Q    And do you recall who was there?

8    A    The same people as before, but I don't remember the

9    mediator being there.

10   Q    Did the parties agree -- did the Company agree to any of

11   the Union's proposals during this session?

12   A    No.

13   Q    Did the Union agree to any of the Company's proposals

14   during this session?

15   A    No.  That meeting, there was a lot of discussion over

16   retiree insurance and all.  And the one thing that I tried to

17   ensure -- because Mr. Head was very adamant about the fact,

18   about changing of retiree insurance.  And he was talking about

19   past retirees.  And I ensured him that I was not negotiating

20   past retirees and whatever their insurance was was going to

21   continue.  And he kept indicating, since it was not part of the

22   contract about past retirees, that we could change it.  And I

23   explained to him that I was not going to get into ERISA charges

24   by just arbitrarily changing past retirees' insurance and that

25   there was, you know, there was nothing changed, so whatever it

1  was.  And so there was a lot of discussion on that.  And there

2  was no intent to change those past retirees' insurance.  That

3  was a lot of discussion around that aspect of it.

4  Q    Did the Union ask you to bargain from the Red Book during

5  this day?

6  A    Jethro -- Mr. Head indicated to me that we needed to go

7  back to the Red Book.

8  Q    Did you agree to do that?

9  A    Absolutely not.

10  Q    Did the Union modify any of its proposals on this day?

11  A    No, sir.

12  Q    When was the parties' next day of bargaining?

13  A    It was supposed to been the next day, on the 9th, but Mr.

14  Head at later on that day said, "There's no use in getting

15  together tomorrow," and canceled the day.

16  Q    So did the parties get back together in November?

17  A    Yes.

18  Q    Do you recall when?

19  A    It was November 4th.

20  Q    Did the Company agree to any of the Union's proposals on

21  this day?

22  A    No.

23  Q    Did the Union agree to any of the Company's proposals on

24  this day?

25  A    No.

1  Q     Was there any discussion about the status of the parties'

2  negotiations?

3  A     I'm sorry, sir?

4  Q     Was there any discussion about the status of the parties'

5  negotiations?

6  A     That we weren't moving -- either party was not moving.

7       JUDGE CARISSIMI:  Who said that, Mr. Meadows?

8       THE WITNESS:  It was Mr. Head and myself both agreeing and

9  saying that, you know, neither one of us are moving.

10  Q     BY MR. BUTTRICK:  Did the parties discuss using local

11  bargaining as a potential tool to get things moving?

12  A     On November the 4th, at that meeting, yeah, there was --

13  there was three -- there was some items brought up that seemed

14  to be a concern, and that -- one of them was overtime.  And me

15  and Mr. Head discussed the fact that, you know, the contract is

16  there, the overtime procedure is there, but if there's things

17  that need to be worked out -- I mean, the Company was going to

18  continue to keep an open mind.  If there was things that needed

19  to be worked out -- you know, I felt like we had an obligation

20  to get to a signed contract.  So there was things that we were,

21  you know, open to listen to and could try to work through.  That

22  overtime procedure, based on the way that we looked at it, me

23  and Mr. Head agreed to back out and leave the local guys there

24  to see if they could work out their overtime issue, and we felt

25  like they could.  So me and Mr. Head left them to try to work

1  that out.

2  Q    Who suggested that the parties end bargaining on that day?

3  A    Mr. Head.

4  Q    Since November 4th have the parties continued to meet and

5  bargain?

6  A    Yes, they have.

7  Q    Do you remember approximately what months they have been

8  meeting and bargaining since then?

9  A    February and March.  They continued to negotiate as early

10  as this past Monday, I believe.

11      MR. BUTTRICK:  Just go off the record for one moment, Your

12  Honor?

13      JUDGE CARISSIMI:  Off the record.

14  (Off the record.)

15      JUDGE CARISSIMI:  Back on the record.

16      You may continue, counsel.

17      MR. BUTTRICK:  Nothing further.

18      JUDGE CARISSIMI:  Nothing further?  Very good.

19      Cross-examination?

20      MR. WIESE:  Your Honor, I'd like to request an hour and a

21  half to prepare.

22      JUDGE CARISSIMI:  I think the testimony of the witness was

23  very lengthy, so I'm going to grant you that time.

24      What I would suggest is let's everybody be back here, at

25  least, in an hour and 15 minutes.

1    If you need more time, I'm going to give you the more time,

2    up to an hour and a half.  But sometimes things go a little

3    quicker than you expect.

4    So we will be in recess for -- it's like 10 -- close to

5    10:30.  So we'll be in recess until 1 o'clock.  But I'd like

6    everybody here -- I'm sorry.  Until noon.  I misspoke.  To noon,

7    but I'd like everybody to be back here a couple minutes before

8    then, and if we're able to start before, we will.  If not, it'll

9    be noon when we start.  So what I'd like everybody to do is try

10   to have an early lunch so that we'll just continue on until the

11   end of the hearing.  All right?

12   And with that, we're off the record.

13   (Whereupon a recess was taken at 10:23 a.m., to resume at 12:00

14   p.m. in the same place.)

15   JUDGE CARISSIMI: On the record.

16   Mr. Wiese, you may cross-examine.

17                 CROSS-EXAMINATION

18   Q    BY MR. WIESE:  Good morning, Mr. Meadows.

19   A    Good morning.

20   Q    Have you discussed your testimony with anybody besides Mr.

21   Funk and Mr. Buttrick?

22   A    No.

23   Q    In preparing for your testimony today, did you review any

24   documents?

25   A    For today?

1  Q    Yes.

2  A    Didn't really review any documents, no.

3  Q    What about your testimony yesterday?

4  A    In preparation for the trial, I had reviewed documents.

5  Q    Okay.  What documents did you review?

6  A    Our proposals.  I have reviewed the notes.

7  Q    When you say, "the notes," are you talking about the

8  bargaining notes?

9  A    Okay.

10  Q    Whose bargaining notes did you review?

11  A    Levi Wood and Erwin Froehlich.

12  Q    Did you, yourself take any bargaining notes?

13  A    No, I did not.

14  Q    You never took any notes?

15  A    No, sir.

16  Q    At any bargaining session?

17  A    No, sir.

18  Q    Are you the custodian of record for the company's

19  bargaining materials, the bargaining notes and proposals?

20  A    Yes.

21  Q    Are you aware of any other bargaining notes that were taken

22  by company representatives besides Mr. Froehlich and Mr. Wood?

23  A    There were notes taken by some of the other people that

24  attended the session.  I mean, a trainee was trying to learn how

25  to take notes.

1   Q    And when you say the "trainee," are you talking about Kris

2   Nisavic?

3   A    Yes.

4   Q    Okay.

5        Ms. Villegas was at several bargaining sessions as well, is

6   that right?

7   A    Yes.

8   Q    And she also took notes?

9   A    She took notes.

10  Q    Okay, and you were the custodian of record for those notes,

11  is that right?

12  A    Yes.

13  Q    As the custodian of record for those bargaining notes,

14  including Ms. Nisavic -- or Mr. Nisavic and Ms. Villegas, did

15  you review those notes?

16  A    In preparation for this trial?

17  Q    Yes.

18  A    I was focused on the other two.

19  Q    Okay.  What about in preparation for bargaining?

20  A    I'm not sure I understand your question.

21  Q    Did you review -- so let's take -- we'll focus on a day.

22       So after June 1st, did you take a look at the company's

23  bargaining notes before you returned to the table on June 29th?

24  A    When we caucused or into the day, I would go through their

25  notes and, you know, see if there was anything that I missed in

1  discussions.

2  Q    Okay.  And so you would do that at the end of each day of

3  negotiations.

4  A    Yes.

5  Q    Or during a caucus during that negotiation?

6  A    Correct.

7  Q    Okay.  And that was for each of the sets of notes?  That

8  was for each of the sets of notes?

9  A    Correct.

10  Q    Including Ms. Villegas' notes?

11  A    Correct.

12  Q    And Mr. Nisavic's?

13  A    I really didn't look at Mr. Nisavic's, because I was

14  experienced at his experience level, but a quick -- let him talk

15  about it, but that's about it

16  Q    Did you have any concerns about Levi Wood's experience as a

17  note taker?

18  A    No, we  had a lot of discussion about -- up front about,

19  you know, capturing and, you know, "Try to get as much as you

20  possibly can, be as accurate as you possibly can," so he

21  understood and I was confident in what he was doing.

22  Q    Did you have a similar conversation with Mr. Froehlich

23  about how to take bargaining notes?

24  A    That discussion was with the group, but mainly focused on

25  Levi.

1  Q    Okay.  So there's a group discussion, Mr. Froehlich, Mr.

2  Wood -- these were instructions that he gave to both of them?

3  A    Correct.

4  Q    Mr. Meadows, I'd like to direct your attention to Penford

5  Exhibit 37; and I'll grab that for you in a second.

6  (Witness proffered the document.)

7      JUDGE CARISSIMI:  Everybody have it?

8      MR. WIESE:  Great, you do.

9      JUDGE CARISSIMI:  You may proceed, Mr. Wiese.

10 Q    BY MR. WIESE:  Mr. Meadows, do you recall the Union

11 bringing up this notice at the bargaining table?

12 A    Yes.

13 Q    Do you recall what day that was?

14 A    I'd have to double check the notes, but it was either July

15 27th of July 28th.

16 Q    Okay.  So the Union gave this document to you at the

17 bargaining table.  That's right?

18 A    Correct.

19 Q    Okay.  When the Union presented this document to you, did

20 you ask any questions about it?

21 A    I believe the question asked because I was not sure about

22 what time we had to let the people out of the plant, just a

23 logistics.

24 Q    You never asked the Union when they presented this whether

25 they were going on strike, did you?

1   A    No.

2   Q    And directing your attention to that line in bold at the

3   bottom of the document, "as a precaution" -- starting with "as a

4   precaution."  Do you see where I'm pointing to?

5   A    Yes, sir.

6   Q    You didn't ask any questions specifically about that line,

7   did you?

8   A    No, I did not.

9   Q    All right, I'd like to direct your attention to Penford

10  Exhibit 34.

11  (Witness proffered the document.)

12  Q    This is the e-mail exchange between you and the mediator.

13       JUDGE CARISSIMI:  Mr. Buttrick, have you located yours?

14       MR. BUTTRICK:  Not quite yet, Your Honor.

15       JUDGE CARISSIMI:  All right, that's fine.

16       MR. BUTTRICK:  I've got it.  Here it is.

17       JUDGE CARISSIMI:  Okay.

18       You can proceed, Mr. Wiese.

19  Q    BY MR. WIESE:  Mr. Meadows, looking at this e-mail chain,

20  the first e-mail in it is from Mr. Tuecke.  Is that how you say

21  his last name?

22  A    Don't make a liar out of me.  I'm not sure how you

23  pronounce that.

24  Q    Okay, we'll go with Tuecke.

25       That first e-mail is from Mr. Tuecke to you, is that right?

1    A    That's correct.

2    Q    An that was the initial contact between you and Mr. Tuecke,

3    is that right?

4    A    That's correct.

5    Q    You hadn't reached out to the mediator before that, is that

6    right?

7    A    I'm sorry, say that again?

8    Q    You had not reached out to the mediator before you received

9    this e-mail, is that correct?

10    A    That's correct.

11    Q    And to your knowledge, in order for a Federal mediator to

12    appear at the bargaining table, both parties have to consent to

13    that, is that right?

14    A    That's correct.

15    Q    I'd like to direct your attention to Penford Exhibit 35.

16    (Witness proffered the document.)

17    JUDGE CARISSIMI:  Mr. Buttrick, you'll let me know when you

18    have it.

19    MR. BUTTRICK:  I've got it.

20    JUDGE CARISSIMI:  Okay, very good.

21    Mr. Wiese, you may proceed.

22    Q    BY MR. WIESE:  So this is the e-mail that you received from

23    Mr. Head cancelling negotiations in July, is that right?

24    A    That's correct.

25    Q    Okay.  And he sent it to you on June 18th, is that correct?

1   A    That's correct.

2   Q    In this e-mail, he said there were some issues that had

3   come up, and that was the reason that he wasn't able to meet

4   with you, is that right?

5   A    That's correct.

6   Q    Okay.  Did you follow up on what those issues were?

7   A    No, I did not.

8   Q    Did you ever send an e-mail to Mr. Head objecting to his

9   cancelling negotiations in July?

10  A    I never sent an e-mail to him, no.

11  Q    Did you ever call him?

12  A    We a conversation on the phone.

13  Q    And in that phone conversation, did you object to him

14  cancelling negotiations in July?

15  A    I just commented and explained that, you know, we need to

16  get the dates as quickly as possible to continue moving forward.

17  I let him know my concern about going to the last week of July.

18  Q    But you didn't specifically object to his cancelling of

19  dates in July -- on July 13th through 15th, is that right?

20  A    No.

21  Q    That's not right?

22       JUDGE CARISSIMI:  Well, I guess the question is did you

23  object or did you not object?

24       THE WITNESS:  I did not object.

25       MR. WIESE:  Thank you, Your Honor.

1    JUDGE CARISSIMI:  That's quite all right.

2    MR. WIESE:  All right.

3  Q    BY MR. WIESE:  I'm going to direct your attention now to

4  Penford Exhibit 16.

5  (Witness proffered the document.)

6    MR. BUTTRICK:  I have it, Your Honor.

7    JUDGE CARISSIMI:  You have it?  Good.

8    You can proceed, Mr. Wiese.

9  Q    BY MR. WIESE:  Mr. Meadows, you drafted Penford Exhibit 16,

10  is that right?

11  A    That's correct.

12  Q    Okay.  And you made this proposal after reviewing the Red

13  Book, is that right?

14  A    As I was going through the materials that I had, including

15  the Red Book, and looking at what our proposals needed to be,

16  yes, I went through the Red Book, as I drafted this document.

17  Q    Did you work with anyone else in crafting this document?

18  A    No, I did not.

19  Q    After you had crafted this document, did you show it to

20  anyone for their review besides attorneys?

21  A    No.

22  Q    And to make sure I have the order correct, did you -- so

23  you drafted Penford Exhibit 16, and then you drafted the

24  proposal in Joint Exhibit 1, the company's initial proposal, is

25  that right?

 1   A    That's correct.  That was done -- I'm sorry, what document

 2   number did you say?

 3   Q    Joint Exhibit 1, the company's initial proposal.  I can dig

 4   it --

 5   A    No, I just wanted to make sure that I was responding to the

 6   correct thing.

 7        That document was done a little bit after I did this

 8   document, because I did this document --

 9        JUDGE CARISSIMI:  When you say "this document," what --

10        THE WITNESS:  I'm sorry, PF16.

11        JUDGE CARISSIMI:  Okay.

12        THE WITNESS:  And, you know, really went through it several

13   times after I did this, and then worked on that.

14        THE WITNESS:  Okay.

15        JUDGE CARISSIMI:  And when you say, "worked on that,"

16   that's Joint Exhibit --

17        THE WITNESS:  PF1 -- is it --

18        MR. WIESE:  Joint Exhibit 1.

19        THE WITNESS:  Joint Exhibit 1, I'm sorry.

20        JUDGE CARISSIMI:  And do you know what that document is?

21   Do you want to see that document?

22        THE WITNESS:  He showed it to me.  I'm okay with what he

23   showed me.

24        JUDGE CARISSIMI:  Okay, very good.

25   Q    BY MR. WIESE:  Mr. Meadows, when negotiations opened on

1  June 1st, you told the Union that you were seeking an Ingredion

2  contract, is that right?

3  A    I think I used those words, yes.

4  Q    Do you recall informing the Union that there would be

5  radical changes in the contract?

6  A    No, that's not what I said.

7  Q    Did you use the term "radical changes"?

8  A    As I was going through my -- some of the opening, the

9  comment that I made that there was going to be what some people

10  will consider radical changes in this plant.  One of the things

11  I continued to talk about, for example, was the aspect of some

12  of the employment/management changes that we were making at the

13  facility, you know; that some of the changes included looking at

14  the product lives, that we were doing a network optimization

15  study, that w were going through the aspect of some of the

16  products that we made at other plants, the same product was made

17  here.  We were looking at should we be moving that product from

18  that plant to this plant, you know.  Ethanol was not in our

19  portfolio; was that something we should continue on with.  And

20  all those things were being looked at and, you know, then a lot

21  of people were looking at some of these things as radical

22  changes.

23  Q    But you would agree with me at the time that you made the

24  statement about radical changes, you weren't having a discussion

25  with the Union about product lines, were you?

1    A    But I made the statement that radical changes were coming,

2    and the whole conversation was about network optimization and

3    the product lines, and, yeah, that was all part of that

4    statement.

5    Q    But you were in collective bargaining negotiations at that

6    time, right?

7    A    Correct.

8    Q    You were negotiating a collective bargaining agreement with

9    the Union?

10   A    Correct.

11   Q    And you said there would be radical changes?

12   A    That was in the opening statement about where the business

13   was headed, you know -- complete.

14   Q    And in that same opening statement, you told the Union that

15   you did not seek any input from Penford managers.  Do you recall

16   making that statement?

17   A    Exactly like what you just said, no, I don't remember

18   saying it that way.

19   Q    Now, I'll direct your attention to Joint Exhibit 1 and GC

20   Exhibits 2(a).

21   (Witness proffered the documents.)

22   Q    Now, Mr. Meadows, on June 1, you would agree with me that

23   the company's proposal in Joint Exhibit 1 was "starting from

24   scratch," was that right?

25   A    No, I won't agree to that.

1  Q    Okay.  You were requesting that the entirety of the

2  parties' existing collective bargaining agreement be opened and

3  renegotiated, is that right?

4  A    That's correct.

5  Q    And that there are -- there were no articles and sections

6  in the company's -- or, excuse me, in the existing contract in

7  the Red Book that the company proposes to remain unchanged, is

8  that right?

9  A    That's correct.

10  Q    But that's not "starting from scratch"?

11  A    I'm not sure of your definition of "starting from scratch."

12  Q    Well, my -- when I say "starting from scratch," I mean a

13  new collective bargaining.  Is that what you were proposing?

14  A    It's a new collective bargaining agreement, but there was a

15  lot of things from the current Red Book that was incorporated

16  into this document.  So my definition of "going from scratch" is

17  that it's not from scratch.

18  Q    Okay.

19       So let's turn your attention to Joint Exhibit 7.

20  (Witness proffered the document.)

21       JUDGE CARISSIMI:  Have it, Mr. Buttrick?

22       MR. BUTTRICK:  Yes.

23       JUDGE CARISSIMI:  Mr. Wiese, you may proceed.

24  Q    BY MR. WIESE:  Mr. Meadows, this is the company's final

25  offer, is that right?

1  A    That's correct.

2  Q    This was given at negotiations on July 31st, is that right?

3  A    That's correct.

4  Q    Okay, so less than two months after the company's initial

5  meeting on June 1st?  It was less than two months after June

6  1st?

7  A    That's correct

8  Q    So at the table, you highlighted some of the changes in

9  this final offer, isn't that correct.

10 Q    One of those changes that highlighted was the Employer's

11 response the Union's pension proposal earlier on July 31st, is

12 that right?

13 A    That's correct.

14 Q    Okay.  And your response, if -- your response was -- or

15 wasn't your response that the Union should look at this

16 proposal, the final offer, to see what the company was proposing

17 for pension?

18 A    My response was that we were not interested in the proposal

19 that they had given us and that we had a pension offer in our

20 final offer.

21 Q    And that pension offer in your final offer -- there wasn't

22 a pension in there, was there?

23 A    I'm sorry, say that again?

24 Q    There was not, in fact, a pension in your final offer?

25       MR. BUTTRICK:  I'm just going to object.  The document

1   speaks for itself.

2       JUDGE CARISSIMI:  Well, it does, but on this one, I'm going

3   to let the witness answer.  Perhaps there's something I'm not

4   understanding here.

5       You can answer the question, Mr. Meadows.

6       THE WITNESS:  There was a pension offered in this final

7   offer.

8   Q   BY MR. WIESE:  And where was that?

9   A   Can I --

10  Q   Absolutely --

11  A   -- get it real quick?

12      JUDGE CARISSIMI:  Let's go off the record.

13  (Off the record.)

14      JUDGE CARISSIMI:  Back on the record.

15      Do you remember the question, Mr. Meadows?

16      THE WITNESS:  Yes, sir.

17      JUDGE CARISSIMI:  Okay.

18      You may answer.

19      THE WITNESS:  Article 20 on page 32 or PF453.

20  Q   BY MR. WIESE:  And the proposal in this document was to

21  freeze the current pension plan, was that right?

22  A   I -- that's a question I can answer, but not with just a

23  "yes" and a "no.

24  Q   Okay.

25      JUDGE CARISSIMI:  If you can answer --

1    MR. WIESE:  Yes, go ahead.

2    JUDGE CARISSIMI:  Go ahead.

3    THE WITNESS:  Okay.

4    They currently had two pension programs at their facility,

5    and one was considered a defined benefit plan and there was a

6    certain group of employees that were in that plan.  And then

7    there was a certain group of people that had a DC contribution

8    plan and in it.

9    JUDGE CARISSIMI:  Sir, could you define "DC contribution

10   plan"?

11   THE WITNESS:  "Defined contribution plan:"  basically a

12   percentage of their wages which go into a 401(k) account.

13   JUDGE CARISSIMI:  Thank you.

14   THE WITNESS:  Okay.

15   And the proposal here was the people that were in the

16   defined benefit plan -- it was at a multiplier of 51 -- I

17   believe it was $51.00, that that plan was going to be frozen

18   effective January 1st.  All of those people were going to be

19   moved in the same defined contribution plan as the other

20   employees, but the rate that those people were getting --

21   percentage in their definite contribution -- those people were

22   getting an increase in that and all of the people that were

23   frozen in the defined benefit were going into that plan.

24   Q    BY MR. WIESE:  Okay.  And when I was talking about

25   "freezing," I meant the defined benefit pension plan.  So you

1   would agree with me that the defined benefit plan -- that that

2   was being frozen in the proposal?

3   A    That portion was being frozen.

4   Q    Ingredion doesn't have any defined benefit plans at any of

5   its plants in the United States, does it?

6   A    All the defined benefit plans at other facilities are

7   frozen.

8   Q    And that proposal to freeze the defined benefit pension --

9   that was in every single one of your offers that you made, is

10  that right?

11  A    That's correct.

12  Q    Never moved on that, right?

13  A    Never.

14  Q    And you would never agree to a contract with a defined

15  benefit pension plan in the United States, would you?

16  A    I think that's an unfair question, I mean, because I don't

17  know what's going --

18       JUDGE CARISSIMI:  Well, you know, whether it's unfair or

19  not is for to me to decide.

20       THE WITNESS:  I cannot -- yeah, I cannot say that.

21  Q    BY MR. WIESE:  So another change in the final offer that

22  you -- do you recall when you presented this final offer to the

23  Union on July 31st, highlighting changes to the bidding

24  procedure?

25  A    Say --

1  Q    Would you like me to say that again?

2  A    Say it again, please.

3  Q    Okay, yes, yes.

4       When you presented this final offer to the Union at the

5  table on July 31st, you highlighted changes to the bidding

6  procedure, is that correct?

7  A    That's correct.

8  Q    Do you recall telling the Union that the bidding procedure

9  in the final offer was basically the same as what they had in

10  the Red Book?

11  A    I think my group agreed that it was identical to what was

12  in the original Red Book.

13     JUDGE CARISSIMI:  Well, the question was, as I recall it,

14  what you told the Union.  What did you tell the Union about the

15  bidding procedure at that meeting?

16     THE WITNESS:  Sorry, that it was back to their plant

17  department seniority and then goes to the plant, that it was --

18  it was the same as what was originally.

19  Q    BY MR. WIESE:  Is it your recollection that the Union

20  specifically requested this final offer on July 31st?

21     JUDGE CARISSIMI:  "This final offer" is Joint Exhibit 7?

22     MR. WIESE:  Joint Exhibit 7.

23     JUDGE CARISSIMI:  That's fine.

24     THE WITNESS:  Yes, the Union asked for it.

25  Q    BY MR. WIESE:  The Union specifically used the term "final

1  offer"?

2  A    Jethro Head specifically said, "Give me your final offer."

3  Q    At the time that you allege that Mr. Head made this

4  statement, Erwin Froehlich was not at the bargaining table, was

5  he?

6  A    I'd have to check the notes on that.  I'm not a hundred

7  percent sure.  Again, he was -- some medical procedures and so

8  forth and whether he had -- if that was the day or time and

9  point, I'm not a hundred percent sure.

10 Q    Mr. Head made -- allegedly made that statement before you

11 presented the final offer, is that right?

12 A    Correct.

13 Q    Direct the witness' attention to PF66.

14 (Witness proffered document.)

15      JUDGE CARISSIMI:  Mr. Buttrick, you've located it?

16      MR. BUTTRICK:  I have, I think I have, yes.

17      JUDGE CARISSIMI:  Very good.

18      You may proceed, Mr. Wiese.

19 Q    BY MR. WIESE:  Directing your attention to PF230 -- are you

20 on that page?

21 A    PF230?

22 Q    Yes.

23 A    Yes.

24 Q    Okay.  These are Mr. Froehlich bargaining notes from July

25 31st, is that right?

1  A    That's correct.

2  Q    Okay.

3       Take a look at these bargaining notes and point out to me

4  where it says that Mr. Head requested a final offer from the

5  employer.

6       JUDGE CARISSIMI:  Mr. Wiese, can't you do that in your

7  brief?

8       MR. WIESE:  I can, Your Honor, if that's how you prefer

9  this argument being made.

10      JUDGE CARISSIMI:  Yes.

11      MR. WIESE:  I'm more than happy to.

12      JUDGE CARISSIMI:  I mean, you know, it's either there or

13 it's not.

14      MR. WIESE:  Okay.

15      JUDGE CARISSIMI:  And I imagine you will tell me.

16      MR. WIESE:  Okay.

17      JUDGE CARISSIMI:  All right.  We don't need the witness to

18 take time to read it and this is really -- the document speaks

19 for itself.

20      MR. WIESE:  Okay.  I'll move on.

21 Q    BY MR. WIESE:  Mr. Meadows, do you recall -- and I'll take

22 those notes back from you.

23      Mr. Meadows, do you recall the Union making an offer to

24 extend the Red Book in bargaining in July?

25 A    Yes, I do.

1  Q   And you rejected that offer at the time it was made?

2  A   Yes, I did.

3  Q   And at a later bargaining date, the Union -- do you recall

4  the Union clarifying that it was a standing offer?

5  A   Correct.

6  Q   And at the time the Union said it was a standing offer, you

7  rejected that extension again, is that right?

8  A   I did.  I explained to the Union that we were interested in

9  getting a contract and not extending the current contract.

10 Q   So you never proposed a 3-year contract extension, did you?

11 A   There was discussion on the contract and before it was

12 finally said we didn't want an extension, there was conversation

13 about would you look at other time periods.

14 Q   Did you -- when you say time periods, are you talking about

15 a 3-year time period for an extension?

16 A   Yah, it was mentioned -- a 3-year or about a 2-year, I

17 mean, there was different time elements put in there.

18 Q   So was that a proposal that you made for a 3-year contract?

19 A   It was a discussion, it was not a proposal.

20 Q   What date do you recall those discussions happening?

21 A   I don't remember exactly.

22 Q   Would it have been before August 1st?

23 A   Oh, yes.

24 Q   Mr. Meadows, do you recall calling the Department of Labor

25 about the flower fund?

1    A    Yes, I do.

2    Q    Which department did you call at the Department of Labor?

3    A    Wage and Hour.

4    Q    Do you recall who you spoke with there?

5    A    No, I do not.

6    Q    Do you recall when that conversation took place?

7    A    Exact date, no, I do not.

8    Q    What about your best approximation?

9    A    About the 2nd week of July.

10   Q    And you had proposed eliminating the flower fund before

11   that date, is that right?

12   A    Yes, I had.

13   Q    Mr. Meadows, prior to negotiations on June 1st, did you

14   conduct a thorough review of the existing Red Book?

15   A    Say it again.

16   Q    Prior to negotiations on June 1st, did you conduct a

17   thorough review of the Red Book, the parties' existing contract?

18   A    Yes, I did.

19   Q    Have you reviewed the Red Book since that date?

20   A    Yes, I have.

21   Q    Do you know where the attendance policy is in the Red Book?

22   A    Exactly what page now, no, I do not know where it's -- what

23   it -- where it's at.

24   Q    There is an attendance policy in the Red Book, though, is

25   that right?

```
 1   A      Correct.

 2   Q      And do you know where the disciplinary rules are in the Red

 3   Book?

 4   A      Exact page, I do not.

 5   Q      Do you know what section they are in?

 6   A      I would have to look at the contract book to answer that.

 7   Q      But those disciplinary rules were in the Red Book, is that

 8   right?

 9   A      There was a set of disciplinary rules in the book, yes.

10   Q      Do you know where bidding is in the Red Book?

11   A      Not exact page number, at this point in time, I do not.

12   Q      Can you identify which section bidding is in the Red Book?

13   A      I would have to look at the book to tell you that.

14   Q      Mr. Meadows, have you had any unfair labor practice charges

15   filed against you in the past?

16   A      No, I have not.

17   Q      Are you aware of any unfair labor practice charges that

18   have been filed against your employer that name you?

19   A      Yes.

20   Q      When was that charge filed?

21   A      Oh, I don't remember the exact date on that.  It's long

22   ago.

23   Q      How --

24   A      That's long ago.

25   Q      Who is the employer in that?
```

1  A    National Starch.

2  Q    Mr. Meadows, were you involved in the decision to recognize

3  and continue to apply the Red Book after Ingredion purchased

4  Penford?

5  A    When Penford -- oh, when Ingredion --

6  Q    Or --

7  A    -- about Penford and I was told that they were buying the

8  company, and they asked what needed to be done from the Union's

9  standpoint, and I explained to them, you know, you need to send

10  a letter.  And I was asked to send the letter and take care of

11  that process, which I did do.

12  Q    And at the time you sent that letter, you knew that there

13  was an existing collective bargaining agreement.

14  A    Correct.

15  Q    And you knew that that agreement expired on August 1, 2015,

16  is that right?

17  A    That's correct.

18  Q    At the end of July in 2015, you were aware that a number of

19  senior employees were considering retiring at the Cedar Rapids

20  facility, is that right?

21  A    That was brought to my attention, yes.

22  Q    Was it brought to your attention that there were

23  potentially 40 employees who were retiring?

24  A    I do not remember a number that high.

25  Q    Would it have been 30?  Would that number have been brought

1    to your attention?

2    A    That's a number still higher than what I was told.

3    Q    Okay.  What number were you told?

4    A    I believe the number was 21.

5    Q    Okay.

6         Prior to July of 2015, were you aware of what the annual

7    turnover had been at the Cedar Rapids facility for employees?

8    A    No, I wasn't.

9    Q    Okay.  You never checked into that?

10   A    I did look hard and heavy at the turnover.

11   (EXHIBIT MARKED:  GENERAL COUNSEL'S 71(a) through (d).)

12        MR. WIESE:  I'm going to show the witness what's been

13   marked as General Counsel Exhibits 71(a) through (d).

14   (Witness proffered the documents.)

15        MR. WIESE:  Could we go off the record for just a second.

16        JUDGE CARISSIMI:  Yes, off the record.

17   (Off the record.)

18        JUDGE CARISSIMI:  Back on the record.

19        You may proceed, Mr. Wiese.

20        MR. WIESE:  Showing the witness what's been  marked as

21   General Counsel Exhibit 71(a) through (d).

22   Q    BY MR. WIESE:  Mr. Meadows, looking at page 71 -- or,

23   excuse me, page 1 of General Counsel Exhibit 71(a), is that your

24   e-mail at the top?

25   A    I'm sorry, say that again?

1 Q    Looking at General Counsel 71(a), at the top of that

2 document, is that your e-mail below Mike Robilotto's name?

3 A    Yes.

4 Q    And then drawing your attention to General Counsel Exhibit

5 71(b), the second e-mail on that page, dated September 18, 2015,

6 at 12:09, in the "cc" line, is that you e-mail?

7 A    Yes, it is.

8 Q    Directing your attention to General Counsel 71(c), in the

9 "cc" line of the second e-mail on that page, is that your e-

10 mail?

11 A    I'm going to answer your question in a minute, but I want

12 to make sure.

13      THE WITNESS:  I actually have two copies of 71(b).

14      MR. WIESE:  I'll take that extra copy back.

15      JUDGE CARISSIMI:  Let's go off --

16      THE WITNESS:  Looks like it's missing one.

17      JUDGE CARISSIMI:  Let's go off the record.

18 (Off the record.)

19      JUDGE CARISSIMI:  Back on the record.

20      You may proceed, Mr. Wiese.

21 Q    BY MR. WIESE:  Directing your attention to General Counsel

22 Exhibit 71(c), is that your e-mail in the "cc" line on the e-

23 mail dated 9/23/2015 at 7:55 a.m.?

24 A    Correct.

25 Q    And directing your attention to General Counsel Exhibit

1  71(d), again, the second e-mail on that page, is that your e-

2  mail in the "cc" line of the e-mail dated 9/23/2015 at 6:53

3  a.m.?

4  A    Yes, it is.

5  Q    Or actually in the "To" line, excuse me.

6  A    Yes, it is.

7  Q    Okay, thank you.

8       MR. WIESE:  I'll offer General Counsel 71(a) through (d).

9       JUDGE CARISSIMI:  Is there an objection to 71(a) through

10 (d)?

11      MR. BUTTRICK:  There is, Your Honor.

12      These appear all to be related to maintenance schedules,

13 and Mr. Meadows gave no testimony related to the maintenance

14 schedules.  It's beyond the scope of direct.

15      MR. WIESE:  Your Honor, may I ask --

16      JUDGE CARISSIMI:  Mr. Wiese, how does it relate to the

17 witness' direct testimony?

18      MR. WIESE:  May I ask the witness to leave?

19      JUDGE CARISSIMI:  Pardon?

20      MR. WIESE:  May I ask the witness to leave the room before

21 I respond to his objection?

22      JUDGE CARISSIMI:  Yes.

23      Mr. Meadows, if you could step outside, we're going to have

24 a legal discussion.

25      Thank you, sir.

1    (Witness temporarily excused from the stand.)

2        JUDGE CARISSIMI:  All right, Mr. Meadows has left the

3    hearing room.

4        Mr. Wiese, you may proceed.

5        MR. WIESE:  So, Your Honor, Mr. Meadows has previously

6    testified that he had no involvement in the maintenance

7    schedules and that testimony is subject to a credibility

8    resolution.   These documents --

9        JUDGE CARISSIMI:  When he was called on 611(c)?

10       MR. WIESE:  That's correct, Your Honor.

11       JUDGE CARISSIMI:  All right.

12       MR. WIESE:  That was testimony that was raised on 611(c);

13   but these documents are relevant to Mr. Meadows' credibility

14   over all and --

15       JUDGE CARISSIMI:  Did you have these documents, 71(a)

16   through (d), when you called Mr. Meadows?

17       MR. WIESE:  No, we did not, Your Honor, on 611(c).

18       JUDGE CARISSIMI:  You did not have those --

19       MR. WIESE:  We did not have those documents.

20       JUDGE CARISSIMI:  -- in your possession?

21       MR. WIESE:  That's --

22       MS. OHAERI:  We may have had -- so this is what we talked

23   about before about there were several versions or productions

24   since Monday of maintenance documents, so it's possible that we

25   may have had in our possession some of these.  We received it

1  right when we walked it; however, we didn't have a chance to

2  review what was received at the time that we called Mr. Meadows,

3  and, some of which we may not have actually received, we may

4  have received either after he was done testifying or on Tuesday

5  or Wednesday of last week.  So we were unable to use whatever we

6  did have for when we questioned him;  however, we did ask him

7  about the documents under 611(c).

8       JUDGE CARISSIMI:  All right.

9       So when were these particular documents, 71(a) through (d)

10  --

11      MS. OHAERI:  So as I received things, I just put them in

12  one thing.  So some of them would have been received on -- for

13  already subpoenaed, would have been received on Monday morning,

14  just shortly before we started the hearing.  That was when we

15  received the first group of maintenance documents responsive to

16  our subpoena.

17      JUDGE CARISSIMI:  Okay.

18      MS. OHAERI:  Then there were subsequent conversations and

19  productions throughout Monday, Tuesday and the latest was

20  Wednesday afternoon last week, which was, in fact, Your Honor,

21  before we called our witness on the maintenance documents stuff.

22  So it was an ongoing discussions between us.

23      JUDGE CARISSIMI:  Counsel for the Respondent, do you

24  dispute anything that Ms. Ohaeri said or is there anything you'd

25  like to add to the equation?

1   MR. FUNK:  I do dispute some of what has been said.  I do

2   recall that there was sort of a rolling production on some of

3   the maintenance documents, but, as I recall, the only documents

4   that were provided after the start of the hearing were then

5   introduced into evidence earlier.  These, I recall communicating

6   with Counsel for the General Counsel over the weekend letting

7   them know that we had these, offering them in a digital form

8   Sunday, to be delivered immediately or picked up Sunday in a

9   hard copy.  And Counsel for the General Counsel said that it

10  would be O.K. to just bring them to the hearing on Monday

11  morning, which I did, and gave them to them before we opened the

12  record.

13  JUDGE CARISSIMI:  All right.

14  MS. OHAERI:  I can respond to that if you would like.

15  JUDGE CARISSIMI:  You can, briefly.

16  Go ahead.

17  MS. OHAERI:  There was no -- there was a discussion of the

18  fact that he located some documents.  There was no discussion

19  about what they were or what they looked like or anything about

20  their substance.  He offered to have me come to his hotel on

21  Sunday to pick up the documents, or he would provide them on

22  Monday.  He only had hard copies, he did not have electronic

23  versions.  I said, you know, Sunday was obviously the day before

24  the hearing; I said I didn't have the ability to come and pick

25  them up.  I had talked to Tyler and we said we'll just have to

1  receive them the next day at the start of the hearing, because

2  he only had them in physical form.

3      JUDGE CARISSIMI:  All right.

4      Well, first, I have no doubt about the good faith exhibited

5  by both Counsel for the General Counsel and counsel for the

6  Respondent.  It's a big case.  I've had instances where there's

7  production of documents as the -- even during the trial.  So --

8  and the other thing is that the direct testimony did talk about

9  bargaining that occurred in September and in through October.

10     So balancing everything out, I'm going to admit the --

11  admit 71(a) through (d).

12  (EXHIBITS RECEIVED:  GENERAL COUNSEL'S 71(a) through (d).)

13     JUDGE CARISSIMI:  And then we can have Mr. Meadows come

14  back in and we will continue.

15     Let's go off the record briefly.

16  (Off the record.)

17     JUDGE CARISSIMI:  Back on the record.

18  (Witness resumed the stand.)

19     JUDGE CARISSIMI:  Mr. Wiese, you may continue.

20  Q    BY MR. WIESE:  Mr. Meadows, prior to the company's July

21  28th proposal, the company was proposing a 50-50 split for

22  payment of the gap insurance, is that right, between the

23  employee and the company?

24  A    Correct.

25  Q    Are you aware of what the cost of premiums would be for

1  employees under that proposal?

2  A    Off the top of my head right now, no, I do not.

3  Q    Would it have been more than $51.00 a month?

4  A    I would say yes.  There is -- it was $51.00 per person, so

5  if it had been a joint plan, that would have been $102.00 versus

6  what our proposal -- we had in there that they had actually had

7  what was called a "two-tier system" -- single and family.  And

8  we were proposing a four-tier system, which was devised out into

9  single -- there's single and family, but the other two tiers are

10 employee and children and employee and spouse.

11 Q    Okay.  And the cost of the premiums under each of these

12 four tiers -- what's the best -- strike that.

13     Did you provide that information to the Union, the cost of

14 the premiums for each of the four tiers?

15 A    Yes, we did.

16 Q    When did you provide that?

17 A    Again, I'd have to go back and look at -- it's something to

18 give an exact date on it, but it's one of the documents that I

19 had earlier today and presented; but I'd have to go back and

20 look at the exact date on it.

21 Q    Would you agree with me that a 50-50 split in the premium

22 is between what the -- or with the employee paying 50 percent

23 and the company paying 50 percent of those premiums, that that

24 would cost the employee more than $51.00 a month per person?

25 A    Yes, it could.

1 Q    It could or it would?

2 A    Without knowing exactly what the premiums are, I'm

3 estimating that it would, but if a premium was -- it could go

4 the opposite direction.   I don't know until I know what those

5 premiums are.

6 Q    And you aren't sure what those premiums are?

7 A    No.

8 Q    In the past, did you know what those premium numbers were

9 at some point in the past?

10 A    What the premiums were?

11 Q    Yes.

12 A    Yes, and I provided those to the Union.

13 Q    Okay.

14      Mr. Meadows, when the parties scheduled bargaining

15 sessions, they scheduled those sessions by date, is that right?

16 A    By dates?

17 Q    By dates.

18 A    Correct.

19 Q    Okay.  So there was -- so they would schedule -- the

20 parties would schedule a bargaining session for June 1st, right?

21 A    Correct.

22 Q    And that was understood by the parties to be the bargaining

23 sessions?

24 A    Correct.

25 Q    Okay.  And that same understanding was true for all of the

1  dates where the parties met, is that right?

2  A    That's correct.

3  Q    Mr. Meadows, do you recall making any statements about a

4  last -- a best and final offer on June 30, 2015, at the

5  bargaining table?

6  A    No, I did not.

7  Q    Did you make a statement about a best and final offer at

8  the bargaining table on June 30, 2015?

9  A    I don't remember making a statement of that nature.

10 Q    So you don't remember whether you made a statement of that

11 nature?

12 A    I didn't make a statement of that nature.

13 Q    I'm -- I guess I'm just still confused.  Did you make a

14 statement about a best and final offer at negotiations on June

15 30th?

16 A    On what?

17 Q    On June 30th?

18 A    No.

19 Q    So if that was in Ms. Villegas' notes, that would be a

20 mistake?

21 A    You know, I don't know what the context of that is, and to

22 the best of my knowledge, I did not make that comment.

23 Q    Okay.

24 (EXHIBIT MARKED:  GENERAL COUNSEL'S 91.)

25 (Witness proffered the document.)

1  Q    BY MR. WIESE:  I'm showing the witness what's been marked

2  as General Counsel Exhibit 91.

3       Do you recognize these notes, Mr. Meadows?

4  A    Yes.

5  Q    Are these Kim Villegas' bargaining notes?

6  A    Yes.

7  Q    Directing your attention to page 2 of those bargaining

8  notes, starting with the initials "K.M." and "These are ING

9  procedures."  Do you see where I'm at?

10 A    Yes, I do.

11 Q    Three lines down from there --

12 A    Yes.

13 Q    Or, excuse me, four lines down from there, do you see that?

14 A    Yes.

15 Q    That's your statement, right?

16 A    I see what she wrote down.  I do not remember saying it

17 like that.

18 Q    Okay, but she did write down "best and final" on that day?

19 A    I see what she wrote down, yes.

20 Q    And she wrote down, "I can put a best and final" --

21      JUDGE CARISSIMI:  I can read it, sir.

22      MR. WIESE:  Okay, thank you.

23      JUDGE CARISSIMI:  If you're going to introduce it.  And if

24 you're not going to introduce it --

25      MR. WIESE:  I'm not planning on entering this document.

1    JUDGE CARISSIMI:  Oh, if you're not -- I assumed.  I made

2  an assumption, which I shouldn't do.  If you aren't going to

3  introduce this document then, if you want to read the portion of

4  the document that you feel is important for me to consider, then

5  you should do so.

6  Q    BY MR. WIESE:  And Ms. Villegas' notes on that line say, "I

7  can put a best and final on July 31st," is that right?

8  A    That's what it says.

9  Q    And in her notes, that statement is attributable to you?

10 A    That's correct.

11     MR. WIESE:  I'm going to retrieve the exhibit.

12     JUDGE CARISSIMI:  Very good.

13 Q    BY MR. WIESE:  Mr. Meadows, at the time that -- strike

14 that.

15     At some point during bargaining, you understood that the

16 parties had 46 tentative agreements.  Is that right?

17 A    Somewhere in that neighborhood, yes.

18 Q    Is there any document that you can point me to reflecting

19 those 46 tentative agreements?

20 A    What I felt like was the tentative agreements?

21 Q    Yes.

22 A    The proposals that were made, when I made them, I thought

23 we had agreements.  The summary document that was given I think

24 outlines those documents.  But that was all based upon the

25 proposals, and those proposals were what I thought we had

1  tentative agreements on.

2  Q    Okay.  And this summary document that you're talking about

3  -- what document is that?

4  A    That was the one that was presented earlier.  I called it a

5  summary document, I --

6  Q    So Penford Exhibit -- was it 74?  Yes, Penford Exhibit 74

7  is the one you're talking about?

8       JUDGE CARISSIMI:  Well, let's show it to Mr. Meadows and

9  make sure that's what he's referring to, since there's been

10 reference to a document, and I think the record is a little

11 unclear what that is.

12 (Witness proffered document.)

13      THE WITNESS:  Yes, this is the summary of it, and these are

14 items that I thought we had tentative agreements on.

15 Q    BY MR. WIESE:  This document wasn't created while

16 negotiations were occurring, was it?

17 A    No, sir.

18      JUDGE CARISSIMI:  "This document" being Respondent's 74,

19 correct?

20      MR. WIESE:  General -- or, excuse me, Penford Exhibit 74.

21      THE WITNESS:  No, sir.

22 Q    BY MR. WIESE:  Did you create this document?

23 A    I assisted in helping create the document.

24 Q    And when did you assist in helping to create this?

25 A    A couple weeks ago -- a week ago.

1       MR. WIESE:  I'll retrieve the exhibit from the witness.

2       JUDGE CARISSIMI:  Thank you.

3   Q   BY MR. WIESE:  Did the Union sign off on any of these 46

4   TAs?

5       JUDGE CARISSIMI:  By that, you mean the tentative

6   agreements?

7       MR. WIESE:  Tentative agreements.

8       JUDGE CARISSIMI:  Yes.

9       MR. WIESE:  Thank you.

10      THE WITNESS:  No, they did not.

11  Q   BY MR. WIESE:  Did you ever tell the Union at the

12  bargaining table that you had 46 tentative agreements?

13  A   As we went through the proposals, I went through them and

14  explained that based on their -- the conversation and the

15  comments, that these were agreements that we'd reached, and Mr.

16  Head said, "No, we've not reached any tentative agreements."

17  Q   Is this something that the Union said every time you

18  brought a new proposal, that they disputed tentative agreements,

19  or did it only happen once at the bargaining table?

20  A   They didn't say it every time, but it was said on several

21  occasions.

22  Q   When?

23  A   Well --

24  Q   Best approximation.

25  A   I can't answer that question.

1   Q    Did you indicate to the Union at the bargaining table every

2   time you thought the parties had reached tentative agreement?

3   A    When I went through the proposals, again, would state,

4   "This is based upon the conversation that we had, things that

5   you, you know, said that you needed, and that they're in here,

6   that things I felt like what we've agreed to, what you wanted

7   and we've agreed."

8   Q    Did you characterize those as "tentative agreements" each

9   time you presented a new proposal?

10  A    I don't think that I used the word "tentative," but I used

11  the word "what I thought we had agreed to."

12  Q    Okay.

13  (EXHIBIT MARKED:  GENERAL COUNSEL'S 94.)

14  (Witness proffered the document.)

15      MR. WIESE:  Showing the witness what's been marked as

16  General Counsel Exhibit 94.

17  Q    BY MR. WIESE:  Mr. Meadows, do you recognize this letter?

18  A    Yes, I remember seeing it.

19      MR. WIESE:  I'll offer General Counsel Exhibit 94 into

20  evidence.

21      JUDGE CARISSIMI:  Any objection to GC 94?

22      MR. BUTTRICK:  We're just checking to see if it's already

23  in evidence somewhere.

24      JUDGE CARISSIMI:  All right.

25      MR. BUTTRICK:  It looks familiar, so I don't know.

1    MR. WIESE:  Okay, yes, you could be right.

2    MR. BUTTRICK:  So if we could go off the record and just

3 check.

4    JUDGE CARISSIMI:  Off the record.

5 (Off the record.)

6    JUDGE CARISSIMI:  Back on the record.

7    MR. WIESE:  I'll retrieve those documents, Your Honor.

8    JUDGE CARISSIMI:  Yes.

9    Off the record, counsel for Respondent has noted that, in

10 fact, this document is already introduced as General Counsel

11 Exhibit 77.

12    So General Counsel is withdrawing GC 94.  Correct, Mr.

13 Wiese?

14    MR. WIESE:  Yes.

15 (EXHIBIT WITHDRAWN:  GENERAL COUNSEL'S 94.)

16    MR. WIESE:  and I'll direct the witness' attention to

17 General Counsel Exhibit 77.

18    JUDGE CARISSIMI:  Very good.

19 (Witness proffered the document.)

20    JUDGE CARISSIMI:  Let's go off the record briefly.

21 (Off the record.)

22    JUDGE CARISSIMI:  back on the record.

23    Mr. Meadows now has General Counsel's 77 before him.

24 Q   BY MR. WIESE:  Mr. Meadows, do you recognize General

25 Counsel Exhibit 77?

1  A    Yes, I've seen this document.

2  Q    And this was the company's response to the Union regarding

3  bargaining dates in October.  Is that right?

4  A    That's correct.

5  Q    And it indicates that the company was willing to meet on

6  October 8th, is that right?

7  A    That's correct.

8       MR. WIESE:  I'll retrieve the document from the witness.

9       JUDGE CARISSIMI:  Very good.

10      MR. WIESE:  I'm going to direct the witness attention to

11  Joint Exhibit 8, the company's last, best and final offer, and

12  also Joint Exhibit 9, the addendum to that offer.

13  (Witness proffered the documents.)

14  Q    BY MR. WIESE:  Mr. Meadows, you drafted Joint Exhibit 8, is

15  that right?

16  A    Correct.

17  Q    The company's last, best and final offer?

18  A    Correct.

19  Q    And this was the company's real final offer, is that right?

20      MR. BUTTRICK:  Well, I'm just going to object about that

21  characterization.  The document says what it says.

22      JUDGE CARISSIMI:  Yes, I guess the document has a title on

23  it, so let' --

24      MR. WIESE:  Okay.

25      JUDGE CARISSIMI:  Let's go by that.

1    MR. WIESE:  Okay.

2    JUDGE CARISSIMI:  So I'm sustaining that objection.

3    MR. WIESE:  Yes, understood, Your Honor.

4  Q    BY MR. WIESE:  So, Mr. Meadows, after you present a last,

5  best and final offer, there should be no room to move

6  afterwards, is that right?

7  A    There should be no room to move, but I've been doing this a

8  long time, and I understand that the ultimate goal is to get a

9  contract, and you're always continuing to try to find a happy

10 medium to get to that point.  So, you know, discussions didn't

11 stop, we kept working on it; but, yes, this should be -- should

12 be it.

13 Q    And once you have a last, best and final offer on the

14 table, there isn't any room to massage proposals, is there?

15 A    Again, if there is -- keeping an open mind, you want to get

16 to a final contract.  And if there is -- and you're continuing

17 to negotiate, you're continuing to try to move forward, there's

18 -- you know, I don't think I could ever say that -- don't keep

19 an open mind and don't ever consider something, so I think there

20 always has to be some ability.

21 Q    Ability to move?

22 A    There's got to be something, you've got to keep the door

23 open.

24 Q    Mr. Meadows, when you presented this last, best and final

25 offer to the Union at the bargaining table on August 18th -- do

1  you recall doing that?

2  A    Yes.

3  Q    And when you did that, you highlighted some changes to the

4  Union in this last, best and final offer, is that right?

5  A    Yes, I did.

6  Q    One of those changes was to the recognition clause, is that

7  correct?

8  A    That tried to make sure that it was exactly like the Red

9  Book and to try to put that to bed, because there was never an

10  intent to change it, just was looking for clarification.  When I

11  got clarification, I just went back and put the exact in there.

12  Q    Prior to August 18th, the Union had repeatedly told you at

13  negotiations that they were not going to agree to any changes to

14  the recognition clause, is that right?

15  A    They made that statement and I continued to tell them that

16  I wasn't trying to change the recognition clause, I just needed

17  to make sure that it was accurate and to capture it correctly.

18  Q    But prior to August 18th, you did make changes in the

19  recognition clause across the company's proposals, is that

20  right?

21  A    I'd have to go back and change it.  I was trying to get it

22  correct and, you know, if I didn't get it correct -- but at the

23  very end, the Union was never specific to me on what I was doing

24  or what I was saying that was wrong, and I kept trying to

25  clarify.  And when this was put together, I did make sure that

1   it was exactly like they thought it should be.

2   Q    The Union told you what they wanted in the recognition

3   clause, isn't that right, prior to August 18th?

4   A    No.

5   Q    They never told you that they wanted the old language from

6   the Red Book in the recognition clause?

7   A    Not in those exact words, no.

8   Q    What about in the -- not verbatim, but in the sense of, "We

9   want the recognition clause from the Red Book in the company's

10  proposal."

11  A    The statement was, "We're not negotiating our recognition

12  clause" is what Mr. head was saying.

13  Q    Because the Union wanted it to stay the same?

14  A    Mr. Head kept saying, "We're not negotiating our

15  recognition clause."

16  Q    Okay.  Let's move on.

17       Do you recall highlighting a change at the bargaining table

18  on August 18th regarding the Union bargaining committee, changes

19  in your last, best and final offer?

20  A    Yes.

21  Q    Regarding the Union bargaining committee?

22  A    Yes.

23  Q    You recall making statements about that at the bargaining

24  table?

25  A    Yes, as I stated earlier, I wind up taking out any

1 reference to how many people they could have. Again, when I was

2 putting this last, best and final together, I was trying to do

3 everything I could to make that it was -- "Here it is, it's the

4 best I can do." And that clause was one of them that, yes, it

5 was in the old clause, yes, we had kind of agreed to add to the

6 numbers, and then, as I said, I just felt like it shouldn't be

7 our -- we shouldn't be something that's negotiable, we should

8 just -- it's their decision what they've got on their committee.

9 Q    And so you just removed that entire provision in the last,

10 best and final offer, is that right?

11 A    Correct.

12 Q    Not just the limit on the number of people on the

13 negotiating committee?

14 A    Correct.

15 Q    Okay.

16 A    Left it for their determination, not us, for our input.

17 Q    Do you also recall on August 18th, discussing the changes

18 to the disciplinary procedure in your last, best and final

19 offer?

20 A    Yes.

21 Q    Do you recall highlighting the fact that the proposal now

22 allowed for the removal of discipline from an employee's record?

23 A    Correct.

24 Q    Did you point out to the Union at the bargaining table that

25 discipline could only be removed if the company agreed to remove

1  the discipline?

2  A    The company and the Union is in agreement.

3  Q    Did you point at the bargaining table that the decision --

4  that decision was not subject to review by an arbitrator?

5  A    That's correct.

6  Q    You did point that out at the bargaining table?

7  A    Correct.

8  Q    Besides the removal of discipline, there was another change

9  in the disciplinary procedure, is that right?  Do you recall

10 another change being there?

11 A    I'd have to review the notes.  I don't recall it off the

12 top of my head.

13 Q    Do you recall there being a change to whether verbal

14 warnings would be documented?

15 A    We have had, yeah, several discussions about a verbal

16 warning has to be documented, otherwise, how do you know a

17 verbal warning was ever given.

18 Q    Do you recall highlighting any changes at the bargaining

19 table on August 18th to the sickness and accident benefits in

20 the last, best and final offer?

21 A    Yes, I do.

22 Q    And when you highlighted that provision, you pointed out to

23 the Union that these benefits would no longer be suspended

24 during a work stoppage, is that right?

25 A    Or a layoff, correct.

1  Q    Yes, work stoppage or a layoff, okay.

2       And your last, best and final offer at that time had a no-

3  strike/no lock-out clause, is that right?

4  A    Correct.

5  Q    Another change that you highlighted was regarding how

6  overtime was going to be managed.  Do you recall doing that?

7  A    Correct.

8  Q    And when you highlighted that change, do you recall making

9  the statement that, "Now salaried people would be doing the

10 overtime"?

11 A    That management would be responsible for -- the hourly

12 people would not do the -- have to call in for their own

13 overtime, that it would be management's responsibility to see to

14 it that the overtime was done.

15 Q    After you highlighted these five changes that we discussed,

16 do you recall the Union asking if there was anything else that

17 had been changed in the last, best and final offer?

18 A    The specific question, I don't remember.  They made that --

19 they made it on the final, "Is there anything else that you have

20 to offer?  Has anything else been changed."  I have no reason to

21 believe they didn't ask for it at that -- they didn't make that

22 comment at that time.

23 Q    Do you recall saying that there was nothing else to change

24 or nothing else that had been changed?

25 A    I remember making a comment that for them to take a look at

1   it, and if I had missed something, to let me know, and we would

2   get -- we would correct it.

3   Q    Did you highlight any changes on August 18th at the

4   bargaining table to Article 24 -- excuse me, Article 25, Section

5   2, of the last, best and final offer?

6   A    May I look at it?

7   Q    You may.

8   A    Can you give me a page number?

9   Q    Yes, it's page 36 of Joint Exhibit 8.

10  A    On PF2261?

11  Q    That's correct

12  A    Okay, yes, I do remember adding the one statement there

13  that the Union had asked me to put in here.

14  Q    And what statement was that?

15  A    On Article 27, you know, that we had discussion about plant

16  rules not being listed, and that I told them that I would put in

17  -- our discussion that I would put in and then I actually came

18  back and put it in about discussions with the Union before plant

19  rules changed and went into effect.

20  Q    But what about -- I'm talking specifically about Article

21  25, Section 2, on the top of page 36.  Did you highlight any

22  changes in that section to the Union at the bargaining table on

23  August 18th?

24  A    That was actually put in there at the point in time.  I

25  might have missed it, but that was actually put in there based

1  off of a sidebar discussion I had with Jethro Head.  It was not

2  discussed at the table.

3      JUDGE CARISSIMI:  Let's go off the record for a minute.

4  (Off the record.)

5      JUDGE CARISSIMI:  Back on the record.

6      Mr. Wiese, you may continue.

7  Q    BY MR. WIESE:  Mr. Meadows, we were looking at Joint

8  Exhibit 8, Article 24, Section 2, and you mentioned that --

9      JUDGE CARISSIMI:  Well, I think it was Article 25 we were

10  looking at.

11      MR. WIESE:  Thank you, Your Honor.   That is right.

12  Article 25, Section 2.

13  Q    BY MR. WIESE:  Is it your recollection that it was the

14  Union who proposed the change to Article 25, Section 2?

15  A    There was a sidebar conversation that me and Mr. Head had,

16  and he had mentioned that we didn't have anything in here

17  relating to that, and this was a sidebar that happened before

18  that particular day.  And when I got to putting the final

19  together, it dawned on me that we had had that conversation, and

20  he had mentioned that I didn't have anything in there about

21  something of that nature and I went back and put this in there.

22  Q    Okay.  So this was in addition to the last, best, final

23  offer?

24  A    When the last, best and final offer was done, yes, this was

25  added.

1   Q     Okay.

2         So you presented the last, best and final offer at the

3   beginning of negotiations on August 18th, is that right?

4   A     I believe that's correct.

5   Q     And at that time, you now recall that's when the parties

6   declared impasse or that's when the -- or, excuse, me, not the

7   parties -- strike that.

8         That's when you declared impasse?

9   A     That's correct.  I went through an explanation that the

10  Union wasn't providing anything that -- further, that, you know,

11  we were opening to listening, but there was nothing there that

12  this was the last, best and final offer, just based on the fact

13  that where we were at and both taking the positions that we were

14  at, that we were at impasse.

15  Q     So that declaration of impasse happened at the bargaining

16  table?

17  A     That's correct.

18  Q     On August 18th?

19  A     Correct.

20  Q     Before or after you presented your last, best and final

21  offer?

22  A     During the exchange.

23  Q     Okay.

24        So after the LBF was on the table on August 18th, the Union

25  presented a new proposal, is that right?

1  A    Correct.

2  Q    And then later that same day, the Union presented its first

3  wage proposal, is that right?

4  A    I believe that's correct.

5  Q    And, in your view, these proposals were unacceptable, is

6  that correct?

7  A    That's correct.

8  Q    Because -- and they were unacceptable because they weren't

9  proposed the right way, is that correct, in terms of their form?

10 A    They were presenting items back directly from the Red Book.

11 And we explained that was not interested in the Red Book and

12 that we had put this on the table, and that if there was

13 specific items that they wanted to discuss here, to let me know.

14 Q    At the time the Union was presenting these proposals on

15 August 18th, do you recall saying that you would be happy to

16 tweak your last, best, final offer?

17 A    When I presented this to them, again, I stated that I want

18 them to review it, this is the document that was working for, if

19 there's things that they wanted to discuss and if there was

20 things that could move a little bit on or do something with, I

21 was more than happy to consider -- consider it; again, with the

22 understanding that we were trying to get to a signed contract.

23 Q    But I'm talking now -- and moving forward in those

24 negotiations on August 18th, after the Union  had presented its

25 proposals, the wage and the other proposal, do you recall saying

1   that you would be happy to tweak your last, best and final

2   offer?

3   A    I said, "If you want to take a look at this and if we're --

4   if there's an area that we can massage or tweak to help us get

5   to the final, let me know what it is.  But, if it's not, this is

6   my last, best and final."

7   Q    Do you recall making statements along those lines after the

8   Union had presented its proposals on August 18th?

9   A    Yes, when this was presented --

10   JUDGE CARISSIMI:  When you say "this"?

11   THE WITNESS:  This JT 8.

12   JUDGE CARISSIMI:  Mmm-hmm.

13   THE WITNESS:  Again, I kept referring to this, and when

14   they put those other documents in front of me, we went through

15   them, took a look at them.  It was -- we were not interested in

16   those.  And I kept saying, "If you've got something specific to

17   my offer, let me know what that is."

18   Q    BY MR. WIESE:  Did you say you would be happy to massage

19   and tweak your final offer after the Union presented its wage

20   proposal on August 18th?

21   MR. BUTTRICK:  Objection:  asked and answered.

22   JUDGE CARISSIMI:  Sustained.

23   MR. WIESE:  Could we go off the record for one minute, Your

24   Honor?

25   JUDGE CARISSIMI:  Off the record.

1   (Off the record.)

2       JUDGE CARISSIMI:  On the record.

3       Mr. Wiese, you may proceed.

4   Q   BY MR. WIESE:  I'm going to direct the witness' attention

5   to Penford Exhibit 67.

6   (Witness proffered the document.)

7   Q   These are Levi Wood's bargaining notes, is that correct?

8   A   That's correct.

9   Q   And you recall the Union presenting a proposal after the

10  parties' first caucus on August 18th.  Do you recall that?

11  A   I believe that was the time frame.

12  Q   Directing your attention to PF46 of that document, next to

13  the initials "K.M." in the middle of the page below, "J.H.  What

14  is the problem in preamble?"  Do you see where I'm at.

15  A   I do.

16  Q   The last -- the last sentence in that line -- do you see

17  that?

18  A   Yes.

19  Q   And do you recall making that statement?

20  A   And you're talking about just the last sentence of that?

21  Q   Yes, starting with, "If there are items," that sentence,

22  ending with, "I'm happy to tweak."

23  A   Yes, I was asking them to look at ours.  If there was some

24  things that needed to be tweaked or massaged to try to get a

25  final, that I would definitely look at it and address it.

1    MR. WIESE:  I'm going to retrieve Penford Exhibit 67 from

2    the witness.

3    Q    BY MR. WIESE:  So the parties' next negotiations after

4    August 18the -- those negotiations were on September 9th, is

5    that right?

6    A    I believe so, correct.

7    Q    The parties didn't meet for very long at the bargaining

8    table that day, did they?

9    A    No, we didn't.

10    Q    And on that day, the Union made a proposal or stated that

11    it wanted to continue to make proposals article by article.  Do

12    you recall the Union making that statement?

13    A    They did.

14    Q    And you said you weren't interested in that, is that right?

15    A    That's correct.

16    Q    It was after you said that you weren't interested in that,

17    that the Union said they were done for the day?

18    A    They said they were done.

19    Q    Okay.

20    A    And that was Mr. Head that said that.

21    Q    And then the parties met again on September 10th, is that

22    right?

23    A    Correct.

24    Q    And during that session on September 10th, the Union -- do

25    you recall the Union asking you if you wanted to look at a new

1  proposal from them or something along those lines?

2  A    Yes, I do, and my response to that was, "I'm willing to

3  consider anything that you guys want to propose if it's in

4  reference to our last, best and final."

5  Q    And you specifically told the Union that, that that

6  proposal had to be in reference to the last, best and final?

7  A    To our last, best and final, correct.

8  Q    So after you made that statement and the parties took a

9  long caucus that day, is that right, or long break, whatever you

10 want to call it?

11 A    Yes.

12 Q    Is that right, okay.

13      And the Union came back that evening with the proposal in

14 Joint Exhibit 15.

15      MR. WIESE:  And I'll direct the witness to that document.

16 (Witness proffered the document.)

17 Q    BY MR. WIESE:  This is the proposal that the Union came

18 back with, is that right, on September 10th, after the long

19 break?

20 A    Correct.

21 Q    And they gave it to you that evening?

22 A    It was -- yah, after 12 hours of waiting around, they gave

23 it to us late that afternoon.

24 Q    That time in the upper right-hand corner of the document in

25 Mr. Woods' handwriting -- is that about the time you recall

1   getting this document?

2   A   Correct.

3   Q   When you received this proposal from the Union, you said it

4   was unacceptable, is that right?

5   A   I explained that I felt, you know, it was very -- I very

6   quickly thumbed through it, realized it was the Red Book with

7   just, you know, changes in it.  And I did make the statement

8   that I found this to be unacceptable and I would look at it over

9   the night, but my first impression of this was this was

10  unacceptable, it was nothing but the Red Book, and I was not

11  interested in going to the Red Book.

12  Q   And after you said that, you handed the Union a letter of

13  implementation, is that right?

14  A   Yes.

15  Q   And you had drafted that letter of implementation before

16  you received the Union's contract proposal in Joint Exhibit 15,

17  is that right?

18  A   When the Union -- Mr. Head had stated the day before that

19  we were done and there was, again, a sidebar conversation.  But

20  when he said he was --

21      MR. WIESE:  Your Honor, I would direct the witness to

22  answer my question.  I just asked the witness when it was

23  drafted.

24      JUDGE CARISSIMI:  I believe the witness is -- sorry?

25      MR. WIESE:  The question was when the letter is drafted.

1    JUDGE CARISSIMI:  All right.

2    Just answer that question, Mr. Bellows.

3    THE WITNESS:  I actually had drafted the letter -- I had

4  told the Union that I was going to -- that if we weren't making

5  any headway and that my intent was to implement the following

6  Monday, and that I would get them a letter, I told them that the

7  night before, "And I'll get you a letter."  I had drafted the

8  letter and I had it with me.

9  Q    BY MR. WIESE:  When did you draft that letter?

10  A    The night of the 9th.

11  (EXHIBIT MARKED:  GENERAL COUNSEL 6(b) and 6(c).)

12  (Witness proffered the document.)

13    MR. WIESE:  Showing the witness what's been marked as

14  General Counsel 6(b) and 6(c).

15    JUDGE CARISSIMI:  These are new exhibits?

16    MR. WIESE:  These are new exhibits, Your Honor.

17  Q    BY MR. WIESE:  Do you recognize these documents, Mr.

18  Meadows?

19  A    I have probably seen these documents in detail, but I would

20  -- yes, I would say I've seen these documents.

21  Q    They are position statements that were provided by Mr.

22  Buttrick to the National Labor Relations Board, is that right?

23  A    Correct.

24  Q    Did you review these position statements before they were

25  sent out?

1   A    I would say that I read through them, reviewed them.

2   Q    And these, both the August 17th position statement and the

3  October 28th position statement deal with the bargaining in this

4  case, is that correct?

5   A    Yes.

6     MR. WIESE:  I'll offer General Counsel Exhibits 6(b) and

7  (c).

8     JUDGE CARISSIMI:  Is there any objection to -- we'll take

9  them in order -- 6(b)?

10     MR. BUTTRICK:  No, no, objection, Your Honor, and I'll note

11  that they are masterpieces.

12     JUDGE CARISSIMI:  And then I take it there's no objection

13  to 6(c) then, Mr. Buttrick?

14     MR. BUTTRICK:  No, no objection.

15     JUDGE CARISSIMI:  All right.

16     General Counsel 6(b) and 6(c) are admitted.

17  (EXHIBITS RECEIVED:  GENERAL COUNSEL'S 6(b) and 6(c).)

18   Q    BY MR. WIESE:  Directing your attention to negotiations on

19  October 10th, do you recall the parties -- or, excuse me,

20  October 8th, after implementation, do you recall the parties --

21  or strike that.

22     Do you recall the Employer proposing at the bargaining

23  table that day to consolidate job classifications?

24   A    It was not a proposal, it was discussions.

25   Q    Are you aware of any written documents reflecting

1 discussions to change the job classifications?

2 A   I know there was some documents that the local plant had

3 worked up and were looking at what the possibilities were.  And

4 the discussion around that was the -- was from the amount of

5 people that had left, all the new hires that came in.  There was

6 an overtime issue and some people were doing more overtime than

7 what was -- than what you would like.  And the local plant was -

8 - local facility was looking at what could they do to help

9 offset some of the overtime.  And one of the things they had

10 looked at is can you combine classifications at all and was

11 there some discussions about that.

12 Q   And you brought up -- you brought that up at the bargaining

13 table on October 8th, combining classifications.  Is that right?

14 A   I talked about the fact that I know the local plant had

15 been looking at this and there was something that they were

16 thinking about, and what was the opinion of the Union.

17     MR. WIESE:  Could we go off the record for one minute, Your

18 Honor?

19     JUDGE CARISSIMI:  Off the record.

20 (Off the record.)

21     JUDGE CARISSIMI:  Back on the record.

22     Mr. Wiese, you may proceed.

23     MR. WIESE:  Nothing further.

24     JUDGE CARISSIMI:  Very good.

25     Is there any redirect examination?

1    MR. BUTTRICK:  No redirect, Your Honor.

2    JUDGE CARISSIMI:  Very good.

3    So does the Respondent have any further witnesses?

4    MR. BUTTRICK:  No further witnesses, Your Honor.

5    JUDGE CARISSIMI:  So the Respondent rests?

6    MR. BUTTRICK:  We do.

7    JUDGE CARISSIMI:  Mr. Meadows, you may be excused as a

8    witness, sir.  You may step down.

9    (Witness excused from the stand.)

10   JUDGE CARISSIMI:  So the General Counsel, from our off-the-

11   record discussion, has some rebuttal, is that correct?

12   MR. WIESE:  Yes, Your Honor.

13   JUDGE CARISSIMI:  At least a document?

14   MR. WIESE:  To offer General Counsel Exhibit 92, a

15   demonstrative --

16   JUDGE CARISSIMI:  And, again, we've had some discussion.

17   This document is what sir?

18   MR. WIESE:  It's a document that was created by the General

19   Counsel reflecting what we believe to be the movement across the

20   company's proposals.  The items in red represent no change from

21   the company's initial offer.  The items in green represent

22   changes on that day.  And then, the boxes in yellow represent no

23   change from the green.

24   Does everybody -- is that clear?

25   JUDGE CARISSIMI:  Well -- and, again, we'll have to -- at

1   least I will have to take a look at the transcript.  There's no

2   code on here to reflect that, is that correct?

3        MR. WIESE:  That's correct, Your Honor, that's why I was

4   making the statement --

5        JUDGE CARISSIMI:  All right.  So we'll have to pay

6   attention carefully to your recitation of these colors in order

7   to understand this document.

8        And this was prepared by Counsel for the General Counsel?

9        MR. WIESE:  That's correct, Your Honor, based off -- as a

10  demonstrative exhibit.

11       JUDGE CARISSIMI:  And this is, as I understand it, based

12  upon the evidence that's included in the record?

13       MR. WIESE:  That's correct, Your Honor.  It's based solely

14  off the proposals that have been entered as Joint Exhibits 1

15  through 8.

16       JUDGE CARISSIMI:  And does the Respondent have any

17  objection to the introduction of General Counsel's 92?

18       MR. BUTTRICK:  Well, we won't concede that the data is

19  correct, without having a chance to cross-reference, as

20  mentioned, the record but --

21       JUDGE CARISSIMI:  Sure.

22       MR. BUTTRICK:  -- of course, we don't have any objection to

23  the demonstrative exhibit.

24       JUDGE CARISSIMI:  Very good.

25       I'm going to admit the document, but as I've indicated when

1   the Respondent's summary was admitted, this may be of some help

2   to all of us, but the principle issues and the evidence that I'm

3   going to consider are the actual documents themselves.  I think

4   that these both may be of an aid to me, but if there's something

5   in either document that the other side feels is inaccurate, they

6   can tell me.   I'll certainly -- I'm going to read every exhibit

7   in this record, but that's the purpose of briefs, to assist me

8   in focusing on the critical evidence.

9        So I'm going to admit the General Counsel 92, the summary

10  of the documents.

11  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 92.)

12       JUDGE CARISSIMI:  Does the General Counsel have any further

13  rebuttal evidence?

14       MR. WIESE:  Could we have 5 minutes just off the record to

15  discuss quick?

16       JUDGE CARISSIMI:  Yes, let's go off the record.

17  (Off the record.)

18       JUDGE CARISSIMI:  On the record.

19       MR. WIESE:  Your Honor, we do have very brief rebuttal.

20       I'd like to call Mr. Eby to the stand.

21       JUDGE CARISSIMI:  Very good, you may do so.

22       Mr. Eby, if you would please come up to the witness stand.

23  (WITNESS RECALLED:  CHRISTOPHER EBY)

24       JUDGE CARISSIMI:  You can have a seat, Mr. Eby, since

25  you've been previously sworn as a witness in the case.  I'm not

1   going to administer the oath to you, but I will remind you, sir,

2   that you are still under oath.

3       Mr. Wiese, you may proceed.

4                         DIRECT EXAMINATION

5   Q    BY MR. WIESE:  Mr. Eby, during the time that you've worked

6   for Ingredion and Penford, what is your best estimate of the

7   annual employee turnover?

8   A    At one point, in the last few years while I was on the

9   Executive Committee, I believe Pat Drahos said it was about

10  seven -- the attrition rate.

11  Q    Nothing -- seven what?

12  A    Seven people a year.

13  Q    Okay.  Employees or management or both?

14      MR. BUTTRICK:  I'm just going to object.  I think this is

15  impact evidence for the 10(j) and not relevant to the proceeding

16  at hand.

17      JUDGE CARISSIMI:  And what is the relevance of this?  I

18  know there was some testimony about turnover on -- when you

19  cross-examined Mr. Meadows.  But can you tell me why I need to

20  know this for my purposes?

21      MR. WIESE:  Well, yes, Your Honor.

22      It's relevant to Respondent's actions in those July

23  negotiations.  I mean, in what the -- how big of an impact

24  having 20 people retire at once was on their facility, and the -

25  - you know, evidence about the annual turnover versus how many

1  people were looking to retire at that time is relevant in our

2  view.

3      JUDGE CARISSIMI:  Well, I really don't see it, but I

4  suspect this is going to be very brief.

5      MR. WIESE:  Yes.

6      JUDGE CARISSIMI:  At least this portion of it.

7      MR. WIESE:  This is it, this is it, Your Honor.

8      JUDGE CARISSIMI:  Mr. Buttrick, I'm inclined to agree with

9  you.  I mean, I'm going to decide, you know, obviously the

10  issues in this case.  And the effect or impact it has really

11  isn't -- or employees' perception of what they thought was going

12  on isn't really something that I have concern about.

13      Now, I also know, only because you've told me, that the

14  General Counsel's position is that this record -- that General

15  Counsel wants this record to be relied upon in the District

16  Court for the 10(j), is that correct?

17      MR. WIESE:  That's correct, Your Honor.

18      JUDGE CARISSIMI:  Has the District Court ruled on that

19  motion?

20      MR. WIESE:  Yes.

21      JUDGE CARISSIMI:  All right, and the District Court has

22  issued an order saying they will rely on this record.

23      MR. WIESE:  That's correct, Your Honor.

24      MR. BUTTRICK:  Well, not entirely.

25      MR. WIESE:  Right, right.

1    MR. BUTTRICK:  That wasn't the tenor of the order.  The

2  order is that they will certainly consider this record, but also

3  additional evidence is being allowed to be put in by the

4  parties, including depositions or written discovery.

5    JUDGE CARISSIMI:  Okay.  All right, so there may be

6  discovery.  The Court may have some kind of a hearing.

7    MR. BUTTRICK:  There will be a hearing.

8    JUDGE CARISSIMI:  So -- but at least the Court is going to

9  consider this record.

10    Now, generally, and I'm pretty strict upon if things are in

11  a 10(j), that's in a 10(j) record, all right, just and proper --

12  particularly just and proper evidence.  There's nothing that I'm

13  going to consider in the unfair labor practice case that goes to

14  that.  But since this is going to brief, and since the District

15  Court has issued an order saying at least that this record is

16  going to be something they'll consider, I'll let you do that.

17  But I'm going to tell everybody I doubt seriously that I'm going

18  to really have -- or give much consideration to this evidence,

19  all right.

20    MR. WIESE:  Okay, understood, Your Honor.

21    And just to be clear, I mean, the reason we're offering is

22  not for the 10(j), it's not for impact.  It's -- it may be

23  relevant to that, but our relevance argument is based off of the

24  Employer's -- off a way to explain the Employer's proposals,

25  specifically, the changes it was making to gap insurance in

1 July.

2     JUDGE CARISSIMI:  Well -- but I'll say once again, I mean,

3 that's going to be the subject of the documentary evidence and

4 the testimony of the hearing.  Again, what affect that may have

5 had on employees is not something that I think right now.

6 Perhaps you have a case that you can change my mind, but I'm

7 going to be honest with you, right now, I don't see how this

8 evidence is going to aid me much in determining whether or not

9 there was good faith bargaining or whether or not there was a

10 valid impasse.  But, as I said, I'll let you continue because

11 your representation of this is going to be brief, all right.

12     MR. WIESE:  That's correct, Your Honor.

13     Thank you.

14 Q    BY MR. WIESE:  So, Mr. Eby, I believe you were explaining

15 what Ms. Drahos had said to you.  Could you continue with that

16 answer?

17 A    Yes, I mean, I believe the question was actually did -- if

18 you asked if that was just Union people?

19 Q    Oh, yes, you're right.

20 A    We --

21 Q    We moved past that.

22     JUDGE CARISSIMI:  So the answer is on the -- well, Mr. Eby,

23 can you tell us with regard to the annual employee turnover as

24 it's been relayed to you by Ms. Drahos, approximately how many

25 individuals?

1    THE WITNESS:  Approximately seven is the attrition rate.

2    JUDGE CARISSIMI:  And do you want to follow that up,

3 counsel, to differentiate?

4    MR. WIESE:  Yes.

5 Q   BY MR. WIESE:  Of those seven, did she specify how many

6 were bargaining unit employees?

7 A   I believe she was referring to all of them as bargaining,

8 and it would include those that don't make probation, those that

9 go get other jobs and those that retire, I mean, entirety.

10    MR. WIESE:  Nothing further, Your Honor.

11    JUDGE CARISSIMI:  All right.

12    Mr. Buttrick, do you have any questions.

13    MR. BUTTRICK:  Sure.

14                    CROSS-EXAMINATION

15 Q   BY MR. BUTTRICK:  Mr. Eby, you don't work in HR, correct?

16 A   That's correct.

17 Q   Okay.  And so you have no personal knowledge about the

18 number of employees that actually do leave the facility at any

19 given time, correct?

20 A   I would -- if somebody is terminated, I would have notice;

21 if somebody retires, I would have notice.  Generally, the only

22 ones that I don't receive notice would be if like they don't

23 make their probationary period.  A lot of times I get that too.

24 Q   But you're no longer the Union President, correct?

25 A   Not as of January 1st.

1 Q    All right.  Are you getting those notices currently?

2 A    No.

3 Q    Okay.  So the data you have is from before January 1s,

4 correct?

5 A    Correct.

6 Q    And you never get any notices about the number of salaried

7 employees who leave at a given time, correct?

8 A    No.

9    MR. BUTTRICK:  Nothing else.

10    JUDGE CARISSIMI:  Very good.

11    So there's no further questions for Mr. Eby?

12    MR. WIESE:  That's correct, Your Honor.

13    JUDGE CARISSIMI:  Mr. Eby, you are excused.  You may step

14 down.

15    And the General Counsel has no further rebuttal?

16    MR. WIESE:  That's correct, Your Honor.

17    JUDGE CARISSIMI:  Very good.

18    I will prepare and file with the Board my decision in this

19 proceeding.  Copy will be served on each of the parties.

20    You are reminded to refer to the Board's rules and

21 regulations for information regarding the filing of briefs and

22 proposed findings for my consideration, and regarding procedures

23 before the Board after the issuance of Judge's decision.

24    Now that all the evidence is in, I think all of you have a

25 better opportunity to assess your chances regarding the outcome

1  of the issues in this case more than you had the outset of the

2  trial.  All the parties should carefully weigh the risks

3  entailed in going to a decision, and decide whether an amicable

4  settlement of the issues might not offer a more satisfactory

5  resolution.  I encourage the parties to continue their

6  bargaining, and I encourage them to try to resolve the issues in

7  this case in that bargaining.  As I said before, I think that

8  would be the best resolution of this matter.

9       I will allow until June 2nd of 2016 for the filing of

10 briefs and any proposed findings and conclusions in this case.

11      Now since the General Counsel is the proponent of the

12 Complaint, I request that the General Counsel set forth a

13 proposed order and notice for my consideration.

14      I understand the Respondent's position is that there are no

15 unfair labor practices that have been committed here, but, of

16 course, the Respondent is free to address the remedial issues in

17 the case also.

18      The briefs should be filed directly with the Judge's

19 Division in Washington, D.C.

20      Any requests for extensions of time for the filing of

21 briefs must be made in writing to the Chief Judge in Washington,

22 D.C. and served on the other parties.  The positions of the

23 other parties regarding the extension should be obtained and set

24 forth in the request.  It is the policy of the Division of

25 Judges to grant discretionary extensions only when they are

1  clearly justified.  Requests for extensions must contain

2  specific reasons and show that the requesting party cannot

3  reasonably meet the current deadline.

4       I will say further that I think both the Respondent and the

5  General Counsel have been ably represented by the counsel in

6  this case.  You all have worked very hard and you've displayed

7  courtesy toward each other and me; and I appreciate that greatly

8  and your respective principals should feel that, since it's a

9  fact, that you all have done a very good job in this case.

10       There being nothing further, the trial is now closed, and

11  we are off the --

12       MR. WIESE:  Your Honor, before we go off the record.

13       JUDGE CARISSIMI:  I'm sorry, yes?

14       MR. WIESE:  I would just like to renew my request to either

15  retrieve the Jencks statements or have those statements be

16  destroyed.

17       JUDGE CARISSIMI:  Yes, I did ask you to remind me of that

18  and you have, so I would now instruct the Respondent counsel to

19  return all affidavits that have been -- or any other Jencks

20  material that's been provided during the trial.

21       And you've done that, Mr. Funk?

22       MR. BUTTRICK:  We just did that, yes.

23       JUDGE CARISSIMI:  Very good.

24       So is there anything further?

25       MR. WIESE:  Nothing further, Your Honor.

1    JUDGE CARISSIMI:  For the Respondent?

2    MR. BUTTRICK:  Nothing, Your Honor.

3    JUDGE CARISSIMI:  With that, we are off the record and the

4  trial is closed.

5    MR. WIESE:  Thank you.

6    MR. BUTTRICK:  Thank you.

7    JUDGE CARISSIMI:  Off the record.

8  (Whereupon, at 2:23 p.m., the trial in the above-entitled matter

9  concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>C E R T I F I C A T E</u>

2        This is to certify that the attached proceedings before the

3    National Labor Relations Board, Region 18, Case 18-CA-160654 and

4    18-CA-170682, Ingredion, Inc, d/b/a Penford Products Co. and

5    BCTGM Local 100G, affiliated with Bakery, Confectionary, Tobacco

6    Workers, and Grain Millers International Union, AFL-CIO, in

7    Cedar Rapids, Iowa on April 28, 2016, was held according to the

8    record, and that this is the original, complete and true and

9    accurate transcript that has been compared to the recording, at

10   the hearing; and that the exhibits are complete and no exhibits

11   received in evidence or in the rejected exhibit files are

12   missing.

13

14                    *Christopher Walls*

15                    Christopher Walls

16                    Official Reporter

17

18

19

20

21

22

23

24

25