**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| MARLIN O. OSTHUS, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, <br><br> Plaintiff, <br><br> vs. <br><br> INGREDION, INC., d/b/a Penford Products Co., <br><br> Defendant. | No. 16-CV-38-LRR <br><br> **ORDER** |

_____

*TABLE OF CONTENTS*

*I.     INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

*II.    PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.   SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . *2*

*IV.   FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
        *A.    Parties and Relevant Players* . . . . . . . . . . . . . . . . . . . . *2*
        *B.    Collective Bargaining* . . . . . . . . . . . . . . . . . . . . . . . . . *3*
        *C.    Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*V.    ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
        *A.    Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
        *B.    Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*VI.   CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

*I.  INTRODUCTION*

The matter before the court is Plaintiff Marlin O. Osthus, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on behalf of the

National Labor Relations Board's ("Board") Petition for Injunction ("Petition") (docket no. 2).

## II. PROCEDURAL HISTORY

On September 24, 2015, the Bakery, Confectionary, Tobacco Workers, and Grain Millers Local 100-G ("Union") filed a charge against Defendant Ingredion, Inc. ("Company") with the Board. *See* Charge Against Employer (docket no. 2-1) at 2. The charge alleges that Ingredion has engaged in unfair labor practices as defined in Sections 8(a)(1) and (5) of the National Labor Relations Act ("Act"). On December 29, 2015, the Union filed an amended charge. *See id.* at 4. On February 29, 2016, the Union filed a separate charge against Ingredion. *See id.* at 6. On January 28, 2016, the Board issued a Complaint and Notice of Hearing against Ingredion. *See id.* at 8. On March 16, 2016, the Board filed the instant Petition. On May 13, 2016, the Board filed its Brief ("Petition Brief") (docket no. 20). On May 27, 2016, the Company filed a Resistance (docket no. 22). On June 16, 2016, the court held an evidentiary hearing on the Petition. *See* June 16, 2016 Minute Entry (docket no. 32).

## III. SUBJECT MATTER JURISDICTION

The court has jurisdiction in this matter pursuant to Section 10(j) of the Act. *See* 29 U.S.C. § 160(j) ("The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.").

## IV. FACTUAL BACKGROUND

### A. Parties and Relevant Players

Marlin O. Osthus is the Regional Director of Region Eighteen of the Board. The Company is a Delaware corporation with an office and place of business in Cedar Rapids,

Iowa, specializing in the manufacture of food products. Penford is a corn wet milling plant located in Cedar Rapids, Iowa. In March of 2015, the Company purchased Penford and took over operations. The Union has been the exclusive bargaining representative for certain Penford employees since the 1940s. The Union represents approximately 150 to 165 bargaining unit employees.

## B. Collective Bargaining[1]

At the time the Company assumed operational control of Penford, the Union and Penford were operating under a collective bargaining agreement. The agreement was set to expire on August 1, 2015. Several members of the Company's management team, including Ken Meadows, the Director of Human Resources and lead negotiator in collective bargaining for the Company's national facilities, visited the Cedar Rapids location on April 6, 2015. As part of this visit, Meadows met with then-Union president Chris Eby and other Union officials. The parties dispute the content of discussions that Meadows engaged in with Union officials and various bargaining unit employees during that visit, but agree that such discussions took place.

On May 11, 2015, Meadows sent a letter to Jethro Head, International Vice President of the Union, and Eby, notifying them of the Company's intent to terminate the existing collective bargaining agreement upon its expiration and to negotiate a new contract. *See* General Counsel ("GC") Exhibit 15 (docket no. 19-10) at 178. The Union offered to begin negotiations early, *see* GC Exhibit 13 (docket no. 19-10) at 176, but negotiations began on June 1, 2015. Meadows served as the lead negotiator for the Company and Eby and Head served as the lead negotiators for the Union. The parties

---

[1] In this section, the court will discuss only the facts which appear to be agreed upon by both parties. Accordingly, the court will not make any determinations regarding the truth of certain statements or disregard others in setting forth the factual background. Furthermore, the court may discuss additional facts in conjunction with the court's analysis.

negotiated on thirteen separate occasions: June 1, June 29, June 30, July 27, July 28, July 29, July 30, July 31, August 17, August 18, September 9, September 10 and September 11, 2015. *See* Joint Exhibit 29 (docket no. 19-4) at 159-160 (setting forth the dates and approximate times for each negotiating session).

The collective bargaining agreement in effect when negotiations began was commonly referred to as the Red Book. At the first bargaining session, the Union presented a proposal that reflected changes to the Red Book. The Company presented a proposal that reflected a new contract, not based on the Red Book or its prior format. The Company told the Union that it intended to open "every section of the Red Book for negotiation . . . ." Resistance at 9; *see* Transcript (docket no. 19-1) at 410-11, 964. The negotiations that took place following the first session continued to reflect the Union's desire to negotiate using changes to the existing Red Book versus the Company's intent to abandon the Red Book and begin with a new contract. On June 30, 2015, at the third bargaining session, Meadows told the Union that he was willing to put together a "last, best, and final offer" ("LBF") in the event they could not reach an agreement. *See* GC Exhibit 7 (docket no. 19-10) at 82.

The parties did not meet again for negotiations until the end of July. On July 17, 2015, the Company sent letters to Union employees to address rumors regarding the Company's contract proposal. *See* GC Exhibit 20 (docket no. 19-10) at 191. The letter includes statements regarding continued GAP insurance coverage and seniority-based bidding and refutes the suggestion that the Company "is refusing to bargain with the [U]nion negotiating committee." *Id*. The letter also states that employees should educate themselves on the contract offer and instructs them "to just ask a member of the [U]nion's negotiating committee to review in detail the current proposal." *Id*. at 192. The letter goes on to note that

> because the [C]ompany and your representatives are still in the process of negotiating a collective bargaining agreement, the

4

> above may not end up reflecting exact changes in contract language. Also, while the above is meant to accurately reflect the current positions of management on the rumors I have heard, this letter itself is not and should not be considered contractual.

*Id.* at 2.

Federal Mediator Jim Tuecke attended the July 27, 2015 bargaining session. The Union and the Company did not make any progress at that meeting. On July 28, 2015, a ten minute bargaining session took place. On July 29, 2015, the Union and the Company began substantive negotiations again, but no agreement was reached. On July 30, 2015, they again failed to reach an agreement after several hours of negotiations. On July 31, 2015, the day prior to expiration of the Red Book, the parties negotiated from approximately 9:00 a.m. to 3:30 p.m. Twenty-eight bargaining unit members were considering whether to retire prior to the expiration of the Red Book on August 1, 2015. Meadows informed Head that August 1, 2015 was a "drop dead date" for the Company. *See* Exhibit 8 (docket no. 19-10) at 159. The Company subsequently presented a "final" offer to the Union.

On the morning of August 1, 2015, the Union held a vote on the "final" offer, which was rejected by nearly all Union members. Following the rejection of the "final" offer, the parties did not negotiate again until August 17, 2015. On August 18, 2015, Meadows presented the Union with the LBF. The Union responded by presenting two of their own offers. No agreements were reached at the end of this session. On September 10, 2015, the parties negotiated again and the Union presented Meadows with an offer. Meadows also gave the Union letters of implementation for the LBF. No agreements were reached at the end of this session. On September 14, 2015, the Company implemented the LBF.

Following implementation of the LBF, various changes occurred at the Company with respect to the Union. The parties disagree as to the exact nature of the changes that

5

occurred and whether such changes have had a positive or negative overall effect. However, both parties admit that negotiations have continued to occur in some form between the Company and the Union. The Board argues that the changes resulting from the LBF have been, on the whole, detrimental to the Union, while the Company argues that the changes have been beneficial for the Company and for many Union members.

### *C. Proceedings[2]*

The instant action arises under Section 10(j) of the Act. On April 18 though April 28, 2016, Administrative Law Judge Mark Carissimi held hearings on the allegations of unfair labor practices. ALJ Carissimi is responsible for deciding the merits of this case, which will be appealable to the Board.

On June 16, 2016, the court held a hearing on the Petition. *See* June 16, 2016 Minute Entry. At the hearing, the following seven witnesses testified on behalf of the Board: Mike Sacora, Adam Beitz, Kenneth Frost, Todd Railsback, Elaine Sweiger, Richard Beitz and James Kersten. *See* June 16, 2016 Witness List (docket no. 32-1). The witnesses' testimony included their experiences working at the Cedar Rapids plant since the Company assumed operational control, changes in scheduling and overtime, differences with respect to insurance plans, implementation of the LBF since the expiration of the previous agreement, their views of the Union and its effectiveness since the Company took over and the witnesses' general impressions regarding the Company's impact on the Union and the Cedar Rapids plant in general. The following witnesses testified on behalf of the Company: Erwin Froehlich and Andy Sullivan. *See id.* Froehlich testified as to the effect

---

[2] The parties raised various evidentiary objections. The court is mindful of the fact that even if "evidence was inadmissible under the Federal Rules of Evidence, . . . a district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits." *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010). Therefore, the court shall consider the evidence submitted by the parties and give it the appropriate weight in reaching a determination on the Petition.

the LBF has had on the Cedar Rapids plant, including the reduction in forced shutdowns due to understaffing. Sullivan testified regarding ongoing negotiations between the Union and the Company.

## V. ANALYSIS

The Board alleges that the Company engaged in various unfair labor practices, beginning with the Company leadership's initial visit to the Penford plant and lasting up until the filing of the Complaint. These practices include the Company's "illegal implementation of [the LBF]; its bad faith at the bargaining table; its undermining and denigration of the Union away from the bargaining table; and its unlawful unilateral changes to employees' terms and conditions of employment." Petition Brief at 3 (footnote omitted). The Board argues that the court should grant the Petition "to prevent [the Company] from achieving through unlawful means, that which it cannot achieve lawfully—unilaterally imposing its desired terms and conditions of employment, without regard for the Union . . . or its obligation to bargain in good faith under the Act." *Id.* at 2.

### A. Applicable Law

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see also McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1122-23 (8th Cir. 2015) (reiterating that courts apply the four *Dataphase* factors to determine whether an injunction is warranted). Section 10(j) injunctions are "a limited exception to the federal policy against labor injunctions and [are] reserved for serious and extraordinary cases when the remedial purpose of the Act would be frustrated unless immediate action is taken." *McKinney ex*

*rel. N.L.R.B.*, 786 F.3d at 1123 (quoting *Sharp v. Parents in Cmty. Action, Inc.*, 172 F.3d 1034, 1037 (8th Cir. 1999)) (quotation marks omitted); *see also Osthus v. Whitesell Corp.*, 639 F.3d 841, 845 (8th Cir. 2011) ("Section 10(j) relief is reserved for serious and extraordinary cases." (quoting *Parents in Cmty. Action, Inc.*, 172 F.3d at 1037) (quotation marks omitted)). When deciding whether to grant an injunction, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *Whitesell Corp.*, 639 F.3d at 845 (quoting Fed. R. Civ. P. 52 advisory committee's note (1946)). "Merely indicating the factual basis for the ultimate conclusion will suffice in most cases." *Id.* (quoting *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1092 (8th Cir. 1980)).

The first question courts should focus on is "the question of irreparable injury." *Id.* (quoting *Parents in Cmty. Action, Inc.*, 172 F.3d at 1039). The party seeking an injunction

> must satisfy "the court that the case presents one of those rare situations in which the delay inherent in completing the adjudicatory process will frustrate the Board's ability to remedy the alleged unfair labor practices." In this circuit, the court proceeds to examine the likelihood of success on the merits and the other relevant factors only if the [Board] clears the 'relatively high hurdle' of establishing irreparable injury.

*McKinney ex rel. N.L.R.B.*, 786 F.3d at 1123 (quoting *Parents in Cmty. Action, Inc.*, 172 F.3d at 1039).

Irreparable injury under § 10(j) "is the harm to the collective bargaining process or to other protected employee activities if a remedy must await the Board's full adjudicatory process. . . . The question in each case is whether the extraordinary remedy of a preliminary injunction is 'necessary either to preserve the status quo or to prevent frustration of the basic remedial purpose of the Act.'" *Parents in Cmty. Action, Inc.*, 172 F.3d at 1038-39 (quoting *Minn. Min. & Mfg. Co. v. Meter for and on Behalf of N.L.R.B.*,

385 F.2d 265, 270 (8th Cir. 1967)); *see also Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813, 817 (E.D. Mo. 2012). "Irreparable injury under Section 10(j) is established when the alleged unfair labor practice 'so chilled on-going protected employee activity, such as collective bargaining or union organizing, that delay will frustrate the effectiveness of the Board remedies.'" *Hubbel*, 903 F. Supp. 2d at 817 (quoting *Parents in Cmty. Action, Inc.*, 172 F.3d at 1040). The burden of demonstrating irreparable harm is on the movant, who must demonstrate that such harm is not only possible, but "is *likely* in the absence of an injunction." *Sierra Club v. U.S. Army Corp. of Eng'rs*, 645 F.3d 978, 992 (8th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

### B. Application

The Board argues that "[t]he injuries to the collective-bargaining process and employee rights that have already been caused by [the Company] will be irreparable if [the Company] is allowed to bear the fruits of its labor." Petition Brief at 24. The Board argues that employee support for the Union has waned in light of the Company's alleged undermining of the collective bargaining process and that diminished support will render the Union "unable to bargain effectively regardless of the ultimate relief granted by the Board." *Id.* at 24-25 (quoting *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1193 (9th Cir. 2011)). Finally, the Board lists the following issues as reflective of the irreparable injury that the Union will suffer absent an injunction: (1) "loss of faith in the Union's ability to aid [employees] in affecting terms and condition[s] of employment and adjusting grievances"; (2) "loss of faith in the collective-bargaining process due to [the Company's] unlawful implementation of its LBF, and the Union's subsequent inability to affect that implementation"; (3) Union "[e]mployees and their families forgoing medical care due to the increased costs under [the Company's] unilaterally imposed health insurance plans"; (4) the "voting out [of] incumbent union leadership in the fall of 2015 due to [the Company's] unlawful direct dealing and misinformation about negotiations"; (5)

9

"employees looking for new jobs due to . . . unworkable conditions"; (6) employees being disciplined under the "unilaterally imposed attendance plan while taking care of sick children, spouses, and other family members"; (7) "employees working excessive and unsafe amounts of overtime, while other employees have not been able to volunteer for overtime that they are otherwise qualified to work—all occurring without regard to seniority"; (8) "lack of sufficient notice for overtime," causing undue hardship; and (9) "[e]mployee sentiments that [the Company] now operates as an essentially non-union employer, as their working conditions depend on who is supervising them, not on the terms of [the Company's] LBF." *Id.* at 26-27.

The Company argues that the Board "cannot show the Union will suffer irreparable harm in the absence of injunctive relief." Resistance at 20 (formatting omitted). The Company argues that the instant action is not reflective of "egregious conduct [that is] likely to chill protected activities . . . ," and that an injunction is, therefore, unwarranted. *Id.* (quoting *Osthus v. TruStone Fin. Fed. Credit Union*, __ F. Supp. 3d __, __, 2016 WL 1643770, at *7 (D. Minn. April 26, 2016)) (alteration in original).

The court finds that the Board has failed to meet its burden to demonstrate that irreparable injury is likely to occur absent injunctive relief. At the hearing, the court heard testimony from various bargaining unit employees. Such testimony demonstrated that numerous employees are upset over the Company's handling of the collective bargaining process, the changes that have resulted from implementation of the LBF and that some employees are actively seeking other jobs. However, the crux of the issue facing the court is not the merits of the underlying allegations, which will be resolved by the administrative process. *See Parents in Cmty. Action, Inc.*, 172 F.3d at 1040 ("The district court in a § 10(j) proceeding does not decide whether the respondent has committed unfair labor practices. That is the province of the Board's on-going adjudicatory proceeding, subject to judicial review by a court of appeals."). The issue is whether an injunction, a judicial

tool reserved for only "extraordinary circumstances," is necessary, lest "the alleged unfair labor practices threaten to frustrate the remedial purposes of the Act unless immediate action is taken." *Id.* at 1039. Here, the Board has not presented sufficient evidence of irreparable injury.

In cases where preliminary injunctions have been granted, there have generally been allegations of more egregious behavior than in the instant action. *See e.g., McKinney ex rel. N.L.R.B.*, 786 F.3d at 1124-25 (vacating a district court's grant of an injunction and noting the types of behavior often warranting injunctive relief); *Osthus v. A.S.V., Inc.*, Civil No. 14-4445 ADM/HB, 2015 WL 1530434, at *6 (D. Minn. April 2, 2015) (unpublished decision) (citing cases where an injunction was warranted due to conduct including (1) a company refusing to recognize a union and laying off employees after the end of a strike and (2) a company that interrogated employees "about their support for the union, discharged employees because of their support for the union [and] threatened employees with physical harm, loss of wages and benefits"); *Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813, 817 (E.D. Mo. 2012) (finding a threat of irreparable harm to the collective bargaining process existed where a "respondent completely eliminated the bargaining unit and replaced the union workers with non-union members after flat-out refusing to negotiate with the union"); *Osthus v. Vincent/Metro Trucking LLC*, Civil No. 09-1726(DSD/JJK), 2009 WL 2516165, at *1 (D. Minn. Aug. 14, 2009) (unpublished decision) (granting an injunction where an employer, among other things, refused to implement and honor a negotiated collective bargaining agreement and withdrew recognition from the union).

Here, there is no evidence that the Union is losing members as a result of the alleged unfair labor practices or that such loss is likely to occur in the future. In fact, at the hearing, the court heard testimony that the Union has not lost any active members still

working at the Company since the expiration of the Red Book.[3]  Additionally, "[w]hile the [c]ourt may take into consideration the timeliness of the petition, [it] is not required to do so.  Rather . . . the appropriate focus is on whether it is necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the [Act], and whether achieving status quo is possible." *Hubbel*, 903 F. Supp. 2d at 818 (quoting *Chester v. CMPJ Enters.*, Civil No. 07-2530, 2007 WL 1994045, at *3 (D. Minn. July 2, 2007) (unpublished decision)) (third alteration in original).

The Board argues that Union officials have been replaced as a result of the unfair labor practices.  However, those replacements were the result of closely contested Union elections and the resignation of several Union officials.  The Board does not allege that the Company itself took action against the former Union officials.  Furthermore, the Union has continued to meet with the Company for the purpose of conducting collective bargaining sessions at several points during the spring of 2016 and the court heard testimony regarding such negotiations.  *See* Sullivan Affidavit, Company Exhibit A (docket no. 22-1) at 1-3.

At the hearing, the Board presented testimony from current Union employees.  The Union employees testified that they are, on the whole, worse off under the LBF than under the Red Book.  The Union employees discussed, among other things, changes to the seniority system, scheduling of overtime, health benefits and the arbitration process since the implementation of the LBF.  It is not the province of the court, however, to judge whether the Union employees' grievances are the product of unfair labor practices.  That is a matter for ALJ Carissimi and, ultimately, the Board to determine.  The only issue this court can address is the propriety of granting the Board's petition for injunction.  Because

---

[3] The Union has not lost any members since multiple bargaining unit employees retired just prior to the expiration of the collective bargaining agreement on August 1, 2015.

the record in the instant action does not demonstrate the likelihood that irreparable harm will occur absent an injunction, the court need not address the other *Dataphase* factors and shall deny the Petition.

### VI. CONCLUSION

In light of the foregoing, the Petition (docket no. 2) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 28th day of July, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA